## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, DC 20530,

*Plaintiff*,

v.

ASSA ABLOY AB
Klarabergsviadukten 90
Stockholm, Sweden SE-111 64

and

SPECTRUM BRANDS HOLDINGS, INC.
3001 Deming Way
Middleton, WI 53562,

*Defendants.*

## COMPLAINT

The United States brings this antitrust lawsuit to stop Defendant ASSA ABLOY AB

("ASSA ABLOY") from acquiring a division of Defendant Spectrum Brands Holdings, Inc.

("Spectrum")—ASSA ABLOY's largest competitor in supplying the $2.4 billion residential door

hardware industry in the United States.  Foreshadowing the anticompetitive effects of the

proposed transaction, ASSA ABLOY internally predicted that, as a result of the transaction, one

of its residential door hardware brands would be "in a better pricing negotiation position and can

expect to increase prices."

The Defendants are close head-to-head competitors whose rivalry has benefitted

consumers and who are part of a trio that today dominates the concentrated U.S. residential door

hardware industry.  But this entrenched position was not enough for ASSA ABLOY, whose CEO insisted just last year that the company "ha[s] to make sure we stop or buy" competitors before they "can grow."  For ASSA ABLOY, which has a long history of buying firms in the industry, purchasing Spectrum's Hardware and Home Improvement division ("Spectrum HHI") is the latest step in its attempts to advance the trend toward concentration in the residential door hardware industry.

The proposed transaction, which would leave American consumers with only two significant producers of residential door hardware, violates the Clayton Act in at least two separate antitrust markets in the United States: (1) premium mechanical door hardware and (2) smart locks, which are wirelessly connected digital door locks.  In the premium mechanical door hardware market, the proposed transaction would be a merger to near-monopoly, where the merged firm would account for around 65% of sales, becoming more than ten times larger than its next-largest competitor.  In the market for smart locks, the proposed transaction would cut off competition in a fast-growing door hardware segment, leaving the merged firm with more than a 50% share and only one remaining meaningful competitor—an effective duopoly.  In both of these relevant markets, the proposed transaction easily surpasses the thresholds that trigger a presumptive violation of the Clayton Act.

Historically, competition between Defendants to sell residential door hardware to showrooms, home improvement stores, builders, online retailers, home security companies, and other customers has generated lower prices, higher quality, exciting innovations, and superior customer service.  As outlined in detail below, the head-to-head competition between the Defendants is significant.  They regularly reduce price to win business from each other and respond to each other's competitive initiatives with innovation and better offerings.  For

example, one of Spectrum's top "strategic imperatives" in 2021 was to invest heavily in better service and pricing for its premium mechanical door hardware brands (Baldwin Estate and Baldwin Reserve) in order to recapture market share from its "chief competitor," ASSA ABLOY's EMTEK brand.  Similarly, ASSA ABLOY has recently invested in a new lineup of smart locks designed to "take [a half] bay" (*i.e.*, take shelf space) from Spectrum's Kwikset brand and its other large competitor in major home improvement stores.  The proposed transaction would eliminate those benefits altogether.

Acknowledging the harm that their proposed transaction would cause to competition, the Defendants have offered to sell off selected portions of ASSA ABLOY's globally integrated business.  But offering a complex divestiture of carved-out assets from a globally-integrated business in an attempt to remedy a deal that presents a massive competitive problem would leave American consumers to bear the significant risks that the divestiture would fail to preserve the intensity of existing competition.  Regardless of who the unknown buyer turns out to be, such a hazardous corporate restructuring would be inadequate to remedy the harms of Defendants' anticompetitive deal.  The only remedy that will preserve competition is to stop the proposed transaction outright.  Therefore, the United States of America brings this lawsuit to enjoin ASSA ABLOY's proposed acquisition of Spectrum HHI because it violates Section 7 of the Clayton Act, 15 U.S.C. § 18.  The United States alleges as follows:

## INTRODUCTION

1.      American homeowners and renters routinely rely on residential door hardware to meet their most basic privacy and security needs.  Because virtually every door in every home in the United States has door hardware on it, about $2.4 billion of residential door hardware is sold in the United States each year.

2.      The residential door hardware industry in the United States is concentrated. Spectrum, which owns the Baldwin and Kwikset brands, and ASSA ABLOY, which owns the August, EMTEK, and Yale brands, are, after many years of competition, the largest and third-largest producers of residential door hardware in the United States, collectively accounting for more than half of sales.  Together with the other major supplier, the three largest producers account for about 75% of sales, with the remaining sales attributed to much smaller players.

3.      In September 2021, ASSA ABLOY agreed to pay $4.3 billion to acquire Spectrum HHI.  If consummated, this transaction would eliminate important head-to-head competition and move the residential door hardware industry ever closer toward monopoly.

4.      While the transaction would further consolidate the entire residential door hardware industry, its harm would likely be felt most acutely by customers seeking to purchase two distinct categories of residential door hardware: (1) premium mechanical door hardware and (2) smart locks.  Head-to-head competition between Defendants has made these products more responsive to the changing economic, aesthetic, technological, and security demands of American households—lowering prices, fostering innovation, increasing the variety and quality of offerings, and improving customer service.  The proposed transaction would end that important competition and deprive American consumers of the benefits of such competition in the future.

5.      In premium mechanical door hardware, Defendants are by far the two largest producers and closest rivals in the United States through ASSA ABLOY'S EMTEK brand and Spectrum HHI's Baldwin Estate and Baldwin Reserve brands.  Based on information gathered thus far, the Defendants collectively accounted for approximately 65% of sales in 2021.  The

Defendants are strong and regular competitors in this market, as the market shares would suggest and the Defendants' own documents indicate.

6.      In smart locks, Defendants are the two largest producers in the United States, primarily through ASSA ABLOY's August and Yale brands and Spectrum HHI's Kwikset brand.  Based on information gathered thus far, they collectively accounted for about 50% of sales in 2021.  Defendants have both invested significantly in efforts to win smart lock market share from each other, making them two of the three dominant incumbents in the growing smart lock market that have scale, resources, and access to distribution that dwarf all other competitors. The proposed transaction would consolidate the smart lock market into a duopoly.

