# EXHIBIT 1

1/5/23, 9:04 AM    Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitr…

Case 1:22-cv-02791-ABJ   Document 58-1   Filed 01/13/23   Page 2 of 6

🇺🇸 An official website of the United States government
   Here's how you know



JUSTICE NEWS

# Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitrust Section

Washington, DC ~ Monday, January 24, 2022

---

*Remarks as Prepared for Delivery*

*Virtual Event*

Thank you for the introduction. And thank you to the New York State Bar Association for your invitation to address the Antitrust Law Section. I'm honored to be with you this evening.

This is a very special address for me personally and professionally. I was born and raised in Queens, and I have been a member of the New York Bar for over 20 years. So, in many ways, this virtual reception feels like a call home. I am disappointed that I cannot be with you in person this year. Instead we will have to settle for the virtual equivalent of "bridge and tunnel."

There's another reason I am pleased to be speaking to this group tonight. By delivering my first address as Assistant Attorney General for Antitrust to this group, I'm following in the footsteps of one of my role models — and a role model to many of my predecessors: Robert Jackson.

Jackson became Assistant Attorney General for Antitrust in January 1937, and he delivered his first speech as AAG to the New York State Bar Association that same month.[1] Of course, Jackson went on to serve as Attorney General, Associate Justice of the Supreme Court, and war crimes prosecutor at Nuremberg. Today, I would like to reflect on AAG Jackson's brief but highly influential tenure at the Antitrust Division.

In 1937, our country was suffering from widespread corporate concentration. At the time, monopoly power was not just a technocratic concern relegated to the narrow halls of white-shoe law firms and elite institutions. Americans understood acutely the economic forces that operated on them. Concerns about monopoly power were a kitchen table issue. American citizens were craving access to economic opportunity, competitive wages, and democratic institutions that worked for all people, not just a small cadre of plutocrats. Entrepreneurs and innovators wanted access to markets and the opportunity to succeed by building their own competitive and successful businesses.

Jackson's solution was to embark on an aggressive campaign of antitrust enforcement to free markets from the grip of monopoly power. "Our solution of the anti-monopoly problems must be in terms of our ideals," he said, "the ideals of political and economic democracy."[2]

The economy in Jackson's time was at an inflection point. He believed that the country faced a choice: rigorous antitrust enforcement, on the one hand, or greater government regulation, on the other. Jackson subscribed to the view that regulating *competition* was preferable to regulating monopolies. Thus, antitrust was beneficial not only for consumers and workers, but for *businesses* that longed for the opportunity compete on the merits.

In his first year at the Antitrust Division, Jackson instituted dozens of cases, including the landmark challenges against Socony-Vacuum Oil Company and the Aluminum Company of America. It was an impressive campaign that helped lay the groundwork for one of the greatest periods of economic growth in American history. It also helped bring clarity to the law, which is a point that I will return to later in my remarks.

1/5/23, 9:04 AM    Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitr…

Case 1:22-cv-02791-ABJ   Document 58-1   Filed 01/13/23   Page 3 of 6

Today's economy is much different than that of the late 1930s. In fact, it's much different from the economy of the 1990s or even the 2000s. In the past 20 years, we have seen an evolution in industry on par with, and perhaps greater than, the industrial revolution.

With it has come serious competition challenges in too many markets. For example: In the past two decades, concentration has increased in more than 75% of U.S. industries, including healthcare, financial services, agriculture, and others. Price-cost markups have tripled over the past 40 years. Some labor markets are even more concentrated than product markets. The monopsony power of employers in labor markets tends to depress wages, erode quality of life, and make it harder for workers to switch jobs. And as more markets are dominated by large companies, it has become harder for entrepreneurs and small businesses to get off the ground. In fact, the rate of new business formation has fallen by half in the last 50 years.

