IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**United States of America,**
**Plaintiff,**

**vs.**
**Assa Abloy AB,**
**Spectrum Brands Holdings,**
**Inc.,**

**Defendants.**

**Civil Action**
**No. 22-cv-2791**

### BRIEF OF *AMICI CURIAE*
### THE AMERICAN ANTITRUST INSTITUTE AND THE HON. WILLIAM J. BAER

THE HON. WILLIAM J. BAER
6628 Landon Lane
Bethesda, MD 20817
(202) 215-1000
bill.baer50@gmail.com

JOSHUA P. DAVIS
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
SUITE 1000
WASHINGTON, DC 20036
(202) 905-5420
jdavid@bm.net

BROWNSTEIN HYATT FARBER SCHRECK, LLP
*Counsel of Record*

ALLEN P. GRUNES, D.C. Bar No. 989298
1155 F Street N.W., Suite 1200
Washington, D.C. 20004
(202) 296-7353
agrunes@bhfs.com

DAVID B. MESCHKE, D.C. District Court
No. CO0069
ROSA L. BAUM (*admission pending*)
410 SEVENTEENTH STREET, SUITE 2200
DENVER, CO 80202-4432
(303) 223-1100
dmeschke@bhfs.com; rbaum@bhfs.com

*Counsel for Amici Curiae*

January 13, 2023

TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ................................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ............................................................................................................................. 3

    I.     Section 7 is Intended to Prevent Anticompetitive Mergers that Risk
          Substantially Lessening Competition in Their Incipiency ...................................... 3

    II.    The Law of This Circuit is that the Burden Should Shift to the
          Respondents to Show that the Remedy Eliminates the Risk to Competition
          Caused by the Merger ............................................................................................. 5

    III.   Absent Burden Shifting, Merging Parties are Incentivized to Propose
          Weaker Remedies that Circumvent Section 7's Incipiency Mandate .................... 7

CONCLUSION ........................................................................................................................ 10

TABLE OF AUTHORITIES

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)...............................................................................................4

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972)...............................................................................................6

*FTC v. Elders Grain, Inc.*,
   868 F.2d 901 (7th Cir. 1989) ................................................................................5

*FTC v. Sysco*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................3, 5, 6

*United States v. Aetna Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) .......................................................................5, 6

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ..............................................................................3

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) ............................................................................3

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ..................................................................... *passim*

*United States v. E. I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961)...............................................................................................6

*United States v. Ticketmaster Entertainment, Inc. and Live Nation Entertainment
   Inc.*, Motion to Modify Final Judgment and Enter Amended Final Judgment,
   Case No. 1:10-cv-00139-RMC (D.D.C. Jan. 9, 2020)..........................................9

*United States v. UnitedHealth Group, Inc.*,
   No. 1:22-cv-0481, 2022 WL 4365867 (D.D.C. Sept. 21, 2022)...........................7

**Statutes**

15 U.S.C. § 18................................................................................................... *passim*

**Other Authorities**

Deborah L. Feinstein, Director, Bureau of Competition, FTC, FTC v. Sysco: *Old-School Antitrust with Modern Economic Tools* (Sept. 18, 2015) ...............................................6

*The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics*, at 7 (Jan. 2017) .............................................................................8

*In the Matter of Cerberus Inst. Partners V, L.P., AB Acquisition LLC, and Safeway, Inc.*, No. 141-0108 (Jan. 27, 2015) ............................................................8

*In the Matter of Hertz Global Holdings, Inc.*, No. C-4376 (July 10, 2013), bit.ly/3jX3lTb...............................................................................................................9

Letter from Diana Moss, President, American Antitrust Institute, to Makan Delrahim, Assistant Attorney General (Feb. 4, 2020) ...............................................9

*Merger Remedies Manual*, Antitrust Div. U.S. Dep't of Just., 5 (Sept. 2020)...............................5

