**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ASSA ABLOY AB, *et al.*,<br><br>*Defendants.* | Civil No. 1:22-cv-02791-ABJ |

**JOINT STATUS REPORT**

Pursuant to the Court's request during the December 5, 2022 status hearing and subsequent Order, and in advance of the status hearing set for January 18, 2023, at 9:30am, the Parties respectfully submit the following Joint Status Report regarding various topics and issues.

**Joint Statement**

The Parties had constructive discussions about a possible stipulation regarding product market definition but were unable to reach an agreement. Defendants offered to stipulate to the two relevant product markets using the language alleged in the complaint: residential premium mechanical door hardware and residential smart locks. The United States took the position that Defendants also must stipulate that certain brands and categories of Defendants' products are in the relevant markets. Defendants took the position that they could not do so unless and until, among other things, they understood whether the United States was including similar products sold by competitors in the relevant markets. Despite multiple discussions, the Parties have been unable to resolve their differences on the product market stipulation. The Parties have agreed to discuss a potential stipulation again at the conclusion of discovery in an effort to reach a stipulation in advance of trial.

**Statement of the United States**

As the Court is aware, the United States is proceeding on two separate but parallel tracks in this litigation: (1) liability discovery related to the legality of the proposed merger between Defendants that is the subject of the complaint filed by the United States; and (2) analysis of the divestiture remedy proposed by Defendants in the middle of litigation. The United States has been working diligently to conduct discovery simultaneously related to both lines of inquiry. While our investigation is ongoing, the United States has identified several potential concerns and unanswered questions about the divestiture remedy, which require the continuation of discovery and preparation for trial in this matter.

As requested by the Court during the December 5 status hearing and December 23 discovery conference, the United States summarizes below the current case status in two specific areas: (1) current status of fact discovery; and (2) current concerns regarding the proposed divestiture remedy based on discovery to date. For the reasons stated below, the United States renews its request that fact discovery in this matter be extended by at least 30 days due to (i) the Defendants' delayed production of over 84,000 divestiture remedy related documents which were not produced on December 1 as required by the CMO, and (ii) Defendants and the carve-out buyer have not yet finalized critical agreements relating to the proposed remedy. The United States acknowledges that granting its requests will likely require the modification of deadlines contained with the Case Management Order (CMO), including a possible extension of the current trial date.[1]

---

[1] The United States maintains that Defendants can voluntarily extend their merger agreement in order to accommodate a later trial date; however, we are also prepared to discuss alternatives to moving the current trial date including bifurcation of the liability and remedy phases, or shortening of other Court ordered deadlines as necessary.

We will be prepared to answer additional questions from the Court during the January 18 status hearing.

## I.    **Discovery Status**

The United States requests a 30-day extension of fact discovery as well leave to take three additional fact depositions.[2]  To date, the United States has issued multiple document requests and interrogatories to Defendants, responded to numerous requests and interrogatories from Defendants, and issued over 20 third-party subpoenas to market participants including customers, competitors, consultants, and the divestiture buyer.  As a result of the Parties failure to reach a product market stipulation, the United States is conducting full discovery on the existence of the alleged product markets as well as the fact of and extent to which Defendants compete in those same markets.  The United States has already taken 5 depositions with an additional 9 party depositions and 8 third-party depositions scheduled or to be scheduled before the current close of discovery on February 10.

Since the last discovery conference held with the Court on December 23, Defendant Assa Abloy has finally begun to produce the documents related to the proposed divestiture that were created since September 15, 2022 and had previously been withheld from the United States.  After the December 23 discovery conference, the United States received over 33,000 additional documents from Defendants on December 27.  The United States understood that the December 27 production would include all or substantially all of the documents that were required to be produced on December 1 pursuant to paragraph 24 of the CMO related to the proposed divestiture

---

[2] The Parties have engaged in multiple meet and confers over the past several weeks related to the topics of case schedule and depositions.  Defendants agreed to postpone depositions based on the late arrival of documents and have also now agreed to enlarge the deposition limit imposed on the United States to add three fact depositions.  However, Defendants have refused to extend the deadline for the close of fact discovery despite the discovery issues identified in this report.

