**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Case No. 22-2791-ACR |
| ASSA ABLOY AB, *et al.*, | |
| *Defendants*. | |

**SUPPLEMENTAL PRETRIAL BRIEF OF
<u>PLAINTIFF UNITED STATES OF AMERICA</u>**

Plaintiff United States of America submits this supplemental pretrial brief at the Court's invitation to respond to questions the Court raised at the status conference held on March 14, 2023. Those questions relate fundamentally to how Defendants' proposed divestiture and its procedural posture (pursued in litigation, rather than submitted for pre-complaint review) fit into the Court's analysis. As explained below, Defendants' divestiture proposal should be evaluated for what it is—a remedy—and under a remedy standard, not as a rebuttal to liability.

Specifically, the Court asked about: (1) the meaning of "acquisition" in the Clayton Act, as it relates to the United States' liability burden under Section 7; (2) the pre-consummation review procedures in the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act") and their role in the Clayton Act's statutory framework; (3) the precise nature of each side's burden at each step of a Section 7 challenge, including when the defendants propose a divestiture remedy; and (4) the practical import of addressing the anticompetitive effects of an unremedied acquisition when the merging parties have proposed a divestiture remedy.

*The meaning of "acquisition" for the United States' burden and the role of the HSR Act*. The text, structure, purpose, and legislative history of the Clayton Act all demonstrate that, in a Section 7 challenge, the "acquisition" as to which the United States bears a liability burden refers to the specific acquisition as to which the United States had a chance to make a "thorough evaluation" prior to litigation under the HSR Act (Section 7A). S. Rep. No. 94-803, pt. 1, at 65 (1976). Congress thought that process was "essential in order to carry out the underlying purpose of section 7." *Id*. Congress intended Section 7A to facilitate the United States carrying its liability burden. That also means the United States' liability burden should not include a separate acquisition (in this case, a contested divestiture remedy) that did not undergo HSR Act review.

And even if other "acquisitions" may sometimes be relevant, the statutory text indicates that the United States may challenge one specific "acquisition" at a time ("such acquisition").

***The nature of each side's burdens***. Merging firms may choose whether to (1) submit a proposed divestiture for HSR Act review or (2) pursue it in litigation as a contested remedy. The merging firms' choice determines the allocation of burdens concerning the divestiture. Here, Defendants chose to pursue their divestiture—a transaction ordinarily subject to HSR Act review—as a remedy, outside of the HSR Act process. They therefore bear the burden of persuasion under the law of remedies to prove the divestiture's adequacy. The United States need only account for such a reportable divestiture in proving liability for a separate acquisition if the United States has had an opportunity to investigate the divestiture during an HSR Act review.

Because Congress intended the United States could rely on a pre-complaint investigation to carry its liability burden, the nature of each side's Section 7 burdens depends in part on what has been submitted for pre-complaint review. The burden-shifting framework established in *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990), governs whether an acquisition investigated pre-complaint, and later challenged, violates Section 7. Under *Baker Hughes*, if an acquisition submitted for HSR Act review is later challenged, then the burden of production shifts between the parties to make competing assessments of the risk of substantial lessening of competition from that specific acquisition, and the United States bears the burden of persuasion to prove that "such acquisition" violates Section 7. Alternatively, if two transactions (an acquisition and a related divestiture) were both submitted for HSR Act review, and the acquisition was later challenged as a Section 7 violation, then the defendants could raise the divestiture as a rebuttal to the United States' *prima facie* case, and the United States would bear the ultimate burden to prove that the acquisition, in light of the divestiture, violates Section 7.

Divestitures proposed by defendants as contested remedies in litigation, rather than submitted for HSR Act review, should be evaluated under the law of remedies—after a determination that the challenged acquisition violates Section 7—not as part of the *Baker Hughes* framework. Under the law of remedies, the parties proposing the remedy (here, Defendants) have the burden of persuasion to establish that it would fully address the violation and restore the relevant markets to their pre-acquisition degree of competitive intensity.

