# Attachment A

Contents:

1. Stock Purchase Agreement, dated as of December 1, 2022 among ASSA ABLOY Inc., Fortune Brands Innovations, Inc. (f/k/a Home & Security, Inc.,) ("Fortune") and solely for purposes of Section 13.20 thereof, ASSA ABLOY AB;
2. Closing Implementation Letter, dated as of April 13, 2023 among ASSA ABLOY AB, ASSA ABLOY Inc., and Fortune;
3. Software License Agreement to be entered into as of the Divestiture Date between August Home, Inc. and ASSA ABLOY Inc.;
4. Patent License Agreement to be entered into as of the Divestiture Date between each of August Home, Inc. and ASSA ABLOY Residential Group, Inc., on the one hand, and ASSA ABLOY Inc. or their designated Affiliates, on the other hand;
5. Patent License Back Agreement to be entered into as of the Divestiture Date between each of August Home, Inc. and ASSA ABLOY Residential Group, Inc., on the one hand, and ASSA ABLOY Inc. or their designated Affiliates, on the other hand;
6. Intellectual Property Assignment Agreement to be entered into as of the Divestiture Date between Fortune or its Affiliates, on the one hand, and ASSA ABLOY Inc. or its designated Affiliates, on the other hand;
7. Transition Services Agreement to be entered into as of the Divestiture Date between Fortune and ASSA ABLOY Inc. (or any Affiliates thereof); and
8. Supply Agreement to be entered into as of the Divestiture Date between Fortune and ASSA ABLOY Inc., or their designated Affiliates.

1.  Stock Purchase Agreement, dated as of December 1, 2022 among ASSA ABLOY Inc., Fortune Brands Innovations, Inc. (f/k/a Home & Security, Inc.,) ("Fortune") and solely for purposes of Section 13.20 thereof, ASSA ABLOY AB.

EXECUTION VERSION

# STOCK PURCHASE AGREEMENT

dated as of

December 1, 2022

among

ASSA ABLOY INC.,

FORTUNE BRANDS HOME & SECURITY, INC.,

and

solely for purposes of Section 13.20,

ASSA ABLOY AB

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX003**

04149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144363

# Table of Contents

**Page**

### ARTICLE 1
### Definitions

Section 1.01   Definitions ........................................................................................... 1

Section 1.02   Other Definitional and Interpretative Provisions ............................................ 20

### ARTICLE 2
### Purchase and Sale

Section 2.01   Purchased Shares ..................................................................................... 21

Section 2.02   Estimated Closing Calculations .................................................................. 21

Section 2.03   Closing ................................................................................................. 22

Section 2.04   Post-Closing Purchase Price Adjustment. ..................................................... 24

Section 2.05   Adjustment of Purchase Price .................................................................... 26

Section 2.06   Payments ............................................................................................... 26

Section 2.07   Withholding ........................................................................................... 26

Section 2.08   Deferred Closings .................................................................................... 27

Section 2.09   Shared Contracts; Wrong Pockets .............................................................. 31

### ARTICLE 3
### Representations and Warranties of Seller

Section 3.01   Corporate Existence and Power ................................................................. 33

Section 3.02   Seller Authorization ................................................................................ 33

Section 3.03   Governmental Authorization ..................................................................... 33

Section 3.04   Non-contravention .................................................................................. 34

Section 3.05   Purchased Shares .................................................................................... 34

Section 3.06   Acquired Entities .................................................................................... 34

Section 3.07   Financial Documents ............................................................................... 35

Section 3.08   Absence of Certain Changes ..................................................................... 36

i

\\4149-1218-4642 v11

AA-LITTRGT-000144364

Section 3.09   No Undisclosed Material Liabilities ................................................... 36

Section 3.10   Material Contracts ................................................................................ 36

Section 3.11   Litigation .............................................................................................. 39

Section 3.12   Compliance with Laws; Permits ........................................................... 40

Section 3.13   Real Property; Liens ............................................................................. 41

Section 3.14   Customers and Suppliers ...................................................................... 42

Section 3.15   Intellectual Property ............................................................................. 43

Section 3.16   Privacy and Data Security ..................................................................... 45

Section 3.17   Employees and Benefit Plans ............................................................... 47

Section 3.18   Taxes .................................................................................................... 49

Section 3.19   Environmental Compliance .................................................................. 51

Section 3.20   Condition and Sufficiency of Assets ..................................................... 52

Section 3.21   Product Liability; Warranty .................................................................. 52

Section 3.22   Finders'        Fees ................................................................................... 52

## ARTICLE 4
### Representations and Warranties of Buyer

Section 4.01   Corporate Existence and Power ............................................................ 52

Section 4.02   Buyer Authorization ............................................................................. 52

Section 4.03   Governmental Authorization ................................................................ 53

Section 4.04   Non-contravention ................................................................................ 53

Section 4.05   Financing .............................................................................................. 54

Section 4.06   Solvency ............................................................................................... 54

Section 4.07   Litigation .............................................................................................. 54

Section 4.08   Competitive Activities .......................................................................... 54

Section 4.09   Finders'        Fees ................................................................................... 54

ii

\\4149-1218-4642  v11

AA-LITTRGT-000144365

Section 4.10   Purchase for Investment ........................................................................................... 55

## ARTICLE 5
### Covenants of Seller

Section 5.01   Conduct of the Business ............................................................................................ 55

Section 5.02   Termination of Intercompany Agreements and Balances. ......................................... 58

Section 5.03   Third-Party Consents................................................................................................. 59

Section 5.04   Pre-Closing Reorganization....................................................................................... 59

Section 5.05   Data Room ................................................................................................................ 60

Section 5.06   Non-Solicitation; No-Hire ......................................................................................... 61

Section 5.07   Exclusive Dealing...................................................................................................... 61

Section 5.08   Buyer Offers of Employment. ................................................................................... 62

## ARTICLE 6
### Covenants of Buyer

Section 6.01   Confidentiality........................................................................................................... 62

Section 6.02   Contact with Customers, Suppliers and Other Business Relations ............................. 63

Section 6.03   Directors and Officers. .............................................................................................. 63

Section 6.04   Seller Names and Marks............................................................................................ 64

Section 6.05   Yale Marks. ............................................................................................................... 65

Section 6.06   License....................................................................................................................... 66

## ARTICLE 7
### Covenants of Buyer and Seller

Section 7.01   Regulatory Undertaking; Further Assurances............................................................. 67

Section 7.02   Public Disclosure....................................................................................................... 69

Section 7.03   Notices of Certain Events .......................................................................................... 70

Section 7.04   Waiver of Conflicts Regarding Representation; Nonassertion of Attorney- Client
Privilege.       70

Section 7.05   Access to Information; Cooperation............................................................................ 71

iii

AA_CONFIDENTIAL AA-LITTRGT-000144366

Section 7.06   Replacement of Guarantees ................................................................................. 73

Section 7.07   Insurance Coverage .......................................................................................... 73

Section 7.08   Confidentiality .................................................................................................. 74

Section 7.09   Pre-Closing Services Acknowledgement ......................................................... 75

Section 7.10   R&W Insurance Policy ..................................................................................... 75

Section 7.11   Buyer Covenant ................................................................................................ 75

Section 7.12   Canada .............................................................................................................. 75

ARTICLE 8
Tax Matters

Section 8.01   Preparation and Filing of Tax Returns............................................................. 75

Section 8.02   Cooperation on Tax Matters ............................................................................ 76

Section 8.03   Buyer Covenants .............................................................................................. 77

Section 8.04   Transfer Taxes .................................................................................................. 77

Section 8.05   Straddle Period Taxes ...................................................................................... 77

Section 8.06   Seller Tax Certificates ..................................................................................... 78

Section 8.07   Seller Tax Indemnity ....................................................................................... 78

Section 8.08   Certain Matters Related to Tax Indemnification and Tax Proceedings .......... 78

Section 8.09   Certain Tax Refunds ........................................................................................ 79

Section 8.10   Seller Tax Groups and Records ....................................................................... 79

Section 8.11   Section 338 Election ........................................................................................ 79

ARTICLE 9
Employee Matters

Section 9.01   Transfer of Employees...................................................................................... 81

Section 9.02   Maintenance of Terms and Conditions ............................................................ 81

Section 9.03   U.S. Defined Contribution Plans ..................................................................... 82

Section 9.04   Severance........................................................................................................... 83

iv

AA_CONFIDENTIAL                                                                    AA-LITTRGT-000144367

Section 9.05   Flexible Spending Plans ................................................................ 83

Section 9.06   Workers Compensation ................................................................ 84

Section 9.07   Works Council Information/Consultation Obligations .................................. 84

Section 9.08   Assumed Arrangements ................................................................ 84

Section 9.09   Employee Communications ............................................................. 84

Section 9.10   WARN Act ............................................................................ 84

Section 9.11   Liability for Business Employees .................................................... 85

Section 9.12   No Third-Party Beneficiaries ........................................................ 86

Section 9.13   Cooperation ......................................................................... 86

## ARTICLE 10
### Conditions to Closing

Section 10.01   Conditions to Obligations of Buyer and Seller ...................................... 86

Section 10.02   Conditions to Obligations of Buyer ................................................. 87

Section 10.03   Conditions to Obligations of Seller ................................................ 87

Section 10.04   Frustration of Closing Conditions .................................................. 87

## ARTICLE 11
### Termination

Section 11.01   Grounds for Termination ........................................................... 87

Section 11.02   Effect of Termination ............................................................. 88

## ARTICLE 12
### Indemnification

Section 12.01   Survival .......................................................................... 88

Section 12.02   Indemnification Obligations of Seller .............................................. 88

Section 12.03   Limitations on Indemnification Obligations ......................................... 88

## ARTICLE 13
### Miscellaneous

Section 13.01   Survival .......................................................................... 89

\\4149-1218-4642  v11

AA_CONFIDENTIAL                                          AA-LITTRGT-000144368

Section 13.02    Release ................................................................................................ 89

Section 13.03    No Other Representations or Warranties; Investigation ............................... 91

Section 13.04    Notices ............................................................................................... 93

Section 13.05    Amendments and Waivers. ..................................................................... 94

Section 13.06    Expenses ............................................................................................ 94

Section 13.07    Successors and Assigns ........................................................................ 95

Section 13.08    Governing Law .................................................................................... 95

Section 13.09    Jurisdiction ......................................................................................... 95

Section 13.10    Counterparts; Effectiveness; No Third-Party Beneficiaries. ...................... 95

Section 13.11    Specific Performance ........................................................................... 96

Section 13.12    Entire Agreement ................................................................................ 96

Section 13.13    Severability ......................................................................................... 96

Section 13.14    Disclosure Schedule ............................................................................ 96

Section 13.15    Currency ............................................................................................. 97

Section 13.16    No Recourse ....................................................................................... 97

Section 13.17    Waiver of Jury Trial ............................................................................. 97

Section 13.18    Further Assurances .............................................................................. 97

Section 13.19    No Waiver Relating to Claims for Actual Fraud ...................................... 98

Section 13.20    Parent Guaranty .................................................................................. 98

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144369

Schedules and Exhibits
DISCLOSURE SCHEDULE

SCHEDULE I          Pre-Closing Reorganization
SCHEDULE II         Accounting Principles
SCHEDULE III        338 Allocation Schedule
SCHEDULE IV         Illustrative Net Sales Amount


EXHIBIT A-1         Form of Seller Patent License Agreement
EXHIBIT A-2         Form of Buyer Patent License Agreement
EXHIBIT B           Form of Software License Agreement
EXHIBIT C           Form of Supply Agreement
EXHIBIT D           Form of Trademark Assignment Agreement
EXHIBIT E           Form of Transition Services Agreement

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144370

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "**Agreement**") dated as of December 1, 2022 is being entered into by and among, ASSA ABLOY Inc., an Oregon corporation ("**Seller**"), Fortune Brands Home & Security, Inc., a Delaware corporation ("**Buyer**"), and solely for purposes of Section 13.20, ASSA ABLOY AB, an *aktiebolag* duly incorporated under the laws of Sweden with corporate identity number 556059-3575 ("**Parent**").

## W I T N E S S E T H :

WHEREAS, Parent entered into that certain Asset and Stock Purchase Agreement dated as of September 8, 2021 (as may be amended, restated or modified from time to time, the "**HHI Agreement**") with Spectrum Brands, Inc., a Delaware corporation ("**Spectrum Brands**"), pursuant to which Parent agreed to acquire the Purchased Shares (as defined in the HHI Agreement) and the Purchased Assets (as defined in the HHI Agreement) and assume the Assumed Liabilities (as defined in the HHI Agreement) from Spectrum Brands (the "**HHI Transaction**");

WHEREAS, Seller (or one of its Affiliates) is the sole legal and beneficial owner of all of the issued and outstanding shares of capital stock (the "**Purchased Shares**") of the Acquired Entities as of the date hereof (as hereinafter defined);

WHEREAS, immediately following, and conditioned upon, the closing of the HHI Transaction, Seller desires to sell or cause to be sold to Buyer, and Buyer desires to purchase from Seller (or its Affiliate, as applicable), all of the Purchased Shares, upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, prior to the Closing, Seller intends to undertake a series of transactions, as further described on Schedule I hereto (the transactions set forth on such Schedule I, collectively, the "**Pre-Closing Reorganization**").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein (the receipt and sufficiency of which is hereby acknowledged and agreed), the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01 *Definitions*. As used herein, the following terms have the following meanings:

"**338 Allocation Schedule**" shall have the meaning given to such term in Section 8.11(c).

"**Accounting Principles**" means the rules and principles set forth on Schedule II.

"**Accounting Referee**" means an independent accounting firm of recognized national standing as Buyer and Seller may mutually agree, which agreement shall not be unreasonably

\\4149-1218-4642 v11

withheld; *provided, however*, in the event Buyer and Seller are unable to mutually agree on such Person, Buyer, on the one hand, and Seller, on the other hand, will each select an independent accounting firm of recognized national standing and both such selected accounting firms will select a third independent accounting firm of recognized national standing to be deemed to be the independent accounting firm selected by the parties, which firm may not be the regular auditing firm of Buyer or Seller; *provided, further*, that if either Buyer, on the one hand, or Seller, on the other hand, fails to select such independent accounting firm within ten (10) days following notice of a party that it is unable to agree with the other party on a substitute independent accounting firm, then the parties agree that the independent accounting firm selected by the other party is deemed to be the independent accounting firm selected by the parties.

"**Acquired Entities**" means the entities designated as " Acquired Entities" set forth in Section 1.01(a) of the Disclosure Schedule as updated by Seller in accordance with Section 5.04, and each of them is an "**Acquired Entity**" .

"**Acquired Entity Securities**" shall have the meaning given to such term in Section 3.06(b).

"**Action**" means any action, suit, arbitration, charge, complaint, proceeding, audit, investigation, litigation or other proceeding (public or private), in each case by or before any arbitrator or Governmental Authority.

"**Actual Fraud**" means, with respect to a party hereto, the making by such party to another party hereto of an express representation or warranty contained in this Agreement; *provided* that at the time such representation or warranty was made by such party, (i) such representation or warranty was inaccurate, (ii) such party had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the inaccuracy of such representation or warranty, (iii) in making such representation or warranty such party had the intent to deceive such other party and to induce such other party to enter into this Agreement, and (iv) such other party acted in reasonable reliance on such representation or warranty and suffered damages as a result of such reliance. For the avoidance of doubt, " Actual Fraud" does not include equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including fraud) based on negligence or recklessness.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such first Person. For purposes of this definition, "**control**" (including, for the avoidance of doubt, its correlative meanings " controlled by" and " under common control with" ), when used with respect to any Pe means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. For purposes of this Agreement, (i) each Acquired Entity shall be an Affiliate of Seller prior to the Closing, but shall cease to be an Affiliate of Seller as of and after the Closing, (ii) the Acquired Entities shall not be Affiliates of Buyer prior to the Closing, but shall be Affiliates of Buyer as of and after the Closing, and (iii) (A) Affiliates of Seller shall only include entities that, as of the applicable

2

AA_CONFIDENTIAL

AA-LITTRGT-000144372

time, are either Parent or any controlled Affiliate of Parent and (B) Affiliates of Buyer shall only include entities that, as of the applicable time, are either Buyer or any controlled Affiliate of Buyer.

"**Agreement**"      shall have the meaning given to such term in the Preamble.

"**Annual Financial Information**"      shall have the meaning given to such term in Section 3.07(a).

"**Anti-Corruption Law**"      means: (i) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 1997; (ii) the Foreign Corrupt Practices Act of 1977 of the United States of America, as amended from time to time; (iii) the UK Bribery Act 2010; and (iv) any other Applicable Law which prohibits the conferring of any gift, payment or other benefit on any Person or any officer, employee, agent or advisor of such Person or is broadly equivalent to the laws referred to in (ii) and (iii) or was intended to enact the provisions of the OECD Convention or which has as a primary objective the prevention of corruption.

"**Applicable Law**"      means, with respect to any Person, any federal, state, territorial, provisional, foreign or local law (including common law), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling, settlement, award or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person.

"**Assumed Benefit Plans**"      shall have the meaning given to such term in Section 9.08.

"**August**"      means August Home, Inc., a Delaware corporation.

"**Base Purchase Price**"      means eight hundred million dollars ($800,000,000).

"**Benefit Plan**"      means each (i) " employee benefit plan"      as defined in Section 3(3) of ERISA, (ii) compensation, severance, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers'      compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits); *provided* that a Benefit Plan shall not include any statutory severance or statutory termination indemnity payments or any governmental plan or program requiring the mandatory payment of social insurance taxes or similar contributions to a governmental fund with respect to the wages of an employee or any other plan, agreement, arrangement, program or policy administered or maintained by a Governmental Authority.

3

AA_CONFIDENTIAL                                                                                 AA-LITTRGT-000144373

"**Business**"        means (i) the Emtek® branded business, (ii) the Schaub® branded business, (iii) the August® branded business, and (iv) the Yale® branded electronic residential businesses in the U.S. and Canada (including the Yale Real Living business), each as conducted by Seller on the date hereof or as of the Closing, including any assets held for use in the Business as of the Closing; *provided* that, for the avoidance of doubt, the Business shall not include the Retained Business.

"**Business Benefit Plan**"        means each Benefit Plan that is contributed to, required to be contributed to, sponsored, maintained or entered into by Seller or any of its Affiliates under which any Business Employees, Former Business Employee or their eligible dependents participate or have a present or future right to benefits.

"**Business Data**"        means all confidential data, information, and data compilations contained in the Business Systems or any databases of the Acquired Entities, including Personal Data, that is used by, or necessary to the Business of, the Acquired Entities.

"**Business Day**"        means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York or Stockholm, Sweden are authorized or required by Applicable Law to close.

"**Business Employee**"        means the employees of the Acquired Entities set forth under the heading "        Business Employees"        on Section 1.01(b) of the Disclosure Schedule, which (i) may be updated by Seller from time to time with Buyer'        s consent (not to be unreasonably withheld, conditioned or delayed) and (ii) shall be updated by Seller as applicable, without Buyer'        s consent, in the event that after the date hereof the employment of any Business Employee terminates or Seller or its Affiliate hires a new employee for the Business in the Ordinary Course and in accordance with Section 5.01.

"**Business Financial Information**"        shall have the meaning given to such term in Section 3.07(a).

"**Business Intellectual Property**"        means the Transferred Intellectual Property together with the Intellectual Property rights granted to Buyer or its Affiliates under this Agreement or other Transaction Documents.

"**Business Intercompany Contract**"        shall have the meaning given to such term in Section 5.02(a).

"**Business Software**"        means the Software owned by Seller or any of its Affiliates included in the Business Intellectual Property.

"**Business System**"        means all IT Assets used by the Business.

"**Buyer**"        shall have the meaning given to such term in the Preamble.

"**Buyer FSA Plan**"        shall have the meaning given to such term in Section 9.05.

4

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000144374

"**Buyer Indemnitee**" shall have the meaning given to such term in Section 12.02.

"**Buyer Patent License Agreement**" means the Patent License Agreements to be entered into between each of the Acquired Entities, on the one hand, and Seller or their designated Affiliates, on the other hand, at the Closing in substantially the form attached hereto as Exhibit A-2.

"**Buyer Related Parties**" shall have the meaning given to such term in Section 13.03(a).

"**Buyer Released Claims**" shall have the meaning given to such term in Section 13.02(a).

"**Buyer Released Parties**" shall have the meaning given to such term in Section 13.02(b).

"**Buyer Releasing Parties**" shall have the meaning given to such term in Section 13.02(a).

"**Cash**" means, with respect to any Person as of any time, the cash and cash equivalents and any accrued interest thereon (including marketable securities) and security deposits held by or on behalf of such Person at such time, and shall include checks, ACH transactions and other wire transfers and drafts deposited or available for deposit for the account of such Person at such time (net of issued but uncleared checks and drafts written or issued by or to such Person); *provided*, *however*, that " Cash" shall not include, as of the Measurement Time, the amount of any cash or cash equivalents of the Acquired Entities that is subject to restriction or limitation on use imposed by contract or Applicable Law.

"**Closing**" shall have the meaning given to such term in Section 2.03.

"**Closing Cash**" means an amount equal to the aggregate amount of Cash held by the Acquired Entities as of the Measurement Time (but after giving effect to the settlement of intercompany accounts to the extent set forth in Section 5.02), calculated in accordance with the Accounting Principles.

"**Closing Date**" means the date on which the Closing occurs.

"**Closing Indebtedness**" means the aggregate amount of Indebtedness of the Acquired Entities, in each case as of the Measurement Time (but after giving effect to the settlement of intercompany accounts to the extent set forth in Section 5.02) and calculated in accordance with the Accounting Principles; *provided* that Closing Indebtedness shall exclude any amounts taken into account in the calculation of Closing Net Working Capital. For the avoidance of doubt, Closing Indebtedness shall also exclude any intercompany obligations between or among the Acquired Entities.

"**Closing Net Working Capital**" means (i) the Current Assets of the Acquired Entities *minus* (ii) the Current Liabilities of the Acquired Entities, in each case as of the Measurement Time (but after giving effect to the settlement of intercompany accounts to the extent set forth

5

AA_CONFIDENTIAL    AA-LITTRGT-000144375

in Section 5.02) and calculated in accordance with the Accounting Principles; *provided* that Closing Net Working Capital shall not take into account any amounts included in Retained Tax Liabilities.

"**Closing Net Working Capital Adjustment Amount**" means an amount, which may be positive or negative, equal to (i) Closing Net Working Capital *minus* (ii) Closing Net Working Capital Target.

"**Closing Net Working Capital Target**" means (i) fifteen and eighty hundredths percent (15.8%) *multiplied by* (ii) the aggregate Net Sales Amount calculated for the twelve (12) month period ending on the calendar month-end immediately preceding the Closing Date (*provided,* that in the event the Closing occurs within the first five (5) Business Days of the month, then, such ending shall occur on the calendar month-end two (2) months preceding the Closing Date).

"**COBRA**" shall have the meaning given to such term in Section 9.11(c).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competition Laws**" means statutes, rules, regulations, orders, decrees, administrative and judicial doctrines, and other laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade.

"**Confidentiality Agreement**" means the Confidentiality Agreement dated as of July 27, 2022, by and between Seller and Buyer.

"**Continuation Period**" shall have the meaning given to such term in Section 9.02(a).

"**Continuing Employee**" shall have the meaning given to such term in Section 9.01(a).

"**Contract**" means any binding contract, agreement, indenture, note, bond, warrant, lease, commitment, license or other similar agreement.

"**Controlled Group Liability**" shall have the meaning given to such term in Section 9.11(b).

"**Copyrights**" shall have the meaning given to such term in the definition of " Intellectual Property" in this Section 1.01.

"**Covered Income Tax Return**" means any Tax Return for Income Taxes that is both (i) required to be filed by any Acquired Entity for a taxable period that ends on or before the Closing Date and (ii) due (taking into account extensions) after the Closing Date; *provided, however,* for the avoidance of doubt, Covered Income Tax Returns shall not include any Tax Return for Income Taxes of any Seller Group.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any variants or evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144376

"**COVID-19 Events**" means any quarantine, " shelter in place" , " stay at hc workforce reduction, social distancing, shut down, closure, sequester, change of habit or behavior of individuals (or groups of individuals) or any other Applicable Law, Order, directive, guideline or recommendation by any Governmental Authority, including the Center for Disease Control and Prevention, and any other similar health or safety organization, agency, institute or group or any industry organization, agency, institute or group in connection with or related to COVID-19 (or any worsening or escalation thereof).

"**Credit Support**" shall have the meaning given to such term in Section 7.06.

"**Current Assets**" shall have the meaning given to such term in Schedule II.

"**Current Liabilities**" shall have the meaning given to such term in Schedule II. For the avoidance of doubt, Current Liabilities shall not include any intercompany obligations between or among the Acquired Entities.

"**Current Representation**" shall have the meaning given to such term in Section 7.04(a).

"**D&O Indemnitees**" shall have the meaning given to such term in Section 6.03(a).

"**D&O Tail Policy**" shall have the meaning given to such term in Section 6.03(b).

"**Damages**" means any and all damages, losses, liabilities and expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any Action).

"**Data Processor**" means a natural or legal Person, public authority, agency or other body that Processes Personal Data on behalf of or at the direction of the Acquired Entities.

"**Deferred Hong Kong Closing**" shall have the meaning given to such term in Section 2.08(a)(ii).

"**Deferred Hong Kong Closing Date**" shall have the meaning given to such term in Section 2.08(a)(i).

"**Deferred Korea Closing**" shall have the meaning given to such term in Section 2.08(b)(ii).

"**Deferred Korea Closing Date**" shall have the meaning given to such term in Section 2.08(b)(i).

"**Deferred Vietnam Closing**" shall have the meaning given to such term in Section 2.08(c)(ii).

"**Deferred Vietnam Closing Date**" shall have the meaning given to such term in Section 2.08(c)(i).

7

AA_CONFIDENTIAL                                                              AA-LITTRGT-000144377

"**Delayed Transfer Employees**"      means those Business Employees located in Hong Kong, South Korea or Vietnam as of the Closing Date or, if applicable, the Deferred Hong Kong Closing Date, the Deferred Korea Closing Date or the Deferred Vietnam Closing Date, respectively, and who, under the terms of a Secondment Agreement or such other arrangements as the parties may make, shall remain employees of Seller or its Affiliate.

"**Designated Person**"       shall have the meaning given to such term in Section 7.04(a).

"**Disclosure Schedule**"      means the disclosure schedule delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"**Dispute Notice**"       shall have the meaning given to such term in Section 2.04(c).

"**Disputed Items**"        shall have the meaning given to such term in Section 2.04(c).

"**End Date**"       shall have the meaning given to such term in Section 11.01(b).

"**Enforceability Exceptions**"       shall have the meaning given to such term in Section 3.02.

"**Environmental Laws**"      means any Applicable Law relating to protection of human health and safety, natural resources or the environment, including Applicable Laws relating to contamination and the use, generation, management, handling transport, treatment, disposal, storage, Release or threatened Release of Hazardous Substances.

"**ERISA**"       means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**"       with respect to an entity means any other entity that, together with such first entity, would be treated as a single employer under Section 414 of the Code.

"**Estimated Closing Cash**"      shall have the meaning given to such term in Section 2.02.

"**Estimated Closing Indebtedness**"       shall have the meaning given to such term in Section 2.02.

"**Estimated Closing Net Working Capital**"       shall have the meaning given to such term in Section 2.02.

"**Estimated Closing Net Working Capital Target**"       shall have the meaning given to such term in Section 2.02.

"**Estimated Net Working Capital Adjustment Amount**"       means an amount, which may be positive or negative, equal to (i) Estimated Closing Net Working Capital *minus* (ii) Closing Net Working Capital Target.

"**Estimated Purchase Price**"       means an amount in cash equal to (i) the Base Purchase Price, *plus* (ii) the Estimated Net Working Capital Adjustment Amount, *minus* (iii) Estimated Closing Indebtedness, *plus* (iv) Estimated Closing Cash, *minus* (v) Estimated Transaction Expenses, each as determined pursuant to Section 2.02.

8

AA_CONFIDENTIAL                                                          AA-LITTRGT-000144378

"**Estimated Transaction Expenses**"       shall have the meaning given to such term in Section 2.02.

"**Excess Recovery**"       shall have the meaning given to such term in Section 12.03(b).

"**Final Closing Statement**"       shall have the meaning given to such term in Section 2.04(a).

"**Final Determination**"       means any final determination of liability in respect of a Tax that, under Applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended returns or appeals from adverse determinations).

"**Former Business Employee**"       means any individual formerly employed at any time prior to Closing by Seller or any of its Affiliates and whose employment therewith was primarily related to the Business.

"**Fundamental Representations**"       means the representations and warranties contained in the first sentence of Section 3.01 (*Corporate Existence and Power*), Section 3.02 (*Seller Authorization*), Section 3.04(a) (*Non-contravention*), Section 3.05 (*Purchased Shares*), Section 3.06 (other than subsection (c)) (*Acquired Entities*), Section 3.22 (*Finders' Fees*), Section 4.01 (*Corporate Existence and Power*), Section 4.02 (*Buyer Authorization*) and Section 4.09 (*Finders' Fees*).

"**Governmental Authority**"       means any transnational, domestic or foreign federal, state, provincial or local, governmental authority, department, court, agency or official, including any political subdivision thereof, or any self-regulatory organization.

"**Hazardous Substances**"       means any pollutant or contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, including petroleum, its derivatives, by-products and other hydrocarbons, and any other substance, waste or material regulated as a pollutant or otherwise as " hazardous" under any Environmental Law.

"**HHI Agreement**"       shall have the meaning given to such term in the Recitals.

"**HHI Transaction**"       shall have the meaning given to such term in the Recitals.

"**Hong Kong Business**" shall have the meaning given to such term in Section 2.08(a)(i).

"**Hong Kong Entity**"       shall have the meaning given to such term in Section 2.08(a)(i).

"**IFRS**"       means International Financial Reporting Standards as adopted by the European Union (EU), the Swedish Annual Accounts Act and the Swedish Financial Reporting Board's RFR 1 Supplementary Accounting Rules for Corporate Groups.

9

AA_CONFIDENTIAL                                                                                                    AA-LITTRGT-000144379

"**Income Tax**"      means any United States federal, state, local or non-U.S. Tax based on or measured by gross or net receipts of gross or net income (including any Tax in the nature of minimum taxes and alternative minimum taxes that are based on or measured in such manner).

"**Indebtedness**"      means (without duplication) as of any particular time, (i) the principal amount of any indebtedness for borrowed money of the Acquired Entities (including any indebtedness and liabilities under any line of credit, to the extent undrawn, evidenced by notes, bonds, debentures or other debt securities) outstanding together with any accrued and unpaid interest thereon and any prepayment premiums, bank fees or penalties and other amounts in regard thereof payable solely as a result of the transactions contemplated hereby, (ii) all obligations of the Acquired Entities relating to letters of credit, bankers'     acceptances, surety, performance bonds or other bonds or similar instruments, solely to the extent drawn, (iii) financing lease obligations that are capitalized in the Business Financial Information which, for the sake of clarity, shall not include operating lease obligations or real estate leases, (iv) any obligations under conditional sale, deferred consideration or other title retention agreements relating to the purchase of any property, assets or services, including any "     earn-out"     or other similar performance-based contingent payment obligations, (v) guarantees or similar commitments with respect to obligations of the Acquired Entities of the type described in clauses (i) through (iv) above of any Person other than the Acquired Entities, (vi) any payment obligation of an Acquired Entity in respect of interest under any existing interest rate swap or hedge contract, and any costs associated with termination of any such arrangement, (vii) any amounts payable to current or former members or other equityholders of any Acquired Entity, and any intercompany indebtedness that is not settled as of the Measurement Time in accordance with Section 5.02(b), (viii) any unclaimed funds or amounts subject to escheatment of the Acquired Entities, including outstanding uncashed payroll checks or amounts related to aged checks outstanding (including uncleared accounts payable checks), (ix) all authorized or accrued and unpaid dividends or distributions payable by the Acquired Entities, (x) all accrued and unpaid interest, penalties, prepayment penalties or premiums, breakage, make-whole payments, fees and other charges and amounts related to any of the foregoing and due by the Acquired Entities, and (xi) reserves or other provisions related to the Pre-Closing Reorganization; *provided,* that for purposes of calculating Closing Indebtedness, Indebtedness shall not include any of the foregoing to the extent taken into account as a Current Liability in Closing Net Working Capital or as a Transaction Expense and, without limiting the foregoing, shall be calculated without regard to any amounts Buyer or Seller has agreed to assume liability for otherwise in this Agreement; *provided, further,* that Indebtedness shall not include any trade payables.

"**Information Privacy and Security Requirements**"      means any Applicable Law or binding directive issued by a Governmental Authority, all binding guidance issued by any Governmental Authority thereunder, any applicable self-regulatory guidelines that Seller or its Affiliates (including the Acquired Entities) is obligated to comply with under any Applicable Law, and any obligations under any Contract or Privacy Policies, in each case governing or regarding: (i) the privacy, protection, or security of Personal Data, including as relevant to the collection, storage, use, processing, transfer, disclosure, sharing and destruction of Personal

10

AA_CONFIDENTIAL                                                                        AA-LITTRGT-000144380

Data or (ii) online behavioral advertising, tracking technologies, call or electronic monitoring or recording, or any outbound calling and text messaging, telemarketing and email marketing.

"**Information Security Program**" means an information security program that complies in all material respects with Information Privacy and Security Requirements.

"**Insurance Claim**" shall have the meaning given to such term in Section 7.07.

"**Insurance Policies**" shall have the meaning given to such term in Section 7.07.

"**Intellectual Property**" means (i) issued patents and pending patent applications, including provisionals, non-provisionals, priority applications, PCT applications, continuations, divisionals, continuations-in-part, reexaminations, reissues, renewals, patent term extensions and supplementary protection certificates ("**Patents**" ), (ii) registered and unregistered trademarks, service marks, trade names, trade dress, internet domain names, logos and other source identifiers, including all applications and registrations of, and all goodwill associated with, the foregoing ("**Trademarks**" ), (iii) copyrightable works and copyrights and moral rights, including registrations or applications for registrations thereof and all renewals, extensions, restorations and reversions of the foregoing ("**Copyrights**" ), (iv) know-how and trade secrets, (v) Software and mask works, (vi) all rights in, arising out of, or associated with databases (including knowledge databases, customer lists and customer databases), (vii) other similar types of proprietary or intellectual property rights, (viii) all copies and tangible embodiments thereof in whatever form or medium, and (ix) all rights to sue or recover and retain damages, costs and attorney's fees for past, present and future infringement or violation of any of the foregoing.

"**Investment Laws**" shall have the meaning given to such term in Section 3.03.

"**IRS**" means the United States Internal Revenue Service.

"**IT Assets**" means any and all computers, software, firmware, middleware, servers, workstations, routers, hubs, switches, networks, data communications lines, telecommunications systems, and all other information technology equipment or systems, and all associated documentation used by Seller in connection with the Business.

"**knowledge of Seller**," **Seller's knowledge** or any other similar knowledge qualification with respect to Seller in this Agreement means the actual knowledge after due inquiry of the individuals set forth in Section 1.01(c) of the Disclosure Schedule under the heading "Seller's Knowledge Parties" .

"**Korea Business**" shall have the meaning given to such term in Section 2.08(b)(i).

"**Korea Entity**" shall have the meaning given to such term in Section 2.08(b)(i).

"**Latest Financial Information**" shall have the meaning given to such term in Section 3.07(a).

11

AA_CONFIDENTIAL                                                    AA-LITTRGT-000144381

"**Leased Real Property**"         shall have the meaning given to such term in Section 3.13(a).

"**Lien**"         means, with respect to any property or asset, any mortgage, deed of trust, lien, license, lease, right of way, option, right of first refusal, easement, encroachment, encumbrance, restriction, title or survey defect, pledge, charge, or security interest in respect of such property or asset.

"**Major Customers**"         shall have the meaning given to such term in Section 3.14(a).

"**Major Suppliers**"         shall have the meaning given to such term in Section 3.14(b).

"**Material Adverse Effect**"         means any fact, condition, circumstance, occurrence, effect, change, event or development that, individually or in the aggregate, has had a material adverse effect on the business, assets, liabilities, financial condition or results of operations of the Business, taken as a whole; *provided*, that none of the following will be deemed in themselves, either alone or in combination, to constitute, a Material Adverse Effect: (i) changes in IFRS or changes in other accounting requirements or principles applicable to any industry in which the Business operates, (ii) changes in general economic conditions, including changes in the financial markets, securities markets, currency markets, financial capital markets or credit markets in any jurisdiction in which the Business operates, (iii) changes in Applicable Law generally affecting any industry in which the Business operates, (iv) acts of war or terrorism, or hurricanes, tornadoes, earthquakes and other weather-related acts of nature, pandemics, epidemics or other outbreaks of disease or public health events (including COVID-19), (v) the negotiation, execution or performance of this Agreement or the HHI Agreement, the announcement, pendency or consummation of the transactions contemplated hereby and thereby, the identity of Buyer or any other facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's specific and express plans or intentions with respect to the conduct of the Business after the Closing, including the effect of any of the foregoing on the relationships, contractual or otherwise, of the Business with clients, customers, partners, principals, employees, suppliers, vendors, service providers or Governmental Authorities or third parties, (vi) any failure to meet any internal or analysts' projections, forecasts or predictions in respect of financial performance (it being understood that any underlying facts giving rise or contributing to such failure that are not otherwise excluded from the definition of " Material Adverse Effect" may be taken into account in determining whether there has been a Material Adverse Effect), (vii) any action taken (or omitted to be taken) at the express request of or with the written consent of Buyer, (viii) any action taken (or omitted to be taken) by Seller or its Affiliates that is expressly required to be taken or omitted or are expressly contemplated pursuant to this Agreement, or (ix) any matter or other item disclosed on the Disclosure Schedule, *provided*, that in the case of clauses (i), (ii) and (iv), such changes will constitute, and will be taken into account in determining the occurrence of, a Material Adverse Effect if any such changes impact the Business in a disproportionate manner relative to other businesses in the industry in which the Business operates.

"**Material Contract**"         shall have the meaning given to such term in Section 3.10(a).

AA_CONFIDENTIAL                                                                AA-LITTRGT-000144382

"**Measurement Time**"        means 11:59 p.m. Eastern Time on the day immediately prior to the Closing.

"**Net Sales Amount**"        means an amount equal to the net sales amount of the Acquired Entities during the measurement period in question calculated in accordance with IFRS as consistently applied. Schedule IV has been included for illustrative purposes for purposes of calculating the Net Sales Amount.

"**Non-Solicit Period**"        shall have the meaning given to such term in Section 5.06.

"**Open Source Software**"        means any Software that is licensed pursuant to: (i) any license that is a license now or in the future approved by the Open Source Initiative and listed at http://www.opensource.org/licenses; (ii) any license to Software that is considered "    free"    or "    open source software"        by the Open Source Foundation or the Free Software Foundation; or (iii) any Software distributed with any license term or condition that: (a) requires or conditions the use or distribution of such Software on the disclosure, licensing, or distribution of any source code for any portion of such Software or any derivative work of such Software; or (b) otherwise imposes any limitation, restriction, or condition on the right or ability of the licensee of such Software to use or distribute such Software or any derivative work of such Software.

"**Order**"        means any order, writ, injunction, decree, judgment, award, settlement or stipulation issued, promulgated, made, rendered or entered into by or with any Governmental Authority.

"**Ordinary Course**"        means the ordinary course of the Business consistent with the past practices of the Business.

"**Owned Real Property**"        means the building and all improvements located on the Leased Real Property located in Vietnam.

"**Parent**"        shall have the meaning given to such term in the Recitals.

"**Parent Financial Statements**"        shall have the meaning given to such term in Section 3.07(a).

"**Patent License Agreements**"        means the Seller Patent License Agreements and Buyer Patent License Agreements collectively.

"**Patents**"        shall have the meaning given to such term in the definition of "    Intellectual Property"    in this Section 1.01.

"**Permits**"        shall have the meaning given to such term in Section 3.12(b).

"**Permitted Liens**"        means (i) Liens disclosed in Section 1.01(d) of the Disclosure Schedule under the heading "    Permitted Liens"    ; (ii) Liens disclosed in the Business Financial Information or notes thereto or securing liabilities reflected in the Business Financial

13

AA_CONFIDENTIAL        AA-LITTRGT-000144383

Information or notes thereto and for which adequate reserves have been set aside in accordance with IFRS; (iii) Liens for Taxes that are not yet due and payable (or, if due, not delinquent) or that are being contested in good faith and for which adequate reserves have been set aside in accordance with IFRS; (iv) mechanic's, materialman's, carrier's, repairer's, workmen's warehouseman's and other similar Liens arising or incurred in the Ordinary Course or that are not yet due and payable (or, if due, not delinquent) or that are being contested in good faith; (v) statutory or contractual Liens of landlords or Liens on the landlord's or prior landlord's interests; (vi) zoning, building codes and other land use laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority that are not violated in any material respect by the current use and occupancy of the Real Property and the Business conducted thereon; (vii) Liens incurred in the Ordinary Course since the Reference Date; (viii) purchase money Liens and Liens securing rental payments under capital lease arrangements; (ix) Liens on the Real Property (including easements, covenants, rights of way and similar restrictions) that are (a) matters of record and (b) do not materially interfere with the present uses of such Real Property and do not detract from the value of the Real Property; (x) Liens arising under workers' compensation, unemployment insurance, social security, retirement or similar laws; (xi) transfer restrictions of general applicability as may be provided under applicable securities laws; (xii) Liens constituting non-exclusive licenses or non-exclusive sublicenses in respect of any Intellectual Property granted in the Ordinary Course; and (xiii) Liens which will be extinguished and released in full as of the Closing.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority, or any division of such Person.

"**Personal Data**" means, in connection with the Business, information relating to or reasonably capable of being associated with an identified or identifiable person and, where required by Information Privacy and Security Requirements, a device or household, including (i) a natural person's name, street address or specific geolocation information, date of birth, telephone number, email address, online contact information, photograph, biometric data, Social Security number, driver's license number, passport number, tax identification number, any government-issued identification number, financial account number, credit card number, any information that would permit access to a financial account, a user name and password that would permit access to an online account, health information, insurance account information, any persistent identifier such as customer number held in a cookie; or (ii) "personal data," "personal information," "protected health information," "nonpublic personal information," or other similar terms as defined by Information Privacy and Security Requirements.

"**Post-Closing Representation**" shall have the meaning given to such term in Section 7.04(a).

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and, with respect to a Straddle Tax Period, the portion of such Tax period beginning after the Closing Date.

14

AA_CONFIDENTIAL                                                                            AA-LITTRGT-000144384

"**Pre-Closing Reorganization**"       shall have the meaning given to such term in the Recitals.

"**Pre-Closing Tax Period**"       means any Tax period ending on or before the Closing Date and, with respect to a Straddle Tax Period, the portion of such Tax period ending on the Closing Date.

"**Preliminary Closing Statement**"       shall have the meaning given to such term in Section 2.02.

"**Privacy Policies**"       means any (i) internal or external past or present data protection, data usage, privacy and security written policies of the Acquired Entities, (ii) public statements, representations, obligations, promises, commitments by the Acquired Entities relating to privacy, security, or the Processing of Personal Data, and (iii) written policies and obligations applicable to the Acquired Entities as a result of any certification relating to privacy, security, or the Processing of Personal Data.

"**Processing**," "**Process**," "**Processed**"       means any collection, access, acquisition, storage, protection, use, recording, maintenance, operation, dissemination, re-use, disposal, disclosure, re-disclosure, deletion, destruction, sale, transfer, modification, or any other processing (as defined by Information Privacy and Security Requirements).

"**Purchase Price**"       means an amount in cash equal to (a) the Base Purchase Price, *plus* (b) the Closing Net Working Capital Adjustment Amount, *minus* (c) Closing Indebtedness, *plus* (d) Closing Cash, *minus* (e) Transaction Expenses, each as finally determined pursuant to Section 2.04.

"**Purchased Shares**"       shall have the meaning given to such term in the Recitals.

"**R&W Insurance Policy**"       shall have the meaning given to such term in Section 7.10.

"**Real Property**"       means the Owned Real Property and the Leased Real Property.

"**Real Property Lease**"       shall have the meaning given to such term in Section 3.13(a).

"**Reference Date**"       means June 30, 2022.

"**Registered Business IP**"       means all registrations and applications for registration of Patents, Trademarks, Copyrights included in the Business Intellectual Property.

"**Release**"       means any releasing, disposing, discharging, injecting, spilling, leaking, leaching, pumping, dumping, emitting, escaping, emptying, seeping, dispersal, migration, transporting, placing and the like, including the moving of any materials through, into or upon any land, soil, surface water, groundwater or air, or otherwise entering into the indoor or outdoor environment.

15

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000144385

"**Representative**" means, with respect to any Person, such Person's directors, officers, partners, principals, employees, counsel, financial advisors, auditors, agents and other authorized representatives.

"**Retained Business**" means any business now, previously or hereafter conducted by Seller or any of its respective Affiliates other than the Business, including (i) the Yale® branded commercial business anywhere in the world, (ii) the Yale® branded mechanical business in the U.S. and Canada and (iii) all other Yale® branded businesses anywhere in the world.

"**Retained Tax Liabilities**" means (i) Taxes imposed upon any Acquired Entity for a Pre-Closing Tax Period (including Straddle Tax Period Taxes as determined in accordance with Section 8.05 and any Taxes attributable to the Pre-Closing Reorganization), (ii) Seller Combined Taxes, (iii) Taxes for which an Acquired Entity (or any successor) is liable (a) by virtue of being a member of a Tax group prior to Closing, including any such liability under U.S. Treasury Regulation 1.1502-6 or (b) pursuant to a contract in existence at the Closing, including any Taxes related to any indemnification or similar agreement, but excluding any commercial contract or agreement the primary purposes of which does not relate to Tax matters, and (iv) Taxes of any other Person for which any Acquired Entity is liable as a transferee or successor to the extent that the events or transactions giving rise to such Taxes occurred on or before the Closing, provided that (A) Retained Tax Liabilities shall exclude any Taxes that would not arise but for any action, event, or transaction on the Closing Date but after the Closing that was taken by or at the direction of Buyer or any of its Affiliates (including, after the Closing, any Acquired Entity) outside the Ordinary Course and (B) any Transfer Taxes incurred in connection with the transactions contemplated by this Agreement and shall be paid in the manner set forth in Article 8.

"**Sale Transaction**" shall have the meaning given to such term in Section 5.07(a).

"**Secondment Agreement**" means any agreement between Buyer and Seller, or their designated Affiliates, pursuant to which Business Employees located in Hong Kong, South Korea or Vietnam shall be seconded to Buyer or their Affiliates for the Secondment Period.

"**Secondment Period**" means, for each Delayed Transfer Employee, the period from the Closing or, if applicable, the Deferred Hong Kong Closing Date, the Deferred Korea Closing Date, or the Deferred Vietnam Closing Date, respectively, until the termination of (i) the Secondment Agreement applicable to such Delayed Transfer Employee or (ii) such other arrangement as the parties may have made in relation to such Delayed Transfer Employee to govern the employment of such Delayed Transfer Employee from and after the Closing Date.

"**Section 338(h)(10) Election**" shall have the meaning given to such term in Section 8.11(a).

"**Section 338(h)(10) Entity**" shall have the meaning given to such term in Section 8.11(a).

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                                                  AA-LITTRGT-000144386

"**Section 338(h)(10) Forms**"      shall have the meaning given to such term in Section 8.11(a).

"**Security Incident**"      means any unauthorized Processing of Business Data, any unauthorized access to the Business Systems that is reasonably suspected to result in unauthorized access to or disclosure of Business Data, or any incident that requires notification to any Person, Governmental Authority, or any other entity under Information Privacy and Security Requirements.

"**Seller**"      shall have the meaning given to such term in the Preamble.

"**Seller Combined Taxes**"      means Taxes computed on a group basis by reference to a Seller Group.

"**Seller Credit Support Arrangements**"      shall have the meaning given to such term in Section 7.06.

"**Seller Defined Contribution Plan**"      shall have the meaning given to such term in Section 9.03.

"**Seller FSA Plan**"      shall have the meaning given to such term in Section 9.05.

"**Seller Group**"      means any affiliated, consolidated, combined, unitary or similar Tax group that includes both (i) an Acquired Entity, and (ii) Seller or any of its Subsidiaries (other than an Acquired Entity).

"**Seller Names and Marks**"      means, except for the Transferred Trademarks, any and all (i) Trademarks of Seller or any of its Affiliates, and (ii) Trademarks confusingly similar to any of the foregoing.

"**Seller Patent License Agreement**"      means the Patent License Agreements to be entered into between each of the Acquired Entities, on the one hand, and Seller or their designated Affiliates, on the other hand, at the Closing in substantially the form attached hereto as <u>Exhibit A-1</u>.

"**Seller Related Parties**"      shall have the meaning given to such term in Section 13.03(a).

"**Seller Released Claims**"      shall have the meaning given to such term in Section 13.02(b).

"**Seller Released Parties**"      shall have the meaning given to such term in Section 13.02(b).

"**Seller Releasing Parties**"      shall have the meaning given to such term in Section 13.02(b).

"**Seller Tax Records**"      means any Tax Return, Tax schedules, work papers or other information of or with respect to Seller or any Affiliate thereof; *provided*, that, for the avoidance

AA_CONFIDENTIAL                                                       AA-LITTRGT-000144387

of doubt, Seller Tax Records shall not include any Tax Return, Tax schedules or other information with respect to any Seller Group except for any portions that relate solely to an Acquired Entity.

"**Shared Contract**"     shall have the meaning given to such term in Section 2.09(a).

"**Software**"     means computer programs, applications, systems and code, including implementations of algorithms, models and methodologies, program interfaces, and source code and object code.

"**Software License Agreement**"     means the Software License Agreement to be entered into between August, on the one hand, and Seller, on the other hand, at the Closing in substantially the form attached hereto as <u>Exhibit B</u>.

"**Specified Employees**"     shall have the meaning given to such term in Section 5.06.

"**Spectrum Brands**"     shall have the meaning given to such term in the Recitals.

"**Straddle Tax Period**"     means a Tax period that begins before, and ends after, the Closing Date.

"**Straddle Tax Returns**"     means any Tax Return of an Acquired Entity for a Straddle Tax Period; *provided, however*, that Straddle Tax Returns shall not include any Tax Return of a Seller Group.

"**Subsidiary**"     means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such first Person.

"**Supply Agreement**"     means the Supply Agreement to be entered into between Buyer and Seller, or their designated Affiliates, at the Closing as provided in substantially the form attached hereto as <u>Exhibit C</u>.

"**Tax**"     means (i) all federal, state, local or foreign taxes imposed by any Governmental Authority responsible for the imposition of any such tax (a "**Taxing Authority**"     ) and any other duties, fees, charges or assessments in the nature of a tax, including all net income, gross income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheat / unclaimed property, estimated taxes or any other taxes of any kind; and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed in connection with any item described in clause (i) of this definition.

"**Tax Asset**"     means any net operating loss, net capital loss, investment tax credit, foreign tax credit or any other credit or tax attribute that could be carried forward or back to reduce Taxes and losses or deductions deferred by Applicable Law.

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                    AA-LITTRGT-000144388

"**Tax Proceeding**"       means any proceeding, judicial or administrative, involving Taxes or any audit, examination, deficiency asserted or assessment made by the IRS or any other Taxing Authority.

"**Tax Return**"       means any report, return, document, declaration, attachment or other information or filing required to be supplied to any Taxing Authority with respect to Taxes, including information returns and any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration, attachment or other information.

"**Third-Party Consent**"       means: (i) in respect of an assigned Contract or Real Property Lease, any consents or waivers required from the relevant third party counterparty (which does not include Seller, its Subsidiaries or any of their respective Affiliates) for the assignment or transfer of such assigned Contract or assignment or sublease of such Real Property Lease to Buyer or its Affiliates; and (ii) in respect of an assigned Permit, any consent or waiver required from a Governmental Authority for the assignment or transfer of that assigned Permit to Buyer or one of its Affiliates, in each case, as required pursuant to the terms of this Agreement.

"**Trademark Assignment Agreement**"       means the Trademark Assignment Agreement to be entered into between Buyer or its Affiliates, on the one hand, and Seller or their designated Affiliates, on the other hand, at the Closing in substantially the form attached hereto as <u>Exhibit D</u>.

"**Trademarks**"       shall have the meaning given to such term in the definition of " Intellectual Property"       in this Section 1.01.

"**Transaction Documents**"       means, collectively, this Agreement, the Patent License Agreements, the Supply Agreement, the Trademark Assignment Agreement, the Software License Agreement, the Transition Services Agreement and any other documents or agreements delivered pursuant to Section 2.03(a)(iii) or Section 2.03(b)(iii).

"**Transaction Expenses**"       means the following fees, costs and expenses incurred by an Acquired Entity or subject to reimbursement by the Acquired Entities based on contracts entered into prior to the Closing, whether accrued for or not, in each case in connection with the transactions contemplated by this Agreement and payable by an Acquired Entity and not paid prior to the Closing: (i) any brokerage fees, commissions, finders'       fees, or financial advisory fees, and, in each case, related costs and expenses; (ii) any fees, costs and expenses of counsel, accountants or other advisors or external service providers; (iii) any fees, costs, and expenses associated with the termination of any Business Intercompany Contracts; (iv) fifty percent (50%) of any Transfer Taxes arising out of the transactions contemplated by this Agreement, and (v) any compensatory amounts payable by any of the Acquired Entities in respect of the transactions contemplated by this Agreement, including any retention bonus, transaction bonus, discretionary bonus or change-of control payment, other than (x) any severance payment triggered upon a termination of employment by Buyer that occurs following the Closing, (y) a payment required to be paid by Applicable Law as a result of the transactions

19

\\4149-1218-4642 v11

contemplated by this Agreement, or (z) those payments set out on Section 1.01(e) of the Disclosure Schedule, in each case under this clause (v), including the employer portion of any payroll, social security, unemployment or similar Taxes.

"**Transfer Tax**" means any excise, sales, use, value added, registration, stamp, stamp duty, stamp duty reserve tax, stamp duty land tax, recording, documentary, conveyancing, franchise, property, real property, transfer and similar Taxes, duties, levies, charges and fees (including any penalties and interest).

"**Transferred FSA Balances**" shall have the meaning given to such term in Section 9.05.

"**Transferred Intellectual Property**" means all Intellectual Property (other than Trademarks) owned by Seller and its Subsidiaries and exclusively related to or exclusively used in the Business as of the Closing. For clarity, Transferred Intellectual Property shall include all Intellectual Property owned or purported to be owned by the Acquired Entities following completion of the Pre-Closing Reorganization and the Transferred Trademarks.

"**Transferred Trademarks**" means those certain Trademarks set forth on Section 1.01(f) of the Disclosure Schedule.

"**Transition Services Agreement**" means the Transition Services Agreement to be entered into between Buyer and Seller (or any Affiliates thereof) at the Closing in accordance with Section 7.11.

"**TSA Asset**" shall have the meaning given to such term in Section 5.04(d).

"**Vietnam Business**" shall have the meaning given to such term in Section 2.08(c)(i).

"**Vietnam Entity**" shall have the meaning given to such term in Section 2.08(c)(i).

"**WARN**" shall have the meaning given to such term in Section 9.10.

"**Yale Marks**" means the Trademarks set forth on Section 1.01(f) of the Disclosure Schedule and identified as Yale Marks.

Section 1.02 *Other Definitional and Interpretative Provisions.* The words " hereof" , " hereby" , " herein" and " hereunder" and words of like import used in this Agree to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits, Annexes and Schedules are to Articles, Sections, Exhibits, Annexes and Schedules of this Agreement unless otherwise specified. All Exhibits, Annexes and Schedules (including the Disclosure Schedule) annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule (including the Disclosure Schedule) but not otherwise defined therein shall have the meaning as defined in this Agreement. The word " extent" in the phrase " to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean

20

AA_CONFIDENTIAL                                                       AA-LITTRGT-000144390

"    if"    . Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "    include"   , "    includes"    or "    including" Agreement, they shall be deemed to be followed by the words "    without limitation"   , whether or not they are in fact followed by those words or words of like import. "    Writing"   , "    written" comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute, law or other Applicable Law shall be deemed to refer to such statute, law or other Applicable Law as amended from time to time and, if applicable, to any rules or regulations promulgated thereunder. References to any agreement or Contract are to that agreement or Contract as amended, modified or supplemented from time to time in accordance with the terms thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The word "    or"    shall not be exclusive (i.e., "    or"    shall mean "    and/or"    ). The word " same meaning as "    will"    and vice versa. References to any period of days will be deemed to be the relevant number of calendar days, unless otherwise specified. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for giving of such notice or the performance of such action will be extended to the next succeeding Business Day. The terms "    reasonable best efforts"    and "    commercially reasonable best efforts"    will be deemed to have the same meaning. The term "    made available"    or terms of similar import mean with respect to any document or material, that a copy of such document or material has been posted on or before 12:00 p.m. (Eastern Time) on December 1, 2022 to the electronic data room hosted by Datasite entitled "    Project Prime" **Data Room**"    ). A contract, asset or right shall be deemed to be "    primarily related to"    or "    primarily used in"    the Business only if, as of the date of this Agreement or the Closing, such contract, asset or right is used in connection with the Business more than it is used in connection with the Retained Business. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
### PURCHASE AND SALE

Section 2.01    *Purchased Shares.* Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase (or cause to be purchased) from Seller, the Purchased Shares for the Purchase Price, free and clear of all Liens (other than restrictions imposed under applicable securities laws).

Section 2.02    *Estimated Closing Calculations.* Not less than six (6) Business Days prior to the Closing Date, Seller shall deliver to Buyer a written statement setting forth in reasonable detail with reasonable supporting documentation (a) the Seller'   s good faith estimates of (i) Closing Net Working Capital Target ("**Estimated Closing Net Working Capital**

21

AA_CONFIDENTIAL                                                                                   AA-LITTRGT-000144391

Target"       ), (ii) Closing Net Working Capital ("**Estimated Closing Net Working Capital**"       ), (iii) Closing Indebtedness ("**Estimated Closing Indebtedness**"       ), (iv) Closing Cash ("**Estimated Closing Cash**"       ), and (v) Transaction Expenses ("**Estimated Transaction Expenses**"       ), (b) Seller's calculation of the Estimated Net Working Capital Adjustment Amount, and (c) on the basis of the foregoing, Seller's good-faith calculation of the Estimated Purchase Price (together with the calculations referred to in clauses (a) and (b) above, the "**Preliminary Closing Statement**"       ). During the period from Buyer's receipt of the Preliminary Closing Statement until the Closing Date, (1) Buyer and its Representatives, upon advance written request of Seller, will have reasonable access to Seller's personnel and relevant Representatives in connection with Buyer's review of the Preliminary Closing Statement, as well as the relevant books and records of Seller related thereto during regular business hours, and (2) Seller will consider in good faith any comments to the Preliminary Closing Statement proposed by Buyer and will correct and adjust any manifest error identified by Buyer; it being understood and agreed that any such comments proposed by Buyer or corrections or adjustments identified by Buyer (if any) shall not delay the Closing in any respect. The Preliminary Closing Statement (as may be revised pursuant to the immediately preceding sentence) will be used for purposes of the cash payment made at Closing as contemplated by Section 2.03(a). No comments provided or review conducted by Buyer or any of its representatives with regard to any materials provided by Seller under this Section 2.02 will limit or prevent Buyer from exercising any of its rights or remedies under this Agreement (regardless of whether Seller corrects, adjusts or otherwise modifies any such materials as a result thereof).

Section 2.03   *Closing.*  Subject to the terms and conditions of this Agreement, the closing (the "**Closing**"       ) of the transactions contemplated hereby shall take place at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, New York, 10017 (or remotely by exchange of documents and signatures (or their electronic counterparts)), as promptly as practicable and in any event no later than three (3) Business Days after the date on which all of the conditions set forth in Article 10 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or such other date and time as Buyer and Seller may agree in writing. The Closing shall be deemed effective as of 12:01 a.m. Eastern Time on the Closing Date. At the Closing, the following transactions will occur:

(a)      Buyer shall deliver to Seller:

(i)      a certificate, dated as of the Closing Date and signed by an officer of Buyer, certifying that (A) (1) the Fundamental Representations made by Buyer shall be true and correct in all material respects as of the Closing Date as though made on and as of such date, except with respect to those Fundamental Representations made by Buyer that by their terms address matters as of an earlier date, which shall be so true and correct only as of such earlier date, and (2) all other representations and warranties of Buyer contained in this Agreement shall be true and correct (disregarding all qualifications and limitation as to "      materiality"     , "      Material Adverse Effect"       or words of similar import therei

22

AA_CONFIDENTIAL                                                                          AA-LITTRGT-000144392

of the Closing Date as though made on and as of such date, except with respect to those representations and warranties that by their terms address matters as of an earlier date, which representations and warranties shall be so true and correct only as of such earlier date, except, in the case of this clause (2) for any inaccuracy or omission that would not, individually or in the aggregate, materially prevent, impair or delay Buyer's ability to perform or comply with its obligations under this Agreement or consummate the transactions contemplated hereby, and (B) each of the covenants of Buyer contained in this Agreement that are to be performed by it on or prior to the Closing Date shall have been shall have duly performed in all material respects;

(ii)     an amount equal to the Estimated Purchase Price in immediately available funds by wire transfer to an account or accounts designated by Seller, by written notice to Buyer;

(iii)     the Patent License Agreements, the Software License Agreement, the Supply Agreement, the Trademark Assignment Agreement, and the Transition Services Agreement, in each case duly executed by Buyer or its applicable Affiliate; and

(iv)     any Foreign Acquisition Agreements, in each case duly executed by Buyer or its applicable Affiliate, as the parties hereto and their respective counsel shall deem reasonably necessary to consummate the transactions contemplated in Section 2.08.

(b)     Seller shall deliver, or cause to be delivered, to Buyer:

(i)     a certificate, dated as of the Closing Date and signed by an officer of Seller, certifying that (A) (1) the Fundamental Representations made by Seller shall be true and correct in all material respects (disregarding all qualifications and limitation as to " materiality" , " Material Adverse Effect" or words of similar import therein) as of the Closing Date as though made on and as of such date, except with respect to those Fundamental Representations made by Seller that by their terms address matters as of an earlier date, which shall be so true and correct only as of such earlier date, and (2) all other representations and warranties of Seller contained in this Agreement shall be true and correct (disregarding all qualifications and limitation as to " materiality" , " Material Adverse Effect" or words of similar import therein) as of the Closing Date, as though made on and as of such date, except with respect to those representations and warranties that by their terms address matters as of an earlier date, which representations and warranties shall be so true and correct only as of such earlier date, except, in the case of this clause (2), for any inaccuracy or omission that would not reasonably be expected to have a Material Adverse Effect; (B) each of the covenants of Seller contained in this Agreement that are to be performed

23

AA_CONFIDENTIAL                                                    AA-LITTRGT-000144393

by it on or prior to the Closing Date shall have been duly performed in all material respects; and (C) since the date of this Agreement, a Material Adverse Effect shall not have occurred;

(ii)     duly executed instruments of transfer in respect of the Purchased Shares in favor of Buyer or its applicable Affiliate and, to the extent such Purchased Shares are represented by share certificates, such share certificates for such Purchased Shares in the name of the holders thereof and a copy of any power of attorney under which any transfer is executed on behalf of such holder or any nominee;

(iii)     the Patent License Agreements, the Software License Agreement, the Supply Agreement, the Trademark Assignment Agreement, and the Transition Services Agreement, in each case duly executed by Seller or its applicable Affiliate;

(iv)     a duly executed IRS Form 8023 for each Acquired Entity pursuant to Section 8.11(a);

(v)     any Foreign Acquisition Agreements, in each case duly executed by Buyer or its applicable Affiliate, as the parties hereto and their respective counsel shall deem reasonably necessary to consummate the transactions contemplated in Section 2.08; and

(vi)     evidence of the release of the UCC Financing Statement in favor of Silicon Valley Bank filed on June 26, 2015, encumbering the assets of August.

Section 2.04     *Post-Closing Purchase Price Adjustment.*

(a)     As promptly as practicable, but no later than ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller a written statement (the "**Final Closing Statement**") setting forth in reasonable detail with reasonable supporting documentation, Buyer's good faith calculation of (i) the Closing Net Working Capital Target, (ii) Closing Net Working Capital, (iii) Closing Indebtedness, (iv) Closing Cash, (v) Transaction Expenses and (vi) the Closing Net Working Capital Adjustment Amount, and on the basis of the foregoing, its calculation of the Purchase Price. If Buyer fails to timely deliver the Final Closing Statement in accordance with the first sentence of this Section 2.04, then the Preliminary Closing Statement delivered by Seller to Buyer pursuant to Section 2.02 shall be deemed to be the Final Closing Statement, subject to the remainder of this Section 2.04.

(b)     Following the Closing, Buyer shall provide Seller and its Representatives reasonable access during ordinary business hours to the books, records and personnel of the Business and (subject to the execution of customary work paper access letters if requested) auditors and such other information as Seller may reasonably request, in each case to the extent

24

AA_CONFIDENTIAL     AA-LITTRGT-000144394

used in preparation of the Final Closing Statement, in order to review and analyze (or, if applicable prepare) the Final Closing Statement and the calculations set forth thereon.

(c)     If Seller disagrees with the calculation of the Purchase Price as set forth in the Final Closing Statement, Seller may, within forty-five (45) days after receipt of the Final Closing Statement, deliver a written notice to Buyer (a "**Dispute Notice**"     ) setting forth in reasonable detail the particulars of such disagreement (taking into account the information then known to Seller). In the event a Dispute Notice is provided, Buyer and Seller shall for a period of thirty (30) days negotiate in good faith to resolve any such disagreements with respect to the Final Closing Statement. If no Dispute Notice is delivered to Buyer on or prior to such forty-five (45) day period, then the Final Closing Statement will be deemed to be accepted by Seller and will become final and binding on Buyer and Seller. If, following such period Buyer and Seller are unable to reach agreement in respect of the Purchase Price, then at the written request of either Buyer or Seller, Buyer and Seller shall promptly thereafter jointly retain the Accounting Referee to review any items that remain in dispute (the "**Disputed Items**"     ), and only those items, for the purpose of calculating the Purchase Price (it being understood and agreed that in conducting such review and making such calculation, the Accounting Referee shall adhere to the provisions of this Section 2.04 (and related definitions)). Buyer and Seller shall promptly provide their assertions regarding the Disputed Items in writing to the Accounting Referee and to each other. The Accounting Referee shall be instructed to render its determination in the form of a written report setting forth its calculations (including the basis thereof) with respect to only the Disputed Items as promptly as reasonably possible (which the parties hereto agree should not be later than forty-five (45) days following the date on which the disagreement is referred to the Accounting Referee). In the event Seller believes that either Buyer or the Acquired Entities have not provided certain papers or documents reasonably requested by Seller or any of its authorized representatives, Seller shall notify Buyer in writing of such request for such papers or documents. Within seven (7) days of a request therefor (or such shorter period as may remain in such forty-five (45) day period), Buyer, in its sole discretion, shall either (i) certify to Seller that all such papers or documents have been provided, in which case no extension of such forty-five (45) day period shall apply, or (ii) provide such papers or documents to Seller and such forty-five (45) day period shall be extended by one day for each additional day required for Buyer or the Acquired Entities to fully respond to such request. The Accounting Referee shall base its determination solely on (A) the written submissions of the parties hereto and shall not conduct an independent investigation (and the parties agree there shall be no *ex parte* communications with the Accounting Referee) and (B) the extent (if any) to which Closing Net Working Capital, Closing Indebtedness, Closing Cash and/or Transaction Expenses require adjustment (only with respect to the Disputed Items submitted to the Accounting Referee) in order to be determined in accordance with this Agreement. The Accounting Referee'     s determination of each Disputed Item shall not be greater than the greatest value for such Disputed Item claimed by Seller in the Dispute Notice or Buyer in the Final Closing Statement or less than the lowest value for such Disputed Item claimed by Seller in the Dispute Notice or Buyer in the Final Closing Statement, as applicable. The Accounting Referee'     s report shall be final, binding and conclusive for all purposes hereunder (absent manifest error or fraud). The Accounting Referee shall act in a capacity as an expert

25

AA_CONFIDENTIAL                                                        AA-LITTRGT-000144395

and not an arbitrator. The costs, fees and expenses of the Accounting Referee to resolve the Disputed Items shall be borne by Seller and Buyer in the same proportion that the aggregate amount of the Disputed Items submitted to the Accounting Referee that are unsuccessfully disputed by each such party (as finally determined by the Accounting Referee) bears to the total amount of such Disputed Items so submitted. For the avoidance of doubt and for illustrative purposes only, if the Disputed Items total $100 and the Accounting Referee awards $60 in Seller's favor, then Buyer shall pay 60% of the fees of the Accounting Referee. All other costs, fees and expenses incurred by the parties hereto in connection with resolving such dispute shall be borne by the party incurring such cost and expense.

(d)      For the avoidance of doubt, the parties hereto acknowledge and agree that the determination of the Closing Net Working Capital Adjustment Amount is intended solely to reflect changes between the Closing Net Working Capital and the Closing Net Working Capital Target, and any such change can be measured only if Closing Net Working Capital and the calculations and determinations thereof are prepared using the Accounting Principles. Neither the calculations to be made pursuant to Section 2.02 or this Section 2.04 nor the purchase price adjustment to be made pursuant to Section 2.05 is intended to be used to adjust for errors or omissions, under IFRS or otherwise, that may be found with respect to the Business Financial Information or the Closing Net Working Capital Target. No event, act, change in circumstance or similar development, including any market or business development or change in IFRS or Applicable Law, arising or occurring after the Closing, shall be taken into consideration in the calculations to be made pursuant to this Section 2.04 (even if IFRS would require such matter to be taken into consideration in such calculations).

Section 2.05   *Adjustment of Purchase Price.* If the Purchase Price as finally determined pursuant to Section 2.04 exceeds the Estimated Purchase Price, Buyer shall pay to Seller, within two (2) Business Days of such determination, the amount of such excess by wire transfer of immediately available funds to an account designated by Seller. If the Purchase Price as finally determined pursuant to Section 2.04 is less than the Estimated Purchase Price, Seller shall pay to Buyer, within two (2) Business Days of such determination, the amount of such shortfall by wire transfer of immediately available funds to an account designated by Buyer.

Section 2.06   *Payments.* Any amount required to be paid by Buyer or Seller under this Agreement that is not paid within the period specified for such payment shall bear interest on a daily basis, commencing the day after such payment was found to be due and payable hereunder, but excluding the date of payment, at a rate per annum equal to 1.5% *plus* the rate of interest publicly announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its office located at 270 Park Avenue, New York, New York in effect from time to time during the period commencing the day after such payment was found to be due and payable hereunder, to the date of payment. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated on the basis of a year of three hundred sixty-five (365) days and the actual number of days elapsed.

Section 2.07   *Withholding.* Buyer, Seller and their respective Affiliates shall each be entitled to deduct and withhold from any consideration payable hereunder, or other payment

26

AA_CONFIDENTIAL                                      AA-LITTRGT-000144396

otherwise payable pursuant to this Agreement, the amounts required to be deducted and withheld under Applicable Law; *provided* that (i) so long as Seller delivers the certificate described in Section 8.06, the parties hereto agree that no withholding for U.S. Tax is required under current law on any payments to Seller or any of its Subsidiaries, and (ii) promptly upon becoming aware of any requirement to withhold on any payments to Seller or any of its respective Affiliates, Buyer shall use reasonable best efforts to provide Seller with reasonable advanced notice in reasonable detail of any anticipated required withholding and the parties hereto shall reasonably cooperate to reduce or eliminate such deduction or withholding. Any amounts so withheld shall be paid over to the appropriate Governmental Authority and shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect to which such deduction and withholding was made.

Section 2.08    *Deferred Closings.*

(a)    Hong Kong.

(i)    Notwithstanding anything to the contrary in this Agreement, the sale, conveyance, transfer, assignment and delivery of the equity securities of an entity to be formed after the date hereof under the laws of Hong Kong in order to hold the assets and conduct the Business as presently conducted in Hong Kong as described on Section 2.08(a)(i)(A) of the Disclosure Schedules (such Business, the " **Hong Kong Business**" and such entity, the "**Hong Kong Entity**" ) to Buyer (or its designated Affiliate) shall occur on the later of (x) the Closing Date and (y) the last Business Day of the month in which all of the customary closing conditions and regulatory conditions (if any) of a transaction of this nature in Hong Kong are satisfied (the "**Deferred Hong Kong Closing Date**" ). The applicable organizational, constitutional or governing documents of the Hong Kong Entity shall be in a form mutually agreed upon by Buyer and Seller.

(ii)    The sale, conveyance, transfer, assignment and delivery of the equity securities of the Hong Kong Entity shall take place on the Deferred Hong Kong Closing Date at a closing (the "**Deferred Hong Kong Closing**" ) at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, New York, 10017 (or remotely by exchange of documents and signatures (or their electronic counterparts)), or at such other time and at such other location as is agreed between the parties.

(iii)    At the Deferred Hong Kong Closing, the parties shall, and shall cause their respective Affiliates to execute and deliver such documents and instruments as may be reasonably necessary to evidence the transfer of the equity securities of the Hong Kong Entity, including those required to be delivered by them pursuant to Section 2.03(b) of this Agreement.

27

AA_CONFIDENTIAL                                                                                                    AA-LITTRGT-000144397

(iv)     If the Deferred Hong Kong Closing is to occur later than the Closing, during the period between the Closing and the Deferred Hong Kong Closing: (A) the benefits and burdens of the Hong Kong Business shall be for the account of Buyer; (B) all income, proceeds or other monies received by Seller or any Affiliate thereof (other than the Hong Kong Entity) for and on behalf of the Hong Kong Business, and all profits and losses generated by the Hong Kong Business, shall be held in trust for, and the net profits paid to Buyer or its Affiliates, as designated by Buyer, notwithstanding any other provision in this Agreement to the contrary, on the Deferred Hong Kong Closing Date; and (C) the parties shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to cooperate with each other to take such actions (including delivery of notice) that may be required to satisfy the conditions described in Section 2.08(a)(i).

(v)     From the Closing Date to the Deferred Hong Kong Closing Date, unless the context clearly requires otherwise, all references in this Agreement to the "   Closing"   or the "   Closing Date"   shall, with respect to the transfer of the e securities of the Hong Kong Entity, be deemed to refer to the Deferred Hong Kong Closing and the Deferred Hong Kong Closing Date, as applicable, and the parties shall continue to comply with all covenants and agreements contained in this Agreement that are required by their terms to be performed prior to the Closing to the extent applicable to the Hong Kong Entity, including, for the avoidance of doubt, the covenants set forth in Section 5.01 with respect to actions or inactions of the Hong Kong Business.

(vi)     If the Deferred Hong Kong Closing Date has not occurred on or before the one (1) year anniversary of the Closing Date, the parties shall, and shall cause their Affiliates to, negotiate in good faith alternative arrangements to effectuate the intent of this Agreement.

(b)     South Korea.

(i)     Notwithstanding anything to the contrary in this Agreement, the sale, conveyance, transfer, assignment and delivery of the equity securities of an entity to be formed after the date hereof under the laws of South Korea in order to hold the assets and conduct the Business as presently conducted in South Korea as described on Section 2.08(b)(i)(A) of the Disclosure Schedules (such Business, the "   Korea Business" such entity, the "Korea Entity"   ) to Buyer (or its designated Affiliate) shall occur on the later of (x) the Closing Date and (y) the last Business Day of the month in which all of the customary closing conditions and regulatory conditions (if any) of a transaction of this nature in South Korea are satisfied (the "Deferred Korea Closing Date"   ). The applicable organizational, constitutional or governing documents of the Korea Entity shall be in a form mutually agreed upon by Buyer and Seller.

28

AA_CONFIDENTIAL                                                    AA-LITTRGT-000144398

(ii)     The sale, conveyance, transfer, assignment and delivery of the equity securities of the Korea Entity shall take place on the Deferred Korea Closing Date at a closing (the "**Deferred Korea Closing**"     ) at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, New York, 10017 (or remotely by exchange of documents and signatures (or their electronic counterparts)), or at such other time and at such other location as is agreed between the parties.

(iii)     At the Deferred Korea Closing, the parties shall, and shall cause their respective Affiliates to execute and deliver such documents and instruments as may be reasonably necessary to evidence the transfer of the equity securities of the Korea Entity, including those required to be delivered by them pursuant to Section 2.03(b) of this Agreement.

(iv)     If the Deferred Korea Closing is to occur later than the Closing, during the period between the Closing and the Deferred Korea Closing: (A) the benefits and burdens of the Korea Business shall be for the account of Buyer; (B) all income, proceeds or other monies received by Seller or any Affiliate thereof (other than the Korea Entity) for and on behalf of the Korea Business, and all profits and losses generated by the Korea Business, shall be held in trust for, and the net profits paid to Buyer or its Affiliates, as designated by Buyer, notwithstanding any other provision in this Agreement to the contrary, on the Deferred Korea Closing Date; and (C) the parties shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to cooperate with each other to take such actions (including delivery of notice) that may be required to satisfy the conditions described in Section 2.08(b)(i).

(v)     From the Closing Date to the Deferred Korea Closing Date, unless the context clearly requires otherwise, all references in this Agreement to the "     Closing" or the "     Closing Date"     shall, with respect to the transfer of the e securities of the Korea Entity, be deemed to refer to the Deferred Korea Closing and the Deferred Korea Closing Date, as applicable, and the parties shall continue to comply with all covenants and agreements contained in this Agreement that are required by their terms to be performed prior to the Closing to the extent applicable to the Korea Entity, including, for the avoidance of doubt, the covenants set forth in Section 5.01 with respect to actions or inactions of the Korea Business.

(vi)     If the Deferred Korea Closing Date has not occurred on or before the one (1) year anniversary of the Closing Date, the parties shall, and shall cause their Affiliates to, negotiate in good faith alternative arrangements to effectuate the intent of this Agreement.

(c)     Vietnam.

\\4149-1218-4642 v11

AA_CONFIDENTIAL                    AA-LITTRGT-000144399

(i)     Notwithstanding anything to the contrary in this Agreement, the sale, conveyance, transfer, assignment and delivery of the equity securities of an entity to be formed after the date hereof under the laws of Vietnam in order to hold the assets and conduct the Business as presently conducted in Vietnam as described on Section 2.08(c)(i)(A) of the Disclosure Schedules (such Business, the "**Vietnam Business**" and such entity, the "**Vietnam Entity**") to Buyer (or its designated Affiliate) shall occur on the later of (x) the Closing Date and (y) the last Business Day of the month in which all of the customary closing conditions and regulatory conditions (if any) of a transaction of this nature in Vietnam are satisfied (the "**Deferred Vietnam Closing Date**"). The applicable organizational, constitutional or governing documents of the Vietnam Entity shall be in a form mutually agreed upon by Buyer and Seller.

(ii)    The sale, conveyance, transfer, assignment and delivery of the equity securities of the Vietnam Entity shall take place on the Deferred Vietnam Closing Date at a closing (the "**Deferred Vietnam Closing**") at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, New York, 10017 (or remotely by exchange of documents and signatures (or their electronic counterparts)), or at such other time and at such other location as is agreed between the parties.

(iii)   At the Deferred Vietnam Closing, the parties shall, and shall cause their respective Affiliates to and execute and deliver such documents and instruments as may be reasonably necessary to evidence the transfer of the equity securities of the Vietnam Entity, including those required to be delivered by them pursuant to Section 2.03(b) of this Agreement.

(iv)    If the Deferred Vietnam Closing is to occur later than the Closing, during the period between the Closing and the Deferred Vietnam Closing: (A) the benefits and burdens of the Vietnam Business shall be for the account of Buyer; (B) all income, proceeds or other monies received by Seller or any Affiliate thereof (other than the Vietnam Entity) for and on behalf of the Vietnam Business, and all profits and losses generated by the Vietnam Business, shall be held in trust for, and the net profits paid to Buyer or its Affiliates, as designated by Buyer, notwithstanding any other provision in this Agreement to the contrary, on the Deferred Vietnam Closing Date; and (C) the parties shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to cooperate with each other to take such actions (including delivery of notice) that may be required to satisfy the conditions described in Section 2.08(c)(i).

(v)     From the Closing Date to the Deferred Vietnam Closing Date, unless the context clearly requires otherwise, all references in this Agreement to the "Closing" or the "Closing Date" shall, with respect to the transfer of the e securities of the Vietnam Entity, be deemed to refer to the Deferred Vietnam

30

AA_CONFIDENTIAL                                                                    AA-LITTRGT-000144400

Closing and the Deferred Vietnam Closing Date, as applicable, and the parties shall continue to comply with all covenants and agreements contained in this Agreement that are required by their terms to be performed prior to the Closing to the extent applicable to the Vietnam Entity, including, for the avoidance of doubt, the covenants set forth in Section 5.01 with respect to actions or inactions of the Vietnam Business.

(vi)     If the Deferred Vietnam Closing Date has not occurred on or before the one (1) year anniversary of the Closing Date, the parties shall, and shall cause their Affiliates to, negotiate in good faith alternative arrangements to effectuate the intent of this Agreement.

(d)     The transfer of (i) the Hong Kong Entity, (ii) the Korea Entity, and (iii) the Vietnam Entity will be effected pursuant to short-form acquisition agreements on a country-by-country basis (the "**Foreign Acquisition Agreements**"     ), each of which shall, in accordance with local Applicable Law, follow the formalities or procedures required to legally effect a transfer of such asset and liability or equity interest, respectively, from Seller and its Affiliates to Buyer and its Affiliates. From and after the date of this Agreement, the parties shall work together in good faith to prepare such Foreign Acquisition Agreements; *provided*, in each case, that the applicable Foreign Acquisition Agreement (including any related transfer instruments thereto) shall serve solely to effect the legal transfer of the applicable Purchased Shares of each Acquired Entity, respectively, and shall not have any effect on the value being received by Buyer or given by Seller, including the allocation of assets and liabilities as between them or any other terms or conditions of such transfer, all of which shall be determined solely in accordance with this Agreement. With respect to any conflict between any Foreign Acquisition Agreement (including any related transfer instruments thereto) and this Agreement, the terms of this Agreement shall control in all respects. Notwithstanding the foregoing, in the event it is preferable and mutually agreed between the parties to structure any of the Deferred Hong Kong Closing, the Deferred Korea Closing, or the Deferred Vietnam Closing as an asset transfer rather than as contemplated under this Agreement, the parties shall, in good faith, cooperate to determine a mutually agreeable transfer mechanism and agree to enter into customary transfer agreements to transfer the assets and any liabilities exclusively related to any such assets in such jurisdictions.

Section 2.09   *Shared Contracts; Wrong Pockets.*

(a)     With respect to any material Contract of Seller or any of its Affiliates that (1) is used in the Business and not exclusively used by or exclusively held by an Acquired Entity (excluding any agreement for which the benefits are provided to Buyer or any of its Affiliates through the Transition Services Agreement (or any agreement that would constitute an Excluded Service as defined in the Transition Services Agreement)) or (2) is used in the Retained Business but will convey with an Acquired Entity (a "**Shared Contract**"     ), if so requested by Buyer or Seller, as applicable, the other party will use reasonable best efforts to obtain the agreement of the applicable counterparty (or counterparties) to any such Shared

31

AA_CONFIDENTIAL                                          AA-LITTRGT-000144401

Contract to split such Shared Contract into two separate agreements, one with Seller or its Affiliate(s) and the other with an Acquired Entity, in order to provide each of Seller or its Affiliate(s), on the one hand, and such Acquired Entity, on the other hand, with the same benefits of such Shared Contract as were provided to the Retained Business and the Business, respectively, prior to the Closing. In the event that such counterparty to such Shared Contract does not agree to the splitting arrangement described herein, upon reasonable request by either Buyer or Seller, the other party shall use reasonable best efforts to establish an agency type or other similar arrangement as may be permitted by Applicable Law so that from and after the Closing Buyer and its Affiliates or Seller and its Affiliates, as applicable, will receive the benefits and burdens of those parts of the Shared Contract that relate to the Business or Retained Business, respectively; *provided* that (x) for so long as Seller or any of its Affiliates, or Buyer or any of its Affiliates, as applicable, provides Buyer or any of its Affiliates, or Seller or any of its Affiliates, respectively, any benefits of any Shared Contract pursuant to this Section 2.09(a), Buyer or Seller, as applicable, shall indemnify and defend Seller, its Affiliates and each of their respective Representatives, or Buyer, its Affiliates and each of their respective Representatives, respectively, against, and shall hold each of them harmless from, any and all Damages incurred or suffered by any such Person arising out of or in connection with the provision of such benefits under such Shared Contract (except to the extent such Damages arise out of the gross negligence or willful misconduct of Seller, its Affiliates or any of their respective Representatives, or Buyer, its Affiliates or any of their respective Representatives, respectively), and (y) neither Seller nor any of its Affiliates, nor Buyer nor any of its Affiliates, as applicable, shall be required to pay any money or other consideration or grant any other accommodation or concession to any Person or initiate any claim or proceeding against any Person in connection with this Section 2.09(a).

(b)     If at any time after the Closing Date, either Seller or any of its Affiliates, on the one hand, or Buyer or any of its Affiliates, on the other hand, holds or comes into possession of any asset or liability meant to be conveyed to the other party under this Agreement, then such party shall (i) promptly notify the other party thereof and (ii) transfer, or cause its respective Affiliate to transfer, at no cost, as promptly as reasonably practicable, to the other party (or an Affiliate designated by such other party) such assets and/or liabilities and, until the time of such transfer, the transferring party (or its relevant Affiliate) shall hold and manage and operate such assets and/or liabilities for the other party' s benefit and account, with all gains, income, losses, Damages, Taxes and Tax benefits or other items generated to be for the other party' s account. In the event of any transfer of assets and/or liabilities made pursuant to the foregoing sentence, no consideration shall be provided to any Person in respect to such transfer. The parties shall use reasonable best efforts to structure such transfer in an equitable manner for both Seller and Buyer, including from legal and Tax perspectives, with a view to ensuring that from an economic standpoint the relevant transfer is neutral for the parties.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedule, Seller represents and warrants to Buyer:

32

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144402

Section 3.01   *Corporate Existence and Power.*  Seller is a legal entity, duly incorporated or organized, validly existing and, to the extent legally applicable, in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate or other similar organizational powers required to carry on its business as now conducted. Seller is duly qualified to do business as a foreign entity and, to the extent legally applicable, in good standing as a foreign entity in each jurisdiction where such qualification is necessary, except for failures to be so qualified or in good standing that would not have a Material Adverse Effect.

Section 3.02   *Seller Authorization.*  The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within Seller'       s corporate or other similar organizational powers and have been duly authorized by all necessary corporate or other similar organizational action on the part of Seller and no additional corporate or similar organizational authorization or consent is required in connection with the execution, delivery and performance by Seller of this Agreement or the transactions contemplated hereby. The execution, delivery and performance of each other Transaction Document to which Seller or any of its Affiliates is a party, by Seller and any such Affiliates, and the consummation by Seller and such Affiliates of the transactions contemplated thereby, are within Seller'       s and any such Affiliate'       s corporate or other similar organizational powers and have been, or will be prior to their execution, delivery and performance, duly authorized by all necessary corporate or other similar organizational action on the part of Seller and any such Affiliates and no additional corporate or similar organizational authorization or consent is required in connection with the execution, delivery and performance of any other Transaction Document to which Seller or any of its Affiliates is a party, by Seller and any such Affiliates. Assuming due and valid execution by each other party hereto, this Agreement constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws affecting creditors'       rights generally and general principles of equity (collectively, the "**Enforceability Exceptions**"       )). Assuming due and valid execution by each other party thereto, each other Transaction Document to which Seller or any of its Affiliates is a party constitutes or, upon the execution and delivery thereof by Seller or any such Affiliate, shall constitute, a valid and binding agreement of Seller or any such Affiliate, enforceable against Seller or any such Affiliate in accordance with its terms, subject to the Enforceability Exceptions.

Section 3.03   *Governmental Authorization.*  Assuming the truth and accuracy of the representations and warranties of Buyer set forth in Section 4.03, and except for actions or filings required as a result of the identity, business or operations of Buyer or its Affiliates, the execution, delivery and performance by Seller of this Agreement and by Seller and its applicable Affiliates of each other Transaction Document to which Seller or any of its Affiliates is a party, and the consummation by Seller and such Affiliates of the transactions contemplated hereby and thereby, require no action by or in respect of, or filing with, any Governmental Authority, other than (a) compliance with any applicable requirements of Competition Laws and any other applicable United States or foreign merger control or investment laws or laws

33

AA_CONFIDENTIAL                                                                                        AA-LITTRGT-000144403

that provide for review of national security or defense matters, in each case as set forth on Section 3.03(a) of the Disclosure Schedule (collectively, this clause (a), "**Investment Laws**"     ); (b) compliance with applicable securities laws; (c) the filing of applications and notices with, and receipt of approvals, licenses or consents of, the Governmental Authorities set forth in Section 3.03(c) of the Disclosure Schedule; and (d) such other actions and filings as to which the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to adversely affect Seller'     s ability to perform or comply with its obligations under this Agreement or consummate the transactions contemplated hereby.

Section 3.04   *Non-contravention.* The execution, delivery and performance by Seller of this Agreement and by Seller and its applicable Affiliates of the other Transaction Documents to which Seller or any of its Affiliates is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate the applicable organizational, constitutional or governing documents of Seller or any Acquired Entity, (b) assuming compliance with the matters referred to in Section 3.03, violate any Applicable Law, (c) require any consent or other action by any Person under, conflict with or constitute a default under, or give rise to any right of termination, cancellation, modification or acceleration (whether after the giving of notice or the lapse of time or both) of any right or obligation under any Material Contract that is held by an Acquired Entity, or (d) result in the creation or imposition of any Lien on any asset of the Acquired Entities, except for Permitted Liens, with such exceptions, in the case of each of clauses (b) through (d), as would not, individually or in the aggregate, reasonably be expected to adversely affect the Acquired Entities in any material respect.

Section 3.05   *Purchased Shares.* Seller (or its Affiliate) is the sole legal and beneficial owner of the Purchased Shares set forth on Section 3.06(b) of the Disclosure Schedule. The Purchased Shares constitute all of the issued and outstanding Acquired Entity Securities of the Acquired Entities. Seller will transfer and deliver (or cause to be transferred and delivered) to Buyer, on the Closing Date, good and valid title to the Purchased Shares free and clear of any Lien (other than Liens under applicable securities laws or arising solely as a result of actions taken by Buyer or any of its Affiliates). All Purchased Shares (a) are duly authorized, validly issued, fully paid and non-assessable, and (b) were not issued in breach of any Contract to which Seller or any Acquired Entity or any of their Affiliates is a party or subject to, or in violation of, any preemptive or similar rights or in violation of Applicable Law.

Section 3.06   *Acquired Entities.*

(a)       To the extent in existence, each Acquired Entity is duly organized and validly existing under the laws of its jurisdiction of organization and has all organizational powers required to carry on its business as now conducted. Any Acquired Entity that is organized after the date of this Agreement shall be duly organized and validly existing under the laws of its jurisdiction of organization as of the date of its organization, and shall have all organizational powers required to carry on its business as shall be proposed to be conducted.

(b)       To the extent in existence, the authorized and issued and outstanding shares, membership interests or other voting or equity interests of each such Acquired Entity is set forth

34

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000144404

in Section 3.06(b) of the Disclosure Schedule. Such issued and outstanding shares, or equity interests of each Acquired Entity that are reflected on Section 3.06(b) of the Disclosure Schedule as being owned by Seller constitute all of the Purchased Shares and are owned beneficially and of record directly or indirectly by Seller free and clear of any Lien (other than Liens arising under applicable securities laws), and have been duly authorized and validly issued and, to the extent such terms are applicable, are fully paid and non-assessable. Except as set forth in Section 3.06(b) of the Disclosure Schedule, there are no outstanding (i) shares of capital stock, equity interest or voting securities of any Acquired Entity, (ii) securities of any Acquired Entity convertible into or exchangeable for shares of capital stock, equity interest or voting securities of such Acquired Entity, or (iii) options, phantom equity, equity appreciation or similar rights, or other rights to acquire from any Acquired Entity, or other obligations of any Acquired Entity to issue, any capital stock, equity interest, voting securities or securities convertible into or exchangeable for capital stock, equity interest or voting securities of such Acquired Entity (the foregoing, collectively, "**Acquired Entity Securities**"). Except for this Agreement, there are no binding agreements, arrangements, warrants, preemptive rights, options, puts, rights or other outstanding commitments or rights, to which Seller or any Acquired Entity is a party relating to the issuance, sale, purchase, redemption, conversion, exchange, registration, voting or transfer of any of the Acquired Entity Securities. There are no outstanding obligations of any Acquired Entity to repurchase, redeem or otherwise acquire any outstanding Acquired Entity Securities. Seller has made available to Buyer true, correct and complete copies of all applicable organizational, constitutional or governing documents of each Acquired Entity (including all amendments thereto) as in effect as of the date of this Agreement. No Acquired Entity is in violation of any of the provisions of its applicable organizational, constitutional or governing documents.

(c)     Except as would not be material to the Business, individually or in the aggregate, each Acquired Entity that is in existence as of the date of this Agreement is, and each Acquired Entity that is organized after the date of this Agreement will be, to the extent legally applicable, in good standing as a foreign entity in each jurisdiction where such qualification is necessary.

Section 3.07   *Financial Documents.*

(a)     Section 3.07(a) of the Disclosure Schedule sets forth unaudited balance sheets of the Business as of December 31, 2020 and December 31, 2021 and unaudited income statements of the Business for the year-to-date period then ended (the "**Annual Financial Information**"), and an unaudited balance sheet of the Business as of June 30, 2022 and an unaudited income statement of the Business for the six (6) month period then ended (the "**Latest Financial Information**" and collectively with the Annual Financial Information, **Business Financial Information**"). The Business Financial Information has been prepared from and is consistent with the audited consolidated financial statements of Parent (the "**Parent Financial Statements**") for the relevant periods.

(b)     Except as set forth in Section 3.07(b) of the Disclosure Schedule, the Business Financial Information presents fairly, in all material respects in accordance with IFRS, the

35

AA_CONFIDENTIAL                                                     AA-LITTRGT-000144405

financial condition of the Business as of the dates and for the periods specified therein and the results of the operations of the Business for the periods indicated and changes in financial condition for the respective periods covered thereby; *provided* that (i) throughout the periods covered by the Business Financial Information, the Business has not operated as separate stand-alone entities of Parent, and instead the balance sheet and results of operations of the Business have been reported within the Parent Financial Statements, and (ii) stand-alone financial statements have not historically been prepared for the Business. The Business Financial Information have been prepared from the books of account and ledgers of Parent and its Subsidiaries and in accordance with the adjustments, methodologies and assumptions applied in the preparation of the Parent Financial Statements; *provided*, however that the Business Financial Information (x) does not reflect normal year-end adjustments (the effect of which will not be materially adverse) and reclassifications for months which are not a year-end and (y) does not contain footnote disclosures. The adjustments, methodologies and assumptions applied in the preparation of the Business Financial Information have been prepared in good faith.

(c)     The trade receivables and notes receivable which are reflected on the Business Financial Information, or which arose subsequent to the date of the Latest Financial Information, arose out of bona fide, arms-length transactions and are properly reflected in the Business Financial Information (if in existence as of the applicable dates). All such receivables are good and collectible (or have been collected) in the Ordinary Course in accordance with their terms, and at the aggregate recorded amounts thereof, using normal collection practices, less the amount of applicable reserves for doubtful accounts and for allowances and discounts (if any).

(d)     The inventory of the Acquired Entities, whether or not reflected in the Latest Financial Information, consists of a quality and quantity usable and salable in the Ordinary Course. All such inventory is owned by the Acquired Entities free and clear of any Liens (except for Permitted Liens), and no inventory is held on a consignment basis.

Section 3.08   *Absence of Certain Changes*. Since the Reference Date, the Business has been conducted in the Ordinary Course and there has not been any event, occurrence, development or state of circumstances or facts that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.09   *No Undisclosed Material Liabilities*. There are no liabilities of the Acquired Entities, other than (a) liabilities specifically provided for in the Business Financial Information or disclosed in the notes thereto; (b) liabilities incurred in the Ordinary Course since the Reference Date (none of which is a liability for breach of contract, breach of warranty, tort, infringement or violation of Applicable Law); (c) liabilities incurred in connection with the transactions contemplated by this Agreement; and (d) other liabilities which, individually or in the aggregate, would not reasonably be expected to be adverse to the Business, taken as a whole.

Section 3.10   *Material Contracts*.

36

\\4149-1218-4642 v11

      (a)     Section 3.10 of the Disclosure Schedule sets out the following Contracts related to the Business in effect as of the date of this Agreement to which Seller or any of its Affiliates are currently subject or bound (but excluding any Business Benefit Plan), (collectively, any such Contracts that are, or are required to be, set forth on Section 3.10 of the Disclosure Schedule, the "**Material Contracts**"    ):

       (i)     any Contract (or group of related Contracts with the same Person) (excluding purchase orders entered into in the Ordinary Course) that Seller reasonably anticipates will involve annual payments or consideration furnished to Seller and its Affiliates (individually or in the aggregate) of more than seven hundred fifty thousand dollars ($750,000) per annum;

       (ii)    any binding sales, distribution or other similar Contracts (excluding purchase orders entered into in the Ordinary Course) providing for the purchase by Seller and its Affiliates of materials, supplies, goods, services, equipment or other tangible assets requiring annual payments by Seller and its Affiliates of seven hundred fifty thousand dollars ($750,000) or more during the current fiscal year;

       (iii)   any lease (whether of real or personal property and including sale leaseback arrangements) requiring Seller and its Affiliates to make (A) annual rental payments of one million dollars ($1,000,000) during the current fiscal year, or (B) aggregate rental payments of one million dollars ($1,000,000) or more during the current fiscal year, in each case, that cannot be terminated on not more than one hundred and twenty (120) days' notice without payment by Seller or any of its Affiliates;

       (iv)   any Contract that grants any Acquired Entity an equity or other interest in any partnership, joint venture, strategic alliance, limited liability company or other similar agreement involving a sharing of profits, losses, costs or liabilities with any other Person or involving sharing of equity interests;

       (v)    any Contract (A) containing covenants limiting the freedom of the Business to engage or participate or compete in any line of business, or with any Person or in any geographic region or (B) granting a third party exclusive rights of any type or scope with respect to any applicable products, technology, rights in Intellectual Property or other aspects of the Business;

       (vi)   any Contract as obligor or guarantor relating to indebtedness for borrowed money (excluding intercompany loans) in excess of one million dollars ($1,000,000) or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset);

       (vii)   any Business Intercompany Contract;

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144407

(viii)   any Contracts to which Seller or any of its Affiliates obtains from a third party a license under any Intellectual Property (including any settlement, co-existence, covenant not to sue, or similar agreements), other than any licenses for non-customized commercial or off the shelf computer software that are generally available on nondiscriminatory pricing terms;

(ix)   any agreement pursuant to which any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable and including a right to receive a license, a covenant not to sue, and similar rights) or interest in, any Business Intellectual Property, excluding non-exclusive licenses granted or obtained in the Ordinary Course;

(x)   any Contract involving resolution or settlement of any actual or threatened Action (A) in an amount greater than one million dollars ($1,000,000) that has not been fully performed by Seller or its Affiliates or (B) otherwise imposes continuing obligations on Seller or any of its Affiliates;

(xi)   any Contract containing " most-favored nation," " most favored pricing" or similar clauses in favor of any Person;

(xii)   any Contract pursuant to which Seller or any of its Affiliates grants any other party any rights of first refusal, rights of first negotiation, or similar rights;

(xiii)   any Contract providing for Seller or any of its Affiliates to indemnify a third party;

(xiv)   any Contract with any Governmental Authority;

(xv)   any Contract entered into since December 31, 2019 relating to the acquisition or divestiture (whether by merger, sale of stock, sale of assets or otherwise) of any Person or material line of businesses or the future acquisition or divestiture (whether by merger, sale of stock, sale of assets or otherwise) of any Person or material line of business in an amount greater than five hundred thousand dollars ($500,000);

(xvi)   any Contracts between or among any Acquired Entity, on the one hand, and any of its respective executive-level employees or officers or directors, on the other hand (other than employment agreements or other agreements related to compensation);

(xvii)   any Contracts with any sole supplier of goods or services to any Acquired Entity for which there is not a reasonably available alternative on substantially similar terms;

38

AA_CONFIDENTIAL                                                                                          AA-LITTRGT-000144408

(xviii)  any collective bargaining agreement or other Contracts with any labor union, works council, trade council or other labor organization;

(xix)    any stock purchase, stock option, restricted stock, restricted stock unit or similar plans of the Acquired Entities;

(xx)     Premises Sublease Agreement, by and between VINA –    CPK COMPANY LIMITED and ASSA ABLOY Smart Product Vietnam Co., Ltd., dated July 23, 2019; and

(xxi)    any Contracts that cannot be terminated without a monetary penalty on less than ninety (90) days'    notice.

(b)      Seller has made available to Buyer copies of each Material Contract set forth on the Disclosure Schedule.  Each Material Contract is a valid and binding agreement of Seller or its Affiliates party thereto and, to the knowledge of Seller, each other party to such Material Contract. Each Material Contract is enforceable against the applicable Acquired Entity and, to the knowledge of Seller, each other party to such Material Contract in accordance with its terms. Neither Seller nor such applicable Affiliate nor, to the knowledge of Seller as of the date hereof, any other party thereto is in default or breach in any respect under the terms of any such Material Contract and there does not exist any event, condition or omission that would constitute such a default or breach (whether by lapse of time or notice or both). No party to any Material Contract has given written notice to Seller or any Acquired Entity of its intention to cancel, terminate, or otherwise modify or accelerate the obligations of any Acquired Entity under such Material Contract.

Section 3.11   *Litigation.* Except as set out in Section 3.11 of the Disclosure Schedule:

(a)      There are no material Actions pending against or, to the knowledge of Seller, threatened against, Seller or any of its Affiliates in respect of the Business nor has there been any such Action since December 31, 2019;

(b)      Neither Seller nor any of its Affiliates is or since December 31, 2019 has been a party or subject to, or in default under, any material Order, and each such party is in compliance with all settlement agreements or similar written agreements with any Governmental Authority and outstanding orders, enforcement notices, judgments, decrees, awards, rulings, decisions, verdicts, subpoenas and injunctions entered or issued by any Governmental Authority in relation to the Business, other than any such noncompliance that would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole; and

(c)      As of the date hereof, there are no pending or, to the knowledge of Seller, threatened Actions, investigations or proceedings involving Seller or any of its Affiliates that would seek to prevent, materially delay or materially impair the consummation of the transactions contemplated hereby.

39

AA_CONFIDENTIAL                                      AA-LITTRGT-000144409

Section 3.12    *Compliance with Laws; Permits.*

(a)    Since January 1, 2019, Seller and the Acquired Entities have not been in violation of, have not been under investigation with respect to, and to the knowledge of Seller, have not been threatened to be charged with any violation of, any Applicable Law relating to the conduct of the Business, except in each case of the foregoing as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(b)    Since December 31, 2019, Seller and the Acquired Entities have held all permits, licenses, registrations, regulatory clearances, approvals, certifications and other similar items granted by or issued pursuant to the authority of a Governmental Authority and necessary for the operation of the Business (collectively, "**Permits**"      ), except for those, the absence of which, individually or in the aggregate, would not reasonably be expected to be material to the Business, taken as a whole. As of the date of this Agreement, there are no Actions pending or, to the knowledge of Seller, threatened, which would reasonably be expected to result in the revocation or termination of any such Permit, except for any such revocation or termination as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole. Neither the execution of this Agreement, nor the performance by Seller or any Acquired Entity of their obligations hereunder will invalidate or adversely affect any such Permits.

(c)    No Representative of Seller or of any Acquired Entity is or, since January 1, 2019, has been party to: (i) the use of any assets of Seller or any Acquired Entity for improper or unlawful contributions, gifts, entertainment or other improper or unlawful expenses relating to political activity or to the making of any direct or indirect improper or unlawful payment to government officials or employees, or private officers or employees, from such assets; (ii) the establishment or maintenance of any improper, unlawful or unrecorded fund of monies or other assets; (iii) the making of any false or fictitious entries on the books or records of Seller or any Acquired Entity; (iv) the making of any improper, unlawful or undisclosed payment; or (v) the making or authorization of any payment, contribution, or gift of money, property or services involving the direct or indirect use of any funds of Seller or any Acquired Entity (including entertainment or other expenses), in each case in contravention of Applicable Law, (A) as a " kickback" or bribe to any Person, or (B) to any political organization or the holder of (or Person who seeks) any elective or appointive public office related to political activity or otherwise related to political activity.

(d)    Since January 1, 2019, no Business Employee, Representatives of Seller or of any Acquired Entity or any other Person acting on behalf of the Business, in each case in their capacity as such, is or has been engaged in any activity or conduct that has resulted or would reasonably be expected to result in a violation of any Anti-Corruption Laws or any Applicable Law relating to economic or trade sanctions, including the laws or regulations implemented by the Office of Foreign Assets Control of the United States Department of the Treasury and any similar laws or regulations in other jurisdictions.

40

\\4149-1218-4642 v11

(e)      Since December 31, 2019, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, (i) there are no allegations of sexual harassment made against any officer or director of Seller, any Acquired Entity, or against any Representative thereof, and (ii) neither Seller nor any Acquired Entity has entered into any settlement agreement related to allegations of sexual harassment or sexual misconduct by a Representative of Seller or any of any Acquired Entity.

(f)      Since January 1, 2019, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, neither Seller nor any Acquired Entity has: (i) been under any administrative, civil or criminal investigation, audit, indictment or information request by any Governmental Authority; (ii) been the subject of any audit or investigation by Seller, in each case, with respect to any alleged act or omission arising under or relating to any Contract or subcontract with any Governmental Authority; (iii) been debarred or suspended from doing business with any Governmental Authority nor received written notice that any such suspension or debarment action has been proposed; or (iv) been convicted of a crime for which the maximum potential sentence which could have been imposed exceeded imprisonment for one (1) year.

Section 3.13    *Real Property; Liens.*

(a)      Neither Seller nor any of its Affiliates is obligated or bound by any contractual rights to sell, lease or acquire any real property (except under the Real Property Leases) with respect to the Business. Seller and its Affiliates have good and valid title to all of the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(b)      Section 3.13(b) of the Disclosure Schedule sets forth a complete and accurate list of all leases, subleases, licenses or other occupancy agreements (each a "**Real Property Lease**") pursuant to which Seller or any of its Affiliates leases (as tenant) or subleases (as subtenant) real property for use in the conduct of the Business (the "**Leased Real Property**"), true and correct copies of which have previously been made available to Buyer. With respect to each Leased Real Property:

(i)      Seller or its Affiliates (as the case may be) have a valid leasehold (or subleasehold) interest in such Leased Real Property, free and clear of Liens (except Permitted Liens);

(ii)      Seller or its Affiliates (as the case may be) are in possession of such Leased Real Property;

(iii)      Seller or its Affiliates (as the case may be) and, to the knowledge of Seller, each other party to such Real Property Lease have performed in all material respects all material obligations required to be performed by them under such Real Property Lease, and neither Seller nor its Affiliate (as the case may be) or, to the knowledge of Seller, each other party to such Real Property Lease are in default thereunder beyond all applicable notice and cure periods; and

41

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000144411

(iv)     Seller or its Affiliates (as the case may be) have not received notice of termination with respect to, and to the knowledge of Seller, no party has threatened to terminate, such Real Property Lease.

Neither Seller nor its Affiliates have assigned, transferred or pledged any interest in any of the Real Property Leases.

(c)     There are no pending or, to knowledge of Seller, threatened condemnation or eminent domain proceedings or similar Actions that affect any Real Property. No Person other than Seller or its Affiliates (as the case may be) has any right in any of the Leased Real Property or any right to use or occupy any portion of the Leased Real Property. To the knowledge of Seller, the improvements on the Real Property are in good working condition, suitable for intended use thereof and in compliance with Applicable Law.

(d)     The Real Property represents all of the real property used in the conduct of the Business in the manner in which it is now owned, operated, used and maintained. Seller and its Affiliates have the full right and authority to use and operate all of the improvements currently being used in the Business and located on the Real Property, subject to Applicable Law and Permitted Liens.

Section 3.14   *Customers and Suppliers.*

(a)     Section 3.14(a) of the Disclosure Schedule sets forth complete and accurate lists (separated by applicable fiscal year) of the top ten (10) customers of the Business (on a consolidated basis) as measured by the dollar amount of annual recurring revenue, for the fiscal year ended December 31, 2021 and the six (6) month period ended June 30, 2022 (the "**Major Customers**"      ), together with the amount received by Seller or its Affiliates (as the case may be), in the aggregate, from each Major Customer during such periods in respect of the Business.  No Major Customer has (i) materially reduced its business with any Acquired Entity or the Business from the levels achieved during the fiscal year ended December 31, 2021, or (ii) since December 31, 2019, cancelled or otherwise terminated its relationship with the Business or any Acquired Entity and neither Seller nor any Acquired Entity has received any notice, and Seller and the Acquired Entities have no reason to believe, that any Major Customer has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce or otherwise limit or alter its relationship with any Acquired Entity or the Business (whether as a result of the consummation of the transactions contemplated by this Agreement, the other Transaction Documents or otherwise).

(b)     Section 3.14(b) of the Disclosure Schedule sets forth complete and accurate lists (separated by applicable fiscal year) of the top ten (10) suppliers of goods or services to the Business (on a consolidated basis) as measured by the dollar volume of purchases, for the fiscal year ended December 31, 2021 and the six (6) month period ended June 30, 2022 (the "**Major Suppliers**"      ), together with the amount of payments to each such Major Supplier during such periods in respect of the Business.  No Major Supplier has (i) materially reduced its business

42

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144412

with any Acquired Entity or the Business from the levels achieved during the fiscal year ended December 31, 2021, or (ii) since December 31, 2019, cancelled or otherwise terminated its relationship with the Business or any Acquired Entity and neither Seller nor any Acquired Entity has received any notice, and Seller and the Acquired Entities have no reason to believe, that any Major Supplier has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce or otherwise limit or alter its relationship with any Acquired Entity or the Business (whether as a result of the consummation of the transactions contemplated by this Agreement, the other Transaction Documents or otherwise).

(c)    Neither Seller nor any Acquired Entity has received written notice of (or, to the knowledge of Seller, has been threatened in respect of) any material claim, dispute or controversy with any Major Customer or Major Supplier, and no Acquired Entity has received written notice of (or, to the knowledge of Seller, has been threatened in respect of) any material claim, dispute or controversy with any of its other customers or suppliers.

Section 3.15    *Intellectual Property.*

(a)    Section 3.15(a) of the Disclosure Schedule contains a correct and complete list of all registrations and applications for registration of Patents (including the country of filing, owner, filing number, date of issue or filing, expiration date and title), Trademarks (including country of filing, description of goods or services, registration or application number and date of issue), Copyrights (including description of the work, country of filing, owner, filing number, date of issue and expiration date) and domain names included in the Transferred Intellectual Property. All Business Intellectual Property is subsisting, valid and enforceable. Without limiting the generality of the foregoing, no interference, opposition, cancellation, reissue, reexamination or other Action is pending or, to the knowledge of Seller, threatened, in which the scope, validity or enforceability of any Registered Business IP is being contested or challenged.

(b)    Seller and its Affiliates are the sole and exclusive owner of all right, title and interest in and to the Business Intellectual Property, free and clear of all Liens (other than Permitted Liens) and including all right, title, and interest to sue for past, present and future interference with, infringement upon, or misappropriation or other violation of any Business Intellectual Property. Upon the closing Buyer or the Acquired Entities will own all right, title and interest in and to the Transferred Intellectual Property, free and clear of all Liens (other than Permitted Liens) and including all right, title, and interest to sue for past, present and future interference with, infringement upon, or misappropriation or other violation of any Transferred Intellectual Property.

(c)    Except for the Seller Names and Marks, the Business Intellectual Property constitutes all of the Intellectual Property owned by Seller and its Affiliates that is necessary to conduct the Business following the Closing in substantially the same manner as it is currently conducted. Seller and its Affiliates own or otherwise have a valid license right to use, and after

43

AA_CONFIDENTIAL                                              AA-LITTRGT-000144413

the Closing, Buyer will own or have a valid license right to use, all Intellectual Property necessary to conduct the Business.

(d)     The conduct of the Business as currently conducted is not infringing, misappropriating, diluting or otherwise violating, and the conduct of the Business has not, since December 31, 2019, infringed, misappropriated, diluted or otherwise violated, any Intellectual Property of any Person. To the knowledge of Seller, no third party is infringing any Business Intellectual Property. Seller has not received written notice of any, and there are no, Actions that are pending or threatened in writing against Seller or any of its Affiliates that (A) challenge the validity, registration, scope, use, ownership or enforceability of any Business Intellectual Property or (B) allege that the Business has infringed, misappropriated, diluted or otherwise violated any Intellectual Property of any Person, including any letter or other written communication suggesting or offering that Seller of any of its Affiliates obtain a license to any Intellectual Property of another Person. No Transferred Intellectual Property is subject to any outstanding agreement, covenant, judgment, injunction, order or decree restricting the use or enforcement thereof by Seller or any of its Affiliates or that will restrict the use or enforcement thereof by any Acquired Entity following the Closing.

(e)     All documents and instruments necessary to establish, perfect and maintain the rights of Seller in any Registered Business IP have been validly executed, delivered and filed in a timely manner with the appropriate Governmental Authority. All maintenance fees, annuities, and renewals due or payable with respect to the Registered Business IP as of the date hereof have been, and as of the Closing will have been, timely paid.

(f)     Since December 31, 2019, neither Seller nor any of its Affiliates has received any written charge, complaint, claim, demand, or notice alleging that any Transferred Intellectual Property licensed by Seller or any of its Affiliates to any third party was done in conflict with the rights of any other third party and, to the knowledge of Seller, no such license has been granted.

(g)     Seller has not sent to any third party since December 31, 2019 or otherwise communicated to another Person since December 31, 2019 any written charge, complaint, claim, demand or notice asserting infringement or misappropriation of, or other conflict with or violation of, any Business Intellectual Property by such other Person, including, without limitation, any rights of Seller or any of its Affiliates in and to any Business Intellectual Property.

(h)     Seller and its Affiliates have taken commercially reasonable steps designed to protect and maintain the confidentiality of, and otherwise protect and enforce its rights in, trade secrets included in the Business Intellectual Property. No material trade secret has been disclosed by Seller or any of its Affiliates other than to employees, contractors, consultants, representatives and agents of Seller or its Affiliates pursuant to written confidentiality agreements or has been disclosed or misappropriated by any other Person.

44

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000144414

(i)     Each employee of or contractor or consultant to Seller or its Affiliates that is or has been involved in the development, creation, invention or authorship of any Intellectual Property has entered into a written agreement with Seller by which such employee or contractor or consultant discloses and assigns, and is required to disclose and assign, such Intellectual Property to Seller. No funding, facilities or personnel of any Governmental Authority or any university, research or educational institution were used, directly or indirectly, to develop or create, in whole or in part, any Transferred Intellectual Property.

(j)     Seller and its Affiliates have complied in all material respects with the conditions and obligations of licenses for any Open Source Software that is incorporated into, integrated or bundled with, or derived from or linked to any Business Software. Except as set forth in Section 3.15(j) of the Disclosure Schedule, none of the Business Software uses, incorporates, or is integrated or bundled with or derived from or linked to any Open Source Software or any modification or derivative thereof in a manner that would (i) grant or purport to grant to any Person any rights to or immunities under any Business Intellectual Property or (ii) require the disclosure, distribution, license of the source code included in any Business Intellectual Property, whether for free or at a charge, in each case under the terms of the same license by which such Open Source Software was licensed.

(k)     Neither Seller nor any of its Affiliates has delivered, licensed or made available to any escrow agent or other Person who is not an employee or contractor of Seller or its Affiliates any source code for Business Software. Neither Seller nor any of its Affiliates has any duty or obligation (whether present, contingent or otherwise) to deliver, license or make available the source code for any Business Software to any escrow agent or other Person. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, result in Seller or any of its Affiliates' delivery, license or disclosure of the source code for any Business Software to any other Person.

(l)     Neither the execution, delivery or performance of this Agreement or any other Transaction Documents nor the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document will, with or without notice or lapse of time, result in, or give any other Person the right or option to cause or declare:  (i) a loss of, or Lien on, any Business Intellectual Property; (ii) the release, disclosure or delivery of any Business Intellectual Property by or to any escrow agent or other Person; or (iii) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any of Business Intellectual Property or any Intellectual Property owned by Buyer.

(m)     Neither Seller nor any of its Affiliates has made any submission or suggestion to, nor is Seller or any of its Affiliates or any Transferred Intellectual Property subject to any agreement with, any standards body or other entity that would obligate Seller or any of its Affiliates or Buyer to grant licenses to, or otherwise impair or limit its control of, its respective Intellectual Property.

Section 3.16    *Privacy and Data Security.*

45

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144415

(a)     The Acquired Entities have implemented and maintained an Information Security Program that includes: (i) written policies and procedures regarding Personal Data, and the Processing thereof; (ii) administrative, technical and physical safeguards designed to protect the security, confidentiality, availability, and integrity of any Personal Data, controlled, held, or Processed by the Acquired Entities; (iii) disaster recovery, business continuity, incident response, and security plans, procedures and facilities; and (iv) protections against Security Incidents, malicious code, and against loss, misuse, unauthorized access to, and disruption of, the Processing of Business Data or Business Systems. The Acquired Entities have established, and since December 31, 2019 have been in material compliance with, their Information Security Program. The Acquired Entities have (i) assessed and tested their respective Information Security Program in accordance with Information Privacy and Security Requirements and industry standards and (ii) remediated all known critical and high risks and vulnerabilities in accordance with the Information Security Program and industry standards. None of the Business Software contains any (A) material bugs, errors or defects or (B) " back door," " time bomb," " Trojan horse," " worm," " drop dead device," " exploit" commonly used in the computer software industry) or other undocumented software or hardware components intended to provide unauthorized access to, or disruption, disablement, erasure or otherwise impeding or maliciously exploiting in any manner any software, hardware, data or other IT Assets. All Business Data will continue to be available for Processing by the Acquired Entities following the Closing on substantially the same terms and conditions as existed immediately before the Closing.

(b)     The Business Systems (i) operate and perform in all commercially reasonable material respects in accordance with their documentation and functional specifications, (ii) are in good working condition (subject to normal wear and tear) and adequate for the current needs of the Business, including as to reliability and capacity, and (iii) since December 31, 2019 have not malfunctioned or failed in a manner that has caused material disruption to the Business.

(c)     To the knowledge of Seller, the Acquired Entities (i) have not suffered and are not suffering a Security Incident, (ii) have not been and are not adversely affected by any malicious code, ransomware or malware attacks, or denial-of-service attacks on any Business Systems, (iii) have not been and are not required to notify any Person or Governmental Authority of any Security Incident, and (iv) have not received notice of the occurrence of (i), (ii), or (iii) by any Data Processor. To the knowledge of Seller, neither the Acquired Entities nor any third party acting at the direction or authorization of the Acquired Entities has paid any perpetrator of any actual or threatened Security Incident or cyber attack, including, but not limited to a ransomware attack or a denial-of-service attack.

(d)     To the extent required by Information Privacy and Security Requirements or Privacy Policies, (i) the Acquired Entities encrypt Personal Data, and (ii) the Acquired Entities securely delete or destroy Personal Data. The Acquired Entities have complied with Information Privacy and Security Requirements in connection with any selling (as defined by the California Consumer Privacy Act of 2018) of Personal Data to Persons or other third parties. Neither the execution, delivery or performance of this Agreement nor any of the other

46

AA_CONFIDENTIAL                                                              AA-LITTRGT-000144416

agreements contemplated by this Agreement, nor the consummation of any of the transactions contemplated by this Agreement or any such other agreements violate any Information Privacy and Security Requirements or Privacy Policies. Where the Acquired Entities use a Data Processor to Process Personal Data, the Acquired Entities have taken commercially reasonable measures to obtain guarantees, warranties or covenants from such Data Processor in relation to Processing of Personal Data, confidentiality, or security measures in a manner sufficient for the Acquired Entities' material compliance with Information Privacy and Security Requirements.

(e)     The Acquired Entities and, to the knowledge of the Seller, its Data Processors, materially comply and, since December 31, 2019, have materially complied with Privacy Policies and all Information Privacy and Security Requirements. To Seller's knowledge, the Acquired Entities have not received a written notice (including any enforcement notice), letter, or complaint from a Governmental Authority or any Person alleging noncompliance or potential noncompliance with any Information Privacy and Security Requirements or Privacy Policies and has not been subject to any proceeding relating to noncompliance or potential noncompliance with Information Privacy and Security Requirements or the Acquired Entities' Processing of Personal Data. Acquired Entities only make international transfers of Personal Data where such transfers comply with Information Privacy and Security Requirements and Privacy Policies. The Acquired Entities are covered by a cyber liability insurance policy. The representations and warranties set forth in this Section 3.16 are the sole and exclusive representations and warranties of Seller and its Affiliates with respect to privacy and data security matters relating to the Acquired Entities and the Business.

Section 3.17     *Employees and Benefit Plans.*

(a)     Section 3.17 of the Disclosure Schedule lists each material Business Benefit Plan, and in each case indicates whether an Acquired Entity is the sponsor of such Business Benefit Plan or has any contractual liabilities or obligations thereunder; *provided*, that Seller shall not be required to disclose any employment agreements or offer letters using Seller's standard form and providing for annual base compensation of less than two hundred thousand dollars ($200,000). For each material Assumed Benefit Plan, Seller has made available to Buyer a copy or description of such plan (or in the case of individual agreements that are based on a form agreement, a copy of such form) and all material amendments thereto and, if applicable, (i) the plan's annual return/report (such as a Form 5500 or other local jurisdiction equivalent) for the two most recently completed plan years; (ii) all trust agreements or other funding arrangements and amendments thereto; (iii) the current prospectus or summary plan description and all summaries of material modifications; and (iv) the most recent favorable determination or opinion letter from the IRS. For each such material Business Benefit Plan that is not an Assumed Benefit Plan, Seller has made available to Buyer a copy or description of such plan (or in the case of individual agreements that are based on a form agreement, a copy of such form) and all material amendments thereto.

(b)     Each Business Benefit Plan has been maintained in compliance in all material respects with its terms and all Applicable Law, including ERISA and the Code. No action, suit,

47

AA_CONFIDENTIAL                                                                                          AA-LITTRGT-000144417

investigation, audit, proceeding or claim (other than routine claims for benefits) is pending against or involves or, to the knowledge of Seller, is threatened against or threatened to involve, any Business Benefit Plan.

(c)     No Acquired Entity nor any of their ERISA Affiliates (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to (or has any obligation to contribute to), or has in the past six years sponsored, maintained, administered or contributed to (or had any obligation to contribute to), or has or is reasonably expected to have any direct or indirect liability with respect to, any plan subject to Title IV of ERISA, including any "  defined benefit plan"  (within the meaning of Section 3(35) of ERISA), "  multiemployer plan" (within the meaning of Section 3(37) of ERISA) or a "  multiple employer plan"  (within the meaning of Section 4063 or Section 4064 of ERISA or Section 413(c) of the Code).

(d)     No Business Benefit Plan other than an Assumed Benefit Plan is or will be directly or indirectly binding on Buyer by virtue of the transactions contemplated hereby. Buyer and its Affiliates (including without limitation, on an after the Closing, the Acquired Entities) shall have no liability for, under, with respect to or otherwise in connection with any Business Benefit Plan, which liability arises under ERISA or the Code, by virtue of an Acquired Entity being aggregated with any other person that is an ERISA Affiliate (other than with an Acquired Entity) in a controlled group or affiliated service group for purposes of ERISA or the Code at any relevant time prior to Closing.

(e)     (i) No Business Benefit Plan provides any post-retirement medical, dental or life insurance benefits to any Business Employee (other than coverage mandated by Applicable Law, including COBRA); and (ii) no Acquired Entity maintains or has any obligation to contribute to any "  voluntary employees'  beneficiary association"  within the meaning of Section 501(c)(9) of the Code or other funding arrangement for the provision of welfare benefits.

(f)     Each Business Benefit Plan maintained solely for the benefit of Business Employees subject to federal income taxation in the United States that is intended to be qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired. Except as would not result in liability to the Acquired Entities, each Business Benefit Plan has been maintained in material compliance with its terms and Applicable Law.

(g)     Subject to Buyer'  s performance of its obligations under Article 9, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein (either alone or upon the occurrence of any additional or subsequent event), will cause any (i) payments or other amounts to become due or payable to any Business Employee (including, without limitation, any payment that would result, separately or in the aggregate, in the payment (whether in connection with any termination of employment or otherwise) of any "  excess parachute payment"  within the meaning of Section 280G of the Code)

48

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144418

or (ii) payment, acceleration, vesting or increase in benefits to any Business Employee, in each case under any Business Benefit Plan.

(h)  (i) No Benefit Plan (for purposes of Section 409A of the Code), including the administration and settlement thereof, is or has been or will be in violation of Section 409A of the Code such that any tax or other penalty would be due (from any person) under Section 409A of the Code and (ii) neither Seller nor any Acquired Entity has any obligation to gross-up, indemnify or otherwise reimburse any current or former Business Employee for any Tax incurred by such Business Employee, including under Section 409A, 457A or 4999 of the Code.

(i)  No Action (other than routine claims for benefits) is pending against or involves or, to the knowledge of Seller, is threatened against or threatened to involve, any Business Benefit Plan.

(j)  All contributions required to be made to any Business Benefit Plan on behalf of the Business Employees by Applicable Law or pursuant to the terms of such Business Benefit Plan for any period through the date hereof that are due have been timely made or, to the extent not required to be made on or before the date hereof, have been properly reflected in the Business Financial Information.

(k)  Seller and the Acquired Entities are, with respect to Business Employees, in material compliance with all Applicable Laws relating to labor and employment, including those relating to labor management relations, wages, hours, overtime, employee classification (including exemption and independent contractor classification), discrimination, sexual harassment, civil rights, affirmative action, work authorization, immigration, safety and health and continuation coverage under group health plans, except for failures to comply that, individually or in the aggregate, would not result in any liability to the Acquired Entities.

(l)  With respect to any Business Employee, (i) there is no collective bargaining, works council or other agreement with any employee representative group, nor is any such agreement presently being negotiated; (ii) to the knowledge of Seller, there is no union organizing activity currently pending with regard to any Business Employees, nor has there been any such activity since December 31, 2019; (iii) there is no concerted labor strike or stoppage pending or, to the knowledge of Seller, threatened, that relates to the Business Employees; and (iv) there is no union, works council, health and safety committee or other employee representative group which, pursuant to Applicable Law or agreement, must be notified, consulted or with which negotiations need to be conducted in connection with the transactions contemplated by this Agreement.

Section 3.18  *Taxes.* Except to the extent related to U.S. federal, state or local Taxes (or Tax Returns) of Seller or a Seller Group:

(a)  All income and other material Tax Returns required to be filed by each Acquired Entity have, in each case, been timely filed with the appropriate taxing authorities. Each such

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144419

Tax Return is true, correct and complete in all material respects (taking into account applicable extensions).

(b)      All material Taxes due and payable by or with respect to each Acquired Entity (whether or not shown to be due and payable on any Tax Return) have been timely paid in full.

(c)      Each Acquired Entity has withheld or collected all material Taxes required by Applicable Law to have been withheld or collected in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, member or other third party, and all such Taxes withheld or collected have been timely paid over to the proper authorities to the extent due and payable. Each Acquired Entity has timely and properly withheld or collected all material sales, use, ad valorem, and value added Taxes and has timely remitted all such Taxes to the proper authorities to the extent due and payable.

(d)      There is no Action now pending or threatened in writing against or with respect to any Acquired Entity in respect of any Tax.

(e)      There are no agreements or arrangements with any Taxing Authority with regard to Tax liabilities of any Acquired Entity, other than settlements or compromises with respect to asserted Tax liabilities for prior Tax years that do not impose any payment obligation on such Acquired Entity after the Closing Date.

(f)      There are no outstanding proposed tax adjustments with respect to any Acquired Entity or outstanding proposed tax adjustments with respect to Seller the non-payment of which, in each case, would result in a Lien on any asset of an Acquired Entity (other than a Permitted Lien or other Lien that would not be material to the Business, taken as a whole).

(g)      During the three (3) year period ending on the date hereof, none of the Acquired Entities was a distributing corporation or a controlled corporation in a transaction intended to be governed by Section 355 of the Code.

(h)      None of the Acquired Entities is or has been a party to any " listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) (or similar provision of state, local or foreign law).

(i)      None of the Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction or loss from, a taxable period (or portion thereof) ending after the Closing Date as a result of any (i) installment sale or open transaction disposition made on or prior to the Closing Date, (ii) " closing agreement," as described in Section 7121 of the Code (or any corresponding or similar provision of U.S. state, local or non-U.S. law) executed on or prior to the Closing Date, (iii) prepaid amount or any other income eligible for deferral under the Code or Treasury Regulations promulgated thereunder (including pursuant to Code Sections 455 or 456), or any applicable provision of state, local or non-U.S. Law, in each case received on or prior to the Closing Date other than in the Ordinary Course or (iv) change in method of accounting made prior to the Closing Date, including under Section

50

AA_CONFIDENTIAL                                                                          AA-LITTRGT-000144420

481(a) of the Code or any similar law, or use of an improper method of accounting for any Pre-Closing Tax Period.

(j)     All transactions and agreements between any of Seller and the Acquired Entities and any related entities have been carried out on an arm's length basis and comply in all respects with all applicable transfer pricing requirements.

(k)     (i) The accruals and reserves for unpaid Taxes of the Acquired Entities (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) specifically set forth and included in the Business Financial Information are adequate in accordance with IFRS to fully cover all Taxes accrued or accruable through the date hereof and such reserves for Taxes, as adjusted for operations and transactions and the passage of time through the Closing Date, are adequate to cover all unpaid Taxes of the Acquired Entities accruing through the Closing Date, and (ii) none of the Acquired Entities nor Seller has any liability for Taxes incurred after the date of the Business Financial Information other than Taxes incurred by it in the Ordinary Course.

(l)     Section 3.17 (solely to the extent related to Taxes) and this Section 3.18 contain the sole and exclusive representations and warranties of Seller with respect to Taxes. No representation or warranty is made in this Agreement with respect to the amount, sufficiency or availability of any Tax Asset available in or to be carried forward to a Post-Closing Tax Period.

Section 3.19    *Environmental Compliance*. Except as to matters that would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, or as set forth in Section 3.19 of the Disclosure Schedule:

(a)     with respect to the Business and the Leased Real Property of Seller, Seller and the Acquired Entities are in compliance with all applicable Environmental Laws and have obtained and are in compliance with all permits, licenses, registrations and certifications required under Environmental Law to operate the Business;

(b)     since December 31, 2019, there has been no Action pending or, to the knowledge of Seller, threatened, which (i) alleges a violation of or liability under any Environmental Law for which any of the Acquired Entities are reasonably expected to have liability, (ii) relates to the Business, and (iii) has not been settled, dismissed, paid or otherwise resolved;

(c)     there has been no Release of Hazardous Substances at, on, or under the Leased Real Property requiring investigation, remediation or other response action by Seller or any of the Acquired Entities pursuant to Environmental Law;

(d)     neither Seller nor any of the Acquired Entities is party to any order that imposes any material continuing obligation under any Environmental Laws on any of the Acquired Entities or the Business; and

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                              AA-LITTRGT-000144421

(e)      no Leased Real Property is on premises where Hazardous Substances have been released, disposed or discharged into the environment, including migration of such substances from or to said premises, in concentrations or in a manner that would reasonably be expected to (i) give rise to any material obligation of the owner or occupant to undertake investigation or remediation, or (ii) otherwise cause the owner or occupant to incur any material liability.

Section 3.20   *Condition and Sufficiency of Assets.* Seller or an Acquired Entity (as of the Closing) own good and marketable title to, or hold a good and valid leasehold interest in, all of the personal property of the Business, free and clear of all Liens, except for Permitted Liens. Each such item of personal property is in operable condition and repair, subject to normal wear and tear, ongoing repairs or refurbishments in the Ordinary Course and obsolescence in the Ordinary Course. The personal property of the Acquired Entities, together with all other properties and assets of Seller or its Affiliates made available under the Transition Services Agreement, are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the rights, property and assets necessary to conduct the Business.

Section 3.21   *Product Liability; Warranty.* There is no existing, and has been no, material product liability, warranty, recall or post-sale warning or similar action conducted by, or against, Seller or any of the Acquired Entities since December 31, 2019 with respect to any product designed, manufactured, serviced, produced, modified, distributed or sold by or on behalf of the Business.  Each such product manufactured, sold or delivered by any Acquired Entity or with respect to any services rendered by any Acquired Entity has been in conformity in all material respects with contractual commitments and express warranties.

Section 3.22   *Finders'     Fee.* Except for BofA Securities, Inc., whose fees shall be paid by Parent, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

Section 4.01   *Corporate Existence and Power.* Buyer is a legal entity, duly incorporated or organized, validly existing and, to the extent legally applicable, in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate or other similar organizational powers required to carry on its business as now conducted.

Section 4.02   *Buyer Authorization.* The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within Buyer'     s corporate or other similar organizational powers and have been duly authorized by all necessary or similar organizational action on the part of Buyer and no additional authorization

52

AA_CONFIDENTIAL                                                                                       AA-LITTRGT-000144422

or consent is required in connection with the execution and delivery and performance by Buyer of this Agreement or the transactions contemplated hereby. The execution, delivery and performance of each other Transaction Document to which Buyer or any of its Affiliates is a party, by Buyer and any such Affiliates, and the consummation of the transactions contemplated thereby, are within Buyer's and any such Affiliate's corporate or other similar organizational powers and have been, or will be prior to their execution, delivery and performance, duly authorized by all necessary corporate or other similar organizational action on the part of Buyer and any such Affiliates and no additional authorization or consent is required in connection with the execution, delivery and performance of any other Transaction Document to which Buyer is a party, by Buyer. Assuming due and valid execution by each other party hereto, this Agreement constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject to the Enforceability Exceptions. Assuming due and valid execution by each other party thereto, each other Transaction Document to which Buyer or any of its Affiliates is a party constitutes or, upon the execution and delivery thereof by Buyer and any such Affiliate, shall constitute, a valid and binding agreement of Buyer and any such Affiliate, enforceable against Buyer and any such Affiliate in accordance with its terms, subject to the Enforceability Exceptions.

Section 4.03  *Governmental Authorization.* The execution, delivery and performance by Buyer and its Affiliates of this Agreement and each other Transaction Document to which Buyer or its Affiliates is a party and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Authority other than (a) compliance with any applicable requirements of Investment Laws; (b) compliance with any applicable securities laws; (c) the filing of applications and notices with, and receipt of approvals, licenses or consents of, the Governmental Authorities set forth in Section 4.03(c) of the Disclosure Schedule; and (d) any such action and filing as to which the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to adversely affect Buyer's ability to perform or comply with its obligations under this Agreement or consummate the transactions contemplated hereby.

Section 4.04  *Non-contravention.* The execution, delivery and performance by Buyer and its Affiliates of this Agreement and the other Transaction Documents to which Buyer or its Affiliates is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate the organizational or governing documents of Buyer or such Affiliates, (b) assuming compliance with the matters referred to in Section 4.03, violate any Applicable Law, (c) require any consent or other action by any Person under, conflict with or constitute a default under, or give rise to any right of termination, cancellation, modification or acceleration (whether after the giving of notice or the lapse of time or both) of any right or obligation of Buyer or such Affiliates or to a loss of any benefit to which Buyer or such Affiliates is entitled under any provision of any material Contract binding upon Buyer or such Affiliates, or (d) result in the creation or imposition of any Lien on any asset of Buyer or such Affiliates, except for any such Liens as would not be material to the business of Buyer, taken as a whole, and with such exceptions, in the case of each of clauses (b) through (d), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or

53

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144423

delay the transactions contemplated by this Agreement or any other Transaction Document to which Buyer or any of its Affiliates is a party or Buyer's ability to perform or comply with its obligations hereunder or thereunder.

Section 4.05   *Financing.* Buyer has, and will have at the Closing, sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make full payment of the Purchase Price and any other amounts to be paid by it hereunder and the other Transaction Documents and Buyer acknowledges and agrees that the availability of funds shall not be a condition to the obligation of Buyer to consummate the transactions contemplated hereby or thereby.

Section 4.06   *Solvency.* Buyer is not entering into the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of the Business. At and immediately after the Closing, and after giving effect to the transactions contemplated by this Agreement, Buyer and its Subsidiaries (a) will be solvent (in that both the fair value of its assets will not be less than the sum of its debts and that the present fair saleable value of its assets will not be less than the amount required to pay its probable liabilities on its debts as they become absolute and matured), (b) will have adequate capital and liquidity with which to engage in its business and (c) will not have incurred and will not incur debts beyond its ability to pay as they become absolute and matured.

Section 4.07   *Litigation.* There are no material Actions pending against or, to the knowledge of Buyer, threatened against, Buyer or any of its Affiliates, except for such Actions as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the transactions contemplated by this Agreement or any other Transaction Document to which Buyer or any of its Affiliates is a party or Buyer's ability to perform or comply with its obligations hereunder or thereunder.

Section 4.08   *Competitive Activities.* As of the date hereof, none of Buyer nor any of its Affiliates is currently a party to any contract, agreement, license, commitment, undertaking or arrangement in respect of any actual or proposed investment or ownership interest in any business or asset that would or would reasonably be expected to: (i) impose any non de-minimis delay in the obtaining of, or increase the risk in a non de-minimis manner of not obtaining, any consents of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period; (ii) increase the risk in a non de-minimis manner of any Governmental Authority seeking or entering an Order prohibiting the consummation of the transactions contemplated by this Agreement; (iii) increase the risk in a non de-minimis manner of not being able to remove any such Order on appeal or otherwise; or (iv) delay in a non de-minimis way or prevent the consummation of the transactions contemplated by this Agreement.

Section 4.09   *Finders' Fee.* Except for Ardea Capital Partners and J.P. Morgan Securities LLC, the fees and expenses of which will be borne in full by Buyer, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                  AA-LITTRGT-000144424

connection with the transactions contemplated by this Agreement or the other Transaction Documents.

Section 4.10   *Purchase for Investment.* Buyer is purchasing the Purchased Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Shares and is capable of bearing the economic risks of such investment.

ARTICLE 5

COVENANTS OF SELLER

Section 5.01   *Conduct of the Business.* From the date hereof until the Closing Date (subject to Section 2.08 and, except as set forth in Section 5.01 of the Disclosure Schedule, as required to consummate the HHI Transaction pursuant to the HHI Agreement or by Applicable Law, as contemplated by the Transaction Documents (including the settlement of intercompany accounts to the extent set forth in Section 5.02), as required to consummate the Pre-Closing Reorganization or with Buyer's consent (which consent shall not be unreasonably withheld, conditioned or delayed)), Seller shall, and shall cause the Acquired Entities to, use reasonable best efforts to (x) conduct the Business in the Ordinary Course, (y) preserve the Business (including operations, organization and goodwill) and the relationships of the Business, including with each of its material customers and material suppliers, and (z) keep available the services of the present Business Employees that are executives (other than due to terminations of employment or absences from employment in the Ordinary Course), *provided, however*, that no action by Seller or any of the Acquired Entities with respect to any of the matters addressed by Sections 5.01(a) through (u) shall be deemed a breach of the foregoing unless such action would constitute a breach of such Sections. Without limiting the generality of the foregoing sentence, except as set forth in Section 5.01 of the Disclosure Schedule, as required by Applicable Law, as expressly contemplated by the Transaction Documents (including the settlement of intercompany accounts to the extent set forth in Section 5.02) or with Buyer's consent (which consent shall not be unreasonably withheld, conditioned or delayed), solely with respect to the Business, Seller shall not, and shall cause the Acquired Entities not to (except, in each case, as expressly contemplated by any other clause):

(a)   amend the articles or certificate of incorporation or other organizational documents of an Acquired Entity (other than in accordance with the Pre-Closing Reorganization);

(b)   acquire assets (including capital stock) from any Person (other than Seller or any of its Affiliates) except (i) pursuant to existing contracts or commitments or (ii) otherwise in the Ordinary Course;

55

AA_CONFIDENTIAL                    AA-LITTRGT-000144425

(c)      sell, lease, license, abandon or otherwise dispose of any Purchased Shares or any asset of an Acquired Entity except (i) pursuant to existing contracts or commitments or (ii) sales of inventory or disposals of assets in the Ordinary Course;

(d)      (i) other than dividends or distributions payable in cash, declare, set aside or pay any dividend or other distribution with respect to the Acquired Entity Securities, (ii) issue, sell, transfer, pledge, dispose of or encumber or agree to issue, sell, transfer, pledge, dispose of or encumber (other than Permitted Liens) any Acquired Entity Securities to any Person (other than as may be required in connection with the Pre-Closing Reorganization), (iii) split, combine or reclassify the Purchased Shares or any other outstanding Acquired Entity Securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution therefor, or (iv) redeem, purchase or otherwise acquire, directly or indirectly, any Acquired Entity Securities;

(e)      incur any capital expenditures in respect of the Business, except for (i) aggregate capital expenditures contemplated by Seller's fiscal year 2022 forecast for capital expenditures reflected in the financial model made available to Buyer prior to the date of this Agreement, (ii) unbudgeted capital expenditures not to exceed two hundred fifty thousand dollars ($250,000) individually or five hundred thousand dollars ($500,000) in the aggregate or (iii) amounts to be paid in full prior to the Closing or reflected as a Current Liability in Closing Net Working Capital;

(f)      make any loans or advances to any Business Employee, other than (i) advances of travel expenses in the Ordinary Course or (ii) amounts to be paid in full prior to the Closing or reflected as a Current Liability in Closing Net Working Capital;

(g)      (i) except as required by Applicable Law, amend or modify any Material Contract in any way adverse to the Business, or voluntarily terminate any Material Contract, or otherwise waive or release any material rights, claims or benefits of the Business thereunder, in each case other than in the Ordinary Course, or (ii) enter into any new Contract that would otherwise be a Material Contract if existing on the date hereof;

(h)      settle, or offer or propose to settle, any Action involving the Business, except (i) in the Ordinary Course or (ii) where such settlement or compromise would not involve payments with respect to the Business in excess of five hundred thousand dollars ($500,000), in each case that does not impose any ongoing non-monetary obligation or limitation on the Business;

(i)      with respect to each Acquired Entity, (i) make or change any Tax election, change any annual Tax accounting period, or change any method of Tax accounting or (ii) enter into any agreement in respect of Taxes with any Taxing Authority, including the settlement or compromise of any Tax claim, in each case except (A) if such action is not reasonably expected to have a material and adverse impact on Buyer or an Affiliate (including any Acquired Entity following the Closing), or (B) to the extent solely related to a Seller Group;

56

AA_CONFIDENTIAL                                         AA-LITTRGT-000144426

(j)     with respect to each Acquired Entity, incur any indebtedness for borrowed money other than (i) in an amount not to exceed one million dollars ($1,000,000) in the aggregate, (ii) accounts receivable factoring or (iii) pursuant to intercompany notes extended by Seller or any of its Subsidiaries;

(k)     make any material change in any method of accounting with respect to the Business, except for any such change required by reason of a concurrent change in IFRS or Applicable Law;

(l)     materially increase the compensation or benefits of any Business Employee other than (i) annual salary or wage rate or target bonus adjustments made for 2023 in the Ordinary Course, and consistent with past practice, in connection with an annual compensation review, (ii) as required by Applicable Law, the terms of any Business Benefit Plan or any applicable collective bargaining or works council agreement in effect as of the date hereof, (iii) any adjustments to health and welfare plans that generally apply to employees of Seller and its Affiliates as a whole and that are made in the Ordinary Course, or to one or more of Seller's   s business units as a whole other than the Business, or that otherwise does not seek to target the Business or Business Employees, or (iv) for which Seller and its Affiliates (other than the Acquired Entities) shall be solely obligated to pay and as would not result in a liability to Buyer or an Acquired Entity;

(m)     enter into, materially amend or terminate any Assumed Benefit Plan or any Business Benefit Plan that would be an Assumed Benefit Plan if it was in effect as of the date of this Agreement;

(n)     hire, terminate or transfer to another Seller division (other than another Acquired Entity) any Business Employee whose base salary (effective as of the date of hire or termination of such Business Employee) exceeds one hundred seventy-five thousand dollars ($175,000), or promote any Business Employee such that his or her base salary after such promotion exceeds one hundred seventy-fifty thousand dollars ($175,000);

(o)     assign, transfer, sell, abandon, fail to maintain, or permit to lapse any Business Intellectual Property, except non-exclusive licenses granted in the Ordinary Course;

(p)     (i) adopt a plan of complete or partial liquidation, restructuring or dissolution or (ii) enter into any Contracts or submit any letter of intent or similar arrangement to make any acquisition (whether by merger, acquisition of stock or assets, otherwise) of any business or line of business;

(q)     lease, sub-lease, license or otherwise give any Acquired Entity or any third party the right to use or occupy any real property or to purchase any real property;

(r)     engage in any promotional sales or discount or other activity with customers (other than in the Ordinary Course consistent with past practice) that would reasonably be

57

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144427

expected to have the effect of accelerating to pre-Closing periods sales that would otherwise be reasonably expected to occur in post-Closing periods;

(s)     make any changes in its cash management process, conduct its billing and collection of receivables and inventory purchases other than in the Ordinary Course or make any write down in the value of its assets;

(t)     delay or postpone the repair and maintenance of its properties or the payment of accounts payable, accrued liabilities and liabilities other than in the Ordinary Course; and

(u)     authorize or commit or agree to do any of the foregoing.

Notwithstanding the foregoing, nothing in this Section 5.01 shall restrict Seller or any Acquired Entity, in any respect, from taking any action to (i) cause an Acquired Entity to dividend, distribute or otherwise pay to another Acquired Entity, Seller or any of its respective Affiliates (or another equityholder of such Acquired Entity) any or all of its Cash, (ii) remove and pay to Seller or any of its respective Affiliates any Cash held in any bank account of an Acquired Entity or the Business, (iii) settle or otherwise terminate or eliminate intercompany balances, or terminate any contracts, between Seller and any of its Affiliates in respect of the Business, (iv) make or incur any intercompany loans among Affiliates (excluding the Acquired Entities) under common control with or controlled by Seller, (v) otherwise comply with or give effect to the provisions of this Agreement, or (vi) take (or omit to take) any action that Seller or any of its Affiliates determines, in its sole discretion, is reasonable in response to COVID-19 or any COVID-19 Event in a manner consistent with (1) the Ordinary Course responses previously taken by Seller and the Acquired Entities and (2) any other Ordinary Course responses taken by Seller or any of its Affiliates with respect to its other businesses.

Section 5.02     *Termination of Intercompany Agreements and Balances.*

(a)     Seller shall take any and all actions necessary to terminate the contracts solely between or among an Acquired Entity, on the one hand, and Seller and any of its Affiliates (other than the Acquired Entities), on the other hand, (each of the foregoing contracts referred to in this clause (a), a "**Business Intercompany Contract**"     ), in each case prior to or simultaneously with the Closing, except in each case (x) the Transaction Documents and (y) such agreements expressly provided in or expressly contemplated by the Transaction Documents or listed in Section 5.02 of the Disclosure Schedule.

(b)     Seller shall take all actions necessary to cancel, pay or otherwise settle all intercompany balances (i) between an Acquired Entity, on the one hand, and Seller and any of its Affiliates (other than the Acquired Entities), on the other hand, or (ii) between the Business, on the one hand, and any Retained Business, on the other hand, prior to or simultaneously with the Closing, in each case, in such a manner as to ensure that no liability or obligation arising therefrom or related thereto is imposed on Seller or an Acquired Entity (other than (A) amounts to be paid in full prior to the Closing or reflected as a Current Liability in Closing Net Working

58

AA_CONFIDENTIAL

Capital, (B) trade payables and trade receivables incurred in the Ordinary Course, and (C) under contracts that are not required to be terminated pursuant to this Agreement).

(c)     Prior to delivery of the Preliminary Closing Statement, Seller shall use good faith efforts to minimize the amount of Cash held by the Acquired Entities in jurisdictions other than the United States above that required to maintain the working capital of the Business with respect to each such Acquired Entity pursuant to the conduct of the Business in the Ordinary Course, it being understood and agreed that a failure to so minimize cash shall not be a breach of any covenant or agreement under this Agreement or failure of a closing condition to this Agreement or delay the Closing in any respect.

Section 5.03     *Third-Party Consents*. From the date hereof until the Closing, Seller shall use its reasonable best efforts to obtain all applicable Third-Party Consents set forth on Section 3.04(iii) of the Disclosure Schedule in accordance with the terms hereof. Any documented, out-of-pocket fees, costs, payments or other liabilities incurred in connection with obtaining such Third-Party Consents shall be borne by Buyer; *provided* that (i) Seller shall cooperate in good faith to minimize the amount of any such fees, costs, payments or other liabilities, and (ii) if such fees, costs, payments or other liabilities are material, Seller shall provide written notice thereof to Buyer prior to incurring any such fees, costs, payments or other liabilities, and Buyer may instruct Seller in writing to cease seeking such Third-Party Consent. Buyer shall reasonably assist and cooperate with Seller in order to obtain any Third-Party Consent. Nothing in this Agreement shall require Seller or any of its Affiliates to pay any money or other consideration or grant any other accommodation or concession to any Person or to initiate any claim or proceeding against any Person (including in connection with obtaining any Third-Party Consent) or pursuant to Section 2.04.

Section 5.04     *Pre-Closing Reorganization*

(a)     Seller shall use its reasonable best efforts to take such steps as are required to consummate the transactions constituting the Pre-Closing Reorganization prior to the Closing.

(b)     Seller may make such changes to <u>Schedule I</u> and Section 1.01(a) of the Disclosure Schedule (including in order to designate any additional Subsidiaries as an Acquired Entity (so long as such Subsidiary, if replacing another Subsidiary, is not in a different jurisdiction than the replaced Subsidiary), to remove any Subsidiary of Seller from the group of Acquired Entities, or to otherwise change any Subsidiary of Seller with respect to any particular Acquired Entity) at any time prior to the Closing as it deems necessary or advisable and in its sole discretion; *provided* that such changes do not have an adverse impact on Buyer. Any such changes shall be incorporated into a revised, amended and restated <u>Schedule I</u> or Section 1.01(a) of the Disclosure Schedule, as applicable. Any other changes to <u>Schedule I</u> and Section 1.01(a) of the Disclosure Schedule shall be subject to the prior written consent of Buyer (not to be unreasonably withheld, delayed or conditioned).

\\4149-1218-4642  v11

AA_CONFIDENTIAL                                                              AA-LITTRGT-000144429

(c)     Buyer shall be permitted from time to time to propose in good faith any amendments or modifications to the Pre-Closing Reorganization with a view to optimizing value to each of Buyer and its Affiliates, on the one hand, and Seller and its Affiliates, on the other hand. Seller shall consider all such comments in good faith and shall implement any such amendment or modification that does not or would not be reasonably expected to adversely impact the ability of Seller or its Affiliates to consummate the transactions constituting the Pre-Closing Reorganization in accordance with the terms hereof, delay the Closing in a non de-minimis manner or have any non de-minimis adverse impact on Seller or any of its Affiliates.

(d)     For a period of sixty (60) days following the date of this Agreement, (i) Buyer and Seller may mutually agree to amend and update Schedule I to designate any additional Subsidiary of Seller as a Acquired Entity, to remove any Subsidiary of Seller from the group of Acquired Entities, or to otherwise change any Subsidiary of Seller with respect to any Acquired Entity, and (ii) Seller shall be permitted to revise Section 3.06 of the Disclosure Schedules to include any additional necessary disclosures related thereto.

(e)     Seller and Buyer acknowledge and agree that, to the extent necessary for a an asset or liability of the Business, or any claim, right or benefit arising thereunder (together, the "**TSA Assets**"      ), to remain with Seller or its applicable Affiliate in order for Seller or its applicable Affiliate to provide services pursuant to the Transition Services Agreement in accordance with the terms thereof, without any reduction in the Purchase Price, legal title to the TSA Assets shall not be conveyed to Buyer at the Closing pursuant to this Agreement. Subject to the other provisions of this (e), upon expiration or termination of the applicable services pursuant to the Transition Services Agreement in accordance with the terms thereof, legal title to such TSA Asset shall be conveyed, transferred, novated and assigned to Buyer or its applicable Affiliate without any increase in the Purchase Price.

(f)     Prior to the Closing, Seller shall use its reasonable best efforts to take such actions as may be reasonably requested by Buyer in order to ensure that, immediately prior to the Closing, any director, officer or manager of the Acquired Entities (as applicable) who has been identified in advance to Seller by Buyer shall have either (i) delivered a letter of resignation (in a form reasonably satisfactory to Buyer) or (ii) been removed, in each case, from such person'      s position as a director, officer or manager (as applicable).

(g)     Prior to the Closing, Seller shall use its reasonable best efforts to provide copies of all documents, agreements and instruments executed in connection with the Pre-Closing Reorganization, in each case, in a form acceptable to Buyer.

Section 5.05   *Data Room*. Seller will cause the documents or materials contained in the Data Room to be memorialized in electronic format on a USB flash drive (or other electronic format) delivered to Buyer, at Buyer'      s cost, at or promptly following (a) the date hereof, and (b) the Closing.

60

AA_CONFIDENTIAL                                                                AA-LITTRGT-000144430

Section 5.06    *Non-Solicitation; No-Hire.* Subject to the parties'        rights and obligations under Section 5.01, during the period commencing on the Closing Date and ending two (2) years following the Closing Date (the "**Non-Solicit Period**"        ), Seller shall not, and shall cause its respective Affiliates not to, directly or indirectly (a) solicit or facilitate any third party in connection with the solicitation of any employee of any Acquired Entity as of or after the date hereof (the "**Specified Employees**"        ) to resign or leave the employ of any Acquired Entity, or (b) hire or retain any Specified Employees; *provided*, that the foregoing restrictions in this Section 5.06 will not prohibit Seller or its Affiliates from (i) soliciting or hiring any Specified Employee who has been terminated by Buyer or any Acquired Entity or otherwise ceased to be employed with Buyer or any Acquired Entity, in each case for at least twelve (12) months prior to such solicitation or hiring, (ii) making any general solicitation for employment by use of advertisements in the media or otherwise (including through the use of professional search firms) that is not specifically directed at any Specified Employees and hiring any such Specified Employee who responds to any such general solicitation.   Seller acknowledges that the covenants set forth in this Section 5.06 are reasonable in order to protect the value to Buyer of the transactions contemplated hereby and the value of the Business. Seller understands that Buyer would not have entered into this Agreement absent the provisions in this Section 5.06. Seller acknowledges that a violation of this Section 5.06 would cause Buyer irreparable harm, which would not be adequately compensated for by money damages.   Seller therefore agrees that in the event of any violation of this Section 5.06, Buyer will be entitled, in addition to other remedies that it may have, to a temporary restraining order and preliminary and final injunctive relief against Seller or such Affiliate to prevent any violations of this Section 5.06, without the necessity of posting a bond or proving any actual damages.   It is the intent and understanding of Buyer and Seller that if, in any Action before any Governmental Authority legally empowered to enforce this Section 5.06, any term, restriction, covenant or promise in this Section 5.06 is found to be unreasonable and for that reason unenforceable, then such term, restriction covenant or promise will be deemed modified by the minimal amount necessary to make it enforceable by such court or agent, to the extent permissible under Applicable Law.   In the event of any breach or violation of this Section 5.06, the Non-Solicit Period shall automatically be extended by the period of the breach or violation.

Section 5.07    *Exclusive Dealing.*

(a)      Seller nor the Acquired Entities nor any of their Affiliates or Representatives will, directly or indirectly, (i) discuss, encourage, negotiate, undertake, initiate, authorize, recommend, propose or enter into, whether as the proposed surviving, merged, acquiring or acquired corporation or otherwise, any transaction involving a merger, consolidation, business combination, purchase or disposition of any material amount of the assets of the Business, the Acquired Entities or any capital stock or other ownership interests of the Acquired Entities other than the transactions contemplated hereby (a "**Sale Transaction**"        ) and sales of inventory in the Ordinary Course, (ii) facilitate, encourage, solicit or initiate discussions, negotiations or submissions of proposals or offers in respect of a Sale Transaction, (iii) furnish or cause to be furnished, to any Person, any information concerning the Business, operations, properties or assets of the Acquired Entities in connection with a Sale Transaction, or (iv) otherwise

61

AA_CONFIDENTIAL                                                    AA-LITTRGT-000144431

cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek any of the foregoing.

(b)    Seller will notify Buyer in writing promptly (but in no event later than one (1) Business Day) after receipt by Seller, the Acquired Entities or any of their Representatives of any proposal or offer from any Person other than Buyer to effect a Sale Transaction or any request for non-public information relating to the Business or the Acquired Entities or for access to the properties, books or records of the Acquired Entities by any Person other than Buyer. Such notice will indicate the identity of the Person making the proposal or offer, or intending to make a proposal or offer or requesting non-public information or access to the books and records of the Acquired Entities, the material terms of any such proposal or offer, or modification or amendment to such proposal or offer and copies of any written proposals or offers or amendments or supplements thereto. Seller will keep Buyer informed, on a current basis, of any material changes in the status and any material changes or modifications in the material terms of any such proposal, offer, indication or request.

(c)    Seller and the Acquired Entities will (and will cause their Representatives to) immediately cease and cause to be terminated any existing discussion or negotiations with any Person (other than Buyer) conducted before the date hereof with respect to any Sale Transaction.

Section 5.08    *Buyer Offers of Employment.*

(a)    Subject to Section 9.02(a), any offers of employment from Buyer or its Affiliates to, or proposed modifications by Buyer to the employment terms with an Acquired Entity of, a Business Employee shall be subject to the Closing occurring and contain such terms as determined by Buyer; for the avoidance of doubt, such offers may include restrictive covenants including non-competition, non-solicitation, invention assignment, confidentiality and other similar obligations as determined by Buyer in its sole discretion.

(b)    Subject to Section 9.02(a), Seller shall provide reasonable assistance in transmitting the offers of employment to such Business Employees and shall use reasonable best efforts to facilitate introductions of Buyer to such Business Employees and provide Buyer with reasonable access during normal business hours and on reasonable advance notice to such employees; provided that such access shall be in a manner that does not interfere with the normal business operations of the Acquired Entities or any of their Affiliates.

ARTICLE 6
COVENANTS OF BUYER

Section 6.01    *Confidentiality.*    All information provided or made available to Buyer, its Affiliates or any of their respective Representatives pursuant to any of the Transaction Documents or in connection with any of the transactions contemplated thereby, whether provided prior to or after the date hereof, shall be subject to the Confidentiality Agreement. The Confidentiality Agreement shall terminate at the Closing, except for the confidentiality and non-

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144432

use obligations (and provisions related or incidental thereto) with respect to that portion of the Information (as defined in the Confidentiality Agreement) as relates to Seller and the Retained Business, which shall continue in full force and effect following the Closing in accordance with the terms and conditions of the Confidentiality Agreement. If this Agreement is terminated, for any reason or by either party, prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 6.02   *Contact with Customers, Suppliers and Other Business Relations.* During the period from the date of this Agreement until the Closing, Buyer agrees that it is not authorized to and shall not, and shall not permit any of its Affiliates or any of its or their respective Representatives to, contact any employee or other service provider, customer, supplier, distributor or other material business relation of the Business, specifically regarding the Business or the transactions contemplated by this Agreement, without the prior written consent of Seller; *provided* that nothing in this Section 6.02 shall be deemed to prohibit communications with any Business Employees for purposes of making an offer of employment pursuant to Article 9.

Section 6.03   *Directors and Officers.*

(a)   From and after the Closing, Buyer shall cause the Acquired Entities to maintain in effect and continue to provide to the fullest extent permitted by Applicable Law all rights to indemnification, advancement of expenses, exculpation and other limitations on liability currently existing in favor of any current or former director, manager or officer (or equivalent positions) of the Acquired Entity including any predecessors thereof (collectively, the "**D&O Indemnitees**"   ) under, and in no event on terms less favorable than those contained in, the organizational documents of each Acquired Entity in effect on the date of this Agreement.

(b)   At or prior to the Closing, Buyer shall purchase or cause to be purchased a noncancellable extension of the directors'      and officers'      liability coverage of Seller's (or its Affiliates'   ) existing directors'      and officers'      insurance policies for the D&O Indemnitees and Seller's (or its Affiliates'   ) existing fiduciary liability insurance policies for the D&O Indemnitees (collectively, the "**D&O Tail Policy**"   ), which shall (i) be for a claims reporting or discovery period of at least six (6) years from and after the Closing with respect to any claim related to any period or time at or prior to the Closing, (ii) be from Seller's (or their Affiliates'   ) current insurance carrier with respect to such coverage or an insurance carrier with the same or better credit rating and (iii) have terms, conditions, retentions and limits of liability that are no less favorable than the coverage provided under Seller's (or its Affiliates'   ) existing insurance coverage for the D&O Indemnitees with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against the beneficiaries thereof by reason of their having served in such capacity that existed or occurred at or prior to the Closing (including in connection with this Agreement or the transactions or actions contemplated thereby); *provided* that (A) in no event shall the premiums for the D&O Tail Policy exceed an aggregate premium amount in excess of three hundred fifty percent (350%) of the premium amount per annum for Seller's (or its Affiliates'   ) existing insurance coverage for the D&O Indemnitees and (B) if the aggregate premium amount for the D&O Tail

63

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                          AA-LITTRGT-000144433

Policy exceeds such amount, Buyer shall be obligated to obtain a D&O Tail Policy with the greatest coverage available, with respect to matters occurring prior to the Closing, for a cost not exceeding such amount.

(c)      In the event that Buyer, an Acquired Entity or any successor or assign of the foregoing (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or a majority of its properties and assets to any Person, then in each such case, proper provision shall be made so that the successors and assigns of Buyer or such Acquired Entity, as the case may be, shall succeed to and be bound by the obligations set forth in this Section 6.03.

(d)      The obligations of Buyer under this Section 6.03 shall not be terminated or modified in such a manner as to materially and adversely affect any D&O Indemnitee to whom this Section 6.03 applies without the written consent of such affected D&O Indemnitee (it being expressly agreed that each D&O Indemnitee shall be a third-party beneficiary of this Section 6.03).

Section 6.04    *Seller Names and Marks.*

(a)      Except as expressly permitted under the Supply Agreement, immediately following the Closing Date (and in any event within eight (8) months thereafter with respect to the Yale® branded electronic residential businesses in the U.S. and Canada and twelve (12) months thereafter with respect to the Emtek® branded business), Buyer shall, and shall cause its Affiliates (including, as of the Closing, the Acquired Entities) to, (i) cease and discontinue any and all uses of Seller Names and Marks, (ii) destroy and dispose of, or otherwise remove all Seller Names and Marks from, any materials of Buyer or any of its Affiliates (including, as of the Closing, the Acquired Entities) bearing any Seller Names and Marks and (iii) cause their names to be changed to such other names that do not include the Seller Names and Marks and make all necessary filings, and use reasonable best efforts to cause all applicable Governmental Authorities, to change all applications, registrations and filings, including corporate names, seals and certificates of Buyer and its Affiliates (including, as of the Closing, the Acquired Entities), such that they will not include any Seller Names and Marks; *provided, however*, that, to the extent that it is necessary for the name of any Acquired Entity to continue to include any Seller Names and Marks in connection with the provision or receipt of any services pursuant to the Transition Services Agreement, Buyer shall not, and shall cause its Affiliates (including, as of the Closing, the Acquired Entities) not to, cause such name to be changed as contemplated herein until the expiration of the Transition Services Agreement or otherwise such earlier date mutually agreed upon by Buyer and Seller. Any use by Buyer or its Affiliates (including, as of the Closing, the Acquired Entities) of the Seller Names and Marks during the limited period provided in this Section 6.04 shall be (A) solely in connection with goods, products and services that are (x) the type of goods, products and services in connection with which Seller and its Affiliates were using the Seller Names and Marks as of Closing and (y) of a quality at least as high as the quality of goods, products and services provided by Seller and its Affiliates immediately prior to the Closing and (B) subject to all style and other usage guidelines in effect

64

AA_CONFIDENTIAL      AA-LITTRGT-000144434

for the Seller Names and Marks immediately prior to the Closing. All goodwill associated with the use by Buyer and its Affiliates (including, as of the Closing, the Acquired Entities) of the Seller Names and Marks shall inure to the sole and exclusive benefit of Seller or its Affiliates, as applicable.

(b)    Buyer, on behalf of itself and its Affiliates (including, as of the Closing, the Acquired Entities), acknowledges and agrees that neither Buyer nor any of its Affiliates (including, as of the Closing, the Acquired Entities) has acquired or will acquire any right, title or interest in or to the Seller Names and Marks (or any goodwill associated therewith). From and after the Closing, (x) Buyer shall not, and shall cause each of its Affiliates (including, as of the Closing, the Acquired Entities) not to, hold itself out as having any affiliation (other than an accurate description of the historical relationship between the Seller and its Affiliates and the Acquired Entities) with Seller or any of its Affiliates and (y) none of Buyer or its Affiliates (including, as of the Closing, the Acquired Entities) shall, or shall assist any third party to, challenge or seek to deny or restrict the ownership, validity or enforceability of any Seller Names and Marks.

Section 6.05    *Yale Marks.*

(a)    Within twelve (12) months following the Closing Date, Seller shall, and shall cause its Affiliates (excluding the Acquired Entities) to, (i) cease and discontinue any and all uses of Yale Marks in the United States and Canada, and (ii) destroy and dispose of, or otherwise remove all Yale Marks from, any materials of Seller or any of its Affiliates (excluding the Acquired Entities) bearing any Yale Marks in the United States and Canada; *provided however*, nothing contained in this Agreement will prevent Seller or its Affiliates for a period of two (2) years following the Closing Date with respect to sales of products in the Commercial Business (as defined in the Patent License Agreement) from honoring any specification or quote, in each case issued prior to the Closing Date and retaining, using or selling any materials containing the Yale Marks in the United States and Canada to the extent necessary in connection therewith.  Any use by Seller or any of its Affiliates (excluding the Acquired Entities) of the Yale Marks in the United States and Canada during the limited period provided in this Section 6.05 shall be (A) solely in connection with goods, products and services that are (x) the type of goods, products and services in connection with which Seller and its Affiliates were using the Yale Marks in the United States and Canada as of Closing and (y) of a quality at least as high as the quality of goods, products and services provided by Seller and its Affiliates immediately prior to the Closing and (B) subject to all style and other usage guidelines in effect for the Yale Marks in the United States and Canada immediately prior to the Closing. All goodwill associated with the use by Seller and its Affiliates (excluding the Acquired Entities) of the Yale Marks in the United States and Canada shall inure to the sole and exclusive benefit of Buyer or its Affiliates, as applicable. As soon as reasonably practicable after the date hereof, Seller agrees to cease directly specifying products bearing the Yale Marks for potential customers use and shall encourage third parties that specify such products to cease such specification.

65

AA_CONFIDENTIAL                                                                                          AA-LITTRGT-000144435

(b)      Except as expressly set forth below, Seller, on behalf of itself and its Affiliates (excluding the Acquired Entities), acknowledges and agrees that neither Seller nor any of its Affiliates (excluding the Acquired Entities) has acquired or will acquire pursuant to this Section 6.05 any right, title or interest in or to the Yale Marks (or any goodwill associated therewith) other than the limited usage rights expressly set forth herein. From and after the Closing, (x) Seller shall not, and shall cause each of its Affiliates (excluding the Acquired Entities) not to, hold itself out as having any affiliation (other than an accurate description of the historical relationship between the Seller and its Affiliates and the Acquired Entities) with Buyer or any of its Affiliates and (y) none of Seller or its Affiliates (excluding the Acquired Entities) shall, or shall assist any third party to, challenge or seek to deny or restrict the ownership, validity or enforceability of any Yale Marks in the United States and Canada.

(c)      Seller hereby agrees to work with Buyer in good faith to determine a process prior to the Closing to resolve potential post-Closing export issues related to Yale branded products manufactured by Buyer outside the United States and Canada and intended for import to the United States or Canada.

Section 6.06    *License.*

(a)      Effective as of Closing, Seller on behalf of itself and its Affiliates (excluding the Acquired Entities), hereby grants to Buyer and the Acquired Entities a non-exclusive, limited, personal, sublicenseable, transferable (solely as set forth below), perpetual license to continue to use solely in the Business (as defined in the Software License Agreement), the Intellectual Property (excluding Trademarks and Patents) (and make, use, offer to sell or sell products and services covered thereby), if any, that, in each case: (i) is owned by Seller or its Affiliates (excluding the Acquired Entities) as of the Closing Date; (ii) is not licensed to an Acquired Entity under the Seller Patent License Agreement, Software License Agreement or Transition Services Agreement; and (iii) was used, on or before the Closing Date, in the Business (as defined herein) (collectively, the "**Additional Licensed IP**"       ).

(b)      The license granted in Section 6.06(a) is intended to run with the Intellectual Property subject to such license. Buyer may not assign, delegate or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations in the Additional Licensed IP without the prior written consent of Seller; provided that Buyer may assign or transfer all of its rights or obligations with respect to such Additional Licensed IP without such consent, but upon notice to Seller, in connection with: (a) any transfer to any Affiliate of Buyer; (b) a transfer or sale, through whatever means, of all or substantially all of the assets or the business of Buyer to which the Business relates (whether by assignment, conveyance, reorganization, merger, assumption, purchase and sale, by contract or by operation of law or at equity). Any attempted assignment, delegation or transfer in violation of this Section 6.06 shall be null and void *ab initio*. Seller is deemed to transfer its license granted to Buyer and the Acquired Entities, in whole or in part, to the successor or acquirer of any Intellectual Property subject thereto.

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                            AA-LITTRGT-000144436

(c)    If at any time after the Closing Date, Buyer becomes aware of any Patents that: (i) are owned by Seller or its Affiliates (excluding the Acquired Entities) as of the Closing Date; (ii) are not licensed to an Acquired Entity under the Seller Patent License Agreement; and (iii) were used on or before the Closing Date in the Business (as defined herein) or contemplated to be used in connection with the roadmap set forth Section 6.06(c) of the Disclosure Schedule, Buyer shall notify Seller in writing thereof.    Such Patents shall automatically be deemed "    Licensed Patents"    (as defined in the Seller Patent License Agreement) and licensed to Buyer pursuant to the Seller Patent License Agreement effective as of the Effective Date (as defined in the Seller Patent License Agreement.

(d)    The rights granted in Section 6.06(c) are intended to run with the Patents subject to such rights.  Seller hereby covenants and agrees that for the four (4) years following the Closing Date that if Seller or its Affiliates (excluding the Acquired Entities) transfers or assigns any Patent (other than a Licensed Patent), such assignment shall be subject to the exercise of Buyer'    s rights set forth in Section 6.06(c).

## ARTICLE 7
### COVENANTS OF BUYER AND SELLER

Section 7.01    *Regulatory Undertaking; Further Assurances.*

(a)    Subject to the terms and conditions of this Agreement, Buyer and Seller shall use their respective reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Laws to consummate the transactions contemplated by this Agreement and the other Transaction Documents as promptly as practicable, which shall include (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary or desirable filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary or desirable to consummate the transactions contemplated by this Agreement and the other Transaction Documents as promptly as practicable, and (iii) engaging in any litigation initiated or threatened by any Governmental Authority regarding the transactions contemplated by this Agreement or the HHI Transaction. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and use reasonable best efforts to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, to vest in Buyer ownership of the Acquired Entities.

(b)    In furtherance and not in limitation of the foregoing, each of Buyer and, where applicable, Seller shall make, with respect to the transactions contemplated by this Agreement, as promptly as reasonably practicable after the date hereof, all filings required pursuant to applicable Competition Laws and Investment Laws as described in Section 7.01(b) of the Disclosure Schedule.

\\4149-1218-4642 v11

AA_CONFIDENTIAL    AA-LITTRGT-000144437

(c)     Buyer shall (i) respond as promptly as practicable to any inquiries or requests received from any Governmental Authority, including in connection with any Competition Laws applicable to the transactions contemplated hereby; (ii) supply as promptly as practicable any additional information and documentary material that may be requested by a Governmental Authority; and (iii) subject to Buyer'     s other obligations under this Section 7.01, not enter into any agreement (or agree to do the foregoing) with any Governmental Authority to not consummate the transactions contemplated by this Agreement.

(d)     If any objections are asserted with respect to the transactions contemplated by this Agreement or any other Transaction Documents by any Governmental Authority, under any Applicable Law (including applicable Competition Laws), or if any Action is instituted or threatened by any Governmental Authority or any private party challenging any of the transactions contemplated by this Agreement or any other Transaction Document as violative of any Applicable Law (including applicable Competition Laws), Buyer shall, and shall cause its Affiliates (including, following the Closing, the Acquired Entities) to (i) create any relationship, contractual rights or obligations of the Acquired Entities, or Buyer or any of its Affiliates with Seller or its Affiliates and (ii) oppose, fully and vigorously, (A) any administrative or judicial action or proceeding that is initiated or threatened to be initiated challenging this Agreement or the consummation of the transactions contemplated by this Agreement and (B) any request for, the entry of, and seek to have vacated or terminated, any Order that could restrain, prevent or delay the consummation of the transactions contemplated by this Agreement, including in the case of either (A) or (B) by defending through litigation any action asserted by any Person in any court or before any Governmental Authority, and vigorously pursue all available avenues of administrative and judicial appeal (and, in each case, to enter into agreements or stipulate to the entry of an Order or decree or file appropriate applications with any Governmental Authority in connection with any of the foregoing and, in the case of actions by or with respect to the Acquired Entities, by consenting to such action subject only to the proviso at the end of this sentence), as may be required (x) by the applicable Governmental Authority in order to resolve such objections as such Governmental Authority may have to such transactions under any Applicable Law (including any other applicable Competition Law) or (y) by any domestic or foreign court or other tribunal, in any Action challenging such transactions as violative of any Applicable Law (including any other applicable Competition Law), in order to avoid the entry of, or to effect the dissolution, vacating, lifting, altering or reversal of, any Order that has the effect of restricting, preventing or prohibiting the consummation of the transactions contemplated by this Agreement.

Nothing set forth in this Section 7.01 or otherwise in this Agreement shall require, or be construed to require, Buyer or any of its Affiliates to agree to hold separate or to divest any assets or business segments, or terminate any existing relationships, contractual rights, or ventures. Subject to compliance with the provisions of this Section 7.01 (including Buyer'     s obligations under this Section 7.01(d)), Seller and Buyer shall cooperate (i) to devise and implement the strategy and process by which the parties will seek required approvals under any applicable Competition Laws, (ii) in connection with all other matters relating to any actions taken to resolve any objections raised by any Governmental Authority, and (iii) the defense or

68

AA_CONFIDENTIAL                                                                                  AA-LITTRGT-000144438

prosecution of any administrative or judicial action or proceeding relating thereto (it being acknowledged and agreed that Seller shall be entitled to primarily lead all meetings and communications with any Governmental Authority in connection with resolving any such objections raised by any Governmental Authority, except that Buyer shall be entitled to primarily lead such meetings and communications to the extent related to Buyer's own assets, personnel, witnesses or pleadings).

(e)     Subject to Applicable Law relating to the sharing of information, each party hereto shall (i) furnish the other party with copies of all documents (except documents or portions thereof for which confidential treatment has been requested or given, which the party may limit to sharing only with the external legal counsel of the other party) and correspondence (A) prepared by or on behalf of such party for any Governmental Authority and affording the other party the opportunity to comment and participate in responding, where appropriate; or (B) received by or on behalf of such party from any Governmental Authority, in each case in connection with the consents, authorizations, orders or approvals contemplated by this Section 7.01 and (ii) use reasonable best efforts to consult with and keep the other party hereto informed as to the status of such matters. Further, no party hereto shall, nor shall it permit any of its Representatives to, meet or engage in substantive conversations with any Governmental Authority or representative of such Governmental Authority in connection with obtaining any such consent, authorization, order and approval unless it consults with the other party in advance and, to the extent not precluded by Applicable Law, offers the other party the opportunity to participate in such meeting or conversation. Notwithstanding anything to the contrary in this Agreement, as between the parties hereto, Seller shall control all strategy and communications with the Department of Justice and any other Governmental Authority related to the HHI Transaction in connection with or under any Competition Law.

(f)     Without limiting the generality of the foregoing, in no event will Buyer acquire or agree to acquire any assets or business or take any other action, or permit any of its controlled Affiliates to acquire or agree to acquire any assets or business or take any other action, that would or would reasonably be expected to impose any material delay in the obtaining of, or increase the risk in a material manner of not obtaining, any consents of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement and the HHI Transaction or the expiration or termination of any applicable waiting period hereunder or thereunder; increase the risk in a material manner of any Governmental Authority seeking or entering an Order prohibiting the consummation of the transactions contemplated by this Agreement or the HHI Transaction; increase the risk in a material manner of not being able to remove any such Order on appeal or otherwise; or delay in a material manner or prevent the consummation of the transactions contemplated by this Agreement or the HHI Transaction.

Section 7.02   *Public Disclosure.* Any press release announcing the execution of this Agreement shall be issued in such form as shall be mutually agreed upon by Seller and Buyer. Unless otherwise required by Applicable Law (including any securities laws) or the rules of any securities exchange on which a party's or its Affiliates' securities are listed, neither Seller nor Buyer shall, and each shall cause their respective Affiliates not to, make any public

69

AA_CONFIDENTIAL                                                            AA-LITTRGT-000144439

announcement or publicly disseminate any written communication with respect to this Agreement or the transactions contemplated hereby (including broad communications to Business Employees), or otherwise communicate with any news media regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and Seller; *provided* that if any such announcement or communication is so required, Buyer and Seller shall consult with each other, to the extent reasonably practicable, in advance as to the contents and timing thereof; *provided, further*, that after the transactions contemplated by this Agreement have been announced, Seller and its Affiliates and Buyer and its Affiliates shall be entitled to respond to questions in the ordinary course or issue any press release or make any other public statement that, in each case, is consistent (as to nature and scope) with any public statement previously issued or made by it in accordance with the provisions of this Section 7.02.

Section 7.03   *Notices of Certain Events.*

(a)     Each of Seller, on the one hand, and Buyer, on the other hand, shall promptly notify the other parties of any of the following if such party has knowledge thereof: (i) to the extent permitted by Applicable Law, any material written notice or other material written communication received by such party from any Governmental Authority in connection with the transactions contemplated by this Agreement; or (ii) any fact or circumstance that would reasonably be expected to result in a failure of the other party' s conditions to closing in Article 10 to be satisfied; *provided* that a party' s good faith failure to comply with this Section 7.03 shall not provide any other party hereto or any of such other party' s Affiliates with a right not to effect the transactions contemplated by this Agreement, except to the extent that any other provision of this Agreement independently provides such right.

(b)     As promptly as practicable following each fiscal quarter prior to the Closing Date, Seller will make available to Buyer the trial balances of the Business in the form that it customarily prepares for its internal purposes for the period then ended.

Section 7.04   *Waiver of Conflicts Regarding Representation; Nonassertion of Attorney- Client Privilege.*

(a)     Buyer waives and shall not assert, and agrees to cause its controlled Affiliates to waive and not to assert, any conflict of interest or other objection arising out of or relating to the representation, after the Closing (the "**Post-Closing Representation**" ), of Seller or any of its Affiliates or any shareholder, officer, employee or director of Seller or any of its Affiliates (any such Person, a "**Designated Person**" ) in any matter involving or relating to this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, by any legal counsel currently representing Seller or any of its Affiliates, including the Acquired Entities, in connection with any Transaction Document or the HHI Transaction or the transactions contemplated hereby or thereby (the "**Current Representation**" ).

(b)     Buyer waives and agrees not to assert, and agrees to cause its controlled Affiliates, to waive and to not assert, any attorney-client privilege or attorney work product doctrine with respect to any communication between any legal counsel and any Designated

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144440

Person occurring during the Current Representation in connection with any Post-Closing Representation, including in connection with a dispute with Buyer or any of its Affiliates, and following the Closing, with an Acquired Entity, it being the intention of the parties hereto that all such rights to such attorney-client privilege or attorney work product doctrine and to control such attorney-client privilege or work product doctrine shall be retained by Seller; *provided*, that the foregoing waiver and acknowledgment of retention shall not extend to any communication not involving this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, or to communications with any Person other than the Designated Persons and their advisors.

(c)     Buyer, on behalf of itself and its controlled Affiliates, agrees that no communications (including email or other written communications) subject to attorney-client privilege or attorney work product doctrine in connection with the Current Representation shall be subject to disclosure, directly or indirectly, to Buyer or any Person acting on behalf of Buyer, and the Acquired Entities shall, without the necessity of further documentation of transfer, be deemed to have irrevocably assigned and transferred to Seller, the attorney-client privilege or attorney work product doctrine and expectation of client confidence with respect to all such communications, and all books and records and other documents of the Acquired Entities containing any such advice, communication or other materials with respect to this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby, and with respect to the HHI Transaction, and the same shall be controlled by Seller and shall not be used or claimed by, and no copies shall be retained by, Buyer or any of its controlled Affiliates.

(d)     Nothing in this Section 7.04 is intended to or shall be deemed to operate as a waiver of any applicable privilege or protection that could be asserted to prevent disclosure of any confidential communication by any legal counsel currently representing Seller or any of its Affiliates, including the Acquired Entities.

(e)     Seller and Buyer agree to take, and to cause their respective controlled Affiliates to take, all steps reasonably necessary to implement the intent of this Section 7.04.

Section 7.05     *Access to Information; Cooperation.*

(a)     From the date hereof until the Closing Date (or, if earlier, the termination of this Agreement), but subject to Applicable Law and the Confidentiality Agreement, Seller and its Affiliates will (i) give Buyer, its counsel and other authorized Representatives reasonable access to the properties, books and records of the Business, (ii) furnish to Buyer, its counsel and other authorized Representatives such financial and operating data and other information relating to the Business as such Persons may reasonably request, (iii) in accordance with Section 5.08, give Buyer and its authorized Representatives reasonable access to key Business Employees for purposes of preparing post-Closing employee retention programs, and (iv) instruct the employees, counsel and financial advisors of Seller and its Affiliates to reasonably cooperate with Buyer in its investigation of the Business. For the avoidance of doubt, the Confidentiality Agreement shall remain in effect in accordance with its terms, and such

71

AA_CONFIDENTIAL                                                          AA-LITTRGT-000144441

information, and all information provided pursuant to this Section 7.05 shall be treated as "Confidential Information" pursuant to the terms of the Confidentiality Agreement. Notwithstanding the foregoing, Buyer, its counsel and other authorized Representatives and its other agents shall not have access to (A) any information where such access or disclosure would, in the good faith judgment of Seller, in light of COVID-19 or COVID-19 Events, be unreasonable or jeopardize the health and safety of any Business Employee, (B) any properties of the Business, including the Leased Real Property, for purposes of conducting any sampling or other invasive investigation, including of the air, soil, soil gas, surface water, groundwater, building materials or other environmental media, (C) any information to the extent relating to the Retained Business or (D) Seller Tax Records.

(b)      From and after the Closing Date, and subject to Applicable Law, Buyer will preserve and maintain the books and records of the Business transferred from Seller to Buyer pursuant to the transactions contemplated hereby held by it for a period of five (5) years after the Closing Date (other than the books and records related to Taxes, which shall be held by it for a period of seven (7) years), and otherwise in accordance with its internal document retention policies and practices. Notwithstanding the foregoing, Buyer may dispose of any such books and records during such five (5) year period if such books and records are first offered in writing to Seller and not accepted by Seller within thirty (30) days of such written offer. Buyer shall not be required to retain such books and records for which Seller has been provided with a copy. Upon prior written request, and only for the purposes set forth in this Section 7.05(b), Buyer will provide Seller and its authorized Representatives reasonable access to the properties, books, records, employees and auditors of the Business to the extent such information is not competitively sensitive (i) to the extent requested to permit Seller or any of its Affiliates to comply with their financial reporting, accounting, tax, litigation, contractual or auditing obligations with respect to the period prior to the Closing with respect to the Business, and (ii) in connection with any Action related to the conduct of the Business prior to the Closing and for which Seller or such Affiliate has retained liability under this Agreement.

(c)      Any access granted or cooperation provided pursuant to this Section 7.05 shall be conducted during regular business hours and in such manner as not to interfere unreasonably with the conduct of the business of the party granting such access or providing such cooperation. The party to whom such access or other cooperation is granted pursuant to this Section 7.05 shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred by the other party, its Affiliates or any of their Representatives in connection therewith.

(d)      Notwithstanding anything to the contrary contained herein, nothing in this Section 7.05 shall require (i) Seller or Buyer, as applicable, to provide the other party or its Representatives with access to (A) personnel records of employees relating to individual performance or evaluation records, medical histories or other information which, in the disclosing party's good faith determination, is sensitive or the disclosure of which would violate Applicable Law or could subject such party or its Affiliates to risk of liability or (B) information the disclosure of which, in the disclosing party's good faith determination, would conflict with

72

AA_CONFIDENTIAL                                                                                                                AA-LITTRGT-000144442

contractual obligations to which such party or any of its Affiliates is bound, violate any Applicable Law or result in the forfeiture or waiver of any attorney-client or similar legal privilege; *provided*, that the parties hereto shall cooperate in good faith to develop substitute arrangements, to the extent reasonably possible, that do not result in the violation of such Applicable Law, breach of such obligations or loss or reduction of such privilege, or (ii) either party's independent accountants to make available to the other party or its Representatives any work papers unless and until such Person has signed a customary confidentiality and hold harmless agreement relating to such access to work papers in form and substance reasonably acceptable to such independent accountants.

Section 7.06 *Replacement of Guarantees*. Buyer shall use its reasonable best efforts to (a) (i) at or prior to the Closing, arrange for substitute letters of credit, guarantees, financial assurances, surety bonds, performance bonds or other credit support arrangements ("**Credit Support**") to replace (A) any Credit Support posted or obtained by or on behalf of Seller or any of its Affiliates (other than solely by the Acquired Entities) in connection with the obligations of the Acquired Entities, including those set forth on Section 7.06 of the Disclosure Schedule (collectively, the "**Seller Credit Support Arrangements**"), outstanding as of the date hereof, and (B) with the prior written consent of Buyer, the Seller Credit Support Arrangements entered into in the Ordinary Course on or after the date of this Agreement and prior to the Closing; *provided*, that the foregoing clauses (A) and (B) shall not require Buyer or any of its Affiliates to make any payment to such guarantor prior to the Closing Date, or (ii) assume all obligations under the Seller Credit Support Arrangements, obtaining from the creditors or other counterparties thereto full releases (in a form reasonably satisfactory to Seller and Buyer) of all parties liable, directly or indirectly, for reimbursement to the creditor or fulfillment of other obligations to a counterparty in connection with amounts drawn under Seller Credit Support Arrangements, and (b) by no later than thirty (30) days after the Closing Date, arrange for substitute Credit Support to replace the Seller Credit Support Arrangements set forth on Section 7.06 of the Disclosure Schedule; *provided*, that if any Seller Credit Support Arrangement is not so replaced or assumed effective as of the Closing, Buyer shall defend and indemnify Seller and its Affiliates against, and hold each of them harmless from, any and all Damages incurred or suffered by Seller or any of its Affiliates related to or arising out of such Seller Credit Support Arrangements. In respect of the foregoing, Seller will, and will cause its Affiliates and its and their Representatives to, cooperate with Buyer in connection with satisfying the obligations set forth in this Section 7.06.

Section 7.07 *Insurance Coverage*. From and after the Closing, the Acquired Entities shall cease to be insured by Seller's and its Affiliates' insurance policies or by any of their respective self-insurance programs (including insurance policies issued by any Affiliate of Seller), and Seller and its Affiliates shall retain all rights to control such insurance policies and self-insurance programs, including the right to exhaust, settle, release, commute, buy back or otherwise resolve disputes with respect to any of its insurance policies and self-insurance programs. Notwithstanding the foregoing, with respect to any event that occurs on or before the Closing Date that gives rise to a claim or claims (an "**Insurance Claim**") under any Insurance Policy maintained by Seller or any of its Affiliates, including any insurance provided by any

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                                                  AA-LITTRGT-000144443

captive entity, that relate to the assets, business, operations, employees, officers, directors and managers of the Acquired Entities (the "**Insurance Policies**"     ), Seller shall, and shall cause its applicable Affiliates to, cooperate in a commercially reasonable manner in the making of any such Insurance Claim under any of the applicable Insurance Policies at Buyer'     s reasonable request, provided that the foregoing shall not require Seller or its applicable Affiliates to maintain such Insurance Policies beyond their current terms. Seller shall, upon written request of Buyer, provide to Buyer following the Closing Date, true, complete and correct copies of all loss runs under any Insurance Policies maintained by Seller or any of its Affiliates to the extent reasonably available. Insurance Claims will be subject to any applicable deductibles, retentions, co-payments or self-insurance provisions of the Insurance Policies, and, with respect to any such deductibles, retentions, co-payments or self-insurance provisions that require a payment by Seller or its Affiliates, Buyer shall promptly reimburse Seller or its Affiliates for all such amounts paid by Seller or its Affiliates.

   Section 7.08   *Confidentiality*.

   (a)     Except as otherwise expressly provided in the Transaction Documents, from and after the Closing, Seller shall not, and shall cause its respective Affiliates and Representatives not to, for a period of three (3) years after the Closing Date, directly or indirectly, without Buyer'     s consent, disclose to any third party (other than to each other and their respective Representatives on a need-to-know basis) any confidential or proprietary information concerning Buyer or the Business; *provided*, that the foregoing restriction shall not (i) apply to any information that (A) is or becomes generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 7.08), (B) is, was or becomes available to Seller or any of its Affiliates or Representatives on a non-confidential basis from a source other than from Buyer or any Representative of Buyer (*provided*, that such source is not known by Seller or its Affiliates or Representatives after reasonable inquiry to be bound by any legally binding obligation to keep such information confidential) or (C) is independently developed by Seller or any of its Affiliates (other than by the Business prior to the Closing) without use of, or reference to, such confidential or proprietary information, or (ii) prohibit any disclosure (x) required by Applicable Law so long as, to the extent practicable and legally permissible, Seller provides Buyer with reasonable prior notice of such disclosure and a reasonable opportunity (at Buyer'     s sole cost and expense) to contest such disclosure or (y) made in connection with the enforcement of any right or remedy relating to any of the Transaction Documents or the transactions contemplated thereby.

   (b)     Except as otherwise expressly provided in the Transaction Documents, from and after the Closing, Buyer shall not, and shall cause its Affiliates and Representatives not to, for a period of three (3) years after the Closing Date, directly or indirectly, without Seller'     s consent, disclose to any third party (other than to each other and their respective Representatives on a need-to-know basis) any confidential or proprietary information concerning the Retained Business or Seller; *provided*, that the foregoing restriction shall not (i) apply to any information that (A) is or becomes generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 7.08), (B) is, was or becomes available to Buyer or any

74

AA_CONFIDENTIAL                                   AA-LITTRGT-000144444

of its Affiliates or Representatives on a non-confidential basis from a source other than from Seller or any Representative of Seller who is not subject to any legally binding obligation to keep such information confidential or (C) is independently developed by Buyer or any of its Affiliates or Representatives (other than by the Business prior to the Closing) without use of, or reference to, such confidential or proprietary information, or (ii) prohibit any disclosure (x) required by Applicable Law so long as, to the extent practicable and legally permissible, Buyer provides Seller with reasonable prior notice of such disclosure and a reasonable opportunity (at Seller's sole cost and expense) to contest such disclosure or (y) made in connection with the enforcement of any right or remedy relating to any of the Transaction Documents or the transactions contemplated thereby.

Section 7.09   *Pre-Closing Services Acknowledgement*. Buyer acknowledges that Seller and its Affiliates provide various services, rights and support to the Business with respect to the following matters: tax, legal, compliance, audit, treasury, financing and provision of indemnification and guarantees, in each case, that will not continue after the Closing except to the extent expressly provided in the Transition Services Agreement.

Section 7.10   *R&W Insurance Policy*. Buyer agrees that if Buyer or any of its Affiliates obtains or binds a representations and warranties insurance policy with respect to any of the representations or warranties of Seller under this Agreement (each, a "**R&W Insurance Policy**"), each such R&W Insurance Policy shall provide, at all times, that: (a) the insurer shall have no, and shall waive and not pursue any and all, subrogation rights against Seller or any of its Affiliates except for Actual Fraud by Seller; (b) Seller is a third party beneficiary of such waiver; and (c) Buyer shall have no obligations to pursue any claim against Seller in connection with any Damages.

Section 7.11   *Buyer Covenant*. Buyer covenants and agrees that Buyer and its Affiliates (including the Acquired Entities) shall not: (a) use the Yale Marks in the Commercial Business (as defined in the Seller Patent License Agreement); or (b) authorize any third party to use the Yale Marks in the Commercial Business (as defined in the Seller Patent License Agreement).

Section 7.12   *Canada*. After the date hereof, the parties shall cooperate in good faith to determine a mutually agreeable transfer mechanism for any assets related to the Business in Canada that are meant to be conveyed to Buyer under this Agreement.

## ARTICLE 8
### TAX MATTERS

Section 8.01   *Preparation and Filing of Tax Returns*. Subject to Section 8.11:

(a)      Seller shall prepare or cause to be prepared at its own expense all Covered Income Tax Returns and deliver such Covered Income Tax Returns to Buyer at least twenty (20) Business Days prior to the due date (after any extensions) of any such Tax Return; provided that all such Covered Income Tax Returns shall be prepared in a manner consistent with past

AA_CONFIDENTIAL                                                                                AA-LITTRGT-000144445

practice to the extent consistent with Applicable Law, and Buyer may review and comment on such Covered Income Tax Returns and Seller shall consider Buyer's comments with respect to such Covered Income Tax Returns in good faith and shall cause any revision reasonably requested by Buyer on such Covered Income Tax Returns to be reflected prior to filing such Covered Income Tax Returns; *provided* that such Covered Income Tax Return shall not reflect any material position for which the likelihood of prevailing on the merits is not at least " more likely than not," *provided further* that if Seller determines that any such position is not at least " more likely than not," Buyer and Seller shall jointly retain an Accounting Referee to resolve the disputed items. The costs, fees and expenses of the Accounting Referee shall be borne in the manner described in Section 2.04(c). Buyer shall timely file or cause to be timely filed all Covered Income Tax Returns as prepared by Seller (taking into account any revisions in response to Buyer's comments). For the avoidance of doubt, Buyer is entitled to seek indemnification from Seller with respect to any Taxes shown as due with respect to Covered Income Tax Returns pursuant to and to the extent provided in Section 8.07.

(b)    Buyer shall prepare or cause to be prepared at its own expense all Tax Returns required to be filed by any Acquired Entity for a taxable period that ends on or before the Closing Date (other than Covered Income Tax Returns) that are first due after the Closing Date and any Straddle Tax Returns and deliver such Tax Returns to Seller at least twenty (20) Business Days prior to the due date (after any extensions) of any such Tax Return; provided that all such Tax Returns shall be prepared in a manner consistent with past practice to the extent consistent with Applicable Law, and Seller may review and comment on such Tax Returns and Buyer shall cause any revision reasonably requested by Seller on such Tax Returns to be reflected prior to filing such Tax Returns. To the extent that a Tax item with respect to any transactions in the Pre-Closing Reorganization is reflected on any Tax Return prepared by Buyer pursuant to this Section 8.01(b), such item shall be reported in a manner determined by Seller, *provided* that such Tax Return shall not reflect any material position for which the likelihood of prevailing on the merits is not at least " more likely than not," *provided further* that if Buyer determines that any such position is not at least " more likely than not," Buyer and Seller shall jointly retain an Accounting Referee to resolve the disputed items. The costs, fees and expenses of the Accounting Referee shall be borne in the manner described in Section 2.04(c).

(c)    Nothing in this Section 8.01 shall prevent the parties from carrying out the provisions of Section 8.11 in connection with making a Section 338(h)(10) Election.

Section 8.02    *Cooperation on Tax Matters.* Subject to Section 8.10, Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Entities (including access to books and records) as is within such party's possession or control and is reasonably necessary for the filing of all Tax Returns (including Tax Returns of Seller Group), the making of any election relating to Taxes, the preparation for and conduct of any audit by any Taxing Authority, and the prosecution or defense of any Action relating to any Tax. Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Acquired Entities that are within such party's

76

AA_CONFIDENTIAL                                              AA-LITTRGT-000144446

possession or control until the expiration of any applicable statute of limitations and abide by all record retention agreements entered into with any Taxing Authority for all periods required by such Taxing Authority. For the avoidance of doubt, nothing in this Agreement shall require Seller to provide Buyer with any Tax Return, Tax schedules or other information with respect to any Seller Group except for any portions that relate solely to an Acquired Entity.

Section 8.03   *Buyer Covenants.* Without the prior written consent of Seller (not to be unreasonably withheld or delayed), Buyer and its Affiliates shall not (a) cause any Acquired Entity to take any action on the Closing Date but after the Closing other than in the ordinary course of business (and other than any action expressly contemplated by this Agreement), (b) make or change any Tax election with respect to an Acquired Entity that has a retroactive impact to a Pre-Closing Tax Period (other than a Section 338(h)(10) Election pursuant to Section 8.11(a)), (c) amend any Tax Return of any Acquired Entity for a Pre-Closing Tax Period, (d) file any Tax Returns of any Acquired Entity for a taxable period that ends on or before the Closing Date except for Tax Returns described in Sections 8.01(a) and 8.01(b) that are first due after the Closing Date, or (e) to the extent related to any Acquired Entity for a taxable period ending on or before the Closing Date, initiate any voluntary disclosure or new communication with any Taxing Authority (other than non-substantive communications) with respect to any tax items not currently subject to dispute or inquiry by a Taxing Authority.

Section 8.04   *Transfer Taxes.* With the exception of any Transfer Taxes attributable to the Pre-Closing Reorganization, which the parties agree shall be borne one hundred percent (100%) by Seller, all Transfer Taxes arising out of the transactions contemplated by this Agreement shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Seller. The party required by Applicable Law to file a Tax Return with respect to Transfer Taxes shall timely prepare and file (with the other party's cooperation) such Tax Return. Buyer and Seller each agree to timely sign and deliver (or cause their Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from or reduction in Transfer Taxes payable hereunder.

Section 8.05   *Straddle Period Taxes.* Taxes for any Straddle Tax Period of an Acquired Entity shall be allocated between the period ending on the Closing Date and the period beginning on the day after the Closing Date, as follows: (i) with respect to real property Taxes, personal property Taxes and similar *ad valorem* Taxes, the amount allocable to the portion of the period ending on the Closing Date shall equal the amount of such Taxes for such entire Straddle Tax Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Tax Period that are in the portion of such Straddle Tax Period ending on the Closing Date and the denominator of which is the number of days in the Straddle Tax Period, and (ii) with respect to all other Taxes, the amount allocable to the portion of the period ending on the Closing Date shall be determined based on an actual closing of the books used to calculate such Taxes as if such tax period ended as of the close of business on the Closing Date (and for such purpose, the tax period of any partnership or other pass-through entity in which any Acquired Entity holds a beneficial interest shall be deemed to terminate at such time). In the case of clause "(ii)" of the preceding sentence, exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed

77

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000144447

as if the Closing Date was the last day of the Straddle Tax Period) shall be allocated between the portion of the Straddle Tax Period ending on the Closing Date and the portion of the Straddle Tax Period thereafter in proportion to the number of days in each such portion.

Section 8.06    *Seller Tax Certificates*. Seller shall deliver to Buyer a completed IRS Form W-9 establishing that Seller is a U.S. person within the meaning of Section 7701(a)(30) of the Code.

Section 8.07    *Seller Tax Indemnity*. From and after Closing until the date that is ninety (90) days following the expiration of the applicable statute of limitations (taking into account any relevant extensions), Seller shall defend and indemnify Buyer and the Acquired Entities, and shall hold each of them harmless from, any Retained Tax Liabilities; provided, that (i) Buyer shall not be entitled to recover or make a claim under this Section 8.07 for any Retained Tax Liabilities taken into account in calculating the Indebtedness, the Closing Net Working Capital or otherwise taken into account in the Final Closing Statement and (ii) any recovery shall be net of any amounts that have been recovered by Buyer pursuant to any indemnification by, or indemnification agreement with, any third party or any insurance policy (including any R&W Insurance Policy), if any, or other cash receipts or sources of reimbursement in respect of such Taxes (and in the event that an insurance, indemnification or other recovery is received by any Buyer with respect to any Retained Tax Liabilities for which any Buyer has been indemnified hereunder, then a refund equal to the aggregate amount of the recovery shall be promptly made to Seller). Buyer shall use reasonable best efforts to collect any amounts available under insurance coverage (including any R&W Insurance Policy) for any Retained Tax Liabilities payable prior to seeking any recovery from Seller.

Section 8.08    *Certain Matters Related to Tax Indemnification and Tax Proceedings*.

(a)    Following Closing, Buyer shall notify Seller in writing within ten (10) Business Days of the receipt by Buyer or any of its Affiliates (including the Acquired Entities) of any written notice of a pending or threatened Tax Proceeding (received from a Taxing Authority) relating to an Acquired Entity that relates to a Pre-Closing Tax Period or that could reasonably be expected to give rise to an indemnity claim under Section 8.07 (it being understood that the failure to give such written notification on a timely basis shall not affect the indemnification provided hereunder except to the extent Seller is actually prejudiced as a result of such failure).

(b)    Seller shall control any Tax Proceeding relating to any Taxes described in the definition of Retained Tax Liabilities, provided, however, that except as set forth in the next sentence, Buyer shall have the right (but not the obligation), at its sole cost and expense, to participate in any such Tax Proceeding (which right shall include the right to receive copies of documents furnished or received by Seller in connection with the Tax Proceeding, the right to be involved in oral communications, where practical, between any representative of Seller and the Taxing Authority, the right to be consulted about significant decisions regarding the conduct of the Tax Proceeding, and the right to have a reasonable opportunity to provide input to the representatives of Seller regarding all such significant decisions) and Seller shall not settle any such Tax Proceeding without the prior written consent of Buyer (not unreasonably withheld,

78

AA_CONFIDENTIAL                                                                                          AA-LITTRGT-000144448

conditioned or delayed). Notwithstanding any other provision of this Agreement, Seller shall have the sole right to conduct and control any Tax Proceeding relating any Taxes described in clause (ii) or (iii)(a) of the definition of Retained Tax Liabilities and Buyer shall have no rights with respect to any such Tax Proceeding.

Section 8.09   *Certain Tax Refunds*. Any refunds or credits of Taxes described in Retained Tax Liabilities (other than any Taxes resulting from the carryback of any Tax items from a Post-Closing Tax Period to a Pre-Closing Tax Period) shall be for the account of Seller and, upon receipt of any such refund or credit, Buyer shall as soon as reasonably practicable make a cash payment to Seller in an amount equal to such refund or credit; provided, however, that in no event shall Buyer be entitled to any refund with respect to any Seller Combined Taxes. For the avoidance of doubt, such refunds or credits of Taxes shall only include those refunds or credits not taken into account in calculating the Purchase Price. To the extent permitted by Applicable Law, upon Seller's request, and at Seller's own cost and expense, Buyer shall, and shall cause the Acquired Entities and its Affiliates to, execute such documents, take such commercially reasonable actions, and otherwise use reasonable best efforts to cooperate with Seller and its Affiliates, as may be necessary for Buyer, the Acquired Entities, and its Affiliates, to seek, file for, perfect their rights in, and obtain any such refund or credit. All other refunds or credits of Taxes of the Acquired Entities not otherwise described in this Section 8.09 shall be for the account of Buyer and, to the extent taken into account in calculating the Purchase Price, Seller shall execute such documents, take such commercially reasonable actions, and otherwise use reasonable best efforts to cooperate with Buyer and its Affiliates, as may be necessary for Buyer, the Acquired Entities, and its Affiliates, to seek, file for, perfect their rights in, and obtain any such refund or credit.

Section 8.10   *Seller Tax Groups and Records*. Notwithstanding anything in this Agreement to the contrary, (i) Buyer shall not have any rights with respect to any Seller Group, including any right with respect to the preparation, filing, reporting, paying, contesting or settlement of any Seller Combined Taxes and (ii) Buyer shall have no right to receive, access, obtain or review any Seller Tax Records.

Section 8.11   *Section 338 Election*.

(a)   Seller and such of its Subsidiaries as are necessary, on the one hand, and Buyer or such of its Subsidiaries as are necessary, on the other hand, shall jointly make an irrevocable election (a "**Section 338(h)(10) Election**") under Section 338(h)(10) of the Code (and any corresponding elections under state or local Applicable Law) with respect to each Acquired Entity that is a "domestic corporation" within the meaning of Section 7701(a)(30)(C) of the Code (each such entity, a "**Section 338(h)(10) Entity**"). Seller and Buyer shall, and shall cause their respective Affiliates to, (x) treat each Section 338(h)(10) Election as valid, (y) file all Tax Returns in a manner consistent with the Section 338(h)(10) Election, and (z) take no position contrary to any Section 338(h)(10) Election, except, in each case, to the extent otherwise required pursuant to a Final Determination. With respect to each Section 338(h)(10) Election, Buyer and Seller shall cooperate in the preparation of any form, attachment, schedule, or

\\4149-1218-4642 v11

AA_CONFIDENTIAL   AA-LITTRGT-000144449

document required to effect a valid and timely Section 338(h)(10) Election in accordance with the provisions of Treasury Regulations Section 1.338(h)(10)-1 (or any corresponding provisions of state or local Applicable Law), including IRS Forms 8023 and 8883 and any similar forms under applicable state and local Applicable Laws, in each case, in a manner that incorporates, reflects, and is consistent with the 338 Allocation Schedule and Section 8.11(c) (collectively, the "**Section 338(h)(10) Forms**"    ). Buyer and Seller shall (or shall cause their relevant Affiliates to) timely file such Section 338(h)(10) Forms with the applicable Governmental Authority.

(b)    In furtherance of this Section 8.11, with respect to each Section 338(h)(10) Election, prior to the Closing, Seller and Buyer shall agree, based on information then available, on the form and content of, and at Closing, Seller shall deliver to Buyer a duly executed, IRS Form 8023 that reflects such Section 338(h)(10) Election (and any analogous forms required to effectuate such Section 338(h)(10) Election for state or local Tax purposes).

(c)    Seller shall deliver to Buyer, within ninety (90) days after the Purchase Price is finally determined pursuant to Section 2.04, a schedule (the "**338 Allocation Schedule**"    ) consistent with the principles of Schedule III allocating the Purchase Price (as adjusted pursuant to Section 2.05) among the Acquired Entity Securities (including the portion allocable to each Section 338(h)(10) Entity) and the Transferred Trademarks, together with any amounts that are treated as additional consideration among the assets of each Section 338(h)(10) Entity that, for U.S. federal income Tax purposes are treated as assets purchased by Buyer or one of its Affiliates. The 338 Allocation Schedule shall be prepared in accordance with Section 338 of the Code and the Treasury Regulations thereunder. Buyer may dispute any amounts reflected on the 338 Allocation Schedule by providing written notice to Seller of the disputed items, and setting forth in reasonable detail the basis of such dispute, within thirty (30) days following receipt of the 338 Allocation Schedule. In the event Buyer and Seller are unable to resolve any dispute within thirty (30) calendar days, Buyer and Seller shall submit the dispute to the Accounting Referee in the manner provided by Section 2.04(c). Buyer and Seller agree (i) to file, and to cause their respective Affiliates to file, all Tax Returns (including IRS Form 8883, Asset Allocation Statement Under Section 338) in a manner consistent with the 338 Allocation Schedule (as modified by the mutual agreement of Buyer and Seller or as finally determined by the Accounting Referee) and not to take (and to cause their respective Affiliates not to take) any position inconsistent therewith in any Tax Return, unless required to do so by Applicable Law (including as a result of an audit) or with prior written consent of the other parties. If any Governmental Authority disputes the allocation contained in the final 338 Allocation Schedule, the party receiving notice thereof shall promptly notify and consult with the other parties concerning such dispute.

(d)    To the extent permissible by or required by law, Seller (and such of its Subsidiaries as are necessary) and Buyer (and such of its Subsidiaries as are necessary) shall cooperate in the preparation and timely filing of any corrections, amendments, or supplements to any Section 338(h)(10) Form; provided, however, that all such forms and reports shall be prepared in a manner that incorporates, reflects, and is consistent with the 338 Allocation

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                    AA-LITTRGT-000144450

Schedule and Section 8.11(c). To the extent necessary for the valid filing of any such corrections, amendments, supplements, forms, or reports, Seller (and such of its Subsidiaries as are necessary) and Buyer (and such of its Subsidiaries as are necessary) shall cooperate in the timely execution thereof.

(e)    Subject to Section 8.11(d), neither Seller nor Buyer shall, or shall permit any of its Subsidiaries (including the Acquired Entities) to modify any of the Section 338(h)(10) Forms (including any corrections, amendments, and supplements thereto) after the execution of such Section 338(h)(10) Forms or to modify or revoke any Section 338(h)(10) Election following the filing of the relevant IRS Form 8023 by Buyer, in each case, without the written consent of Seller or Buyer, as the case may be, except as may be required pursuant to a Final Determination; provided, however, that IRS Form 8883 may be filed without the consent of the other party so long as such form is filed in a manner that incorporates, reflects, and is consistent with the 338 Allocation Schedule and Section 8.11(c).

### ARTICLE 9
#### EMPLOYEE MATTERS

Section 9.01    *Transfer of Employees.*

(a)    Prior to the Closing, Seller shall use reasonable best efforts to cause each Business Employee to be employed by an Acquired Entity. Each Business Employee who, as of the Closing, is employed by an Acquired Entity shall continue employment with such Acquired Entity immediately following the Closing (hereafter referred to as a "**Continuing Employee**"    ).

(b)    Notwithstanding the foregoing, the parties intend that the Delayed Transfer Employees will remain as employees of Seller or its applicable Affiliate for the duration of the Secondment Period, and will become employees of Buyer (or its designated Affiliate(s)) immediately following termination or expiration of the Secondment Period as part of the transactions contemplated by this Agreement. Accordingly, in this Section 9.01 and in respect of the Delayed Transfer Employees only, any reference to "    Closing"    , the "    Closing Date" "    Deferred Hong Kong Closing"    , the "    Deferred Hong Kong Closing Date"    , "    Defe[...] Closing"    the "    Deferred Korea Closing Date"    , "    Deferred Vietnam Closing"    , or the Vietnam Closing Date"    shall be treated as a reference to the end of the Secondment Period.

Section 9.02    *Maintenance of Terms and Conditions.*

(a)    For a period of at least twelve (12) months commencing on the earliest Closing Date under this Agreement or such longer period as required by Applicable Law (the "**Continuation Period**"    ), Buyer shall provide, or shall cause one of its Affiliates to provide, each Continuing Employee who remains employed or becomes employed by Buyer or one of its Subsidiaries (including an Acquired Entity) upon and following the Closing Date with (i) at least the same base salary or wage rate provided to such Continuing Employee immediately prior to the Closing Date, (ii) a target short-term incentive compensation opportunity, based

81

AA_CONFIDENTIAL    AA-LITTRGT-000144451

solely on the target percentage of base salary or wage rate and not the attainability of applicable performance metrics, that are no less favorable than the short-term incentive compensation opportunity provided to such Continuing Employee immediately prior to the Closing Date, and (iii) other employee benefits, including, paid time-off and severance benefits and protections, which are no less favorable in the aggregate to such other compensation and employee benefits provided to similarly situated employees of Buyer and its Affiliates; *provided*, that notwithstanding anything to the contrary herein, such compensation and employee benefits provided by Buyer (or one of its Subsidiaries) shall be of the type and at levels sufficient to comply with Applicable Law or the terms of any collective bargaining, works council or other agreement with any employee representative group.

(b)     Buyer and its Affiliates will recognize and assume the liability with respect to accrued but unused vacation time and sick leave as of the Closing Date for all Continuing Employees in which such recognition is permitted or required by Applicable Law.

(c)     With respect to any employee benefit plan maintained by Buyer or any of its Affiliates in which any Continuing Employee becomes a participant, for purposes of determining eligibility to participate, vesting, vacation, paid time-off and severance plan accruals, each Continuing Employee's service with Seller or any of its Affiliates (as well as service with any predecessor employer, to the extent recognized by Seller or any of its Affiliates) shall be treated as service with Buyer and its Affiliates; *provided, however*, that such service need not be recognized (i) to the extent that such recognition would result in any duplication of benefits or (ii) such service was not recognized under a comparable Business Benefit Plan immediately prior to the Closing.

(d)     Buyer shall use reasonable best efforts to waive, or shall cause its Affiliates to waive, any preexisting conditions, limitations, exclusions, actively at work requirements and waiting periods (or other equivalent requirements for each applicable jurisdiction) under any welfare benefit plan maintained by Buyer or any of its Affiliates in which any Continuing Employees (and such Continuing Employees eligible dependents) will be eligible to participate from and after the Closing, except to the extent that such items would not have been satisfied or waived under the comparable Business Benefit Plan immediately prior to the Closing. Buyer shall use reasonable best efforts to recognize, or shall cause its Affiliates to recognize, all co-payments, deductibles and similar expenses and out-of-pocket maximums incurred by each Continuing Employee (and such Continuing Employees eligible dependents) prior to the Closing during the plan year in which Closing occurs for purposes of satisfying any comparable deductible and co-payment limitations and out-of-pocket requirements under the relevant welfare benefit plans in which such Continuing Employee (and such Continuing Employees eligible dependents) will be eligible to participate from and after the Closing during the plan year in which Closing occurs.

Section 9.03     *U.S. Defined Contribution Plans.* As soon as practicable after the Closing Date, account balances as of the Closing Date of each Continuing Employee who participates in Seller's or any Affiliate's retirement savings plan (the **Seller Defined**

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                                    AA-LITTRGT-000144452

**Contribution Plan**"        ), including any outstanding participant loans, shall be transferred to a qualified defined contribution plan of Buyer or one of its Affiliates. Such transfer shall be effected in accordance with Applicable Law. During the Continuation Period, Buyer shall or shall cause its Affiliates to provide each Continuing Employee who participated in the Seller Defined Contribution Plan with an employer matching contribution on the same basis as the employer matching contribution provided to similarly situated employees of Buyer who are not Continuing Employees, subject to Buyer's recognition of such Continuing Employee's service in accordance with Section 9.02(c).

Section 9.04    *Severance.*

(a)    If Buyer adversely changes the terms of employment, compensation or benefits provided or offered to any non-U.S. Continuing Employee or any non-U.S. Business Employee who, but for such changes, would have become a Continuing Employee upon or after the Closing, and such changed terms cause Seller or one of its Affiliates to be responsible for the payment of severance or termination-related payments or benefits to such Continuing Employee or Business Employee, then Buyer and its Affiliates shall reimburse Seller or its relevant Affiliate for the cost of such severance or termination payments or benefits; *provided, however*, for clarity, that, except as provided under Section 9.04(b), should an Acquired Entity be responsible for the payment of severance or termination-related payments or benefits for any Continuing Employee upon or after the Closing, such payments and/or benefits will be exclusively the obligation of the Buyer and/or its Affiliates.

(b)    If Buyer offers to employ a Business Employee on terms, including compensation and benefits, that are substantially comparable to the terms of such Business Employee's employment with Seller or its Affiliates in effect immediately prior to the Closing, but such Business Employee becomes entitled to severance or termination-related payments or benefits in connection with the transactions contemplated by this Agreement, either because such Business Employee declines such offer or for any other reason, then Seller shall be solely responsible for the payment of such severance or termination-related payments or benefits. Seller shall also be solely responsible for any severance or termination-related payments or benefits payable to (i) any employee or former employee of Seller or any of its Affiliates who does not become a Continuing Employee due to Seller's failure to comply with its obligations under this Agreement or (ii) any Continuing Employee who becomes entitled to severance or termination-related payments or benefits prior to or upon the Closing. To the extent the severance or termination-related payments or benefits for which Seller is responsible pursuant to this Section 9.04 are paid by Buyer or one of its Affiliates, Seller shall reimburse Buyer or its relevant Affiliate for the cost of such severance or termination-related payments or benefits.

Section 9.05    *Flexible Spending Plans.* Effective as of the Closing Date, Buyer shall use reasonable best efforts to establish or provide a flexible spending plan maintained in the United States (the "**Buyer FSA Plan**"        ) in which Continuing Employees in the United States will be eligible to participate. Where applicable, Seller and Buyer shall take all commercially reasonable actions necessary or appropriate so that, effective as of the Closing Date, (i) the account balances (whether positive or negative) (the "**Transferred FSA Balances**"        ) under the

83

AA_CONFIDENTIAL                                                                                   AA-LITTRGT-000144453

applicable flexible spending plan of Seller (collectively, the "**Seller FSA Plan**") of the Continuing Employees in the United States who are participants in the Seller FSA Plan shall be transferred to the Buyer FSA Plan; (ii) the elections of such Continuing Employees in the United States shall apply under the Buyer FSA Plan in the same manner as under the Seller FSA Plan; and (iii) such Continuing Employees in the United States shall be reimbursed from the Buyer FSA Plan for claims incurred at any time following the Closing Date that are submitted to the Buyer FSA Plan from and after the Closing Date on the same basis and the same terms and conditions as under the Seller FSA Plan. As soon as practicable after the Closing Date, and in any event within ten (10) Business Days after the amount of the Transferred FSA Balances is determined, (A) Seller shall pay Buyer, in cash, the net aggregate amount of the Transferred FSA Balances, if such amount is positive, or (B) Buyer shall pay to Seller, in cash, the net aggregate amount of the Transferred FSA Balances, if such amount is negative.

Section 9.06    *Workers Compensation.* Buyer and its Affiliates shall be responsible for providing benefits in respect of all claims for benefits in respect of workers compensation and any comparable liabilities that are based upon Continuing Employees' injuries or illnesses that arise at or after the Closing. Seller shall be responsible for providing benefits in respect of all claims for benefits (other than claims covered under Business Benefit Plans) in respect of workers compensation and any comparable liabilities that are based upon Continuing Employees' injuries or illnesses that arise prior to the Closing.

Section 9.07    *Works Council Information/Consultation Obligations.* The parties hereby agree to cooperate in good faith to comply with all information, consultation and other processes, if any, relating to any works councils, union and any employee representative bodies in connection with the transactions contemplated by this Agreement which, for avoidance of doubt, shall include such required information, consultation or other processes as required to either: (i) obtain an opinion or approval from such union, works council or other employee representative body; or (ii) establish that such opinion or approval is not a precondition to the Closing.

Section 9.08    *Assumed Arrangements.* At Closing, Buyer and its Affiliates shall assume or honor each Business Benefit Plan maintained or sponsored by an Acquired Entity and each other Business Benefit Plan listed on Section 9.08 of the Disclosure Schedule, (all such assumed plans and arrangements, the "**Assumed Benefit Plans**"), and each of the parties hereto shall use their respective reasonable best efforts and cooperate in good faith to make effective the assumption of the Assumed Benefit Plans.

Section 9.09    *Employee Communications.* Seller and Buyer shall cooperate in communications with Business Employees with respect to employee benefit plans maintained by Seller or Buyer or their respective Affiliates and with respect to other matters arising in connection with the transactions contemplated by the Transaction Documents.

Section 9.10    *WARN Act.* Buyer and its Affiliates shall assume all liabilities for the provision of notice or payment in lieu of notice and any applicable penalties under the Worker Adjustment and Retraining Notification Act ("**WARN**") or any similar Applicable Law arising

84

AA_CONFIDENTIAL                                    AA-LITTRGT-000144454

as a result of the transactions contemplated by the Transaction Documents. Buyer hereby indemnifies Seller and its Affiliates against and agrees to hold each of them harmless from any and all Damages incurred or suffered by Seller or any of its Affiliates with respect to WARN or any similar Applicable Law arising as a result of the transactions contemplated by the Transaction Documents.

Section 9.11   *Liability for Business Employees.*

(a)      Except as set forth in this Article 9, effective from and after the Closing Date, Buyer and its Affiliates shall assume and be responsible for any and all liabilities or obligations of Seller (i) arising under or with respect to any Assumed Benefit Plan, (ii) arising with respect to Business Employees or Former Business Employees in connection with their employment by an Acquired Entity (including those who become Continuing Employees), whether incurred prior to, on or after the Closing Date (excluding any liabilities or obligations arising under any Business Benefit Plan other than an Assumed Benefit Plan and except as otherwise provided in this Article 9), (iii) arising with respect to the employment of Continuing Employees with Buyer and its Affiliates on or after the Closing Date (excluding any liabilities or obligations arising under any Business Benefit Plan other than an Assumed Benefit Plan), and (iv) that transfer by operation of law.

(b)      Except as set forth in this Article 9, effective from and after the Closing Date, Seller shall, and shall cause its Affiliates to, remain responsible for any and all liabilities or obligations arising under or with respect to (i) any Business Benefit Plan other than any Assumed Benefit Plan, (ii) the employment of any person with Seller or any of its Affiliates other than an Acquired Entity or (iii) any liability or obligation (contingent or otherwise) of Seller or any entity that together with Seller could be treated as a single employer or Commonly Controlled Entity under Applicable Law, including Section 4001 of ERISA or Section 414 of the Code in respect of, any " multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or as a result of any Controlled Group Liability. "**Controlled Group Liability**" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302, 303 or 4068(a) of ERISA, (iii) under Section 412, 430 or 4971 of the Code, (iv) for violation of the continuation coverage requirements of Sections 601 et seq. of ERISA and Section 4980B of the Code or the group health requirements of Sections 701 et seq. of ERISA and Sections 9801 et seq. of the Code, or (v) for violation of HIPAA or the Patient Protection and Affordable Care Act of 2010, as amended, in the case of each of the foregoing clauses (i) through (v), with respect to any Person that, together with Seller, is treated as a single employer under Section 414 of the Code.

(c)      Seller and its Affiliates shall be solely responsible for compliance with the requirements of Section 4980B of the Code and part 6 of subtitle B of Title I of ERISA (such provisions of the Code and ERISA collectively referred to as "**COBRA**" ), including the provision of continuation coverage (within the meaning of COBRA), with respect to all Business Employees and Former Business Employees (except Continuing Employees), and their respective spouses and dependents for whom a qualifying event (within the meaning of COBRA) occurs at or any time prior to the Closing Date. Buyer and its Affiliates shall be solely responsible for compliance with COBRA with respect to each Continuing Employees, and their

85

AA_CONFIDENTIAL                                                                                          AA-LITTRGT-000144455

respective spouses and dependents for whom a qualifying event (within the meaning of COBRA) occurs at or any time following the Closing Date.

Section 9.12    *No Third-Party Beneficiaries.* Nothing in this Article 9, express or implied, (a) is intended to or shall confer upon any Person other than the parties hereto, including any Business Employee, any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, (b) shall establish, or constitute an amendment, termination or modification of, or an undertaking to amend, establish, terminate or modify, any benefit plan, program, agreement or arrangement or (c) shall create any obligation on the part of Seller, Buyer or any of their respective Affiliates to employ any Business Employee for any period following Closing.

Section 9.13    *Cooperation.* Each of Buyer and Seller recognize it to be in the best interests of the parties hereto and their respective employees that the transactions in this Article 9 be effected in an orderly manner and agree to devote their respective reasonable best efforts and to cooperate fully in complying with the provisions of this Article 9. Without limiting the generality of the foregoing, each party agrees to execute, deliver and file all documents and to take all such actions as are deemed necessary or desirable in order to carry out and perform the purpose of this Article 9 and to facilitate the transactions referred to in this Article 9. Additionally, without prejudice to Section 9.01 to Section 9.02 above, each of Buyer and Seller agree to cooperate and use reasonable best efforts to ensure that no severance is triggered and becomes due to any Continuing Employee as a result of the transfers of employment under Section 9.01 and Section 9.02 above.

ARTICLE 10
CONDITIONS TO CLOSING

Section 10.01    *Conditions to Obligations of Buyer and Seller.* The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction or waiver of each of the following conditions:

(a)    there shall not be in effect any Applicable Law or Order issued by any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated hereby, involving a claim that consummation thereof would result in the violation of any Applicable Law, or seeking to impose any material condition on the consummation of the transactions contemplated hereby;

(b)    the closing of the HHI Transaction shall have occurred; and

(c)    the filings, consents, approvals, authorizations, clearances or other actions under any other Competition Law or Investment Law set forth on Section 10.01(c) of the Disclosure Schedule shall have been made, obtained or taken and any applicable approvals or waiting periods thereunder shall have been received and remain in effect (in the case of approvals) or expired or been terminated (in the case of waiting periods).

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144456

Section 10.02 *Conditions to Obligations of Buyer*. The obligations of Buyer to consummate the Closing are subject to the satisfaction or waiver of the following further condition: Buyer shall have received all of the items required to be delivered to Buyer pursuant to Section 2.03(b).

Section 10.03 *Conditions to Obligations of Seller*. The obligations of Seller to consummate the Closing are subject to the satisfaction or waiver of the following further condition: Seller shall have received all of the items required to be delivered to Section 2.03(a).

Section 10.04 *Frustration of Closing Conditions*. Neither Buyer nor Seller may rely on the failure of any condition set forth in this Article 10 to be satisfied if such failure was caused by such party's breach of, or failure to comply with, any provision of this Agreement.

ARTICLE 11

TERMINATION

Section 11.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Buyer;

(b)     by either Seller or Buyer, if the Closing shall not have occurred on or before June 30, 2023 (the "**End Date**" pro)*vided*, that such End Date shall be automatically extended to no later than July 31, 2023 in the event that a final, nonappealable order in respect of the transactions contemplated hereby has not been issued by the applicable court of competent jurisdiction over such Action by June 30, 2023 so long as such extension is not caused by Seller's or Buyer's breach of, or failure to comply with, any provision of this Agreement, and, upon mutual consent by Seller and Buyer, the End Date may be extended by successive thirty (30) day periods without any further action required by either party in the event that the HHI Transaction has not yet closed or any Action by any Governmental Authority that would cause any of the conditions not to be satisfied has not been completed by the End Date; *provided further* that the right to terminate this Agreement pursuant to this Section 11.01(b) shall not be available to any party whose breach of any provision of this Agreement has caused or resulted in the failure of the Closing to have occurred by such time;

(c)     by either Seller or Buyer, if there is any final and non-appealable Order issued after the date hereof by any court of competent jurisdiction enjoining, prohibiting or rendering illegal the consummation of the Closing; or

(d)     by Seller, upon the termination of the HHI Agreement or abandonment for any reason whatsoever of the HHI Transaction.

Other than in the case of a termination pursuant to Section 11.01(a), the party desiring to terminate this Agreement pursuant to any clause of this Section 11.01 shall give written notice of such termination to the other party.

87

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                      AA-LITTRGT-000144457

Section 11.02 *Effect of Termination*. If this Agreement is terminated as permitted by Section 11.01, such termination shall be without liability of any party (or any stockholder or Representative of such party) to the other party to this Agreement; *provided* that if such termination shall result from an intentional and knowing material breach by a party hereto, such party shall be fully liable for any and all Damages and liabilities of any kind, character or description incurred or suffered by another party hereto as a result of such breach. Notwithstanding the termination of this Agreement in accordance with the terms herein, the Confidentiality Agreement, the provisions of this Section 11.02 and the provisions of Sections 1.01, 6.01, 7.02 and Article 13 shall survive any such termination.

ARTICLE 12

INDEMNIFICATION

Section 12.01 *Survival*. The rights of indemnification for Damages pursuant to the matters described on Section 12.02(b) of the Disclosure Schedule shall survive the Closing until ninety (90) days after the expiration of all applicable statutes of limitations related to such matters (taking into account any extensions thereof, and including statutes of limitations applicable to the underlying subject matter of any such claims.

Section 12.02 *Indemnification Obligations of Seller*. Seller shall defend, indemnify, save and keep harmless Buyer, its Affiliates and their respective officers, directors, stockholders, equity holders, partners, employees, agents, lenders, successors and permitted assigns (each a " Buyer Indemnitee" and collectively, the " Buyer Indemnitees" ) agains from all Damages sustained or incurred by any of them resulting from or arising out of:

(a)    any Damages related to the Pre-Closing Reorganization; and

(b)    the matters set forth on Section 12.02(b) of the Disclosure Schedule.

Notwithstanding anything else to the contrary contained in this Agreement, Seller shall have the sole and exclusive right to contest, defend, litigate and settle any claim in its sole and absolute discretion relating to (x) the Pre-Closing Reorganization or (y) the matters set forth on Section 12.02(b) of the Disclosure Schedule; *provided*, that in the event the matters set forth on Section 12.02(b) of the Disclosure Schedule are deemed not to be settled or otherwise remain ongoing, then Seller shall keep Buyer informed of the status of such ongoing matters and Buyer shall have the right to consult with Seller regarding any strategy and process related to such claim, which Seller will consider in good faith.

Section 12.03 *Limitations on Indemnification Obligations*.

(a)    Seller shall not be liable to the Buyer Indemnitees under this Article 12 for Damages in excess of the Purchase Price.

(b)    If the Buyer Indemnitees collect an amount in discharge of a claim in respect of Damages pursuant to this Article 12 and the Buyer Indemnitees subsequently recovers from a

88

\\4149-1218-4642 v11

                                     AA-LITTRGT-000144458

third party in respect of the same Damages such that the Buyer Indemnitees have recovered in excess of the entire Damages (such excess recovery, the "**Excess Recovery**"      ), such Buyer Indemnitees shall (or, as appropriate, shall procure that an Affiliate shall) forthwith repay to Seller an amount equal to the Excess Recovery less any reasonable, out-of-pocket costs or expenses incurred by the Buyer Indemnitee in procuring the Excess Recovery.

(c)      Notwithstanding anything to the contrary in this Agreement, to the extent there is any conflict between the provisions of this Article 12 with respect to any third-party claim involving Taxes, Article 8 shall govern.

ARTICLE 13

MISCELLANEOUS

Section 13.01 *Survival*. The representations and warranties of the parties hereto contained in this Agreement shall not survive the Closing and, except with respect to claims of Actual Fraud against either party, there shall be no liability in respect thereof, whether such liability has accrued prior to, at or after the Closing, on the part of any party, its Affiliates, and their respective Representatives. The covenants and agreements of the parties contained in this Agreement shall not survive the Closing, except to the extent such covenants and agreements by their terms are to be performed in whole or in part at or after the Closing, which covenants and agreements shall survive in accordance with their terms. For the avoidance of doubt, the covenants and agreements set forth in Article 8 shall survive the Closing for a period equal to ninety (90) days past the applicable statute of limitations (taking into account any relevant extensions). Notwithstanding the foregoing, nothing in this Section 13.01 shall limit or prohibit the rights of Buyer to pursue recoveries under the R&W Insurance Policy.

Section 13.02 *Release*.

(a)      Effective as of the Closing (but only if the Closing actually occurs), except for any rights or obligations expressly set forth in this Agreement, the other Transaction Documents or any Business Intercompany Contract that survives the Closing in accordance with the terms hereof and to which Seller or any of its Affiliates is a party after the Closing, Buyer, on behalf of itself and each of its Affiliates (including the Acquired Entities) and each of its and their respective past, present and/or future officers, directors, employees, agents, general or limited partners, managers, members, advisors, stockholders, equity holders, controlling Persons or other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Buyer Releasing Parties**"      ), hereby irrevocably and unconditionally (i) releases and forever discharges Seller, its Affiliates, and each of their respective past, present and/or future officers, directors, employees, agents, partners, principals, managers, members, advisors, stockholders, equity holders, controlling Persons or other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Seller Released Parties**"      ) of and from any and all legal proceedings, Actions, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and demands whatsoever, whether known or unknown, whether

89

\\4149-1218-4642 v11

                                                                    AA-LITTRGT-000144459

liquidated or unliquidated, whether actual or contingent, whether at law or in equity, whether in contract, tort, statute or otherwise, which the Buyer Releasing Parties have or may have against any of the Seller Released Parties, previously, now or in the future, in each case, in respect of any cause, matter or thing relating to this Agreement, the Transaction Documents, the Acquired Entities, the Business, or any actions taken or failed to be taken by any of the Seller Released Parties in any capacity related thereto occurring or arising at or prior to the Closing Date, other than a claim by a Buyer Releasing Party that is a party hereto for Actual Fraud by a Seller Released Party that is a party hereto (the foregoing, the "**Buyer Released Claims**"    ), (ii) covenants and agrees that it shall not bring, initiate or support, directly or indirectly, or permit any other Person to bring, initiate or support, directly or indirectly, any Buyer Released Claim and (iii) waives any rights under California Civil Code Section 1542 or any similar provision of Applicable Law; said Section 1542 provides: "    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR"    . The Buyer Released Claims include claims for contribution or other rights of recovery arising out of or relating to any Environmental Law (whether now or hereinafter in effect), including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq., or to any Hazardous Substances, claims for breach of contract, breach of representation or warranty, negligent misrepresentation and all other claims for breach of duty.

(b)    Effective as of the Closing (but only if the Closing actually occurs), except for any rights or obligations expressly set forth in this Agreement, the Transaction Documents or any Business Intercompany Contract that survives the Closing in accordance with the terms hereof and to which Buyer, its Affiliate or an Acquired Entity is a party after the Closing, Seller, on behalf of itself and each of its Affiliates and each of its and their respective past, present and/or future officers, directors, employees, agents, general or limited partners, managers, members, advisors, stockholders, equity holders, controlling Persons or other Representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Seller Releasing Parties**"    ), hereby irrevocably and unconditionally (i) releases and forever discharges Buyer and its Affiliates, and each of their respective past, present and/or future officers, directors, employees, agents, partners, principals, managers, members, advisors, stockholders, equity holders, controlling Persons or other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Buyer Released Parties**"    ) of and from any and all legal proceedings, Actions, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and demands whatsoever, whether known or unknown, whether liquidated or unliquidated, whether actual or contingent, whether at law or in equity, whether in contract, tort, statute or otherwise, which the Seller Releasing Parties have or may have against any of the Buyer Released Parties, previously, now or in the future, in each case, in respect of any cause, matter or thing relating to this Agreement, the Transaction Documents, the Acquired Entities, the Business, or any actions taken or failed to be taken by any of the Buyer Released Parties in any capacity related thereto occurring or arising at or prior to the Closing Date, other than a claim by a Seller

90

AA_CONFIDENTIAL    AA-LITTRGT-000144460

Releasing Party that is a party hereto for Actual Fraud by a Buyer Released Party that is a party hereto (the foregoing, the "**Seller Released Claims**"    ), (ii) covenants and agrees that it shall not bring, initiate or support, directly or indirectly, or permit any other Person to bring, initiate or support, directly or indirectly, Seller Released Claim and (iii) waives any rights under California Civil Code Section 1542 or any similar provision of Applicable Law; said Section 1542 provides: "    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR"    . The Seller Released Claims include claims for contribution or other rights of recovery arising out of or relating to any Environmental Law (whether now or hereinafter in effect), including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq., or to any Hazardous Substances, claims for breach of contract, breach of representation or warranty, negligent misrepresentation and all other claims for breach of duty.

Section 13.03  *No Other Representations or Warranties; Investigation.*

(a)    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT OR OTHERWISE, EACH OF BUYER AND SELLER ACKNOWLEDGES AND AGREES THAT (I) THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER EXPRESSLY SET FORTH IN ARTICLE 3, ON THE ONE HAND, AND MADE BY BUYER EXPRESSLY SET FORTH IN ARTICLE 4, ON THE OTHER HAND, ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO BUYER AND TO SELLER, RESPECTIVELY, IN CONNECTION WITH THIS AGREEMENT, THE ACQUIRED ENTITIES, SELLERS, BUYER AND THE BUSINESS AND (II) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN THE PRECEDING CLAUSE (I), NEITHER BUYER NOR SELLER NOR ANY OF THEIR RESPECTIVE AFFILIATES NOR ANY OTHER PERSON HAS MADE OR IS MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, WITH RESPECT TO THIS AGREEMENT, THE ACQUIRED ENTITIES, SELLER, BUYER OR THE BUSINESS, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS, THE ASSETS OF THE ACQUIRED ENTITIES, SELLER, BUYER OR THE BUSINESS OR NON-INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OF THIRD-PARTY INTELLECTUAL PROPERTY AND ANY SUCH OTHER PURPORTED REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY DISCLAIMED. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT OR OTHERWISE, EACH OF BUYER AND SELLER REPRESENTS, WARRANTS, COVENANTS AND AGREES, (X) WITH RESPECT TO BUYER, ON BEHALF OF ITSELF AND EACH OF ITS AFFILIATES AND ITS AND THEIR RESPECTIVE FORMER, CURRENT OR FUTURE MANAGERS, DIRECTORS,

91

AA_CONFIDENTIAL    AA-LITTRGT-000144461

OFFICERS, EMPLOYEES, EQUITY HOLDERS, CONTROLLING PERSONS, AFFILIATES, MANAGEMENT COMPANIES, INCORPORATORS, MEMBERS, LIMITED OR GENERAL PARTNERS, AGENTS, CONSULTANTS, FINANCIAL OR OTHER ADVISORS, INVESTMENT BANKERS, ATTORNEYS, ACCOUNTANTS AND OTHER REPRESENTATIVES, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS, ASSIGNS, HEIRS, EXECUTORS OR ADMINISTRATORS (COLLECTIVELY, THE "**BUYER RELATED PARTIES**"    ) AND (Y) WITH RESPECT TO SELLER, ON BEHALF OF ITSELF AND EACH OF ITS AFFILIATES AND ITS AND THEIR RESPECTIVE FORMER, CURRENT OR FUTURE MANAGERS, DIRECTORS, OFFICERS, EMPLOYEES, EQUITY HOLDERS, CONTROLLING PERSONS, AFFILIATES, MANAGEMENT COMPANIES, INCORPORATORS, MEMBERS, LIMITED OR GENERAL PARTNERS, AGENTS, CONSULTANTS, FINANCIAL OR OTHER ADVISORS, INVESTMENT BANKERS, ATTORNEYS, ACCOUNTANTS AND OTHER REPRESENTATIVES, TOGETHER WITH THEIR RESPECTIVE SUCCESSORS, ASSIGNS, HEIRS, EXECUTORS OR ADMINISTRATORS (COLLECTIVELY, THE "**SELLER RELATED PARTIES**"    ), THAT IN DETERMINING TO ENTER INTO THIS AGREEMENT AND CONSUMMATE THE TRANSACTIONS, OTHER THAN THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (I) OF THE IMMEDIATELY PRECEDING SENTENCE, NEITHER BUYER NOR SELLER HAS RELIED NOR IS RELYING UPON ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, MADE OR PURPORTEDLY MADE BY OR ON BEHALF OF ANY PERSON (INCLUDING ANY PURPORTED REPRESENTATIONS AND WARRANTIES DESCRIBED AS DISCLAIMED IN CLAUSE (II) OF THE FIRST SENTENCE OF THIS PARAGRAPH), OR UPON THE ACCURACY OR COMPLETENESS OF ANY DOCUMENTS OR INFORMATION PROVIDED TO (1) ANY OF THE BUYER RELATED PARTIES BY OR ON BEHALF OF SELLER, THE ACQUIRED ENTITIES OR ANY OTHER PERSON, OR (2) ANY OF THE SELLER RELATED PARTIES BY OR ON BEHALF OF BUYER, ITS AFFILIATES OR ANY OTHER PERSON.

Without limiting the generality of the immediately preceding paragraph, it is understood and agreed by Buyer, on behalf of itself and the other Buyer Related Parties, that any cost estimate, projection, forecast or other prediction, any data or information of any kind (including any financial data or information) or any memoranda or offering materials or presentations, including any memoranda and materials provided by or on behalf of Seller or the Acquired Entities, or any of their Affiliates or Representatives, or any other Person, are not and shall not be deemed to be or to include representations or warranties (express or implied) of any Person, and have not been and are not being relied upon in determining to enter into this Agreement and consummate the transactions contemplated by this Agreement.

(b)      Buyer acknowledges, covenants and agrees, on behalf of itself and each of the other Buyer Related Parties, (i) that it is an informed and sophisticated purchaser, has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as that contemplated by this Agreement and has completed to its satisfaction its own due diligence investigation, and based thereon, formed its own independent judgment with respect to the

92

AA_CONFIDENTIAL                                                                  AA-LITTRGT-000144462

Acquired Entities and the Business, (ii) that it has been furnished with or given full access to such documents and information about the Acquired Entities and the Business as it and its Representatives have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby, (iii) that, in entering into this Agreement, it has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth by Seller in Article 3, (iv) that there are uncertainties inherent in attempting to make estimates, projections, forecasts, plans, budgets and similar materials and information, and Buyer is familiar with such uncertainties and (v) other than the representations and warranties of Seller in Article 3, Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of any and all estimates, projections, forecasts, plans, budgets and other materials or other information that may have been delivered or made available to it or any of its Representatives, Buyer has not relied and shall not rely on such information (or the accuracy or completeness thereof), and Buyer shall not assert, and shall cause its Affiliates not to assert, any claims against Seller, any of its respective Subsidiaries or Affiliates or any other Person with respect thereto.

Section 13.04 *Notices*. All notices, requests and other communications to any party hereunder shall be in writing (including email transmission, so long as a receipt of such email is confirmed by the recipient thereof) (whether or not expressly required herein) and shall be given,

if to Buyer, to:

Fortune Brands Home & Security, Inc.
520 Lake Cook Road Suite 300
Deerfield, IL 60015
Attention: John Lee (Senior Vice President, Global Growth & Development) and Hiranda S. Donoghue (Senior Vice President, General Counsel & Secretary)
Email: john.lee@fbhs.com and hiranda.donoghue@fbhs.com

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attention: Chris Abbinante and Jonathan Blackburn
Email: cabbinante@sidley.com and jblackburn@sidley.com

if to Seller or Parent, to:

ASSA ABLOY AB
P.O. Box 70340

93

AA_CONFIDENTIAL                                            AA-LITTRGT-000144463

SE-107 23 Stockholm, Sweden
Attention: Johan Ahlgren
Email: johan.ahlgren@assaabloy.com

and to:

ASSA ABLOY Inc.
110 Sargent Drive
New Haven, CT 06511
Attention: L. Page Heslin
Email: Page.Heslin@assaabloy.com

and with a copy (which shall not constitute notice) to:

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
                 Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
            megan.ridley-kaye@hoganlovells.com

or such other address or email as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 13.05  *Amendments and Waivers.*

(a)      Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Buyer and Seller, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)      No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Except as otherwise provided in Section 2.05, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 13.06  *Expenses.* Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party (including its Affiliates) incurring such cost or expense.

94

AA_CONFIDENTIAL                                                                    AA-LITTRGT-000144464

Section 13.07 *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided*, that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of Buyer and Seller, except that Buyer may designate one or more of its wholly owned Subsidiaries as the buyer of the Purchased Shares; *provided further* that such assignment or designation pursuant to this proviso shall not relieve Buyer of any of its obligations hereunder or restrict or delay consummation of the transactions contemplated hereby or otherwise adversely affect Seller or any of its Affiliates.

Section 13.08 *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state.

Section 13.09 *Jurisdiction.* The parties hereto agree that, except as set forth in Section 2.04, any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, only if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware), so long as one of such courts shall have subject matter jurisdiction over such Action, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereto hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action brought in any such court has been brought in an inconvenient forum. Process in any such Action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 13.04 shall be deemed effective service of process on such party.

Section 13.10 *Counterparts; Effectiveness; No Third-Party Beneficiaries.*

(a)     This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

(b)     No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns, except, with respect to Section 7.04, any legal counsel representing Seller or any of its Affiliates, including the Acquired Entities, in connection with the Current Representation, and Seller with respect to Section 7.10.

95

\\4149-1218-4642 v11

Section 13.11 *Specific Performance*. The parties hereto agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy. To the extent any party hereto brings an Action to enforce specifically the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives termination of this Agreement), the End Date shall automatically be extended to (i) the twentieth (20th) Business Day following the resolution of such Action or (ii) such other time period established by the court presiding over such Action.

Section 13.12 *Entire Agreement*. The Transaction Documents and the Confidentiality Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the parties hereto with respect to the subject matter hereof and thereof.

Section 13.13 *Severability*. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 13.14 *Disclosure Schedule*. The parties acknowledge and agree that (i) matters reflected on the Disclosure Schedule are not necessarily limited to matters required to be reflected therein, (ii) the inclusion of any items or information in the Disclosure Schedule that are not required by this Agreement to be so included is solely for the convenience of Buyer, (iii) the disclosure by Seller of any matter in the Disclosure Schedule shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material, (iv) headings have been inserted in the Disclosure Schedule for convenience of reference only and have no contractual meaning or impact, (v) the Disclosure Schedule is qualified in its entirety by reference to specific provisions of this Agreement and (vi) the Disclosure Schedule and the information and statements contained therein are not intended to constitute, and shall not be construed as constituting,

96

AA_CONFIDENTIAL                                                           AA-LITTRGT-000144466

representations or warranties of Seller except as and to the extent provided in this Agreement. Without limiting the generality of the foregoing, all references in the Disclosure Schedule to the enforceability of agreements with third parties, the existence or non- existence of third-party rights, the absence or existence of breaches or defaults by Seller, any of its Subsidiaries, or third parties, or similar matters or statements, are intended only to allocate rights and risks among the parties hereto and are not intended to be admissions against interests, give rise to any inference or proof of accuracy or be admissible against any party by or in favor of any Person who is not a party hereto.

Section 13.15  *Currency*. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in U.S. dollars. The parties agree that to the extent this Agreement provides for any valuation, measurement or test as of a given date based on an amount specified in U.S. dollars and the subjects of such valuation, measurement or test are comprised of items or matters that are, in whole or in part, denominated other than in U.S. dollars, such foreign dollar amounts shall be converted into U.S. dollars using an exchange rate that will be the closing mid-point real spot rate as of the second (2nd) Business Day prior to such date quoted by Bank of America for U.S. dollars to amounts of such foreign currency.

Section 13.16  *No Recourse*. Without limiting any other provision of this Agreement, it is hereby agreed and acknowledged that this Agreement may only be enforced against, and any claims or actions that may be based upon, arise out of, or relate to, this Agreement, or the negotiation, execution or performance of this Agreement, may only be made against the parties hereto, and no former, current or future Affiliates, officers, directors, managers, employees, equity holders, managers, members, partners, agents, Representatives or assigns of Seller or Buyer, in each case who is not a party hereto shall have any liability for any obligations of the parties hereto or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 13.17  *Waiver of Jury Trial*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.18  *Further Assurances*.

(a)      Each party hereto shall execute and cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

(b)      For the thirty (30) day period after the date hereof, (i) Buyer may elect to remove any bundle of services from the Transition Services Agreement and (ii) each of Buyer and Seller shall negotiate in good faith with respect to any additional services reasonably requested by Buyer.

\\4149-1218-4642 v11

AA_CONFIDENTIAL                                                          AA-LITTRGT-000144467

Section 13.19 *No Waiver Relating to Claims for Actual Fraud*. Notwithstanding anything to the contrary contained in this Agreement, none of the provisions set forth in this Agreement shall be deemed a waiver by any party to this Agreement of any right or remedy which such party may have at law or in equity against a Person as a result of such Actual Fraud, nor will any such provisions limit, or be deemed to limit:  (a) the amounts of recovery sought or awarded in any claim for Actual Fraud against such other Person; (b) the time period during which a claim for Actual Fraud may be brought against such other Person; or (c) the recourse which any such party may seek against such other Person with respect to a claim for Actual Fraud against such Person.

Section 13.20 *Parent Guaranty*.  Parent hereby absolutely, unconditionally and irrevocably guarantees to Buyer the full and prompt performance by Seller and its Affiliates of all of the obligations of Seller and its Affiliates pursuant to Article II, as and when required and due in accordance with the terms and conditions of this Agreement.  This guaranty is non-assignable except with Buyer'      s prior written consent.  Parent represents and warrants to Buyer as follows: (a) Parent is an *aktiebolag* duly incorporated under the laws of Sweden with corporate identity number 556059-3575; (b) Parent has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and (c) this Agreement constitutes a valid and binding obligation of Parent, enforceable in accordance with its terms, except as limited by the Enforceability Exceptions.

[*Signature page follows*]

98

\\4149-1218-4642  v11

AA-LITTRGT-000144468

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT**:

ASSA ABLOY AB

By _____  _____

Name: Lucas Boselli

Title: EVP and Head of Americas

*[Signature Page to Stock Purchase Agreement]*

AA-LITTRGT-000144469

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLER**:

ASSA ABLOY INC.

By _____

Name: Lucas Boselli

Title: President

*[Signature Page to Stock Purchase Agreement]*

AA-LITTRGT-000144470

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER**:

FORTUNE BRANDS HOME & SECURITY, INC.

By _Nicholas Fink_

Name: NICHOLAS FINK

Title: CHIEF EXECUTIVE OFFICER

*[Signature Page to Stock Purchase Agreement]*

AA-LITTRGT-000144471

**Schedule I**

Pre-Closing Reorganization

See attached.

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144472

**Schedule II**

Accounting Principles

See attached.

AA_CONFIDENTIAL

AA-LITTRGT-000144473

**Schedule III**

338 Allocation Schedule

The Purchase Price (and any other amounts treated as consideration for Tax purposes) shall be allocated among the Acquired Entity Securities and the Transferred Trademarks based on their fair market values, and the portion of the Purchase Price allocable to the Acquired Entity Securities of each Section 338(h)(10) Entity (and any other amounts treated as consideration for Tax purposes) shall be further allocated among the assets of each Section 338(h)(10) Entity deemed purchased pursuant to an election under Section 338(h)(10) of the Code in the following manner:

| Asset | Allocation of Value |
| --- | --- |
| Class I. Cash and cash equivalents | Net book value |
| Class II. Marketable stock/securities and actively traded personal property | Net book value |
| Class III. Accounts receivable and similar rights to payment | Net book value |
| Class IV. Inventory/stock in trade/property held for sale in ordinary course of business | Net book value |
| Class V. All assets other than Class I, II, III, IV, VI, VII assets | Consistent with the values provided in valuation reports prepared by Duff & Phelps |
| Class VI and VII. Intangible property, goodwill and going concern value | The remainder of the consideration for tax purposes not allocated to Classes I, II, III, IV and V assets shall be allocated to the Class VI and Class VII assets |

\\4149-1218-4642 v11

**<u>EXHIBIT A-1</u>**

<u>Form of Seller Patent License Agreement</u>

See attached.

AA_CONFIDENTIAL
AA-LITTRGT-000144475

<u>**EXHIBIT A-2**</u>

<u>Form of Buyer Patent License Agreement</u>

See attached.

\\4149-1218-4642  v11

AA_CONFIDENTIAL

AA-LITTRGT-000144476

**EXHIBIT B**

Form of Software License Agreement

See attached.

AA_CONFIDENTIAL

AA-LITTRGT-000144477

**EXHIBIT C**

Form of Supply Agreement

See attached.

AA_CONFIDENTIAL

AA-LITTRGT-000144478

**EXHIBIT D**

Form of Trademark Assignment Agreement

See attached.

\\4149-1218-4642 v11

AA_CONFIDENTIAL

AA-LITTRGT-000144479

**EXHIBIT E**

Form of Transition Services Agreement

See attached.

\\4149-1218-4642  v11

                                    AA-LITTRGT-000144480

2. Closing Implementation Letter, dated as of April 13, 2023 among ASSA ABLOY AB, ASSA ABLOY Inc., and Fortune.

Execution Version

**CONFIDENTIAL**

Fortune Brands Innovations, Inc.
520 Lake Cook Road Suite 300
Deerfield, IL 60015
Attention: John Lee (Senior Vice President, Global Growth & Development)
        Hiranda S. Donoghue (Senior Vice President, General Counsel & Secretary)
Email: john.lee@fbhs.com
      hiranda.donoghue@fbhs.com

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attention: Chris Abbinante
       Jonathan Blackburn
Email: cabbinante@sidley.com
      jblackburn@sidley.com

April 13, 2023

John and Hiranda,

**Re:  Closing Implementation Letter (this "Letter")**

       Reference is hereby made to the Stock Purchase Agreement (the "**Purchase Agreement**") dated as of December 1, 2022, by and among ASSA ABLOY Inc. ("**Seller**"), Fortune Brands Home & Security, Inc., now known as Fortune Brands Innovations, Inc. ("**Buyer**"), and solely for purposes of Section 13.20 therein, ASSA ABLOY AB ("**Parent**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement.

       In furtherance of the Parties' obligations under the Transaction Documents, the parties understand those Transaction Documents to require as follows, and will perform their respective obligations accordingly:

       <u>Section 1</u>    <u>Vietnam Closing</u>.  In furtherance of Sections 2.08(c) and 2.08(d) of the Purchase Agreement:

       (a)    The "**Vietnam Entity**" shall be deemed to mean ASSA ABLOY Smart Product Vietnam Co., Ltd. ("**AAVN**"), rather than a new entity to be formed under the laws of Vietnam in order to hold the assets and conduct the Vietnam Business.

\\4153-2976-5190  v7

AA-LITTRGT-000181387

(b)     ASSA ABLOY Asia Holding AB has entered into a lease agreement for the premises located at Lot CN6, Ba Thien Industrial Zone, Ba Hien Town, Binh Xuyen District, Vinh Phuc Province, Vietnam  (the "**New Site**") with Intramedia Minhduc Inc.  as lessor.

(c)     As soon as reasonably practicable, Seller and Parent shall cause ASSA ABLOY Asia Holding AB to incorporate a new entity under the laws of Vietnam in order to hold the assets and liabilities and conduct the business of the Retained Business in Vietnam (the "**New Vietnam Entity**").

(d)     Following the incorporation of the New Vietnam Entity, including obtainment of an Investment Registration Certificate and an Enterprise Registration Certificate, Seller and Parent shall cause AAVN and the New Vietnam Entity to enter into an agreement (the "**Retained Business Transfer Agreement**") to transfer all assets and employees of AAVN other than those assets and employees set out on Section 2.08(c)(i) of the Disclosure Schedules (and any other assets contemplated to be conveyed to Buyer in accordance with Section 2.09 of the Purchase Agreement, if any) (the "**Retained Vietnam Business**") from AAVN to the New Vietnam Entity. In furtherance of this Section 1(d), Seller and Parent shall cause the New Vietnam Entity and AAVN to negotiate in good faith with the employees of the Retained Vietnam Business to provide substantially the same terms of employment to such employees by the New Vietnam Entity and enable such employees to be transferred to the New Vietnam Entity as promptly as reasonably practicable. Following the execution and delivery of the Retained Business Transfer Agreement, Seller and Parent shall cause AAVN and the New Vietnam Entity to physically relocate the Retained Vietnam Business (including the inventory and equipment included in the Retained Vietnam Business) to the New Site as promptly as reasonably practicable. For the avoidance of doubt, all Contracts held by AAVN and used by the Vietnam Business will remain with AAVN following the transfer of AAVN to Buyer (or an Affiliate thereof) and will not be subject to the contract splitting process described in Section 2.09(a) of the Purchase Agreement.

(e)     The execution and delivery of a Foreign Acquisition Agreement to effect the sale of the equity securities of AAVN to Buyer (or an Affiliate thereof) (the "**Vietnam Transfer Agreement**") shall take place as promptly as practicable following the execution and delivery of the Retained Business Transfer Agreement. Upon the execution and delivery of the Vietnam Transfer Agreement, the parties shall cause AAVN to apply for an amendment of its Investment Registration Certificate and Enterprise Registration Certificate to reflect Buyer (or its Affiliate) as the registered owner of the equity securities of AAVN.

(f)     In the event that (i) AAVN has applied for and obtained an amendment to its Investment Registration Certificate and/or its Enterprise Registration Certificate reflecting Buyer (or its Affiliate) as the registered owner of the equity securities of AAVN and (ii) the Purchase Agreement is terminated for any reason whatsoever, Seller and Buyer shall take all actions necessary or advisable to transfer the equity securities of AAVN back to ASSA ABLOY Asia Holding AB for nominal consideration as promptly as practicable. In furtherance of the foregoing sentence, the parties shall cooperate in good faith to cause AAVN to abandon its application(s) to amend its Investment Registration Certificate and/or its Enterprise Registration Certificate, as applicable, or to the extent such application has already been approved, to submit a

new application to the applicable Governmental Authority to reflect ASSA ABLOY Asia Holding AB as the registered owner of the equity securities of AAVN.

(g)     For the avoidance of doubt, and not in limitation of any rights or obligations set forth in the Purchase Agreement, the parties acknowledge and agree that, pursuant to Section 2.08(c)(iv) of the Purchase Agreement, in the event that the foregoing implementation plan is not completed for any reason whatsoever prior to the Closing Date, Seller is obligated to operate the Vietnam Business at the direction of Buyer for the benefit of Buyer, including obligations to hold in trust all profits generated by the Vietnam Business and to pay net income generated from the Vietnam Business to Buyer, until such time as the foregoing implementation plan has been finalized and AAVN has been transferred to Buyer.

Section 2     Canada.  The parties agree that the assets of the Business located in Canada are not presently held by or in the name of ASSA ABLOY of Canada, Ltd. ("AAC") or any other Subsidiary of Parent organized under the laws of any province of Canada. Accordingly, in furtherance of Section 7.12 of the Purchase Agreement, it is the parties expectation that:

(a)     All Contracts of the Business used in the Canadian operations of the Business and not currently held in the name of an Acquired Entity will be assigned to an Acquired Entity in accordance with Section 5.03 of the Purchase Agreement. All other assets of the Business held for use in Canada are owned by an Acquired Entity, and will transfer with the Acquired Entities at the Closing.

(b)     The Business Employee currently located in Canada will enter into an employment contract with Buyer (or an Affiliate thereof, which may include an Acquired Entity) effective as of the Closing.

Section 3     Hong Kong Closing.  In furtherance of Sections 2.08(a) and 2.08(d) of the Purchase Agreement, it is the parties expectation that:

(a)     The Hong Kong Entity will be formed as soon as reasonably practicable by ASSA ABLOY Global Solutions Hong Kong Limited ("AAHK") as a subsidiary thereof.

(b)     Following the formation of the Hong Kong Entity, AAHK will: (i) contribute the assets listed on Section 2.08(a)(i) of the Disclosure Schedule (and any other assets contemplated to be conveyed to Buyer in accordance with Section 2.09 of the Purchase Agreement, if any) to the Hong Kong Entity; and (ii) enter into a tripartite agreement among AAHK, the Hong Kong Entity and each of the employees listed on Section 2.08(a)(i) of the Disclosure Schedule providing for the transfer of such employees' employer of record to the Hong Kong Entity.

(c)     At the Closing, AAHK will enter into a short-form definitive agreement between AAHK and Buyer (or an Affiliate thereof) for the sale and purchase of the equity securities in the Hong Kong Entity to Buyer, effective as of the date thereof. For the avoidance of doubt, there will not be a Deferred Hong Kong Closing Date.

Section 4      South Korea Closing.  In furtherance of Sections 2.08(b) and 2.08(d) of the Purchase Agreement, it is the parties expectation that:

(a)      The Korea Entity will be formed as soon as reasonably practicable by ASSA ABLOY Korea Co., Ltd. ("**AAK**") as a subsidiary thereof.

(b)      Following the formation of the Korea Entity, AAK will: (i) contribute the assets listed on Section 2.08(b)(i) of the Disclosure Schedule (and any other assets contemplated to be conveyed to Buyer in accordance with Section 2.09 of the Purchase Agreement, if any) to the Korea Entity; and (ii) use its reasonable best efforts to transfer the employees listed on Section 2.08(b)(i) of the Disclosure Schedule to the Korea Entity.

(c)      At the Closing, AAK will enter into a short-form definitive agreement between AAK and Buyer (or an Affiliate thereof) for the sale and purchase of the equity securities in the Korea Entity to Buyer, effective as of the date thereof. For the avoidance of doubt, there will not be a Deferred Korea Closing Date.

Section 5      Supply Agreement.  In furtherance of the intent of the parties to provide AARG with the products used in the Business prior to the Closing at the prices paid by the Business for such products prior to the Closing, Exhibit A to the Supply Agreement is hereby replaced in its entirety with Exhibit A to this Letter.

Section 6      Transition Services Agreement.  The parties hereby confirm that the obligations under Section 7.1(b) of the Transition Services Agreement include an obligation by Seller to use the Buyer Confidential Information solely for purposes of providing the TSA Services and not to disclose the Buyer Confidential Information to other employees of Seller.

Section 7      Business Employees.

(a)      In connection with the contemplated transfer of the Hong Kong Business, the Korea Business and the Vietnam Business as clarified in this Letter, the parties acknowledge that no Secondment Agreement is expected to be entered into at the Closing.

(b)      The Business Employees currently located in China and employed by ASSA ABLOY (China) Investment Co., Ltd. Shanghai Branch ("**AAS**") are expected to be transferred to Buyer (or an Affiliate thereof) at the Closing, rather than transferred to an Acquired Entity at or prior to the Closing. For the avoidance of doubt, all obligations of the parties with respect to the transfer of Business Employees will apply to the transfer of such Business Employees from AAS to Buyer (or an Affiliate thereof).

Section 8      Miscellaneous.

(a)      Sections 1.02 (*Other Definitional and Interpretive Provisions*), 13.04 (*Notices*), 13.05 (*Amendments and Waivers*), 13.06 (*Expenses*), 13.07 (*Successors and Assigns*), 13.08 (*Governing Law*), 13.09 (*Jurisdiction*), 13.10 (*Counterparts; Effectiveness; No Third-Party Beneficiaries*), 13.11 (*Specific Performance*),  13.13 (*Severability*), 13.17 (*Waiver of Jury Trial*),

Execution Version

13.18(a) (*Further Assurances*), and 13.20 (*Parent Guaranty*) of the Purchase Agreement shall each apply to this Letter, *mutatis mutandis*.

(b)     Except as expressly set forth herein, the Purchase Agreement is and will remain unmodified and in full force and effect. Each party hereto, on behalf of itself and its Affiliates, hereby reserves all rights under the Purchase Agreement.

[*Remainder of page intentionally left blank*]

\\4153-2976-5190  v7

AA_CONFIDENTIAL                                                                        AA-LITTRGT-000181391

Execution Version

Please confirm that the foregoing is our mutual understanding and agreement by signing and returning to us an executed counterpart of this Letter.

**ASSA ABLOY INC.**

By: _____
DocuSigned by:
*Lucas Boselli*
736A8032A193412
Name: Lucas Boselli
Title: EVP and Head of Americas

**ASSA ABLOY AB**

By: _____
DocuSigned by:
*Lucas Boselli*
736A8032A193412
Name: Lucas Boselli
Title: EVP and Head of Americas

Accepted and agreed to as of the date first written above:

**FORTUNE BRANDS INNOVATIONS, INC.**

By _____
  Name:
  Title:

Cc:

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
        Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
        megan.ridley-kaye@hoganlovells.com

Click here to enter text.                              Hogan Lovells

\\4153-2976-5190  v7

AA_CONFIDENTIAL                              AA-LITTRGT-000181392

Execution Version

Please confirm that the foregoing is our mutual understanding and agreement by signing and returning to us an executed counterpart of this Letter.

**ASSA ABLOY INC.**

By: _____
    Name:
    Title:

**ASSA ABLOY AB**

By: _____
    Name:
    Title:

Accepted and agreed to as of the date first written above:

**FORTUNE BRANDS INNOVATIONS, INC.**

By _____
    Name: John Lee
    Title: Executive Vice President, Chief
        Strategy and Growth Officer

Cc:

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
        Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
      megan.ridley-kaye@hoganlovells.com

AA-LITTRGT-000181393

Execution Version

<u>Exhibit A</u>

Product and Price List

See attached.

AA_CONFIDENTIAL

3. Software License Agreement to be entered into as of the Divestiture Date between August Home, Inc. and ASSA ABLOY Inc.

## SOFTWARE LICENSE AGREEMENT

This SOFTWARE LICENSE AGREEMENT ("**Agreement**") dated as of [●] (the "**Effective Date**"), is being entered into by and between ASSA ABLOY Inc., an Oregon corporation ("**Licensor**"), and August Home, Inc., a Delaware corporation ("**Licensee**"). Licensor and Licensee are each referred to herein as a "**party**" and collectively as the "**parties**."

### W I T N E S S E T H:

WHEREAS, Licensor is the owner or licensor, as applicable, of the Software (defined below);

WHEREAS, Licensor is party to that certain Stock Purchase Agreement between Licensor and [●], a [●] ("**Buyer**"), dated as of [●] (the "**Purchase Agreement**"), pursuant to which, among other things, Buyer has agreed to purchase the Purchased Shares (as defined in the Purchase Agreement), in each case, from Licensor, and Licensor has agreed to sell the Purchased Shares to Buyer, upon the terms and subject to the conditions set forth therein; and

WHEREAS, in connection with the Purchase Agreement, Licensee desires to obtain, and Licensor desires to grant to Licensee, a license to access and use the Software, in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein (the receipt and sufficiency of which is hereby acknowledged and agreed), the parties hereto agree as follows:

### Article 1
### DEFINITIONS

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX009**

1.1    Definitions.

"**Action**" means any action, suit, investigation or proceeding, in each case by or before any arbitrator or Governmental Authority.

"**Business**" means the development, manufacturing, marketing, sale and distribution of products and services which are designed for use in Residences, but does not include any Commercial Business.

"**Commercial Business**" means the development, manufacturing, marketing, sale and distribution of products and services which function to increase security, other than Residential Products.

"**Commercial Products**" means the "NexTouch" and commercial door lock and hardware products sold by Licensor (or its affiliates) and similar products provided by third parties which function to increase security, including lock and builder's hardware products, designed for use in commercial applications.

"**Improvement**" means any error correction, improvement, addition or revision to the Software.

"**Residences**" means single family homes and residential units within multifamily

[ PAGE \* MERGEFORMAT ]

dwellings, whether owned or whether leased or offered for long term or short term use by unit or home owner directly or through third party, including properties provided under AirBnB, VRBO and similar businesses, but specifically excludes hotel rooms, rooms in medical and long-term care facilities, dormitory rooms, and prison cells.

"**Residential Products**" means products which function to increase security, including lock and builder's hardware products, delivery boxes and lockers at Residences, and ANSI graded products (even if described as "commercial", "commercial grade" or "commercial quality" in connection with ANSI grade, subject to Section 2.2), in each case designed for use in Residences.

"**Software**" means Licensor's "August/Yale Access" software (as described in more detail on Exhibit A) in object code and source code form and technical and user documentation related thereto.

1.2     Any additional capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement.

**Article 2**
**LICENSE**

2.1     License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, an exclusive, perpetual, irrevocable, royalty-free, non-transferable (except as set forth in Section 9.5) and sublicensable license to install, copy, modify, create derivative works of, and use the Software solely in the United States and Canada in the Business. The scope of the foregoing license also includes Licensee's right to use the Software in Commercial Products supplied for entrances and exits to (i) multifamily properties and (ii) common areas in multifamily properties (but not educational, medical, retail, commercial, industrial, professional, or other areas); provided that sales are limited to existing and future business-to-business multifamily customers (including SmartRent Technologies, Inc. and Chirp Systems, Inc.) where the inclusion of Commercial Products as part of a "bundle" or "suite" of products (along with Residential Products) is requested by such customer or otherwise reasonably required to service the needs of such customers. The foregoing license does not permit Licensee to (a) use or permit the use of the Software outside of the United States or Canada; (b) use or permit the use of the Software outside of the Business; or (c) directly or indirectly take any action described in the license grant that would make the Software, or any portion thereof, generally publicly available or subject to any open source license terms.  Licensee will not knowingly or intentionally induce any third party to infringe any Software, and Licensee will use commercially reasonable efforts to mitigate the damages resulting from any such infringement. Licensee will use efforts to prevent infringement of the Software and to prevent use of the Software beyond the license scope set forth in this Section 2.1, which efforts shall be no less stringent than the efforts Licensee uses to protect its own Intellectual Property of a similar nature. Licensee shall promptly notify Licensor in writing of any actual or suspected infringement of any Software by any third party of which Licensee has actual knowledge. Notwithstanding anything to the contrary in this Agreement, storage of the Software in a server (and related processing of data)

[ PAGE  \\* MERGEFORMAT ]

outside of the United States and Canada (e.g., Ireland) is expressly permitted.

2.2     Yale Branded Products. Licensee agrees not to use "commercial", "commercial grade" or "commercial quality" or similar descriptions in connection with "Yale" branded products.

2.3     Licensor Restrictions. Licensor hereby covenants and agrees that Licensor shall not use the Software in the United States and/or Canada for any purpose. Notwithstanding anything to the contrary in this Agreement, Licensor's use at any time within the United States and/or Canada of any libraries, routines or other code that are commonly used in Licensor's industry (e.g., AES encryption) is expressly permitted, and shall not be considered a breach of Licensor's obligations, under this Agreement, even if such libraries, routines or other code is also included within the Software. Licensor agrees that Licensor shall not use the Software to access Licensee's servers.

## Article 3
## PROPRIETARY RIGHTS

3.1     Ownership. The Software and all proprietary rights thereto will at all times be and remain the exclusive property of Licensor; *provided, however*, that Licensee shall retain all rights in and to any Improvements made by Licensee to the Software. Licensor shall retain all rights in and to any Improvements made by Licensor to the Software. Neither Licensee nor Licensor shall have any obligation to license or deliver to the other party any Improvements made by such party.

3.2     Limited Rights. Licensor reserves all rights and licenses in and to the Software not expressly granted to Licensee under this Agreement. This Agreement does not constitute a sale of the Software in whole or in part, and Licensee shall not have any title to or ownership of the Software, regardless of the form in which the original and any copies may exist.

## Article 4
## NO DELIVERY; VALIDATION OF SOFTWARE; NO SUPPORT

4.1     No Delivery. The parties acknowledge that, as of the Effective Date, Licensee has in its possession one or more copies of the Software. Licensor shall have no obligation to deliver any Software to the Licensee hereunder.

4.2     Initial Baseline Validation of Software. Within sixty (60) days following the Effective Date, Licensor shall engage an independent third party auditor to perform a code base assessment of the Software ("**Code Assessment**") in order to inventory the proprietary libraries comprising the Software (the "**Baseline Libraries**") and confirm that the Baseline Libraries are not included within the software for any smart Residential Products developed, manufactured, marketed, sold and distributed by Licensor and its subsidiaries ("**Licensor Products**"). To the extent any such Code Assessment determines that one or more of the Baseline Libraries are found within Licensor Products, Licensor shall modify or otherwise redesign the software for such Licensor Products to remove such Baseline Libraries within one hundred eighty (180) days following the completion of such Code Assessment.

[ PAGE  \* MERGEFORMAT ]

AA_CONFIDENTIAL

4.3   <u>Annual Validation By Licensee</u>.  For a period of five (5) years following the Effective Date (but no more than once per year), Licensee shall have the right to request an additional Code Assessment to confirm whether any of the Baseline Libraries are included within Licensor Products.  Upon such request, Licensor shall engage an independent third party auditor reasonably acceptable to Licensee to perform such Code Assessment.  If, after any such annual Code Assessment, the third party auditor determines that the Baseline Libraries are used in Licensor Products, Licensor shall inform Licensee of such determination and shall modify or otherwise redesign the software for such Licensor Products within a reasonable time to remove such Baseline Libraries.  If Licensor completes such modification or other redesign within a reasonable period of time after the initial identification of use of the applicable Baseline Library(ies), Licensor shall have no further liability, and Licensee shall have no additional rights or remedies, with respect to such Code Assessment or related actions.

4.4   <u>Annual Validation By Licensor</u>. For a period of five (5) years following the Effective Date (but not more than once per year), Licensor shall have the right to request a code base assessment of Licensee's commercial product offerings ("**Licensee Commercial Products**") to confirm whether any of the Baseline Libraries are included within the Licensee Commercial Products. Upon such request, Licensee shall engage an independent third party auditor reasonably acceptable to Licensor to perform such Code Assessment; provided the costs of each such audit shall not exceed fifty thousand dollars ($50,000), unless Licensor agrees to incur all costs exceeding fifty thousand dollars ($50,000). If, after any such annual assessment, the third party auditor determines that the Baseline Libraries are used in Licensed Commercial Products, Licensee shall inform Licensor of such determination and shall modify or otherwise redesign the software for such for such Licensee Commercial Products within a reasonable time to remove such Baseline Libraries. If Licensee completes such modification or other redesign within a reasonable period of time after the initial identification of use of the applicable Baseline Library(ies), Licensee shall have no further liability, and Licensor shall have no additional rights or remedies, with respect to such assessment or related actions.

4.5   <u>Escalation</u>. It is the intent of the parties to use reasonable efforts to resolve expeditiously any dispute, controversy or claim related to any Code Assessment between the parties on a mutually acceptable negotiated basis. In furtherance of the foregoing, a party involved in any such dispute, controversy or claim may deliver a notice (an "**Escalation Notice**") demanding an in-person meeting involving representatives of the parties at a senior level of management (or if the parties agree, of the appropriate strategic business unit or division within such entity). A copy of any such Escalation Notice shall be given to the General Counsel, or like officer or official, of the party involved in the dispute, controversy or claim (which copy shall state that it is an Escalation Notice pursuant to this Agreement). Any agenda, location or procedures for such discussions or negotiations between the parties may be established by the parties from time to time; provided, however, that the parties shall use reasonable efforts to meet within thirty (30) days of the Escalation Notice.  The parties shall follow the foregoing escalation procedure prior to filing any Action under Section 9.2.2 (*Dispute Resolution*) or seeking any other rights or remedies with respect to a Code Assessment. Without prejudice to the limitations contained in Article 7, if the parties are unable to resolve any disputes, controversies or claims resulting from a Code Assessment after

[ PAGE  \* MERGEFORMAT ]

following the procedures set out in this Section 4.5, either party will be entitled to seek such damages at law and equity as may be available for the other party's breach of this Agreement. The foregoing process shall apply, *mutatis mutandis*, with respect to any dispute, controversy or claim related to any assessment conducted pursuant to Section 4.4.

    4.6    No Ongoing Support. Licensor shall not have any obligation to provide bug fixes, error corrections or any other support or maintenance services for the Software.

## Article 5
## WARRANTY DISCLAIMER

WITHOUT LIMITING OR MODIFYING THE PURCHASE AGREEMENT, THE SOFTWARE IS PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS, AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LICENSOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES AND CONDITIONS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, SYSTEM INTEGRATION, DATA ACCURACY, AND NON-INFRINGEMENT.  WITHOUT LIMITING OR MODIFYING THE PURCHASE AGREEMENT, (A) LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES THAT USE OF THE SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE; AND (B) LICENSOR IS NOT LIABLE FOR DAMAGES INCURRED BY LICENSEE IF LICENSEE FAILS TO TAKE ALL NECESSARY PRECAUTIONS TO ENSURE THAT ANY CONTENT OR OTHER MATERIAL OBTAINED FROM THE SOFTWARE IS FREE OF VIRUSES AND OTHER POTENTIALLY HARMFUL DEVICES.

## Article 6
## CONFIDENTIALITY

Each party acknowledges that the terms and conditions of this Agreement, are the confidential information of the other party.  Licensee acknowledges that the Software is the confidential information of Licensor. Each party shall maintain the confidential information of the other party in confidence and not disclose the same to any third party.  Notwithstanding the foregoing, nothing in this Article 6 shall be interpreted to limit Licensee's express license rights to the Software or in connection with a permitted assignment of this Agreement as set forth in Section 9.5. In addition, Licensor agrees to maintain the Software in confidence in a manner consistent with past practice.

## Article 7
## LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES WHETHER BASED IN CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

[ PAGE  \* MERGEFORMAT ]

**Article 8**
**TERM**

8.1     <u>Term</u>. This Agreement shall commence on the Effective Date and will remain in full force and effect without limitation.

8.2     <u>Monetary Damages</u>. If Licensee breaches any material term of this Agreement and fails to cure such breach within thirty (30) days after written notice thereof, the parties agree that monetary damages are sufficient compensation for any such breach by Licensee. For the avoidance of doubt, Licensee's payment of monetary damages is Seller's exclusive remedy for any breach by Licensee.  Notwithstanding the foregoing, each party may seek injunctive relief from any court of competent jurisdiction in the event of a breach or threatened breach of this Agreement by the other party where such relief is available under Applicable Law and as otherwise permitted pursuant to Section 9.9.

**Article 9**
**MISCELLANEOUS**

9.1     <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including email transmission, so long as a receipt of such email is confirmed by the recipient thereof) (whether or not expressly required herein) and shall be given,

if to Licensee, to:

> August Home, Inc.
> 520 Lake Cook Road Suite 300
> Deerfield, IL 60015
> Attention: John Lee
>          Hiranda S. Donoghue
> Email: [ HYPERLINK "mailto:john.lee@fbhs.com" ]
>          [ HYPERLINK "mailto:Hiranda.donoghue@fbhs.com" ]

if to Licensor, to:

> ASSA ABLOY Inc.
> 110 Sargent Drive
> New Haven, CT 06511
> Attention: L. Page Heslin
> [ HYPERLINK "mailto:Page.Heslin@assaabloy.com" ]

and with a copy (which shall not constitute notice) to:

> Hogan Lovells US LLP
> 390 Madison Avenue
> New York, NY 10017
> Attention: Peter Cohen-Millstein
>          Megan Ridley-Kaye
> Email: [ HYPERLINK "mailto:peter.cohen-millstein@hoganlovells.com" ]
>          [ HYPERLINK "mailto:megan.ridley-kaye@hoganlovells.com" ]

[ PAGE  \* MERGEFORMAT ]

or such other address or email as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

9.2     Governing Law; Jurisdiction; Waiver of Jury Trial.

9.2.1   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law rules of such state.

9.2.2   The parties agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, only if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter or if the Delaware Court of Chancery does not have subject matter jurisdiction over such Action, any federal court within the State of Delaware), so long as one of such courts shall have subject matter jurisdiction over such Action, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereto hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action brought in any such court has been brought in an inconvenient forum. Process in any such Action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 9.1 shall be deemed effective service of process on such party. In the event of any Action arising out of this Agreement, each party shall bear its own respective costs and fees, including attorneys' fees, incurred in connection with any such Action.

9.2.3   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.3 Severability. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

[ PAGE  \* MERGEFORMAT ]

9.4 <u>Amendments; Waiver</u>.

9.4.1   Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Licensee and Licensor, or in the case of a waiver, by the party or parties against whom the waiver is to be effective.

9.4.2   No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

9.5 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Except for sublicensing permitted hereunder, Licensee may not assign, delegate or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of Licensor; provided that Licensee may assign or transfer all of its rights or obligations under this Agreement without such consent, but upon notice to Licensor, in connection with: (a) any transfer of this Agreement or any rights hereunder to any affiliate of such Licensee; (b) a transfer or sale, through whatever means, of all or substantially all of the assets or the business of Licensee to which this Agreement relates (whether by assignment, conveyance, reorganization, merger, assumption, purchase and sale, by contract or by operation of law or at equity). Notwithstanding the foregoing, no assignment, delegation or other transfer of rights under this Agreement shall relieve the assignor of any liability or obligation hereunder. Any attempted assignment, delegation or transfer in violation of this Section 9.5 shall be null and void *ab initio*.

9.6 <u>Relationship of Parties</u>. The Agreement establishes a relationship of licensor and licensee between the parties, and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise, or agency between the parties. This Agreement does not provide either party with the power to bind the other or incur obligations on the other's behalf without the other's prior written consent.

9.7 <u>Counterparts; Effectiveness</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

9.8 <u>Entire Agreement</u>. This Agreement and the Purchase Agreement contain the entire agreement between the parties with respect to the matters described herein and supersedes all previous oral and written discussions, agreements or understandings between the parties regarding such matters. As between the parties, no oral statements or prior written material not

specifically incorporated into this Agreement shall be of any force and effect.

9.9  Specific Performance. The parties hereto agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

9.10  Enforcement. Licensee has the right, in its discretion, to bring any action or proceeding with respect to any such infringement of the Software in the Business in the United States and Canada; provided however, that Licensee shall consult in good faith with Licensor, in each instance, with respect to its pursuit of any such action or proceeding. Licensor shall provide Licensee with all assistance that Licensee may reasonably request, at Licensee's expense, in connection with any such action or proceeding. For the avoidance of doubt, Licensor as owner of the Software retains the right to bring any action or proceeding with respect to infringement of the Software anywhere in the world.

9.11  Effect of Licensor Bankruptcy. All rights and licenses granted by Licensor under this Agreement are and shall be deemed to be rights and licenses to "intellectual property", and the subject matter of this Agreement, including the Software, is and shall be deemed to be "embodiment[s]" of "intellectual property", for purposes of and as such terms are used in and interpreted under section 365(n) of the United States Bankruptcy Code (11 U.S.C. § 365(n)).

9.12  Captions. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

9.13  Third Party Beneficiaries. Except as expressly provided herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

9.14  Construction. As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural. References in this Agreement to a party or other person include their respective successors and assigns. The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". Unless the context otherwise requires, references in this Agreement to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any

[ PAGE  \* MERGEFORMAT ]

particular Article, Section or provision hereof. Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or". With regard to each and every term and condition of this Agreement, the parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which party actually prepared, drafted or requested any term or condition of this Agreement. All references in this Agreement to "dollars" or "$" shall mean United States dollars.

*[Signature page follows]*

[ PAGE \* MERGEFORMAT ]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed with effect as of the Effective Date by their duly authorized representatives.

**LICENSOR:**

**ASSA ABLOY INC.**

By:_____
Name:_____
Title:_____

**LICENSEE:**

**AUGUST HOME, INC.**

By:_____
Name:_____
Title:_____

[ PAGE  \* MERGEFORMAT ]

**EXHIBIT A**
**SOFTWARE DESCRIPTION**

Yale Access is an access control system designed for residences.  It consists two parts.  The customer is provided with a mobile application that is used to set up devices, grant and remove access to locks, understand when the locks are used, and to operate those locks over Bluetooth Low Energy when the mobile device is in range and via internet when the device is not in range.  This mobile application connects to a backend ecosystem that provides a variety of functions.  These functions include provisioning of devices, lock access control rules, lock usage access logs, and providing messaging services for notification such as when locks need new batteries, when locks are operated, etc.

Additionally, Yale Access provides partners with the ability to integrate their services with our locks.  These integrations have different types.  The first is where Yale Access integrates into other services such as Google Assistant, Apple HomeKit, or Amazon Alexa, which allows our customers to use voice commands to operate our locks.  Another type of integration is with systems such as IFTTT or Philips Hue, where we send information to the partner, which they use to trigger actions such as turning on the lights or disarming the alarm when the user comes home.  The last type of integration is where the partner uses our locks in their access control system.  In this type of integration we are providing the means to either directly operate a lock via Bluetooth Low Energy using our SDK, to remotely operate a lock using WiFi via our API, or to remotely provision PINS for keypads.

[ PAGE  \* MERGEFORMAT ]

[ IF "  DOCVARIABLE "SWDocIDLocation"  " = "1" "  DOCPROPERTY "SWDocID"  " "" ]
AA_CONFIDENTIAL

4. Patent License Agreement to be entered into as of the Divestiture Date between each of August Home, Inc. and ASSA ABLOY Residential Group, Inc., on the one hand, and ASSA ABLOY Inc. or their designated Affiliates, on the other hand.

## PATENT LICENSE AGREEMENT

This PATENT LICENSE AGREEMENT ("**Agreement**") dated as of [●] (the "**Effective Date**"), is being entered into by and between ASSA ABLOY Inc., an Oregon corporation, on behalf of itself and its Affiliates (excluding the Acquired Entities) ("**Licensor**"), and [August Home, Inc., a Delaware corporation ("**August**")][ASSA ABLOY Residential Group, Inc., a California corporation ("**AARG**"] or "**Licensee**"). Licensor and Licensee are each referred to herein as a "**party**" and collectively as the "**parties**."

### W I T N E S S E T H:

WHEREAS, Licensor or its Affiliates own the patents and patent applications set forth on Exhibit A (together with all patents that issue therefrom and all continuations, continuations-in-part, divisionals, extensions, substitutions, reissues, re-examinations, and renewals thereof, whether issued or filed before, on, or after the Effective Date) (the "**Licensed Patents**");

WHEREAS, Licensor is party to that certain Stock Purchase Agreement between Licensor and [●], a [●] ("**Buyer**"), dated as of [●] (the "**Purchase Agreement**"), pursuant to which, among other things, Buyer has agreed to purchase the Purchased Shares (as defined in the Purchase Agreement), in each case, from Licensor, and Licensor has agreed to sell the Purchased Shares to Buyer, upon the terms and subject to the conditions set forth therein; and

WHEREAS, in connection with the Purchase Agreement, Licensee wishes to practice the Licensed Patents, and Licensor is willing to grant to Licensee a license under the Licensed Patents, to facilitate Licensee's conduct of the Business.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein (the receipt and sufficiency of which is hereby acknowledged and agreed), the parties hereto agree as follows:

### Article 1
### DEFINITIONS

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX007**

1.1    Definitions.

"**Action**" means shall mean any action, suit, investigation or proceeding, in each case by or before any arbitrator or Governmental Authority.

"**Business**" means the development, manufacturing, marketing, sale and distribution of products and services which are designed for use in Residences, but does not include any Commercial Business.

"**Commercial Business**" means the development, manufacturing, marketing, sale and distribution of products and services which function to increase security, other than Residential Products.

"**Improvements**" means any improvement, enhancement, or other modification of the inventions or technology claimed or described in any of the Licensed Patents (whether or not patentable or reduced to practice).

"**Residences**" means single family homes and residential units within multifamily

[ PAGE \\* MERGEFORMAT ]

dwellings, whether owned or whether leased or offered for long term or short term use by unit or home owner directly or through third party, including, without limitation, properties provided under AirBnB, VRBO and similar businesses, but specifically excludes hotel rooms, rooms in medical and long-term care facilities, dormitory rooms, and prison cells.

"**Residential Products**" means products which function to increase security, including lock and builder's hardware products, delivery boxes and lockers at Residences, and ANSI graded products (even if described as "commercial", "commercial grade" or "commercial quality" in connection with ANSI grade, subject to Section 2.2), in each case designed for use in Residences.

1.2     Any additional capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement.

### Article 2
### LICENSE

2.1     <u>License</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a non-exclusive, perpetual, irrevocable, royalty-free, non-transferable (except as provided in Section 11.5) and non-sublicensable (except as provided in Section 2.3) license under the Licensed Patents set forth on Part I of Exhibit A and an exclusive (even as to Licensor), perpetual, irrevocable, royalty-free, non-transferable (except as provided in Section 11.5) and non-sublicensable (except as provided in Section 2.3) license under the Licensed Patents set forth on Part II of Exhibit A, in each case, to make, have made, use, offer to sell, sell, and import any product and perform any process or method solely in the Business in the United States and Canada.  For the avoidance of doubt, the foregoing shall not prohibit Licensee (or sublicensees) from manufacturing, and the Licensee (or sublicensees) is expressly licensed to manufacture, products abroad outside of the United States and Canada so long as the same are not sold or offered for sale outside of the United States and Canada.  Licensee will not knowingly or intentionally induce any third party to infringe the Licensed Patents, and Licensee will use commercially reasonable efforts to mitigate the damages resulting from any such infringement.  Licensee will use efforts to prevent infringement of the Licensed Patents and to prevent use of the Licensed Patents beyond the license scope set forth in this Section 2.1, which efforts shall be no less stringent than the efforts Licensee uses to protect its own Intellectual Property of a similar nature.

2.2     <u>Yale Branded Products</u>. Licensee agrees not to use "commercial", "commercial grade" or "commercial quality" or similar descriptions in connection with "Yale" branded products.

2.3     <u>Sublicensing</u>. Licensee may grant a written sublicense of any of its rights under this Agreement to one or more of its Affiliates and to manufacturers of products and services of the Business, provided that: (a) Licensee shall ensure that each sublicensee complies with the applicable terms and conditions of this Agreement; (b) sublicenses to manufacturers of Licensee shall grant limited rights to permit such manufacturers to make the Residential Products solely for Licensee; (c) any act or omission of a sublicensee that would be a material breach of this Agreement if performed by Licensee will be deemed to be a material breach by

[ PAGE   \* MERGEFORMAT ]

Licensee; and (d) with respect to sublicensed Affiliates, each sublicense will terminate effective as of the date the sublicensee ceases to be an Affiliate of Licensee and with respect to sublicensed manufacturers, the date the sublicensee ceases to be a manufacturer of Licensee.

2.4     Reservation of Rights. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement, including the right to practice the Licensed Patents covered by the exclusive license grant hereunder (a) within the United States and Canada for all purposes outside of the Business and (b) anywhere else in the world for all purposes.

## Article 3
## PROSECUTION AND MAINTENANCE; ENFORCEMENT

3.1     Prosecution and Maintenance. Licensor has the sole right, in its discretion and at Licensor's expense, to file, prosecute, and maintain all patents and applications under the Licensed Patents. On an annual basis, Licensor shall provide to Licensee a written update with respect to (a) filings and progress of all material aspects of the prosecution of such patent application, and the issuance of patents from any such patent application and (b) any additions, deletions or changes in the status of such patents and applications.

3.2     Enforcement. Licensee shall promptly notify Licensor in writing of any actual or suspected infringement of any Licensed Patent by any third party of which Licensee has actual knowledge. Licensor has the sole right, in its discretion, to bring any action or proceeding with respect to any such infringement, and to defend any declaratory judgment action concerning any Licensed Patent, and to control the conduct of any such action or proceeding (including any settlement thereof). Licensee shall provide Licensor with all assistance that Licensor may reasonably request, at Licensor's expense, in connection with any such action or proceeding. Licensor will be entitled to retain any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for its own account.

## Article 4
## COMPLIANCE WITH LAWS

4.1     Patent Marking. Licensor and Licensee shall work together in good faith to ensure compliance with the patent marking laws of all applicable jurisdictions with respect to the products produced by Licensee using the Licensed Patents and sold in those countries.

## Article 5
## PROPRIETARY RIGHTS

5.1     Ownership. The Licensed Patents and all proprietary rights thereto will at all times be and remain the exclusive property of Licensor. Licensor shall retain all rights in and to any Improvements made by Licensor to the Licensed Patents. Neither Licensee nor Licensor shall have any obligation to license or deliver to the other party any Improvements made by such party.

5.2     Limited Rights. Licensor reserves all rights and licenses in and to the Licensed Patents not expressly granted to Licensee under this Agreement. This Agreement does not constitute a sale of the Licensed Patents in whole or in part, and Licensee shall not have any

[ PAGE  \* MERGEFORMAT ]

title to or ownership of the Licensed Patents, regardless of the form in which the original and any copies may exist.

## Article 6
## WARRANTY DISCLAIMER

WITHOUT LIMITING OR MODIFYING THE PURCHASE AGREEMENT, THE LICENSED PATENTS ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS, AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LICENSOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES AND CONDITIONS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUT WITHOUT LIMITING OR MODIFYING THE PURCHASE AGREEMENT, (A) LICENSOR MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE VALIDITY, ENFORCEABILITY, OR SCOPE OF THE LICENSED PATENTS; AND (B) LICENSOR SHALL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE ARISING OUT OF OR IN CONNECTION WITH THE MANUFACTURE, USE, OFFER FOR SALE, SALE, OR IMPORT OF A PRODUCT USING THE LICENSED PATENTS OR THE PRACTICE OF THE LICENSED PATENTS.

## Article 7
## RESERVED

## Article 8
## CONFIDENTIALITY

Licensee acknowledges that all trade secrets and confidential information included in the unpublished patent applications and invention disclosures, included in the Licensed Patents will be deemed confidential information of Licensor. Licensee shall maintain such confidential information in confidence and not disclose the same to any third party or use the same for any purpose other than as permitted pursuant to this Agreement. Notwithstanding the foregoing, nothing in this Article 8 shall be interpreted to limit Licensee's license rights to the Licensed Patents or in connection with a permitted assignment of this Agreement as set forth in Section 11.5.

## Article 9
## LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES WHETHER BASED IN CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

[ PAGE  \* MERGEFORMAT ]

## Article 10
## TERM

10.1     Term. This Agreement shall commence on the Effective Date and will remain in full force and effect until the last to expire of the Licensed Patents.

10.2     Escalation.

(a)     In the event of any dispute, controversy or claim arising out of or in connection with this Agreement (including its formation, interpretation, or breach, and whether contractual or non-contractual in nature) (a "**Dispute**"), either party may serve written notice of the Dispute on the other party (a "**Dispute Notice**"). Upon receipt of a Dispute Notice, the respective Representatives of Licensor and Licensee shall meet and negotiate in good faith for twenty-one (21) days following receipt of a Dispute Notice, unless such other period of time is otherwise agreed to by the parties in writing, to seek to amicably resolve such Dispute. If the matter that is the subject of the Dispute is of an insurable nature, the disputing party shall provide notice of claim to its insurer within such 21-day period. In the event that the Representatives are unable to resolve the Dispute, the respective general counsels of Licensor and Licensee and/or an executive officer designated by each party shall negotiate in good faith for a further period of twenty-one (21) days, unless such other period of time is otherwise agreed to by the parties in writing, to seek to amicably resolve such Dispute; provided, that the total good faith negotiations of the Representatives and the general counsels, respectively, shall not exceed forty-five (45) days from the time of receipt by a party of a Dispute Notice, unless otherwise agreed by the parties in writing.

(b)     Section 10.2(a) shall not prohibit a party from seeking injunctive relief from any court of competent jurisdiction in the event of a breach or threatened breach of this Agreement by the other party where such relief is available under Applicable Law and as otherwise permitted pursuant to Section 11.9. The parties acknowledge and agree that, in the event either party seeks injunctive relief in the event of a breach or prospective breach of this Agreement.

10.3     Monetary Damages. If, following the process described in Section 10.2(a) above, the parties remain in dispute about whether a breach of any material term of this Agreement by Licensee has occurred and has not been cured, the parties agree that monetary damages are sufficient compensation for any such breach by Licensee. For the avoidance of doubt and subject to Section 10.2(b), Licensee's payment of monetary damages is Seller's exclusive remedy for any breach by Licensee.

## Article 11
## MISCELLANEOUS

11.1     Notices. All notices, requests and other communications to any party hereunder shall be in writing (including email transmission, so long as a receipt of such email is confirmed by the recipient thereof) (whether or not expressly required herein) and shall be given,

if to Licensee, to:

[August Home, Inc.][ASSA ABLOY Residential Group, Inc.]

[ PAGE  \* MERGEFORMAT ]

520 Lake Cook Road Suite 300
Deerfield, IL 60015
Attention: John Lee
         Hiranda S. Donghue
Email: john.lee@fbhs.com
         hiranda.donoghue@fbhs.com

if to Licensor, to:

ASSA ABLOY Inc.
110 Sargent Drive
New Haven, CT 06511
Attention: L. Page Heslin
Page.Heslin@assaabloy.com

with a copy (which shall not constitute notice) to:

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
         Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
         megan.ridley-kaye@hoganlovells.com

or such other address or email as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

11.2    Governing Law; Jurisdiction; Waiver of Jury Trial.

11.2.1 This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state.

11.2.2 The parties agree that any Action to enforce any provision of, or based on any matter arising out of or in connection with this Agreement or the transactions contemplated hereby shall be brought in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, only if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter or if the Delaware Court of Chancery does not have subject matter jurisdiction over such Action, any federal court within the State of Delaware), so long as one of such courts shall have subject matter jurisdiction over such Action, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereto hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action

[ PAGE   \* MERGEFORMAT ]

in any such court or that any such Action brought in any such court has been brought in an inconvenient forum. Process in any such Action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.1 shall be deemed effective service of process on such party. In the event of any Action arising out of this Agreement, each party shall bear its own respective costs and fees, including attorneys' fees, incurred in connection with any such Action.

11.2.3 EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.3 Severability. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other governmental authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.4 Amendments; Waiver.

11.4.1 Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Licensee and Licensor, or in the case of a waiver, by the party or parties against whom the waiver is to be effective.

11.4.2 No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

11.5 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Licensee may not assign, delegate or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of Licensor; provided that Licensee may assign or transfer all of its rights or obligations under this Agreement without such consent, but upon notice to Licensor, in connection with: (a) any transfer of this Agreement or any rights hereunder to any Affiliate of such Licensee; (b) a transfer or sale, through whatever means, of all or substantially all of the assets or the business of Licensee to which this Agreement relates (whether by assignment, conveyance,

[ PAGE  \* MERGEFORMAT ]

reorganization, merger, assumption, purchase and sale, by contract or by operation of law or at equity). Notwithstanding the foregoing, no assignment, delegation or other transfer of rights under this Agreement shall relieve the assignor of any liability or obligation hereunder. Any attempted assignment, delegation or transfer in violation of this Section 11.5 shall be null and void *ab initio*.

11.6 <u>Relationship of Parties</u>. The Agreement establishes a relationship of licensor and licensee between the parties, and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise, or agency between the parties. This Agreement does not provide either party with the power to bind the other or incur obligations on the other's behalf without the other's prior written consent.

11.7 <u>Counterparts; Effectiveness</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

11.8 <u>Entire Agreement</u>. This Agreement and the Purchase Agreement contain the entire agreement between the parties with respect to the matters described herein and supersede all previous oral and written discussions, agreements or understandings between the parties regarding such matters. As between the parties, no oral statements or prior written material not specifically incorporated into this Agreement shall be of any force and effect.

11.9 <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

11.10 <u>Effect of Licensor Bankruptcy</u>. All rights and licenses granted by Licensor under this Agreement are and shall be deemed to be rights and licenses to "intellectual property", and the subject matter of this Agreement, including the Licensed Patents, is and shall be deemed to be "embodiment[s]" of "intellectual property", for purposes of and as such terms are used in and interpreted under section 365(n) of the United States Bankruptcy Code (11 U.S.C. § 365(n)).

11.11 <u>Captions</u>. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

[ PAGE  \* MERGEFORMAT ]

11.12 <u>Third Party Beneficiaries</u>. Except as expressly provided herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

11.13 <u>Construction</u>. As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural. References in this Agreement to a party or other person include their respective successors and assigns. The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". Unless the context otherwise requires, references in this Agreement to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision hereof. Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or". With regard to each and every term and condition of this Agreement, the parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which party actually prepared, drafted or requested any term or condition of this Agreement. All references in this Agreement to "dollars" or "$" shall mean United States dollars.

*[Signature page follows]*

[ PAGE  \* MERGEFORMAT ]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed with effect as of the Effective Date by their duly authorized representatives.

**LICENSOR:**

**ASSA ABLOY INC.**

By:_____
Name:_____
Title:_____

**LICENSEE:**

**[AUGUST HOME, INC.**

By:_____
Name:_____
Title:_____]

**[ASSA ABLOY RESIDENTIAL GROUP, INC.**

By:_____
Name:_____
Title:_____]

[ IF "   DOCVARIABLE "SWDocIDLocation"   " = "1" "   DOCPROPERTY "SWDocID"   " "" ]
AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000136761

# EXHIBIT A

## Licensed Patents

### Part 1

Non-Exclusive License

| Title | Application No | Filing Date | Registration No | Registration Date | Current Assignee |
|---|---|---|---|---|---|
| DOOR LOCK ESCUTCHEON | CA 173323 | 2017-03-01 | 173323 | 2018-01-29 | YALE SECURITY INC. |
| LOCKING MECHANISM FOR BORED LOCK | 16/580035 | 2019-09-24 | 10920455 | 2021-02-16 | SARGENT MANUFACTURING COMPANY |
| DOOR LOCK WITH INTEGRATED DOOR POSITION SENSOR | 14/353679 | 2012-11-01 | 10435917 | 2019-10-08 | SARGENT MANUFACTURING COMPANY |
| INTERCONNECTED LOCK WITH DIRECT DRIVE FOR ADJUSTABLE DEADBOLT TO LATCHBOLT SPACING | 14/924050 | 2015-10-27 | 9890564 | 2018-02-13 | SARGENT MANUFACTURING COMPANY |
| LOCKING DEVICE WITH CONFIGURABLE ELECTRICAL CONNECTOR KEY AND IC BOARD FOR ELECTRONIC DOOR LOCKS | 16/357426 | 2019-03-19 | 10829959 | 2020-11-10 | SARGENT MANUFACTURING COMPANY |
| LOCKING DEVICE WITH INTEGRATED CIRCUIT BOARD | 14/627375 | 2015-02-20 | 9512645 | 2016-12-06 | SARGENT MANUFACTURING COMPANY |
| INLINE MOTORIZED LOCK DRIVE FOR SOLENOID REPLACEMENT | 16/751235 | 2020-01-24 | 11187012 | 2021-11-30 | SARGENT MANUFACTURING COMPANY |
| DOOR LOCK SYSTEM | 90/012969 | 2013-09-04 | 8035478 | 2014-08-11 | ASSA ABLOY KOREA CO., LTC[1] |

### Part 2

Exclusive License

| Title | Application No | Filing Date | Registration No | Registration Date | Current Assignee |
|---|---|---|---|---|---|
| SMART LOCK FRONT PANEL | CA 163437 | 2015-07-15 | 163437 | 2016-03-29 | YALE SECURITY INC. |
| INTERIOR HOUSING FOR A DOOR LOCK | CA 163444 | 2015-07-15 | 163444 | 2016-04-19 | YALE SECURITY INC. |
| SMART LOCK FRONT PANEL | CA 167243 | 2015-07-15 | 167243 | 2016-03-29 | YALE SECURITY INC. |
| INTERIOR HOUSING FOR A DOOR LOCK | CA 167244 | 2015-07-15 | 167244 | 2016-04-19 | YALE SECURITY INC. |

---

[1] **Note to Seller**: Deleted to avoid confusion as we saw Seller had moved this patent to Section 3.15(a) of the Disclosure Schedules. **Note to Buyer**: We have removed the patent from the disclosure schedules. This patent is not owned by the business, and as such, it cannot be transferred with the business.

[ PAGE  \* MERGEFORMAT ]

5.  Patent License Back Agreement to be entered into as of the Divestiture Date between each of August Home, Inc. and ASSA ABLOY Residential Group, Inc., on the one hand, and ASSA ABLOY Inc. or their designated Affiliates, on the other hand.

EXECUTION COPY

## PATENT LICENSE-BACK AGREEMENT

This PATENT LICENSE AGREEMENT ("**Agreement**") dated as of [●] (the "**Effective Date**"), is being entered into by and between [August Home, Inc., a Delaware corporation ("**August**")][ASSA ABLOY Residential Group, Inc., a California corporation ("**AARG**"] or "**Licensor**"), and ASSA ABLOY Inc., an Oregon corporation, on behalf of itself and its Affiliates (excluding the Acquired Entities) ("**Licensee**"). Licensor and Licensee are each referred to herein as a "**party**" and collectively as the "**parties**."

## W I T N E S S E T H:

WHEREAS, an Affiliate of Licensor, on the one hand, and Licensee, on the other hand, have entered into that certain Stock Purchase Agreement, dated as of [●] (the "**Purchase Agreement**"), pursuant to which Licensee has agreed to sell to an Affiliate of Licensor, and such Affiliate of Licensor has agreed to purchase, acquire and accept from Licensee, the Purchased Shares (as defined in the Purchase Agreement) upon the terms and subject to the conditions set forth therein;

WHEREAS, Licensor wishes to grant a license to Licensee, and Licensee desires to receive from Licensor, a license to practice the patents and patent applications set forth on Exhibit A (together with all patents that issue therefrom and all continuations, continuations-in-part, divisionals, extensions, substitutions, reissues, re-examinations, and renewals thereof, whether issued or filed before, on, or after the Effective Date) (the "**Licensed Patents**"), to facilitate the conduct of the Commercial Business;

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein (the receipt and sufficiency of which is hereby acknowledged and agreed), the parties hereto agree as follows:

## Article 1
## DEFINITIONS

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX008**

1.1   Definitions.

"**Action**" means shall mean any action, suit, investigation or proceeding, in each case by or before any arbitrator or Governmental Authority.

"**Business**" means the development, manufacturing, marketing, sale and distribution of products and services which are designed for use in Residences, but does not include any Commercial Business.

"**Commercial Business**" means the development, manufacturing, marketing, sale and distribution of products and services which function to increase security, other than Residential Products.

"**Improvements**" means any improvement, enhancement, or other modification of the inventions or technology claimed or described in any of the Licensed Patents (whether or not patentable or reduced to practice).

"**Residences**" means single family homes and residential units within multifamily dwellings, whether owned or whether leased or offered for long term or short term use by unit

[ PAGE  \* MERGEFORMAT ]

or home owner directly or through third party, including, without limitation, properties provided under AirBnB, VRBO and similar businesses, but specifically excludes hotel rooms, rooms in medical and long-term care facilities, dormitory rooms, and prison cells.

"**Residential Products**" means products which function to increase security, including lock and builder's hardware products, delivery boxes and lockers at Residences, and ANSI graded products, in each case designed for use in Residences.

1.2     Any additional capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement.

## Article 2
## LICENSE

2.1     <u>License</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a non-exclusive, perpetual, irrevocable, royalty-free, non-transferable (except as provided in Section 11.5) and non-sublicensable (except as provided in Section 2.3) license under the Licensed Patents to make, have made, use, offer to sell, sell, and import any product and perform any process or method solely in the Commercial Business anywhere in the world. Licensee will not knowingly or intentionally induce any third party to infringe the Licensed Patents, and Licensee will use commercially reasonable efforts to mitigate the damages resulting from any such infringement. Licensee will use efforts to prevent infringement of the Licensed Patents and to prevent use of the Licensed Patents beyond the license scope set forth in this Section 2.1, which efforts shall be no less stringent than the efforts Licensee uses to protect its own Intellectual Property of a similar nature.

2.2     <u>Sublicensing</u>. Licensee may grant a written sublicense of any of its rights under this Agreement to one or more of its Affiliates and to manufacturers of products and services of the Commercial Business, provided that: (a) Licensee shall ensure that each sublicensee complies with the applicable terms and conditions of this Agreement; (b) sublicenses to manufacturers of Licensee shall grant limited rights to permit such manufacturers to make the products for the Commercial Business solely for Licensee; (c) any act or omission of a sublicensee that would be a material breach of this Agreement if performed by Licensee will be deemed to be a material breach by Licensee; and (d) with respect to sublicensed Affiliates, each sublicense will terminate effective as of the date the sublicensee ceases to be an Affiliate of Licensee and with respect to sublicensed manufacturers, the date the sublicensee ceases to be a manufacturer of Licensee.

2.3     <u>Reservation of Rights</u>. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

## Article 3
## PROSECUTION AND MAINTENANCE; ENFORCEMENT

3.1     <u>Prosecution and Maintenance</u>. Licensor has the sole right, in its discretion and at Licensor's expense, to file, prosecute, and maintain all patents and applications under the Licensed Patents. On an annual basis, Licensor shall provide to Licensee a written update with

[ PAGE  \* MERGEFORMAT ]

EXECUTION COPY

respect to (a) filings and progress of all material aspects of the prosecution of such patent application, and the issuance of patents from any such patent application and (b) any additions, deletions or changes in the status of such patents and applications.

3.2     Enforcement. Licensee shall promptly notify Licensor in writing of any actual or suspected infringement of any Licensed Patent by any third party of which Licensee has actual knowledge. Licensor has the sole right, in its discretion, to bring any action or proceeding with respect to any such infringement, and to defend any declaratory judgment action concerning any Licensed Patent, and to control the conduct of any such action or proceeding (including any settlement thereof). Licensee shall provide Licensor with all assistance that Licensor may reasonably request, at Licensor's expense, in connection with any such action or proceeding. Licensor will be entitled to retain any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for its own account.

### Article 4
### COMPLIANCE WITH LAWS

4.1     Patent Marking. Licensor and Licensee shall work together in good faith to ensure compliance with the patent marking laws of all applicable jurisdictions with respect to the products produced by Licensee using the Licensed Patents and sold in those countries.

### Article 5
### PROPRIETARY RIGHTS

5.1     Ownership. The Licensed Patents and all proprietary rights thereto will at all times be and remain the exclusive property of Licensor. Licensor shall retain all rights in and to any Improvements made by Licensor to the Licensed Patents. Neither Licensee nor Licensor shall have any obligation to license or deliver to the other party any Improvements made by such party.

5.2     Limited Rights. Licensor reserves all rights and licenses in and to the Licensed Patents not expressly granted to Licensee under this Agreement. This Agreement does not constitute a sale of the Licensed Patents in whole or in part, and Licensee shall not have any title to or ownership of the Licensed Patents, regardless of the form in which the original and any copies may exist.

### Article 6
### WARRANTY DISCLAIMER

THE LICENSED PATENTS ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS, AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LICENSOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES AND CONDITIONS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, (A) LICENSOR MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE VALIDITY, ENFORCEABILITY, OR SCOPE OF THE LICENSED

[ PAGE  \* MERGEFORMAT ]

PATENTS; AND (B) LICENSOR SHALL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE ARISING OUT OF OR IN CONNECTION WITH THE MANUFACTURE, USE, OFFER FOR SALE, SALE, OR IMPORT OF A PRODUCT USING THE LICENSED PATENTS OR THE PRACTICE OF THE LICENSED PATENTS.

## Article 7
## RESERVED

## Article 8
## CONFIDENTIALITY

Licensee acknowledges that all trade secrets and confidential information included in the unpublished patent applications and invention disclosures, included in the Licensed Patents will be deemed confidential information of Licensor. Licensee shall maintain such confidential information in confidence and not disclose the same to any third party or use the same for any purpose other than as permitted pursuant to this Agreement. Notwithstanding the foregoing, nothing in this Article 8 shall be interpreted to limit Licensee's license rights to the Licensed Patents or in connection with a permitted assignment of this Agreement as set forth in Section 11.5.

## Article 9
## LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES WHETHER BASED IN CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## Article 10
## TERM

10.1    Term. This Agreement shall commence on the Effective Date and will remain in full force and effect until the last to expire of the Licensed Patents.

10.2    Escalation.

(a)    In the event of any dispute, controversy or claim arising out of or in connection with this Agreement (including its formation, interpretation, or breach, and whether contractual or non-contractual in nature) (a "**Dispute**"), either party may serve written notice of the Dispute on the other party (a "**Dispute Notice**"). Upon receipt of a Dispute Notice, the respective Representatives of Licensor and Licensee shall meet and negotiate in good faith for twenty-one (21) days following receipt of a Dispute Notice, unless such other period of time is otherwise agreed to by the parties in writing, to seek to amicably resolve such Dispute. If the matter that is the subject of the Dispute is of an insurable nature, the disputing party shall provide notice of claim to its insurer within such 21-day period. In the event that the

Representatives are unable to resolve the Dispute, the respective general counsels of Licensor and Licensee and/or an executive officer designated by each party shall negotiate in good faith for a further period of twenty-one (21) days, unless such other period of time is otherwise agreed to by the parties in writing, to seek to amicably resolve such Dispute; provided, that the total good faith negotiations of the Representatives and the general counsels, respectively, shall not exceed forty-five (45) days from the time of receipt by a party of a Dispute Notice, unless otherwise agreed by the parties in writing.

(b)     Section 10.2(a) shall not prohibit a party from seeking injunctive relief from any court of competent jurisdiction in the event of a breach or threatened breach of this Agreement by the other party where such relief is available under Applicable Law and as otherwise permitted pursuant to Section 11.9. The parties acknowledge and agree that, in the event either party seeks injunctive relief in the event of a breach or prospective breach of this Agreement.

10.3    Monetary Damages. If, following the process described in Section 10.2(a) above, the parties remain in dispute about whether a breach of any material term of this Agreement by Licensee has occurred and has not been cured, the parties agree that monetary damages are sufficient compensation for any such breach by Licensee. For the avoidance of doubt and subject to Section 10.2(b), Licensee's payment of monetary damages is Seller's exclusive remedy for any breach by Licensee.

**Article 11**
**MISCELLANEOUS**

11.1    Notices. All notices, requests and other communications to any party hereunder shall be in writing (including email transmission, so long as a receipt of such email is confirmed by the recipient thereof) (whether or not expressly required herein) and shall be given,

if to Licensor, to:

> [August Home, Inc.][ASSA ABLOY Residential Group, Inc.]
> 520 Lake Cook Road Suite 300
> Deerfield, IL 60015
> Attention: John Lee
>         Hiranda S. Donoghue
> Email: [ HYPERLINK "mailto:john.lee@fbhs.com" ]
>        [ HYPERLINK "mailto:hiranda.donoghue@fbhs.com" ]

if to Licensee, to:

> ASSA ABLOY Inc.
> 110 Sargent Drive
> New Haven, CT 06511
> Attention: L. Page Heslin
> Page.Heslin@assaabloy.com

with a copy (which shall not constitute notice) to:

[ PAGE  \* MERGEFORMAT ]

EXECUTION COPY

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
         Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
      megan.ridley-kaye@hoganlovells.com

or such other address or email as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

11.2   Governing Law; Jurisdiction; Waiver of Jury Trial.

11.2.1  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state.

11.2.2  The parties agree that any Action to enforce any provision of, or based on any matter arising out of or in connection with this Agreement or the transactions contemplated hereby shall be brought in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, only if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter or if the Delaware Court of Chancery does not have subject matter jurisdiction over such Action, any federal court within the State of Delaware), so long as one of such courts shall have subject matter jurisdiction over such Action, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereto hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action brought in any such court has been brought in an inconvenient forum. Process in any such Action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.1 shall be deemed effective service of process on such party. In the event of any Action arising out of this Agreement, each party shall bear its own respective costs and fees, including attorneys' fees, incurred in connection with any such Action.

11.2.3  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.3 Severability. Each term, provision, covenant and restriction of this Agreement is severable. If any term, provision, covenant or restriction of this Agreement is held by a court

[ PAGE  \* MERGEFORMAT ]

of competent jurisdiction or other governmental authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.4 Amendments; Waiver.

11.4.1 Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Licensee and Licensor, or in the case of a waiver, by the party or parties against whom the waiver is to be effective.

11.4.2 No failure or delay by any party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

11.5 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Licensee may not assign, delegate or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of Licensor; provided that Licensee may assign or transfer all of its rights or obligations under this Agreement without such consent, but upon notice to Licensor, in connection with: (a) any transfer of this Agreement or any rights hereunder to any Affiliate of such Licensee; (b) a transfer or sale, through whatever means, of all or substantially all of the assets or the business of Licensee to which this Agreement relates (whether by assignment, conveyance, reorganization, merger, assumption, purchase and sale, by contract or by operation of law or at equity). Notwithstanding the foregoing, no assignment, delegation or other transfer of rights under this Agreement shall relieve the assignor of any liability or obligation hereunder. Any attempted assignment, delegation or transfer in violation of this Section 11.5 shall be null and void *ab initio*.

11.6 Relationship of Parties. The Agreement establishes a relationship of licensor and licensee between the parties, and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise, or agency between the parties. This Agreement does not provide either party with the power to bind the other or incur obligations on the other's behalf without the other's prior written consent.

11.7 Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each

[ PAGE  \* MERGEFORMAT ]

party hereto shall have received a counterpart hereof signed by the other parties hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

11.8 <u>Entire Agreement</u>. This Agreement and the Purchase Agreement contain the entire agreement between the parties with respect to the matters described herein and supersede all previous oral and written discussions, agreements or understandings between the parties regarding such matters. As between the parties, no oral statements or prior written material not specifically incorporated into this Agreement shall be of any force and effect.

11.9 <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

11.10 <u>Effect of Licensor Bankruptcy</u>. All rights and licenses granted by Licensor under this Agreement are and shall be deemed to be rights and licenses to "intellectual property", and the subject matter of this Agreement, including the Licensed Patents, is and shall be deemed to be "embodiment[s]" of "intellectual property", for purposes of and as such terms are used in and interpreted under section 365(n) of the United States Bankruptcy Code (11 U.S.C. § 365(n)).

11.11 <u>Captions</u>. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

11.12 <u>Third Party Beneficiaries</u>. Except as expressly provided herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

11.13 <u>Construction</u>. As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural. References in this Agreement to a party or other person include their respective successors and assigns. The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". Unless the context otherwise requires, references in this Agreement to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement. Unless the context otherwise requires, the words "hereof,"

[ PAGE  \* MERGEFORMAT ]

"hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision hereof. Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or". With regard to each and every term and condition of this Agreement, the parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which party actually prepared, drafted or requested any term or condition of this Agreement. All references in this Agreement to "dollars" or "$" shall mean United States dollars.

*[Signature page follows]*

[ PAGE  \* MERGEFORMAT ]

AA_CONFIDENTIAL

EXECUTION COPY

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed with effect as of the Effective Date by their duly authorized representatives.

**LICENSOR:**

**[AUGUST HOME, INC.**

By:_____
Name:_____
Title:_____]

**[ASSA ABLOY RESIDENTIAL GROUP, INC.**

By:_____
Name:_____
Title:_____]

**LICENSEE:**

**ASSA ABLOY INC.**

By:_____
Name:_____
Title:_____

[ PAGE   \* MERGEFORMAT ]

# EXHIBIT A

## Licensed Patents

Non-Exclusive License

| Title | Application No | Filing Date | Publication No | Publication Date | Registration No | Registration Date | Current Assignee |
|---|---|---|---|---|---|---|---|
| INTELLIGENT DOOR LOCK SYSTEM WITH A HAPTIC DEVICE | 14/205973 | 2014-03-12 | | | 9644398 | 2017-05-09 | AUGUST HOME, INC |
| INTELLIGENT DOOR LOCK SYSTEM AND VIBRATION/TAPPING SENSING DEVICE TO LOCK OR UNLOCK A DOOR | 14/465527 | 2014-08-21 | | | 9695616 | 2017-07-04 | AUGUST HOME, INC. |
| WIRELESS ACCESS CONTROL SYSTEM AND METHODS FOR INTELLIGENT DOOR LOCK SYSTEM | 14/622654 | 2015-02-13 | | | 9530295 | 2016-12-27 | AUGUST HOME, INC. |
| INTELLIGENT DOOR LOCK SYSTEM WITH THIRD PARTY SECURED ACCESS TO A DWELLING | 14/796994 | 2015-07-10 | | | 9922481 | 2018-03-20 | AUGUST HOME, INC. |
| DOOR LOCK SYSTEM WITH CONTACT SENSOR | 15/463022 | 2017-03-20 | 2017/0193724 | 2017-07-06 | 11043055 | 2021-06-22 | AUGUST HOME, INC. |
| ELECTRONIC LOCKSET SERIES | 29/780414 | 2021-04-23 | | | | | ASSA ABLOY RESIDENTIAL GROUP, INC. |
| DEADBOLT LOCK SYSTEM | 63/291881 | 2021-12-20 | | | Not in PAIR | | |
| | | | | | | | |

[ PAGE  \* MERGEFORMAT ]

6. Intellectual Property Assignment Agreement to be entered into as of the Divestiture Date between Fortune or its Affiliates, on the one hand, and ASSA ABLOY Inc. or its designated Affiliates, on the other hand.

## EXHIBIT A

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "**Assignment**"), dated as of [□], 2022 (the "**Effective Date**"), is entered into by and between ASSA ABLOY Inc., an Oregon corporation (the "**Seller**"), ASSA ABLOY Access and Egress Hardware Group, Inc., a Delaware corporation ("**AEHG**"), and ASSA ABLOY AB, an *aktiebolag* duly incorporated under the laws of Sweden with corporate identity number 556059-3575 ("**Parent**") (collectively, "**Assignor**") on the one hand, and [*Buyer*], a [*jurisdiction*] [*entity type*] ("**Assignee**") on the other hand. Assignor and Assignee may be referred to herein individually as a "**Party**" and collectively as the "**Parties**." Capitalized terms used but not defined in this Assignment shall have the respective meanings ascribed to them in that certain Stock Purchase Agreement by and between the Seller and Assignee, dated as of [□], 2022 (the "**Purchase Agreement**").

## W I T N E S S E T H :

WHEREAS, pursuant to the terms and subject to the conditions of the Purchase Agreement, Seller has agreed to sell, or cause to be sold, the Transferred Trademarks to Assignee and Assignee has agreed to purchase from Seller, including through Assignor, the Transferred Trademarks set forth on Schedule A (the "**Transferred Trademarks**"); and

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement, Assignor desires to assign to Assignee, and Assignee desires to acquire from Assignor, Assignor's right, title and interest in and to the Transferred Trademarks as specified herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Purchase Agreement and subject to the terms and conditions therein, the Parties, intending to be legally bound, hereby agree as follows:

## DEFINITIONS

"**Canadian Territory**" means Canada and its territories.

"**US Territory**" means the United States and its territories and possessions.

## TRANSFER OF INTELLECTUAL PROPERTY

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX012**

1.     AEHG hereby irrevocably and unconditionally transfers, assigns and conveys to Buyer and its successors and assigns, and Buyer hereby accepts and acquires, all of AEHG's right, title and interest in and to the trademarks set forth on Schedule A-1 hereto under the heading "US Trademarks" in the US Territory (the "**US Trademarks**"), and the business goodwill associated with and symbolized by the US Trademarks in the US Territory, including the right to

[ IF "  DOCVARIABLE "SWDocIDLocation"   " = "1" "  DOCPROPERTY "SWDocID"   " "" ]

sue and collect damages and profits for past, present, and future infringements of such US Trademarks.

2.    Parent hereby irrevocably and unconditionally transfers, assigns and conveys to Buyer and its successors and assigns, and Buyer hereby accepts and acquires, all of Parent's right, title and interest in and to the trademarks set forth on Schedule A-2 hereto under the heading "Canadian Trademarks" in the Canadian Territory (the "**Canadian Trademarks**"), and the business goodwill associated with and symbolized by the Canadian Trademarks in the Canadian Territory, including the right to sue and collect damages and profits for past, present, and future infringements of such Canadian Trademarks.

3.    Assignor shall sign all necessary papers and perform all lawful acts reasonably requested by Assignee to give effect to and record the assignment to Assignee under this Assignment, without further compensation, but at the reasonable cost and expense of Assignee or its successors and assigns. Assignor hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office and the officials of corresponding entities or agencies in the US Territory and Canadian Territory to record and register this Assignment upon request by Assignee.

4.    Buyer shall comply with all covenants and restrictions relating to the US Trademarks and Canadian Trademarks set forth in

5.    Within thirty (30) days following the Effective Date, Buyer agrees to complete and file the appropriate assignment documents with the U.S. Patent and Trademark Office and the Canadian Intellectual Property Office in order to record Buyer as owner of the US Trademarks and Canadian Trademarks. AEHG and Parent shall provide reasonable assistance to Buyer, at Buyer's request, to record this Assignment or a short-form version thereof with any relevant or appropriate Governmental Authority or for the recording of Buyer as owner of the US Trademarks and Canadian Trademarks. AEHG's and Parent's assistance may include signing any additional documents, including a shortened version or translation of the major terms of this Assignment, as any such documents may be required.

## WARRANTY DISCLAIMER

6.    EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT, SELLER, AEHG, AND PARENT MAKE NO, AND EACH OTHER PARTY HEREBY DISCLAIMS ANY, REPRESENTATION OR WARRANTY REGARDING THE US TRADEMARKS OR THE CANADIAN TRADEMARKS, EXPRESS OR IMPLIED, INCLUDING NON-INFRINGEMENT, VALIDITY, ADEQUACY, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

[PAGE]
[ IF " DOCVARIABLE "SWDocIDLocation" " = "1" " DOCPROPERTY "SWDocID" " "" ]

AA_CONFIDENTIAL

AA-LITTRGT-000137226

**MISCELLANEOUS**

7.     This Assignment is being executed and delivered pursuant to, and is subject to and shall be governed by the terms and conditions of, the Purchase Agreement. Nothing in this Assignment is intended to or shall be deemed to amend, modify, supplement, or limit in any manner any of the representations, warranties, covenants, agreements, rights, or obligations of Seller and Buyer under the Purchase Agreement. In the event of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

8.     This Assignment shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state. This Assignment is binding upon, and inures to the benefit of, the Parties and their respective successors and assigns. No waiver, modification or amendment of any provision of this Assignment shall be valid unless in writing and signed by the Party against whom such claimed waiver, modification or amendment is sought to be enforced.

9.     The Parties agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Assignment or the transactions contemplated hereby shall be brought in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, only if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter or if the Delaware Court of Chancery does not have subject matter jurisdiction over such Action, any federal court within the State of Delaware), so long as one of such courts shall have subject matter jurisdiction over such Action, and that any cause of action arising out of this Assignment shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereto hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action brought in any such court has been brought in an inconvenient forum. Process in any such Action may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12 shall be deemed effective service of process on such Party. In the event of any Action arising out of this Assignment, each Party shall bear its own respective costs and fees, including attorneys' fees, incurred in connection with any such Action.

10.     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS ASSIGNMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.     Each term, provision, covenant and restriction of this Assignment is severable. If any term, provision, covenant or restriction of this Assignment is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment shall remain in full force

[ IF "  DOCVARIABLE "SWDocIDLocation"   " = "1" "   DOCPROPERTY "SWDocID"   " "" ]

AA_CONFIDENTIAL
AA-LITTRGT-000137227

and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Assignment so as to effect the original intent of the Parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

12.     All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission, so long as a receipt of such email is confirmed by the recipient thereof) (whether or not expressly required herein) and shall be given,

if to Buyer to:

> Fortune Brands Home & Security, Inc.
> 520 Lake Cook Road Suite 300
> Deerfield, IL 60015
> Attention: John Lee and Hiranda S. Donoghue
> Email: john.lee@fbhs.com
>         hiranda.donoghue@fbhs.com

if to Seller, AEHG or Parent, to:

> ASSA ABLOY Inc.
> 110 Sargent Drive
> New Haven, CT 06511
> Attention: L. Page Heslin
> Page.Heslin@assaabloy.com

with a copy (which shall not constitute notice) to:

> Hogan Lovells US LLP
> 390 Madison Avenue
> New York, NY 10017
> Attention: Peter Cohen-Millstein
>            Megan Ridley-Kaye
> Email: peter.cohen-millstein@hoganlovells.com
>        megan.ridley-kaye@hoganlovells.com

or such other address or email as such Party may hereafter specify for the purpose by notice to the other Parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

13.     No failure or delay by any Party in exercising any right, power or privilege hereunder shall impair such right or remedy or operate or be construed as a waiver or variation thereof or preclude its exercise at any subsequent time nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of

AA_CONFIDENTIAL                                                    AA-LITTRGT-000137228

any other right, power or privilege, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

14.     The provisions of this Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

15.     The Assignment establishes a relationship of transferor and transferee between the Parties, and this Assignment will not establish any relationship of partnership, joint venture, employment, franchise, or agency between the Parties. This Assignment does not provide any Party with the power to bind the others or incur obligations on the others' behalf without the others' prior written consent.

16.     This Assignment and the Purchase Agreement (including the Transaction Documents referenced therein) contains the entire agreement between the Parties with respect to the matters described herein and supersedes all previous oral and written discussions, agreements or understandings between the Parties regarding such matters. As between the Parties, no oral statements or prior written material not specifically incorporated into this Assignment shall be of any force and effect.

17.     The Parties hereto agree that irreparable damage would occur, and that the Parties would not have any adequate remedy at law, in the event that any of the provisions of this Assignment were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, the Parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Assignment and to specifically enforce the terms and provisions of this Assignment, without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at law or in equity. Each Party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

18.     The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

19.     Except as expressly provided herein, nothing expressed or implied in this Assignment is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Assignment, or result in such person or entity being deemed a third party beneficiary of this Assignment.

20.     As used in this Assignment, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural. References in this Assignment to a Party or other person include their respective successors and assigns. The words "include," "includes" and "including" when used in this Assignment shall be deemed to be followed by the phrase "without limitation." Unless the context otherwise requires, references in this Assignment to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Assignment. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when

[PAGE]

[ IF " DOCVARIABLE "SWDocIDLocation" " = "1" " DOCPROPERTY "SWDocID" " "" ]

used in this Assignment refer to this Assignment in its entirety and not to any particular Article, Section or provision hereof. Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or." With regard to each and every term and condition of this Assignment, the Parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition of this Assignment. All references in this Assignment to "dollars" or "$" shall mean United States dollars.

21.     This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Assignment shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Parties hereto. Until and unless each Party has received a counterpart hereof signed by the other Party hereto, this Assignment shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

[*The remainder of this page has been intentionally left blank; Signature page follows.*]

AA_CONFIDENTIAL                                                                                  AA-LITTRGT-000137230

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the Effective Date.


ASSA ABLOY INC.

By:
Name:
Title:

ASSA ABLOY ACCESS AND EGRESS HARDWARE GROUP, INC.

By:
Name:
Title:

ASSA ABLOY AB
By:
Name:
Title:


[*ASSIGNEE*]
By:
Name:
Title:


[*Signature Page to Intellectual Property Assignment Agreement*]

[ IF "   DOCVARIABLE "SWDocIDLocation"   " = "1" "   DOCPROPERTY "SWDocID"   " "" ]

**<u>Schedule A</u>**
**<u>Transferred Trademarks</u>**

AA_CONFIDENTIAL

AA-LITTRGT-000137232

7. Transition Services Agreement to be entered into as of the Divestiture Date between Fortune and ASSA ABLOY Inc. (or any Affiliates thereof).

**TRANSITION SERVICES AGREEMENT**

**by and between**

**ASSA ABLOY INC.**

**and**

**FORTUNE BRANDS HOME & SECURITY, INC.**

Dated as of
[•]

#94927708v5
04161-2416-6978  v5

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX014**

AA_CONFIDENTIAL

AA-LITTRGT-000136770

# TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is made and entered into as of [●] (the "Commencement Date"), between ASSA ABLOY Inc., an Oregon corporation ("Seller"), and Fortune Brands Home & Security, Inc., a Delaware corporation ("Buyer"). Seller and Buyer are each referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, Seller and Buyer are parties to that certain Stock Purchase Agreement, dated as of December 1, 2022, (the "Purchase Agreement"), by and among Seller, Buyer and, solely for the purposes of Section 13.20 therein, ASSA ABLOY AB, an aktiebolag duly incorporated under the laws of Sweden with corporate identity number 556059-3575, pursuant to which, among other things, Buyer has agreed to purchase the Purchased Shares (as such term is defined in the Purchase Agreement) from Seller, and Seller has agreed to sell (or cause to be sold) the Purchased Shares to Buyer, upon the terms and subject to the conditions set forth therein; and

WHEREAS, in connection with the Purchase Agreement, Seller has agreed to provide the TSA Services (as defined below), and Buyer has agreed to accept and receive from Seller the TSA Services (as defined below) on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## DEFINITIONS

Unless otherwise defined herein, all capitalized terms used herein have the same meanings as set forth in the Purchase Agreement.

"Accession Agreement" shall have the meaning set forth in Section 1.11(b).

"Accession Date" shall have the meaning set forth in Exhibit B (Accession Agreement).

"Bundle Cost" shall mean the bundle cost listed on the Services Schedule for the relevant TSA Bundle.

"Business Transferee" shall have the meaning set forth in Section 1.11(a).

"Change Request" shall have the meaning set forth in Section 1.5(a).

"Confidential Information" shall mean any information (including, for the avoidance of doubt, any Personal Data) furnished or obtained in connection with or as a result of this Agreement, or performance or receipt of TSA Services hereunder that is confidential, non-public, or proprietary about a Person, its Affiliates and any of their respective businesses, operations, clients, customers, prospects, personnel, properties, processes or products, financial, technical, commercial or other information (regardless of the form or format of the information

AA_CONFIDENTIAL                                                    AA-LITTRGT-000136771

(written, verbal, electronic or otherwise) or the manner or media in or through which it is furnished to or otherwise obtained by another Person or its Affiliates or Representatives), including all materials derived from, reflecting or incorporating, in whole or in part, any such information. With the exception of Personal Data, which shall always be treated as Confidential Information, "Confidential Information" shall not include information that: (i) is or becomes generally available to, or known by, the public through no direct or indirect violation of this Agreement, act or omission by the Person receiving such information or by any of its Affiliates or Representatives; and (ii) is, was or becomes available to a Person or any of its Affiliates or Representatives on a non-confidential basis from a source other than the disclosing Person, *provided*, that such source was not known to the receiving Person after reasonable inquiry to be bound by any legally binding obligation to keep such information confidential.

"Costs" shall have the meaning set forth in Section 2.1.

"Dispute" shall have the meaning set forth in Section 8.2(a).

"Dispute Notice" shall have the meaning set forth in Section 8.2(a).

"Excluded Services" shall mean the following services:

"Extended Period" shall have the meaning set forth in Section 5.2.

"Force Majeure Event" shall have the meaning set forth in Section 10.15.

"Initial Period" shall have the meaning set forth in Section 5.1.

"JAMS" shall have the meaning set forth in Section 10.11(a).

"Local Agreement" shall mean any Local Service Provider Agreement or Local Services Agreement.

"Local Buyer Entity" shall mean any Buyer Affiliate that receives TSA Services from any Seller Affiliate under a Local Services Agreement.

"Local Services Agreement" shall mean an agreement in substantially the form set out in Exhibit E (Template Local Services Agreement) under which an Affiliate of Seller shall provide TSA Services to an Affiliate of Buyer.

"Local Service Provider Agreement" shall mean an agreement in substantially the form set out in Exhibit D (Template Local Service Provider Agreement) under which an Affiliate of Seller shall act as agent for an Affiliate of Buyer.

2

#94927708v5
\4161-2416-6978 v5

"Local Seller Entity" shall mean any Seller Affiliate that provides TSA Services to any Buyer Affiliate under a Local Services Agreement.

"Look-Back Period" shall mean the twelve (12) month period immediately prior to the Closing Date of the Purchase Agreement.

"New Contract" shall mean any contracts entered into on Buyer's behalf, solely at Buyer's request; for the avoidance of doubt, such contracts must always be: (i) in accordance with Buyer's directions; and (ii) on terms of supply or sale (as appropriate) as provided by Buyer or such other terms as Buyer shall approve in writing, including in any case a Novation Clause.

"Novation Clause" shall mean a clause (no matter the form) that enables Seller to transfer (by way of novation, assignment, or otherwise as required under Applicable Law) all its past, present, and future rights and obligations under the relevant contract to Buyer, immediately upon giving notice to the other parties to such contract, as appropriate, without any further consent being required.

"Party-Appointed Arbitrator" shall have the meaning set forth in Section 10.11(a).

"Products" shall mean the products of the Business.

"Retained Business Separation Event" shall mean the transfer, sale, division, divestiture, or any other form of separation of: (i) any part of the Business in any country into one or more legal entities; or (ii) any part of the Retained Business in any country into one or more legal entities.

"Retained Subsidiaries" shall mean all of the direct and indirect Subsidiaries of Seller, other than the Acquired Entities.

"Review Meetings" shall have the meaning set forth in Section 8.1.

"Seller Group" shall mean any consolidated, combined, unitary or similar group of which Seller or any of its Subsidiaries (other than the Acquired Entities), on the one hand, and one or more of the Acquired Entities, on the other hand, are members for Tax purposes.

"Seller Service Providing Party" shall have the meaning set forth in Section 1.2.

"Sensitive Business Information" shall mean, with respect to any Person, any information or data by owned or licensed to such Person which could reasonably be considered business, commercial or trade secrets and, thus, which could reasonably be expected to cause economic or competitive harm to such Person, or could reasonably be expected to cause harm to the reputation of such Person, if known by any business competitor or the general public.

"Service Modification" shall have the meaning set forth in Section 1.5.

"Service Taxes" shall have the meaning set forth in Section 2.5.

"Services Schedule" shall have the meaning set forth in Section 1.2.

3

AA_CONFIDENTIAL                          AA-LITTRGT-000136773

"Sublicenseable" shall have the meaning set forth in <u>Section 1.10(a)</u>.

"Termination Date" shall have the meaning specified in <u>Section 5.2</u>.

"Termination Notice" shall have the meaning specified in <u>Section 5.2</u>.

"Third Party" shall mean any Person other than any Party or any of its respective Affiliates.

"TSA Bundle" shall mean one or more TSA Services that are bundled together as indicated on the Services Schedule.

"TSA Representative" shall have the meaning set forth in <u>Section 8.1</u>.

"TSA Services" shall have the meaning set forth in <u>Section 1.2</u>.

"TSA Services Third Party Consent" shall mean any Third Party approvals, consents, or authorizations required for Seller to provide the TSA Services.

## ARTICLE I.

## TSA SERVICES TO BE PROVIDED BY SELLER

1.1    <u>Purpose</u>. Without limiting Seller's obligations under <u>Section 1.2</u>, Seller and its Affiliates agree to provide (or cause to be provided) to Buyer the TSA Services (as defined below) and Buyer will obtain the use of certain facilities from Seller and its Affiliates on an interim basis in order to: (i) permit Buyer and its Affiliates to continue the operation of the Business, including with respect to the availability of Products to customers of the Business, in all material respects; (ii) assist in an orderly transfer of the Business from Seller and its Affiliates to Buyer and its Affiliates; and (iii) permit Buyer and its Affiliates the opportunity to obtain alternate sources of supply of such services or facilities within a reasonable time after the Closing Date.

1.2    <u>TSA Services and Cost</u>. In order to facilitate the above, Seller shall provide (or cause to be provided through one or more Affiliates or Persons (each such Affiliate or Person, a "<u>Seller Service Providing Party</u>")) to Buyer and to any of its Affiliates to the extent they participate in the operation of the Business (which Affiliates will receive TSA Services in substantially the same place and manner as Buyer would have received them), for the operation of the Business, the services and facilities access (each such service and facilities access, in relevant part, a "<u>TSA Service</u>") set forth in the services schedule attached hereto as <u>Exhibit A</u> (Service Schedule) (the "<u>Services Schedule</u>") and all services necessary and inherent thereto; *provided*, that Seller may delegate or transfer the provision of any TSA Services to a Seller Service Providing Party, including: (a) where such Seller Service Providing Party is an Affiliate; (b) to a third-party service provider, where Seller or any of its Affiliates have delegated the provision of such TSA Service to such third-party consistent with past practices of the Business; or (c) where, subject to <u>Section 1.11</u>, such Seller Service Providing Party is an acquirer of all or the relevant portion of the Business from Seller.  In the event Seller desires to delegate or transfer the provision of any TSA Services to a Seller Service Providing Party pursuant to clause (b) of the immediately preceding sentence, and Seller is then providing, or will be providing, such TSA Services to any of its

4

AA_CONFIDENTIAL

AA-LITTRGT-000136774

Affiliates, then Seller shall use commercially reasonable efforts to delegate or transfer the provision of such TSA Services to the same third-party service provider as Seller's Affiliates. Seller acknowledges that, notwithstanding any delegation or transfer of its responsibilities under this Agreement, it shall remain responsible and liable for the provision of the TSA Services and its Seller Service Providing Party's compliance hereunder with respect to such TSA Service as if such delegation did not occur. TSA Services will be bundled together such that one or more TSA Services forms a TSA Bundle. Notwithstanding the foregoing, to the extent any provision of a Services Schedule conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail.

1.3     Service Provider Appointments. In order to facilitate the provision of certain of the TSA Services relating to the procurement from suppliers and the sale to customers of Products as set out in Exhibit C (List of Service Provider Appointments), Seller has agreed to procure the entry by certain of its Affiliates into a Local Service Provider Agreement.

1.4     Updating Service Provider Appointments; Further Disposal. The Parties acknowledge that Exhibit C (List of Service Provider Appointments) attached hereto may not identify all of the appointments that may be necessary or appropriate to effect the understanding set forth in Section 1.3, and such appointments may change after the Commencement Date. The Parties shall cooperate and endeavor in good faith to clarify, modify and supplement Exhibit C (List of Service Provider Appointments) and this Agreement, including any Exhibits, Schedules or other attachments thereto, if any, to accurately identify new or changed appointments, and to specify the manner and the term in which such appointments shall be performed, and, as appropriate, to enter into ancillary agreements addressing the provision of certain appointments or the provision of appointments in certain jurisdictions, or by or to certain third parties that may acquire assets or other businesses from a Party and/or its respective Affiliates in order to refine and further effect the understandings set forth in Section 1.3. For the avoidance of doubt, in no event shall any such clarification, modification or supplement to Exhibit C (List of Service Provider Appointments) or the execution of any ancillary agreements result in any change to the fees set forth in any Services Schedule (or any Costs) with respect to the appointments set forth therein without the prior express written agreement of the Parties. Without limitation of the foregoing, the Parties acknowledge and agree that Exhibit C (List of Service Provider Appointments) will need to be updated in connection with any Retained Business Separation Event.

1.5     Changes to TSA Services. Service Modifications. During the term of this Agreement, the Parties may, in accordance with the procedures specified in this Section 1.5, agree to modify a previously agreed-upon TSA Service (a "Service Modification"). For the avoidance of doubt, the migration of a TSA Service, in whole or in part, from Seller to Buyer or to a third party service provider engaged by Buyer (and the resulting reduction or termination of the TSA Service) shall not be considered a "Service Modification."

(a)     Change Requests. In the event either of the Parties desires a Service Modification, the Party requesting the Service Modification will deliver a written description of the proposed Service Modification (a "Change Request") to the other Party's TSA Representative.

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                    AA-LITTRGT-000136775

(b) <u>Meeting of the Parties.</u> Unless the Party receiving the Change Request agrees to implement the Change Request as proposed, the TSA Representatives will meet in person or by telephone to discuss the Change Request no later than seven (7) Business Days after delivery of the Change Request to the other Party.

(c) <u>Approval of Change Requests.</u> All Change Requests must be approved by the non-requesting Party's TSA Representative in writing and in their sole discretion before the Service Modification may be implemented in accordance with <u>Section 1.5(d)</u> below, such requests to be considered in good faith.

(d) <u>Implementation of Approved Service Modification.</u> If a Change Request is approved in accordance with this <u>Section 1.5</u>, the Services Schedules will be amended in accordance with <u>Section 10.8</u> to reflect the implementation of the Change Request, the Costs for the applicable TSA Services and any other agreed-upon terms or conditions relating to the Service Modification. For the avoidance of doubt, other than such agreed-upon terms and conditions relating to the Service Modification, the terms and conditions of this Agreement shall apply to any modified TSA Service, including with respect to service levels.

(e) <u>Inadvertently Omitted Tasks.</u> If after the Closing Date, Buyer identifies a material service that was provided during the Look-Back Period but was inadvertently omitted from <u>Exhibit A</u>, but excluding any Excluded Services ("<u>Inadvertently Omitted Tasks</u>"), then if Buyer so notifies Seller in writing within six (6) months of the Closing Date, then Seller shall use reasonable best efforts to provide such Inadvertently Omitted Tasks hereunder; *provided*, however, that (i) Buyer shall bear the actual, fully loaded costs of Seller's provision of such Inadvertently Omitted Task (including costs associated with third party consents) at cost, (ii) Seller shall not be required to pay any money or other consideration or grant any other accommodation or concession to any Person or initiate any claim or proceeding against any Person in order to provide such Inadvertently Omitted Task hereunder, and (iii) the Parties shall follow the procedures set forth in this <u>Section 1.5</u> with respect to requesting, approving and implementing such Service Modifications.

1.6   <u>Standard of Performance.</u> Seller shall provide (or cause to be provided) to Buyer the TSA Services at substantially the same level of service, timeliness, and quality, and using substantially the same degree of care and skill, as provided to and by the Business during the Look-Back Period.

1.7   <u>Exceeding Volumes.</u> Seller shall not be obligated to perform or to cause to be performed any TSA Service in a transactional volume or quantity that exceeds the historical transactional volumes or quantities of such TSA Services performed by Seller or its Affiliates for the Business during each corresponding month during the Look-Back Period; *provided, however,* if Buyer wishes to increase the volume or quantity of such TSA Services provided under this Agreement by more than such amount, Buyer shall make a Change Request to Seller's TSA Representative pursuant to <u>Section 1.5</u>. For the avoidance of doubt, references to transactional volume and quantities in this <u>Section 1.7</u> do not concern the amount of effort, hours, staffing or customer support required of Seller to perform any TSA Service but rather specifically relate only to historical transactional volumes, quantities of customer orders and the number of invoices produced, as applicable.

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000136776

1.8     <u>Systems</u>. If Seller is required to make more than routine modifications to its own systems to provide any TSA Service, Seller shall have a reasonable period of time to comply with such changes (and in no event less than thirty (30) days), and additional compliance time should be requested in writing and shall not be unreasonably withheld by Buyer. If Seller cannot so comply or such compliance would result in Seller incurring more than a *de minimis* cost or expense (including with respect to any training for its employees) or would impair or prevent Seller from performing any of its obligations under this Agreement, (i) Seller shall promptly notify Buyer thereof, and the Parties shall work together in good faith to resolve such issue in a manner that permits Seller to continue to perform the TSA Services; and (ii) Seller's failure or delay in performing such TSA Services (or failure or delay to cause such obligation to be performed) shall not constitute a breach of this Agreement, and Seller shall be relieved of such obligation and have no liability for any such failure or delay, to the extent that the non-performance or delay results from such direction.

1.9     <u>Compliance</u>. Seller shall, in connection with its provision of TSA Services, comply with its own policies, standards, and procedures with respect to its own provision of substantially similar products or services to itself or any Third Parties, which shall include, without limitation, maintaining accurate and complete books and records and utilizing internal controls and procedures reasonably designed to ensure the integrity of financial and accounting information and prevent fraud, and Seller shall reasonably cooperate with any request by Buyer to review any such policies, standard and procedures. Each Party shall perform its obligations and exercise its rights hereunder in compliance with all Applicable Laws. Seller shall not be required hereunder to take any action (including by providing any TSA Services) that would constitute a violation of Applicable Law or have a material and adverse impact on its business. In the event that the provision of any TSA Service would constitute a violation of Applicable Law or have a material and adverse impact on Seller's business, the Parties shall work together in good faith to modify such affected TSA Service such that the provision of such TSA Service would no longer be in violation of the Applicable Law or otherwise resolve the issue.

1.10    <u>Intellectual Property Rights</u>.

(a)     <u>Limited Licenses</u>. Subject to the terms and conditions of this Agreement, Seller (on behalf of itself and its Affiliates) hereby grants to Buyer, during the term of this Agreement, a fully-paid-up, royalty free, non-exclusive, non-transferable (except as provided in <u>Section 10.6</u>) license, on an "as is", warranty free basis, to use any Intellectual Property owned or Sublicenseable by Seller or its Affiliates that is necessary for Buyer to receive or enjoy the benefit of the applicable TSA Services, solely to the extent necessary for Buyer to receive or enjoy the benefit of the TSA Services in accordance with this Agreement. Subject to the terms and conditions of this Agreement, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and any Seller Service Providing Party, during the term of this Agreement, a fully-paid-up, royalty free, non-exclusive, non-transferable (except as provided in <u>Section 10.6</u>) license, on an "as is", warranty free basis, to use any Intellectual Property owned or Sublicenseable by Buyer or its Affiliates solely to the extent necessary for Seller and any such Seller Service Providing Party to provide the TSA Services as required under this Agreement. The licenses expressly granted in this <u>Section 1.10</u> shall terminate and be of no further force or effect upon expiration or earlier termination of the applicable TSA Service, and licensee shall cease use of all applicable Intellectual Property and assets of licensing Party and shall return or destroy (at licensing Party's

7

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000136777

request) all information or embodiments of such Intellectual Property provided in connection with this Agreement. Except as expressly granted to the licensee under this Section 1.10, each licensing Party retains and reserves any and all right, title, interest, and control in, to, and of the Intellectual Property licensed by it, and nothing in this Agreement shall be deemed to convey to the licensee any rights in and to the Intellectual Property licensed to it other than the rights expressly granted in this Section 1.10. "Sublicenseable" means, with respect to Intellectual Property, if licensing party has the right to grant the sublicenses or rights granted by licensing party to such Intellectual Property pursuant to this Section 1.10 without: (i) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or additional obligations upon licensing Party or any loss of rights of, or breach by, licensing Party; (ii) loss of any rights of, or breach by, licensing Party; (iii) additional obligations upon licensing Party; or (iv) any additional fees or consideration payable to the licensor.

(b)     Data. Seller shall determine the format in which all data is delivered to Buyer; provided that such delivery must be in a secure format with reasonable safeguards in place, taking into account the nature and scope of the delivered data. All data created by Seller pursuant to a TSA Service on behalf of, and exclusively for use by, Buyer (excluding performance data relating to Seller's telecommunications and computer systems) shall be owned by Buyer.

1.11   Sale to Business Transferee.

(a)     Further Disposal. The Parties agree that, notwithstanding anything to the contrary in this Agreement, each Party will have the right to sell, assign, divest, or transfer any Affiliate or business unit providing or receiving TSA Services hereunder to a third party (a "Business Transferee") without limitation or restriction, and any applicable TSA Services will, subject to the provisions of paragraphs (b) and (c) below, continue to be provided and received in accordance with the terms hereof; *provided, however,* that where such Party is the Seller, if such transferred Affiliate or business unit has access to any Sensitive Business Information of Buyer in the provision of any TSA Service and the Business Transferee is a competitor to Buyer, then, at Seller's election, either (i) the Business Transferee will be required to implement customary "clean team" confidentiality procedures reasonably acceptable to Buyer providing reasonable assurances that Sensitive Business Information will not be inappropriately shared, or (ii) such TSA Service with access to Sensitive Business Information will be provided directly by Seller or its Affiliate or through a third-party subcontractor (in each case, other than the transferred Affiliate) in accordance with Section 1.2.

(b)     Accession. The Parties agree that a Business Transferee may accede to this Agreement by executing an accession agreement in the form set forth in Exhibit B ("Accession Agreement"), which shall provide that such Business Transferee fully, unconditionally and irrevocably agrees to be bound to the terms and conditions of this Agreement and assumes all of the rights and obligations and partakes of all of the benefits under this Agreement, in each case solely to the extent of the TSA Services to be provided or received by such Business Transferee.

(c)     Continuing Obligations. Following entry into an Accession Agreement by a Business Transferee, the Parties and their Affiliates shall first seek performance of any obligation assigned by Seller to a Business Transferee and Business Transferee's Affiliates under this Agreement from a Business Transferee. If such Business Transferee fails to perform such

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                          AA-LITTRGT-000136778

obligation or there is an unreasonable delay in performance of such obligation, on reasonable notice from Buyer to Seller and such Business Transferee of such non-performance or unreasonable delay, Seller shall use commercially reasonable efforts to procure the performance of such obligations by such Business Transferee.

## ARTICLE II.

## PRICING AND PAYMENT FOR TSA SERVICES

2.1 Pricing. The costs for the TSA Services, which may in certain instances include Bundle Costs (the "Costs"), will be the actual, fully-loaded costs incurred in connection with the provision of such TSA Services as indicated on the Services Schedule (it being acknowledged and agreed that the Costs set forth on the Services Schedule represent illustrative costs of the actual, fully-loaded costs incurred in connection with the provision of such TSA Services). Buyer shall pay to Seller, in U.S. dollars or the local currency specified in the Services Schedule, the Costs for each TSA Service specified in the Services Schedule during the Initial Period and, if applicable, the increased Cost for each TSA Service specified in the Services Schedule during the Extended Period. Buyer shall also pay to Seller any costs that are incurred by Seller in performing the applicable TSA Services as identified in the Services Schedule or otherwise approved in advance in writing.

2.2 Invoicing. Subject to the remainder of this Section 2.2, Seller shall issue a separate, reasonably detailed, monthly invoice for each country receiving TSA Services to Buyer for all TSA Services provided to Buyer and its Affiliates in the immediately preceding month. Such invoices shall be due for payment within ▮▮▮▮▮ of Buyer's receipt of the invoice. Any amounts paid or payable by any Affiliate of Buyer under any Local Agreement shall not also be payable under this Agreement and accordingly shall not be included in any monthly invoice as referred to above.

2.3 Invoice Disputes. At Buyer's cost, Buyer may request reasonable documentation from Seller to validate details relating to the Costs in accordance with this Agreement, and Seller shall provide relevant documentation without unreasonable delay. Should Buyer dispute any portion of any invoice in good faith, Buyer shall notify Seller in writing of the nature and basis of the dispute as promptly as practicable following receipt of Seller's invoice. In no circumstances shall Buyer be entitled to withhold any disputed amounts or Seller be entitled to suspend any TSA Services during the pendency of any such dispute. If the resolution or adjudication of such dispute results in an adjustment in favor of Buyer, then Seller shall pay to Buyer an amount equal to such adjustment within ▮▮▮▮▮ following the final resolution of such dispute plus interest as calculated under Section 2.4 from the date that the disputed amount was paid.

2.4 Interest Payable on Amounts Past Due. All amounts required to be paid pursuant to this Agreement shall bear interest starting on the first day after the date such payment is due u▮ ▮ but excluding the date of payment, at a monthly rate equal to the lesser of: (i) ▮ ▮▮▮▮ per month; or (ii) the maximum rate permitted by Applicable Law.

9

AA_CONFIDENTIAL

2.5     Taxes. The fees described herein with respect to the TSA Services do not include any sales, service, use, excise, value added, goods and services or similar Taxes (together with any interest, penalties or additions to Tax imposed with respect thereto) ("Service Taxes"). In addition to the amounts required to be paid as set forth herein, Buyer shall pay and be responsible for and shall promptly reimburse Seller for any such Service Taxes paid by Seller, with respect to such amounts or the provision of TSA Services hereunder (including Seller's cost in acquiring property or services used or consumed by Seller in providing TSA Services hereunder), *provided* that the Parties shall cooperate and take commercially reasonable actions to mitigate such Service Taxes to the extent permitted by Applicable Law. Buyer shall (i) remit any such Service Taxes imposed on the provision or receipt of TSA Services hereunder to the applicable Governmental Authorities and (ii) prepare and file any Tax Returns required to be filed by it under Applicable Law with respect to such Service Taxes. Buyer shall be responsible for any interest, penalties and similar additions to tax imposed by an applicable Governmental Authority as a result of a failure by Buyer to timely remit any such Service Tax to the applicable Governmental Authority and shall hold Seller harmless for any such interest, penalties and similar additions to tax imposed on it, other than any amounts arising out of a failure of Seller to comply with its obligations pursuant to this Agreement. Pursuant to Section 2.2, for each country in which Seller provides TSA Services to Buyer, Seller shall provide to Buyer a customary invoice (or other document reasonably acceptable to Buyer) in accordance with applicable legal requirements (including with respect to reclaiming any VAT or similar Taxes, where applicable) for such Service Taxes. Notwithstanding anything in the contrary herein, each Party shall pay and be responsible for its own personal property Taxes and Taxes based on its own or its subsidiaries' income, profits, or assets. Buyer shall be entitled to deduct and withhold or cause to be deducted and withheld any Taxes as required by Applicable Law in connection with the transactions contemplated by this Agreement; *provided, however*, that Buyer will provide written notice to Seller (and will use commercially reasonable efforts to provide such notice at least five (5) Business Days) prior to withholding to give Seller an opportunity to provide additional information or to apply for an exemption from, or a reduced rate of, withholding. Any such amounts withheld or deducted and properly remitted to the applicable Governmental Authority shall be treated for purposes of this Agreement as having been paid to the person in respect of which such deduction or withholding was made. The Parties hereby agree to, upon the other Party's reasonable request, provide any documentation or other information that is reasonably necessary for such other Party (or its Affiliate) to comply with any Tax withholding, Tax Return filing or other Tax compliance requirement, in each case, with respect to the transactions contemplated in this Agreement. Notwithstanding anything to the contrary herein, Seller shall exclusively and fully control, and Buyer and its Affiliates shall not have a right to any notice in respect of or access to, any Tax documentation or other information to the extent that it relates to the Seller Group or in respect of any Seller Tax Record (except if such items (i) relate solely to the Acquired Entities and (ii) affect Tax liabilities of the Acquired Entities).

## ARTICLE III.

## COOPERATION; ACCESS

3.1     Cooperation; Access. During the term of this Agreement, the Parties shall use good faith efforts to cooperate with each other in connection with all matters related to the provision or receipt of the TSA Services, including timely responding to reasonable information

#94927708v5
\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                          AA-LITTRGT-000136780

requests and reasonably exchanging information with respect to the TSA Services. The Parties acknowledge that the timely completion of TSA Services by Seller may depend upon the provision of products and/or services and/or information by Buyer. To the extent Buyer (i) fails to provide any such information reasonably requested by Seller, and to the extent such information was necessary for Seller to be able to meet its obligations hereunder, (ii) terminates or removes Business Employees (as such term is defined in the Purchase Agreement) that are historically necessary to provide the applicable TSA Service or TSA Bundle, or (iii) engages in any operations, acts, or omissions which directly contributes to Seller's failure to provide any affected TSA Services, then Seller shall not be responsible for the failure to provide any affected TSA Services hereunder; *provided*, that under clause (ii), in the event such termination or removal of any Business Employee is due to termination for cause or in the case of death, disability or retirement, Seller will use commercially reasonable efforts to cooperate with Buyer in good faith in providing an alternative solution or arrangement to provide any affected TSA Services hereunder. To the extent reasonably requested in advance by Seller, Buyer shall, at its own expense, provide to Seller reasonable accompanied access to its equipment, office space, data, telecommunications and computer systems and/or any other assets and operations required for delivery of all or any part of the TSA Services; *provided*, that (a) Seller shall use commercially reasonable efforts to not unreasonably disrupt the personnel and operations of Buyer, (b) Seller agrees to comply with all written policies and procedures governing access to and use of office space, systems and other assets that are made known to Seller in advance, (c) Seller shall not have access to any premises or information where such access or disclosure would, in the good faith judgment of Buyer, in light of COVID-19 or COVID-19 measures, be unreasonable or jeopardize the health and safety of any employee of such Party, and (d) all such access shall be conducted during regular business hours.

**ARTICLE IV.**

**CONTRACT RIGHTS**

    4.1    <u>Third Party Consents for TSA Services</u>. Seller's obligation to deliver any TSA Services requiring a TSA Services Third Party Consent is conditional upon Seller obtaining such TSA Services Third Party Consent, and Seller shall use reasonable best efforts (without any obligation to pay any money or grant any other accommodation) to obtain such TSA Services Third Party Consent. If Seller, notwithstanding having used such reasonable best efforts, is unable to obtain the necessary TSA Services Third Party Consent, Buyer shall reasonably cooperate with and assist Seller in obtaining any TSA Services Third Party Consent required to be obtained or made for the performance by Seller of its obligations under this Agreement; *provided, however,* that if such TSA Services Third Party Consent cannot be obtained, the Parties shall work together in good faith and reasonably cooperate to arrange for alternative methods of delivering such affected TSA Services, or to agree on modifications of the affected TSA Services such that the TSA Services Third Party Consent in question is not required. All costs, fees and expenses of obtaining any TSA Services Third Party Consent shall be borne by Seller.

    4.2    <u>Third Party Consents for New Contracts</u>. Seller shall timely invoke the Novation Clause in any New Contract, in order to effectuate the transfer of these contracts to Buyer in full, with effect immediately upon termination or expiration of this Agreement.

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL    AA-LITTRGT-000136781

## ARTICLE V.

## TERM; TERMINATION

5.1 <u>Initial Period</u>. Except as set forth in a Services Schedule, TSA Services shall commence on the Commencement Date and shall terminate on the date that is twelve (12) months after the Commencement Date (the "<u>Initial Period</u>") unless extended in accordance with <u>Section 5.2</u> or unless terminated earlier in accordance with this Agreement.

5.2 <u>Extended Period</u>. Except as set forth in a Services Schedule, and subject to any limitations on Buyer's right to request an extension provided in a Services Schedule, or in this Agreement, Buyer shall have the right to request, upon ▇▇▇ (▇▇ written notice to Seller, an extension of the Initial Period for individual TSA Bundles of up to an additional twelve (12) months (such period, the "<u>Extended Period</u>"), and Seller shall provide the requested TSA Services for the requested extension period.

5.3 <u>Termination of TSA Services</u>. Subject to any limitations set forth in a Services Schedule, Buyer may terminate any TSA Service in any TSA Bundle by providing at least thirty (30) days' prior written notice to Seller (such notice, a "<u>Termination Notice</u>"). The Termination Notice shall specify the date on which Buyer wishes to cease receiving such TSA Service(s) (such date, which shall be at least thirty (30) days from the date of the Termination Notice, the "<u>Termination Date</u>"); *provided, however,* that no such notice may be given until thirty (30) days following the Closing. In the event that Buyer terminates a TSA Service pursuant to this <u>Section 5.3</u>, then Seller will have no further obligation to provide the TSA Bundle that included such TSA Service(s) after the Termination Date and Buyer will have no obligation to pay any future Bundle Costs relating to such TSA Bundle; *provided*, that Buyer shall remain obligated to Seller for the pro-rated Bundle Costs of such TSA Bundle actually performed by Seller prior to the effective date of termination.

5.4 <u>Termination of Agreement</u>.

(a) <u>By Buyer</u>. Buyer may terminate this Agreement for any reason or no reason, at any time, upon not less than thirty (30) days' prior written notice to Seller specifying the date on which such termination is to be effective. For the avoidance of doubt, such termination will only be effective for Buyer's TSA Services on such date. Buyer may terminate this Agreement with respect to one or more TSA Services at any time upon prior written notice to Seller, if Seller has failed to perform any of its material obligations under this Agreement relating to such TSA Services, and such failure shall be continued uncured for a period of thirty (30) days after receipt by Seller of a written notice of such failure from Buyer.

(b) <u>By Seller</u>. Seller may suspend performance of any one or more TSA Services, at any time with immediate effect upon prior written notice to Buyer, if and for so long as Buyer has failed to make any payments due to Seller, including any Bundle Costs, subject to Buyer's right to dispute any invoice pursuant to <u>Section 2.3</u>, and such failure by Buyer shall be continued uncured for a period of thirty (30) days after receipt by Buyer of a written notice of such failure from Seller.

#94927708v5
\4161-2416-6978 v5

AA_CONFIDENTIAL AA-LITTRGT-000136782

5.5     Effect of Termination or Expiration. Except as otherwise agreed by the Parties, promptly following the expiration or termination of this Agreement (but in no event later than thirty (30) days thereafter), each Party shall return to the other Party in accordance with such other Party's instructions, or destroy, in such other Party's sole discretion, all of the other Party's Confidential Information in its possession or control that was disclosed under this Agreement. Notwithstanding the foregoing, each Party may retain copies of any such Confidential Information solely as needed for the continued operation of the Business, for documentary purposes, or to the extent required to comply with Applicable Law or the rules of any professional, regulatory or administrative body (*provided*, that such Party will continue to be bound by the obligations of confidentiality hereunder with respect to such information). A Party shall not be deemed to have violated its obligations with respect to returning or destroying Confidential Information of the other Party to the extent such Confidential Information is located on electronic back-up tapes in accordance with such Party's normal procedures for backing-up data and such back-up tapes are not readily accessible to such Party's employees or officers other than those employees and officers whose duties relate to information technology support (*provided*, that such Party will continue to be bound by the obligations of confidentiality hereunder with respect to such information). Each Party acknowledges and agrees that the termination or expiration of a TSA Service or this Agreement for any reason shall not release a Party from any liability or obligation that already has accrued as of the effective date of such termination or expiration, as applicable, and shall not constitute a waiver or release of, or otherwise be deemed to adversely affect, any rights, remedies or claims which a Party may have hereunder at law, in equity or otherwise or which may arise out of or in connection with such termination or expiration. Section 1.9, Article II, this Section 5.5, Article VI, Article VII, and Article VIII shall survive any termination or expiration of this Agreement.

## ARTICLE VI.

## LIMITATION OF LIABILITY AND INDEMNIFICATION

6.1     Limitation of Liability.

(a)     Neither Seller nor any of its Affiliates shall have any liability under this Agreement whether in contract, tort or otherwise, including for or in connection with any TSA Services rendered or to be rendered by the Seller, its Affiliates or Representatives (each, a "Seller Indemnified Party") pursuant to this Agreement, the transactions contemplated by this Agreement or any Seller Indemnified Party's actions or inaction in connection with any such TSA Services, to Buyer or its Affiliates or Representatives, except to the extent that Buyer or its Affiliates or Representatives suffer Damages (as finally determined by a court of competent jurisdiction) that directly results from such Seller Indemnified Party's gross negligence or fraudulent action in connection with such transactions, actions or inactions, or provision of such TSA Services (collectively, "Misconduct").

(b)     Notwithstanding Section 6.1(a) above or any other provision contained in this Agreement, neither Party nor any of its Affiliates shall be liable for any consequential, special, incidental, indirect or punitive damages, any amount calculated based upon any multiple of earnings, book value or cash flow, or diminution in value, lost profits or similar items (including loss of revenue, business interruption, income or profits, diminution of value or loss of business

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000136783

reputation or opportunity or loss of customers, goodwill or use) regardless of whether such items are based in contract, breach of warranty, tort or negligence or any other theories other than any such payments finally determined to be payable to third parties, and regardless of whether such Party or any of its Affiliates have been advised of, knew or should have known of, anticipated or foreseen the possibility of such damages.

(c)     Buyer acknowledges that Seller and its Affiliates are not in the business of providing TSA Services of the type contemplated under this Agreement and the TSA Services are to be provided on a temporary basis to Buyer with respect to, as the case may be, the businesses of the Acquired Entities to assist with the orderly transition to Buyer of the Business from Seller and its Affiliates' other businesses and operations. Accordingly, except with respect to Damages arising out of the fraud, gross negligence or willful misconduct of Seller, the aggregate liability and indemnification obligations of Seller and its Seller Indemnified Parties with respect to this Agreement, the TSA Services or the transactions contemplated by this Agreement shall not exceed, in the aggregate in the applicable calendar year, the aggregate amount of Costs paid hereunder (until the occurrence of the event giving rise to the claim) to Seller during such calendar year for the TSA Service that is the subject of the claim.

6.2     Indemnification of Seller by Buyer. Buyer shall indemnify, defend, and hold harmless each Seller Indemnified Party from and against any Damages, and reimburse the foregoing for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Seller Indemnified Party is a party, to the extent caused by, resulting from or arising in connection with a breach by Buyer of this Agreement or any obligations hereunder; *provided*, that Buyer shall not be responsible for any Damages to the extent that such Damages are caused by, result from or arise out of the applicable Seller's Misconduct (as finally determined by a court of competent jurisdiction).

6.3     Indemnification of Buyer by Seller. Subject to the limitations set forth in Section 6.1, Seller shall indemnify and hold harmless Buyer and its Affiliates and Representatives (each, a "Buyer Indemnified Party") from and against any Damages, and reimburse each Buyer Indemnified Party for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Buyer Indemnified Party is a Party, to the extent caused by, resulting from or arising in connection with: (a) Seller's or its Affiliate's or Representative's Misconduct (as finally determined by a court of competent jurisdiction) or (b) non-compliance with ARTICLE VII.

6.4     Procedure.

(a)     Any Person seeking indemnification under this ARTICLE VI (the "Indemnified Party") shall give prompt written notice to the Person from whom indemnification is to be sought (the "Indemnifying Party") of the assertion of any claim or the commencement of any Action by any third party ("Third-Party Claim"); *provided*, that the failure of the Indemnified Party to give notice as provided in this Section 6.4(a) shall not relieve any Indemnifying Party of its obligations under Sections 6.2 or 6.3, except to the extent that such failure actually prejudices the rights of any such Indemnifying Party. Such notice shall set forth in reasonable detail the Third-Party Claim and the basis for indemnification (taking into account the information then available to the Indemnified Party). Thereafter, the Indemnified Party shall deliver to the Indemnifying

14

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000136784

Party, as promptly as reasonably practicable following the Indemnified Party's receipt thereof, copies of all written notices and documents (including any court papers) received by the Indemnified Party relating to the Third-Party Claim and the Indemnified Party shall provide the Indemnifying Party with such other information with respect to any such Third-Party Claim reasonably requested by the Indemnifying Party. The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice and, subject to the limitations set forth in this Section 6.4, to assume control of, and defend against, negotiate, settle (subject to Section 6.4(b)) or otherwise deal with such Third-Party Claim. If the Indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Third-Party Claim, then the Indemnified Party may defend against, negotiate, settle (subject to clause (b)) or otherwise deal with such Third-Party Claim. If the Indemnifying Party shall assume the defense of any Third-Party Claim, then the Indemnified Party may participate, at his or its own expense, in the defense of such Third-Party Claim; *provided*, that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnifying Party, a material conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; provided, further, that the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Third-Party Claim.

(b)     Notwithstanding anything in this Section 6.4 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Third-Party Claim or permit a default or consent to entry of any judgment. Notwithstanding the foregoing, consent of the Indemnified Party shall not be required for any such settlement if (i) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, (ii) such settlement does not permit any Order or other equitable relief to be entered, directly or indirectly, against the Indemnified Party or any of its Affiliates and (iii) such settlement includes an unconditional release of such Indemnified Party and its Affiliates from all liability on claims that are the subject matter of such Third-Party Claim and does not include any statement as to or any admission of fault, culpability or failure to act by or on behalf of any Indemnified Party or any of its Affiliates.

(c)     After any decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction, or a settlement shall have been consummated (in accordance with this ARTICLE VI), or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to a Third-Party Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter.

(d)     Each party shall cooperate, and cause its Affiliates to cooperate, in the defense or prosecution of any Third-Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

6.5     Liability for Payment Obligations. Nothing in this ARTICLE VI shall be deemed to eliminate or limit, in any respect, Buyer's express obligation in this Agreement to pay to Seller Costs for TSA Services rendered in accordance with this Agreement.

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                        AA-LITTRGT-000136785

6.6     Exclusion of Other Remedies. Except with respect to Damages arising out of the fraud, gross negligence or willful misconduct of Seller or Buyer, as applicable, the indemnification expressly provided in ARTICLE VI of this Agreement shall be the sole and exclusive monetary remedies of the Seller Indemnified Parties and the Buyer Indemnified Parties, as applicable, for any Damage, whether arising from statute, principle of common or civil law, principles of strict liability, tort, contract or otherwise arising under this Agreement, or in respect of the TSA Services or actions taken by Parties in connection with the transactions contemplated by this Agreement.

6.7     Mitigation. Each indemnified party shall use its commercially reasonable efforts to mitigate (as required by Applicable Law) any Damages for which such indemnified party seeks indemnification under this Agreement.

6.8     Insurance. Buyer will carry the following insurance at all times during the term of this Agreement: (i) commercial general liability insurance which insures against claims for bodily injury, personal injury, advertising injury, and property damage with a combined single limit coverage of not less than ten million dollars ($10,000,000), (ii) workers' compensation insurance to the extent required by Applicable Law, and (iii) umbrella/excess liability insurance, on an occurrence basis, that applies excess of the required commercial general liability with a minimum limit of ten million dollars ($10,000,000). Seller and its officers, directors, agents and employees will be additional insureds on the insurance policies described in subsections (i) and (iii). Buyer shall not do or permit anything to be done that would invalidate the insurance policies required herein.

## ARTICLE VII.

## CONFIDENTIALITY AND DATA PROTECTION

7.1     Confidentiality.

(a)     The Parties shall not, and shall cause their respective Affiliates and Representatives providing or receiving TSA Services or having access to any facilities (including network systems) hereunder not to, disclose to any other Person any Confidential Information of the other Party; *provided, however*, that each Party may disclose Confidential Information of the other Party, to the extent permitted by Applicable Law: (i) to its respective Affiliates and Representatives on a need-to-know basis in connection with the performance of such Party's obligations under this Agreement; (ii) in any report, statement, testimony or other submission to any Governmental Authority having jurisdiction over the disclosing Party; (iii) in order to comply with Applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding; or (iv) subject to Section 1.11, to an acquirer or Seller Service Providing Party on a need-to-know basis in connection with the sale, assignment, delegation, divestiture, or transfer of any rights or obligations under this Agreement. In the event that a Party becomes legally compelled (based on advice of counsel) by deposition, interrogatory, request for documents subpoena, civil investigative demand, stock exchange rule, Securities and Exchange Commission or similar judicial or administrative process to disclose any Confidential Information of the other Party, such disclosing Party (to the extent legally permitted) shall provide

#94927708v5
\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                AA-LITTRGT-000136786

the other Party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other Party (at such other Party's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege. In the event that such protective order or other similar remedy is not obtained, the disclosing Party shall furnish only that portion of the Confidential Information that has been legally compelled, and shall exercise its commercially reasonable efforts (at such other Party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information.

(b)     Each Party shall, and shall cause its respective Affiliates and Representatives to, protect the Confidential Information of the other Party by using the same degree of care to prevent the unauthorized disclosure of such Confidential Information as the Party uses to protect its own confidential information of a like nature.

7.2     Personal Data Protection.

(a)     Each Party shall, and shall cause its Affiliates to, comply with (i) any and all Applicable Laws associated with the protection or processing of Personal Data in connection with the TSA Services and (ii) the data protection and security terms outlined in the Exhibit F (Data Processing Addendum).

## ARTICLE VIII.

## GOVERNANCE; DISPUTE RESOLUTION

8.1     Governance; TSA Representatives; Review Meetings. Seller and Buyer shall each designate in writing to the other Party one representative to act as a contact person with respect to all issues relating to the provision of the TSA Services pursuant to the Services Schedules (such person, a "TSA Representative"). The TSA Representatives shall be responsible for overseeing and managing delivery and receipt of the TSA Services, including all requirements, procedures and processes specified in the applicable Services Schedule under this Agreement. Notwithstanding the requirements of Section 10.2, all communications between the Parties pursuant to this Agreement regarding routine matters involving TSA Services set forth in the TSA Schedules shall be made through the TSA Representatives. The TSA Representatives shall hold review meetings by telephone or in person, as mutually agreed upon by the TSA Representatives, approximately every month or more frequently as may be mutually agreed to discuss issues relating to the provision of such TSA Services ("Review Meetings"). In the Review Meetings, the TSA Representatives shall be responsible for discussing and seeking to address any problems identified relating to the provision, or lack of provision, of such TSA Service, to resolve such problems and, to the extent changes are agreed upon, facilitate the implementation of such changes. Each Party shall notify the other Party of the designation of a new TSA Representative, if applicable, in accordance with Section 10.2.

8.2     Dispute Resolution.

(a)     In the event of any dispute, controversy or claim arising out of or in connection with this Agreement (including its formation, interpretation, breach or termination, and

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                          AA-LITTRGT-000136787

whether contractual or non-contractual in nature) (a "Dispute"), either Party may serve written notice of the Dispute on the other Party (a "Dispute Notice"). Upon receipt of a Dispute Notice, the respective TSA Representatives of Buyer and Seller shall meet and negotiate in good faith up to twenty-one (21) days following receipt of a Dispute Notice, unless such other period of time is otherwise agreed to by the Parties in writing, to seek to amicably resolve such Dispute. If the matter that is the subject of the Dispute is of an insurable nature, the disputing Party shall provide notice of claim to its insurer within such twenty-one (21) day period. In the event that the TSA Representatives are unable to resolve the Dispute, the respective General Counsels of Buyer and Seller and/or an executive officer designated by each Party shall negotiate in good faith for a further period of up to twenty-one (21) days, unless such other period of time is otherwise agreed to by the Parties in writing, to seek to amicably resolve such Dispute; *provided*, that the total good faith negotiations of the TSA Representatives and the General Counsels, respectively, shall not exceed forty-five (45) days from the time of receipt by a Party of a Dispute Notice, unless otherwise agreed by the Parties in writing.

      (b)    Section 8.2(a) shall not prohibit a Party from seeking injunctive relief from any court of competent jurisdiction in the event of a breach or threatened breach of this Agreement by the other Party where such relief is available under Applicable Law.

## ARTICLE IX.

## LOCAL AGREEMENTS

      9.1    Local Services Agreements. The Parties shall cooperate to enter into Local Services Agreements with respect to the Territories identified in Schedule A (Territories) and any such other Territories as the Parties may agree.

      9.2    Application. The terms and conditions of:

      (a)    this Agreement; and

      (b)    the relevant Local Services Agreement,

shall govern the provision or receipt of the relevant TSA Services by the relevant Local Buyer Entity or Local Seller Entity. Subject to Applicable Law, where any provision of any Local Services Agreement conflicts with any provision of this Agreement (including to the extent this Agreement applies to the Local Services Agreement), the provisions of this Agreement shall prevail.

      9.3    Continuing Obligations. Notwithstanding any Local Services Agreements that may be entered into Seller shall remain responsible for ensuring that all relevant TSA Services provided by Seller are provided in accordance with the terms of this Agreement and the relevant Local Services Agreement, including by ensuring that the Local Seller Entity complies with the terms of this Agreement and the relevant Local Services Agreement.

      9.4    Compliance. In determining whether the Local Buyer Entity and the Local Seller Entity have complied with the terms of this Agreement, this Agreement shall be read as if

18

AA_CONFIDENTIAL AA-LITTRGT-000136788

the Local Buyer Entity and the Local Seller Entity were each a party to this Agreement, save that where:

(a)    Buyer is expressed to have an obligation to procure or ensure the performance by a Buyer Affiliate of any obligation, the terms and conditions of this Agreement shall be read as requiring the Local Buyer Entity to perform such obligation of its own accord; and

(b)    Seller is expressed to have an obligation to procure or ensure the performance by a Seller Affiliate of any obligation, the terms and conditions of this Agreement shall be read as requiring the Local Seller Entity to perform such obligation of its own accord.

9.5    <u>Modifications</u>. Each Party shall ensure, and shall procure that its Affiliates ensure, that neither it nor any of its Affiliates shall agree to any modifications to the application of this Agreement to the Local Services Agreement, unless such modifications are strictly necessary to comply with the legal and regulatory requirements of the relevant jurisdiction and are agreed in writing with the other Party, such other Party's agreement not to be unreasonably withheld.

9.6    <u>Local Buyer Entity Disputes</u>. Buyer shall ensure that the Local Buyer Entity:

(a)    does not bring any claims or actions arising under or in connection with this Agreement or the relevant Local Agreement against any Seller Affiliate without Buyer's consent; and

(b)    refers each Dispute and any other issue arising in relation to this Agreement or the relevant Local Agreement to Buyer for resolution in accordance with <u>Section 8.2</u> (Dispute Resolution).

Buyer shall indemnify and hold harmless Seller and its Affiliates (the "<u>Seller indemnified party</u>") against any Damages of whatever nature incurred by the Seller indemnified party arising out of or in connection with any claims or actions brought by Buyer or any Buyer Affiliate which are not brought in accordance with this <u>Section 9.6</u>. The Parties agree that where any claim is made under this Agreement by Buyer pursuant to this <u>Section 9.6</u>, Buyer shall be deemed to have suffered the Damages of the relevant Buyer Affiliate.

9.7    <u>Local Seller Entity Disputes</u>. Seller shall ensure that the Local Seller Entity:

(a)    does not bring any claims or actions arising under or in connection with this Agreement or the relevant Local Agreement against any Buyer Affiliate without Seller's consent; and

(b)    refers each Dispute and any other issue arising in relation to this Agreement or the relevant Local Services Agreement to Seller for resolution in accordance with <u>Section 8.2</u> (Dispute Resolution).

Seller shall indemnify and hold harmless Buyer and its Affiliates (the "<u>Buyer indemnified party</u>") against any Damages of whatever nature incurred by the Buyer indemnified party arising out of or in connection with any claims or actions brought by Seller or any Seller

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL    AA-LITTRGT-000136789

Affiliate which are not brought in accordance with this <u>Section 9.7</u>. The Parties agree that where any claim is made under this Agreement by Seller pursuant to this <u>Section 9.7</u>, Seller shall be deemed to have suffered the Damages of the relevant Seller Affiliate.

      9.8    <u>Conflicts</u>. Subject to Applicable Law, where any provision of any Local Agreement conflicts with any provision of this Agreement (including to the extent this Agreement applies to the Local Services Agreement), the provisions of this Agreement shall prevail.

<h2 style="text-align:center">ARTICLE X.</h2>

<h2 style="text-align:center"><u>MISCELLANEOUS</u></h2>

      10.1    <u>Waiver</u>. Buyer may: (i) extend the time for the performance of any of the obligations or other acts of Seller; (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant to this Agreement; or (iii) waive compliance with any of the agreements or conditions contained herein. Any such extension or waiver shall be valid only if explicitly set forth in an instrument in writing signed by Buyer. Any failure to assert, or delay in the assertion of, rights under this Agreement shall not constitute a waiver of those rights.

      10.2    <u>Notices</u>. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service or by electronic mail (so long as confirmation of transmission is electronically or mechanically generated and kept on file by the sending Party), or by registered or certified mail (postage prepaid, return receipt requested) to the respective Persons at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 10.2</u>):

      If to Seller:

      ASSA ABLOY Americas
      110 Sargent Drive
      New Haven, CT 06511
      Attention: L. Page Heslin
      Email: page.heslin@assaabloy.com

      with a copy (which shall not constitute notice) to:

      Hogan Lovells LLP
      390 Madison Avenue
      New York, NY 10017
      Attention: Peter Cohen-Millstein
            Megan Ridley-Kaye
      Email: peter.cohen-millstein@hoganlovells.com
            megan.ridley-kaye@hoganlovells.com

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL

AA-LITTRGT-000136790

If to Buyer:

Fortune Brands Home & Security, Inc.
520 Lake Cook Road Suite 300
Deerfield, IL 60015
Attention: John Lee (Senior Vice President, Global Growth & Development) and
Hiranda S. Donoghue (Senior Vice President, General Counsel & Secretary)
Email: john.lee@fbhs.com and hiranda.donoghue@fbhs.com


with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attention: Chris Abbinante and Jonathan Blackburn
Email: cabbinante@sidley.com and jblackburn@sidley.com

Notwithstanding anything to the contrary herein, any failure of a Party to comply with any of the provisions of this Section 10.2 shall not be a breach of this Agreement or relieve the other Party of its obligations under this Agreement except and only to the extent the other Party is actually and materially prejudiced thereby.

10.3    Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

10.4    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Applicable Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not fundamentally changed. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

10.5    Entire Agreement. This Agreement (including all Exhibits and Schedules hereto), constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between Seller and Buyer with respect to the subject matter hereof.

10.6    Successors and Assigns. Subject to Section 1.11, this Agreement, and the rights and obligations set forth hereunder, shall not be assignable or otherwise transferable by either Party without the prior written consent of the other Party hereto; *provided*, that (i) a Party may assign any of its rights and/or obligations hereunder to an Affiliate or (ii) a Party may assign or delegate any of its rights and/or, in accordance with Section 1.2(c) or Section 1.11, its obligations, in connection with the sale of any of its assets or business (whether by merger, consolidation, divestiture, reorganization or other similar event), in each case, without the consent

21

#94927708v5
\\4161-2416-6978 v5

 AA-LITTRGT-000136791

of the other Party; *provided* that no such assignment shall release such Party from any obligations or liability and such assigning Party shall remain primarily liable and responsible for all of its obligations under this Agreement in connection with and to the extent of any assignment. Any assignment or delegation pursuant to this Section 10.6 shall be subject to the terms and conditions set forth in this Agreement and, as applicable, all Local Agreements. Any attempted assignment in violation of this Section 10.6 shall be null and void.

10.7    Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Except as provided in Section 1.10, no rights or licenses, express or implied, are granted by Seller under this Agreement.

10.8    Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by the Parties.

10.9    Specific Performance. Seller acknowledges and agrees that a breach of this Agreement would cause irreparable damage to Buyer and that Buyer will not have an adequate remedy at law. Therefore, the obligations of Seller under this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which Buyer may have under this Agreement or otherwise.

10.10    Submission to Jurisdiction, Consent to Service of Process, Waiver of Jury Trial.

(a)    Subject to Section 8.2 and Section 10.11, the Parties hereby irrevocably submit to the exclusive jurisdiction of the court of Chancery of the State of Delaware located in Wilmington, Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding contemplated by this Section 10.10 by delivery of a copy thereof in accordance with the provisions of Section 10.2.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION; (i) ARISING UNDER THIS AGREEMENT; OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                                       AA-LITTRGT-000136792

THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

10.11    Arbitration of Disputes.

(a)    Except as otherwise provided in Section 8.2 and for disputes, controversies or other claims seeking injunctive relief (for which the provisions of Section 10.9 and Section 10.10 will be applicable), all disputes, controversies or claims arising out of or relating to this Agreement or the transactions contemplated hereby (whether in contract, tort, equity or otherwise), including the arbitrability of any dispute or controversy that cannot be settled by mutual agreement will be finally settled by binding arbitration in accordance with the JAMS Comprehensive Arbitration Rules & Procedures ("JAMS"). Any Party aggrieved may commence such binding arbitration by delivery of a notice to the other Party setting forth the specific points in dispute. Any points remaining in dispute twenty (20) days after the giving of such notice may, upon ten (10) days' notice to the other party, be submitted to JAMS arbitration conducted before a panel of three arbitrators in New York, New York. Each Party will each appoint one arbitrator (the "Party-Appointed Arbitrators") and the Party-Appointed Arbitrators will appoint the third and presiding arbitrator within fourteen (14) days of the appointment of the second arbitrator; *provided* that any arbitrator not timely appointed herein will be appointed by JAMS upon the written demand of any Party to the dispute. The arbitrators may enter a default decision against any Party who fails to participate in the arbitration proceedings.

(b)    The decision of the arbitrators on the points in dispute will be final, unappealable and binding, and judgment on the award may be entered in any court having jurisdiction thereof. The arbitrators will only be authorized to interpret the provisions of this Agreement, and will not amend, change or add to any such provisions. The Parties agree that this provision has been adopted by the Parties to rapidly and inexpensively resolve any disputes between them and that this provision will be grounds for dismissal of any court action commenced by any Party with respect to this Agreement (other than disputes, controversies or claims seeking injunctive relief (for which the provisions of Section 10.9 and Section 10.10 will be applicable)). In the event that any court determines that this arbitration procedure is not binding, or otherwise allows any litigation regarding a dispute, claim, or controversy covered by this Agreement to proceed, the Parties hereby irrevocably waive any and all right to a trial by jury in or with respect to such litigation.

(c)    The arbitrators will be authorized to apportion their fees and expenses as the arbitrators deem appropriate, but the arbitrators will not be authorized to award the prevailing Party its fees and expenses (including attorneys' fees), and each Party will otherwise bear its own fees and expenses, including the fees of its own attorney.

#94927708v5
\\4161-2416-6978 v5

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000136793

(d)     The Parties and the arbitrators will keep confidential, and will not disclose to any Person, except the Parties' advisors and legal representatives, or as may be required by law or court order, the existence or content of any controversy under this Section 10.11, the referral of any such controversy to arbitration, or the status or resolution thereof.

(e)     The Parties may seek any interim or conservatory relief, including an injunction or injunctions to prevent breaches of this Agreement in the Court of Chancery of the State of Delaware; *provided*, that, if such court does not have jurisdiction over any such action or proceeding, such action or proceeding will be heard and determined exclusively in any Delaware state or federal court sitting in the City of Wilmington, Delaware, this being in addition to any other remedy to which such Party is entitled at law or in equity. The application of a Party to an above-mentioned judicial authority for such measures or for the implementation of any such measures ordered by an arbitral tribunal will not be deemed to be an infringement or a waiver of this Section 10.11 and will not affect the relevant powers reserved to the arbitral tribunal.

10.12   Governing Law. This Agreement, and all claims or causes of action or other matters (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the consummation of any of the transactions contemplated hereby, shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in the State of Delaware, excluding any conflict or choice of law rule or principle that might otherwise refer construction or interpretation thereof to the substantive laws of another jurisdiction.

10.13   Counterparts. This Agreement may be executed in one or more counterparts, and by the Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (including portable document format) shall be as effective as delivery of a manually executed counterpart of this Agreement.

10.14   Relationship of the Parties. The Parties are independent contractors, and neither Buyer nor Seller is an employee, partner or joint venturer of the other Party. Under no circumstances shall any of the employees of Seller be deemed to be employees of Buyer for any purpose. Neither Party shall not have the right to bind the other Party to any agreement with a Third Party nor to represent itself or themselves as a partner or joint venturers of the other Party. For such time as any employees of Seller or any of its Affiliates are providing TSA Services to Buyer under this Agreement, (i) such employees shall remain employees of Seller or such Affiliate, as applicable, and shall not be deemed to be employees of Buyer for any purpose; and (ii) Seller or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes (including employment and payroll Taxes) relating to such employment.

10.15   Force Majeure. Seller shall not be liable to Buyer for any failure or delay in the performance of its obligations under this Agreement to the extent such failure or delay is caused by a Force Majeure Event. Upon the occurrence of a Force Majeure Event, (a) Seller shall promptly notify Buyer of the circumstances hindering its performance and of its plans and efforts to

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL                                                                AA-LITTRGT-000136794

implement a work-around; (b) Seller shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail and an acceptable work-around is not available; and (c) Seller shall continue to use commercially reasonable efforts to attempt to recommence performance or observance to the greatest extent possible without delay. Seller shall also notify Buyer promptly when the Force Majeure Event has abated. For the avoidance of doubt, Seller shall not have the right to any additional payments from Buyer for costs or expenses incurred by Seller as a result of any Force Majeure Event experienced by Buyer. If Seller fails to provide any TSA Services in connection with any Force Majeure Event, the amounts due to Seller under this Agreement shall be equitably adjusted in a manner such that Buyer shall not be responsible for the payment of any amounts for such TSA Services that Seller failed to provide. The term "Force Majeure Event" shall mean any delay or non-performance of Seller's obligations directly caused by any of the following cause, event or condition that is beyond the reasonable control of Seller: (i) act of war, terrorism, civil riots or rebellions; (ii) Applicable Law, demand, seizure or requirement of any Governmental Authority, epidemic or pandemic (including the COVID-19 pandemic, quarantine, embargo or any other similar unusual action of a Governmental Authority); (iii) extraordinary element of nature or act of God, fire, flood, or storm; or (iv) strike, lockout or other labor trouble, delays by suppliers or carriers, shortages of fuel, power, raw materials or components. Additionally, Seller shall not be liable under this Agreement for any delay or failure to provide or make available TSA Services as set forth herein to the extent such delay or failure was the direct result of Buyer's operations or systems, acts, omissions or failure to reasonably cooperate on the part of Buyer.  Upon the cessation of such Force Majeure Event, Seller shall use its commercially reasonable efforts to resume its performance of its affected obligations hereunder as soon as practicable following such cessation of the Force Majeure Event and the Initial Period or Extended Period, as applicable, for such affected TSA Service shall be extended for each day during which such TSA Service was suspended. If the Force Majeure Event continues to have effect for a period of more than sixty (60) days, Buyer not claiming relief under this Section 10.15 shall have the right to terminate the TSA Services affected by such Force Majeure Event immediately upon written notice of such termination to Seller.

10.16   Purchase Agreement. Nothing herein is intended to modify, limit or otherwise affect the representations, warranties, covenants, agreements and indemnifications contained in the Purchase Agreement, and such representations, warranties, covenants, agreements and indemnifications shall remain in full force and effect in accordance with the terms of the Purchase Agreement. Under no circumstances shall either Party be entitled to duplicate recovery under this Agreement and the Purchase Agreement for the same Damage.

10.17   Interpretation; Absence of Presumption. For the purposes of this Agreement, (i) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (ii) references to the terms Article, Section, Exhibit and Schedule are references to the Articles, Sections, Exhibits and Schedules to this Agreement unless otherwise specified; (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Exhibits and Annexes hereto; (iv) references to "$" shall mean U.S. dollars; (v) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (viii) references to "written" or "in writing"

25

AA_CONFIDENTIAL                                      AA-LITTRGT-000136795

include in electronic form; (ix) Seller and Buyer have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening either Party by virtue of the authorship of any of the provisions in this Agreement; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; (xii) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded; and (xiii) unless otherwise stated in this Agreement, references to any contract are to that contract as amended, modified or supplemented from time to time in accordance with the terms thereof. In the event of any inconsistency or conflict between the terms of this Agreement and any Schedules or Exhibits hereto, the terms of this Agreement shall control.

* * * * *

#94927708v5
\\4161-2416-6978  v5

AA_CONFIDENTIAL

AA-LITTRGT-000136796

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first set forth above.

**SELLER:**

ASSA ABLOY INC.

By: _____
     Name:
     Title:

*[Signature Page to Transition Services Agreement]*

\\4161-2416-6978  v5

AA-LITTRGT-000136797

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first set forth above.

**BUYER:**

FORTUNE BRANDS HOME & SECURITY, INC.

By: _____
Name:
Title:

*[Signature Page to Transition Services Agreement]*

\\4161-2416-6978  v5

AA-LITTRGT-000136798

# Exhibit A

## Services Schedule

[*attached*]

\\4161-2416-6978  v5
#94927708v5

AA_CONFIDENTIAL

AA-LITTRGT-000136799

## Exhibit B

### Accession Agreement

[●], a [●] [●], hereby accedes to the Transition Services Agreement (the "<u>TSA</u>"), dated as of [●], 202[●], between ASSA ABLOY Inc., an Oregon corporation ("<u>Seller</u>"), and Fortune Brands Home & Security, Inc., a Delaware corporation ("<u>Buyer</u>"), as of [●] (the "<u>Accession Date</u>"), and, as of the Accession Date, fully, unconditionally and irrevocably agrees to be bound to the terms and conditions of the TSA and assumes all of the rights and obligations and partakes of all of the benefits of ["[●]"] and a "Party" under the TSA. Capitalized terms used but not defined herein have the respective meanings ascribed to such terms in the TSA.

Address for Notices to [●]:

[●]

       IN WITNESS WHEREOF, it has caused this Accession Agreement to be executed by its duly authorized officers as of the date first set forth above.

|_____|

By:  _____
      Name:
      Title:

AA_CONFIDENTIAL                                                                AA-LITTRGT-000136800

**Exhibit C**

**List of Service Provider Appointments**

[*To be provided*]

#94927708v5
\4161-2416-6978  v5

AA_CONFIDENTIAL

AA-LITTRGT-000136801

**<u>Exhibit D</u>**

**Template Local Service Provider Agreement**

[*attached*]

#94927708v5
\4161-2416-6978  v5

AA-LITTRGT-000136802

**<u>Exhibit E</u>**

**Template Local Services Agreement**

[*attached*]

#94927708v5
\4161-2416-6978  v5

AA_CONFIDENTIAL

AA-LITTRGT-000136803

**<u>Exhibit F</u>**

**Data Processing Addendum**

[*attached*]

#94927708v5
\4161-2416-6978  v5

**Schedule A**

**Territories**



AA_CONFIDENTIAL

8. Supply Agreement to be entered into as of the Divestiture Date between Fortune and ASSA ABLOY Inc., or their designated Affiliates.

## SUPPLY AGREEMENT

**THIS SUPPLY AGREEMENT** (this "**Supply Agreement**") is entered into as of [●], 2023, by and between [ASSA ABLOY Residential Group, Inc.], [a California corporation] ("**Purchaser**"); and [●],[1] a [●] ("**Supplier**," and each of Purchaser and Supplier, a "**Party**" and collectively, the "**Parties**").

## RECITALS

**WHEREAS**, Supplier has entered a Stock Purchase Agreement dated as of December 1, 2022 (the "**SPA**"), pursuant to which, *inter alia*, Supplier has sold 100% of the equity of Purchaser to Fortune Brands Home & Security, Inc. (the "**Acquisition**"); and

**WHEREAS**, in furtherance of and as a condition to the Acquisition, the Parties are entering into this Supply Agreement to set forth the terms and conditions upon which Supplier will supply Purchaser with certain products and services from and following the consummation of the Acquisition.

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF PRODUCTS

1.01    Purchase and Sale of Products.[2]  Subject to the terms and conditions set forth in this Supply Agreement, Supplier hereby undertakes to sell and deliver the products with those specifications (the "**Products**") and at the prices (subject to modification pursuant to this Section 1.01, the "**Prices**") set forth in Exhibit A



Supplier acknowledges and agrees that Purchaser has no obligation to purchase the Products hereunder and may purchase similar products from any other supplier.

1.02    Acceptance.  Supplier reserves the right to decline an Order, in whole or in part, when the creditworthiness of Purchaser is not satisfactory to Supplier in its sole and absolute discretion.

---

[1] **Note to Draft**: Relevant ASSA ABLOY supplying entity to be included; the relevant Products are produced by, and will be supplied by, different ASSA ABLOY entities as listed on Exhibit A.

[2] **Note to Draft**: Supply Agreement will also cover the purchase by Buyer of all of Seller's inventory as of Closing that is branded Yale in the residential mechanical space.

1

US v ASSA/Spectrum
Joint Exhibit
22-cv-2791-ACR
**JX010**

AA_CONFIDENTIAL                                                                                    AA-LITTRGT-000136920

1.03      <u>Taxes</u>. The Prices do not include any present or future federal, state, or local property, license, privilege, sales, use, excise, gross receipts or other like taxes or assessments, which may result from transactions performed in connection herewith.

1.04      <u>Supply by Purchaser</u>. Purchaser acknowledges that components of certain Products are produced by Purchaser's business and Purchaser agrees that should Purchaser place an Order for such Products, it will provide at Supplier's request the necessary quantities and with sufficient speed to Supplier for production. Subject to <u>Section 4.12</u>, Supplier shall continue to manufacture the Products during the entirety of the Term; provided that Supplier shall use commercially reasonable efforts to give Purchaser reasonable advance notice of, and consult with Purchaser about, any substantial modification to form or function of the Product.

**ARTICLE II**
**TERM AND TERMINATION**

2.01      <u>Term</u>. This Supply Agreement shall commence on the date first written above and shall remain in force for two (2) years (the "**Term**").

2.02      <u>Termination</u>. This Supply Agreement may be terminated prior to the end of the Term as follows:

(a)      By mutual written agreement of the Parties;

(b)      With thirty (30) days' prior written notice ("**Notice Period**") by a Party if the other Party materially breaches this Supply Agreement and such breach is not remedied within the Notice Period;

(c)      By Supplier and with immediate effect if Purchaser fails to pay or pays late any undisputed amounts due by Purchaser more than two (2) times in any rolling six month period; or

(d)      by a Party and with immediate effect if the other Party files or has filed against it, a petition for voluntary or involuntary bankruptcy, or becomes insolvent and unable to pay or fails to pay its bills as they are due.

Sections <u>3.04</u>, <u>3.05</u>, <u>3.06</u>, and <u>ARTICLE VII</u> will survive any termination or expiration of this Supply Agreement, along with any payment obligations incurred and liability for any breach that occurred prior to the date of termination or expiration.

**ARTICLE III**
**SPECIFIC PROVISIONS**

3.01      <u>Orders and Acceptance</u>.

(a)      Purchaser may purchase Products by delivering to Supplier an order (electronically or in writing) to buy Products on the terms of this Supply Agreement, including its desired delivery date(s) for such Products (an "**Order**"). Supplier shall promptly acknowledge the receipt of such Order (electronically or in writing), which acknowledgment

2

AA_CONFIDENTIAL      AA-LITTRGT-000136921

shall provide a delivery date as determined in its sole discretion, *provided that* Supplier shall provide lead times to Purchaser consistent with those provided to similarly situated customers purchasing the same Products on substantially the same terms as Purchaser. Purchaser acknowledges that to the extent an Order includes volume of a Product more than

in excess of either the historic purchasing patterns of Purchaser's business or the forecast provided by Purchaser, Supplier's lead time for such Order may be substantially extended.

          (b)    Purchaser may, at no charge or penalty, postpone the delivery of an Order by up to        by notifying Supplier in writing reasonably in advance of the shipping of such Order.

          (c)    Purchaser shall provide on or about the first of every calendar month a rolling monthly forecast to Supplier for Orders intended to be ordered during the lesser of (i) the following twelve (12) months and (ii) the remainder of the Term, which shall be for planning purposes only. Purchaser's five year annual forecast as of the date hereof is set forth in Exhibit A. Forecasts will not be binding on Purchaser or Supplier. Purchaser acknowledges that Supplier requires materials from its suppliers in order to supply the Products, and it agrees to discuss with the Supplier lead times and purchase commitments of Supplier in order to optimize forecasting and ability of Supplier to meet Purchaser's desired lead times.

          (d)    Each of Supplier and Purchaser shall maintain customary insurance for its industry, which shall cover any products or services ordered or delivered under this Supply Agreement, as appropriate.

          3.02    Delivery Term, Place of Delivery and Premises.

          (a)    Supplier shall deliver the Products Ex-Works Incoterms 2010 at [address of applicable Supplier's location] if not otherwise agreed by the Parties (the "**Delivery Terms**"). Timely delivery shall be of the essence for each Order.

          (b)    Freight shall be paid by Purchaser and shall be in addition to the Prices.

          (c)    Title in, and risk of loss or damage to a Product, shall pass to Purchaser in accordance with the Delivery Terms.

          3.03    Payment Terms.

          (a)    All payments hereunder shall be made in US Dollars.

          (b)    Purchaser shall pay invoices within         from the date of the invoice; *provided that* Purchaser shall not be obligated to pay any amount that is the subject of a good faith dispute.

          (c)    Purchaser must notify Supplier in writing of any disputed invoices within fifteen (15) days from the date of the invoice. Deductions should only be taken for the disputed amount and the balance of the invoice is due and payable within standard payment terms.

          (d)    It is understood that Supplier may impose and charge a finance charge which is the lesser of         per month or the highest rate allowed

3

\4150-7553-0306 v12

AA_CONFIDENTIAL

AA-LITTRGT-000136922

by law on any amount which becomes past due and delinquent. Additionally, Purchaser shall be responsible for all collection costs, court costs and reasonable attorney's fees (where allowed by law) in connection with the recovery of any delinquent amount due from Purchaser.

3.04    Exclusion of Implied Warranties. ALL IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXCLUDED AND DO NOT APPLY TO THE PRODUCTS.

3.05    Product Modifications. The Products are not designed or intended for aftermarket modification. The Warranty becomes void if a Product is modified in any way, regardless of whether the modification causes or contributes to any alleged defect. Warranty voiding modifications include, but are not limited to, third-party electrification of non-electric Products and/or the installation of non-approved or non-Supplier components. If a Product is modified it no longer meets industry certification and quality control standards applicable to the original Product and is no longer a genuine Product. A modified Product may not be sold as an ASSA ABLOY product and no ASSA ABLOY® trademarks or certification marks based on the original ASSA ABLOY product, such as U.L. or ANSI/BHMA marks, may appear anywhere on the modified Product or on any packaging, literature, or instructions sold with the modified Product. All original ASSA ABLOY branded packaging and literature carries ASSA ABLOY trademarks and must be destroyed if the original ASSA ABLOY Product is modified. Portions of the Product that carry an ASSA ABLOY trademark or certification mark must be discarded and/or replaced by the party making the modification. U.L. and other certification testing and marking are also the responsibility of the party making modification. The use of ASSA ABLOY trademarks on modified products constitutes trademark infringement.

3.06    Trademark Use Policy.

The following policy ("**Policy**") of ASSA ABLOY Americas ("**ASSA ABLOY**"), and all of its Affiliates (collectively, the "**Group Companies**"), applies to the use of certain intellectual property of all such Group Companies, including all trademarks, names, logos, product images, and related information (the "**ASSA ABLOY Marks**"). ASSA ABLOY Marks are proprietary and critical to the success of ASSA ABLOY and the Group Companies, and may only be used in strict compliance with this Policy. This Policy covers any person or entity reselling any product of any Group Company with the consent of such Group Company (each, an "**Approved Reseller**"). Each Approved Reseller has a non-exclusive right to use certain of the ASSA ABLOY Marks relating to any of the Group Companies for which it is an Approved Reseller, subject to the following conditions:



4

V4150-7553-0306 v12

AA_CONFIDENTIAL

AA-LITTRGT-000136923



ASSA ABLOY reserves the right to review Approved Reseller's usage of ASSA ABLOY Marks at any time and may (a) require changes to the use of ASSA ABLOY Marks at any time in its sole discretion, which changes must be implemented within 30 days of written notice to Approved Reseller; (b) condition the use of ASSA ABLOY Marks on ASSA ABLOY's prior approval of such use, which approval may be withheld in its sole discretion; (c) revoke permission to use ASSA ABLOY Marks at any time for any or no reason upon thirty (30) days' prior written notice to Approved Reseller; and (d) revoke permission to use ASSA ABLOY Marks immediately upon notice to Approved Reseller in the event Approved Reseller is in violation of this Policy, or of any other agreement with ASSA ABLOY or any Group Company; provided that, in the case of (c), Approved Reseller shall be permitted to retain, use, resell and distribute Products that carry an ASSA ABLOY trademark, in each case, purchased by Approved Reseller prior to such revocation. Approved Reseller's right to use ASSA ABLOY Marks in no way conveys to Approved Reseller any proprietary or economic interest in any ASSA ABLOY Marks. Use of ASSA ABLOY Marks in violation of this Policy may result in severe civil and criminal liabilities. ASSA ABLOY will vigorously enforce this Policy by seeking all appropriate legal remedies, including, but not limited to, pecuniary damages and injunctive relief.

3.07     Technical Information and Advice. (a) All designs, data, and specifications provided by Supplier are proprietary and will not be disclosed or reused by Purchaser without the prior written consent of Supplier; and (b) Supplier assumes no obligation

5

V4150-7553-0306 v12

or liability for any advice given by Supplier, the results obtained, or damages incurred, and all such advice is given and accepted at Purchaser's risk.

## ARTICLE IV
## LIMITED WARRANTY

4.01        Supplier provides the limited warranty set forth in this ARTICLE IV (the "**Warranty**") to the original purchaser which purchases the Product from the Purchaser ("**Customer**"). Supplier warrants to Customer that the locksets manufactured by Supplier and purchased by Customer to be free of defects in material and workmanship so long as the consumer (as the term "consumer" is defined under United States Code Section 2301(3)) occupies the residential premises upon which the lockset was originally installed, subject to the expiration of the Warranty set forth in Section 4.02. If, after initial installation of the lockset, any of the mechanical parts or the finish should become defective, Supplier will repair or replace the locksets, in accordance with this ARTICLE IV. The Warranty is also provided to Purchaser, *mutatis mutandis*, for the lesser of (a) one year after receipt by Purchaser of any Product and (b) the date when risk of loss to such Product passes to a customer.

4.02        The Warranty shall expire on the date that is ▮▮▮▮▮ from the date of Customer's purchase of the Product from Purchaser, except that (a) for the electronic components of the Products sold hereunder, the Warranty shall survive for ▮▮ (▮▮ from the date of Customer's purchase of the Product from the Purchaser and (b) when the lockset has been used for multi-family, commercial, institutional, industrial or other installations other than single-family dwellings, the finish warranty is reduced to ▮▮▮▮.

4.03        The warranty on the replacement lockset will be limited to unexpired term of the original warranty.

4.04        This ARTICLE IV shall apply only when the lockset is properly installed in accordance with local codes, ordinances and regulations, the printed instructions provided with it and good industry practices. This ARTICLE IV does not cover defects caused by: modification, alteration, repair or service of the lockset by anyone other than Supplier or an authorized designee of Supplier; physical abuse to, or misuse of, the lockset or operation of it in a manner contrary to the accompanying instructions; shipment of the product to anyone other than Supplier for service; improper installation; acts of God; fire; flood; casualty; failure to exercise normal maintenance; for the consequences of uses for which locksets were not designed or designated, or for defects caused by the use of paints, solvents or other chemicals which come in contact with the lockset. This ARTICLE IV does not cover scratches or abrasions. This ARTICLE IV does not apply to locksets or component parts of locksets that were not originally manufactured by Supplier. This ARTICLE IV does not apply to locksets or component parts of locksets that were not sold pursuant to this Supply Agreement. This ARTICLE IV shall not apply to subsequent owners.

4.05        Under this ARTICLE IV, Supplier will provide only a replacement lockset or a part of it. Supplier will pay reasonable shipping costs for surface transportation only for locksets returned to Supplier's Customer Service Department. Supplier will ship replacement parts under this ARTICLE IV at its expense by surface transportation only. Any special handling, express or expedited service or different method of transportation shall only be provided at the request and expense of the Customer. However, if Supplier determines that

6

AA_CONFIDENTIAL                                                    AA-LITTRGT-000136925

a lockset does not qualify for repair or replacement under the applicable sections of this ARTICLE IV, Supplier will notify the Customer of the estimated costs of repair or replacement and obtain the Customer's authorization and agreement to pay actual repair or replacement costs before proceeding with non-warranty repair or replacement. Supplier shall have no liability to pay any costs for repairs performed by anyone other than Supplier or its designee, unless in each instance Supplier has given written approval for such repair. Supplier shall not be responsible for any costs incurred for the removal or reinstallation of locksets covered by this ARTICLE IV.

4.06    ANY EXPRESS WARRANTY TO THE CUSTOMER NOT PROVIDED IN THIS ARTICLE IV, AND ANY REMEDY OF CUSTOMER FOR BREACH OF CONTRACT THAT, BUT FOR THIS PROVISION, MIGHT ARISE BY IMPLICATION OR OPERATION OF LAW, IS EXCLUDED AND DISCLAIMED. THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR ANY PARTICULAR PURPOSE ARE EXPRESSLY LIMITED TO THE DURATION OF EACH EXPRESS WARRANTY PERIOD.

4.07    Should the locksets be considered a consumer product as may be covered by the Magnusson-Moss Federal Warranty Act, Purchaser and Customer acknowledges that the some states do not allow limitations on how long an implied warranty lasts, so the above limitation in clause 4.06 may not apply to Purchaser.

4.08    To obtain performance of any obligation under this ARTICLE IV, Customer must contact: Yale Locks & Hardware, Customer Service Department, 225 Episcopal Road, Berlin, CT 06037 USA, Tel 1-800-438-1951, Fax 1-800-338-0965. Customer Service Department hours are between 8:00 am and 4:30 pm EST, Monday through Friday, except holidays.

4.09    Supplier will only honor replacement with an identical or similar lockset or parts of it which are then manufactured or distributed by Supplier.

4.10    THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THIS ARTICLE IV. NO OTHER EXPRESS WARRANTY HAS BEEN MADE OR WILL BE MADE ON BEHALF OF THE SUPPLIER WITH RESPECT TO THE LOCKSET OR THE INSTALLATION, OPERATION, REPAIR OR REPLACEMENT OF THE LOCKSET. THE MAXIMUM LIABILITY OF SUPPLIER HEREUNDER IS LIMITED TO THE PURCHASE PRICE OF THE LOCKSET PURCHASED BY CUSTOMER. UNDER NO CIRCUMSTANCES SHALL SUPPLIER BE LIABLE TO CUSTOMER OR ANY OTHER PERSON FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF TORT, BREACH OF WARRANTY, BREACH OF CONTRACT OR OTHERWISE.

4.11    Should the locksets be considered a consumer product as may be covered by the Magnusson-Moss Federal Warranty Act, Purchaser acknowledges that (i) some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion in clause 4.10 may not apply to Purchaser, and (ii) this ARTICLE IV gives Purchaser specific legal rights, and Purchaser may also have other rights which vary from state to state.

7

AA_CONFIDENTIAL                                                                    AA-LITTRGT-000136926

4.12     Supplier reserves the right to make changes in designs and specifications or to make additions or improvements on the Products without notice and without incurring any obligation to incorporate them on products previously manufactured.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES; COVENANTS

5.01   Each Party represents, warrants and covenants to the other Party as to itself as set forth below:

(a)     It is duly organized and validly existing under Applicable Law of the jurisdiction of its organization or incorporation and in good standing under such Applicable Law.

(b)     It has the corporate, governmental or other legal capacity, authority and power to execute this Supply Agreement, to deliver this Supply Agreement and to perform its obligations under this Supply Agreement, and has taken all necessary action to authorize the foregoing.

(c)     The execution, delivery and performance of this Supply Agreement does not violate or conflict with any Applicable Law, any provision of its constitutional documents, any order or judgment of any court or Governmental Authority applicable to it or any of its assets, or any contractual restriction binding on or affecting it or any of its assets.

(d)     Its obligations under this Supply Agreement constitute its legal, valid and binding obligations, enforceable in accordance with the terms of this Supply Agreement (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)     There is no pending or, to its knowledge, threatened action, suit or proceeding at law or in equity or before any court, tribunal, Governmental Authority, official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Supply Agreement or its ability to perform its obligations under this Supply Agreement.

(f)     It has entered into this Supply Agreement as principal (and not as advisor, agent, broker or in any other capacity, fiduciary or otherwise), with a full understanding of the material terms and risks of this Supply Agreement and is capable of assuming those risks.

(g)     Each Party covenants and represents to the other that neither it nor any of its subsidiaries, directors or officers are the target or subject of any Sanctions, pursuant to Sanctions Laws.

(h)     Each Party represents, warrants and covenants that neither it nor any of its subsidiaries will knowingly use any payments made pursuant to this Supply Agreement, (i) to fund or facilitate any activities or business in violation of Sanctions

8

AA_CONFIDENTIAL     AA-LITTRGT-000136927

Laws, Anti-Corruption Laws or Anti-Money Laundering Laws, or with any person who, or any country or territory that, at the time of such funding or facilitation, is the subject or target of Sanctions, or (ii) in any other manner that will result in a violation of Sanctions by any person.

(i)      Each Party will maintain in effect policies and procedures designed to promote and ensure continued compliance by each Party and its subsidiaries, and their respective directors, officers, employees, and agents or other persons acting on behalf thereof, with Sanctions Laws, Anti-Money Laundering Laws and Anti-Corruption Laws.

5.02    At Purchaser's cost, Purchaser may request reasonable documentation from Supplier to validate details relating to Supplier's update of Prices in accordance with Section 1.01, and Supplier shall provide relevant documentation without unreasonable delay.

5.03      Each Party agrees that during the Term, it shall comply with the other Party's Code of Conduct available on such other Party's website, as in effect from time to time.

## ARTICLE VI
## DEFINITIONS

"Acquisition" shall have the meaning given to such term in the Recitals.

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such first Person. For purposes of this definition, "control" (including, for the avoidance of doubt, its correlative meanings "controlled by" and "under common control with"), when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Anti-Corruption Laws" means: (i) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 1997; (ii) the Foreign Corrupt Practices Act of 1977 of the United States of America, as amended from time to time; (iii) the UK Bribery Act 2010; and (iv) any other Applicable Law which prohibits the conferring of any gift, payment or other benefit on any Person or any officer, employee, agent or advisor of such Person or is broadly equivalent to the laws referred to in (ii) and (iii) or was intended to enact the provisions of the OECD Convention or which has as a primary objective the prevention of corruption.

"Anti-Money Laundering Laws" means the Patriot Act, the Money Laundering Control Act of 1986, and the rules and regulations promulgated thereunder, and corresponding laws of any relevant jurisdiction, including the jurisdictions applicable to this Supply Agreement, the Parties, their subsidiaries and any other agreement hereafter entered into in order to effectuate the transactions contemplated by this Supply Agreement.

"Applicable Law" means with respect to any Person, any federal, state, territorial, provisional, foreign or local law (including common law), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar

9

AA_CONFIDENTIAL                                                                 AA-LITTRGT-000136928

requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person.

"Approved Reseller" shall have the meaning given to such term in Section 3.06.

"ASSA ABLOY" shall have the meaning given to such term in Section 3.06.

"ASSA ABLOY Marks" shall have the meaning given to such term in Section 3.06.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York or Stockholm, Sweden are authorized or required by Applicable Law to close.

"Chosen Courts" shall have the meaning given to such term in Section 7.07.

"Confidential Information" shall have the meaning given to such term in Section 7.05.

"Customer" shall have the meaning given to such term in Section 4.01.

"Delivery Terms" shall have the meaning given to such term in Section 3.02(a).

"Dispute" shall have the meaning given to such term in Section 7.01(a).

"Dispute Notice" shall have the meaning given to such term in Section 7.01(a).

"Event of Force Majeure" shall have the meaning given to such term in Section 7.03.

"Governmental Authority" means any transnational, domestic or foreign federal, state, provincial or local, governmental authority, department, court, agency or official, including any political subdivision thereof, or any self-regulatory organization.

"Notice Period" shall have the meaning given to such term in Section 2.02(b).

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Party" shall have the meaning given to such term in the Preamble.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Policy" shall have the meaning given to such term in Section 3.06.

10

V4150-7553-0306 v12

AA_CONFIDENTIAL

AA-LITTRGT-000136929

"Prices" shall have the meaning given to such term in Section 1.01.

"Products" shall have the meaning given to such term in Section 1.01.

"Purchaser" shall have the meaning given to such term in the Preamble.

"Representatives" means, with respect to any Person, such Person's directors, officers, partners, principals, employees, counsel, financial advisors, auditors, agents and other authorized representatives.

"Sanctions" means sanctions enforced by the United States government including, the OFAC, the United Nations Security Council, the European Union, HM Treasury, or other relevant sanctions authority.

"Sanctions Laws" shall mean laws, rules, regulations and executive orders promulgated or administered to implement economic sanctions, export controls or anti-boycott programs.

"SPA" shall have the meaning given to such term in the Recitals.

"Supply Agreement" shall have the meaning given to such term in the Preamble.

"Supplier" shall have the meaning given to such term in the Preamble.



"Term" shall have the meaning given to such term in Section 2.01.

11

AA_CONFIDENTIAL

AA-LITTRGT-000136930

"Warranty" shall have the meaning given to such term in Section 4.01.

## ARTICLE VII
## MISCELLANEOUS

### 7.01    Dispute Resolution.

(a)    In the event of any dispute, controversy or claim arising out of or in connection with this Supply Agreement (including its formation, interpretation, breach or termination, and whether contractual or non-contractual in nature) (a "**Dispute**"), either Party may serve written notice of the Dispute on the other Party (a "**Dispute Notice**"). Upon receipt of a Dispute Notice, the respective Representatives of Supplier and Purchaser shall meet and negotiate in good faith for twenty-one (21) days following receipt of a Dispute Notice, unless such other period of time is otherwise agreed to by the Parties in writing, to seek to amicably resolve such Dispute. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In the event that the Representatives are unable to resolve the Dispute, the respective General Counsels of Supplier and Purchaser and/or an executive officer designated by each Party shall negotiate in good faith for a further period of twenty-one (21) days, unless such other period of time is otherwise agreed to by the Parties in writing, to seek to amicably resolve such Dispute; provided, that the total good faith negotiations of the Representatives and the General Counsels, respectively, shall not exceed forty-five (45) days from the time of receipt by a Party of a Dispute Notice, unless otherwise agreed by the Parties in writing.

(b)    Section 7.01(a) shall not prohibit a Party from seeking injunctive relief from any court of competent jurisdiction in the event of a breach or threatened breach of this Supply Agreement by the other Party where such relief is available under applicable Law.

7.02    Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (a) if by delivery in person or by overnight courier service, upon actual receipt thereof or actual delivery thereof to the correct address; (b) if by electronic mail, upon transmission thereof (with confirmation of transmission) if sent during normal business hours of the recipient and on the next Business Day if sent after normal business hours of the recipient, or (c) by registered or certified mail (postage prepaid, return receipt requested), on the third day after the date mailed, in each case, to the respective Persons at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 7.02):

If to Supplier:

ASSA ABLOY Americas
110 Sargent Drive
New Haven, CT 06511
Attention: L. Page Heslin
Bill Grambo
Email: page.heslin@assaabloy.com
bill.grambo@assaabloy.com

with a copy (which shall not constitute notice) to:

12

AA_CONFIDENTIAL                                    AA-LITTRGT-000136931

Hogan Lovells LLP
390 Madison Avenue
New York, NY 10017
Attention: Peter Cohen-Millstein
          Megan Ridley-Kaye
Email: peter.cohen-millstein@hoganlovells.com
megan.ridley-kaye@hoganlovells.com

If to Purchaser:

Fortune Brands Home & Security, Inc.
520 Lake Cook Road Suite 300
Deerfield, IL 60015
Attention: John Lee (Senior Vice President, Global Growth & Development)
and Hiranda S. Donoghue (Senior Vice President, General Counsel &
Secretary)
Email: john.lee@fbhs.com and hiranda.donoghue@fbhs.com

  with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attention: Chris Abbinante and Jonathan Blackburn
Email: cabbinante@sidley.com and jblackburn@sidley.com

     Notwithstanding anything to the contrary herein, any failure of a Party to comply with any of the provisions of this <u>Section 7.02</u> shall not be a breach of this Supply Agreement or relieve the other Party of its obligations under this Supply Agreement except and only to the extent the other Party is actually and materially prejudiced thereby.

     7.03     <u>Force Majeure</u>. Neither Party will be liable for any delay in performance or non-performance caused by circumstances beyond the Party's reasonable control such as a failure to preform relating to a fire, flood, explosion, acts of God, riots, strikes, labor disputes, war or other hostilities, civil commotion, government action, pandemic or epidemic, inability on commercially reasonable terms to obtain raw materials or services or other similar contingencies or circumstances (each, an "**Event of Force Majeure**"). The Parties will discuss the expected duration of any Event of Force Majeure and, for any existing Orders that cannot be filled within a time period acceptable to Purchaser, Purchaser may cancel the Order. If the Event of Force Majeure is anticipated to exceed ninety (90) days, either Party may terminate this Supply Agreement.

     7.04     <u>Limitation of Remedies</u>. Neither Party may recover from the other Party any incidental, indirect, special, consequential or punitive damages, including any damage for lost profits, lost sales, injury to person or property, or any other incidental or consequential loss, whether arising out of breach of contract, breach of warranty, tort or

AA_CONFIDENTIAL               AA-LITTRGT-000136932

otherwise; provided, however, that the Parties agree that any losses paid to third parties shall constitute direct damages.

7.05     Confidentiality. "**Confidential Information**" means a Party's tangible or intangible information, including but not limited to, business and technical information, plans, samples, prototypes, product designs, data, production facilities, methods, marketing information, financial information, or any other information designated by the disclosing Party as "Confidential". Neither Party may use the other Party's Confidential Information except in furtherance of this Supply Agreement or disclose such Confidential Information to third parties without prior written consent. Each Party will protect the other Party's Confidential Information using a reasonable degree of care. Each Party will only allow access to the other Party's Confidential Information to their employees, contractors, representatives or agents who have a need to know and who have agreed to maintain the secrecy of the Confidential Information. The receiving Party shall be responsible for any breach of such confidentiality requirement by such person. Confidential Information will remain the property of the disclosing Party. Upon the request of the disclosing Party, the receiving Party will promptly return or destroy all Confidential Information received under this Supply Agreement and any copies thereof. This Supply Agreement imposes no obligations with respect to Confidential Information which (i) was already in the possession of the receiving Party and which was not the subject of a separate confidentiality agreement; (ii) becomes public knowledge through no wrongful act of the receiving Party; (iii) is rightfully received by the receiving Party from a third party which was under no duty of confidentiality; (iv) is independently developed or discovered without access to the disclosing Party's Confidential Information; or (v) is forced to be disclosed pursuant to an order or ruling of a judicial or administrative body having competent jurisdiction provided that the disclosing Party is given written notice prior to such disclosure. The obligations of this Section will survive termination or expiration of this Supply Agreement.

7.06     Additional or Different Terms. Any additional or different terms and conditions of Purchaser found in its Order or other documentation in connection with the purchase of a Product or any attempt by Purchaser to vary any of the terms of this Supply Agreement, shall not have any effect and any such terms, conditions or variations are hereby expressly rejected unless mutually agreed in writing by the Parties.

7.07     Governing Law. This Supply Agreement is governed by the laws of the State of New York. The United Nations Convention for the International Sale of Goods 1980 shall not apply to this Supply Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Supply Agreement or the transactions contained in or contemplated by this Supply Agreement exclusively in the Federal or state courts located in New York County, New York (the "**Chosen Courts**"), and solely in connection with claims arising under this Supply Agreement or the transactions that are the subject of this Supply Agreement (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that

14

AA_CONFIDENTIAL                                                   AA-LITTRGT-000136933

service of process upon such party in any such action or proceeding shall be effective if is given in accordance with Section 7.02 of this Supply Agreement.

      7.08      Jury Waiver. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLY AGREEMENT IS EXPRESSLY AND IRREVOCABLY WAIVED.

      7.09      Entire Agreement; Amendment and Waivers.

      (a)      This Supply Agreement is solely for the benefit of the Parties hereto and represents the entire and integrated agreement between the Parties and supersedes all prior negotiation, representations, or agreements, either written or oral. The terms of this Supply Agreement can only be varied or added to by a further agreement that has been reduced to writing and signed by the authorized representatives of both Parties. This Supply Agreement is not intended to and will not confer on any person other than the Parties and their permitted assigns any rights, benefits or remedies of any nature whatsoever.

      (b)      This Supply Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement by the Parties, which specifically references this Supply Agreement. The failure of any Party to assert any of its rights under this Supply Agreement or otherwise will not constitute a waiver of such rights.

      7.10      Assignability and Change of Control. This Supply Agreement may not be assigned by either Party without the express written permission of the other Party and any assignment without such consent shall be void *ab initio*; *provided that* either Party may assign this Supply Agreement to an Affiliate without consent of the other Party. Either Party may terminate this contract if, without its prior written permission, there is an attempt to assign the Supply Agreement by the other Party or if there is a change of control of the other Party, whereby fifty percent (50%) or more of the equity ownership of the Party becomes owned or otherwise controlled by any one person or group of persons acting in concert (not being the persons holding such shares or exercising such control at the date of this Supply Agreement). For the avoidance of doubt, the Acquisition shall not constitute a change of control of Purchaser for purpose of this Section.

      7.11      Intellectual Property. Neither anything contained in this Supply Agreement nor the request or provision of any quote or Order shall be construed as granting either Party, by implication, estoppel or otherwise, any license or other right under any intellectual property, except for those rights expressly granted hereunder or as agreed in writing.

      7.12      Severability. If any term or other provision of this Supply Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other conditions and provisions of this Supply Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not fundamentally changed. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in

15

AA_CONFIDENTIAL      AA-LITTRGT-000136934

good faith to modify this Supply Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

      7.13     Counterparts.  This Supply Agreement may be executed in one or more counterparts, and by the Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Supply Agreement by facsimile or other electronic means (including portable document format) shall be as effective as delivery of a manually executed counterpart of this Supply Agreement.

      7.14     Interpretation; Absence of Presumption. For the purposes of this Supply Agreement, (i) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (ii) references to the terms Article, Section, and Exhibit are references to the Articles, Sections, and Exhibits to this Supply Agreement unless otherwise specified; (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Exhibits and Annexes hereto; (iv) references to "$" shall mean U.S. dollars; (v) the word "including" and words of similar import when used in this Supply Agreement shall mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (viii) references to "written" or "in writing" include in electronic form; (ix) Purchaser and Supplier have each participated in the negotiation and drafting of this Supply Agreement and if an ambiguity or question of interpretation should arise, this Supply Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening either Party by virtue of the authorship of any of the provisions in this Supply Agreement; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; (xii) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Supply Agreement, the date that is the reference date in calculating such period shall be excluded; and (xiii) unless otherwise stated in this Supply Agreement, references to any contract are to that contract as amended, modified or supplemented from time to time in accordance with the terms thereof. In the event of any inconsistency or conflict between the terms of this Supply Agreement and any Exhibits hereto, the terms of this Supply Agreement shall control. In the event of any inconsistency or conflict between the terms of this Supply Agreement, on the one hand, and the SPA or the Trademark Assignment and License-Back Agreement (as defined in the SPA), on the other hand, the terms of the SPA shall control, followed by (in order) the Trademark Assignment and License-Back Agreement and then this Supply Agreement.

*[Signature page follows.]*

16

\\4150-7553-0306 v12

AA_CONFIDENTIAL          AA-LITTRGT-000136935

**IN WITNESS WHEREOF**, each of the Parties has caused this Supply Agreement to be duly executed on its behalf as of the day and year first above written.


[ASSA ABLOY RESIDENTIAL GROUP, INC.]


By:_____
Name:
Title:


[●]


By:_____
Name:
Title:


*[Signature page to Supply Agreement]*

AA_CONFIDENTIAL

AA-LITTRGT-000136936

**Exhibit A**

**Product and Price List**

**[See attached.]**

Exhibit A to Supply Agreement

V4150-7553-0306  v12

| Product | Description | Forecasted Annual Amount 2023 | Forecasted Annual Amount 2024 | Forecasted Annual Amount 2025 | Forecasted Annual Amount 2026 | Forecasted Annual Amount 2027 | ASSA Entity | AAG INVOICE PRICE |
|---|---|---|---|---|---|---|---|---|
| 87804301 | Polished Brass McKinley Passage Handset | | | | | | | |
| 87812201 | Antique Nickel Rainier Single Cylinder Knob Handset | | | | | | | |
| 87812701 | Satin Chrome Rainier Single Cylinder Knob Handset | | | | | | | |
| 87813201 | Antique Nickel Teton Single Cylinder Knob Handset | | | | | | | |
| 87814201 | Antique Nickel McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814301 | Satin Nickel McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814601 | Polished Brass McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814601 | Polished Chrome McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814701 | Satin Chrome McKinley Single Cylinder Knob Handset | | | | | | | |
| 87S02322 | Antique Nickel Rainier Dummy Knob Handset | | | | | | | |
| 87S027327 | Satin Chrome Rainier Dummy Knob Handset | | | | | | | |
| 87S031322 | Antique Nickel Teton Dummy Knob Handset | | | | | | | |
| 87S041322 | Antique Nickel McKinley Dummy Handset | | | | | | | |
| 87S041323 | Antique Brass McKinley Dummy Knob Handset | | | | | | | |
| 87S046326 | Polished Chrome McKinley Dummy Handset | | | | | | | |
| 87S047327 | Satin Chrome McKinley Dummy Knob Handset | | | | | | | |
| 4881619FR | Flat Round Single Cylinder Mechanical Deadbolt Satin Chrome | | | | | | | |
| 4881619SQ | Flat Square Single Cylinder Mechanical Deadbolt Polished Chrome | | | | | | | |
| 4881K19FR | Flat Round Single Cylinder Mechanical Deadbolt Oil Rubbed Bronze | | | | | | | |
| 4881K19SQ | Flat Square Single Cylinder Mechanical Deadbolt Oil Rubbed Bronze | | | | | | | |
| 4881N19FR | Flat Round Single Cylinder Mechanical Deadbolt Satin Nickel | | | | | | | |
| 4881N19SQ | Flat Square Single Cylinder Mechanical Deadbolt Satin Nickel | | | | | | | |
| 4881S19FR | Flat Round Single Cylinder Mechanical Deadbolt Black Suede | | | | | | | |
| 4881S19SQ | Flat Square Single Cylinder Mechanical Deadbolt Black Suede | | | | | | | |
| 87S02632G | Gun Metal Rainier Dummy Knob Handset | | | | | | | |
| 87S02K32K | Oil Rubbed Bronze Permanent Rainier Dummy Knob Handset | | | | | | | |
| 87S02N32N | Satin Nickel Rainier Dummy Knob Handset | | | | | | | |
| 87S02S33S | Black Suede Rainier Dummy Handset | | | | | | | |
| 87S03G32G | Gun Metal Teton Dummy Knob Handset | | | | | | | |
| 87S03K32K | Oil Rubbed Bronze Permanent Teton Dummy Handset | | | | | | | |
| 87S03N32N | Satin Nickel Teton Dummy Knob Handset | | | | | | | |
| 87S04G32G | Gun Metal McKinley Dummy Knob Handset | | | | | | | |
| 87S04K32K | Polished Brass McKinley Dummy Knob Handset | | | | | | | |
| 87S04N32N | Oil Rubbed Bronze Permanent McKinley Dummy Knob Handset | | | | | | | |
| 87S04S33S | Black Suede McKinley Dummy Knob Handset | | | | | | | |
| 87802K01 | Oil Rubbed Bronze Permanent Rainier Passage Knob Handset | | | | | | | |
| 87802N01 | Satin Nickel Rainier Passage Knob Handset | | | | | | | |
| 87803K01 | Oil Rubbed Bronze Permanent Teton Passage Handset | | | | | | | |
| 87803N01 | Satin Nickel  Teton Passage Handset | | | | | | | |
| 87804K01 | Oil Rubbed Bronze Permanent McKinley Passage Handset | | | | | | | |
| 87804N01 | Satin Nickel McKinley Passage Handset | | | | | | | |
| 87812G01 | Gun Metal Rainier Single Cylinder Knob Handset | | | | | | | |
| 87812K01 | Oil Rubbed Bronze Permanent Rainier Single Cylinder Knob Handset | | | | | | | |
| 87812N19 | Satin Nickel Rainier Single Cylinder Knob Handset | | | | | | | |
| 87812S19 | Black Suede Rainier Single Cylinder Handset | | | | | | | |
| 87813G01 | Gun Metal Teton Single Cylinder Knob Handset | | | | | | | |
| 87813K01 | Oil Rubbed Bronze Permanent Teton Single Cylinder Knob Handset | | | | | | | |
| 87813K19 | Oil Rubbed Bronze Permanent Teton Single Cylinder Knob Handset | | | | | | | |
| 87813N01 | Satin Nickel Teton Single Cylinder Knob Handset | | | | | | | |
| 87814G01 | Gun Metal McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814K19 | Oil Rubbed Bronze Permanent McKinley Single Cylinder Knob Handset | | | | | | | |
| 87814N19 | Satin Nickel McKinley Dummy Knob Handset | | | | | | | |
| 87814S19 | Black Suede McKinley Single Cylinder Knob Handset | | | | | | | |
| AL636 | Alpharetta Lever Entry (Keyed), Polished Brass | | | | | | | |
| AT5CIP1S | Athens Creso Interior Pack for Handlesset, Satin Nickel | | | | | | | |
| D3102301 | Bridgeport Knob Passage, Polished Brass | | | | | | | |
| D3102N01 | Bridgeport Knob Passage, Satin Nickel | | | | | | | |
| D3106301 | Cambridge Knob Passage, Polished Brass | | | | | | | |
| D3106K01 | Cambridge Knob Passage, Oil Rubbed Bronze | | | | | | | |
| D3106N01 | Cambridge Knob Passage, Satin Nickel | | | | | | | |
| D3106S01 | Cambridge Knob Passage, Black Suede | | | | | | | |
| D3108301 | Dartmouth Knob Passage, Polished Brass | | | | | | | |
| D3108K01 | Dartmouth Knob Passage, Oil Rubbed Bronze | | | | | | | |
| D3108N01 | Dartmouth Knob Passage, Satin Nickel | | | | | | | |
| D3109K01 | Oxford Knob Passage, Oil Rubbed Bronze | | | | | | | |
| D3109N01 | Oxford Knob Passage, Satin Nickel | | | | | | | |
| D3202301 | Bridgeport Knob Privacy, Polished Brass | | | | | | | |
| D3202N01 | Bridgeport Knob Privacy, Satin Nickel | | | | | | | |
| D3206301 | Cambridge Knob Privacy, Polished Brass | | | | | | | |
| D3206K01 | Cambridge Knob Privacy, Oil Rubbed Bronze | | | | | | | |
| D3206N01 | Cambridge Knob Privacy, Satin Nickel | | | | | | | |
| D3206S01 | Cambridge Knob Privacy, Black Suede | | | | | | | |
| D3208301 | Dartmouth Knob Privacy, Polished Brass | | | | | | | |
| D3208K01 | Dartmouth Knob Privacy, Oil Rubbed Bronze | | | | | | | |
| D3208N01 | Dartmouth Knob Privacy, Satin Nickel | | | | | | | |
| D3209K01 | Oxford Knob Privacy, Oil Rubbed Bronze | | | | | | | |
| D3209N01 | Oxford Knob, Privacy Satin Nickel | | | | | | | |
| D3402301 | Bridgeport Knob Entry, Polished Brass | | | | | | | |
| D3402N01 | Bridgeport Knob Entry, Satin Nickel | | | | | | | |
| D3406301 | Cambridge Knob Entry, Polished Brass | | | | | | | |
| D3406K01 | Cambridge Knob Entry, Oil Rubbed Bronze | | | | | | | |
| D3406N01 | Cambridge Knob Entry, Satin Nickel | | | | | | | |
| D3406S01 | Cambridge Knob Entry, Black Suede | | | | | | | |
| D3408301 | Dartmouth Knob Entry, Polished Brass | | | | | | | |
| D3408K01 | Dartmouth Knob Entry, Oil Rubbed Bronze | | | | | | | |
| D3408N01 | Dartmouth Knob Entry, Satin Nickel | | | | | | | |
| D3409K01 | Oxford Knob Entry, Oil Rubbed Bronze | | | | | | | |
| D3409N01 | Oxford Knob, Entry Satin Nickel | | | | | | | |
| D3S023 | Bridgeport Knob Dummy, Polished Brass | | | | | | | |
| D3S02N | Bridgeport Knob Dummy, Satin Nickel | | | | | | | |
| D3S063 | Cambridge Knob Dummy, Polished Brass | | | | | | | |
| D3S06K | Cambridge Knob Dummy, Oil Rubbed Bronze | | | | | | | |
| D3S06N | Cambridge Knob Dummy, Satin Nickel | | | | | | | |
| D3S06S | Cambridge Knob Dummy, Black Suede | | | | | | | |

AA_CONFIDENTIAL

AA-LITTRGT-000136938

| | |
|---|---|
| D350B3 | Dartmouth Knob Dummy, Polished Brass |
| D350BK | Dartmouth Knob Dummy, Oil Rubbed Bronze |
| D350BN | Dartmouth Knob Dummy, Satin Nickel |
| D35O9K | Oxford Knob Dummy, Oil Rubbed Bronze |
| D35O9N | Oxford Knob Dummy, Satin Nickel |
| DS102301 | Pacific Beach Lever Passage (Non-Locking), Polished Brass |
| DS102701 | Pacific Beach Lever Passage (Non-Locking), Satin Chrome |
| DS102N01 | Pacific Beach Lever Passage (Non-Locking), Satin Nickel |
| DS103301 | Milan Lever Passage (Non-Locking) (Non-Locking), Polished Brass |
| DS103701 | Milan Lever |
| DS103N01 | Milan Lever Passage (Non-Locking) (Non-Locking), Satin Nickel |
| DS105301 | McClure Lever Passage (Non-Locking), Polished Brass |
| DS105K01 | McClure Lever Passage (Non-Locking), Oil Rubbed Bronze |
| DS105N01 | McClure Lever Passage (Non-Locking), Satin Nickel |
| DS107501 | Academy Lever Passage, Antique Brass |
| DS107701 | Academy Lever Passage, Satin Chrome |
| DS107N01 | Academy Lever Passage, Satin Nickel |
| DS108301 | Norwood Lever Passage (Non-Locking), Antique Nickel |
| DS108301 | Norwood Lever Passage (Non-Locking), Polished Brass |
| DS108601 | Norwood Lever Passage (Non-Locking), Antique Brass |
| DS108601 | Norwood Lever Passage (Non-Locking), Polished Chrome |
| DS108701 | Norwood Lever Passage (Non-Locking), Satin Chrome |
| DS108G01 | Norwood Lever Passage (Non-Locking), Gun Metal |
| DS108K01 | Norwood Lever Passage (Non-Locking), Oil Rubbed Bronze |
| DS108N01 | Norwood Lever Passage (Non-Locking), Satin Nickel |
| DS108S01 | Norwood Lever Passage (Non-Locking), Suede Black |
| DS108201 | PASS NOR 15A RCADJ |
| DS108301 | PASS NOR 03 RCADJ |
| DS108-01 | PASS NOR 05 RCADJ |
| DS108601 | PASS NOR 26 RCADJ |
| DS108701 | PASS NOR 26O RCADJ |
| DS108G01 | PASS NOR GM RCADJ |
| DS108K01 | PASS NOR 10BF RCADJ |
| DS108N01 | PASS NOR 15 RCADJ |
| DS108K01SR | PASS NOR 10BF RADJ ASR |
| DS108N01SR | PASS NOR 15 RADJ ASR |
| DS108S01SR | PASS NOR BSP RADJ ASR |
| DS10C701 | Charleston Lever Passage (Non-Locking) (Non-Locking), Satin Chrome |
| DS10CN01 | Charleston Lever Passage (Non-Locking) (Non-Locking), Satin Nickel |
| DS10CS01 | Charleston Lever Passage (Non-Locking) (Non-Locking), Black Suede |
| DS10DN01 | Delaware Lever Passage, Satin Nickel |
| DS10DS01 | Delaware Lever Passage, Suede Black |
| DS10K301 | Kincaid Lever, Passage - Polished Brass |
| DS10KK01 | Kincaid Lever, Passage - Oil Rubbed Bronze |
| DS10KN01 | Kincaid Lever, Passage - Satin Nickel |
| DS10L301 | Kincaid BK Lever, Passage - Polished Brass |
| DS10LK01 | Kincaid BK Lever, Passage - Oil Rubbed Bronze |
| DS10LN01 | Kincaid BK Lever, Passage - Satin Nickel |
| DS10V601 | Valdosta Round Lever Passage (Non-Locking), Polished Chrome |
| DS10V701 | Valdosta Round Lever Passage (Non-Locking), Satin Chrome |
| DS10V701SQ | Valdosta Square Lever Passage (Non-Locking), Satin Chrome |
| DS10VK01 | Valdosta Round Lever Passage (Non-Locking), Oil Rubbed Bronze |
| DS10VN01 | Valdosta Round Lever Passage (Non-Locking), Satin Nickel |
| DS10VN01SQ | Valdosta Square Lever Passage (Non-Locking), Satin Nickel |
| DS10VS01 | Valdosta Round Lever Passage (Non-Locking), Suede Black |
| DS10VS01SQ | Valdosta Square Lever Passage (Non-Locking), Suede Black |
| DS10K301 | PASS KIN 03 RADJ |
| DS10KK01 | PASS KIN 10BF RCADJ |
| DS10KN01 | PASS KIN 15 RADJ |
| DS10KS01 | PASS KIN BSP RADJ |
| DS10L301 | PASS KIN BLK 03 RADJ |
| DS10LK01 | PASS KIN BLK 10BF RADJ |
| DS10LN01 | PASS KIN BLK 15 RADJ |
| DS10V601 | PASS VLD 26 RCADJ |
| DS10V701 | PASS VLD 26O RCADJ |
| DS10V701SQ | PASS VLD 26O RCADJ SQR |
| DS10VK01 | PASS VLD 10BF RCADJ |
| DS10VN01 | PASS VLD 15 RCADJ |
| DS10VN01SQ | PASS VLD 15 RADJ SQR |
| DS10VS01 | PASS VLD BSP RADJ |
| DS10VS01SQ | PASS VLD BSP RADJ SQ |
| DS10VN01SR | PASS VLD 15 RADJ ASR |
| DS10VS01SR | PASS VLD BSP RADJ ASR |
| DS10W701 | Monroe Lever Passage (Non-Locking), Satin Chrome |
| DS202301 | Pacific Beach Lever Privacy (Bed/Bath), Polished Brass |
| DS202701 | Pacific Beach Lever Privacy (Bed/Bath), Satin Chrome |
| DS203301 | Milan Lever Privacy (Bed/Bath) (Bed/Bath), Polished Brass |
| DS203701 | Milan Lever |
| DS203N01 | Milan Lever Privacy (Bed/Bath) (Bed/Bath), Satin Nickel |
| DS205301 | McClure Lever Privacy (Bed/Bath), Polished Brass |
| DS205K01 | McClure Lever Privacy (Bed/Bath), Oil Rubbed Bronze |
| DS205N01 | McClure Lever Privacy (Bed/Bath), Satin Nickel |
| DS207501 | Academy Lever Privacy, Antique Brass |
| DS207701 | Academy Lever Privacy, Satin Chrome |
| DS207N01 | Academy Lever Privacy, Satin Nickel |
| DS208201 | Norwood Lever Privacy (Bed/Bath), Antique Nickel |
| DS208301 | Norwood Lever Privacy (Bed/Bath), Polished Brass |
| DS208601 | Norwood Lever Privacy (Bed/Bath), Antique Brass |
| DS208601 | Norwood Lever Privacy (Bed/Bath), Polished Chrome |
| DS208701 | Norwood Lever Privacy (Bed/Bath), Satin Chrome |
| DS208G01 | Norwood Lever Privacy (Bed/Bath), Gun Metal |
| DS208K01 | Norwood Lever Privacy (Bed/Bath), Oil Rubbed Bronze |
| DS208N01 | Norwood Lever Privacy (Bed/Bath), Satin Nickel |
| DS208S01 | Norwood Lever Privacy (Bed/Bath), Suede Black |
| DS208K01SR | PRIV NOR 10BF RADJ ASR |
| DS208N01SR | PRIV NOR 15 RADJ ASR |
| DS208S01SR | PRIV NOR BSP RADJ ASR |
| DS20C701 | Charleston Lever Privacy (Bed/Bath) (Bed/Bath), Satin Chrome |

\\DE\REST; 41595879-4851 v3

AA_CONFIDENTIAL

AA-LITTRGT-000136939

| Code | Description |
|---|---|
| DS20CN01 | Charleston Lever Privacy (Bed/Bath) (Bed/Bath), Satin Nickel |
| DS20CS01 | Charleston Lever Privacy (Bed/Bath) (Bed/Bath), Black Suede |
| DS20DN01 | Delaware Lever Privacy, Satin Nickel |
| DS20DS01 | Delaware Lever Privacy, Suede Black |
| DS20K301 | Kincaid Lever, Privacy - Polished Brass |
| DS20KK01 | Kincaid Lever, Privacy - Oil Rubbed Bronze |
| DS20KN01 | Kincaid Lever, Privacy - Satin Nickel |
| DS20L301 | Kincaid BK Lever, Privacy - Polished Brass |
| DS20LK01 | Kincaid BK Lever, Privacy - Oil Rubbed Bronze |
| DS20LN01 | Kincaid BK Lever, Privacy - Satin Nickel |
| DS20V601 | Valdosta Round Lever Privacy (Bed/Bath), Polished Chrome |
| DS20V701SQ | Valdosta Square Lever Privacy (Bed/Bath), Satin Chrome |
| DS20VK01 | Valdosta Round Lever Privacy (Bed/Bath), Oil Rubbed Bronze |
| DS20VN01 | Valdosta Round Lever Privacy (Bed/Bath), Satin Nickel |
| DS20VN01SQ | Valdosta Square Lever Privacy (Bed/Bath), Satin Nickel |
| DS20VS01 | Valdosta Round Lever Privacy (Bed/Bath), Suede Black |
| DS20VS01SQ | Valdosta Square Lever Privacy (Bed/Bath), Suede Black |
| DS20VN01SR | PRIV VLD 15 RADJ ASR |
| DS20VS01SR | PRIV VLD BSP RADJ ASR |
| DS20W701 | Monroe Lever Privacy (Bed/Bath), Satin Chrome |
| DS40Z301 | Pacific Beach Lever Entry (Keyed), Polished Brass |
| DS402701 | Pacific Beach Lever Entry (Keyed), Satin Chrome |
| DS402N01 | Pacific Beach Lever Entry (Keyed), Satin Nickel |
| DS403301 | Milan Lever Entry (Keyed) (Keyed), Polished Brass |
| DS403701 | Milan Lever |
| DS403N01 | Milan Lever Entry (Keyed) (Keyed), Satin Nickel |
| DS405301 | McClure Lever Entry (Keyed), Polished Brass |
| DS405K01 | McClure Lever Entry (Keyed), Oil Rubbed Bronze |
| DS405N01 | McClure Lever Entry (Keyed), Satin Nickel |
| DS407S01 | Academy Lever Entry, Antique Brass |
| DS407701 | Academy Lever Entry, Satin Chrome |
| DS407N01 | Academy Lever Entry, Satin Nickel |
| DS408201 | Norwood Lever Entry (Keyed), Antique Nickel |
| DS408301 | Norwood Lever Entry (Keyed), Polished Brass |
| DS408s01 | Norwood Lever Entry (Keyed), Antique Brass |
| DS408601 | Norwood Lever Entry (Keyed), Polished Chrome |
| DS408701 | Norwood Lever Entry (Keyed), Satin Chrome |
| DS408G01 | Norwood Lever Entry (Keyed), Gun Metal |
| DS408K01 | Norwood Lever Entry (Keyed), Oil Rubbed Bronze |
| DS408N01 | Norwood Lever Entry (Keyed), Satin Nickel |
| DS408S01 | Norwood Lever Entry (Keyed), Suede Black |
| DS408K01SR | ENT NOR 10BP RADJ ASR |
| DS408N01SR | ENT NOR 15 RADJ ASR |
| DS408S01SR | ENT NOR BSP RADJ ASR |
| DS40C701 | Charleston Lever Entry (Keyed) (Keyed), Satin Chrome |
| DS40CN01 | Charleston Lever Entry (Keyed) (Keyed), Satin Nicke |
| DS40CS01 | Charleston Lever Entry (Keyed) (Keyed), Black Suede |
| DS40DN01 | Delaware Lever Entry, Satin Nickel |
| DS40DS01 | Delaware Lever Entry, Suede Black |
| DS40K301 | Kincaid Lever, Keyed Entry - Polished Brass |
| DS40KK01 | Kincaid Lever, Keyed Entry - Oil Rubbed Bronze |
| DS40KN01 | Kincaid Lever, Keyed Entry - Satin Nickel |
| DS40L301 | Kincaid BK Lever, Keyed Entry - Polished Brass |
| DS40LK01 | Kincaid BK Lever, Keyed Entry - Oil Rubbed Bronze |
| DS40LN01 | Kincaid BK Lever, Keyed Entry - Satin Nickel |
| DS40V601 | Valdosta Round Lever Entry (Keyed), Polished Chrome |
| DS40V701 | Valdosta Round Lever Entry (Keyed), Satin Chrome |
| DS40V701SQ | Valdosta Square Lever Entry (Keyed), Satin Chrome |
| DS40VK01SQ | Valdosta Square Lever Entry (Keyed), Oil Rubbed Bronze |
| DS40VN01 | Valdosta Round Lever Entry (Keyed), Satin Nickel |
| DS40VN01SQ | Valdosta Square Lever Entry (Keyed), Satin Nickel |
| DS40VS01 | Valdosta Round Lever Entry (Keyed), Suede Black |
| DS40VS01SQ | Valdosta Square Lever Entry (Keyed), Suede Black |
| DS40VN01SR | ENT VLD 15 RADJ ASR |
| DS40VS01SR | ENT VLD BSP RADJ ASR |
| DS40W701 | Monroe Lever Entry (Keyed), Satin Chrome |
| DS5S323 | Pacific Beach Lever Dummy (Closet), Polished Brass |
| DS5S327 | Pacific Beach Lever Dummy (Closet), Satin Chrome |
| DS5S32N | Pacific Beach Lever Dummy (Closet), Satin Nickel |
| DS5S333 | Milan Lever Dummy (Closet) (Closet), Polished Brass |
| DS5S33N | Milan Lever Dummy (Closet) (Closet), Satin Nickel |
| DS5S347 | Milan Lever |
| DS5S353 | McClure Lever Dummy (Closet), Polished Brass |
| DS5S35K | McClure Lever Dummy (Closet), Oil Rubbed Bronze |
| DS5S35N | McClure Lever Dummy (Closet), Satin Nickel |
| DS5S375 | Academy Lever Dummy, Antique Brass |
| DS5S377 | Academy Lever Dummy, Satin Chrome |
| DS5S37N | Academy Lever Dummy, Satin Nickel |
| DS5S382 | Norwood Lever Dummy (Closet), Antique Nickel |
| DS5S383 | Norwood Lever Dummy (Closet), Polished Brass |
| DS5S38s | Norwood Lever Dummy (Closet), Antique Brass |
| DS5S386 | Norwood Lever Dummy (Closet), Polished Chrome |
| DS5S387 | Norwood Lever Dummy (Closet), Satin Chrome |
| DS5S38G | Norwood Lever Dummy (Closet), Gun Metal |
| DS5S38K | Norwood Lever Dummy (Closet), Oil Rubbed Bronze |
| DS5S38KSR | DUM NOR 10BP ASR LH |
| DS5S38NSR | DUM NOR 15 ASR LH |
| DS5S38SSR | DUM NOR BSP ASR LH |
| DS5S38N | Norwood Lever Dummy (Closet), Satin Nickel |
| DS5S38S | Norwood Lever Dummy (Closet), Suede Black |
| DS5S3C7 | Charleston Lever Dummy (Closet) (Closet), Satin Chrome |
| DS5S3CN | Charleston Lever Dummy (Closet) (Closet), Satin Nickel |
| DS5S3CS | Charleston Lever Dummy (Closet) (Closet), Black Suede |
| DS5S3DN | Delaware Lever Dummy, Satin Nickel |
| DS5S3DS | Delaware Lever Dummy, Suede Black |
| DS5S3K3 | Kincaid Lever, Dummy - Polished Brass |
| DS5S3KK | Kincaid Lever, Dummy - Oil Rubbed Bronze |
| DS5S3KN | Kincaid Lever, Dummy - Satin Nickel |

\\109857; 4199589-4851 v3

AA_CONFIDENTIAL

AA-LITTRGT-000136940

| | |
|---|---|
| D553L3 | Kincaid BK Lever, Dummy - Polished Brass |
| D553LK | Kincaid BK Lever, Dummy - Oil Rubbed Bronze |
| D553LN | Kincaid BK Lever, Dummy - Satin Nickel |
| D553V8 | Valdosta Round Lever Dummy (Closet), Polished Chrome |
| D553V7 | Valdosta Round Lever Dummy (Closet), Satin Chrome |
| D553V7SQ | Valdosta Square Lever Dummy (Closet), Satin Chrome |
| D553VK | Valdosta Round Lever Dummy (Closet), Oil Rubbed Bronze |
| D553VN | Valdosta Round Lever Dummy (Closet), Satin Nickel |
| D553VNSQ | Valdosta Square Lever Dummy (Closet), Satin Nickel |
| D553VNSR | DUM VLD 1S ASR |
| D553VSSR | DUM VLD BSP ASR |
| D553V5 | Valdosta Square Lever Dummy (Closet), Suede Black |
| D553V5SQ | Valdosta Square Lever Dummy (Closet), Suede Black |
| D553V7 | Monroe Lever Dummy (Closet), Satin Chrome |
| D554BKSR | DUM NOR 10BP ASR RH |
| D554BNSR | DUM NOR 1S ASR RH |
| D554BSSR | DUM NOR BSP ASR RH |
| D7507K36K | Pedestal Handleset Dummy, Oil Rubbed Bronze |
| D7507K36N | Pedestal Handleset Dummy, Satin Nickel |
| D7507S36S | Pedestal Handleset Dummy, Suede Black |
| D75082362 | Antique Nickel Homestead Dummy Knob Handleset |
| D75083363 | Polished Brass Homestead Dummy Knob Handleset |
| D7508L36S | Antique Brass Homestead Dummy Knob Handleset |
| D7508S12G | Black Suede Homestead Dummy Knob Hand eset |
| D7508K36K | Oil Rubbed Bronze Permanent Homestead Dummy Knob Handleset |
| D7508N32N | Satin Nickel Homestead Dummy Knob Handleset |
| D7508L36S | Oil Rubbed Bronze Permanent Homestead Dummy Knob Handleset |
| D7509I362 | Antique Nickel Jamestown Dummy Knob Handleset |
| D7509I323 | Polished Brass Jamestown Dummy Knob Handleset |
| D7509G32G | Gun Metal Jamestown Dummy Knob Handleset |
| D7509K36K | Oil Rubbed Bronze Permanent Jamestown Dummy Knob Handleset |
| D7509N32N | Satin Nickel Jamestown Dummy Knob Handleset |
| D7806I36301 | Polished Brass Passage Ridgefield Handleset |
| D7806K36K01 | Oil Rubbed Bronze Passage Ridgefield Handleset |
| D7806K36K01SR | HNDL RID 10BP CB RADI ASR |
| D7806N36N01SR | HNDL RID 1S CB RADI ASR |
| D7806S36S01SR | HNDL RID BSP CB RADI ASR |
| D7806N36N01 | Satin Nickel Passage Ridgefield Handleset |
| D7806S36S01 | Black Suede Passage Ridgefield Handleset |
| D7808301 | Polished Brass Homestead Passage Knob Handleset |
| D7808K01 | Oil Rubbed Bronze Permanent Homestead Passage Knob Handleset |
| D7808N01 | Satin Nickel Homestead Passage Knob Handleset |
| D7809301 | Polished Brass Jamestown Passage Knob Handleset |
| D7809K01 | Oil Rubbed Bronze Permanent Jamestown Passage Knob Handleset |
| D7809N01 | Satin Nickel Jamestown Passage Knob Handleset |
| D7809N5KN01 | HNDL JAM 1S KIN RADI |
| D7815301 | Polished Brass Fairfield Single Cylinder Knob Handleset |
| D7816K36K01 | Oil Rubbed Bronze Ridgefield Handleset with Deadbolt |
| D7816N36N01 | Satin Nickel Ridgefield Handleset with Deadbolt |
| D7817K36K01 | Pedestal Handleset Single Cylinder, Oil Rubbed Bronze |
| D7817N36N01 | Pedestal Handleset Single Cylinder, Satin Nickel |
| D7817S36S01 | Pedestal Handleset Single Cylinder, Suede Black |
| D7818232201 | Antique Nickel Homestead Single Cylinder Knob Handleset |
| D7818301 | Polished Brass Homestead Single Cylinder Knob Handleset |
| D7818L01A | Antique Brass Homestead Single Cylinder Knob Handleset |
| D7818G01 | Oil Rubbed Bronze Homestead Single Cylinder Knob Handleset |
| D7818K01 | Oil Rubbed Bronze Permanent Homestead Single Cylinder Knob Handleset |
| D7818N01 | Satin Nickel Homestead Single Cylinder Knob Handleset |
| D7818S01 | Black Suede Homestead Single Cylinder Knob Handleset |
| D7819201 | Antique Nickel Jamestown Single Cylinder Knob Handleset |
| D7819232201 | Antique Nickel Jamestown Passage Knob Handleset |
| D7819301 | Polished Brass Jamestown Single Cylinder Knob Handleset |
| D7819601 | Polished Chrome Jamestown Single Cylinder Knob Handleset |
| D7819G01 | Gun Metal Jamestown Single Cylinder Knob Handleset |
| D7819K01 | Oil Rubbed Bronze Permanent Jamestown Single Cylinder Knob Handleset |
| D7819N01 | Satin Nickel Jamestown Single Cylinder Knob Handleset |
| D881201 | 82 Premier Deadbolt (Keyed) Antique Nickel |
| D881301 | 82 Premier Deadbolt (Keyed) Polished Brass |
| D881SL3 | 82 Premier Deadbolt (Keyed) Antique Brass |
| D881713 | 82 Select Deadbolt (Keyed) Satin Chrome |
| D881N13 | 82 Select Deadbolt (Keyed) Satin Nickel |
| D881S13 | 82 Select Deadbolt (Keyed) Black Suede |
| D981201 | 83 Select Deadbolt (Keyed) Antique Nickel |
| D981319 | 83 Select Deadbolt (Keyed) Polished Brass |
| D981601 | 83 Select Deadbolt (Keyed) Polished Chrome |
| D981701 | 83 Select Deadbolt (Keyed) Satin Chrome |
| D981K13 | 83 Select Deadbolt (Keyed) Oil Rubbed Bronze |
| D981N01 | 83 Select Deadbolt (Keyed) Satin Nickel |
| D982201 | 85 Select Deadbolt (Keyed) Antique Nickel |
| D982301 | 85 Select Deadbolt (Keyed) Polished Brass |
| D982K01 | 85 Select Deadbolt (Keyed) Oil Rubbed Bronze |
| D982N01 | 85 Select Deadbolt (Keyed) Satin Nickel |
| NTB6XX | Next Touch Bored Lock All Functions/Finishes |
| NTM6XX | NexTouch Mortise All Functions/Finishes |
| NTTGXX | NexTouch Trim All Functions/Finishes |
| PS101301 | Navis Paddle, Passage - Polished Brass |
| PS101K01 | Navis Paddle, Passage - Oil Rubbed Bronze |
| PS101N01 | Navis Paddle, Passage - Satin Nickel |
| PS101S01 | Navis Paddle, Passage - Black Suede |
| PS201301 | Navis Paddle, Privacy - Polished Brass |
| PS201K01 | Navis Paddle, Privacy - Oil Rubbed Bronze |
| PS201N01 | Navis Paddle, Privacy - Satin Nickel |
| PS201S01 | Navis Paddle, Privacy - Black Suede |
| PS5313 | Navis Paddle, Dummy - Polished Brass |
| PS531K | Navis Paddle, Dummy - Oil Rubbed Bronze |
| PS531N | Navis Paddle, Dummy - Satin Nickel |
| PS531S | Navis Paddle, Dummy - Black Suede |
| PDPA10BP | Passage Pocket Door Lock Square, Oil Rubbed Bronze |

\\10RPST; 419556?9-4851 v3

AA_CONFIDENTIAL

AA-LITTRGT-000136941

| PDFR1BP | Privacy Pocket Door Lock, Square, Oil Rubbed Bronze |
| PDFRB | Privacy Pocket Door Lock, Square, Black |
| YRO3007KSR | ROSE PR W/ALIGNPLTS ASR 10BP |
| YRO3007NSR | ROSE PR W/ALIGNPLTS ASR 15 |
| YRO3007SSR | ROSE PR W/ALIGNPLTS ASR 05P |
| YRO3008KSR | ROSE INT W/ALIGNPLT ASR 10BP |
| YRO3008NSR | ROSE INT W/ALIGNPLT ASR 15 |
| YRO3008SSR | ROSE INT W/ALIGNPLT ASR 05P |
| YRC218 | YRC218 Interconnect |
| YRC228 | YRC228 Interconnect |
| YRC256 | YRC256 Interconnect |
| YRC622 | YRC622 Interconnect |
| YRCB-490-BLE-WSP | CAB LOCK CBA BLU WHI |
| YRDB10-NR-XXX | TYE Low Cost Deadbolt |
| YRSB-MD-BLE-BLK | Smart Storage Box |

\\109857; 4109587949451 v3

AA-LITTRGT-000136942