## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ASSA ABLOY AB, *et al.*,<br><br>*Defendants.* | Civil No. 1:22-cv-02791-ACR |

## COMPETITIVE IMPACT STATEMENT

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment filed in this civil antitrust proceeding.

## I.      NATURE AND PURPOSE OF THE PROCEEDING

On September 8, 2021, Defendants ASSA ABLOY AB ("ASSA ABLOY") and Spectrum Brands Holding, Inc. ("Spectrum") signed an asset and stock purchase agreement under which ASSA ABLOY would acquire Spectrum's Hardware and Home Improvement division for approximately $4.3 billion. The United States filed a civil antitrust Complaint on September 15, 2022, seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition may be to substantially lessen competition for the premium mechanical door hardware and smart locks markets in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

The parties vigorously litigated this case for more than seven months and, with the assistance of a mediator, have now reached a proposed settlement. The United States files this

Competitive Impact Statement simultaneously with a proposed Final Judgment and an Asset Preservation Stipulation and Order ("Stipulation and Order").

Under the proposed Final Judgment, which is explained more fully below, ASSA ABLOY is required to make certain divestitures to Fortune Brands Innovations, Inc. ("Fortune") or to another entity approved by the United States in its sole discretion. The proposed Final Judgment provides for financial penalties if ASSA ABLOY does not complete the divestiture of assets located outside the United States within a specified period of time. It also provides for appointment of a monitoring trustee to monitor Defendants' compliance with the terms of the proposed Final Judgment, the Stipulation and Order, and any inter-party agreements between ASSA ABLOY and the acquirer that relate to the divestiture. The monitoring trustee will also monitor the acquirer's success in competing in the market for residential smart locks with the assets divested.

Under the terms of the Stipulation and Order, ASSA ABLOY must take certain steps to operate, preserve, and maintain the full economic viability, marketability, and competitiveness of the divested assets until the divestitures ordered in the proposed Final Judgment are complete. The Stipulation and Order requires Defendants to abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.     DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.     The Defendants and the Proposed Transaction

Complete descriptions of the Defendants and their proposed acquisition are found in the Complaint, filed September 15, 2022. (Dkt. No. 1). ASSA ABLOY is a globally integrated conglomerate that manufactures and sells a wide array of access solutions products—including residential and commercial door hardware, doors, and electronic access systems. In the United States, ASSA ABLOY competes in the market for premium mechanical door hardware using the Emtek and Schaub brands and in the market for smart locks using the August and Yale brands. ASSA ABLOY had about $3.5 billion in sales in the United States in 2021.

Spectrum's Hardware and Home Improvement division is the largest residential door hardware producer in the United States. Notably, it competes using the widely known Kwikset brand as well as the Baldwin Estate, Baldwin Reserve, and Baldwin Prestige brands. It had about $1.4 billion in sales in the United States in 2021.

On September 8, 2021, ASSA ABLOY agreed to buy Spectrum's Hardware and Home Improvement division for approximately $4.3 billion.

### B.     The Competitive Effects of the Transaction

Complete descriptions of the potential effects on competition in the markets for both premium mechanical door hardware and for smart locks are found in the Complaint. (Dkt. No. 1). In the markets for smart locks and premium mechanical door hardware, ASSA ABLOY and Spectrum are close competitors and share enormous market shares that render the merger presumptively anticompetitive.

As alleged in the Complaint, the proposed transaction would have threatened competition in at least two separate antitrust markets in the United States: (1) premium mechanical door

hardware and (2) smart locks, which are wirelessly connected digital door locks. In the premium mechanical door hardware market, the proposed transaction would be a merger to near-monopoly, where the merged firm would account for around 65% of sales, becoming more than ten times larger than its next-largest competitor. In the market for smart locks, the proposed transaction would cut off competition in a fast-growing door hardware segment, leaving the merged firm with more than a 50% share and only one remaining meaningful competitor—an effective duopoly. In both of these markets, the proposed transaction easily surpasses the thresholds that trigger a presumptive violation of the Clayton Act.

