**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Civil No. 1:22-cv-02791-ACR |
| ASSA ABLOY AB, *et al.*, | |
| *Defendants.* | |

## **FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on September 15, 2022;

AND WHEREAS, the United States and Defendants, ASSA ABLOY AB ("ASSA ABLOY") and Spectrum Brands Holdings, Inc. ("Spectrum") have consented to entry of this Final Judgment without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendants agree to make certain divestitures;

AND WHEREAS, Defendants represent that the divestitures and other relief required by this Final Judgment can and will be made and that Defendants will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I.   JURISDICTION

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act (15 U.S.C. § 18).

## II.   DEFINITIONS

As used in this Final Judgment:

A.   "ASSA ABLOY" means Defendant ASSA ABLOY AB, a publicly traded Swedish stock company headquartered in Stockholm, Sweden, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.   "Spectrum" means Defendant Spectrum Brands Holdings, Inc., a Delaware corporation with its headquarters in Middleton, Wisconsin, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.   "Fortune" means Fortune Brands Innovations, Inc., a Delaware corporation with its headquarters in Deerfield, Illinois, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D.   "Acquirer" or "Acquirers" means Fortune or another entity, approved by the United States in its sole discretion, to which ASSA ABLOY divests the Divestiture Assets.

E.    "Divestiture Assets" means (1) the Premium Mechanical Divestiture Assets; and (2) the Smart Lock Divestiture Assets.

F.     "Divestiture Date" means the date on which the closing of the transaction between ASSA ABLOY and Acquirer occurs.

G.     "Door" means a swinging door or pocket door used for ingress to a room, closet, dwelling, or passageway, but does not include cabinet doors, rolling doors, garage doors, and, except to the extent located at Residences, delivery locker doors.

H.     "Including" means including, but not limited to.

I.     "Multifamily" means, with respect to any buildings containing more than one Residence, whether or not such buildings have mixed uses, Residences in such buildings, along with common areas associated with Residences in such buildings, including entrances and exits (but not educational, medical, retail, commercial, industrial, or professional areas not associated with Residences).

J.     "Premium Mechanical Divestiture Business" means ASSA ABLOY's (1) Emtek branded business, and (2) Schaub branded business.

K.     "Premium Mechanical Divestiture Assets" means, at the option of Acquirer, all of ASSA ABLOY's rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the Premium Mechanical Divestiture Business, including:

1.     the Emtek brand name and the Schaub brand name, including the right to the exclusive and unlimited worldwide use of the Emtek brand name and the Schaub brand name in all sales channels, as well as all registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications, relating to the Emtek and Schaub trademarks;

2.     leasehold interest to the real property and facilities located at 600 Baldwin Park Boulevard, City of Industry, California;

3

3.      all other real property, including fee simple interests, real property leasehold interests and renewal rights thereto, improvements to real property, and options to purchase any adjoining or other property, together with all buildings, facilities, and other structures;

4.      all tangible personal property, including fixed assets, machinery and manufacturing equipment, tools, vehicles, inventory, materials, office equipment and furniture, computer hardware, and supplies;

5.      all contracts, contractual rights, and customer relationships, and all other agreements, commitments, and understandings, including supply agreements, teaming agreements, and leases, and all outstanding offers or solicitations to enter into a similar arrangement;

6.      all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations, including those issued or granted by any governmental organization, and all pending applications or renewals;

7.      all records and data, including (i) customer lists, accounts, sales, and credits records, (ii) production, repair, maintenance, and performance records, (iii) manuals and technical information ASSA ABLOY provides to its own employees, customers, suppliers, agents, or licensees, (iv) records and research data concerning historic and current research and development activities, including designs of experiments and the results of successful and unsuccessful designs and experiments, and (v) drawings, blueprints, and designs;

8.      in addition to the intellectual property assets listed in Paragraph II.K.1., all other intellectual property owned, licensed, or sublicensed, either as licensor or licensee, including (i) patents, patent applications, and inventions and discoveries that may be patentable,

(ii) registered and unregistered copyrights and copyright applications, and (iii) registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications; and

9.      all other intangible property, including (i) commercial names and d/b/a names, (ii) technical information, (iii) computer software and related documentation, know-how, trade secrets, design protocols, specifications for materials, specifications for parts, specifications for devices, safety procedures (e.g., for the handling of materials and substances), quality assurance and control procedures, (iv) design tools and simulation capabilities, and (v) rights in internet web sites and internet domain names.

L.      "Premium Mechanical Divestiture Relevant Personnel" means, at the option of Acquirer, all full-time, part-time, or contract employees of ASSA ABLOY, wherever located, whose job responsibilities relate in any way to the Premium Mechanical Divestiture Business, at any time between September 8, 2021, and the Divestiture Date. Subject to Acquirer's election, the United States, in its sole discretion, will resolve any disagreement relating to which employees are Premium Mechanical Divestiture Relevant Personnel.

M.      "Regulatory Approvals" means (1) any approvals or clearances pursuant to filings under antitrust or competition laws that are required for the Transaction to proceed; and (2) any approvals or clearances pursuant to filings under antitrust, competition, or other U.S. or international laws that are required for Acquirer's acquisition of the Divestiture Assets to proceed.

