## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>v.<br><br>ASSA ABLOY AB<br><br>and<br><br>SPECTRUM BRANDS HOLDINGS, INC.<br><br>*Defendants.* | Case No. 1:22-cv-02791-ACR |

### ASSA ABLOY AB'S MOTION FOR CLARIFICATION OF THE FINAL JUDGMENT

Defendant ASSA ABLOY AB respectfully requests this Court, pursuant to Section XV of the Final Judgment (ECF No. 143), issue an order clarifying the appropriate scope of the Monitoring Trustee's duties regarding the "competitive intensity" investigation contemplated by Section IV of the Final Judgment and requiring the Monitoring Trustee to stay within its limits. A Memorandum of Points and Authorities in support of the Motion and a Proposed Order are attached.[1]

Dated: June 18, 2024                     Respectfully submitted,

                                        /s/ *Justin W. Bernick*
                                        Justin W. Bernick (D.C. Bar No. 988245)
                                        Lauren E. Battaglia (D.C. Bar No. 1007093)

---

[1] Counsel for ASSA ABLOY met and conferred with counsel for the United States and proposed that they have an opportunity to respond to the instant motion "within 14 days of the date of service," pursuant to Local Civil Rule 7(b) and that any reply in support of the instant motion be filed "within seven days after service of the memorandum in opposition," pursuant to Local Civil Rule 7(d).

Charles A. Loughlin (D.C. Bar No. 448219)
William L. Monts, III (D.C. Bar No. 428856)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
justin.bernick@hoganlovells.com

/s/ *David I. Gelfand*
David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 974-1500
dgelfand@cgsh.com

*Counsel for Defendant ASSA ABLOY AB*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>          *Plaintiff*,<br><br>    v.<br><br>ASSA ABLOY AB<br><br>and<br><br>SPECTRUM BRANDS HOLDINGS, INC.<br><br>          *Defendants.* | Case No. 1:22-cv-02791-ACR |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ASSA ABLOY
AB'S MOTION FOR CLARIFICATION OF THE FINAL JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

    A.    Section IV of the Final Judgment. ....................................................................... 2

    B.    The Monitoring Trustee's Proposed Five-Year Industry Study. ........................... 4

    C.    Undue Burdens Imposed by the  Monitoring Trustee's Unauthorized Five-
          Year Industry Study. ............................................................................................ 6

LEGAL STANDARD.........................................................................................................8

ARGUMENT ......................................................................................................................9

    I.    THE MONITORING TRUSTEE'S PROPOSED FIVE-YEAR INDUSTRY
        STUDY EXCEEDS THE SCOPE OF THE INVESTIGATION
        PERMITTED BY THE PLAIN LANGUAGE OF THE FINAL
        JUDGMENT .........................................................................................................9

    II.    THE NEGOTIATIONS BETWEEN THE PARTIES CONFIRM THE
        MONITORING TRUSTEE'S INTERPRETATION OF THE FINAL
        JUDGMENT IS INCORRECT..........................................................................13

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

\* Asterisks designate cases or authorities counsel chiefly relies upon.

**Page(s)**

**Cases**

*Nat'l Ass'n of Realtors v. United States,*
  97 F.4th 951 (D.C. Cir. 2024) ............................................................... 9

*Richardson v. Edwards,*
  127 F.3d 97 (D.C. Cir. 1997) ................................................................. 9

*Segar v. Mukasey,*
  508 F.3d 16 (D.C. Cir. 2007)\* ....................................................... 8, 9, 13

*United States v. ITT Cont'l Baking Co.,*
  420 U.S. 223 (1975)\* ............................................................................. 8

*United States v. Microsoft Corp.,*
  147 F.3d 935 (D.C. Cir. 1998) ............................................................ 8, 9

*United States v. W. Elec. Co.,*
  154 F.R.D. 1 (D.D.C. 1994) .................................................................... 9

*Washington Metropolitan Area Transit Authority v. Mergentime Corp.,*
  626 F.2d 959 (D.C. Cir. 1980) ............................................................... 9

