# Exhibit 4



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

Wednesday, April 17, 2024

*Via Email*

Melinda Coolidge
Hausfeld
888 16th Street NW
Suite 300
Washington, DC 20006

Re:     *United States of America v. ASSA ABLOY AB, et al.*, 1:22-cv-02791-ACR (D.D.C.)

Dear Melinda:

I write on behalf of ASSA ABLOY with respect to the work of the monitoring trustee in the above-referenced matter.

As discussed on our April 2 call, ASSA ABLOY is concerned that there is a fundamental disagreement regarding the scope of the monitor's responsibilities under the Final Judgment. The monitoring trustee is tasked with monitoring Defendants' compliance with the terms of the Final Judgment. *See* ECF No. 143 at Section X. The Final Judgment requires divestiture of ASSA ABLOY's Premium Mechanical and Smart Lock Divestiture Assets. *Id.* at Section V and VI. The Final Judgment also allows the monitoring trustee to evaluate whether the divestiture buyer's competitive intensity in the Smart Locks business is diminished between three and five years from the date of the entry of the Final Judgment (*i.e.*, between June 20, 2026 to September 23, 2028) specifically as a result of limitations on the buyer's rights to use the rights to the Yale brand name or trademarks in the U.S. or Canada that ASSA ABLOY held as of the Divestiture Date *Id.* at Section IV. The Final Judgment contemplates only the transfer of assets of complete businesses, along with the provision of interim supply and transition services, and accordingly the monitoring trustee's responsibilities are narrow. Unlike in other cases involving a monitorship, there is no complex conduct remedy for the monitoring trustee to oversee.

As explained below, ASSA ABLOY has complied with its divestiture obligations—the Premium Mechanical and Smart Lock Divestiture Assets have been transferred to Fortune Brands. While the monitoring trustee should continue to monitor ASSA ABLOY's compliance with the terms of the supply and transition services agreements, this narrow task should require relatively little burden and expense. However, we understand, based on our call, that the monitoring trustee intends to conduct an ongoing "study" of competition in the smart lock industry, presumably pursuant to Section IV of the Final Judgment, including by demanding documents, data, and interviews of ASSA ABLOY that are not related to the "competitive intensity" of Fortune Brands, much less the competitive intensity of Fortune Brands in the period from 2026 through 2028. While we had hoped that the monitoring trustee's large invoices were the result of a short-term need to "get up to speed" with the relevant transaction documents and existing litigation record, it is now clear, based on the astounding ***$1.5 million*** in invoices received over the past few months, that the monitoring trustee is far exceeding the scope of the monitor's agreed-upon responsibilities, resulting in extreme and unreasonable burdens on ASSA ABLOY that are inconsistent with the Final Judgment, as explained in more detail below.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices: Budapest  Jakarta  Riyadh  Shanghai FTZ  Ulaanbaatar.   Business Service Centers: Johannesburg  Louisville.   Legal Services Center: Berlin.  For more information see www.hoganlovells.com

## I.    PREMIUM MECHANICAL AND SMART LOCK DIVESTITURES

With respect to the divestitures, as explained in ASSA ABLOY's July 27, 2023 Declaration Pursuant to Proposed Final Judgment, the divestiture of the Smart Lock Divestiture Assets, with the exception of the Smart Lock Foreign Divestiture Assets located in Vietnam, was complete on June 20, 2023. ASSA ABLOY responded to all of your questions to date regarding ASSA ABLOY's compliance with Section VI(C) of the Final Judgment with respect to the Smart Lock Foreign Divestiture Assets located in Vietnam. As we explained in our Interrogatory responses dated January 25, 2024, pursuant to the Capital Contribution Transfer Agreement, produced on January 5 via Egress and again on March 22 in response to DR_13, control of the foreign divestiture assets in Vietnam transferred to Fortune Brands as of the effective date of that agreement—December 22, 2023. Additionally, Fortune Brands has been the registered owner of the foreign divestiture assets, and Mr. Jason Williams, a Fortune Brands employee, has been the registered representative and Chairperson of the legal entity that owns those assets since November 23, 2023, as evidenced by the documents produced on March 22 in response to DR_10 and DR_12. Fortune Brands' own counsel has represented, to both the monitoring trustee and the Department of Justice, that Mr. Williams, a Fortune employee, "directs all aspects of the business and operations"; that Mr. Christopher Demko, another Fortune employee, "takes direction from Jason Williams, and, in turn, directs the day-to-day operations of the business"; the employees of the business are "paid via the entity's own payroll [and] the entity's operations generate sufficient cash to fund its working capital requirements"; and that "[n]o member of the ASSA ABLOY Group has any role in the oversight, management, or control" of the business.  See Email from Jonathan Blackburn of Sidley Austin LLP, dated February 14, 2024 and produced on February 16, 2024.

