# Exhibit 5

# HAUSFELD

888 16th Street, N.W.
Suite 300
Washington, DC 20006

**Melinda Coolidge**
**US Managing Partner**
E: mcoolidge@hausfeld.com
T: 202.540.7144

April 26, 2024

**CONFIDENTIAL**
**VIA ELECTRONIC**
**MAIL**

Lauren E. Battaglia, Esq.
Hogan Lovells LLP
555 13th Street, NW
Washington, DC 20004
lauren.battaglia@hoganlovells.com

Re:     *U.S. v. ASSA ABLOY AB, et al.*, Case No. 1:22-cv-02791-ACR

Dear Lauren:

    I am in receipt of your April 17, 2024, letter presenting untimely objections on behalf of ASSA ABLOY. Your letter misunderstands the monitoring trustee's role. As provided in the Final Judgment, the monitoring trustee must "monitor Defendants' compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order [APSO] entered by the Court[.]" FJ § X(B). The monitoring trustee must also conduct an investigation of whether Fortune Brands maintains competitive intensity in residential smart locks between three years from the date of the divestiture and five years from the date of the Final Judgment relative to ASSA ABLOY's pre-divestiture baseline. FJ § IV.

    These provisions mean that my colleagues and I must seek and assess actual *evidence* of compliance and of competition for the sale of residential smart locks. Passively receiving representations from counsel without further inquiry does not discharge my duty to monitor compliance with the Final Judgment and the APSO, and assuming rather than verifying the maintenance of Fortune Brands' competitive intensity in residential smart locks post-divestiture relative to ASSA ABLOY's pre-divestiture competitive intensity does not satisfy my duty to investigate competitive intensity. All of ASSA ABLOY's objections reflect a fundamental misunderstanding of the monitorship, and I trust that once these misunderstandings have been corrected, ASSA ABLOY will begin complying with its obligation to "use best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations under this Final Judgment and the Asset Preservation Stipulation and Order." FJ § X(H).

hausfeld.com

AMSTERDAM   |   BERLIN   |   BOSTON   |   BRUSSELS   |   DÜSSELDORF   |   LONDON   |   NEW YORK   |
PHILADELPHIA   |   SAN FRANCISCO   |   STOCKHOLM   |   WASHINGTON, DC

I.   **ASSA ABLOY Misunderstands the Monitoring Trustee's Responsibilities**

Importantly, I cannot agree with ASSA ABLOY that my responsibilities are as "narrow" as simply assessing "ASSA ABLOY's compliance with the terms of the supply and transition services agreements."[1] The Final Judgment directs that "[t]he monitoring trustee **must** investigate and report on ASSA ABLOY's compliance with this Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between Acquirer and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment and regarding compliance with the terms of this Final Judgment." FJ § X(I) (emphasis added). The APSO, in turn, provides that "[f]or the avoidance of doubt, the United States' consent does not waive any rights or authority the United States or the court-appointed monitor trustee retain under any provision of the proposed Final Judgment with respect to Section IV, compliance with the terms of the proposed Final Judgment, this Stipulation, or divestiture agreements, or consenting or withholding consent for any subsequent modifications as contemplated by the proposed Final Judgment." APSO § VI(B).

Based on those provisions and on consultations with the U.S. Department of Justice Antitrust Division (DOJ), I understand my mandate to include assessing whether each required element of the divestiture under the Final Judgment, APSO, and incorporated agreements between ASSA ABLOY and Fortune Brands actually occurred so as to ensure that the parties completed the divestiture within the terms of the DOJ's consent and the Court's orders. This means my team must review documents and evidence, conduct interviews, and otherwise verify the representations ASSA ABLOY has made as to its compliance with the material obligations of the agreements it has entered to the extent that the Court's orders require compliance with those obligations. While this may not require detailed examination of all aspects of ASSA ABLOY's business activities the way a conduct monitorship might, it does require a thorough examination of the performance of the divestiture agreements to ensure that ASSA ABLOY has in fact complied with its obligations. I therefore cannot agree with ASSA ABLOY's attempt to artificially narrow the scope of my responsibilities and must instead fulfill my duties under the Court's orders.

II.   **ASSA ABLOY's Objections Fail to Comply with the Final Judgment**

I note that ASSA ABLOY's objections do not conform to the requirements of the Final Judgment, which provides that ASSA ABLOY "may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities under any Order of the Court on any ground other than malfeasance by the monitoring trustee" and that any such objections "must be conveyed in writing to the United States and the monitoring trustee within 10 calendar days of the monitoring trustee's action that gives rise to [ASSA ABLOY's] objection." FJ § X(C). ASSA ABLOY received the requests for meetings, documents, and information at issue as well as the disputed invoices far more than 10 days prior to your letter, and ASSA ABLOY has not identified any "malfeasance"—just ASSA ABLOY's implausibly narrow construction of the Final Judgment.