7.      ASSA ABLOY and Spectrum were keenly aware that their proposed deal presented serious anticompetitive issues as they negotiated which firm would bear the risk of inevitable objections from antitrust enforcers.  Spectrum insisted that ASSA ABLOY commit in the purchase agreement to divest assets to try to secure antitrust clearance, but ASSA ABLOY executives were reluctant to make a divestiture commitment because they worried it would "put [their] future at risk."  In September 2021, only four days before the transaction was announced, Spectrum's CEO tried to assuage ASSA ABLOY's concerns, suggesting it could have its cake and eat it too—appease antitrust enforcers with a divestiture commitment structured in a way "where you don't put the assets you want at risk."

8.      Defendants put that strategy into action in the summer of 2022, when they proposed to divest, to an as-yet unidentified buyer, portions of ASSA ABLOY business units that make and sell residential door hardware in the United States.  But divesting carved-out assets from the globally integrated business apparatus that made them successful cannot be relied upon

to replicate the intensity of competition that exists today between ASSA ABLOY and Spectrum HHI and therefore would be an unacceptable remedy.

9.      The proposed transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## DEFENDANTS AND THE PROPOSED TRANSACTION

10.      ASSA ABLOY is a publicly traded Swedish stock company headquartered in Stockholm, Sweden.  It is a globally integrated conglomerate that manufactures and sells a wide array of access solutions products—including residential and commercial door hardware, doors, and electronic access control systems.  ASSA ABLOY sells residential door hardware in the United States under the August, EMTEK, Sure-Loc, Valli & Valli, and Yale brands.  Yale, in particular, is an iconic "master brand," dating back more than 150 years, which "has strong recognition in residential markets worldwide."  ASSA ABLOY is the third largest producer of residential door hardware in the United States (including premium mechanical door hardware and smart locks), as well as the largest producer of commercial door hardware in the United States.  In 2021, ASSA ABLOY earned revenues of approximately $3.5 billion in the United States and approximately $9.1 billion worldwide.

11.      ASSA ABLOY is a creature of corporate consolidation.  It was established in 1994 through the merger of Swedish lock maker ASSA AB and Finnish lock maker Abloy Oy. Since then, ASSA ABLOY has been on a decades-long acquisitions spree—buying more than 300 businesses in 27 years, including all of the companies that now constitute ASSA ABLOY's multi-billion-dollar residential door hardware business.  It acquired Yale in 1999, EMTEK in 2000, Valli & Valli in 2008, August in 2017, and Sure-Loc in 2021.  It also acquired South Korean smart-lock manufacturer iRevo in 2007 and Chinese smart-lock manufacturer Digi in

2014.  These acquisitions and others by ASSA ABLOY have increased concentration in the door hardware industry.

12.     Spectrum is a publicly-traded Delaware corporation headquartered in Middleton, Wisconsin.  It is a diversified, global branded consumer products company with four divisions: (1) Home and Personal Care, (2) Global Pet Care, (3) Home and Garden, and (4) Hardware and Home Improvement.  In 2021, Spectrum earned revenues of approximately $3.2 billion in the United States and approximately $4.6 billion worldwide.

13.     Spectrum's Hardware and Home Improvement division, referred to herein as "Spectrum HHI," is headquartered in Lake Forest, California.  It is the largest producer of residential door hardware in the United States, and it also manufactures and sells commercial door hardware, residential plumbing hardware (*e.g.*, kitchen and bathroom faucets), and builders' hardware.  Spectrum HHI sells residential door hardware, including premium mechanical door hardware and smart locks, in the United States under the Baldwin Estate, Baldwin Reserve, Baldwin Prestige, and Kwikset brands, and it also manufactures private-label residential door hardware for third parties.  In 2021, Spectrum HHI earned revenues of approximately $1.4 billion in the United States.

14.     Spectrum HHI is also the result of decades of consolidation in the residential door hardware industry.  Black & Decker (renamed Stanley Black & Decker in 2010) acquired Kwikset in 1989, Baldwin and Weiser (a Canadian residential door hardware company) in 2003, and Taiwanese door-lock manufacturer Tong Lung Metal in 2012, before selling all four companies to Spectrum in 2012 and 2013.

**Defendants' Residential Door Hardware Brands Sold in the United States**



15.     On September 8, 2021, ASSA ABLOY and Spectrum signed an asset and stock purchase agreement under which ASSA ABLOY would acquire Spectrum HHI for approximately $4.3 billion.  The post-transaction ASSA ABLOY would be an industry behemoth, with almost $5 billion in annual sales in the United States alone, and it would become the largest producer of residential door hardware in the United States, in addition to already being the largest producer of commercial door hardware in the United States.

## INDUSTRY BACKGROUND

16.     The proposed transaction involves products—residential door hardware—that Americans use every day to enter, leave, and secure their homes and interior living spaces, such as bedrooms, bathrooms, and home offices.

17.     Doors used in a residence are almost always hinged or sliding (*e.g.*, pocket doors). Residential door hardware is the hardware affixed to a residential hinged or sliding door that is used to open, close, or lock the door.

18.     Residential door hardware is either (1) mechanical, meaning that it functions only by physical operation at the door (*e.g.*, physically turning a handle or knob and, for exterior doors, using a key), or (2) digital, meaning that it can be operated electronically and, in some cases, remotely.

### A.     Mechanical Residential Door Hardware

19.     Mechanical residential door hardware has interior components (the "chassis") and exterior components (the "trim").  The chassis consists of a latching or locking mechanism and other components.  Trim consists of hardware used to operate the latching or locking mechanism—most commonly a knob or lever for the latch and a mechanical turn piece for the lock—and surrounding pieces of decorative hardware.  Chassis and trim for residential door hardware are usually purchased together as a set, known as a lock set, but they can also sometimes be purchased separately.  The locking mechanism (*e.g.*, deadbolt) is the most common element of a lock set to be purchased separately.