I am deeply concerned about these trends. Too little competition hurts real people, every day. It's not just a statistical or economic concept. It is a half-empty grocery cart for Americans who can't afford price hikes and padded margins. Or lower salaries and worse working conditions because of employers who face too little competition and workers who do not have sufficient options. It is masses of personal, private data extracted by dominant platforms whose digital services have few, if any, realistic alternatives. And it is the inability of Americans to buy a house and save for college.

Antitrust law enforcement has not succeeded in keeping pace with these massive changes in our economy. In my view, the only way to reinvigorate antitrust enforcement is to adapt our approach to reflect the obvious economic and transformational technological changes that now define our economy.

That is why we and our law enforcement partners are committed to using every tool available to promote competition. The American people deserve real antitrust enforcement that meets the economic challenges that we confront.

The principle that civil antitrust enforcement against unlawful mergers, monopolies, and many kinds of restraints should reflect current market realities has long been recognized in the case law.[3] For example, the Supreme Court held in *Eastman Kodak v. Image Technology Services* that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." Instead, the Court explained, it "preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"[4] And just last Term, in *NCAA v. Alston*, a rule-of-reason case involving college athletics, a unanimous Supreme Court reiterated that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities."[5]

But when I look at the current state of antitrust law, the most charitable explanation is that we are stuck fighting the last generation's war, with precedent that bears little or no resemblance to today or the future. Failing to account for market realities is a problem for at least two reasons: First, it ossifies the law even as market realities transform. Monopoly power and anticompetitive conduct today presents differently than it did 20, 30 or 40 years ago. And second, it is inconsistent with the text of the Sherman and Clayton Acts, and with Congress's intent to draft antitrust statutes that are broad and flexible enough to account for economic changes.

I recognize that it can be challenging to ask courts to look at the competitive dynamics in an industry anew. It is often easier for courts to carry forward a test, even when that test was developed at a time when markets functioned in radically different ways. But that is what antitrust law often requires, and it's our job as enforcers to ensure that courts engage with markets as they actually exist.

Adapting to market realities will inevitably involve questions of economics. But we must be mindful that economics — and expertise, more broadly — are merely *tools* to understand facts relevant to a particular case. Courts should use economics and industry expertise to address questions of fact, not to resolve questions of law. And where there are natural experiments and direct evidence of competitive harm, economic theory must give way to market realities.

The principle that antitrust doctrine should be responsive to market realities has application across many areas of antitrust law. And it is guiding our approach at the Antitrust Division. I'd like to touch briefly on how this principle applies in several important areas.

1. **Section 2 of the Sherman Act**

1/5/23, 9:04 AM    Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitr…

Case 1:22-cv-02791-ABJ  Document 58-1  Filed 01/13/23  Page 4 of 6

One area where there's been a growing divide between antitrust doctrine and market realities is Section 2 of the Sherman Act. Approximately 20 years passed between the filing of major DOJ monopolization cases, even as competition languished in vital industries. The result is that there is a dearth of Section 2 case law addressing modern markets.

For example, there are an increasing number of markets where competition is not reflected merely, or primarily, in consumer prices or output. Antitrust doctrine must, therefore, account for the many ways that the *process* of competition is important. Competition brings benefits that include: improved quality; greater choice of products and services; incentives to innovate; the empowerment of workers to negotiate better working conditions or to switch jobs; and the flow of information and news, which is vital to the health of a functioning democracy.

As Jackson put it back in 1937, the ultimate purpose of the antitrust laws is to see to it "that a true competitive economy functions."[6] Section 2 doctrine that is responsive to market realities, not outdated models, is a necessary step to build a competitive economy.

   2. **Merger Review**

In addition to Section 2, merger enforcement likewise needs to track market realities. Merger review has always been an essential part of the division's mission. But we're currently going through a truly unprecedented explosion in premerger notifications. According to our provisional data, in fiscal year 2021 alone we received over 3,500 Hart-Scott-Rodino Act merger notifications. This was the most filings since the current HSR filing requirements went into effect in 2001, and it wasn't close. The *second-highest* annual total in the last 20 years was in 2007, when we received about 2,200 filings, which is just over 60% of the filings from last fiscal year. And the pace shows no signs of slowing down. Our provisional data show that November 2021 and October 2021 are the first- and second-highest ranked months, respectively, for HSR filings in the last 20 years.