Steven C. Salop & Jennifer E. Sturiale, *Fixing "Litigating the Fix,"* 85 Antitrust L.J. __ (forthcoming) .......................................................................................4, 8, 10

Transcript of Merger Remedies Conf. Call with Profs. John Kwoka & Spencer Weber Waller, The Capitol Forum (Sept. 14, 2021)...........................................10

U.S. Dep't. of Just., *Antitrust Div. Policy Guide to Merger Remedies* 1 (2011) ............................5

William Baer, Acting Assoc. Att'y Gen., Remarks at Am. Antitrust Institute's 17th Ann. Conf. (June 16, 2016), https://bit.ly/3ia947w ..................................................4

**STATEMENT OF INTEREST**

AAI is an independent, nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute.org.[1]

The Hon. William J. Baer is a visiting fellow in Governance Studies at the Brookings Institution. He is the former Director of the Bureau of Competition of the Federal Trade Commission and former Assistant Attorney General of the Antitrust Division of the U.S. Department of Justice ("DOJ"). He has written and spoken about the importance of ensuring that merger remedies fully protect competition and consumers.

*Amici*'s interest in this matter is that they are public interest advocates who seek to improve the administration of the antitrust laws and ensure that antitrust enforcement best serves the interests of competition and consumers. The Court's decision in this matter affects the *Amici* because those goals cannot be achieved without thorough analysis of merging parties' attempts to remedy their otherwise-anticompetitive merger through a divestiture or other means. Under this Circuit's *Baker Hughes* burden-shifting framework, once the government meets its initial burden of demonstrating that a merger risks substantially reducing competition and the merging parties respond by contending that they can consummate their transaction while simultaneously "fixing" the problem through a "remedy," Section 7 of the Clayton Act ("Section 7") demands a compelling showing by the merging parties that their proposal eliminates that risk and fully

---

[1] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

protects competition and consumers. To place the burden on the government—and thus consumers—to show the inadequacy of the merging parties' proposed remedy is contrary to Section 7's plain language and judicial precedent.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case involves an important, recurring issue in Section 7 enforcement, often known as "litigating the fix": When the government demonstrates that a merger is presumptively unlawful and the parties put forth a purported "fix" to the problem, who bears the evidentiary burden of demonstrating the adequacy of the proposed remedy? Section 7 and the burden-shifting framework in this Circuit require that defendants show that their proposed remedy—here, a divestiture—restores competition lost through their otherwise-anticompetitive merger. Stated differently, even if the merger will never transpire absent the proposed remedy, the entire evidentiary burden should not be placed on the antitrust agencies to show as part of the government's prima facie case that the merger with the proposed remedy substantially reduces competition. Effective Section 7 enforcement depends on proper balancing of evidentiary burdens.

*Amici* appreciate that the ultimate burden under Section 7 is on the government. The government must first establish that the proposed merger carries substantial anticompetitive risk. The question presented in this case, and others, is how the court should allocate the burden of persuasion when the merging parties claim—in this case in the eleventh hour—to have a restructure proposal that eliminates that risk. Under these circumstances, the proposed remedy is the merging parties' defense, which they crafted and are uniquely positioned to explain. It should be their responsibility to demonstrate that the remedy is concrete, comprehensible, enforceable, and eliminates the risk to competition.

**ARGUMENT**

**I.     Section 7 is Intended to Prevent Anticompetitive Mergers that Risk Substantially Lessening Competition in Their Incipiency.**

Under the *Baker Hughes* burden-shifting framework, "the government must first establish a prima facie case that the merger is likely to substantially lessen competition in the relevant market." *United States v. AT&T, Inc*., 916 F.3d 1029, 1032 (D.C. Cir. 2019). The defendants then "must provide sufficient evidence that the prima facie case 'inaccurately predicts the relevant transaction's probable effect on future competition,' or it must sufficiently discredit the evidence underlying the initial presumption." *United States v. Anthem, Inc*., 855 F.3d 345, 349 (D.C. Cir. 2017) (quoting *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990)). "A defendant can make the required showing by affirmatively showing why a given transaction is unlikely to substantially lessen competition." *Baker Hughes*, 908 F.2d at 991. If the merging parties meet their burden, the burden shifts back to the government and "merges with the ultimate burden of persuasion, which remains with the government at all times." *FTC v. Sysco,* 113 F. Supp. 3d 1, 23 (D.D.C. 2015) (quoting *Baker Hughes*, 908 F.2d at 983).