remedy.  However, on December 28, Defendant Assa Abloy sent another production containing over 21,000 new documents; on January 3, a further production containing over 7,000 documents; and on January 9, yet another production of an additional 23,000 documents.  Yet another tranche of more than 85,000 new custodial documents was produced on January 11 including documents through January 1.  *Since December 27, Defendants have produced nearly 170,000 new custodial documents (nearly one quarter of its entire custodial document production in litigation), half of which (more than 84,000 documents) should have been produced on or immediately after December 1 pursuant to the CMO.*

On January 6, Defendants stated "there will be at least two further custodial document productions" with an unspecified number of additional documents.  Based on the large size of the January 11 production (85,000 documents), the United States is concerned about the size and scope of any future productions.  Although review of the late produced documents is ongoing, the tardy productions include thousands of emails and other relevant correspondence *related to the divestiture remedy* including internal and external correspondence between September 15 and December 1, newly updated or revised versions of various divestiture-related documents and agreements, as well as documents reflecting negotiations related to the proposed divestiture.

Defendants seek to have the United States and the Court focus on the proposed divestiture remedy that Defendants elected to propose in the middle of litigation, but the provision of information about the divesture remains a moving target.  The prejudice of this delay is real.  For example, the United States has not yet been able to proceed with multiple divestiture-related depositions due to the ongoing production and review of highly relevant custodian documents.  Similarly, as explained below, the Defendants and Fortune have not yet finalized critical

agreements relating to the proposed remedy, including the Transition Services Agreement (TSA), which would be necessary for Fortune to operate the divested assets post-closing.

In light of the multiple delayed productions and the outstanding agreements, the United States requests an extension of the fact discovery cut off by at least 30 days. At the inception of this case, the Parties negotiated an expedited discovery schedule that was predicated on Defendants producing divestiture-related materials by December 1.  (CMO ¶ 24).  In exchange, the United States agreed to conduct expedited discovery on the proposed remedy within 72 days (fact discovery is scheduled to close on February 10).  We now know that Defendants failed to uphold their end of the bargain.  Defendants have produced over 84,000 responsive and relevant documents only *after* the United States sought intervention from the Court and over a month *after* December 1.

Defendants' own statement below rehashes their flawed arguments from the December 23 discovery conference, but in the end does not dispute that they delayed production of tens of thousands of divestiture-related documents created between September 15 and December 1 by nearly a month.  These documents are from the critical time period for evaluation of the Defendants' proposed remedy.  Defendants' only excuse is that the United States never asked them to "refresh" their document production.  This justification is unavailing.  As the Court advised during the December 23 conference, Defendants are not entitled to special notice or demand to fulfill their obligations under the Court's CMO and the Federal Rules of Civil Procedure.[3]

As a result, the United States respectfully requests that fact discovery be continued by at least 30 days in order to restore the time period negotiated by the Parties and Ordered by the CMO.

---

[3] Defendants assert "it takes at least three weeks to begin rolling productions of documents following a collection."  In fact, their production from January 11 included 85,000 custodial documents through January 1, just ten days later, not three weeks.

Such an extension may, of course, have other implications to include, for example, moving the trial date. The United States is prepared to discuss this possibility as well as other potential adjustments to the CMO that could potentially preserve the current trial. The Parties have discussed multiple proposals and counter-proposals but have failed to reach a mutual agreement.

Finally, the United States requests leave to take an additional three depositions beyond the current limit of 22 pursuant to the CMO. At the time of the CMO negotiations, the United States anticipated a single deposition of the future buyer, but the now confirmed divestiture buyer Fortune Brands has identified at least four potential employees with important information related to Fortune's proposed divestiture purchase. In addition, both Assa Abloy and Fortune have identified multiple consultants, bankers, and brokers that assisted with material portions of the divestiture agreement. As a result of this new information, and the Defendants' reliance on the proposed divestiture remedy, the United States respectfully requests three additional fact depositions. After multiple meet and confers, Defendants have now agreed to this request.