***The practical reasons to consider the unremedied world***. In a Section 7 case, considering the effect the challenged acquisition ("such acquisition") may have on competition is vital, even when defendants propose a remedy, because the more serious the violation, the stronger and surer the remedy must be. Evaluating existing competition and the competitive effect of the unremedied acquisition is needed to establish the stakes of the inquiry. Doing so does not disregard the remedy proposal or depart from reality. On the contrary, organizing the inquiry in this manner starts from the reality that remedies are at risk of not working as intended and therefore the loss of competition in the unremedied world is at risk of coming to pass.

## I. The United States Bears a Section 7 Liability Burden Only as to the Specific "Acquisition" Investigated Pre-Complaint and Alleged to Violate Section 7

Section 7 of the Clayton Act prohibits any "person" from "acquir[ing]" corporate assets or stock if "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. The HSR Act amended the Clayton Act to create Section 7A, which sets forth procedures to investigate a "proposed acquisition" before it is consummated. *Id*. § 18a. Under those procedures, each merging firm must submit business information and give notice of an intent to consummate a given acquisition, after which the United States has a "waiting period" (usually 30 days) to decide whether to issue requests for "additional information or documentary material" about that acquisition, which extends the waiting period until after compliance. *Id*. §§ 18a(b)(1),

(e)(1). If the United States concludes, after investigation, that the "proposed acquisition" violates Section 7, *id*. § 18a(d)(1), it may challenge "such violation" and seek to enjoin it, *id*. § 25.

The traditional tools of statutory construction indicate that the phrase "such acquisition" should be construed to mean the particular acquisition that antitrust enforcers allege violates Section 7 and that they had an opportunity to review prior to litigation.[1] To read the statute otherwise would be inconsistent with the "totality of statutory context," *Pharm. Mfg. Research Servs., Inc. v. FDA*, 957 F.3d 254, 261 (D.C. Cir. 2020), including the statute's references to a "proposed acquisition," its uses of the word "such," and Congress's intent that Section 7A's pre-complaint review procedures would give antitrust enforcers the time and tools needed to thoroughly evaluate an acquisition before taking on the burden of proving it violates Section 7.

Sections 7 and 7A should be read *in pari materia* to discern the meaning of "such acquisition" because Congress intended the two sections to complement one another in a unified merger-control regime. *See*, *e.g.*, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[S]tatutes addressing the same subject matter generally should be read 'as if they were one law.'"). Congress designed the Section 7A procedures to "strengthen the enforcement of Section 7 by giving the government antitrust agencies a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated." H.R. Rep. No. 94-1373 at 5 (1976). Congress concluded this reform was required for enforcers to have "time to develop the information needed to insure a thorough evaluation." S. Rep. 94-803 at 64-65; *see id.* at 64 ("procedural barriers to antitrust enforcement" needed to be addressed). In short, Section 7A was thought "essential in order to carry out the underlying purpose of section 7." *Id.* at 65.

---

[1] The "traditional tools of statutory construction," *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008), include "the statutory text, structure, purpose and its legislative history," *Kiewit Power Constructors Co. v. Sec'y of Labor*, 959 F.3d 381, 395 (D.C. Cir. 2020).

The statutory text reflects Congress's intent that the United States would be able to rely on a pre-complaint investigation to carry its liability burden, and thus that "such acquisition" refers to the specific acquisition, investigated pre-complaint, that the United States challenges as a violation. Congress refers to the "proposed" acquisition throughout Section 7A, and, importantly, states that the "proposed acquisition" is the acquisition for which the United States is "to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1). It further provides that when a reportable acquisition is subsequently challenged by the United States, the action pertains to whether "a proposed acquisition violates [Section 7]." *Id*. § 18a(f). Thus, Congress intended the Section 7A review process for "a proposed acquisition" to lead to a Section 7 analysis of that same acquisition.