Historically, competition between Defendants to sell residential door hardware to showrooms, home improvement stores, builders, online retailers, home security companies, and other customers has generated lower prices, higher quality, exciting innovations, and superior customer service. The head-to-head competition between the Defendants is significant. They regularly reduce price to win business from each other and respond to each other's competitive initiatives with innovation and better offerings. For example, one of Spectrum's top "strategic imperatives" in 2021 was to invest heavily in better service and pricing for its premium mechanical door hardware brands (Baldwin Estate and Baldwin Reserve) in order to recapture market share from its "chief competitor," ASSA ABLOY's Emtek brand. Similarly, ASSA ABLOY has recently invested in a new lineup of smart locks designed to "take [a half] bay" (*i.e.*, take shelf space) from Spectrum's Kwikset brand and its other large competitor in major home improvement stores. The proposed transaction would eliminate those benefits altogether.

## III.   ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT AND SUMMARY OF SETTLEMENT RATIONALE

As an alternative to the proposed Final Judgment, the United States considered either (1) proceeding to verdict and continuing to request the Court to enter a permanent injunction

blocking the proposed merger between ASSA ABLOY and Spectrum or (2) accepting earlier divestitures that Defendants proposed.

The United States identified several concerns with the divestiture proposals. The divestiture agreement restricted the rights of Fortune to use the Yale brand name to sell products outside of residential smart locks, including important products in the multifamily segment. This would have limited Fortune's incentive to invest in the Yale brand and curtailed its ability to use that brand to compete for customers who sought Yale locks that could be used in all aspects of residential and multifamily buildings. The supply agreement between ASSA ABLOY and Fortune lacked specific enforcement terms and risked Fortune's ability to supply an important customer base. While the Emtek and Schaub assets ASSA ABLOY proposed to divest represented mostly a separate, ongoing business unit, the disparity between the potential competitive significance of those assets and the Yale branded residential smart lock assets would have increased incentives for tacit coordination between the post-merger ASSA ABLOY and Fortune. Finally, the divestiture, as initially proposed, included a lengthy period of transition and entanglement in which ASSA ABLOY and Fortune would have shared—for an indefinite period—an important smart locks manufacturing facility in Vietnam.

Under the guidance of a mediator, a settlement was reached, ultimately culminating in the proposed Final Judgment described below.

This proposed Final Judgment provides greater relief than earlier offers by the Defendants. In particular, the proposed Final Judgment:

- Expands the scope of the Yale-related intellectual property to be divested to Fortune or an alternative acquirer. This includes the unrestricted right to use the Yale brand in the United States and Canada for any smart locks used in single- and multi-family residences,

the right to use the Yale brand for mechanical residential products, as well as an irrevocable license to the Yale Access software platform for associated end uses in the United States and Canada. It also includes rights to the Interconnect and nexTouch brands, which are important to the multifamily segment. These provisions will improve Fortune's or an alternative acquirer's incentives to invest in the divested brands and preserves the acquirer's ability to use those brands to compete against ASSA ABLOY in the future, including in ways and with products not contemplated today.

- Mandates a shortened transition period for entanglements between ASSA ABLOY and the acquirer and subjects ASSA ABLOY to significant daily penalties if it fails to transfer certain smart lock assets located in Vietnam by December 31, 2023.

- Appoints a monitoring trustee to (1) ensure ASSA ABLOY's compliance with the terms of the proposed Final Judgment, the Stipulation and Order, and any inter-party agreements between ASSA ABLOY and the acquirer relating to the divestiture and (2) determine, for a period of up to five years after the entry of the Final Judgment, whether Fortune or an alternative acquirer has replicated the competitive intensity in the residential smart locks business that was lost as a result of ASSA ABLOY's acquisition of Spectrum's Hardware and Home Improvement division and, if not, whether the diminishment in competitive intensity is in material part due to limitations on the acquirer's right to use the Yale brand name or trademarks in the United States and Canada.

- If the monitoring trustee makes such a determination, the monitoring trustee may, after consultation with the United States, provide a written report of that determination to the United States, after which the United States may seek leave of the Court to reopen this

proceeding and seek divestiture of additional brand or trademark rights.

The United States does not contend that the relief obtained by the proposed Final Judgment will fully eliminate the risks to competition alleged in the Complaint. The United States respectfully submits that only a complete injunction preventing the original proposed merger would have eliminated those risks. Alternatively, complete divestitures of all relevant standalone business units necessary to fully compete may have diminished those risks significantly. Based on the totality of circumstances and risks associated with this litigation, however, the United States has agreed to the proposed Final Judgment, which includes additional provisions and protections to address some of the concerns identified above. The United States believes the Court will conclude the proposed Final Judgment is in the public interest under the Tunney Act.