N.      "Residences" means single family homes and residential units within Multifamily dwellings, whether owned or whether leased or offered for long-term or short-term use by a unit or home owner directly or through a third party, including apartments, co-ops, and

condominiums, and properties provided by AirBnB, VRBO and similar businesses, but not including hotel rooms, rooms in medical and long-term care facilities, dormitory rooms, and prison cells.

O.      "Smart Lock" means a wireless connected digital lock affixed to a Door, but does not include any of the product categories listed in Appendix A.

P.      "Smart Lock Divestiture Business" means: (1) the August branded business, and (2) the Yale branded Multifamily and residential Smart Lock businesses in the U.S. and Canada (including Yale Real Living), but does not include (i) the Yale branded commercial business anywhere in the world, and (ii) all other Yale branded businesses anywhere in the world.

Q.       "Smart Lock Divestiture Assets" means the (1) Yale Brand and Trademarks; and (2) at the option of Acquirer, all of ASSA ABLOY's rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the Smart Lock Divestiture Business, including:

i.      The Premises Sublease Agreement, by and between VINA – CPK COMPANY LIMITED and ASSA ABLOY Smart Product Vietnam Co., Ltd., dated July 23, 2019;

ii.      all other real property, including fee simple interests, real property leasehold interests and renewal rights thereto, improvements to real property, and options to purchase any adjoining or other property, together with all buildings, facilities, and other structures;

iii.      all tangible personal property, including fixed assets, machinery and manufacturing equipment, tools, vehicles, inventory (including Yale branded residential

mechanical inventory), materials, office equipment and furniture, computer hardware, and supplies;

       iv.     all contracts, contractual rights, and customer relationships, and all other agreements, commitments, and understandings, including supply agreements, teaming agreements, and leases, and all outstanding offers or solicitations to enter into a similar arrangement;

       v.     all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations, including those issued or granted by any governmental organization, and all pending applications or renewals;

       vi.     all records and data, including (i) customer lists, accounts, sales, and credits records, (ii) production, repair, maintenance, and performance records, (iii) manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees, (iv) records and research data concerning historic and current research and development activities, including designs of experiments and the results of successful and unsuccessful designs and experiments, and (v) drawings, blueprints, and designs;

       vii.     all intellectual property owned, licensed, or sublicensed, either as licensor or licensee, including (i) patents, patent applications, and inventions and discoveries that may be patentable, (ii) registered and unregistered copyrights and copyright applications, and (iii) registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications;

       viii.     all other intangible property, including (i) commercial names and d/b/a names, (ii) technical information, (iii) computer software and related documentation, know-how, trade secrets, design protocols, specifications for materials, specifications for parts, specifications

for devices, safety procedures (e.g., for the handling of materials and substances), quality assurance and control procedures, (iv) design tools and simulation capabilities,  (v) rights in internet web sites and internet domain names;

ix.     an exclusive, perpetual, irrevocable, royalty-free, and sublicensable license to install, copy, modify, create derivative works of, and use solely in the United States and Canada, any access control systems designed for Residences including mobile applications and backend ecosystems, including the Yale Access software platform, *provided, however,* that nothing in this paragraph prohibits ASSA ABLOY from retaining, for use outside the United States and Canada, an independent instance of any internally developed access control system designed for Residences; and

R.     "Smart Lock Divestiture Relevant Personnel" means, at the option of Acquirer, all full-time, part-time, or contract employees of ASSA ABLOY, wherever located, whose job responsibilities relate in any way to the Smart Lock Divestiture Business, at any time between September 8, 2021 and the Divestiture Date. The United States, in its sole discretion, will resolve any disagreement relating to which employees are Smart Lock Divestiture Relevant Personnel.

S.     "Transfer of Smart Lock Foreign Divestiture Assets" means transfer of the Smart Lock Divestiture Assets located at Lot A10, Ba Thien II IP, Thien Ke, Binh Xuyen, Vinh Phuc Vietnam.

T.     "Transaction" means the proposed acquisition of Spectrum's Hardware and Home Improvement Division by ASSA ABLOY, pursuant to a purchase agreement dated September 8, 2021, as amended.

U.     "Yale Brand and Trademarks" means the ownership and exclusive and unrestricted use of the Yale brand name and the business goodwill associated therewith in the

U.S. and Canada for all current and future residential uses and all current and future Multifamily Smart Lock uses (including all interconnect-style Smart Locks for Multifamily uses and nexTouch Smart Locks for Multifamily uses and any future products with similar functionality and applications as interconnect and nexTouch Smart Locks in Residential and Multifamily uses).

## III.    APPLICABILITY

A.      This Final Judgment applies to ASSA ABLOY and Spectrum, as defined above, and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

B.      If, prior to complying with Section V and Section VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of business units that include the Divestiture Assets, Defendants must require any purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from Acquirer.

## IV.    ADDITIONAL RELIEF

If, after three years following the Divestiture Date and until the date that is five years from entry of this Final Judgment, the monitoring trustee determines, after investigation and consultation with the United States, ASSA ABLOY and Acquirer, that:

a.   Acquirer's competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date; and

b.   Such diminishment in competitive intensity is in material part due to limitations on Acquirer's right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada as of the Divestiture Date, then

the monitoring trustee may, after consultation with the United States, provide a written report of the monitoring trustee's conclusions to the United States.  Upon receiving such report, the United States, in its sole discretion, will have the ability to seek leave of the Court to re-open this proceeding specifically to seek only the grant of additional Yale brand name or trademark rights (including the ability to use those rights to compete for any category or customer segment) in the U.S. and Canada to Acquirer.