**Other Authorities**

D.D.C. R. 7(f)……………………………………………………………………16

D.D.C. R. 78.1……………………………………………………………………...16

## EXHIBIT INDEX

1. Proposed Term Sheet, dated Apr. 30, 2023.
2. Engagement Letter, dated Oct. 5, 2023.
3. Monitoring Trustee's Invoiced Fees.
4. Letter from L. Battaglia to M. Coolidge, dated Apr. 17, 2024.
5. Letter from M. Coolidge to L. Battaglia, dated Apr. 26, 2024.
6. Letter from L. Battaglia to M. Coolidge, dated May 8, 2024.
7. Escrow Agreement, dated June 14, 2024.
8. Letter from M. Isaacs to L. Battaglia, dated June 11, 2024.
9. Email from M. Coolidge to L. Battaglia, *et al.*, dated June 3, 2024.
10. Email from M. Coolidge to L. Battaglia, *et al.*, dated June 7, 2024.
11. Document Requests Directed to ASSA ABLOY, dated Mar. 19, 2024.
12. Document Requests Directed to ASSA ABLOY, dated Mar. 7, 2024.

## INTRODUCTION

ASSA ABLOY AB ("ASSA ABLOY") is committed to complying with the terms of the Final Judgment entered by the Court in this matter, and has been working diligently to accommodate requests from the Monitoring Trustee.  However, it has recently become clear that the Monitoring Trustee is engaging in conduct far exceeding the authority conferred by the Final Judgment entered by this Court on at least one issue that requires this Court's intervention.

In particular, the Final Judgment authorizes the Monitoring Trustee, "after three years following the Divestiture Date" (*i.e.*, beginning on June 20, 2026), to determine whether the residential smart lock business that Fortune Brands Innovations, Inc. ("Fortune") acquired from ASSA ABLOY diminished in "competitive intensity" as compared to 2023 (when that business was under ASSA ABLOY's direction), because of, in material part, limitations on Fortune's rights to use the Yale brand name or trademarks in the United States and Canada.  *See* ECF No. 143 at Section IV.  The Monitoring Trustee has between June 20, 2026 and September 13, 2028 to make this determination (the "Assessment Period").  The Monitoring Trustee, however, contends that the Final Judgment empowers it to conduct a continuing industry-wide study that evaluates *all* facets of competition in the smart locks industry from the date of the divestiture in June 2023 and lasting for the entire five-year period of the monitorship.

The Monitoring Trustee's construction is unsupported by the text of the Final Judgment, ignores the extensive negotiations between the parties that preceded its entry, and imposes massive, unforeseen costs on both ASSA ABLOY and Fortune.  In just over six months, the Monitoring Trustee has already billed ASSA ABLOY approximately ***$3.3 million***.  At that rate, the Monitoring Trustee's fees will exceed a jaw-dropping $20 million over the course of the monitorship—largely due to activities associated with the proposed five-year industry study that

far exceeds the limited inquiry permitted by the Final Judgment.  Put differently, the Monitoring

Trustee's costs for purportedly monitoring the divested business are running at a rate of nearly 30

percent of the reported EBITDA of the divested smart lock business during the twelve month

period ending in June 2022.  These direct costs to ASSA ABLOY are extreme, but there are also

substantial non-monetary burdens associated with the Monitoring Trustee's free-ranging inquiry.

Ironically, this burden of complying with the Monitoring Trustee's requests is even putting Fortune

in a position where they are diverting resources they would prefer to invest directly in the divested

business to make the business more competitive.

Accordingly, pursuant to Section XV of the Final Judgment, ASSA ABLOY respectfully

requests that the Court clarify the appropriate scope of the Monitoring Trustee's duties regarding

the "competitive intensity" investigation contemplated by Section IV of the Final Judgment and

require the Monitoring Trustee to stay within its limits.

## BACKGROUND

### A.    Section IV of the Final Judgment.

On September 13, 2023, this Court entered the Final Judgment proposed and agreed-upon

by the parties, which resolved the Department of Justice's challenge to ASSA ABLOY's

acquisition of Spectrum Brands Holding, Inc.'s Hardware and Home Improvement Division and

divestiture of certain premium mechanical and smart lock assets to Fortune.  *See* ECF No. 143.

The Final Judgment contemplates the appointment of a Monitoring Trustee.  *See id.* at 27 (Section

X).  The purpose of the Monitoring Trustee is two-fold.