Operational control of the Smart Lock Foreign Divestiture Assets transferred prior to December 31, 2023.  If you dispute the change in control of the Smart Lock Foreign Divestiture Assets in Vietnam, please identify any information supporting your position by Friday, April 19, so that we can bring this dispute to the attention of the Court, if necessary.

## II.    ADDITIONAL RELIEF UNDER SECTION IV

Based on our April 2 call, we understand that you (together with a team of additional attorneys and economists) intend to conduct an ongoing study of competition in the smart lock business that far exceeds the plain language of the Final Judgment, at tremendous expense to ASSA ABLOY. While the full scope of this study is unclear to ASSA ABLOY at this time, we understand that it exceeds the scope of the relief provided for in the Final Judgment in several fundamental respects:

First, you indicated that the monitoring trustee (and a team of attorneys and economists) intends to conduct an ongoing analysis of competition in the Smart Lock industry throughout the three year period immediately following the Divestiture Date, despite the fact that the Final Judgment makes plain that the relevant question is the competitive intensity of the divested business starting three years *following* that date. The Final Judgment, in explicitly calling for a determination after June 20, 2026 and prior to September 23, 2028, does not impose on ASSA ABLOY the obligation to finance a massive team of attorneys and economists conducting a perpetual analysis of competition across an entire industry.

Second, it is clear from our discussion, as well as the burdensome document and data discovery requests served on ASSA ABLOY, that you intend to conduct a detailed study of ASSA ABLOY's Smart Lock business for that entire five year period, even though the relevant question is instead the competitive intensity of Fortune Brands' Smart Lock business during the period from June 20, 2026 through September 23, 2028. As discussed in more detail below, the present demand for an ongoing feed of detailed, transaction-level data for all ASSA ABLOY Smart Lock sales, as well as monthly productions of multiple categories of ordinary course business documents, is simply not consistent with the scope of the monitoring trustee's obligation to investigate the competitive intensity of Fortune

Brands years from now. Moreover, the requests you previewed on our call for meetings with ASSA ABLOY business personnel to understand ASSA ABLOY's Smart Lock business exceeds the plain language of the relief in Section IV of the Final Judgment.

Third, it is also clear from our discussion that the monitoring trustee intends to evaluate competitive dynamics that have nothing to do with any limitations on Fortune Brands' rights to use the rights to the Yale brand name or trademarks in the U.S. or Canada that ASSA ABLOY held as of the Divestiture Date. On our call, you explained that you and your team of attorneys and economists intended to evaluate *all* competitive conditions in the industry so that you could rule out whether conditions other than trademark rights were the cause of any diminution in Fortune Brands' competitive intensity. But that is not the monitor's responsibility. Part IV of the Final Judgment is clear that the first step is for the monitor to determine *whether* there has been a diminution in competitive intensity "after three years." *Id.* at IV(a). Only then will the monitor determine if that diminution is somehow caused by limitations on rights to the Yale trademarks in the U.S. or Canada. *Id.* at IV(b). You conceded on the call that the monitor has not, at this time, identified any diminution in Fortune Brands' competitive intensity, but were nevertheless conducting a wide-ranging investigation into the drivers of competition in the Smart Lock business. In essence, you are proposing the exact opposite of the inquiry set forth in the Final Judgment—examining any and all competitive dynamics, for any and all market participants, regardless of whether competitive intensity has increased or decreased, and completely untethered to any assessment of the Yale trademark rights.

Fourth, we now understand that you intend to investigate in detail other ASSA ABLOY businesses that do not sell Smart Locks. Specifically, during our call you stated you needed to look beyond residential smart locks to "understand the interplay with commercial and multifamily" and how that interplay impacts competition over time. But the Final Judgment explicitly focuses on "competitive intensity in the residential Smart Locks business" and the connection of that intensity to the Yale brand name or trademarks. *Id.* at Part IV. Again, expanding that focus to segments outside residential is contrary to the plain language of the Final Judgment.