---

[1] *See* Ltr. of Lauren E. Battaglia dated April 17, 2024, at 1.

The untimeliness is especially significant as ASSA ABLOY has already stalled on complying with the outstanding meeting, document, and information requests for several weeks, substantially impairing my team's ability to complete our assessment of ASSA ABLOY's compliance with the Final Judgment and APSO. *Cf.* FJ § X(H) ("ASSA ABLOY and Acquirer may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities."). Given the importance of the requirement for timely objections to ensuring prompt confirmation of ASSA ABLOY's compliance with the Final Judgment, the DOJ would have ample grounds to disregard ASSA ABLOY's letter on this basis alone.

### III. ASSA ABLOY's Failure to Prove Transfer of the Smart Lock Foreign Divestiture Assets Requires Further Investigation

Beyond the failure to object in a manner consistent with the Final Judgment, ASSA ABLOY's complaints have no substantive merit. As to the Vietnam divestiture, the DOJ has advised that ASSA ABLOY has failed to meet its burden of proving (not merely representing) transfer of the Smart Lock Foreign Divestiture Assets or, at a minimum, transfer of "operational control . . . such that the purposes of the divestiture have been carried out." FJ § VI(C).[2] In particular, neither ASSA ABLOY nor Fortune Brands has provided proof of the Vietnamese government's approval of the amended Enterprise Registration Certificate or Investment Registration Certificate, nor have they shown that the Vietnam divestiture has closed. Rather, we understand that the purchase price for the transaction remains in escrow pending completion of the relevant governmental approvals. While we understand that ASSA ABLOY maintains legal transfer occurred despite the absence of the relevant governmental approvals and the failure of the parties to close the transaction, it has provided no evidence supporting that contention.

By default, therefore, ASSA ABLOY would owe penalties of $50,120 per day as of the beginning of this year ($5,813,920 as of the date of this letter) if it did not meet its burden to demonstrate transfer of operational control to Fortune Brands. *Id*. When ASSA ABLOY failed to meet its burden, the DOJ asked the monitoring trustee to do the job ASSA ABLOY was obligated to do and develop the evidence to show whether operational control has fully transferred. That requires production and analysis of evidence as well as interviews with relevant employees at ASSA ABLOY and Fortune Brands—not conclusory representations by counsel—and ASSA ABLOY's failure to cooperate with the MTT's investigation only puts it at risk of having to pay the accrued penalties. *See* FJ § X(H) (monitoring trustee entitled to "full and complete access to all personnel, books, records, and facilities of the Divestiture Assets" and "ASSA ABLOY . . . may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities"). To date, ASSA ABLOY has not provided access to any ASSA ABLOY personnel for an interview on these crucial issues, and I would urge ASSA ABLOY to cooperate with the relevant interview and written information requests so that the MTT may efficiently conclude the compliance investigation regarding the Smart Lock Foreign Divestiture Assets.

---

[2] *See* Ltr. of Matthew Huppert dated February 29, 2024.

**IV.     The Final Judgment Requires an Investigation of Competitive Intensity**

FJ § IV provides:

> If, after three years following the Divestiture Date and until the date that is five years from entry of this Final Judgment, the monitoring trustee determines, after investigation and consultation with the United States, ASSA ABLOY and Acquirer, that:
>
> a. Acquirer's competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date; and
>
> b. Such diminishment in competitive intensity is in material part due to limitations on Acquirer's right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada as of the Divestiture Date, then
>
> the monitoring trustee may, after consultation with the United States, provide a written report of the monitoring trustee's conclusions to the United States.

By its terms, this paragraph requires the monitoring trustee to conduct an "investigation" to "determine[]" whether Fortune Brands' post-divestiture competitive intensity declines relative to ASSA ABLOY's pre-transaction competitive intensity on residential smart locks, and, if so, whether the limitations on Fortune Brands' trademark rights materially contributed to the decline. The Final Judgment does not state that this "investigation" into competitive intensity will only begin three years following the Divestiture Date (i.e., June 20, 2026). Rather, the Final Judgment requires me to determine whether competitive intensity has "diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date," meaning my team and I must establish a pre-transaction baseline for competitive intensity and then observe how competitive intensity evolves after the Divestiture Date relative to this baseline. Establishing that baseline—which includes the period between the end of litigation discovery and the Divestiture Date—has been a substantial focus of my team's analysis since the inception of the monitorship.