20.     Mechanical residential lock sets are sold in a wide variety of functions, hardware types, designs, price points, and materials.  Exterior lock sets have a locking function, but many interior lock sets do not.  Interior lock sets usually serve one of three different functions:

"passage" (turn and latch from both sides, no lock), "privacy" (turn and latch from both sides, lock with privacy button from inside), or "dummy" (no turn, latch, or lock). Exterior lock sets serve what is known as an "entrance" function (turn and latch from both sides, keyed locking on exterior, turn-piece locking from interior).

21.     Mechanical residential door hardware is sold at retail in the United States through several different channels. Entry level and medium-grade hardware is primarily sold in mass-market retail stores, such as "big box" home improvement stores and hardware stores. Premium mechanical door hardware, by contrast, is sold primarily through specialized dealers, such as decorative hardware showrooms. Mechanical residential door hardware is also sold through e-commerce websites, such as Build.com and the websites of brick-and-mortar retailers.

**Examples of Premium Mechanical Door Hardware**

 

**EMTEK (ASSA ABLOY) Lock Set**          **Baldwin Estate (Spectrum) Entry Set**

22.     Door hardware used on residences differs in many ways from door hardware used in commercial settings. Residential door hardware is less complex, less costly, and less durable than commercial door hardware. Commercial door hardware also includes several product

categories that have no residential analogue, including door closers, exit devices, and electronic access control hardware.

**B.      Digital Residential Door Hardware**

23.     Most residential door hardware and essentially all interior residential door hardware is mechanical, but certain American consumers are increasingly selecting exterior residential door hardware that is digital.

24.     The primary type of digital door hardware used in a residential setting is a digital door lock, which is a deadbolt that is operated electronically.  One type of digital door locks, referred to herein as "smart locks," can be operated and/or monitored through a wireless connection to another electronic device.  The other type of digital door locks ("non-connected locks") have no wireless connection and are electronically operated via a device physically connected to the deadbolt, such as an electronic keypad.  Some digital door locks are sold as a lock set that includes mechanical trim, such as a knob or lever.

**Examples of the Two Types of Digital Door Locks**





**August (ASSA ABLOY)**
**Wi-Fi Smart Lock and App**

**Kwikset (Spectrum)**
**Non-Connected Keypad Door Lock**

25.     Smart locks make a wireless connection to another device through a variety of technology protocols, primarily including Wi-Fi, Bluetooth, and low-power mesh-network

protocols (*e.g.*, Z-Wave, Zigbee, or Thread).  The user typically operates the lock from an application on a smart phone or similar device.

26.     In the United States, smart locks make up a growing share of residential digital door lock sales and residential door hardware sales generally.  In 2021, smart locks accounted for about two-thirds of residential digital door locks sold in the United States, and smart lock sales in the United States have approximately doubled in only three years, growing to more than $420 million in 2021.

27.     Digital door locks, including smart locks, are sold at retail in the United States through several different channels, primarily including mass-market retail stores, such as big box home improvement stores, and e-commerce websites, such as Amazon.com.  Smart locks are also sold through consumer electronics stores and specialized dealers, such as home security companies and home technology integrators.

**C.     The Residential Door Hardware Industry in the United States**

28.     In the United States, about 75% of all residential door hardware sold each year is made by ASSA ABLOY, Spectrum, and their largest competitor.  Each of these companies offers a full portfolio of residential door hardware products through multiple brands, including both mechanical and digital door hardware that spans a wide range of product features and price points.  The remaining approximately 25% of residential door hardware sold in the United States is made by a large assortment of much smaller door hardware producers.  Unlike the three dominant firms, each of these smaller producers usually sells residential door hardware under a single brand and specializes in one or two segments of residential door hardware.

29.     Defendants' residential door hardware brands sold in the United States are as follows:

| Product | ASSA ABLOY Brand(s) | Spectrum Brand(s) |
|---|---|---|
| Premium Mechanical Door Hardware | EMTEK Valli & Valli | Baldwin Estate Baldwin Reserve |
| Smart Locks | Yale August | Kwikset |
| Non-Connected Digital Door Locks | Yale | Kwikset |
| Non-Premium Mechanical Door Hardware | Yale Sure-Loc | Baldwin Prestige Kwikset |

30.     Residential door hardware producers, including Defendants, distribute their products to retailers directly or through wholesale distributors.  Producers only rarely sell residential door hardware directly to end-customers.

31.     Residential door hardware end-customers include homeowners, who may purchase a single lock set, and landlords, general contractors, and residential builders, who may purchase hundreds or thousands of different pieces of door hardware in a variety of styles and functions to outfit every type of door in a residential development.

## RELEVANT MARKETS

### A.     Product Markets

32.     Each of the products described below constitutes a line of commerce, as that term is used in Section 7 of the Clayton Act, and each of those is a relevant product market in which the potential competitive effects of this proposed transaction can be assessed within the context of the broader marketplace for residential door hardware.

#### 1.     Premium Mechanical Door Hardware

33.     Premium mechanical door hardware is residential door hardware made of high-quality, durable metals (primarily forged brass and cast bronze), and is highly customizable, design-driven, and constructed with superior craftsmanship.  Such hardware is also offered in a wide variety of styles, designs, and finishes.  These peculiar characteristics create a look and feel to the hardware that is distinct from other mechanical door hardware and connotes quality, style,

and luxury.  For example, Spectrum's Baldwin Reserve and Baldwin Estate brands position their door hardware as "door couture," and ASSA ABLOY's EMTEK brand "present[s] more like a fashion house than [a] hardware company."  Accordingly, these distinguishing features also command distinct price points that are significantly higher than other types of mechanical door hardware—on average, premium mechanical door hardware is about twice as expensive as its non-premium analogues.  More than $260 million of premium mechanical door hardware was sold in the United States in 2021.

34.     Premium mechanical door hardware, unlike other mechanical door hardware, is sold primarily through specialized dealers, such as decorative hardware showrooms, door and window shops, and building-supply retailers known as "lumberyards."  Premium mechanical door hardware is not sold through mass-market retailers, such as "big box" home improvement stores.  The specialized dealers that sell premium mechanical door hardware typically offer high levels of customer service, including in-store displays that exhibit the hardware's customizability and craftsmanship and sales personnel skilled in designing and ordering hardware to exacting standards.  These dealers also cater to a distinct group of premium clientele—typically, discerning homeowners with significant disposable income—and do not offer or offer only a limited selection of non-premium mechanical door hardware.  Intermediaries, such as interior designers, are sometimes also involved in selecting and ordering premium mechanical door hardware.