This surge is taking place even as market-specific and merger-retrospective studies indicate that consolidation has led to less competition and more market power. The surge is also occurring as the division is experiencing a historic resource shortage. The division had over 350 more employees in 1979 than it does today. The Antitrust Division has among the most talented staff in the country, and we are being creative to stretch our resources as far as they can go. Even the exceptionally talented personnel at the Antitrust Division have their limits. We are working with our bipartisan champions in Congress and the Administration to increase funding to support antitrust enforcement. These are urgent and pressing concerns.

We have an obligation to enforce the antitrust laws as written by Congress, and we will challenge any merger where the effect "may be substantially to lessen competition, or to tend to create a monopoly."[7] The second prong—or tend to create a monopoly—has often been given less emphasis. No longer: we intend to remain faithful to the plain language of the Clayton Act.

We are also committed to making sure that we are transparent in how we evaluate mergers, and that our economic models reflect market realities. Accordingly, together with the FTC, we have requested public comment on the existing Horizontal and Vertical Merger Guidelines. This marks the beginning of a process of consultations with state enforcers, other government agencies, businesses, trade and labor groups, scholars and the American people. Our merger guidelines must reflect the text and evident purposes of the antitrust laws enacted by Congress; the economic realities faced by businesses, workers and consumers; and the most recent empirical evidence of how competition functions — or does not function — in today's economy. We are interested in hearing from all stakeholders, especially those impacted by harm to competition resulting from consolidation.

   3. **Remedies**

I would next like to touch briefly on how we remedy antitrust violations. Again, Jackson's wisdom guides us. "We should not spend great sums to obtain decrees which are economically unenforceable," he said, "and, when carried out in form, are often only lessons in futility."[8]

Like Jackson, I am focused on how a remedy will function. After the ink has dried and the press cycle has faded, does a settlement in fact restore competition? Does it preserve the competitive process? Most importantly, does our overall

1/5/23, 9:04 AM                    Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitr…

Case 1:22-cv-02791-ABJ   Document 58-1   Filed 01/13/23   Page 5 of 6

approach to remedies, carried out across cases and industries, protect competition as the law demands? We are law enforcers, not regulators.

I am concerned that merger remedies short of blocking a transaction too often miss the mark. Complex settlements, whether behavioral or structural, suffer from significant deficiencies. Therefore, in my view, when the division concludes that a merger is likely to lessen competition, in most situations we should seek a simple injunction to block the transaction. It is the surest way to preserve competition.

Let me explain why. First, determining the contours of a remedy that carves up a business to maintain competition assumes we can capture with precision the contours of competition in the market. Competition is not static, however. It is dynamic, complex and often multidimensional. How do we determine the appropriate divestiture for evolving business models and innovative markets?

We must give full weight to the benefits of *preserving* competition that already exists in a market, rather than predicting whether a divestiture will actually serve to keep a market competitive. That will often mean that we cannot accept anything less than an injunction blocking the merger — full stop.

Moreover, merger settlements that include partial divestitures too often result in what might be called "concentration creep." This happens when divested assets end up in the hands of someone that does not make effective use of them. Divestiture buyers may lose interest in assets after acquiring them, or be less effective than they expected.

Finally, settlements do not move the law forward. We need new published opinions from courts that apply the law in modern markets in order to provide clarity to businesses. This requires litigation that sets out the boundaries of the law as applied to current markets, and we need to be willing to take risks and ask the courts to reconsider the application of old precedents to those markets.

That is not to say divestitures should never be an option. Sometimes business units are sufficiently discrete and complete that disentangling them from the parent company in a non-dynamic market is a straightforward exercise, where a divestiture has a high degree of success. But in my view those circumstances are the exception, not the rule.