This framework must be applied consistent with Section 7 and its incipiency standard. By congressional design, Section 7 proscribes mergers that *threaten* harm to competition—*i.e.*, where the effect "may be substantially to lessen competition." 15 U.S.C. § 18. To protect competition and consumers, proof that the merger will actually lessen competition is not required. Once merging parties propose an anticompetitive transaction, they, and not the government, need to demonstrate that their purported remedy eliminates the risk of substantial harm. No other approach can be squared with Section 7's incipiency standard.

Legislative history reinforces this point. The 1950 Amendments to the Clayton Act expanded Section 7's purview beyond acquisitions of stock and share capital to include a

merger's effects on competition. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962).
The "pervading congressional consideration [for the Amendments' passage] . . . was a fear of
what was considered to be a rising tide of economic concentration in the American economy."
*Id.* at 315. Congress thus chose to erect a "barrier" to rising concentration, and "a keystone in the
erection of [the] barrier . . . was its provision of authority for arresting mergers at a time when
the trend to a lessening of competition in a line of commerce was still in its incipiency." *Id.* at 17.

Section 7's incipiency mandate and the premerger notification requirements under the
Hart-Scott-Rodino Act (Section 7A of the Clayton Act) reflect Congress's low risk tolerance for
anticompetitive mergers. By choosing a prediction-based regime, Congress demonstrated "that
its concern was with probabilities, not certainties." *Id.* at 323; *see also* William Baer, Acting
Assoc. Att'y Gen., Remarks at Am. Antitrust Institute's 17th Ann. Conf. (June 16, 2016),
https://bit.ly/3ia947w ("The Clayton Act directs antitrust enforcers and the courts to employ a
low risk tolerance and zealously protect the American economy and American consumers from
mergers that may reduce competition[.]"); *see also* Steven C. Salop & Jennifer E. Sturiale,
*Fixing "Litigating the Fix*,*"* 85 Antitrust L.J. __ (forthcoming) at 4, bit.ly/3Qc8Md5 (The
incipiency standard places greater weight "on avoiding harmful mergers (false negatives) at a
cost of sometimes preventing beneficial mergers (false positives)" and counsels courts to "err on
the side of over-deterrence rather than under-deterrence."). Indeed, when merging parties unveil
a proposed remedy late in the process, the government has less time to carefully scrutinize the
merger because the modified transaction was not subject to Section 7A's reporting requirements.

This predictive, prophylactic approach demands that the merging parties, not consumers
and competition, bear the risk of failed remedies. To turn this policy goal into reality, courts have
embraced the federal antitrust agencies' decades-old policy: Section 7 requires that merging

parties show that remedies will preserve competition in the affected market and replace the competitive intensity that may be lost through the transaction. *See, e.g., Sysco,* 113 F. Supp. 3d at 72–73 (reviewing various merger remedy policies and observing that consistently "divestiture assets must be substantial enough to enable the purchaser to *maintain the premerger level of competition*"); *Merger Remedies Manual*, Antitrust Div. U.S. Dep't of Just., 5 (Sept. 2020), bit.ly/3i9GAuG (while withdrawn, continuing to embrace the principle that "risk should be borne by the parties . . . . Consumers should not bear the risk of a failed remedy"). Section 7's incipiency mandate and probabilistic approach require that "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

## II.    The Law of This Circuit is that the Burden Should Shift to the Respondents to Show that the Remedy Eliminates the Risk to Competition Caused by the Merger.