## II.     <u>Divestiture Remedy</u>

As previewed during the last status hearing on December 1, 2022, Defendants disclosed a conditional divestiture remedy and Stock Purchase Agreement (SPA) between Defendant Assa Abloy and buyer Fortune Brands. The SPA is a complex divestiture remedy that proposes to carve-out multiple self-selected product and business lines from a large, interconnected global enterprise. The 118-page SPA incorporates over 20 separate individual agreements, attachments, disclosure schedules, and addendums including: a 60-page disclosure schedule supported by 190 pages of attachments; an intellectual property assignment agreement; a patent license agreement; a patent license-back agreement; a software license agreement; an unexecuted form TSA which identifies over 70 different services that Assa Abloy might provide to the buyer; and a separate supply

agreement for over 400 products that notionally gives the buyer the ability to purchase products manufactured by Assa Abloy rather than actually transferring the assets necessary to manufacture those same products.  While the SPA itself was executed by Assa Abloy and Fortune Brands on December 1, multiple agreements related to the proposed remedy remain subject to additional negotiation and have not yet been executed.  The items to be negotiated and executed are not collateral or ancillary to an evaluation of the divestiture.  Indeed, one of the agreements that remains in progress and unsigned is the TSA, a critical agreement that governs the actual transition of the divested business lines to the proposed buyer.

Defendants' statement below argues that the United States has had "eight months to evaluate the divestiture" is wrong.  In June 2022, Defendants shared a seven-page high level bullet point slide deck which described a "remedy proposal" that is materially different than the divestiture disclosed on December 1, contained no detailed information or agreements, and, critically, failed to identify a buyer.  Indeed, the "remedy proposal[s]" provided on June 6 and August 31 both rested heavily on vague, conclusory statements, such as that the divestiture remedy would include "all relevant personnel" (without identifying them), would include "all IP necessary to the manufacture and sale" of relevant products (without identifying it), and would "provide all standard TSAs" (without describing them).  Defendants refused to answer additional detailed questions from the United States regarding these incomplete proposals, and the United Stated was forced to file its complaint in this matter.

For context, in a typical Hart-Scott-Rodino (HSR) review under the Clayton Act, the United States would have many months to review, investigate and analyze a complex divestiture remedy such as the one proposed here.  The United States has worked over the past 43 days to examine the actual divestiture remedy proposed during the middle of litigation as quickly as

possible.  As of today, the United States has not yet received complete document productions from Defendants, their retained divestiture agents and brokers, or the proposed buyer.  While counsel for the United States, counsel to Defendants, and counsel to buyer Fortune Brands have been in regular contact, the United States has not yet – less than 28 days before the close of fact discovery – had an opportunity to interview or depose any business representatives about the proposed divestiture remedy.  Depositions related to the divestiture remedy are tentatively scheduled for late January.

Based on the incomplete productions to date, the United States has already identified several areas that require further inquiry and investigation before the close of fact discovery in this matter.  Three representative examples of issues identified by the United States to date include:

*1 – United States and Global Brand Split:*  Assa Abloy's proposed remedy includes a narrow divestiture and carveout of the Yale[4] branded global hardware business, but only for "electronic residential" products currently branded Yale, and only in the United States and Canada. Defendant Assa Abloy proposes to retain full use of the Yale brand name for all Yale branded "mechanical" products in the United States and Canada, all overseas products, and will enjoy wide-ranging use rights on all products during a two-year transition period.  This unusual and limited carveout proposal creates the practical risk of conflicts between separate companies using the same brand name in the United States and Canada, as well as the risk of confusion among buyers and sellers of Yale products around the globe.  Further, the proposed divestiture appears to limit the divestiture buyer's ability to introduce new products under the Yale brand.  The United States, among other things, is trying to understand whether the brand split could be detrimental to long

---

[4] Yale branded products include residential smart locks as well as non-premium mechanical and commercial products, sold by Assa Abloy through a variety of retail, wholesale, online, and other distribution channels.

term investment in the Yale brand for one or both of the contracting divestiture parties, thereby jeopardizing the goal of restoring competition to this already highly consolidated market. The United States intends to conduct further discovery on the specific terms and agreements controlling the proposed limited divestiture of the Yale brand.