Moreover, Congress's use of "such" before "acquisition" and "violation," 15 U.S.C. §§ 18, 25, "indicates its intent to reference only *one*" acquisition and violation. *Takeda Pharm., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 99 (D.D.C. 2015) (Brown Jackson, J.), *vacated in part as moot*, 691 F. App'x 634 (2016); *see also NRDC v. Browner*, 57 F.3d 1122, 1126 (D.C. Cir. 1995) ("such deficiency" means a "specific deficiency"); *City of Huntington v. HUD*, 466 F. Supp. 3d 30, 33 (D.D.C. 2020) ("such funds" means "particular unused funds"). The statute's focus on only one "such acquisition," and one "such violation," reflects legislative understanding that the United States can (and usually would) limit its claim, and thus the scope of its liability burden, to a single acquisition that it alleges violates Section 7. Allowing the United States to select a single acquisition to challenge also comports with the principle that plaintiffs "are the masters of their complaints." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013).

The text's focus on a single, investigated acquisition makes sense because it effectuates Congress's aim to give the United States a "meaningful chance to carry its burden of proof" and

a "realistic chance to challenge" illegal mergers. H.R. Rep. 94-1373 at 8. The legislative history shows Congress's awareness that the United States bears the burden of proof in Section 7 cases, and Section 7A was intended specifically to help the United States carry that burden. *See id.*; S. Rep. 94-803 at 64-65. It would be antithetical to this "fundamental proposition[]" underlying the HSR Act if merging firms could force the United States to add to its burden a second transaction that it did not have a "meaningful chance" to investigate "thorough[ly]" before bringing suit. *Id.* at 65; H.R. Rep. 94-1373 at 8. The Court "must avoid" such an interpretation because it would "undermine[] congressional purpose." *United States v. Cordova*, 806 F.3d 1095, 1099 (D.C. Cir. 2015); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 63 (2012) (discussing "presumption against ineffectiveness").

## II. Merging Firms Choose Whether to Submit Their Proposed Divestiture for HSR Act Review, and That Choice Determines the Allocation of Burdens as to the Divestiture

Merging firms wanting to propose a reportable divestiture to cure competitive issues with their original acquisition have two options: (1) submit the separate divestiture for review under Section 7A, or (2) escape Section 7A review and instead pursue the divestiture as a remedy in litigation. Each option entails differing burdens and benefits for merging firms, and their choice should determine, consistent with congressional intent, whether the divestiture is considered in the *Baker Hughes* liability framework or under the law of remedies. The governing framework dictates the legal standard and the burdens that apply to the divestiture.

The burden-shifting framework established in *Baker Hughes* determines whether a challenged acquisition that has undergone pre-complaint review violates Section 7. *Baker Hughes* is a liability framework, not a framework for evaluating remedies, and a divestiture proposed as a remedy should not factor into the liability framework. The separate law of antitrust remedies determines whether a divestiture would cure a Section 7 violation. When a divestiture

is pursued as a contested remedy in litigation, rather than submitted through the HSR Act, it is
evaluated under the law of antitrust remedies, after a liability analysis under *Baker Hughes*.

### A.  The Option to Circumvent HSR Act Review for Contested Divestiture Remedies Arises from an Unintended Loophole in Existing Regulations

The option to pursue a contested divestiture remedy outside the HSR Act process arises
from an HSR Act regulation that exempts reportable transactions from pre-consummation review
if they are completed, *inter alia*, "pursuant to and in accordance with . . . [a]n order of . . . any
Federal court in an action brought by the Federal Trade Commission or the Department of
Justice." 16 C.F.R. § 802.70(a). The original intent of this regulation was to exempt only
divestitures that would be ordered after the United States "already had an opportunity
comparable to that which [the] HSR [Act] provides to weigh the competitive impact of [the]
proposed transaction and to approve or disapprove the transaction." *Premerger Notification;*
*Reporting and Waiting Period Requirements*, 63 Fed. Reg. 34,592, 34,594 (June 25, 1998); *see*
*also Premerger Notification; Reporting and Waiting Period Requirements*, 43 Fed. Reg. 33,450,
33,505 (July 31, 1978) (exempting only acquisitions that are "already subject to careful antitrust
scrutiny by the agencies"). However, the United States does not get "an opportunity comparable"
to HSR Act review when, as here, merging firms disclose the material details of a proposed
divestiture in an already expedited lawsuit.[2] Therefore, the procedural posture of Defendants'
remedy proposal results from an unintended loophole in existing regulations. Moreover, the
regulation's focus on court-ordered divestitures confirms that, other than consent decrees, only
court-imposed *remedies*, entered after a finding of liability, are exempt from HSR Act review.