## IV.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment includes the following terms:

### A.    Divested Assets

The proposed Final Judgment requires ASSA ABLOY to divest to Fortune, or to another acquirer approved by the United States in its sole discretion, what the proposed Final Judgment defines as the "Premium Mechanical Divestiture Assets," which include, at the option of the acquirer, all of ASSA ABLOY's rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the "Premium Mechanical Divestiture Business," which consists of ASSA ABLOY's Emtek and Schaub branded businesses. For example, as further detailed in the proposed Final Judgment, the Premium Mechanical Divestiture Assets include a facility in California, as well as machinery, equipment, contracts, licenses, permits, and intellectual property. This intellectual property

includes the right to exclusive and unlimited worldwide use, in all sales channels, of the Emtek brand names and trademarks and Schaub brand name and trademarks. Pursuant to Paragraph V.D of the proposed Final Judgment, unless the United States otherwise consents in writing, the divestiture must include the entire Premium Mechanical Divestiture Assets.

The proposed Final Judgment also requires ASSA ABLOY to divest to Fortune, or to another acquirer approved by the United States in its sole discretion, the "Smart Lock Divestiture Assets," which includes, at the option of the acquirer, all of ASSA ABLOY's rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the "Smart Lock Divestiture Business." As defined in the proposed Final Judgment, the Smart Lock Divestiture Business consists of (1) the August branded business and (2) the Yale branded multifamily and residential smart lock businesses in the United States and Canada (including Yale Real Living), but does not include (i) the Yale branded commercial business anywhere in the world or (ii) all other Yale branded businesses anywhere in the world. As further detailed in the proposed Final Judgment, the Smart Lock Divestiture Assets include machinery, equipment, contracts, licenses, permits, and intellectual property. This intellectual property includes the right to the Yale brand name and trademarks for uses in the United States and Canada, as well as a license to the Yale Access software platform for use in the United States in Canada. The Smart Lock Divestiture Assets also include a facility in Vietnam. Pursuant to Paragraph VI.D of the proposed Final Judgment, unless the United States consents in writing, the divestiture must include all Smart Lock Divestiture Assets.

Paragraph VI.P of the proposed Final Judgment further provides that, if at any time after the divestiture of the Smart Lock Divestiture assets, the acquirer notifies ASSA ABLOY in writing of any patents that (1) are owned by ASSA ABLOY as of the divestiture date, (2) are not

licensed or otherwise transferred to the acquirer pursuant to the proposed Final Judgment, and (3) were contemplated by ASSA ABLOY to be used in the Smart Lock Divestiture Business prior to the divestiture date, as set forth in the Product Development Roadmap attached to the Stock Purchase Agreement, then those patents will automatically be deemed as licensed to the acquirer under the terms of the proposed Final Judgment.

Paragraph VI.Q of the proposed Final Judgment provides that, for five years after the divestiture of the Smart Lock Divestiture Assets, the acquirer has the right to annually request and receive a code base assessment of the Yale Access control system to inventory the proprietary libraries comprising the Yale Access control system and confirm whether any of the baseline libraries are included within ASSA ABLOY's United States or Canadian products.

Paragraph VI.R of the proposed Final Judgment provides the acquirer the option to purchase all of ASSA ABLOY's Yale branded inventory, as of the divestiture date, relating to the residential mechanical space. This purchase is subject to the terms of any supply agreement(s) entered into pursuant to the proposed Final Judgment, but does not restrict the acquirer on where or how it sells such inventory to residential or multifamily customers.

Paragraph VI.N of the proposed Final Judgment provides ASSA ABLOY the right to use the Yale brand name in the United States and Canada.   It provides for a twelve-month wind-down period during which ASSA ABLOY can continue to use the Yale brand name for commercial products, including in some limited circumstances associated with the Yale Accentra platform and sold to multifamily residences. In addition, ASSA ABLOY is permitted to continue

to use the Yale brand name for commercial products to fulfill specifications or quotes issued prior to the divestiture.