## V.     DIVESTITURE OF THE PREMIUM MECHANICAL DIVESTITURE ASSETS

A.     ASSA ABLOY is ordered and directed, within 3 calendar days after the closing of the Transaction, to divest the Premium Mechanical Divestiture Assets in a manner consistent with this Final Judgment to Acquirer, except that, for individual assets subject to Regulatory Approvals, ASSA ABLOY is ordered and directed to divest such assets by the later of 3 calendar days after the closing of the Transaction or 15 days after the relevant Regulatory Approvals have been received. The United States, in its sole discretion, may agree to one or more extensions of these time periods not to exceed 30 calendar days in total for each time period, and ASSA ABLOY must notify the Court of any extensions agreed to by the United States.

B.     At the option of the Acquirer, for all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer relationships) included in the Premium Mechanical Divestiture Assets, ASSA ABLOY must, assign or otherwise transfer all contracts, agreements, and customer relationships, to the Acquirer within the deadlines set forth in Paragraph V.A. ASSA ABLOY must not interfere with any negotiations between Acquirer and a contracting party.

C.     Subject to Paragraph V.A, ASSA ABLOY must use best efforts to divest the Premium Mechanical Divestiture Assets as expeditiously as possible. ASSA ABLOY must take

no action that would jeopardize the completion of the divestiture ordered by the Court, including

any action to impede the permitting, operation, or divestiture of the Premium Mechanical

Divestiture Assets.

D.     Unless the United States otherwise consents in writing, divestiture pursuant to this

Final Judgment must include the entire Premium Mechanical Divestiture Assets.

E.     In the event ASSA ABLOY is attempting to divest the Divestiture Assets to an

Acquirer other than Fortune, ASSA ABLOY promptly must make known, by usual and

customary means, the availability of the Divestiture Assets. ASSA ABLOY must inform any

person making an inquiry relating to a possible purchase of the Divestiture Assets that the

Divestiture Assets are being divested in accordance with this Final Judgment and must provide

that person with a copy of this Final Judgment. ASSA ABLOY must offer to furnish to all

prospective Acquirers, subject to customary confidentiality assurances, all information and

documents relating to the Divestiture Assets that are customarily provided in a due diligence

process; *provided, however,* that ASSA ABLOY need not provide information or documents

subject to the attorney-client privilege or work-product doctrine. ASSA ABLOY must make all

information and documents available to the United States at the same time that the information

and documents are made available to any other person.

F.     At the option of the Acquirer, ASSA ABLOY must provide prospective Acquirers

with (1) access to make inspections of the Premium Mechanical Divestiture Assets; (2) access to

all material environmental, zoning, and other permitting documents and information relating to

the Premium Mechanical Divestiture Assets; and (3) access to all financial, operational, or other

documents and information relating to the Premium Mechanical Divestiture Assets, in each case,

that would customarily be provided as part of a due diligence process. ASSA ABLOY also must

disclose all material encumbrances on any part of the Premium Mechanical Divestiture Assets, including on intangible property.

       G.      At the option of the Acquirer, ASSA ABLOY must cooperate with and assist Acquirer in identifying and hiring all Premium Mechanical Divestiture Relevant Personnel, including:

          1.      Within 10 business days following the receipt of a request by Acquirer, ASSA ABLOY must identify all Premium Mechanical Divestiture Relevant Personnel to Acquirer and the United States, including by providing organization charts covering all Premium Mechanical Divestiture Relevant Personnel.

          2.      Within 10 business days following receipt of a request by Acquirer or the United States, ASSA ABLOY must provide to Acquirer and the United States additional information relating to Premium Mechanical Divestiture Relevant Personnel, including name, job title, reporting relationships, past experience, responsibilities, training and educational histories, relevant certifications, and job performance evaluations. ASSA ABLOY must also provide Acquirer and the United States information relating to current and accrued compensation and benefits of Premium Mechanical Divestiture Relevant Personnel, including most recent bonuses paid, aggregate annual compensation, any current target or guaranteed bonuses, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or promises made to the Premium Mechanical Divestiture Relevant Personnel. If ASSA ABLOY is barred by any applicable law from providing any of this information, ASSA ABLOY must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation to Acquirer and

the United States of ASSA ABLOY's inability to provide the remaining information, including specifically identifying the provisions of the applicable laws.

3.      At the request of Acquirer, ASSA ABLOY must promptly make Premium Mechanical Divestiture Relevant Personnel available for private interviews with Acquirer during normal business hours at a mutually agreeable location.

4.      ASSA ABLOY must not interfere with any effort by Acquirer to employ any Premium Mechanical Divestiture Relevant Personnel. Interference includes offering to increase the compensation or improve the benefits of Premium Mechanical Divestiture Relevant Personnel unless (i) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to September 8, 2021, or (ii) the offer is approved by the United States in its sole discretion. ASSA ABLOY's obligations under this Paragraph V.G.4. will expire 180 calendar days after the Divestiture Date.