*First*, the Monitoring Trustee is tasked with ensuring ASSA ABLOY, in fact, effects the

divestitures and inter-party agreements required under the Final Judgment and Asset Preservation

Stipulation and Order (ECF No. 130).  *See* ECF No. 143 at 27 (Section X).  ASSA ABLOY has

executed and implemented each of the divestitures and inter-party agreements mandated by those orders.

*Second*, the Final Judgment allows the Monitoring Trustee to investigate, "*after* three years following the Divestiture Date and *until* the date that is five years from the entry of this Final Judgment," (a) whether "[Fortune's] competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date;" and (b) whether that diminution "is in material part due to limitations on [Fortune's] right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada . . . " *See id.* at 9-10 (Section IV) (emphasis added). Only if the Monitoring Trustee determines during the Assessment Period that both of those factors are present, may the monitoring trustee "provide a written report of [its] conclusions to the United States," which, in turn, may "seek leave of Court to re-open this proceeding specifically to seek only the grant of additional Yale brand name or trademark rights . . . in the U.S. and Canada to [Fortune]." *Id.* at 10.

This latter provision was heavily negotiated by the parties. The Department of Justice originally proposed a competitive intensity study that was far more expansive than that ultimately agreed to and submitted to the Court. Specifically, the Department of Justice requested that: (i) the competitive intensity investigation begin on the date of entry of the Final Judgment and last for the entire five-year period of the monitorship; (ii) the competitive intensity investigation cover both the premium mechanical door hardware business and the smart locks business; and (iii) the competitive intensity investigation allow the Monitoring Trustee to evaluate whether Fortune's competitive intensity was diminished, in a "non *de minimus* way," as a result of any "assets that were not conveyed to Fortune . . . as part of the divestiture (whether or not those assets were

supposed to have been conveyed to Fortune . . . pursuant to the divestiture)."  *See* Exhibit 1, Proposed Term Sheet, dated April 30, 2023, at 4.  Defendants rejected this proposal, and the parties ultimately agreed to the language included in the Final Judgment.  *See* ECF No. 143 at Section IV.

**B.      The Monitoring Trustee's Proposed Five-Year Industry Study.**

On August 22, 2023, upon an unopposed motion by the Department of Justice, the Court approved the appointment of Melinda R. Coolidge to serve as the Monitoring Trustee in this action. *See* ECF No. 133.  ASSA ABLOY and Ms. Coolidge's law firm, Hausfeld LLP, subsequently entered an engagement agreement on October 5, 2023, which does not "change, amend, modify, or otherwise expand or limit [the] powers or responsibilities" conferred to the Monitoring Trustee by the Final Judgment.  *See* Exhibit 2, Engagement Letter, at 1.

ASSA ABLOY began to receive a number of large invoices from the Monitoring Trustee, several totaling hundreds of thousands of dollars for a single month's work.[1]  ASSA ABLOY hoped that the large invoices would be limited to a month or two as the Monitoring Trustee "got up to speed," but it became clear that the company was facing a "run rate" of expenses for work that was far broader than the scope of work contemplated by the Final Judgment.  ASSA ABLOY requested a conference with the Monitoring Trustee, which took place on April 2, 2024.  During that conference, the Monitoring Trustee explained that its high invoiced fees were, in part, due to an ongoing analysis of *every* aspect of competition in the smart locks business (not just the aspects potentially related to limitations on rights to the Yale trademarks in the United States and Canada), as well as other businesses beyond smart locks, over the *entire* five-year period of the monitorship (not just during the Assessment Period between June 20, 2026 and September 13, 2028).

---

[1]  The Monitoring Trustee's monthly invoiced fees to date are as follows: (1) September 2023: $76,656; (2) October 2023: $212,226; (3) November 2023: $439,185; (4) December 2023: $280,353; (5) January 2024: $669,781; (6) February 2024: $505,180; (7) March 2024: $578,604; and (8) April 2024: $512,038  *See* Exhibit 3, Monitoring Trustee's Invoiced Fees.