This is not a mere disagreement as to methodology. The document requests that you have served and the invoices that you have submitted reflect the excessive burden, cost, and unreasonableness of this incorrect interpretation of the Final Judgment.

<u>Document and Data Requests</u>

Document Request AA DR 06 asks for ongoing, *monthly* productions of "documentation included in ASSA ABLOY's standard business reviews and management reporting packages relating to the smart lock business in the US" on a monthly or quarterly basis. The request goes on to state that it is not limited to residential business but also includes multifamily and commercial and then identifies over a dozen exemplary categories of documents, such as business plans, product plans, forecasts, and board materials. Similarly, Document Request AA DR 16 requests *ongoing* productions of detailed transactional level data from January 1, 2022 not only to the present but also on an ongoing basis every six months for every smart lock product purchase. The request identifies 28 data fields that it expects to be included.

None of these materials are related to the divested businesses, so we struggle to understand how they relate to the monitoring trustee's responsibility to assess Fortune Brands' competitive intensity in the residential Smart Lock business between June 20, 2026 and September 13, 2028, as ASSA ABLOY's internal business documents and detailed transaction data from 2024 have nothing to do with Fortune Brands' competitive intensity two years from now.

These requests, given their recurring nature and vast breadth, seem guaranteed to keep both ASSA ABLOY and the monitoring trustee working on collecting, reviewing, analyzing, and discussing

documents and data for years, even though there has been no determination made that Fortune Brands' competitive intensity actually declined, much less that it declined during the relevant time period as a result of limitations on Yale trademark rights. The massive burden and cost associated with such an exercise would effectively amount to an ongoing five year Second Request inquiry— something ASSA ABLOY plainly never agreed to, and indeed never would have agreed to after a two year investigation and litigation with the Department of Justice.

Invoices

The document requests and invoices submitted to date clearly demonstrate that ASSA ABLOY's concerns about the significantly outsized cost and burden associated with your overly broad reading of Section IV of the Final Judgment are not merely theoretical. As of the date of this letter, ASSA ABLOY has received five invoices. These invoices cover services purportedly performed by the monitoring trustee and its economists in this matter during the months of September to December 2023 and February 2024. ASSA ABLOY has not yet received the January invoice, and ASSA ABLOY'S legal department did not discover the February invoice until after our call on April 2. Rather than going to the in-house legal team for review and processing, as requested, the February invoice had been submitted directly to ASSA ABLOY's accounts payable department. ASSA ABLOY is investigating to determine whether the January invoice also was sent to a recipient other than the legal team.

| Month | Invoiced Amount | Received |
|-------|-----------------|----------|
| September | $76,656.72 | December 15, 2023 |
| October | $212,226.76 | December 15, 2023 |
| November | $439,185.35 | December 20, 2023 |
| December | $280,353.47 | January 24, 2024 |
| January | N/A | Outstanding |
| February | $505,180.38 | April 8, 2024 |
| **Total** | **$1,513,602.68** | |

These invoices are extreme and excessive, especially given the scope of the monitoring trustee's duties in this matter. While the sum total indicates an average invoice size of over $300,000 per month already, the trend of the invoices is increasing, increasing from less than $80,000 the first month to over $200,000 the second month to over $500,000 for last month received. At this pace, monitoring costs would exceed an astounding ***$15 million*** for the five-year duration of the monitorship.

We had hoped that the initially high invoices were the result of an initial "ramp-up" period in which the attorneys and economists familiarize themselves with the matter and the extensive litigation record, and that invoices would continue to decrease following the decrease from November to December. We have yet to receive an invoice for January time, but the February invoice clearly shows that the monitoring trustee's incorrect interpretation of the Final Judgment is driving excessive attorney and economist costs, even though there is admittedly no evidence whatsoever of any diminution in Fortune Brands' competitive intensity, must less any evidence of such diminution during the time period relevant to the monitor's analysis.

ASSA ABLOY requests a meet and confer to discuss the scope of the monitor's analysis in this matter generally and the nature and breadth of the document and data requests specifically, as well as a substantial reduction on the pending invoices reflecting the monitoring trustee acting "in a reasonable cost-effective manner" consistent with proper scope of the Final Judgment. *Id.* at Part X.

Sincerely,

*/s/ Lauren E. Battaglia*

Lauren E. Battaglia
Partner
lauren.battaglia@hoganlovells.com
(202) 637-5761

cc:

Matthew R. Huppert
matthew.huppert@usdoj.gov

Jay D. Owen
jay.owen@usdoj.gov