In addition, my team's work does not end after establishing the competitive baseline. Competition does not occur in a vacuum, with Fortune Brands only competing against itself. Rather, it occurs through the activities of competitors, product changes and innovations, shifting trends in consumer preferences, and other dynamic processes.

My team must therefore continue to understand how competition in the industry evolves between the Divestiture Date and the assessment period so as to know what maintained or diminished competitive intensity would look like between June 20, 2026, and September 13, 2028. Since ASSA ABLOY remains a substantial competitor in the smart lock space, its data and business plans have indisputable relevance to the investigation required by the Final Judgment because those materials will provide unique perspective on the relevant market dynamics.

4

Information solely from Fortune Brands is not sufficient for my team to evaluate Fortune Brands' position relative to its other competitors. And understanding whether possible alternative causes of any decline in competitive intensity (such as an industry-wide slowdown or a failure of Fortune Brands to innovate as vigorously as its competitors) will aid my team in determining whether the limitations of Fortune Brands' trademark rights materially contributed to any such decline. Importantly, moreover, nothing in the Final Judgment entitles ASSA ABLOY to dictate the timing of my investigation of competitive intensity or to require my team to conduct this investigation on a compressed timeline in 2026 rather than in an orderly manner over the course of the monitorship.

As for the specific requests, they seek nothing more than structured data and completed business plans that ASSA ABLOY already prepares and maintains in the ordinary course of its business. We see no unreasonable burden in producing such materials, and you have cited no evidence that compliance with these requests would impose costs or disruptions disproportionate to the importance of the information. ASSA ABLOY may designate the materials under the protective order as needed to preserve confidentiality, and I have already offered to work with ASSA ABLOY to establish a manageable production schedule. Finally, the document requests pertain to residential, multifamily, and commercial smart locks because my specific mandate is to determine whether a "diminishment in competitive intensity is in material part due to limitations on [Fortune Brands'] right" to trademarks associated with "the Yale branded commercial business," so evidence from all three sectors will bear on the investigation the Final Judgment requires me to undertake. *See* FJ §§ II(P) & IV(b). Under the circumstances, ASSA ABLOY has no valid objection to the interview, document, and data requests, and it should work collaboratively with my team to fulfill those requests so we can conduct the required investigation of competitive intensity as efficiently as possible.

## V. The Invoices to Date Reflect the Work Needed to Comply with the Final Judgment's Requirements for the Monitoring Trustee

The Final Judgment provides that "[t]he monitoring trustee will serve at the cost and expense of ASSA ABLOY," that "[t]he monitoring trustee may hire, at the cost and expense of ASSA ABLOY, any agents and consultants . . . that are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring trustee's duties," and that "[t]he compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities." FJ §§ X(D)-(F). Consistent with these provisions, ASSA ABLOY has been duly advised of the legal, compliance, and economic consultants retained to assist the monitoring trustee and their billing rates.

Our work to date has included project management to ensure the monitorship remains within the scope of duties outlined in the Final Judgment. Within these parameters, we have undertaken efforts to make initial assessments of the Final Judgment and the APSO requirements, review the relevant portions of the litigation record, conduct conferences with counsel for the merging parties and interviews with relevant witnesses, identify gaps and submit requests for evidence we need for our assessments, prepare an initial report to the DOJ, and otherwise lay the groundwork for the required compliance and competitive intensity investigations. These labor-intensive processes necessarily have involved significant time

5

investments by the skilled professionals on my team given the large amount of material we need to understand, and the invoices to date reflect that fact. More active and collaborative cooperation by ASSA ABLOY will go a long way to streamlining my team's work and enabling us to more efficiently conclude the investigations that the Final Judgment requires us to undertake.

As noted in my April 17, 2024, email, I have submitted all invoices according to the process ASSA ABLOY requested, and any belated changes in ASSA ABLOY's invoicing preferences do not excuse it from its obligation to pay the monitoring team's invoices in a timely manner. ASSA ABLOY is now 125 days delinquent on the October 2023 invoice (submitted November 20, 2023, and due January 20, 2024) and 94 days delinquent on the November 2023 invoice (submitted December 20, 2023, and due February 20, 2024), and has recently fallen into arrears on the January 2024 invoice (submitted on February 23, 2024, and due April 23, 2024). Pursuant to the terms of the Final Judgment, I must insist on prompt payment of all outstanding invoices as billed.

***

For the foregoing reasons, I believe the objections outlined in your letter are unfounded. Please confirm as soon as possible that ASSA ABLOY intends to cease its obstructive behavior and to comply with its obligations under the Final Judgment. We are always available to discuss any issues on which you need further clarification, and you are welcome to raise any concerns you may have with the DOJ as appropriate.

Very truly yours,

*/s/ Melinda R. Coolidge*

Melinda R. Coolidge