**Example of EMTEK and Baldwin Reserve In-Store Displays**



35.     Brands of premium mechanical door hardware are recognized by customers and industry participants as "premium" or "luxury" producers.  The largest and most well-known of these brands are owned by Defendants: EMTEK (ASSA ABLOY), Baldwin Reserve (Spectrum), and Baldwin Estate (Spectrum).  These three brands collectively account for approximately two-thirds of the sales of premium mechanical door hardware in the United States.  ASSA ABLOY also owns Valli & Valli, which is a smaller premium mechanical door hardware brand sold in the United States.  Defendants use, among other things, high price points, premium product features, distribution through specialized retailers, and marketing to distinguish these brands from their other, non-premium mechanical door hardware brands, such as Kwikset, Yale, and Sure-Loc. There are premium mechanical door hardware brands not owned by Defendants, but none of them accounts for more than 6% of sales in the United States, and most of them account for 2% or less.

36.     Producers of premium mechanical door hardware in the United States, including ASSA ABLOY and Spectrum HHI, offer a core lineup of product categories that correspond to the lineup of locks and lock sets needed to fully outfit a home.  These core categories of premium mechanical door hardware include entrance lock sets (also called "entry sets"), interior knob and lever lock sets (*i.e.*, passage, privacy, and dummy functions), and deadbolts.  Other makers of premium mechanical door hardware, including ASSA ABLOY and Spectrum HHI, also sell one or more categories of premium mechanical sliding door hardware (*e.g.*, pocket-door hardware).

37.     Even when products are not necessarily substitutes for one another (*e.g.*, entry sets and passage sets), products sold under similar competitive conditions may be aggregated for analytical convenience.  While not necessarily substitutes for one another, the various categories of premium mechanical door hardware (passage sets, privacy sets, dummy sets, entry sets, deadbolts, pocket door hardware, and barn door hardware) are sold under similar competitive conditions and thus may be grouped together for analytical purposes.

38.     Premium mechanical door hardware constitutes a relevant product market. Premium mechanical door hardware satisfies the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice's and Federal Trade Commission's Horizontal Merger Guidelines ("Merger Guidelines").  A hypothetical monopolist of premium mechanical door hardware would find it profitable to impose a small but significant and non-transitory increase in price on such products because relatively few purchasers would substitute away to other types of door hardware in response to such a price increase.  Because other types of door hardware (*e.g.*, commercial door hardware and non-premium mechanical door hardware) do not offer quality, aesthetics, or customization that is comparable to premium mechanical door hardware, customers

desiring these product features have no reasonable substitutes for premium mechanical door hardware.

39.     As alleged above, premium mechanical door hardware also exhibits virtually all of the "practical indicia" that courts use to identify relevant antitrust product markets:  industry or public recognition, peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[1]

### 2.     Smart Locks

40.     Smart locks use wireless connections to allow the user to lock and unlock the door without using a key or physically operating the door hardware.  That wireless connection also allows the user to operate and monitor the smart lock remotely and integrate the lock into a broader home security or "smart home" ecosystem, such as Amazon Alexa, Apple HomeKit, or Google Home.  The physical range of remote operation varies by wireless protocol and degree of integration, but the physical range of shorter-range wireless protocols, such as Bluetooth, can also be extended through the use of a Wi-Fi hub, which most smart lock producers offer as part of a bundle with the smart lock or separately.  The additional technology (hardware and software) incorporated into smart locks also corresponds to significantly higher price points than other kinds of digital door locks that lack this technology—on average, smart locks are about twice as expensive as non-connected locks.  More than $420 million of smart locks were sold in the United States in 2021.

41.     Industry participants and consumers recognize that smart locks are distinct from mechanical door hardware and non-connected digital door locks.  Smart locks also offer technological functionality that mechanical door hardware cannot offer:  the ability to lock and

---

[1] *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

unlock a door without a physical key, the ability to monitor and operate a lock remotely, and the ability to integrate a lock into a smart home ecosystem or home security system. The latter two technological functions (remote operation/monitoring and integration) also distinguish smart locks from non-connected digital door locks and are sought by a distinct set of technologically savvy customers who value security, convenience, and connectivity. Accordingly, neither mechanical door hardware nor non-connected locks are reasonable substitutes for smart locks. Likewise, commercial door hardware is not a reasonable substitute for smart locks for the reasons alleged above. Additionally, smart locks are sold through a variety of channels, but, unlike other types of residential door hardware, smart locks are also sold through firms that specialize in consumer electronics and home security technology, including especially consumer electronics retailers, home security companies, and smart home companies.

42.     Smart locks constitute a relevant product market. Smart locks satisfy the well-accepted hypothetical monopolist test set forth in the Merger Guidelines. A hypothetical monopolist of smart locks would find it profitable to impose a small but significant and non-transitory increase in price on such products because relatively few purchasers would substitute away to other types of door hardware in response to such a price increase. As alleged above, smart locks also exhibit virtually all of the "practical indicia" that courts use to identify relevant antitrust product markets: industry or public recognition, peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[2]

### B.     Geographic Market

43.     The United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act for the product markets alleged herein. Defendants have agreed that the

---

[2] *See id.*

relevant geographic market is no broader than the United States.  Moreover, prices for premium mechanical door hardware and smart locks are set in the United States, independent of pricing elsewhere, and residential door hardware sold outside the United States is often not compatible with doors used in the United States.

## ANTICOMPETITIVE EFFECTS

44.     The proposed transaction would eliminate competition between ASSA ABLOY and Spectrum HHI and significantly consolidate already concentrated markets.  Freed from having to compete against its largest rival in the markets for premium mechanical door hardware and smart locks, ASSA ABLOY would acquire not only Spectrum HHI but also the opportunity to profit by, among other things, raising prices, reducing product quality, reducing investments in innovation, and reducing levels of service.  The proposed transaction would also increase the likelihood of coordination.