Remedies in conduct cases likewise should reflect market realities. Experience shows that it is often impossible to craft behavioral remedies that anticipate the complex incentives that drive corporate decision-making. This is especially true as market realities evolve over time. Therefore, to restore competition in markets that have been harmed by antitrust violations, we will pursue structural remedies in our conduct cases whenever possible. And we will pursue remedies that are forward-looking in nature, especially in dynamic markets. In short, we will pursue remedies — not settlements. We cannot compromise if there is a violation of the law.

4. **A Whole-of-Government Approach**

Finally, we are also working closely with our partner agencies on the whole-of-government competition initiative launched under President Biden's Competition Executive Order. Today, we announced a new program to that end at the Competition Council meeting. We explained that the department is eager to help other federal departments and agencies win cases targeting anticompetitive conduct that violates industry-specific statutes, including through direct litigation support and by formalizing our cooperation in MOUs.

We call the new initiative Antitrust Enforcement for All-of-Government.  Our cooperation through this initiative could transform our approach to competition policy and law enforcement. We plan to work collaboratively with partner agencies to ensure that competition issues are thoroughly considered, and pursued, under all of the statutes that promote competition in the economy.

* * *

In sum, the challenge we face today from increased consolidation and decreased competition is serious. It will take an aggressive campaign of antitrust enforcement to meet the moment. But just as the challenge is great, so too is the opportunity to restore competition to our markets. An antitrust enforcement policy that is focused on markets as they exist in the real world will deliver tangible, real-world benefits to American consumers, workers — and businesses.

1/5/23, 9:04 AM　　　　　Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Remarks to the New York State Bar Association Antitr…

Case 1:22-cv-02791-ABJ   Document 58-1   Filed 01/13/23   Page 6 of 6

On that score, I'd like to return for a moment to Robert Jackson. I maintain, as Jackson did, that competitive markets are ultimately *good* for American businesses. Businesses should *want* strong antitrust enforcement.

First of all, competition enforcement opens markets and frees businesses to compete on the merits. It creates opportunities for entrepreneurs and, ultimately, for innovation and growth. That benefits everyone. Antitrust is not about stifling or controlling markets, it is about opening them to competition.

Second, as I noted in the context of remedies, antitrust enforcement does not merely protect competition in individual cases. It also brings clarity to the law and allows its evolution to contemporary circumstances, which benefits everyone. We need litigation that ends in published decisions so that businesses can know what is lawful and what is not. The clarity that comes from robust antitrust enforcement will help market participants to plan, to invest in next-generation innovations, and to thrive. Ultimately, that is beneficial for competition, our economy and our democracy.

Thank you for your time and attention. I look forward to continued engagement with the New York State Bar Association in the years to come. Enjoy your evening and make sure to tip your virtual waiters and waitresses.

[1] Robert H. Jackson, Assistant Att'y Gen., Address Before the New York State Bar Association (Jan. 29, 1937), https://www.roberthjackson.org/speech-and-writing/address-before-the-new-york-state-bar-association/.

[2] Robert H. Jackson, Assistant Att'y Gen., Should the Antitrust Laws Be Revised? (Sept. 17, 1937), *in* 71 U.S.L. Rev. 575 (1937), https://www.roberthjackson.org/speech-and-writing/should-the-antitrust-laws-be-revised/.

[3] Notably, some restraints are automatically illegal without any inquiry into their market effects at all. *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable — an inquiry so often wholly fruitless when undertaken.").

[4] 504 U.S. 451, 466–67 (1992).

[5] 141 S. Ct. 2141, 2158 (2021).

[6] Jackson, *supra* note 2, at 576.

[7] 15 U.S.C. § 18.

[8] Jackson, *supra* note 2, at 575.

**Speaker:**
Assistant Attorney General, Jonathan Kanter

**Topic(s):**
Antitrust

**Component(s):**
Antitrust Division

*Updated January 25, 2022*