The D.C. Circuit established how to properly allocate burdens under the *Baker Hughes* burden-shifting framework when merging parties propose a remedy, including divestitures. In *United States v. Aetna Inc.*, the court laid out the proper sequencing for considering a structural remedy: "In *rebuttal*, a defendant may introduce evidence that a proposed divestiture would '*restore* [the] competition lost by the merger counteracting the anticompetitive effects of the merger." 240 F. Supp. 3d 1, 60 (D.D.C. 2017) (quoting *Sysco*, 113 F. Supp. 3d at 72) (emphases added). There, after DOJ proved threatened anticompetitive effects from the proposed merger using market-share evidence and data showing that the merging parties were competitors, the Court turned to the second step of the *Baker Hughes* framework and considered defendants' proposed divestiture as a remedy. *Id.* at 42–46. As the court explained, the proposed divestiture "must 'effectively preserve competition in the relevant market." *Id.* at 60 (quoting U.S. Dep't. of Just., *Antitrust Div. Policy Guide to Merger Remedies* 1 (2011)). The court concluded that the "remedy" would not likely address anticompetitive effects, as the competitor would "struggle to

5

put together a competitive provider network in the available time frame." *Id.* at 73.

In *FTC v. Sysco*, the court took the same approach to assessing the adequacy of proposed divestitures following a merger announcement by the two largest U.S. foodservice distribution companies. The merging parties sought to justify their otherwise-anticompetitive merger by proposing to divest 11 of one party's distribution centers to the third largest foodservice distribution company. *Sysco*, 113 F. Supp. 3d. at 21. This proposal amounted to approximately $4.5 billion in sales. *Id.* But the Court, noting that Supreme Court guidance requires that "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition,'" *id.* at 72 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972)), determined that the defendants had not met their burden of showing that the anticompetitive effects would be ameliorated. *Id.* at 73.

By considering the merging parties' proposed remedy during their rebuttal case, the courts in *Aetna* and *Sysco* were better able to address the "key question in assessing any proposed remedy: [D]oes the remedy maintain or restore competition in the markets affected by the merger?" Deborah L. Feinstein, Director, Bureau of Competition, FTC, FTC v. Sysco*: Old-School Antitrust with Modern Economic Tools* (Sept. 18, 2015), bit.ly/3Ghj4UH; *see also Ford*, 405 U.S. at 573 ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'") (quoting *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961)). This burden shifting serves the public interest by requiring that the merging parties prove that the proposed remedy replaces the lost competition. It also better guards against merging parties' self-interest and properly allocates the risk during merger review in light of Section 7's protective design. Simultaneously, this framework allows the merging parties the opportunity to show that the proposed remedy fully addresses the harms identified by the

agencies. And burden shifting on the remedy encourages the government and merging parties to engage during the investigative stage, which allows for the proper vetting of fixes. This conserves judicial resources by both reducing the likelihood of litigation and reducing the need for ongoing judicial supervision of proffered divestitures and conduct remedies.

Judge Nichols strayed from this Circuit's precedent in deciding *United States v. UnitedHealth Group, Inc.*, No. 1:22-cv-0481, 2022 WL 4365867, at \*9 (D.D.C. Sept. 21, 2022), and wrongly held, at least in the alternative, that the government's prima facie case needed to account for the divestiture. But *Baker Hughes* clearly spells out that to rebut the presumption of anticompetitive effects from a merger and "show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition," *merging parties* must demonstrate that the "remedied" merger rebuts the presumption and "is unlikely to substantially lessen competition." 908 F.2d at 991. When a remedy is proposed, the *Baker Hughes* burden-shifting framework is consistent with Section 7 and its incipiency standard only if the burden is placed on the merging parties to show that their proposed remedy, such as a divestiture, restores competition. A proposed remedy thus must be examined in the second step of this framework so courts can ensure compliance with Section 7's text and that the remedy *restores* competition.

## III.   Absent Burden Shifting, Merging Parties are Incentivized to Propose Weaker Remedies that Circumvent Section 7's Incipiency Mandate.