2 – *Remedy Uncertainty and Entanglements:*   Defendants' proposed divestiture remedy leaves numerous significant contractual and practical issues for later negotiations and/or future discussion. Rather than providing a firm basis for the buyer to begin operating the divested assets on day one, the agreements seem to raise uncertainty regarding important aspects of the proposed remedy. For example, the details regarding how 70 different TSA services will be provided by Assa Abloy to the buyer – for a cost – have not yet been negotiated. These services include not only customer-facing functions such as websites and order processing, but also operational control over component sourcing, manufacturing, quality testing, and warehousing products on behalf of the buyer.

In addition, the SPA contemplates that Assa Abloy and the buyer will negotiate a "Secondment Agreement" for employees that will remain with Assa Abloy but perform work on behalf of the buyer for an indeterminate period of time until the companies are able to execute "deferred" closings for assets in Hong Kong, Korea, and Vietnam, including the factory in Vietnam where the buyer's smart lock products will be manufactured. The United States must conduct further discovery to determine the identity and roles of these retained employees, as well as the potential for such employees to share competitively sensitive information between their current employer (Seller Assa Abloy) and their future employer and prospective direct competitor (Buyer Fortune Brands). Even further, Defendants' proposed "deferred" closings present a myriad of real-world issues that could dramatically impact the underlying agreement such as purchase price

adjustments, material limitations on future actions, and potential termination of the agreement if the business or financial condition of the divested assets materially change between signing and closing.

The uncertainty underlying the narrow product line carveouts from the parent global business that has supported the products for decades illustrates the inherent difficulty in attempting to extract the divested assets from their global parent company Assa Abloy. Rather than presenting a complete divestiture agreement and remedy package, Defendant Assa Abloy appears to have proposed a remedy that contains significant uncertainty and numerous ongoing entanglements for the proposed buyer, as well as substantial uncertainty for American consumers.

*3 – Risk of Failure to Restore Competition:*  Because of the significantly delayed document productions related to the divestiture, the United States has not yet had the opportunity to depose business representatives of either Defendant Assa Abloy or buyer Fortune Brands who were involved with the divestiture to inquire about the risks that the proposed divestiture will fail to remedy and restore the injury to competition caused by Defendants' proposed merger.  Such risks can include a failure to identify and transfer the assets necessary to replicate the selected business line operations, a failure to effectively integrate the divested entities, a failure to invest in the acquired assets, or anything else that ultimately would lead to a failure to restore the competition that would be lost from the Defendants merger.  The United States submits that any risk of failure should be borne by the Defendants, and not the American consumer.  As a result, the United States requires additional time for discovery and additional witness testimony in order to determine and evaluate the risk of failure presented by this specific remedy proposal.

### Defendants' Statement

Defendants regret the length and nature of this "joint status report." The government sent Defendants the above text 48 hours before the filing deadline.  Defendants now have no alternative but to respond to what is essentially a full-blown motion by the government to amend the discovery schedule, which does not comply with the requirements in paragraph 13 of the Court's Case Management Order. *See* ECF No. 46. At Defendants' request, the parties engaged in several meet and confers on the day of filing to attempt to resolve these issues and were able to reach an agreement on the deposition limit, as set forth below.

The government's "statement" is factually inaccurate and mischaracterizes the parties' discussions regarding the current status of discovery and the divestiture. Defendants provide an accurate description below and explain why no extension of the discovery schedule is necessary or warranted.

Before addressing those issues, Defendants note that the Court asked in its December 5, 2022 minute order whether Defendants would concede the government's pre-divestiture market concentration statistics or its claim that, absent the proposed divesture, the merger is likely to substantially lessen competition in the relevant markets at step one of the *Baker Hughes* analysis. Defendants cannot do so because, as discussed above in the joint statement, Defendants do not yet know what specific products and competitors the government will attempt to include or exclude from the relevant markets.