---

[2] The United States received only truncated discovery about Defendants' proposed divestiture
and had a relatively narrow window of time to weigh its competitive impact. By contrast, the
United States' pre-complaint review of the challenged acquisition was more fulsome, both in
terms of the amount and specificity of information and the time afforded to evaluate it.

Defendants chose this path, but they had other options. They controlled what they submitted for HSR Act review and when, and they could have submitted their proposed divestiture through the HSR Act process at any time—whether alongside their original acquisition, during the United States' pre-complaint investigation of that acquisition, or even now. If they had chosen either of the latter two options, they also could have withdrawn and refiled their initial HSR Act notification to ensure that both the acquisition and the divestiture were evaluated during the same statutory waiting period. They could still do so now.

### B. The Legal Standards and Allocation of Burdens for a Proposed Divestiture Differ Depending on Which Option Defendants Choose

#### 1. Burdens at Each Step When Defendants Choose to Pursue Their Divestiture as a Contested Remedy During Litigation

When merging firms choose to pursue a divestiture as a contested remedy in litigation, rather than submit it for pre-consummation review under the HSR Act, the *Baker Hughes* burden-shifting framework should only relate to assessing liability under Section 7 for the challenged acquisition that was reviewed before bringing suit. *See* ECF No. 59 (Pl.'s Pretrial Br.) at 5-6. "To show that a merger is unlawful, a plaintiff need only prove that its effect *may be* substantially to lessen competition." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

***Liability Step One.*** At the first step, the United States must present evidence sufficient for a reasonable factfinder to conclude that the effect of the challenged acquisition (*i.e.*, the underlying acquisition reported under the HSR Act) *may be* substantially to lessen competition. One way it can satisfy that burden is through market-concentration statistics showing the challenged acquisition "will lead to undue concentration" in a relevant market. *See Baker Hughes*, 908 F.2d at 982. If the United States produces evidence sufficient to establish a *prima facie* case, a "presumption" arises that the challenged acquisition violates Section 7. *Id.*

**Liability Step Two.** At the second step, the merging firms must rebut the presumption of a Section 7 violation with evidence sufficient for a reasonable factfinder to conclude that "no substantial lessening of competition" is "threatened" by the challenged acquisition. *Id*. at 990. They can do so "by affirmatively showing why [the challenged] transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id*. at 991. "[E]vidence on a variety of factors can rebut a prima facie case," *id*. at 984, though a divestiture remedy is not one of them because a remedy should be considered only after finding a violation, ECF No. 59 at 8-9; *see also Baker Hughes*, 908 F.2d at 985-86 (identifying several potential factors, including "ease of entry").

**Liability Step Three.** At the third step, the United States must present "additional evidence" to carry its ultimate burden of persuasion on liability that the effect of the challenged acquisition may be substantially to lessen competition. *Id*. at 983. This evidence generally responds to defendants' rebuttal arguments and can take many forms. For example, it could consist of additional evidence of competitive factors that suggests the United States' assessment of the risk of a substantial lessening of competition from the challenged acquisition is more persuasive than defendants', such as additional evidence about the degree of barriers to entry or the extent and intensity of head-to-head competition between defendants.

**Remedy.** If application of the *Baker Hughes* framework indicates that the challenged acquisition violates Section 7, then the Court applies the law of antitrust remedies to determine what relief is appropriate. ECF No. 59 at 8-9. The presumptive remedy for a Section 7 violation is a "full stop injunction" of the illegal acquisition. *Id*. at 7-8. If merging firms propose divestiture as an alternative remedy, then the burdens change from what they were in evaluating

liability, and the defendants assume the burden of proving that their divestiture would "restore competition" and "replace the competitive intensity lost as a result of the merger." *Id*. at 8-10.