B. <u>Relevant Personnel</u>

The proposed Final Judgment contains provisions intended to facilitate the acquirer's efforts to hire certain employees. Specifically, Paragraphs V.G and VI.G of the proposed Final Judgment require ASSA ABLOY, at the option of the acquirer, to provide the acquirer and the United States with organization charts and information relating to these employees and to make them available for interviews. It also provides that ASSA ABLOY must not interfere with any negotiations by the acquirer to hire these employees. In addition, for employees who elect employment with the acquirer, ASSA ABLOY must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, provide any pay pro rata, provide all compensation and benefits that those employees have fully or partially accrued, and provide all other benefits that the employees would generally be provided had those employees continued employment with ASSA ABLOY, including but not limited to any retention bonuses or payments.

C. <u>Transitional Services Agreement</u>

The proposed Final Judgment requires ASSA ABLOY to provide transition services to maintain the viability and competitiveness of the Premium Mechanical Divestiture Business and the Smart Lock Divestiture Business in the period following the divestitures. Specifically, Paragraphs V.L and VI.L of the proposed Final Judgment require ASSA ABLOY, at the acquirer's option, to enter into transition services agreements for all services necessary to operate the Premium Mechanical Divestiture Business and Smart Lock Divestiture Business—e.g., back office, human resources, accounting, employee health and safety, and information technology

services and support—for a period of up to 12 months. Paragraph VI.L of the proposed Final Judgment also requires that the applicable transition services agreement cover all services necessary to operate the manufacturing facility located at Lot A10, Ba Thien II IP, Thien Ke, Binh Xuyen, Vinh Phuc, Vietnam for a period of up to 12 months. The acquirer may terminate the transition services agreements, or any portion of them, without cost or penalty, other than payment of any amounts due thereunder, at any time upon 15 calendar days' written notice. The United States, in its sole discretion, may approve one or more extensions of any transition services agreement for a total of up to an additional 12 months and any amendments to or modifications of any provisions of a transition services agreement are subject to approval by the United States, in its sole discretion. Employees of ASSA ABLOY tasked with supporting these transition services agreements must not share any of Fortune's or another acquirer's competitively sensitive information with any other employee of ASSA ABLOY.

D. Supply Agreements

Paragraphs V.J and VI.J of the proposed Final Judgment require ASSA ABLOY, at the acquirer's option, to enter into a supply contract or contracts for all products necessary to operate the Premium Mechanical Divestiture Business and the Smart Lock Divestiture Business, including nexTouch and Interconnect branded products produced by ASSA ABLOY prior to the divestiture date, for a period of up to twelve months. The acquirer may terminate a supply contract, or any portion of it, without cost or penalty, other than payment of any amounts due thereunder, at any time upon 15 calendar days' written notice. The United States, in its sole discretion, may approve up to two extensions of any supply contract for a period of 12 months each, and any amendments to or modifications of any provisions of a supply contract are subject to approval by the United States, in its sole discretion. This will help to ensure that Fortune will

11

not face disruption to its supply during an important transitional period. Employees of ASSA ABLOY tasked with supporting these supply contracts must not share any of Fortune's or another acquirer's competitively sensitive information with any other employee of ASSA ABLOY.

E.  Monitoring Trustee

The proposed Final Judgment provides for the appointment of a monitoring trustee to examine Defendants' compliance with the terms of the proposed Final Judgment, the Stipulation and Order, and any agreements between ASSA ABLOY and the acquirer relating to the divestiture. The monitoring trustee will also monitor Fortune's competitive intensity in the residential smart locks market relative to ASSA ABLOY's pre-divestiture competitive intensity and, for a period of up to five years after entry of the Final Judgment, may report to the United States if that competitive intensity has diminished in material part due to limitations on the acquirer's right to use the Yale brand name or trademarks in the United States and Canada. Upon receipt of such a report, the United States, in its sole discretion, will have the ability to seek leave of the Court to reopen this proceeding to seek additional relief.