5.      For Premium Mechanical Divestiture Relevant Personnel who elect employment with Acquirer within 180 calendar days of the Divestiture Date, ASSA ABLOY must waive all non-compete and non-disclosure agreements; vest and pay to the Premium Mechanical Divestiture Relevant Personnel (or to Acquirer for payment to the employee) on a prorated basis any bonuses, incentives, other salary, benefits or other compensation fully or partially accrued at the time of the transfer of the employee to Acquirer; vest any unvested pension and other equity rights; and provide all other benefits that those Premium Mechanical Divestiture Relevant Personnel otherwise would have been provided had the Premium Mechanical Divestiture Relevant Personnel continued employment with ASSA ABLOY, including any retention bonuses or payments. ASSA ABLOY may maintain reasonable restrictions on disclosure by Premium Mechanical Divestiture Relevant Personnel of ASSA

ABLOY's proprietary non-public information that is unrelated to the Premium Mechanical Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 180 calendar days from the Divestiture Date, ASSA ABLOY may not solicit to rehire any Premium Mechanical Divestiture Relevant Personnel who were hired by Acquirer within 90 calendar days of the Divestiture Date unless (a) an individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that ASSA ABLOY may solicit to rehire that individual. Nothing in this Paragraph V.G.6. prohibits ASSA ABLOY from advertising employment openings using general solicitations or advertisements and rehiring Premium Mechanical Divestiture Relevant Personnel who apply for an employment opening through a general solicitation or advertisement.

H.      At the option of the Acquirer, ASSA ABLOY must warrant to Acquirer that (1) the Premium Mechanical Divestiture Assets will be operational in all material respects and without material defect on the date of their transfer to Acquirer; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Premium Mechanical Divestiture Assets; and (3) ASSA ABLOY has disclosed all material encumbrances on any part of the Premium Mechanical Divestiture Assets, including on intangible property. Following the sale of the Premium Mechanical Divestiture Assets, ASSA ABLOY must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Premium Mechanical Divestiture Assets.

I.      At the option of the Acquirer, ASSA ABLOY must use best efforts to assist Acquirer to obtain all necessary licenses, registrations, and permits to operate the Premium Mechanical Divestiture Business. Until Acquirer obtains the necessary licenses, registrations,

14

and permits, ASSA ABLOY must provide Acquirer with the benefit of ASSA ABLOY's

licenses, registrations, and permits to the full extent permissible by law.

J.      At the option of Acquirer, and subject to approval by the United States in its sole

discretion, on or before the Divestiture Date, ASSA ABLOY must enter into a supply contract or

contracts for all products necessary to operate the Premium Mechanical Divestiture Business for

a period of up to 12 months, on terms and conditions reasonably related to market conditions for

the provision of such products, as agreed to by Acquirer.

K.      Any amendment to or modification of any provision of any such supply contract

is subject to approval by the United States, in its sole discretion. The United States, in its sole

discretion, may approve up to two extensions of any supply contract for a period of 12 months

each. Any supply contract extension will be on terms and conditions reasonably related to market

conditions for the provision of such products, as agreed to by Acquirer. If Acquirer seeks an

extension of the term of any supply contract, ASSA ABLOY must notify the United States in

writing at least 30 calendar days prior to the date the supply contract expires. Acquirer may

terminate a supply contract, or any portion of a supply contract, without cost or penalty, other

than payment of any amounts due thereunder, upon 15 calendar days' written notice. The

employees of ASSA ABLOY tasked with servicing any supply contracts must not share any

competitively sensitive information of Acquirer with any other employee of ASSA ABLOY.

L.      At the option of Acquirer, and subject to approval by the United States in its sole

discretion, on or before the Divestiture Date, ASSA ABLOY must enter into a contract to

provide transition services to cover all services necessary to operate the Premium Mechanical

Divestiture Business, including services for back office, human resources, accounting, employee

health and safety, and information technology services and support for a period of up to 12

months on terms and conditions reasonably related to market conditions for the provision of the transition services, as agreed to by Acquirer.

M.      Any amendment to or modification of any provision of a contract to provide transition services is subject to approval by the United States, in its sole discretion. The United States, in its sole discretion, may approve one or more extensions of any contract for transition services, for a total of up to an additional 12 months. Any contract extension will be on terms and conditions reasonably related to market conditions for the provision of such services, as agreed to by Acquirer. If Acquirer seeks an extension of the term of any contract for transition services, ASSA ABLOY must notify the United States in writing at least 30 calendar days prior to the date the contract expires. Acquirer may terminate a contract for transition services, or any portion of a contract for transition services, without cost or penalty, other than payment of any amounts due thereunder, at any time upon 15 calendar days' written notice. The employees of ASSA ABLOY tasked with providing transition services must not share any competitively sensitive information of Acquirer with any other employee of ASSA ABLOY.

N.      If any term of an agreement between ASSA ABLOY and Acquirer, including an agreement to effectuate the divestiture required by this Final Judgment, varies from a term of this Final Judgment including as implemented by the Asset Preservation and Stipulation and Order entered contemporaneously herewith, to the extent that ASSA ABLOY cannot fully comply with both, this Final Judgment as so implemented determines ASSA ABLOY's obligations.