On April 17, 2024, ASSA ABLOY confirmed in writing its objections to the Monitoring Trustee's proposed five-year industry study as exceeding the authority conferred by the Final Judgment.  *See* Exhibit 4, Ltr. from L. Battaglia to M. Coolidge, dated April 17, 2024.  The Monitoring Trustee responded on April 26, 2024, claiming that its work to date was necessary to "establish a pre-transaction baseline for competitive intensity and then observe how competitive intensity evolves after the Divestiture Date relative to this baseline."  *See* Exhibit 5, Ltr. from M. Coolidge to L. Battaglia, dated April 26, 2024, at 4.  As ASSA ABLOY explained in a formal objection lodged on May 8, 2024, no such study was necessary because "the Department of Justice already expended a massive amount of resources [establishing a pre-transaction baseline] in the underlying trial and litigation," and "[the Final Judgment] plainly does not authorize the Monitoring Trustee to engage in a limitless industry inquiry in fulfillment of the narrow remit provided for in Section IV, which is circumscribed both in time and scope."  *See* Exhibit 6, Ltr. from L. Battaglia to M. Coolidge, dated May 8, 2024, at 1-2.

ASSA ABLOY has deposited $ 2,917,016.58 into an escrow account, reflecting the total amount of the disputed invoices received as of June 17, 2024.  *See* Exhibit 7, Escrow Agreement, dated June 14, 2024.  Those funds will remain in escrow until December 31, 2024, absent agreement with the Monitoring Trustee or Court order.  *Id.*

On May 28, 2024, ASSA ABLOY, Fortune, the Department of Justice, and the Monitoring Trustee met and conferred to discuss the scope of the competitive intensity investigation under Section IV of the Final Judgment.  Following that conference, ASSA ABLOY requested that the Department of Justice provide its position in writing by June 7, 2024.  On June 12, 2024, the Department of Justice advised that, in its view, "the Monitoring Trustee's interpretation of its

responsibilities under Section IV are reasonable." *See* Exhibit 8, Ltr. from M. Isaacs to L. Battaglia, dated June 11, 2024, at 3.

C.     **Undue Burdens Imposed by the  Monitoring Trustee's Unauthorized Five-Year Industry Study.**

On June 3, 2024, at the request of the Department of Justice, the Monitoring Trustee provided a purported breakdown of the fees invoiced to date between the competitive intensity study in dispute and the Monitoring Trustee's other compliance work. *See* Exhibit 9, Email from M. Coolidge to L. Battaglia, *et al.*, dated June 3, 2024. While there is no current dispute regarding the scope of the Monitoring Trustee's work beyond the competitive intensity study, ASSA ABLOY also has serious concerns about the costs associated with that work, and will present those to the Court in the event that the parties are unable to resolve those concerns.[2] On June 7, 2024, the Monitoring Trustee also provided a forward-looking estimate of costs associated with the competitive intensity study through June 2026 (*i.e.*, only through the *beginning* of the Assessment Period) of up to approximately $4.5 million, although the massive invoices to date call into question the reliability of these estimates. *See* Exhibit 10, Email from M. Coolidge to L. Battaglia,

---

[2]  The Monitoring Trustee asserts that $1.8 million of invoiced fees relate not to the competitive intensity study, but to the narrow task of ensuring that ASSA ABLOY is complying with the divestiture and other inter-party agreements.  But over $1 million of the Monitoring Trustee's invoiced fees are purely administrative, described with captions such as "Planning and Project Management," "DOJ Meetings & Communications," and "Monitoring Trustee Team Meetings & Communications."  ASSA ABLOY has also observed the Monitoring Trustee conduct itself in a grossly inefficient manner, with no regard to the burdens and costs inflicted on ASSA ABLOY's business. For example, the Monitoring Trustee regularly overstaff interviews with ASSA ABLOY personnel—often with six or more individuals attending each interview (each billing several hundred dollars an hour), including multiple economists with no apparent role in those meetings. The Monitoring Trustee also planned an in-person visit with her team to Vietnam, ostensibly to visit a facility that ASSA ABLOY vacated and delivered to Fortune nearly ten months ago, over which Fortune has repeatedly confirmed it has full operational control.  As of May 28, 2024, ASSA ABLOY understands that the Monitoring Trustee has canceled this trip following ASSA ABLOY's strenuous objections, but the planning itself is illustrative of the Monitoring Trustee's routine and unjustified waste of resources thus far.

*et al.*, dated June 7, 2024.  Notably, that figure does not account for the fees the Monitoring Trustee will charge for work performed during the Assessment Period itself.