### A.     The Proposed Transaction Is Presumptively Unlawful

45.     The more that a proposed transaction would increase concentration in a market, the more likely it is that the proposed transaction may substantially lessen competition, as prohibited by the Clayton Act.  Mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. As the Supreme Court held, any transaction resulting in "a firm controlling an undue percentage share of the relevant market," including a firm that would "control[] at least 30%" of the market, and "a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined."[3]  For such transactions, including ASSA ABLOY's proposed acquisition of Spectrum HHI, their "size makes them inherently

---

[3] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).

suspect in light of Congress' design in [Clayton Act Section 7] to prevent undue concentration."[4]

Thus, such transactions are entitled to a presumption of illegality under Supreme Court

precedent.

46.     The Herfindahl-Hirschman Index ("HHI") is a measure of market concentration

widely accepted by economists and courts in evaluating the level of competitive vigor in a

market and the likely competitive effects of an acquisition.  HHI values (or "points") are

calculated by summing the squares of the individual firms' market shares.  Accordingly, HHI

values range from 0 in markets with no concentration to 10,000 in markets where one firm has a

100% market share.  As recognized in the Merger Guidelines, if the post-transaction HHI would

be more than 2,500, and the transaction would increase the HHI by more than 200 points, then

the transaction would result in a highly concentrated market, and the transaction is presumed

likely to enhance market power and substantially lessen competition.

47.     The proposed transaction is presumptively unlawful under the Merger Guidelines

as well because it would significantly increase concentration in at least two markets that would

be highly concentrated post-transaction:

| Market | Post-Merger HHI | HHI Increase | Combined Share |
|---|---|---|---|
| Premium Mechanical Door Hardware | > 4,000 | > 1,600 | ~65% |
| Smart Locks | > 3,000 | > 1,200 | ~50% |

48.     So large and expansive are Defendants' businesses and so concentrated is the

residential door hardware industry already, that the proposed transaction would also be

presumptively unlawful under multiple alternative definitions of the relevant product market,

including a product market as broad as all residential door hardware in the United States.  In such

---

[4] *Id.*

a market, for example, the proposed transaction would increase the HHI by more than 500 points and would result in an HHI of more than 3,000.

### B.   The Proposed Transaction Would Eliminate Head-to-Head Competition Between ASSA ABLOY and Spectrum HHI

49.     ASSA ABLOY and Spectrum HHI have competed vigorously for years to be leaders in the United States markets for premium mechanical door hardware and for smart locks. That competition has yielded tangible benefits for American consumers, primarily including lower prices, new and better products, and improved customer service.  The proposed transaction would eliminate Defendants' important competition with each other, to the detriment of consumers.

#### 1.     Premium Mechanical Door Hardware

50.     ASSA ABLOY and Spectrum HHI acknowledge internally that their EMTEK, Baldwin Reserve, and Baldwin Estate brands are each other's "chief," "main," "primary," "major," "biggest," and "closest" competitor.  EMTEK (ASSA ABLOY) is the "market leader in premium residential door hardware," accounting for about 45% of all sales in the United States. Baldwin Reserve and Baldwin Estate (Spectrum) are collectively several times larger than their next largest competitor and account for about 20% of sales of premium mechanical door hardware in the United States.

51.     Baldwin's importance as a competitor to EMTEK and the benefits that competition has for consumers also became apparent when Baldwin had some struggles.  For example, in 2021, a Baldwin sales manager internally assessed that EMTEK had been able "to almost recklessly take more price" (*i.e.*, impose price increases) because Baldwin, EMTEK's "biggest competitor," had "fallen down," meaning it had fallen short as a competitor.

21

52.     EMTEK displaced Baldwin as the premium market leader several years ago.  But Spectrum HHI has made it a top "strategic imperative[]" to take steps to "reaffirm Baldwin as the luxury door hardware leader."  The thrust of Spectrum's Baldwin strategy is to invest several million dollars over a multi-year period to improve, among other things, Baldwin's pricing, customer service, and products in order specifically to "[r]ecapture the leadership position in luxury door hardware from chief competitor Emtek."

53.     The head-to-head rivalry between EMTEK and Baldwin to achieve "leader" status in the premium mechanical door hardware market has been a boon to American consumers in areas including better prices, service, and products.

a.     **Lower Prices**

54.     EMTEK, Baldwin Reserve, and Baldwin Estate regularly offer special discounts to their customers to win business from the other or to keep a customer from switching to the other.

55.     For example, EMTEK regularly has provided additional discounts to win business away from Baldwin or prevent an EMTEK customer from switching to Baldwin.  EMTEK offers additional discounts "only for competitive situations," and has instructed its salespeople that they "should not be offering an additional discount without a competitive need."

56.     Baldwin Reserve and Baldwin Estate also offer customers special discounts to compete against EMTEK.  Between January 2017 and March 2022, more than 60% of Baldwin's requests for special discounts that mentioned a competitor referenced competition from EMTEK as the reason for Baldwin's price concession—far more than any other competitor.  The narratives associated with these "price change requests" illuminate how aggressively Baldwin and EMTEK compete on the basis of price.  To take one example, in 2021, Baldwin offered an

unusually deep discount on "high end custom[]" door hardware from both the Baldwin Reserve and Baldwin Estate brands to a residential architecture firm that was building several single-family homes; Baldwin did so "to keep Emtek OUT!" and win tens of thousands of dollars in new sales to the customer.

57.     In addition to price-change-request discounts, Baldwin also offered targeted additional discounts on its Baldwin Reserve brand in 2021 as part of a broader effort to "attack an Emtek stronghold" with lumberyard and door and window shop customers, which resell premium mechanical door hardware to end-customers.  The Baldwin Reserve brand had been "launched to attack" EMTEK's "beachhead" among these customers in 2011, but by 2021 it had not yet been able to make sufficient headway.  Accordingly, Baldwin took several measures to "get back on track" with these customers, including offering "more aggressive" discounts to EMTEK customers in an effort to get them to switch to Baldwin.