Litigating-the-fix strategies, like the merging parties' proposed divestitures here, are becoming more common as fewer cases settle. The trend, if compounded by reducing the evidentiary burden on merging parties, would undermine Section 7 enforcement. When merging parties are unable to reach a voluntary settlement with a federal agency and offer a self-imposed remedy, but claim it is the government's burden to disprove its effectiveness, they are effectively conceding that the merger, as proposed, threatens anticompetitive harm and violates Section 7.

7

The merging parties' ability in such a scenario to rely on a more permissive standard in court would dramatically increase the incentive to pursue a litigating-the-fix strategy. Rather than designing a remedy strong enough to convince the relevant agency of its ability to restore competition, the merging parties will be incentivized to offer less, knowing that the burden of disproving the "fix" in court will fall on the government.

Post-merger history of failed remedies highlights the risk to consumers. Indeed, the FTC's self-study of negotiated consent decrees between 2006 and 2012 found a significant number of failures. Fed. Trade Comm'n, *The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics*, at 7 (Jan. 2017), bit.ly/3GDiRMU. The data indicate that there was at least some significant competitive harm in 34% of all horizontal merger consent decrees. *Id*.; *see also* Salop & Sturiale, *Fixing "Litigating the Fix,"* at 5 (noting a 2017 FTC study showed "a worrisome number of consents to be failures or achieved success only after substantial delays"). The Safeway/Albertsons merger is a striking example of failed divestitures. Even though Albertsons agreed to divest 168 stores[2]—over one quarter of the stores it owned pre-merger—within a year, the purchasing grocery store declared bankruptcy, and Albertsons reacquired a portion of the divested stores. Hertz's acquisition of Dollar Thirty similarly illustrates why divestures are not a fool-proof remedy. Even though Hertz divested its Advantage rental car business as a "remedy,"[3] Advantage declared bankruptcy mere months later and Hertz reacquired some of its divested interests. *See* Salop & Sturiale, *Fixing "Litigating the Fix,"* at 13–14. And, although it concerns behavioral remedies, "there is no more compelling evidence of failed remedies than . . . the long-term and unmitigated exercise of market power by Live

---

[2] *See* Agreement Containing Consent Order, *In the Matter of Cerberus Inst. Partners V, L.P., AB Acquisition LLC, and Safeway, Inc.*, No. 141-0108 (Jan. 27, 2015), bit.ly/3GMDPIf.

Nation-Ticketmaster." Letter from Diana Moss, President, American Antitrust Institute, to Makan Delrahim, Assistant Attorney General (Feb. 4, 2020), bit.ly/3ir6BpA. Not only did the DOJ seek to modify the final judgment in 2020,[4] but the pending allegations of anticompetitive conduct indicate that corporate self-interest can lead to misconduct on the margins.

Remedies, such as the divestures described above, fail for several reasons, including informational imbalance and the merging parties' economic self-interest. Merging parties that seek to voluntarily cure their own anticompetitive mergers through a proposed remedy appear before courts as the fox promising to guard the henhouse. They are better able to identify buyers' weaknesses, and can more easily identify and withhold assets necessary for a purchaser's success, and thus, effective competition. *See, e.g.*, Compl. ¶ 7 (seeking a divestiture where defendants "don't put the assets [they] want at risk"). As outsiders, enforcers are at a distinct disadvantage in showing a proposed remedy's likely effects. This disadvantage, together with the incentives to offer an inadequate remedy, means that a litigating-the-fix strategy, without proper burden allocation, can become a tool to circumvent effective Section 7 enforcement.