### I.      Discovery Status

The Defendants disagree with the government's characterization of discovery in this case. The government has had 1,700,000 documents, including *substantially all* divestiture-related emails for the scheduled deponents, from December 2, 2019 through December 1, 2022 (the date

the divestiture agreement was signed), since December 28, 2022—nearly four weeks before the government's first deposition of a relevant ASSA ABLOY employee is scheduled to occur. The government largely repeats arguments it made previously to the Court at the parties' December 23 discovery conference, at which the Court encouraged the parties to work together to make accommodations for the scheduling of depositions. Defendants did so, the government has the documents it requires for those rescheduled depositions, and nothing in the government's statement warrants departure from the Court's prior conclusion that modification of the discovery schedule is unnecessary.

As an initial matter, the government misstates Defendants' discovery obligations under Paragraph 24 of the CMO related to divestiture discovery. Defendants have complied with *all* of their obligations under the Federal Rules, the government's discovery requests, and the heightened requirements imposed by that CMO. Paragraph 24 of the CMO was heavily negotiated through numerous exchanged drafts and meet-and-confers. Paragraph 24 imposes three requirements on Defendants:

*First*, Defendants were required to produce the divestiture or license agreement, and other related agreements, on or before December 1, 2022. Defendants did so.

*Second*, Defendants are required to refresh every 12 days their productions of only three specific categories of documents: "(1) communications with any potential or actual buyer(s), (2) any draft or final agreement(s) exchanged with any potential or actual buyer(s) (including all appendices, schedules and exhibits), and (3) any documents or data requested and shared through a data room (or other shared medium) with any potential or actual buyer(s)." Defendants have complied and are continuing to comply with this ongoing requirement.

*Third*, in response to the government's document requests served on or before November 1, 2022 that related to any such divestiture or license agreement, Defendants were required to substantially complete production of documents within 28 days of such requests, but no later than December 1, 2022. The government served its discovery requests on October 14 and November 1, and Defendants complied with this request by initially producing 154,000 documents on November 4 and then rolling in three more sets of productions totaling 450,000 by December 1.

With respect to this third category of documents, neither the CMO, the discovery requests themselves, nor counsel for the government in numerous meet-and-confers ever specified (or requested) a "refresh" of the documents ASSA ABLOY produced as of December 1. Notably, during negotiations regarding the CMO, Defendants offered to refresh their productions on December 15, but the government rejected that proposal. And the government specifically acknowledged on October 13 that the CMO imposed *no obligation* on Defendants to refresh documents beyond the three specific categories of divestiture documents in category two with which Defendants have complied. Instead, the government's document requests simply asked for documents through the close of fact discovery, which was later negotiated to December 31.

Nevertheless, and without a request from the government, ASSA ABLOY voluntarily refreshed its collection of custodial documents—twice. ASSA ABLOY refreshed its custodial collection immediately after December 1 (the date the divestiture was signed, capturing all relevant negotiation documents) and immediately after December 31 (the agreed-upon end date for the government's document discovery). The government identifies no basis for an obligation on ASSA ABLOY to refresh its collection at a different time, and these refreshes have ensured that the government has *all* of the divestiture related communications and documents leading up to the signing of the deal well in advance of the depositions of the relevant ASSA ABLOY employees.

The government claims that the "only excuse" for ASSA ABLOY's choice to refresh its collection and production of documents on *these* dates (instead of some *alternative* dates that the government has yet to identify) is that the government "never asked."  Not so.  Yes, the government was silent on refresh *dates*.  But the CMO, the government's document requests, and even the Federal Rules say nothing about particular refresh *dates* either.  ASSA ABLOY fulfilled its obligations under the CMO and Federal Rules by collecting massive quantities of custodial documents not once, but *three* times, all in the span of a few short months.   Defendants respond specifically below to two of the government's inaccurate statements.