To meet this burden of persuasion, merging firms must show by a preponderance of evidence that their proposed divestiture would "restore the pre-acquisition competitive structure of the market," *Ford Motor Co. v. United States*, 405 U.S. 562, 576 (1972), and "replace fully the competition lost by the merger," *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 91 (D.D.C. 2017). Governing precedent and Clayton Act legislative history are clear that an antitrust remedy is adequate only if it returns the relevant market to "the original state of competition," S. Rep. 94-803 at 61, and thereby "fully restore[s] competition," *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981); *see also Ford*, 405 U.S. at 572 ("restor[e] the pre-acquisition situation"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 73 (D.D.C. 2015) ("effectively preserve competition," "maintain the premerger level of competition"); S. Rep. 94-803 at 70-71 (divestiture is "inadequate remedy" when it "fail[s] to restore the competitive conditions existing before the merger"). Thus, the remedy standard is not the same as the Section 7 liability standard because, once the United States has proven a Section 7 violation, "[t]he burden is not on the Government to show" that an alternative remedy "would [itself] violate § 7," and "all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331, 334 (1961).[3] For this reason, *United States v. UnitedHealth Grp. Inc.*, -- F. Supp. 3d --, 2022 WL 4365867, at *9 (D.D.C. Sept. 21, 2022) was incorrect to look, in dictum, to the Section 7 liability standard in evaluating the sufficiency of a remedy and to state that the remedy standard "contradicts the text of Section 7."

---

[3] This is not unique to Section 7. The antitrust remedy standard from *du Pont* and *Ford* is also applied in the context of Sherman Act violations. *See*, *e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 103, 105 (D.C. Cir. 2001) (en banc) (Sherman Act Sections 1 and 2).

Evaluating whether a remedy "replace[s] fully the competition lost by the merger," *Aetna*, 240 F. Supp. 3d at 72, is a qualitative evaluation of the "intensity" of competition, *id*. at 60; *Sysco*, 113 F. Supp. 3d at 72, not merely a mathematical calculation. While quantitative evidence can be relevant to the inquiry, qualitative factors reflecting market realities are foundational to the analysis. Therefore, an "overly simplified" mathematical illustration of competition (*e.g.*, "50-50"), *UnitedHealth*, 2022 WL 4365867 at *9 n.4, is inapt because it does not reflect how courts evaluate competition being restored. A divestiture's potential effects on competition must be functionally viewed, in terms of the real-world dynamics that shape the quality of competition, *see*, *e.g.*, *Aetna*, 240 F. Supp. 3d at 60-74; *Sysco*, 113 F. Supp. 3d at 72-79; *see also du Pont*, 366 U.S. at 331-32 (looking to "common sense" and "human experience" to evaluate divestiture remedy), not through stylized quantifications.

A divestiture remedy proposed by defendants in a Section 7 case is akin to an affirmative defense, insofar as it effectively concedes liability but offers a collateral justification to overcome that concession. *Cf. United States v. Williams*, 836 F.3d 1, 13 (D.C. Cir. 2016) ("affirmative defenses" are "legally recognized justifications or excuses . . . that eliminate criminal liability *even though* all of the elements of a crime are met"). Therefore, including such a remedy in the scope of the United States' liability burden would be similar to improperly requiring a plaintiff to disprove a defendant's affirmative defense. *See*, *e.g.*, *Patterson v. New York*, 432 U.S. 197, 202 (1977) ("[T]he burden of proving . . . affirmative defenses[,] indeed, all circumstances of justification, excuse or alleviation rest[] on the defendant."); *Tendler v. Jaffe*, 203 F.2d 14, 17 (D.C. Cir. 1953) ("[T]he party asserting an affirmative defense has the burden of establishing it by the necessary proof."). Just as defendants are "in the best position" to present information about affirmative defenses, *see Pa. State Police v. Suders*, 542 U.S. 129, 146 & n.7

(2004) (employer's knowledge of its own "remedial procedures . . . and how [they] operate"), so too are merging firms best positioned to present evidence about their own divestiture remedy.