The monitoring trustee will not have any responsibility or obligation for the operation of the Premium Mechanical Divestiture Assets or Smart Lock Divesture Assets. The monitoring trustee will serve at Defendants' expense, on such terms and conditions as the United States approves, in its sole discretion, and Defendants must assist the monitoring trustee in fulfilling his or her obligations. The monitoring trustee will provide periodic reports to the United States and will serve until the later of (1) the expiration of all transition services agreements or supply agreements entered pursuant to the proposed Final Judgment or (2) conclusion of any reopening of this proceeding by the United States, as provided for by the proposed Final Judgment, or if no

such proceeding is reopened within five years of the entry of the Final Judgment, five years from the entry of the Final Judgment. The United States, in its sole discretion, may determine a different period of time is appropriate for the monitor's term.

F. Penalty for Noncompliance

The proposed Final Judgment requires that ASSA ABLOY use best efforts to complete the divestiture of Smart Lock Divestiture Assets as quickly as possible, including the transfer of overseas assets in Vietnam, to the acquirer. To incentivize ASSA ABLOY to effectuate this transfer as expeditiously as possible, after December 31, 2023, the proposed Final Judgment requires ASSA ABLOY to pay to the United States $50,120 per day until the overseas assets have been transferred. Such payments will not be due, however, if ASSA ABLOY can demonstrate to the United States, after consultation with the monitoring trustee, that (1) the transfer was delayed due to a force majeure event or (2) operational control of the overseas assets has otherwise been given to the acquirer. In the event ASSA ABLOY relies on such operational control provision, ASSA ABLOY shall confer with the United States to reach agreement on this, and if the parties are unable to reach an agreement, ASSA ABLOY may ask the Court to resolve this issue.

G. Dispute Resolution

Paragraph XI.A of the proposed Final Judgment provides that ASSA ABLOY and the acquirer will each have the right to initiate an expedited dispute resolution process in the event of a dispute over the extent of either party's rights under the proposed Final Judgment. This provision does not apply to disputes between ASSA ABLOY and the United States.

H. Other Provisions

13

Paragraphs V.E. and VI.E of the proposed Final Judgment outline procedures to follow if ASSA ABLOY attempts to divest the Premium Mechanical Divestiture Assets or the Smart Lock Divestiture Assets to an acquirer other than Fortune, including what information should be made available to prospective acquirers. ASSA ABLOY is required to inform any such prospective acquirers that the assets are being divested in accordance with the proposed Final Judgment, and to provide to any prospective acquirer a copy of the proposed Final Judgment.

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible. Paragraph XVI.A provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense that the Final Judgment addresses.

Pursuant to Paragraph XVI.B of the proposed Final Judgment, Defendants agree that they will abide by the proposed Final Judgment and that they may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail.

Paragraph XVI.C of the proposed Final Judgment provides that if the Court finds in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may

apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XVI.C of the proposed Final Judgment provides that, in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, the Defendant must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XVI.D of the proposed Final Judgment states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XVII of the proposed Final Judgment provides that the Final Judgment will expire ten years from the date of its entry, except that after five years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and continuation of the Final Judgment is no longer necessary or in the public interest.

## V.      REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## VI.     PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the *Federal Register* unless the

Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Chief, Defense, Industrials, and Aerospace Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 8300
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement

is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks

omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL

1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous

practical consequences for the government's ability to negotiate future settlements," contrary to

congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a

disincentive to the use of the consent decree." *Id.*

     The United States' predictions about the efficacy of the remedy are to be afforded

deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give

"due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron

Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to

settlement agreements under the Tunney Act, a court must be mindful that [t]he government

need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need

only provide a factual basis for concluding that the settlements are reasonably adequate remedies

for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F.

Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's

proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d

1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as

to the effect of proposed remedies, its perception of the market structure, and its view of the

nature of the case."). The ultimate question is whether "the remedies [obtained by the Final

Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the

public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

     Moreover, the Court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint, and does not

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to

public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.   DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States considered documents relating to ASSA ABLOY's proposed divestiture to Fortune Brands. Because these documents were determinative in formulating the proposed Final Judgment, copies are attached to the Stipulation and Order to comply with 15 U.S.C. § 16(b).

Dated: May 5, 2023

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

____/s/ *Matthew Huppert*_____

Matthew R. Huppert (DC Bar #1010997)
Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
Telephone: (202) 476-0383
Email: Matthew.Huppert@usdoj.gov

David E. Dahlquist
Senior Trial Counsel
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
209 South LaSalle Street, Suite 600
Chicago, Illinois 60604
Email: David.Dahlquist@usdoj.gov