## VI.    DIVESTITURE OF SMART LOCK DIVESTITURE ASSETS

A.      ASSA ABLOY is ordered and directed, within 3 calendar days after the closing of the Transaction, to divest the Smart Lock Divestiture Assets in a manner consistent with this Final Judgment to Acquirer, except that, for individual assets subject to Regulatory Approvals,

ASSA ABLOY is ordered and directed to divest such assets by the later of 3 calendar days after the closing of the Transaction or 15 days after the relevant Regulatory Approvals have been received. The United States, in its sole discretion, may agree to one or more extensions of these time periods not to exceed 30 calendar days in total for each time period, and ASSA ABLOY must notify the Court of any extensions agreed to by the United States.

B.      At the option of Acquirer, for all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer relationships) included in the Smart Lock Divestiture Assets, ASSA ABLOY must assign or otherwise transfer all contracts, agreements, and customer relationships, to the Acquirer within the deadlines set forth in Paragraph VI.A. ASSA ABLOY must not interfere with any negotiations between Acquirer and a contracting party.

C.      Subject to Paragraph VI.A, ASSA ABLOY must use best efforts to divest the Smart Lock Divestiture Assets as expeditiously as possible. ASSA ABLOY must take no action that would jeopardize the completion of the divestiture ordered by the Court, including any action to impede the permitting, operation, or divestiture of the Smart Lock Divestiture Assets. To incentivize ASSA ABLOY to achieve Transfer of Smart Lock Foreign Divestiture Assets as expeditiously as possible, after December 31, 2023, ASSA ABLOY is ordered to pay to the United States $50,120 per day until ASSA ABLOY achieves Transfer of Smart Lock Foreign Divestiture Assets, *provided, however,* that such payments will not be due if ASSA ABLOY can demonstrate to the United States, after consultation with the monitoring trustee, that (1) Transfer of Smart Lock Foreign Divestiture Assets was delayed due to a force majeure event, or (2) operational control has otherwise been given to the Acquirer such that the purposes of the divestiture have been carried out. If ASSA ABLOY relies on point (2) of this provision, it shall

confer with the United States in an effort to reach agreement on whether the steps taken carry out the purposes of the divestiture, and if the parties are unable to reach agreement, ASSA ABLOY may ask the Court to resolve this issue. The United States' agreement to an extension pursuant to Paragraph VI.A. will not relieve ASSA ABLOY of the requirement to make these payments. If ASSA ABLOY demonstrates to the United States that unanticipated material difficulties not due to the actions or inaction of ASSA ABLOY have resulted in unavoidable delays to achieve Transfer of Smart Lock Foreign Divestiture Assets, the United States may, in its sole discretion, agree to forgo some or all of the payments.

      D.     Unless the United States otherwise consents in writing, divestiture pursuant to this Final Judgment must include all Smart Lock Divestiture Assets.

      E.     In the event ASSA ABLOY is attempting to divest the Divestiture Assets to an Acquirer other than Fortune, ASSA ABLOY promptly must make known, by usual and customary means, the availability of the Divestiture Assets. ASSA ABLOY must inform any person making an inquiry relating to a possible purchase of the Divestiture Assets that the Divestiture Assets are being divested in accordance with this Final Judgment and must provide that person with a copy of this Final Judgment. ASSA ABLOY must offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets that are customarily provided in a due diligence process; *provided, however,* that ASSA ABLOY need not provide information or documents subject to the attorney-client privilege or work-product doctrine. ASSA ABLOY must make all information and documents available to the United States at the same time that the information and documents are made available to any other person.

F.      At the option of Acquirer, ASSA ABLOY must provide prospective Acquirers with (1) access to make inspections of the Smart Lock Divestiture Assets; (2) access to all material environmental, zoning, and other permitting documents and information relating to the Smart Lock Divestiture Assets; and (3) access to all financial, operational, or other documents and information relating to the Smart Lock Divestiture Assets, in each case, that would customarily be provided as part of a due diligence process. ASSA ABLOY also must disclose all material encumbrances on any part of the Smart Lock Divestiture Assets, including on intangible property.

G.      At the option of Acquirer, ASSA ABLOY must cooperate with and assist Acquirer in identifying and, hiring all Smart Lock Divestiture Relevant Personnel, including:

1.      Within 10 business days following the receipt of a request by Acquirer, ASSA ABLOY must identify all Smart Lock Divestiture Relevant Personnel to Acquirer and the United States, including by providing organization charts covering all Smart Lock Divestiture Relevant Personnel.

2.      Within 10 business days following receipt of a request by Acquirer or the United States, ASSA ABLOY must provide to Acquirer and the United States additional information relating to Smart Lock Divestiture Relevant Personnel, including name, job title, reporting relationships, past experience, responsibilities, training and educational histories, relevant certifications, and job performance evaluations. ASSA ABLOY must also provide Acquirer and the United States information relating to current and accrued compensation and benefits of Smart Lock Divestiture Relevant Personnel, including most recent bonuses paid, aggregate annual compensation, any current target or guaranteed bonuses, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or

19

promises made to the Smart Lock Divestiture Relevant Personnel. If ASSA ABLOY is barred by any applicable law from providing any of this information, ASSA ABLOY must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation to Acquirer and the United States of ASSA ABLOY's inability to provide the remaining information, including specifically identifying the provisions of the applicable laws.

        3.      At the request of Acquirer, ASSA ABLOY must promptly make Smart Lock Divestiture Relevant Personnel available for private interviews with Acquirer during normal business hours at a mutually agreeable location.