At least two disputed requests for information from the Monitoring Trustee reflect the breadth of the Monitoring Trustee's intended work.  One document request, for example, purports to require ASSA ABLOY to produce "all electronic databases showing all transactions (on an individual transaction-by-transaction basis) . . . in which [ASSA ABLOY] sold a Smart Lock product to any purchaser in the United States," on a recurring basis for the entire five-year monitorship period between June 2023 and September 2028.  *See* Exhibit 11, Document Requests Directed to ASSA ABLOY, dated March 19, 2024, at  2 (Document Request 16).  Under the plain terms of Section IV, however, this information is irrelevant—it is the competitive intensity of *Fortune's* residential smart lock business that is at issue, not ASSA ABLOY's.

The second information request seeks, on a recurring "monthly or quarterly" basis, ASSA ABLOY's (i) "[m]onthly and quarterly business reviews, sales and marketing reviews, business strategies, business plans, analyses of major customers, product plans, business strategies, or other related management reporting and presentations;" (ii) "[m]onthly, quarterly, and annual forecasts, budgets, tracking of actuals versus forecast, and metrics used to measure operating results and/or performance," including "any forecasts or tracking on sales revenue, sales quantities, costs (disaggregated into as many components as available), and/or profit margins;" and (iii) "[b]oard kits or any other related reports/materials presented to the Board of Directors,"  until September 2028.  *See* Exhibit 12, Document Requests Directed to ASSA ABLOY, dated March 7, 2024, at 2 (Document Request 6).  Again, however, ASSA ABLOY's post-divestiture business is not part of the assessment to be conducted pursuant to Section IV of the Final Judgment.  Thus, and as

discussed further below, these requests are unreasonable and far exceed the inquiry authorized by the Final Judgment.

Other than these disputed requests for information, ASSA ABLOY has promptly responded to every request for documents, data, and interviews from the Monitoring Trustee. ASSA ABLOY has received six interrogatory requests, sixteen document requests, and five meeting requests from December 2023 to April 2024. To date, ASSA ABLOY understands that there are no outstanding, undisputed requests from the Monitoring Trustee. Compliance with these requests, in addition to the approximately $3.3 million in Monitoring Trustee fees, have imposed a substantial burden on ASSA ABLOY and its counsel. ASSA ABLOY understands that the Monitoring Trustee has made similarly broad and burdensome requests to Fortune that have required the diversion of resources that Fortune believes could be better spent investing in growing the divested smart lock business.

## **LEGAL STANDARD**

Section XV of the Final Judgment "enable[s] any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment." *See* ECF No. 143 at 32.

Consent decrees, such as the Final Judgment, are interpreted as contracts "without reference to the [alleged antitrust violation] the Government originally sought to enforce *but never proved* . . . through litigation." *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 237 (1975) (emphasis added); *see also Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (consent decree is "essentially a contract," and "construction of a consent decree is essentially a matter of contract law") (internal quotation marks omitted); *United States v. Microsoft Corp.*, 147 F.3d 935, 945 n.7 (D.C. Cir. 1998) ("Consent decrees are generally interpreted as contracts."). The Final

Judgment, therefore, should be construed as written under traditional principles of contract law. *See Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997) ("[U]ltimately the question for [the Court], when it interprets a consent decree incorporating a settlement agreement, is what a reasonable person in the position of the parties would have thought the language meant."); *see also United States v. W. Elec. Co.*, 154 F.R.D. 1, 7 (D.D.C. 1994), *aff'd*, 46 F.3d 1198 (D.C. Cir. 1995) ("It is the obligation of this Court to enforce the decree as it is written").

If the Court finds the text of the Final Judgment unambiguous, that is the end of the matter, and the Court "need not address the parties' negotiation history or any other extrinsic evidence." *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024).  But, if the Court finds the Final Judgment's language to be ambiguous, the Court may look to extrinsic evidence of the parties' subjective intent.  *See Segar*, 508 F.3d at 22; *see also Microsoft*, 147 F.3d at 945 n.7.