58.     Competition between Defendants' premium mechanical door hardware brands also constrains increases to list prices, which are published prices used as reference points for discounts.  For example, in 2019, Spectrum HHI senior executives proposed raising the list prices of Baldwin Reserve and Baldwin Estate by 10%, but acknowledged that they would first "need to understand Emtek's recent price increase."  Baldwin's director of sales responded that raising Baldwin prices by 10% would be "insane" because EMTEK had raised prices by only 4.5%, making a 6% price increase "the max" Baldwin could pursue while "still be[ing] competitive."

### b. Better Customer Service

59.     Competition between EMTEK and Baldwin pushes the two to offer customers better levels of service, primarily in the form of faster order fulfillment (or "lead times") and provision of complimentary in-store displays.

60.     Lead times are an important facet of competition in the premium mechanical door hardware market because customers value speedy order fulfillment.  EMTEK, in particular, prides itself on having "the shortest lead times in the industry," which it often credits for allowing it to win business away from competitors, including specifically from Baldwin.  For example, an EMTEK sales director wrote in July 2020 that he "believe[d] a large part of [EMTEK's] demand increase is as a result of our short lead times," noting specifically that those lead times empowered EMTEK to refuse discounts to customers that had no other option but EMTEK:  "We are being careful not to respond to last minute price discount requests for product that cannot be sourced from another supplier within an acceptable lead time."  EMTEK similarly observed in September 2020 that one of its "Top 3 Result Drivers" was that its short lead times were "allowing share grab" because "[c]ompetitors have long lead times."

61.     Baldwin has made investments to improve its lead times to compete better against EMTEK, which has benefited consumers.  Most recently, as part of its broader strategic imperative, beginning in 2021, to "recapture the leadership position" from EMTEK, Baldwin invested heavily to shorten its lead times to match EMTEK's.  It did so through its "Quick Ship" program, the crux of which is to shorten lead times by stocking more inventory, which in turn is intended to "remove Emtek['s] lead time advantage" and "[r]ebuild showroom loyalty and brand preference."

62.     The use of complimentary in-store displays is another facet of competition between EMTEK and Baldwin because such displays are an important sales aid for showrooms and similar dealers.  Because in-store displays help dealers sell door hardware and would otherwise be a substantial cost to the dealer (hundreds or thousands of dollars per display), giving away displays is a way for producers to curry favor with dealers.  That favor can help to displace competitors by securing better real estate on the showroom floor and earning elevated status as a "preferred" or "priority" brand at the dealer.

63.     Accordingly, to compete against each other, EMTEK and Baldwin give away showroom displays, which benefits consumers.  EMTEK especially focuses on providing dealers with free in-store displays, which is one of its "key strategies."  Baldwin spends substantial sums each year providing free in-store displays in "tiers" based on the dealer's estimated annual sales volume.  Baldwin also uses free displays to target EMTEK.  In 2021, it made a concerted effort to provide free displays to lumberyard and door and window shop customers, and it reserved the largest and most expensive free displays for the dealers "that have a large Emtek presence."

### d.     New Products, Styles, and Finishes

64.     Because aesthetics, customization, and expansive optionality are distinguishing features of premium mechanical door hardware, it is important for producers to continuously respond to design trends by offering new products, styles, and finishes.  EMTEK has been known for years as a new product introduction "machine," and Baldwin has likewise sought for years to increase the speed and quantity of its new product introductions to compete better against EMTEK.  The resulting increase in product options has benefitted consumers.

65.     If the proposed transaction were to proceed, the merged firm would likely reduce options available to consumers in the premium mechanical door hardware market, including

potentially curtailing the introduction of new product lines or even eliminating entire brands or product lines. Immediately after the proposed transaction was publicly announced, Spectrum HHI sales personnel internally anticipated that the merged firm would "[p]ut a bullet in [Baldwin] Reserve" and "fold Emtek on the high end," meaning eliminate more expensive EMTEK product lines, such as door hardware for mortise locks. That prediction contrasted sharply with Baldwin's pre-merger strategy to expand its product offerings in order to compete better against EMTEK.

### 2. Smart Locks

66. ASSA ABLOY's August and Yale brands and Spectrum HHI's Kwikset brand are "top competitors" of one another in the market for smart locks in the United States, in which ASSA ABLOY and Spectrum HHI are two of three dominant incumbents. Head-to-head competition between these brands has resulted in lower prices and new and innovative smart lock products, which have benefited consumers.

#### a. Lower Prices

67. Competition between Defendants' smart lock brands constrains price increases. For example, in December 2019, the head of ASSA ABLOY's Global Smart Residential group explained to ASSA ABLOY's CEO that the company was unable to raise prices on ASSA ABLOY's smart locks because of "strong competition" from its two largest rivals, including Spectrum HHI's Kwikset. And ASSA ABLOY's CEO was told that any evidence of Spectrum HHI "raising prices on Kwikset smart locks" would be an "opportunity to take price," *i.e.*, increase prices. In fact, one source of additional revenue that ASSA ABLOY expects to realize from acquiring Spectrum HHI is to "increase [the] price of Yale products" by leveraging Spectrum HHI's "scale and pricing power," especially in big box (also known as "Do It

Yourself" or "DIY") home improvement stores.  ASSA ABLOY anticipates that, "[w]ith scale

from [Spectrum HHI], Yale will be in a better pricing negotiation position and can expect to

increase prices."

68.     Competition between Defendants' smart lock brands has also often resulted in

Defendants lowering their prices to win business from the other or to prevent a customer from

switching to the other.  One example was a request for proposals in 2020 to supply a home

security company with smart locks, in which Spectrum HHI's Kwikset was "going against Yale

predominantly."  ASSA ABLOY's Yale had made a "very competitive . . . offer," and, in

response, Kwikset decided to make a "margin challenged" bid because, in the assessment of

Spectrum HHI's chief marketing officer, the home security company is "one of few, bigger

swing players in this type of market to make a bet on and I don't want Yale to get it."  In another

example, in 2021, Yale was "trying to undercut [Kwikset's] pricing again" for a smart home

company, and in response, Kwikset lowered its pricing "to keep Yale out of there."