If negotiated remedies, such as the divestitures in the Safeway/Albertsons merger, present such a high risk of failure, one-sided "fixes" offered by the merging parties pose an even higher risk. Merging parties have every incentive to propose weak remedies to otherwise-anticompetitive mergers. And, if the burden rests on the agencies to disprove the effectiveness of a proposed remedy, the agencies will also lose leverage at the investigation stage. In turn, agencies will face increased pressure to agree to weaker consent decrees rather than risk losing at

---

[3] *See* Decision and Order, *In the Matter of Hertz Global Holdings, Inc.*, No. C-4376 (July 10, 2013), bit.ly/3jX3lTb.
[4] *See United States v. Ticketmaster Entertainment, Inc. and Live Nation Entertainment Inc.*, Motion To Modify Final Judgment and Enter Amended Final Judgment, Case No. 1:10-cv-00139-RMC (D.D.C. Jan. 8, 2020).

trial to an even less effective remedy. Salop & Sturiale, *Fixing "Litigating the Fix,"* at 16.

The incentive for the merging parties to delay or curtail remedy discussions during the investigation stage, and avoid Section 7A scrutiny, furthers the disadvantages ultimately faced by the antitrust agencies in court. *See, e.g.,* Compl. ¶¶ 7–8 (indicating that at the time of the filing of the complaint in this matter, parties had yet to identify a buyer for the proposed divestiture). If a remedy is not proposed or fully developed until late in the investigation, or even after a complaint is filed, then the agencies have less time to analyze the proposed remedy, identify weaknesses and seek a motion *in limine* to exclude inadequate proposals. Salop & Sturiale, *Fixing "Litigating the Fix,"* at 17–18. Moreover, when merging parties lack the incentive to provide complete, and timely information on the proposed remedy, the remedy itself can become a moving target. Courts are then left with little option other than to analyze the proposal based only on weak, amorphous evidence. Transcript of Merger Remedies Conf. Call with Profs. John Kwoka & Spencer Weber Waller, The Capitol Forum (Sept. 14, 2021), bit.ly/3Qbezzk.

By presenting divestitures and restructuring of their own design, Defendants are effectively conceding DOJ's prima facia case. It is not enough for them to claim that their remedy solves any anticompetitive problems and to argue that the government must then show substantial risk to competition as part of its prima facia case. Instead, they need to put forward persuasive evidence that the problem is indeed solved and the risk to competition the government has shown is eliminated. Otherwise, the plain language and underlying intent of the Clayton Act are undermined.

## CONCLUSION

*Amici* thus urge this Court to apply the *Baker Hughes* burden-shifting framework consistent with the demands of Section 7 and D.C. Circuit precedent and require that Defendants bear the burden of showing that their proposed divestiture eliminates the risk to competition.

10

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

/s/ *Allen P. Grunes*

THE HON. WILLIAM J. BAER
6628 Landon Lane
Bethesda, MD 20817
(202) 215-1000
bill.baer50@gmail.com

1155 F Street N.W., Suite 1200
Washington, D.C. 20004
(202) 296-7353
agrunes@bhfs.com

DAVID B. MESCHKE
ROSA L. BAUM
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
(303) 223-1100
dmeschke@bhfs.com; rbaum@bhfs.com

JOSHUA P. DAVIS
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 905-5420
jdavis@bm.net

*Counsel to Amici Curiae*

Dated: January 13, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2023, I electronically filed a true and correct copy of the foregoing **BRIEF OF *AMICI CURIAE* THE AMERICAN ANTITRUST INSTITUTE AND THE HON. WILLIAM J. BAER** with the Clerk via the CM/ECF system which will send notification of such filing and service upon all counsel of record.

Additionally, I hereby certify I caused a copy of the foregoing to be served upon the following *pro se* party via the following address via U.S. Mail and email address:

JENNIFER E. STURIALE
Delaware Law School
Widener University
4601 Concord Pike
Wilmington, DE 19803
jsturiale@widener.edu

By: */s/ Allen P. Grunes*
BROWNSTEIN HYATT FARBER SCHRECK, LLP
1155 F Street N.W., Suite 1200
Washington, DC 20004
(202) 296-7353
agrunes@bhfs.com

*Counsel to Amici Curiae*