> 1. *"Defendants have produced nearly 170,000 new custodial documents (nearly one quarter of its entire custodial document production in litigation), half of which (more than 84,000 documents) should have been produced on or immediately after December 1 pursuant to the CMO."*

The 84,000 documents the government references were created by ASSA ABLOY employees in the days and weeks leading up to December 1 and were collected in the document refresh immediately after December 1. There is no requirement in the CMO that ASSA ABLOY produce those documents "immediately" on or after December 1, nor could it have done so. As ASSA ABLOY explained to the government in negotiations over the CMO, it takes at least three weeks to begin rolling productions of documents following a collection. Moreover, the government fails to note that, in addition to producing on a rolling basis *all* of the communications with bidders, draft agreements, and data room documents—thousands of documents related to the divestiture—ASSA ABLOY had produced over *600,000* custodial documents by December 1, representing *all* responsive material through the date of the complaint. ASSA ABLOY then voluntarily conducted a refresh of custodial documents following the December 1 deadline and began rolling productions on December 23. Those productions—including the 84,000 documents that the government identifies—were substantially completed for the scheduled deponents by

December 28, nearly four weeks in advance of the scheduled ASSA ABLOY depositions of relevant custodians. ASSA ABLOY conducted another custodial refresh immediately after December 31 and similarly plans to roll in productions during January, including a large production made on January 11. These productions are not "tardy"—they result from the governments' request that ASSA ABLOY collect all documents generated up until just two weeks ago. In total, ASSA ABLOY has produced over 800,000 documents since the start of this litigation on September 15, 2022. These documents stand in addition to the 1,000,000 documents produced during the investigation period. All of this has been in full compliance with ASSA ABLOY's requirements under the CMO and the Federal Rules of Civil Procedure, both on the substance of the documents produced and the timing of productions.

2.       *"[T]he United States agreed to conduct expedited discovery on the proposed remedy within 72 days."*

The government's repeated claim that it only started analyzing the divestiture in December is factually inaccurate. The government has been fully aware of the divestiture since May 2022, giving the government *eight months* to evaluate the divestiture. The parties entered a formal settlement period with the government on May 17, 2022. This settlement period "stopped the clock" with respect to the government's obligations to review the Defendant's merger transaction under the Hart-Scott-Rodino Act ("HSR Act). 15 U.S.C. § 7A. At that time, the parties' counsel presented a divestiture proposal to the government that already reflected the government's stated demands, in particular that the divestiture cover both premium mechanical residential and residential smart locks and that the divested assets come from one party, and not "mix and match" assets from the respective parties.

The parties and the government conferred on May 26, 2022, to discuss the government's detailed feedback on the divestiture proposal. The parties formally submitted a remedy proposal

in writing to the government on June 6. The parties and the government continued settlement discussions until the end of June at which point the government said it would not accept the remedy. The government gave notice on July 1 that it was terminating the settlement period, which terminated a week later on July 8, and restarted the government's time to review the merger under the HSR Act. By that time, the parties had been discussing the divestiture with the government for more than six weeks and Defendants had made considerable concessions on the Yale brand and the Vietnam facility. These concessions were ultimately memorialized in a further revised version of the remedy proposal submitted to the government on August 31.

The divestiture discussed with the government during the settlement period and ultimately memorialized in the August 31 proposal is substantively the same as the actual divestiture agreement submitted to the government on December 1—it is comprised of the same businesses and assets—including the brands, IP, personnel, and facilities. The only material change that occurred on December 1 was identification of who the buyer would be.

***

Given that (1) the government has had the substance and all material details of Defendants' divesture proposal for about eight months and the actual divestiture agreements since December 1, as agreed in the CMO, and (2) Defendants have fully complied with their discovery obligations under both the CMO and the Federal Rules, there is no basis for the government's request for a 30-day extension of the discovery period. Defendants note that the CMO schedule already includes a month-long period of "supplemental discovery" after the February 10, 2023 fact discovery date. Defendants have no objection to certain fact depositions falling into that supplemental discovery period if necessary, and, during meet and confers on the day of filing, proposed to the government an alternative that would permit their experts to rely upon such depositions under the current case

schedule. The government declined Defendants' offer. The government also requests an additional 3 depositions beyond those allowed in the CMO, and Defendants have agreed to this request based on the government's representations regarding the specific additional third-party witnesses they are seeking to depose.