**2.   Burdens at Each Step When Defendants Choose to Submit Their Proposed Divestiture for Pre-Consummation Review Under the HSR Act**

When merging firm submit their divestiture for pre-consummation review under the HSR Act, the litigation burdens under *Baker Hughes* are similar to those described above but must be modified to allow the divestiture to be considered in determining liability. In this hypothetical scenario not presented here, the Liability Step One burden would remain the same because the existence of a separate divestiture would not modify the scope of "such acquisition" being challenged. But at Liability Step Two, the merging parties would be permitted to raise the reported divestiture as a rebuttal, evaluated under the "restoring competition" standard from *Ford* and *du Pont* and in light of the strength of the *prima facie* case, *see* ECF No. 59 at 5, 7, and at Liability Step Three, the United States would bear the ultimate burden of persuasion that the challenged acquisition, in light of the proposed divestiture, violates Section 7.

**C.  The Merging Firms' Choice Entails a Necessary Trade-Off**

The two options available to merging firms wishing to pair a divestiture alongside their original acquisition entail a tradeoff of benefits and burdens.[4] If they choose pre-consummation review under the HSR Act, they must undergo an HSR Act investigation, which takes time and can also require the merging firms to comply with investigative demands for documents, data, and sworn testimony. The benefit of choosing pre-consummation review, however, is that if the United States challenges the underlying acquisition, Defendants could raise the separate divestiture transaction at Liability Step Two as a rebuttal to liability, and the United States would

---

[4] One or both of the merging firms may also first submit a divestiture for HSR Act review on its own before proposing a related acquisition.

have the burden at Liability Step Three to take account of the divestiture in proving liability. *See supra* Part II.B.2. By contrast, if the merging parties choose to bypass pre-consummation review and pursue the separate divestiture as a remedy in litigation, then they get the benefit of avoiding an HSR Act investigation and can exploit the benefits of timing with respect to the litigation, but in exchange they take on the non-shifting burden of proving that their preferred remedy would restore competition. *See supra* Part II.B.1.

The integrity of the Clayton Act's merger-control framework requires this trade-off. If merging firms could both (1) avoid pre-consummation review of a divestiture *and* (2) place the burden on the United States as to that divestiture, then they could secure the primary benefit of submitting their divestiture for HSR Act review without actually having to do so. That would create a perverse incentive to evade, for every divestiture, the pre-consummation review that is "essential in order to carry out the underlying purpose of section 7," thereby routinely depriving the United States of the "thorough evaluation" Congress intended it to be able to perform before deciding whether to take on the burden of challenging a transaction. S. Rep. 94-803 at 63, 65. Divestitures can raise their own competitive concerns and thus require their own investigation.

Allowing merging firms to shoehorn a divestiture remedy into the United States' liability burden would also grant merging firms the extraordinary power to control the contours of that burden. It would begin with one acquisition when the lawsuit is filed and then would change, at defendants' option, to include a divestiture agreement, the material details of which are newly disclosed in the midst of litigation. Permitting the United States' burden to be a moving target controlled by defendants would undermine the HSR Act's purpose to create an orderly and predictable merger-review process and would contravene the bedrock principle that plaintiffs "are the masters of their complaints." *Standard Fire Ins.*, 568 U.S. at 595.

III.   **Evaluating the Risk and Magnitude of Lost Competition from the Unremedied Merger Is Needed to Assess the Adequacy of the Proposed Fix**

It makes practical sense to evaluate the risk and magnitude of competitive effects from the challenged acquisition, even if a fix has been proposed, because if one does not know how much competition is at risk of being lost by the merger and how high that risk is, one cannot know whether a remedy would "replace fully the competition lost by the merger." *Aetna*, 240 F. Supp. 3d at 72. Only by setting a benchmark for the competitive threat posed by the original acquisition can one accurately evaluate the degree of risk that is acceptable in a divestiture remedy proposed to neutralize that threat. The remedied world and the unremedied world are two sides of the same coin, and neither can be ignored in the analysis, because the more serious the violation, the stronger and surer the remedy must be. *See FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1506 (D.C. Cir. 1986) (when "acquisition [is] almost certainly illegal," it is "difficult [to] justify[] anything less than a full stop injunction"); *see also United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89-90 (1950) ("Acts in disregard of law call for repression by sterner measures than where the steps could reasonably have been thought permissible."). The higher the probability and magnitude of lost competition from an unremedied merger, the smaller the tolerance should be for a mediocre or riskier remedy.