        4.      ASSA ABLOY must not interfere with any effort by Acquirer to employ any Smart Lock Divestiture Relevant Personnel. Interference includes offering to increase the compensation or improve the benefits of Smart Lock Divestiture Relevant Personnel unless (a) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to September 8, 2021, or (b) the offer is approved by the United States in its sole discretion. ASSA ABLOY's obligations under this Paragraph VI.G.4. will expire 180 calendar days after the Divestiture Date.

        5.      For Smart Lock Divestiture Relevant Personnel who elect employment with Acquirer within 180 calendar days of the Divestiture Date, ASSA ABLOY must waive all non-compete and non-disclosure agreements; vest and pay to the Smart Lock Divestiture Relevant Personnel (or to Acquirer for payment to the employee) on a prorated basis any bonuses, incentives, other salary, benefits or other compensation fully or partially accrued at the time of the transfer of the employee to Acquirer; vested any unvested pension and other equity rights; and provide all other benefits that those Smart Lock Divestiture Relevant Personnel

otherwise would have been provided had the Smart Lock Divestiture Relevant Personnel continued employment with ASSA ABLOY, including any retention bonuses or payments. ASSA ABLOY may maintain reasonable restrictions on disclosure by Smart Lock Divestiture Relevant Personnel of ASSA ABLOY's proprietary non-public information that is unrelated to the Smart Lock Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 180 calendar days from the Divestiture Date, ASSA ABLOY may not solicit to rehire any Smart Lock Divestiture Relevant Personnel who were hired by Acquirer within 90 calendar days of the Divestiture Date unless (i) an individual is terminated or laid off by Acquirer or (ii) Acquirer agrees in writing that ASSA ABLOY may solicit to rehire that individual. Nothing in this Paragraph VI.G.6. prohibits ASSA ABLOY from advertising employment openings using general solicitations or advertisements and rehiring any Smart Lock Divestiture Relevant Personnel who apply for an employment opening through a general solicitation or advertisement.

H.      At the option of the Acquirer, ASSA ABLOY must warrant to Acquirer that (1) the Smart Lock Divestiture Assets will be operational in all material respects and without material defect on the date of their transfer to Acquirer; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Smart Lock Divestiture Assets; and (3) ASSA ABLOY has disclosed all material encumbrances on any part of the Smart Lock Divestiture Assets, including on intangible property. Following the sale of the Smart Lock Divestiture Assets, ASSA ABLOY must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Smart Lock Divestiture Assets.

I.      At the option of the Acquirer, ASSA ABLOY must use best efforts to assist Acquirer to obtain all necessary licenses, registrations, and permits to operate the Smart Lock Divestiture Business. Until Acquirer obtains the necessary licenses, registrations, and permits, ASSA ABLOY must provide Acquirer with the benefit of ASSA ABLOY's licenses, registrations, and permits to the full extent permissible by law.

J.      At the option of Acquirer, and subject to approval by the United States in its sole discretion, on or before the Divestiture Date, ASSA ABLOY must enter into a supply contract or contracts for all products necessary to operate the Smart Lock Divestiture Business, including nexTouch and Interconnect branded products produced by ASSA ABLOY prior to the Divestiture Date, for a period of up to 12 months, on terms and conditions reasonably related to market conditions for the provision of such products, as agreed to by Acquirer.

K.      Any amendment to or modification of any provision of any such supply contract is subject to approval by the United States, in its sole discretion. The United States, in its sole discretion, may approve up to two extensions of any supply contract of 12 months each. Any contract extension will be on terms and conditions reasonably related to market conditions for the provision of such products, as agreed to by Acquirer. If Acquirer seeks an extension of the term of any supply contract, ASSA ABLOY must notify the United States in writing at least 30 calendar days prior to the date the supply contract expires. Acquirer may terminate a supply contract, or any portion of a supply contract, without cost or penalty, other than payment of any amounts due thereunder, upon 15 calendar days' written notice. The employees of ASSA ABLOY tasked with servicing any supply contracts must not share any competitively sensitive information of Acquirer with any other employee of ASSA ABLOY.

L.      At the option of Acquirer, and subject to approval by the United States in its sole

discretion, on or before the Divestiture Date, ASSA ABLOY must enter into a contract to

provide transition services to cover (1) all services necessary to operate the Smart Lock

Divestiture Business, including services for back office, human resources, accounting, employee

health and safety, and information technology services and support, and (2) all services

necessary to operate the manufacturing facility at Lot A10, Ba Thien II IP, Thien Ke, Binh

Xuyen, Vinh Phuc, Vietnam, for a period of up to 12 months on terms and conditions reasonably

related to market conditions for the provision of the transition services.

M.      Any amendment to or modification of any provision of a contract to provide

transition services is subject to approval by the United States, in its sole discretion. The United

States, in its sole discretion, may approve one or more extensions of any contract for transition

services, for a total of up to 12 additional months, *provided, however,* that any contract extension

will be on terms and conditions reasonably related to market conditions for the provision of such

services. If Acquirer seeks an extension of the term of any contract for transition services, ASSA

ABLOY must notify the United States in writing at least 30 calendar days prior to the date the

contract expires. Acquirer may terminate a contract for transition services, or any portion of a

contract for transition services, without cost or penalty, other than payment of any amounts due

thereunder, at any time upon 15 calendar days' written notice. The employees of ASSA ABLOY

tasked with providing transition services must not share any competitively sensitive information

of Acquirer with any other employee of ASSA ABLOY.