## **ARGUMENT**

### I. **THE MONITORING TRUSTEE'S PROPOSED FIVE-YEAR INDUSTRY STUDY EXCEEDS THE SCOPE OF THE INVESTIGATION PERMITTED BY THE PLAIN LANGUAGE OF THE FINAL JUDGMENT**

The text of the Final Judgment does not authorize the Monitoring Trustee to conduct a continuing competitive intensity study that attempts to assess and evaluate any and all aspects of competition between any and all smart lock industry participants over the next five years.  *See Nat'l Ass'n of Realtors*, 97 F.4th at 957 ("Under general contract law, the plain and unambiguous meaning of an instrument is controlling.") (quoting *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960–61 (D.C. Cir. 1980).  The competitive intensity investigation authorized by the Final Judgment is decidedly more narrow:

> If, after three years following the Divestiture Date and until the date that is five years from entry of this Final Judgment, the monitoring trustee determines, after investigation and consultation with the United States, ASSA ABLOY and Acquirer, that:

      a.      Acquirer's competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date; and

      b.      Such diminishment in competitive intensity is in material part due to limitations on Acquirer's right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada as of the Divestiture Date, then

the monitoring trustee may, after consultation with the United States, provide a written report of the monitoring trustee's conclusions to the United States. Upon receiving such report, the United States, in its sole discretion, will have the ability to seek leave of the Court to re-open this proceeding specifically to seek only the grant of additional Yale brand name or trademark rights (including the ability to use those rights to compete for any category or customer segment) in the U.S. and Canada to Acquirer.

*See* ECF No. 143 at 9-10 (Section IV) (emphasis added). The Monitoring Trustee's proposed five-year industry study improperly expands the scope of the investigation authorized by Section IV of the Final Judgment in at least four ways.

      *First*, the Monitoring Trustee seeks to read the time limitations out of Section IV. Section IV contemplates an assessment of two 'snapshots' of competitive intensity. The first 'snap shot' is of ASSA ABLOY's residential smart lock business at the time that ASSA ABLOY divested that business to Fortune, which occurred on June 20, 2023. There is ample evidence in the litigation record for the Monitoring Trustee to establish a "baseline" for the competitive intensity of ASSA ABLOY's smart lock business pre-divestiture. The second 'snap shot' is to take place three-to-five years later, between June 20, 2026 and the end of the Assessment Period on September 13, 2028. That second 'snap shot' looks at the competitive intensity of the same residential smart lock business, now in the hands of Fortune. The Monitoring Trustee is tasked with comparing the two 'snap shots' and determining whether there was a diminution of competitive intensity caused, in material part, by limitations in Fortune's ability to use certain Yale brand names or trademarks. But, the Monitoring Trustee intends to continuously monitor "how competition in the industry evolves *between* the Divestiture Date and the assessment period." *See* Exhibit 5, Ltr. from M.

Coolidge to L. Battaglia, dated April 26, 2024, at 4 (emphasis added). In other words, the Monitoring Trustee wishes to conduct a detailed study of the smart lock business for the entire five-year period of the monitorship. That approach cannot be squared with the plain language of the Final Judgment and would impose millions of dollars in unforeseen costs that ASSA ABLOY never agreed to bear (for a project that ASSA ABLOY specifically rejected and negotiated out of the Final Judgment).[3]

*Second*, and relatedly, the Monitoring Trustee wishes to investigate competitive dynamics and drivers that have nothing to do with any limitation on Fortune's rights to the Yale trademarks in the United States or Canada. This too deviates from the plain text of the Final Judgment. Under the Final Judgment, only if the Monitoring Trustee identifies a diminution in competitive intensity attributable, "in material part," to limitations on Fortune's rights to the Yale trademarks may it submit a report to the Department of Justice outlining its conclusions. Indeed, the Department of Justice may move this Court to re-open proceedings *only* "to seek . . . the grant of additional Yale brand name or trademark rights" in the United States and Canada. *See* ECF No. 143 at 10 (Section IV). The Monitoring Trustee's task does not require it to assess or rule out any other alternative cause of a putative diminution of competition. Therefore, investigating competitive dynamics

---

[3] While it is true that the Monitoring Trustee needs to establish a baseline of competitive intensity at the time of the divestiture, the litigation record provides ample evidence on the point, and any further evidence that the Monitoring Trustee needs is, accordingly, limited. The Department of Justice already devoted an enormous amount of time, money, and resources evaluating that exact issue in the litigation that preceded the Final Judgment and only a few months passed between the close of discovery and the divestiture date. The Final Judgment, by setting the date of the snapshot three years from the date of the divestiture, necessarily recognizes that the Monitoring Trustee has reams of information about the smart lock business generally from the Government's merger investigation and its litigation discovery and trial record that will be the foundation for the Monitoring Trustee's initial work. And a simple review of the business' sales or market share (or some other reasonable metric) in 2023 would provide the Monitoring Trustee with sufficient information to perform the relevant comparison to the business' competitive intensity in 2026.

untethered to any assessment of the Yale trademark rights improperly expands the limited role of the Monitoring Trustee.