69.     ASSA ABLOY has more recently taken "an aggressive approach" on pricing to

take smart lock market share from Spectrum HHI's Kwikset in DIY home improvement stores.

Starting in 2021, ASSA ABLOY implemented a strategy to organically grow its smart lock

business in the United States, primarily by growing in the DIY sales channel, in which it has

historically been under-exposed, and where Kwikset benefits from an incumbent position.

ASSA ABLOY sought to do so by introducing "new entry-to-mid" price point smart locks under

the Yale brand to compete with its two largest rivals, including Kwikset, and "take [a half] bay

[*i.e.*, shelf space] in entry-to-mid from" one or both of them, thereby significantly increasing its

share of sales in the DIY channel.  Before the new smart locks could be rolled out in the third

quarter of 2022, ASSA ABLOY sought to use an "aggressive" price reduction on its existing

smart lock products to "get a foothold into Home Depot" and greatly expand the number of Home Depot locations that carry Yale or August smart locks.

70.     The centerpiece of ASSA ABLOY's "focused retail strategy" is the introduction of a new version of its Yale Assure smart lock, also called the 400 Series, which will offer price points 15-25% lower than Yale's existing smart locks for equivalent functionality, putting Yale's smart locks on par with the pricing of Spectrum's Kwikset's smart locks.

## b.     New and Innovative Smart Locks

71.     Competition between ASSA ABLOY and Spectrum HHI has also spurred innovation and the introduction of new smart locks, which has benefited consumers.  For example, as alleged in paragraphs 69-70, ASSA ABLOY developed a new line of smart locks— the Yale 400 Series—to compete against Kwikset.  The 400 Series locks will not only be sold at lower prices than Yale's existing smart locks, but they will also be 30% smaller, giving them a sleeker, more compact appearance.  The 400 Series will also offer new features, including a biometric (fingerprint-enabled) Wi-Fi smart lock.  Beyond the 400 Series, ASSA ABLOY is also developing other, lower-priced smart locks in response to "low cost lock leaders" including Kwikset.

72.     Kwikset has likewise innovated new smart locks in response to ASSA ABLOY. For example, it is developing a smart lock to compete against the pricing and features of Yale's existing Assure smart lock, including to "match the flexibility offered by Yale."  Kwikset also developed a new Z-Wave smart lock in 2021 with features that were "absolutely necessary to catch up to where Yale has been for many years."

C.      **The Proposed Transaction Would Make Anticompetitive Coordination More Likely**

73.      In the premium mechanical door hardware market, the proposed transaction would eliminate important competition among major rivals and create an even more dominant firm within a highly concentrated market.  As a result, there is an increased risk that harm from tacit or other forms of coordination would become more likely due to the proposed transaction.

74.      In the smart lock market, the proposed transaction would make coordination more likely by creating a duopoly consisting of the merged firm and its largest competitor, collectively accounting for more than 70% of sales in the market.  In that market structure, the two dominant firms would have an increased ability to analyze and plan for one another's conduct.  By increasing the likelihood of interdependent behavior among competitors in the smart lock market, the proposed transaction may substantially lessen competition and keep prices high in that market.

## ABSENCE OF COUNTERVAILING FACTORS

75.      New entry or expansion by existing competitors in response to an exercise of market power by the post-transaction firm would not be likely, timely, or sufficient in its magnitude, scope, or character to deter or fully offset the proposed transaction's likely anticompetitive effects.

76.      Barriers to merger-induced entry and expansion are high in the market for premium mechanical door hardware.  First, significant financial investment and time are needed to earn and maintain market recognition as a "premium" or "luxury" brand.  Second, premium brands require an exceptionally broad product offering to be competitive, which is expensive and time consuming to design and manufacture at scale.  Third, the customer base of specialized dealers is highly fragmented and costly to serve, requiring large upfront investments in a

widespread and knowledgeable sales force and costly marketing collateral (*e.g.*, in-store displays).  Fourth, ASSA ABLOY'S EMTEK and Spectrum's Baldwin have developed an entrenched and dominant physical and reputational presence in showrooms and other dealers, which would be very difficult to displace.  As Baldwin's sales director observed after the proposed transaction was announced, the combination of EMTEK and Baldwin "should be able to dominate every showroom in the country."

77.     Barriers to entry and expansion are also high in the smart locks market.  First, it is costly to develop competitive smart lock products, both initially and over time, because doing so requires sophisticated software and hardware engineering capabilities.  Second, it takes time and money to break through as a brand that is known and trusted by consumers.  Large incumbents like ASSA ABLOY and Spectrum HHI have a structural advantage in branding because they have been able to build up strong brand recognition over time, which has created a virtuous cycle in which brand recognition spurs increased sales, which further grows the incumbents' market presence, which in turn spurs further increased sales, and so on.  It would be difficult for a new entrant or a smaller existing competitor to disrupt that structural advantage.  Third, significant operational scale is needed to serve many of the most important groups of smart lock customers, especially big-box home improvement stores, consumer electronics stores, home builders, and home security companies.

78.     Neither the premium mechanical door hardware market nor the smart lock market has any unique structural barriers to collusion.  Any barriers to collusion in these markets are no greater than in other industries and therefore would not overcome the normal presumption that the increased concentration resulting from the proposed transaction would increase the likelihood of interdependent behavior among competitors, such as tacit collusion.

79.     The proposed transaction is also unlikely to generate verifiable, merger-specific efficiencies sufficient to prevent or outweigh the anticompetitive effects that the proposed transaction is likely to cause in the relevant markets.

## DEFENDANTS' PROPOSED DIVESTITURES ARE INSUFFICIENT TO REMEDY THE PROPOSED TRANSACTION'S ANTICOMPETITIVE EFFECTS

80.     ASSA ABLOY and Spectrum have known all along that their proposed transaction presented significant antitrust concerns.  The obvious antitrust problems triggered much hand-wringing and negotiation at the highest levels of both companies about how to handle the "anti-trust situation" the transaction would create.  In July 2021, during due diligence for the proposed transaction, ASSA ABLOY executives were "having daily calls on antitrust" and acknowledged early on that the overlap between EMTEK and Baldwin would be "the biggest focus" for competition enforcers.  Spectrum wanted assurance that ASSA ABLOY would do whatever it would take to appease antitrust enforcers' objections, but ASSA ABLOY jealously guarded the collection of assets it had acquired, particularly the assets that make up its "Yale Global business," and it was reluctant to commit to divest them.