## II.    Divestiture

The divestiture agreement executed between ASSA ABLOY AB and Fortune Brands is not complex. It is also not new to the government. In fact, it is a straight-forward memorialization of the same proposal that Defendants presented to the government about eight months ago: (1) the complete divestiture of the EMTEK and Schaub businesses worldwide and (2) the complete divestiture of the August and Yale smart residential businesses in the United States and Canada. There is nothing more complex about this agreement than the agreements parties routinely execute when selling assets or businesses, or that the government has routinely reviewed in divestiture remedies. ASSA ABLOY's smart residential business in the United States (operating under the Yale and August brands) is a complete, standalone business. There is no merit to the government's suggestion, for the first time in this status report after 15 months of investigation, that there is a "Yale branded global hardware business." The complaint makes no such allegation and does not assert any likely lessening of competition in or affecting any such business.

Indeed, as noted above, the government has known about the scope of this remedy for over 240 days and has had ample time to understand it. Defendants had more than a dozen telephone conferences with the government between May 2, 2022 and July 1, 2022 to discuss the details of Defendants' proposal and respond to questions about that proposal. This all took place prior to the government taking a *single* deposition as part of its investigation (of which the government still only used a fraction of what they could have taken) and while it still had the ability to request

documents from additional custodians (as the government ultimately did). Even during discovery in this litigation, Defendants have gone beyond their obligations in the CMO to facilitate the government's understanding of the divestiture transaction, including through a discussion between counsel for the government and the legal teams involved in its negotiation to explain the terms of the divestiture transaction and how they were memorialized. The level of detail reflected in the transaction documents about which the government now expresses concern consists of lists of the specific employees by name and title, patents, trademarks and other IP, and facilities and equipment that will transfer to Fortune Brands. This level of detail *eases* the government's burden and highlights the completeness of the divestiture.

### 1.     The divestiture transaction is fully negotiated.

The Stock Purchase Agreement includes six ancillary agreements—the Seller Patent License Agreement, the Buyer Patent License Agreement, the Software License Agreement, the Supply Agreement, the Trademark Assignment Agreement, and the Transition Services Agreement ("TSA")—all of which are in *agreed form*, meaning that they will be executed at closing as written. None of these ancillary agreements are unusual. It is customary for ancillary agreements to be in agreed form at signing of the main agreement and executed only at closing because the subject matter of these agreements deals entirely with post-closing matters. Effectiveness of these ancillary agreements is not conditioned on anything other than execution by the parties. There is *nothing* left to be negotiated in these agreements.

This includes the TSA, which is customary and which the parties discussed with the government throughout the settlement period during its investigation of the transaction under the HSR Act. The government has routinely described divestitures involving similar TSAs as being "in the public interest" to courts in proceedings under the Antitrust Procedures and Penalties Act,

15 U.S.C. § 16(b)-(h) (the "Tunney Act"). ASSA ABLOY is obligated to provide all of the services contemplated under the TSA—*at cost*, not at "*a*" cost as the government suggests. The only scenario in which ASSA ABLOY would not be responsible for these services is if *the buyer*, Fortune Brands, decides that some or all are unnecessary and unilaterally declines those services, which it may do at any time pre- or post-closing, entirely at *its* option. Thus, the TSA reflects a fully negotiated menu of options (customary for a transaction of this type) that are available to Fortune Brands in order to support an orderly and effective transition to new management— flexibility which works entirely in Fortune's favor. The government is wrong that the TSA is not fully negotiated and that its existence somehow means that Fortune Brands will not be an independent, formidable competitor post-closing. However, even if the government were correct, it has had the fully negotiated TSA since December 1 and will have ample opportunity to ask ASSA ABLOY and Fortune Brands witnesses during depositions about those services as contemplated under the CMO.

The Supply Agreement is likewise fully negotiated, including all of the products to be supplied under that agreement. As is clear from the face of the exhibit to the agreement referenced by the government, the vast majority of the SKUs listed are different finishes available for a far smaller number of products. It is important to note that these products are outside of the relevant markets alleged in the Complaint, and Fortune Brands has the ability to source them from any number of other suppliers. In any event, these products are not a surprise to the government—each of these products was either specifically within the scope of the government's nearly year-long HSR investigation (as is the case for more than 95% of the products listed) or otherwise reflected in documents and data produced by ASSA ABLOY in the course of that investigation and well known to counsel for the government.