Moreover, the inquiry under Section 7 is, by design, inherently probabilistic. *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (Section 7 requires "[a] predictive judgment, necessarily probabilistic and judgmental"); *id.* ("Section 7 is . . . concerned with *probabilities*, not certainties."). Therefore, another practical purpose of evaluating the nature and intensity of existing competition and predicting the state of the unremedied world is to establish the stakes of the probabilistic inquiry, *i.e.*, ascertaining the magnitude of competition that may be lost, and the risk of that loss occurring, if the remedy does not work as planned.

14

It would be inconsistent with the probabilistic nature of the Section 7 analysis to dismiss the unremedied world as merely "fictional" or "a post-merger world that will never come to be." *UnitedHealth*, 2022 WL 4365867, at *8, *10 n.5. Even if a divestiture is certain to *occur*, that does not mean it is certain to *succeed*. Indeed, no divestiture remedy is certain to succeed, and many divestitures have not, *see* ECF No. 59 at 1 n.1, so there is always risk that the unremedied world will "come to be." On this point, Judge Walton's approach in *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002) is instructive. There, the merging firms narrowed their agreement, so that the selling firm would retain (and transfer to another subsidiary) assets in a market where the two firms competed pre-merger. *Id.* at 40-41, 45-47. Even so, the court evaluated "the impact of the original agreement" (*i.e.*, the unremedied world) as "the best evidence of [the amended agreement's] potential effect" because of the risk that the proposed fix would create "an ineffective competitor." *Id.* at 50. Although *Libbey* differs because, among other things, it involved an amended agreement, rather than a separate divestiture transaction, consideration of the unremedied world is similarly warranted here because the United States contends that Fortune Brands "may not be a viable substitute to replace" ASSA ABLOY. *Id.*

Additionally, putting on market-share evidence of the unremedied world as part of the *prima facie* case would not be a flaw in the United States' market-share data. Rather, such evidence would rely on accurate data to predict what the relevant markets may look like if the proposed divestiture remedy does not succeed. The relevance of such evidence is a legal question, not a question of mathematical or economic methodology. Therefore, merely pointing out that such market-share evidence does not account for the possibility of a successful divestiture remedy would not "discredit[] the data" underlying it, and a defendant could not properly rebut the United States' *prima facie* case on that basis. *Baker Hughes*, 908 F.2d at 991.

Dated: March 27, 2023

Respectfully submitted,

_/s/ Matthew R. Huppert_

| | |
|---|---|
| David E. Dahlquist | Matthew R. Huppert (DC Bar #1010997) |
| Senior Trial Counsel | Elizabeth A. Gudis |
| UNITED STATES DEPARTMENT OF JUSTICE | Alice A. Wang (DC Bar #198745) |
| ANTITRUST DIVISION | |
| 209 South LaSalle Street, Suite 600 | Trial Attorneys |
| Chicago, Illinois 60604 | UNITED STATES DEPARTMENT OF JUSTICE |
| Email:  David.Dahlquist@usdoj.gov | ANTITRUST DIVISION |
| | 450 Fifth Street N.W., Suite 8700 |
| | Washington, DC 20530 |
| | Telephone: (202) 476-0383 |
| | Email:  Matthew.Huppert@usdoj.gov |

*Counsel for Plaintiff United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2023, I caused the foregoing to be filed with the Clerk of Court using the Court's Electronic Document Filing System, which served copies on all counsel of record.

/s/ Matthew R. Huppert
Matthew R. Huppert
*Counsel for Plaintiff United States of America*