N.      ASSA ABLOY will have the right to use the Yale brand name in the U.S. and

Canada solely for commercial products not sold for Residences for a transitional, wind-down

period of up to twelve (12) months following the Divestiture Date. (For these purposes only,

Residences does not include commercial products sold in order to fulfill orders in connection

with the Yale Accentra platform for up to six months following the Divestiture Date and

Acquirer may elect, with consent of the United States, to extend this term for an additional six

months.) ASSA ABLOY must within 30 days following the Divestiture Date commence a brand

transition for its Yale branded commercial products in the U.S. and Canada, which shall be

completed no later than twelve (12) months after commencement, in connection with the wind-

down described above in this Paragraph. In addition, ASSA ABLOY will have the right to use

the Yale brand name in the U.S. and Canada solely for commercial products for a transitional,

wind-down for a period of up to two (2) years following the Divestiture Date with respect to

sales of commercial products in connection with honoring any specification or quote, in each

case issued prior to the Divestiture Date.

*For the avoidance of doubt,* nothing in this proposed Final Judgment limits or prohibits

Acquirer's use of any non-Yale brand for any purpose.

     O.     If any term of an agreement between ASSA ABLOY and Acquirer, including an

agreement to effectuate the divestiture required by this Final Judgment, varies from a term of this

Final Judgment including as implemented by the Asset Preservation and Stipulation and Order

entered contemporaneously herewith, to the extent that ASSA ABLOY cannot fully comply with

both, this Final Judgment as so implemented determines ASSA ABLOY's obligations.

     P.     At the option of Acquirer, if at any time after the Divestiture Date, Acquirer

notifies ASSA ABLOY in writing of any patents that (1) are owned by ASSA ABLOY as of the

Divestiture Date; (2) are not licensed or otherwise transferred to Acquirer under Paragraphs

II.Q.2.vii; and (3) were contemplated by ASSA ABLOY to be used in the Smart Lock

Divestiture Business prior to the Divestiture Date as set forth in the Product Development

24

Roadmap attached to the Stock Purchase Agreement, such patents will automatically be deemed licensed to Acquirer under Paragraph II.Q.2.vii.

Q.      At the option of Acquirer, for a period of five years following the Divestiture Date, Acquirer will have the right to request and receive a code base assessment of the Yale Access control system once per year to inventory the proprietary libraries comprising the Yale Access control system and confirm whether any of the baseline libraries are included within ASSA ABLOY's U.S. or Canadian products.

R.      At the option of Acquirer, Acquirer may purchase all of ASSA ABLOY's inventory as of the Divestiture Date that is branded Yale in the residential mechanical space, subject to the terms and conditions of the supply agreement in Paragraph VI.J, but without restriction on how or where it is sold to residential or, solely with respect to such inventory, Multifamily customers.

## VII.   FINANCING

Defendants may not finance all or any part of Acquirer's purchase of all or part of the Divestiture Assets.

## VIII.   ASSET PRESERVATION

Defendants must take all steps necessary to comply with their respective obligations under the Asset Preservation Stipulation and Order entered by the Court.

## IX.   AFFIDAVITS

A.      Within 20 calendar days of the entry of the Asset Preservation Stipulation and Order in this matter, and every 30 calendar days thereafter until the divestitures required by this Final Judgment have been completed, ASSA ABLOY must deliver to the United States and the monitoring trustee, if one has been appointed, an affidavit, signed by each the Chief Financial

Officer and General Counsel of its Americas division, describing in reasonable detail the fact and manner of ASSA ABLOY's compliance with this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

B.      Each affidavit required by Paragraph IX.A. must include: (1) a description of the efforts ASSA ABLOY has taken to complete the sale of any of the Divestiture Assets and to provide required information to Acquirer; and (2) a description of any limitations placed by ASSA ABLOY on information provided to Acquirer. Objection by the United States to information provided by ASSA ABLOY to Acquirer must be made within 14 calendar days of receipt of the affidavit, except that the United States may object at any time if the information set forth in the affidavit is not true or complete.

C.      ASSA ABLOY must keep all records of any efforts made to divest the Divestiture Assets until one year after the Divestiture Date.

D.      Within 20 calendar days of entry of the Asset Preservation Stipulation and Order in this matter, ASSA ABLOY must deliver to the United States an affidavit, signed by the Chief Financial Officer and General Counsel of its America's division, that describes in reasonable detail all actions that ASSA ABLOY has taken and all steps that ASSA ABLOY has implemented on an ongoing basis to comply with Section VIII of this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

E.      If ASSA ABLOY makes any changes to actions and steps described in affidavits provided pursuant to Paragraph IX.D., ASSA ABLOY must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

F.      ASSA ABLOY must keep all records of any efforts made to comply with Section VIII until one year after the Divestiture Date.

## X.      APPOINTMENT OF MONITORING TRUSTEE

A.      Upon application of the United States, which Defendants may not oppose, the Court will appoint a monitoring trustee selected by the United States, after consultation with Defendants, and approved by the Court.

B.      The monitoring trustee will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order entered by the Court and will have other powers as the Court deems appropriate. The monitoring trustee will have no responsibility or obligation for operation of the Divestiture Assets.