*Third*, the Monitoring Trustee intends to evaluate the competitive intensity of market players other than Fortune, the acquirer of the residential smart lock divestiture assets at issue. But the Final Judgment authorizes the Monitoring Trustee to compare only the "Acquirer's [Fortune's] competitive intensity" between 2026 and 2028 against ASSA ABLOY's in June 2023. No other market place participants are implicated by that inquiry. Yet, the Monitoring Trustee has demanded, for example, an ongoing stream of transaction-level data regarding *ASSA ABLOY's* smart lock business through 2028, and has made clear that it is seeking such data from other market participants as well. *See* Exhibit 11, Document Requests Directed to ASSA ABLOY, dated March 19, 2024, at Document Request 16. ASSA ABLOY should not be saddled with a constant stream of burdensome document and data discovery requests for five years when the only question is whether Fortune's smart lock business in 2026–2028 competes as intensely as that same business did under ASSA ABLOY's direction in June 2023. Nor should ASSA ABLOY be required to pay for the Monitoring Trustee's efforts to obtain and assess similar irrelevant data and information from others. Not only are these continuing requests extremely burdensome to both ASSA ABLOY and Fortune, but they are resulting in massive Monitoring Trustee invoices for attorney and expert economist fees for analyses of data that are unnecessary, and certainly unnecessary unless and until the relevance of the data becomes clear after a reduction in competitive intensity is *actually observed*.

*Fourth*, the Monitoring Trustee intends to expand its investigation beyond the residential smart locks business, despite that bargained-for limitation in the Final Judgment. For example, the Monitoring Trustee served multiple document requests pertaining to ASSA ABLOY's

multifamily and commercial smart locks. *See, e.g.*, Exhibit 12, Document Requests Directed to ASSA ABLOY, dated March 7, 2024, at 2 n.1 (defining "smart lock business" as "ASSA ABLOY's residential, multifamily, and commercial smart lock businesses in the U.S."). But the plain language of the Final Judgment limits the competitive intensity investigation to the "residential Smart Locks business." *See* ECF No. 143 at 9 (Section IV). All other business segments are irrelevant.

Based on the plain text, the Monitoring Trustee's proposed five-year industry study exceeds the scope of the competitive intensity investigation authorized by the Final Judgment.

## II. THE NEGOTIATIONS BETWEEN THE PARTIES CONFIRM THE MONITORING TRUSTEE'S INTERPRETATION OF THE FINAL JUDGMENT IS INCORRECT

Even if the language of the Final Judgment were ambiguous, extrinsic evidence from the negotiation history of the Final Judgment also refutes the Monitoring Trustee's construction of Section IV. *See Segar*, 508 F.3d at 22. The Department of Justice originally proposed a far broader competitive intensity investigation. Its first written proposal to ASSA ABLOY read, in pertinent part:

> If, <u>anytime up to five years</u> from the entry of this Final Judgment, the monitoring trustee determines, after investigation and consultation with [ASSA ABLOY] and Fortune (or the other acquiror), that:
>
> > a. Fortune's (or the other acquiror's) competitive intensity in the residential smart locks business <u>or premium mechanical door hardware business</u> has diminished relative to [ASSA ABLOY's] competitive intensity in those business before the Divestiture Date; and
> >
> > b. <u>Assets that were not conveyed to Fortune (or the other acquiror) as a part of the divestiture (whether or not those assets were supposed to have been conveyed to Fortune (or the other acquiror) pursuant to the divestiture)</u> contributed in a non *de minimus* way to the diminishment in competitive intensity, then
>
> the monitoring trustee may provide a written report of the monitoring trustee's conclusions to the United States, and the United States, in its sole discretion, will

> have the ability to seek leave of Court to re-open this proceeding and seek
> additional relief.

*See* Exhibit 1, Proposed Term Sheet, dated April 30, 2023, at 4 (underlined emphasis added).