81.     Ultimately, Defendants' discussions about how to navigate inevitable antitrust objections became so contentious that the transaction's anticompetitive nature nearly sank the proposed deal before it could be signed.  On the afternoon of September 7, 2021, hours before the proposed transaction was announced, ASSA ABLOY's CEO wrote to Spectrum's CEO that, based on unresolved disagreements about how to handle the antitrust risks of the proposed transaction, ASSA ABLOY had "come to the conclusion to withdraw from the process and proceed with other opportunities."

82.     Although Defendants were apparently able to resolve their disagreements at the eleventh hour, the proposed transaction's antitrust problems remained.  Accordingly, in the

summer of 2022, ASSA ABLOY and Spectrum effectively conceded that their proposed transaction would harm competition by proposing a "remedy" to antitrust enforcers that would involve ASSA ABLOY selling off parts of its business units that that sell residential door hardware in the United States.  Selling that incomplete package of assets would not replicate the intensity of competition that exists today.

83.    The touchstone of any appropriate antitrust remedy is the immediate, durable, and complete preservation of competition.  Merely transplanting assets from one firm to another is not an effective antitrust remedy because it creates unacceptable risks of diluting the intensity of competition—the risk of creating a firm with less incentive, ability, or resources than the original owner to use the divested assets in service of competition, the risk of entanglement or conflict between the buyer and seller of the divested assets, and the risk of the buyer liquidating or redeploying the divested assets.  Defendants bear the heavy burden of establishing that any remedy they propose meets these exacting standards, especially given the substantial competitive problems their proposed deal presents, and they cannot meet that burden here.

84.    Defendants have not disclosed all of the details of their proposed "remedy" and have not identified any potential buyer for divested assets, but they have disclosed some information about the assets they propose to divest to try to "fix" their flawed transaction.  In particular, the parties offered to divest portions of ASSA ABLOY's Mechanical Residential business unit relating only to the EMTEK brand and portions of ASSA ABLOY's Global Smart Residential business unit relating only to Yale and August smart locks sold in the United States and Canada.  These partial divestitures would be insufficient to preserve the intensity of existing competition.  They would split up existing business units, cutting off the divested assets from the

organization, resources, and efficiencies that have allowed ASSA ABLOY to be a leading competitor in the United States premium mechanical door hardware and smart lock markets.

85.     The parties' proposed divestitures would be insufficient even if a transfer of assets were executed flawlessly, but the complex carving out (and in some cases splitting) of manufacturing capacity, warehouses, personnel, intellectual property, supply chain relationships, and other resources is virtually guaranteed to be anything but flawless.  American consumers should not be forced to underwrite this risky experiment in corporate reorganization.  The only way to ensure that does not happen is to block Defendants' proposed transaction.

## JURISDICTION AND VENUE

86.     The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

87.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  ASSA ABLOY and Spectrum sell products to numerous customers located throughout the United States.

88.     This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22.  ASSA ABLOY and Spectrum both transact business in this District.  ASSA ABLOY and Spectrum have also both consented to personal jurisdiction in this District.

89.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).  ASSA ABLOY and Spectrum both reside in this District.

## VIOLATION ALLEGED

90.     The United States hereby incorporates the allegations of paragraphs 1 through 89 above as if set forth fully herein.

91.     Unless enjoined, ASSA ABLOY's proposed acquisition of Spectrum HHI may lessen competition substantially and tend to create a monopoly in premium mechanical door hardware and smart locks in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

92.     Among other things, the proposed acquisition would:

a.     eliminate significant present and future head-to-head competition between ASSA ABLOY and Spectrum HHI;

b.     reduce competition generally in the relevant markets;

c.     reduce competition to innovate in the relevant markets;

d.     cause prices to rise for customers in the relevant markets;

e.     cause a reduction in product quality in the relevant markets; and

f.     cause a reduction in customer service in the relevant markets.

## RELIEF REQUESTED

93.     Plaintiff requests that the Court:

a.     adjudge and decree that ASSA ABLOY's proposed acquisition of Spectrum HHI is unlawful and violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.     permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the proposed transaction or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine ASSA ABLOY and Spectrum HHI;

c.       award the United States the costs of this action; and

d.       award the United States such other relief that the Court deems just and proper.

Dated this 15th day of September, 2022.

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**:

JONATHAN S. KANTER (DC Bar #473286)
Assistant Attorney General for Antitrust

DOHA G. MEKKI
Principal Deputy Assistant Attorney General
for Antitrust

ANDREW J. FORMAN (DC Bar #477425)
Deputy Assistant Attorney General for
Antitrust

RYAN DANKS
Director of Civil Enforcement

CRAIG W. CONRATH
Senior Trial Advisor for Civil Litigation

KATRINA ROUSE (DC Bar #1014035)
Chief
Defense, Industrials, and Aerospace Section

JAY D. OWEN
Assistant Chief
Defense, Industrials, and Aerospace Section

SOYOUNG CHOE
Assistant Chief
Defense, Industrials, and Aerospace Section

_____/s/ Matthew R. Huppert_____
MATTHEW R. HUPPERT (DC Bar #1010997)*
SILVIA J. DOMINGUEZ-REESE
MATTHEW C. FELLOWS (DC Bar #1736656)
CHRISTINE A. HILL (DC Bar #461048)
GABRIELLA MOSKOWITZ (DC Bar #1044309)
REBECCA Y. VALENTINE (DC Bar # 989607)

Trial Attorneys
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
Telephone: (202) 476-0383
Fax: (202) 514-9033
Email:  Matthew.Huppert@usdoj.gov

DAVID E. DAHLQUIST
Senior Litigation Counsel
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
209 South LaSalle Street, Suite 600
Chicago, Illinois 60604
Email:  David.Dahlquist@usdoj.gov

* LEAD ATTORNEY TO BE NOTICED