**2.      The divestiture transaction will close if the HHI transaction closes.**

The primary condition to closing the divestiture transaction is the closing of the HHI transaction. The only other conditions to closing of the divestiture transaction are that the parties certify that the representations and warranties already made in the Stock Purchase Agreement remain true and correct (generally subject to a very high material adverse effect standard) and execute the already agreed ancillary agreements (which they are contractually required to do at closing). Closing of the divestiture transaction is not subject to any other competition law or investment clearances or approvals. Nor is it contingent upon Fortune Brands securing financing.

**3.      The government mischaracterizes the divestiture, and in any event has ample time to investigate the "issues" it has identified.**

The other "issues" the government raises about the divestiture mischaracterize the agreement between ASSA ABLOY and Fortune Brands. For example, the government states that ASSA ABLOY will "retain full use of the Yale brand name … in the United States and Canada." But this is not accurate. ASSA ABLOY in fact will *not* retain *any* rights to the Yale brand in the United States or Canada with the exception of a very limited and customary "wind down" right to use the Yale brand in connection with selling down existing *commercial* inventory and to do right by *commercial* customers by honoring existing quotes or bids that are issued prior to closing. Once this sell-down period concludes, Fortune Brands will be the *only* door hardware supplier with the right to use the Yale brand in the U.S. and Canada and will be able to use the Yale brand in *any* residential product (including future products outside the relevant markets alleged in the government's complaint). This is evident in the plain language of the agreement itself. In any event, there is no risk of consumer confusion during this finite period of time that could in any way inhibit Fortune Brands' ability or incentive to compete now or in the future in the relevant markets alleged by the government. The products, customers and sales channels for commercial

door hardware are separate and distinct from those for residential door hardware, and the government's complaint does not allege otherwise.

The government's other assertions regarding the deferred closings reflect its misinterpretation of the plain language of the agreements. The possibility of deferred closings, which are common for transactions of this type, have only been included to allow for the possibility that additional time may be required to complete the formal transfer of legal title to specified assets and entities in those countries and as a result will not have any operational impact. There is no uncertainty here warranting additional discovery time—these are routine processes and the parties do not expect these closings, if necessary at all, to be deferred materially beyond the closing of the main divestiture transaction. Moreover, the agreement requires ASSA ABLOY to pass on *all burdens and benefits* of those portions of the business during any such interim period. It is to this end alone that it is possible that certain employees may be seconded to Fortune Brands for this brief interim period. There is likewise no uncertainty on this score. The employees that may be seconded to Fortune Brands (if it becomes necessary to do so) are the very same employees that will transfer in full with the deferred closings. Each and every such employee is specified by name and title in a disclosure schedule disclosed to the government on December 1.

Dated:  January 13, 2023

 /s/ David Dahlquist

Matthew R. Huppert (DC Bar #1010997)
Trial Attorney
UNITED STATES DEPARTMENT OF
JUSTICE
ANTITRUST DIVISION
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
(202) 476-0383
Matthew.Huppert@usdoj.gov

David E. Dahlquist
Senior Litigation Counsel
UNITED STATES DEPARTMENT OF
JUSTICE
ANTITRUST DIVISION
209 South LaSalle Street, Suite 600
Chicago, Illinois 60604
(202) 805-8563
David.Dahlquist@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

Respectfully submitted,

 /s/ *Justin Bernick*
Charles A. Loughlin (D.C. Bar #448219)
Justin W. Bernick (D.C. Bar #988245)
William L. Monts, III (DC Bar # 428856)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com
william.monts@hoganlovells.com

 /s/ *David Gelfand*
Daniel P. Culley (D.C. Bar No. 988557)
David I. Gelfand (D.C. Bar No. 416596)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500
Facsimile: (202) 974-1999
dculley@cgsh.com
dgelfand@cgsh.com

*Counsel for Defendant ASSA ABLOY AB*

 /s/ Paul Spagnoletti
Paul Spagnoletti
Arthur J. Burke
Greg D. Andres
Nikolaus J. Williams
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
paul.spagnoletti@davispolk.com
arthur.burke@davispolk.com
greg.andres@davispolk.com
nikolaus.williams@davispolk.com

*Counsel for Defendant*
*Spectrum Brands Holdings, Inc.*