C.      Defendants may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities under any Order of the Court on any ground other than malfeasance by the monitoring trustee. Objections by Defendants must be conveyed in writing to the United States and the monitoring trustee within 10 calendar days of the monitoring trustee's action that gives rise to Defendants' objection.

D.      The monitoring trustee will serve at the cost and expense of ASSA ABLOY pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion.

E.      The monitoring trustee may hire, at the cost and expense of ASSA ABLOY, any agents and consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring trustee's duties. These agents or consultants will be solely accountable to the monitoring trustee and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion.

F.      The compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the monitoring trustee and ASSA ABLOY are unable to reach agreement on the monitoring trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the monitoring trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court. Within three business days of hiring any agents or consultants, the monitoring trustee must provide written notice of the hiring and the rate of compensation to Defendants and the United States.

G.      The monitoring trustee must account for all costs and expenses incurred.

H.      ASSA ABLOY and Acquirer must use best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations under this Final Judgment and the Asset Preservation Stipulation and Order. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, ASSA ABLOY and Acquirer must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets. ASSA ABLOY and Acquirer may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities.

I.      The monitoring trustee must investigate and report on ASSA ABLOY's compliance with this Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between Acquirer and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment and regarding compliance with the terms of this Final Judgment.  During any period while any

transition services or supply agreements entered into pursuant to Sections V and VI of this Final Judgment are in effect, or any period while a proceeding may be reopened by the United States pursuant to Section IV of this Final Judgment, the monitoring trustee must provide periodic reports to the United States setting forth Defendants' efforts to comply with their obligations under this Final Judgment and under the Asset Preservation Stipulation and Order. The United States, in its sole discretion, will set the frequency of the monitoring trustee's reports.

J.      The monitoring trustee will serve until the later of (1) the expiration of the terms of all transition services agreements or supply agreements entered pursuant to Sections V and VI of this Final Judgment or (2) the conclusion of any proceeding reopened by the United States pursuant to Section IV of this Final Judgment, or, if no such proceeding is reopened prior to the date that is five (5) years from entry of this Final Judgment, five (5) years from entry of this Final Judgment; unless the United States, in its sole discretion, determines a different period is appropriate.

K.      If the United States determines that the monitoring trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute.

## XI.    DISPUTE RESOLUTION

A.      ASSA ABLOY and Acquirer will each have the right to initiate an expedited dispute resolution process in the event of a dispute over the extent of either party's rights under this Final Judgment, including whether an application is Multifamily, commercial, or residential and whether the intellectual property rights set forth in Paragraph II.Q.2.vii have been transferred. In any such dispute over whether an application is Multifamily, commercial or residential, ASSA ABLOY will bear the burden of proof and all ambiguities in the agreement

29

with respect to whether an application is Multifamily, commercial or residential will be construed against it; the losing party will pay all expenses. With respect to a dispute under any supply agreement pursuant to Paragraphs V.J, V.K, VI.J, or VI.K of this Final Judgment and until the expiration of the Final Judgment, ASSA ABLOY and Acquirer will each have the right to initiate a one-day binding arbitration to be held within 15 days of notice by either party.

B.      This Section XI will not be interpreted to limit or impact the monitoring trustee's responsibilities under Section X.

## XII.    COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment or of related orders such as the Asset Preservation Stipulation and Order or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendants, Defendants must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1.      to have access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

2.      to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendants must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

## XIII.  NO REACQUISITION

ASSA ABLOY may not reacquire any part of or any interest in the Divestiture Assets during the term of this Final Judgment without prior authorization of the United States.

## XIV.  PUBLIC DISCLOSURE

A.      No information or documents obtained pursuant to any provision of this Final Judgment may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, for the purpose of evaluating the proposed Acquirer or securing compliance with this Final Judgment, or as otherwise required by law.

B.      In the event of a request by a third party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, for disclosure of information obtained pursuant to any provision of this Final Judgment, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendants submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

C.      If at the time that Defendants furnish information or documents to the United

States pursuant to any provision of this Final Judgment, Defendants represent and identify in

writing information or documents for which a claim of protection may be asserted under Rule

26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of

such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of

Civil Procedure," the United States must give Defendants 10 calendar days' notice before

divulging the material in any legal proceeding (other than a grand jury proceeding).

## XV.    RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the

Court at any time for further orders and directions as may be necessary or appropriate to carry

out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and

to punish violations of its provisions.

## XVI.   ENFORCEMENT OF FINAL JUDGMENT

A.      The United States retains and reserves all rights to enforce the provisions of this

Final Judgment, including the right to seek an order of contempt from the Court. Defendants

agree that in a civil contempt action, a motion to show cause, or a similar action brought by the

United States relating to an alleged violation of this Final Judgment, the United States may

establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a

preponderance of the evidence, and Defendants waive any argument that a different standard of

proof should apply.

B.      Defendants agree that they may be held in contempt of, and that the Court may

enforce, any provision of this Final Judgment that, as interpreted by the Court applying ordinary

tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and

unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.      In an enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

D.      For a period of four years following the expiration of this Final Judgment, if the United States has evidence that a Defendant violated this Final Judgment before it expired, the United States may file an action against that Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section XVI.

## XVII.  EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire 10 years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and continuation of this Final Judgment is no longer necessary or in the public interest.

33

## XVIII. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: September 13, 2023

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

_____

ANA C. REYES
United States District Judge