ASSA ABLOY objected to this broad study (which also sought to implicate Fortune's "premium mechanical door hardware business"), and the parties negotiated, and ultimately agreed to, an assessment that was more tailored and much narrower. Against this backdrop, the Monitoring Trustee's interpretation of the Final Judgment is untenable and would result in a monitorship that is even broader than what the Department of Justice originally sought, let alone actually negotiated.

*First*, the Department of Justice's original proposal called for a competitive intensity study that lasted the entire five-year monitorship—just as the Monitoring Trustee proposes to do now—but ASSA ABLOY explicitly rejected that language and agreed to an investigation that would begin only "after three years following the Divestiture Date." *See* ECF No. 143 at 9 (Section IV). That alone belies the Monitoring Trustee's belief that it is empowered to continuously monitor "how competition in the industry evolves between the Divestiture Date and the assessment period." *See* Exhibit 5, Ltr. from M. Coolidge to L. Battaglia, dated April 26, 2024, at 4.

*Second*, the Department of Justice's original proposal, like the Final Judgment, focused exclusively on Fortune's—and no other entity's—competitive intensity after the divestiture on June 20, 2023. The Monitoring Trustee's proposed expansion of this inquiry to other market participants, such as ASSA ABLOY, after the divestiture goes beyond even the inquiry that the Department of Justice originally proposed.

*Third*, the Monitoring Trustee's intention to investigate all aspects of Fortune's competitive intensity—rather than whether any diminution is attributable, in material part, to limitations on the use of the Yale brand name or trademarks—would expand the agreed-upon scope of the investigation beyond what the Department of Justice was able to achieve in the parties' arms-

length negotiations.  The Department of Justice originally proposed a competitive intensity study that evaluated all "[a]ssets that were not conveyed to Fortune . . . as a part of the divestiture (whether or not those assets were supposed to have been conveyed to Fortune . . . pursuant to the divestiture)," and permitted the Department of Justice to re-open the proceedings to seek broad "additional relief" if the Monitoring Trustee found a relative reduction in competitive intensity. *See* Exhibit 1, Proposed Term Sheet, dated April 30, 2023, at 4 .  The parties, however, ultimately agreed to an investigation limited only to the Yale brand name or trademarks in the United States and Canada.  *See* ECF No. 143 at Section IV.  The Court should not permit the Monitoring Trustee to unilaterally unwind the deal the parties struck on this issue.

*Fourth*, even this early draft of the language governing the competitive intensity investigation fails to include any mention of the multifamily and commercial segments that the Monitoring Trustee has stated it intends to study.  The Monitoring Trustee cannot claim now that those separate business segments are within the authorized scope of the competitive intensity study, when no prior draft ever contemplated their inclusion.

The Monitoring Trustee's interpretation of the Final Judgment is incompatible with the terms negotiated  between the parties.  Therefore, should the Court find it necessary to look to extrinsic evidence beyond that plain language of the Final Judgment, that history also weighs in favor of rejecting the Monitoring Trustee's proposed five-year industry study.

## **<u>CONCLUSION</u>**

For the foregoing reasons, pursuant to Section XV of the Final Judgment, ASSA ABLOY respectfully requests that the Court clarify the appropriate scope of the Monitoring Trustee's duties regarding the "competitive intensity" investigation contemplated by Section IV of the Final Judgment and require the Monitoring Trustee to stay within its limits.  Pursuant to Local Civil

Rules 7(f) and 78.1, ASSA ABLOY also respectfully requests that the Court hold an oral hearing on this matter.

Dated: June 18, 2024

Respectfully submitted,

/s/ *Justin W. Bernick*
Justin W. Bernick (D.C. Bar No. 988245)
Lauren E. Battaglia (D.C. Bar No. 1007093)
Charles A. Loughlin (D.C. Bar No. 448219)
William L. Monts, III (D.C. Bar No. 428856)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
justin.bernick@hoganlovells.com

/s/ *David I. Gelfand*
David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 974-1500
dgelfand@cgsh.com

*Counsel for Defendant ASSA ABLOY AB*

## CERTIFICATE OF CONCURRENCE

I hereby certify that pursuant to Local Civil Rule 7(m), counsel for movant sought concurrence from the parties.  The Department of Justice advised that the instant motion is opposed.

Dated: June 18, 2024                                    /s/ *Justin W. Bernick*

17