## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ASSA ABLOY AB, *et al.*,<br><br>*Defendants.* | Civil No. 1:22-cv-02791-ACR |

## PLAINTIFF'S CROSS-MOTION TO ENFORCE THE FINAL JUDGMENT AND OPPOSITION TO ASSA ABLOY'S MOTION FOR CLARIFICATION

# **TABLE OF CONTENTS**

BACKGROUND ......................................................................................................... 2

I.    The Final Judgment and the Monitor's Duties ...................................................... 2

II.   The Engagement Agreement Between the Monitor and ASSA ABLOY ............................ 4

III.  The Monitor's Work to Date.................................................................................... 5

IV.  ASSA ABLOY's Refusal to Pay the Monitor ....................................................... 6

LEGAL STANDARD............................................................................................................ 9

ARGUMENT ...................................................................................................................... 11

I.    ASSA ABLOY Is in Violation of the Final Judgment ......................................... 11

A. ASSA ABLOY Has Engaged in Unauthorized Self-Help by Unilaterally Withholding Payment to the Monitor ....................................................................... 11

B.   ASSA ABLOY's Course of Conduct Precludes Its Objections to the Scope or Timing of the Monitor's Work to Date............................................................... 14

II.  The Monitor's Competitive Intensity Investigation Is Authorized by and Essential to the Final Judgment and Should Proceed Without Delay......................................................... 17

A.   The Final Judgment Requires the Monitor to Investigate All Issues That Bear Upon Competitive Intensity............................................................................... 18

B.   The Final Judgment Does Not Limit When the Monitor May Conduct the Competitive Intensity Investigation............................................................................... 22

C. The Parties' Early Term Sheet Is Irrelevant and Does Not Suggest That Anything the Monitor Has Done Is Unauthorized.................................................................. 26

CONCLUSION................................................................................................................... 27

i

# TABLE OF AUTHORITIES

**CASES**

*Cemex, Inc. v. Dept. of the Interior*,
    560 F. Supp. 3d 268, 278-79 (D.D.C. 2021)....................................................... 23, 24

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194, 202 (4th Cir. 2001) ........................................................................... 21

*Davis v. Nat'l Council of Negro Women, Inc.*,
    821 F. Supp. 2d 262, 267 (D.D.C. 2011)................................................................. 13

*Evans v. Williams*,
    206 F.3d 1292, 1296 (D.C. Cir. 2000).............................................................. 11, 14

*FAA v. Cooper*,
    566 U.S. 284, 291-92 (2012) ................................................................................... 18

*FTC v. Libbey, Inc.*,
    211 F. Supp. 2d 34, 48 (D.D.C. 2002)..................................................................... 18

*FTC v. Raladam Co.*,
    283 U.S. 643, 649 (1931)......................................................................................... 21

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1, 73-77 (D.D.C. 2015).................................................................. 18

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*,
    926 F.3d 819, 824 (D.C. Cir. 2019) ......................................................................... 22

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
    467 U.S. 51, 59 (1984).............................................................................................. 17

*In re Peterson*,
    253 U.S. 300, 312 (1920).......................................................................................... 10

*Kozlowski v. Coughlin*,
    871 F.2d 241, 245 (2d Cir. 1989) ............................................................................ 10

*McDermott Int'l, Inc. v. Wilander*,
    498 U.S. 337, 342 (1991).......................................................................................... 18

*Nat'l Ass'n of Realtors v. United States*,
    97 F.4th 951, 957 (D.C. Cir. 2024).......................................................................... 26

*NLRB v. Harris Teeter Supermarkets*,
    215 F.3d 32, 35 (D.C. Cir. 2000).............................................................................. 10

*Petties v. Dist. of Columbia,*
 238 F. Supp. 2d 114, 120-21 (D.D.C. 2002)................................................................ 16

*Pigford v. Veneman,*
 292 F.3d 918, 923-27 (D.C. Cir. 2002)................................................................ 18, 20

*Richardson v. Edwards,*
 127 F.3d 97, 101 (D.C. Cir. 1997)................................................................ 10

*Rufo v. Inmates of Suffolk Cnty. Jail,*
 502 U.S. 367, 383 (1992)................................................................ 11

*Segar v. Mukasey,*
 508 F.3d 16, 21 (D.C. Cir. 2007)................................................................ 10

*Twelve John Does v. Dist. of Columbia,*
 861 F.2d 295, 298 (D.C. Cir. 1988)................................................................ 10

*United States v. Aetna, Inc.,*
 240 F. Supp. 3d 1, 64-73 (D.D.C. 2017)................................................................ 18

*United States v. Apple Inc.,*
 787 F.3d 131, 141 (2d Cir. 2015) ................................................................ 10

*United States v. Apple Inc.,*
 992 F. Supp. 2d 263, 281, 287 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) ....... passim

*United States v. Armour & Co.,*
 402 U.S. 673, 682 (1971)................................................................ 25

*United States v. Franklin Elec. Co.,*
 130 F. Supp. 2d 1025, 1033-34 (W.D. Wis. 2000)................................................................ 18

*United States v. ITT Cont'l Banking Co.,*
 420 U.S. 223, 236 n.10 (1975)................................................................ 10, 18

*United States v. Microsoft Corp.,*
 147 F.3d 935, 945 n.7 (D.C. Cir. 1998)................................................................ 10

**STATUTES**

15 U.S.C. § 16................................................................ 3

**RULES**

FED. R. CIV. P. 53(a)(1)(C) ................................................................ 10

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)......................................................................... 13

## <u>INDEX OF EXHIBITS</u>

1.     Email Correspondence among G. Lazarus, M. Coolidge, and M. Huppert, dated Sept. 19 to Sept. 26, 2023

2.     Letter from M. Huppert to G. Lazarus, dated Feb. 29, 2024

3.     Email from M. Huppert to G. Lazarus, dated Mar. 5, 2024

4.     Email from M. Huppert to J. Bernick, *et al.*, dated Mar. 26, 2024

5.     Letter from M. Isaacs to L. Battaglia, dated May 31, 2024

6.     Letter from M. Isaacs to L. Battaglia, dated June 11, 2024

7.     Email from M. Isaacs to L. Battaglia, dated June 17, 2024

In the middle of trial, ASSA ABLOY struck a deal to complete its multi-billion-dollar acquisition.  As part of that deal, ASSA ABLOY made promises to the Court that are memorialized in the terms of the Final Judgment, ECF No. 143.  Those promises involved, among other items, judicial monitoring.  Now that ASSA ABLOY has been able to complete its acquisition, it seeks to unilaterally revise and walk away from its promises to the Court.  But it would utterly defeat the purpose of a consent decree and judicial monitoring to allow the monitored party to engage in the sort of self-help and refusal to pay for the work of the Court-appointed monitoring trustee (the "Monitor") that ASSA ABLOY has engaged in here.  Such efforts should be addressed promptly to ensure that the terms on which the Court authorized the acquisition to be closed are, in fact, honored.

ASSA ABLOY is in violation of the Court's Final Judgment.  That order required appointment of the Monitor, as an arm of the Court, to ensure that Defendants comply with the Final Judgment and to minimize any harm to competition.  The Final Judgment is clear that the Monitor and her team "serve at the cost and expense of ASSA ABLOY."  *Id* § X(D).  Despite that obligation, ASSA ABLOY began unilaterally refusing to pay the Monitor for her Court-ordered work within months of the Final Judgment's entry.  Rather than seek a prompt resolution of that dispute under procedures set forth in the Final Judgment, ASSA ABLOY engaged in impermissible self-help by making only partial payments—and stopping them altogether in February 2024.  The Monitor made extensive efforts to ensure ASSA ABLOY complied with its obligations, resulting in payment for only about 10% of her work to date and the Monitor's cessation of part of her work, namely her competitive intensity investigation.  The United States asks that the Court swiftly end the continuing violation of the Final Judgment and direct ASSA

1

ABLOY to pay the Monitor's costs and expenses as the Final Judgment requires, and as ASSA ABLOY voluntarily promised the Court to do.

Also, ASSA ABLOY seeks to further undermine the Final Judgment by requesting that the Court delay and limit the Monitor's ability to perform a key part of her work—assessing the competitive intensity of the smart lock business ASSA ABLOY sold to Fortune Brands.  That work, along with ensuring compliance with the Final Judgment and its divestiture provisions, is expressly contemplated in the Final Judgment, vital to protecting competition, and a predicate for potential supplemental remedies.  It merits payment.

Accordingly, the United States respectfully requests that the Court deny ASSA ABLOY's motion for "clarification" (in substance, a motion for modification) of the Final Judgment and grant the United States' cross-motion to enforce the Final Judgment, including by ordering ASSA ABLOY to pay the Monitor in accordance with the Final Judgment, with no further delay to her Court-ordered work.[1]

## BACKGROUND

### I.    The Final Judgment and the Monitor's Duties

To resolve the United States' challenge to ASSA ABLOY's proposed acquisition of the Hardware and Home Improvement division of Spectrum Brands, the parties agreed to the Final Judgment.  That consent decree contemplates, among other things, a Court-supervised divestiture of smart lock and premium mechanical door hardware assets from ASSA ABLOY to non-party

---

[1] Prior to filing its cross-motion, counsel for the United States discussed the anticipated motion with counsel for ASSA ABLOY in an effort to determine whether it was opposed and to narrow the areas of disagreement. *See* LOCAL CIV. R. 7(m). ASSA ABLOY opposes the motion.

2

Fortune Brands.  The Court entered the Final Judgment on September 13, 2023, after the public comment period mandated by the Tunney Act, 15 U.S.C. § 16.  ECF No. 143.

An important provision of the Final Judgment requires the appointment of the Monitor, who is obligated to "investigate and report on ASSA ABLOY's compliance with the Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between [Fortune Brands] and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment."  Final Judgment § X(I).  Section IV of the Final Judgment further requires the Monitor to "investigat[e]" the "competitive intensity" of the divested smart lock business, namely whether the competitive intensity of that business in the hands of Fortune Brands "diminishe[s] relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date [June 20, 2023]."  *Id.* § IV.  To carry out that duty, the Monitor is to first engage in "investigation and consultation with the United States," and then, beginning "three years following the Divestiture Date," the Monitor may "determine[], *after* [that] investigation and consultation," (1) whether the smart lock business's competitive intensity has diminished, and (2) whether such diminishment "is in material part due to limitations" on Fortune Brand's rights relating to "the Yale brand name or trademarks in the U.S. and Canada." *Id.* (emphasis added).  If the Monitor determines both conditions are met, then the United States may seek to re-open proceedings and request additional Yale brand divestitures.  *Id.*

The United States requested the appointment of Melinda Coolidge as the Monitor on August 22, 2023, and the Court approved her appointment that same day.  *See* ECF Nos. 132, 133; *see also* ECF No. 132 at 2 (describing how Ms. Coolidge's "extensive experience as a private enforcer" of the antitrust laws "will position her well to lead this monitorship, in which critical investigation of competitive effects and potential coordination are relevant").

3

Because the Monitor is an impartial adjunct of the Court, rather than an agent of any party, the Final Judgment protects her work from interference by monitored parties, including ASSA ABLOY.  For example, ASSA ABLOY "may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities," and it "must use best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations."  Final Judgment § X(H).  ASSA ABLOY also has only a circumscribed ability to object to the Monitor's actions. It may not object to the Monitor's "actions taken . . . in fulfillment of [her] responsibilities . . . on any ground other than malfeasance by the monitoring trustee," and it must also convey any objections to the Monitor's conduct "in writing to the United States and the monitoring trustee within 10 calendar days of the monitoring trustee's action that give rise to Defendants' objection."  *Id*. § X(C).

## II.      The Engagement Agreement Between the Monitor and ASSA ABLOY

Although the Monitor is appointed by the Court, and therefore does not work for ASSA ABLOY or the United States, the Monitor and any "agents and consultants" she retains to assist her with her duties work "at the cost and expense of ASSA ABLOY."  *Id*. § X(D)-(E).  To govern that purely financial relationship, the Final Judgment contemplates the Monitor and ASSA ABLOY signing a "written agreement" that sets forth "the terms and conditions of engagement," including "[t]he compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee."  *Id*. § X(D)-(F).

Following her appointment, the Monitor negotiated over six weeks an engagement agreement with ASSA ABLOY that contemplated immediate and substantial work on the competitive intensity investigation.  *See* Ex. 1.  In negotiating that agreement in September, ASSA ABLOY initially contended that the Monitor's proposed team was "excessive for the

4

*immediate, known* needs of the Monitorship" and "should include only individuals *necessary at this point*." *Id*. at 9 (Sept. 20 Email from G. Lazarus) (emphasis added).  In response, the Monitor proposed removing several team members from the initial roster, and she summarized for ASSA ABLOY her "workstream structure and the types of activities for which the [remaining] personnel . . . will be responsible." *Id*. at 5-8 (Sept. 21 Email from M. Coolidge). Specifically, the Monitor described a distinct "workstream" dedicated to "monitoring changes to competitive intensity." *Id*. at 7.  For that workstream, the Monitor proposed six primary team members, including two economists and a certified public accountant who would, among other things, "design and implement a study that measures changes in competitive intensity in the residential Smart Lock business over time." *Id*.  ASSA ABLOY "agreed with" the Monitor's proposal, including the immediate retention of a team dedicated to studying competitive intensity in the way the Monitor had described. *Id*. at 2 (Sept. 26 Email from G. Lazarus).  All the team members dedicated to studying competitive intensity and their "reasonable and customary" hourly billing rates are included in the engagement agreement ASSA ABLOY later signed on October 5, 2023.  ECF No. 144-2 at 16.

## III.    The Monitor's Work to Date

As reflected in the overview the Monitor provided ASSA ABLOY in September 2023, the Monitor's work to date can be categorized into two separate workstreams.  *See* Ex. 1 at 6-7; ECF No. 144-9.  The "compliance workstream" is dedicated to monitoring compliance with the terms of the Final Judgment, Asset Preservation Stipulation and Order, and inter-party agreements (*e.g.*, supply agreement).  ECF No. 144-9; Final Judgment § X(I); ECF No. 146-1 ¶ 17, ¶¶ 49-84 ("Monitor Statement")*.*  Approximately 60% of the Monitor's work to date has related to this workstream, a significant portion of which was devoted to monitoring the transfer

to Fortune Brands of ASSA ABLOY's smart lock assets in Vietnam.  *See* Monitor Statement ¶ 17, ¶¶ 49-84.  Legal transfer of those assets took several months longer than contemplated by the Final Judgment, a delay that required the Monitor to investigate whether Fortune Brands had received "operational control" of the assets.  *See* Final Judgment § VI(C); *see also* Ex. 2 (Feb. 29 Letter from M. Huppert); Monitor Statement ¶¶ 54, 67-84.  The Monitor had to take on this fact-intensive inquiry because ASSA ABLOY could neither complete the transfer of the assets promptly nor independently satisfy its obligation to "demonstrate to the United States" the transfer of operational control.  *See* Final Judgment § VI(C); Ex. 3 (Mar. 5 Email from M. Huppert); Monitor Statement ¶¶ 12, 54, 69-72.

The "competitive intensity workstream" is dedicated to investigating the competitive intensity of the divested smart lock business.  ECF No. 144-9; Monitor Statement ¶¶ 31-36.  To date, this workstream has primarily consisted of analyzing the expert reports and the litigation record relating to the divested smart lock business and how competition occurs in the residential smart lock market.  ECF No. 144-9; *see* Monitor Statement ¶¶ 17, 37-38.  It has also included work by the Monitor and her team, as contemplated by the engagement agreement ASSA ABLOY signed, to construct benchmark measures of competitive intensity that can later be used to determine whether competitive intensity diminishes from that benchmark.  ECF No. 144-9; *see* Monitor Statement ¶¶ 17, 41, 43-44, 47.

## IV.    ASSA ABLOY's Refusal to Pay the Monitor

Pursuant to the engagement agreement, the Monitor has provided ASSA ABLOY eight monthly invoices, each of which itemizes hours worked and "a high-level description" of the work performed by each individual member of the Monitor's team from August 2023 to April 2024.  *See* ECF No. 144-2 at 11; ECF No. 144-3; Monitor Statement ¶¶ 14, 17.  Although ASSA

6

ABLOY is obligated to "promptly pay all invoices upon presentation, and in no case later than 60 days following presentation," ECF No. 144-2 at 11, it has paid only two of the six invoices that have come due, which account for less than 11% of the Monitor's costs and expenses to date, and it has indicated that it refuses to pay any other invoices absent intervention by the Court.  Monitor Statement ¶¶ 14-15, 17.

To aid the Court, a summary of the Monitor's invoices by dates of work performed is provided below, including, (1) dates they were provided to ASSA ABLOY, (2) dates that payments were due, (3) the status of payment/non-payment, and (4) whether any competitive intensity work was included in the invoice:

| | Work Performed | Invoice Provided to ASSA | Payment Due | Status | Any Competitive Intensity? |
|---|---|---|---|---|---|
| 1 | Aug./Sept. 2023 | 10/25/23 (original) 12/15/23 (revised)[2] | 12/24/23 (original) 2/13/24 (revised) | Paid (2/16/24) | No |
| 2 | October 2023 | 11/20/23 (original) 12/15/23 (revised) | 1/19/24 (original) 2/13/24 (revised) | Unpaid | Yes |
| 3 | November 2023 | 12/20/23 | 2/18/24 | Unpaid | Yes |
| 4 | December 2023 | 1/24/24 | 3/24/24 | Paid (2/16/24) | Yes |
| 5 | January 2024 | 2/23/24 | 4/23/24 | Unpaid | Yes |
| 6 | February 2024 | 4/1/24 | 5/31/24 | Unpaid | Yes |
| 7 | March 2024 | 5/9/24 | 7/8/24 | Unpaid | Yes |
| 8 | April 2024 | 6/17/24 | 8/16/24 | Unpaid | Yes |

**Sources**: Monitor Statement ¶¶ 14, 17; ECF No. 144-3.

The relationship began normally enough, with the Monitor starting her work in August 2023.  In November 2023, ASSA ABLOY requested changes to the first two invoices for work performed in August/September and October 2023—namely "further details" about the nature of

---

[2] As set forth in more detail below, ASSA ABLOY requested that the first and second invoices include additional detail, *see* Monitor Statement ¶ 14, resulting in "revised" invoices that arguably created new payment due dates.

the Monitor's work, including identifying "when [her] work related to the competitive intensity investigation"—and the parties thereafter reached an agreement regarding changes to those invoices on December 15, 2023. Monitor Statement ¶ 14. The Monitor then submitted revised invoices to ASSA ABLOY on December 15, 2023, for her August/September and October 2023 work, reflecting their mutual understanding. *Id.* Those revised invoices were due to be paid no later than February 13, 2024. *See* ECF No. 144-2 at 11.

But that is where the normalcy ended. Despite the December agreement about the first two invoices, ASSA ABLOY failed to pay one agreed-upon invoice (October) and paid the other one (August/September) late. Monitor Statement ¶ 14. After ASSA ABLOY became delinquent on both negotiated invoices (on February 13, 2024), it paid one overdue invoice three days late (August/September), never paid the other (October), and yet *did* pay a third invoice for work performed in December 2023 that had not yet come due. *Id.*

The December 2023 invoice that ASSA ABLOY paid without objection on February 16, 2024, *see id.*, included 223 hours of work expressly dedicated to "the competitive intensity study" and "competitive intensity analysis." ECF No. 144-3 at17-18. And that was no outlier. Seven of the Monitor's eight invoices, beginning with the October 2023 invoice, specifically identified time dedicated to "the competitive intensity study." ECF No. 144-3 at 8; *see also id.* at 13 (November); *id.* at 17 (December); *id.* at 20, 24 (January); *id.* at 26, 29 (February); *id.* at 34 (March); *id.* at 40 (April). Moreover, notwithstanding the continuous presence of competitive-intensity work on the Monitor's invoices submitted to ASSA ABLOY since November 2023, approximately 60% of the total amount invoiced to date is for the Monitor's compliance workstream. *See* Monitor Statement ¶ 17; *see also* ECF No. 144-9.

The Monitor first brought ASSA ABLOY's failure to pay the Monitor's invoices to the attention of the United States on March 14, 2024.  Monitor Statement ¶ 16.  Since then, the United States has taken several steps to encourage ASSA ABLOY to come into compliance with the consent decree, both in person and in writing, *e.g.*, Ex. 4 (Mar. 26 Email from M. Huppert); Ex. 5 (May 31 Letter from M. Isaacs), including by facilitating and participating in a meet-and-confer on May 28 between ASSA ABLOY and the Monitor in an attempt to resolve this dispute without the Court's intervention.  *See* Monitor Statement ¶ 48.  In a letter dated May 31, 2024, the United States noted that "ASSA ABLOY's failure to pay these invoices means that it is in breach of the Final Judgment."  Ex. 5 at 3.

Subsequently, on June 10, 2024, ASSA ABLOY counsel orally informed the United States that ASSA ABLOY refuses to make any further payments to the Monitor absent judicial intervention, including any payments for compliance work to which it does not object. The next day, the United States sent a letter that once again reminded ASSA ABLOY that it was violating the Final Judgment.  *See* Ex. 6 at 1-2 (June 11 Letter from M. Isaacs). ASSA ABLOY was, unbeknownst to the United States, also preparing to move millions of dollars into an escrow account at that same time, which for the four-plus months during which it had been in arrears to the Monitor it had not yet done.  *See* ECF No. 144-7.  The United States continued to make efforts to negotiate a path forward, sending an email on June 17, 2024, to that end.  *See* Ex. 7 (June 17 Email from M. Isaacs).  ASSA ABLOY instead chose to file its pending "Motion for Clarification" the next day.

## LEGAL STANDARD

Consent decrees are generally interpreted as contracts, and so interpretation of their terms falls within the purview of contract law.  *See United States v. Microsoft Corp.*, 147 F.3d 935, 945

n.7 (D.C. Cir. 1998); *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007).  Accordingly, the

decree must be evaluated "as it is written" without consideration of extrinsic purpose or

evidence, unless the Court determines the decree is ambiguous on its face.  *Richardson v.*

*Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997); *see also Segar*, 508 F.3d at 22.

     Consent decrees also "have attributes both of contracts and of judicial decrees."  *United*

*States v. ITT Cont'l Banking Co.*, 420 U.S. 223, 236 n.10 (1975).  "The judicial aspect of a

consent decree derives from the imprimatur of the court, which invests the decree with the

integrity of the judiciary and signifies the court's willingness to implement the solution of the

parties."  *Kozlowski v. Coughlin*, 871 F.2d 241, 245 (2d Cir. 1989).  In this regard, the Monitor,

who was appointed and approved by the Court, is "an impartial arm of the court," *United States*

*v. Apple Inc.*, 787 F.3d 131, 141 (2d Cir. 2015), and her authority to carry out the Final Judgment

is an extension of the Court's jurisdiction to enforce compliance with its orders.  Such

appointments "aid judges in the performance of specific judicial duties, as they may arise in the

progress of a cause."  *In re Peterson*, 253 U.S. 300, 312 (1920); *see* FED. R. CIV. P. 53(a)(1)(C)

     For enforcement, the Final Judgment is to be "interpreted by the Court applying ordinary

tools of interpretation."  Final Judgment § XVI(B).  The United States has "all rights to enforce

the provisions" of the Final Judgment, and "may establish a violation of [the] Final Judgment

and the appropriateness of a remedy therefor by a preponderance of the evidence."  *Id*.

§ XVI(A).

     Modification of a consent decree "is an extraordinary remedy" because it "allows a

party . . . to escape commitments voluntarily made and solemnized by a court decree."  *Twelve*

*John Does v. Dist. of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988).  Accordingly, courts

approach any modification request "with caution."  *NLRB v. Harris Teeter Supermarkets*, 215

F.3d 32, 35 (D.C. Cir. 2000).  "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree."  *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).  If the moving party meets that burden, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance."  *Id*.  Recognizing this high bar, ASSA ABLOY has styled its motion as one for "clarification," but for the reasons articulated below, it is actually a request for modification, which is relief ASSA ABLOY cannot justify.

## ARGUMENT

### I.      ASSA ABLOY Is in Violation of the Final Judgment

ASSA ABLOY is violating the Court's Final Judgment by willfully withholding payment to the Court-appointed Monitor, and it should be ordered to come into compliance immediately and pay the Monitor pursuant to the Final Judgment.  Although the Court need not reach these issues in upholding the terms of the consent decree, ASSA ABLOY's course of conduct and untimely objections are further reasons to deny it the relief it seeks.

### A.      ASSA ABLOY Has Engaged in Unauthorized Self-Help by Unilaterally Withholding Payment to the Monitor

The Court's Final Judgment indisputably obligates ASSA ABLOY to pay the Monitor's costs and expenses.  Final Judgment §§ X(D)-(E) (Monitor and her team work "at the cost and expense of ASSA ABLOY").  At a minimum, that payment obligation extends to the Monitor's work investigating and reporting on Defendants' compliance with the terms of the Final Judgment, Asset Preservation Stipulation and Order, and divestiture-related agreements. ASSA ABLOY is clearly obligated to pay for the Monitor's compliance work, and it concedes that there is "no current dispute regarding [that work's] scope."  ECF No. 144 at 6.  By its own admission,

11

therefore, each of ASSA ABLOY's "missed payment[s]" for compliance work is "a separate violation of the consent decree." *Evans v. Williams*, 206 F.3d 1292, 1296 (D.C. Cir. 2000).

ASSA ABLOY's claim that it now "has serious concerns about the costs associated with that [compliance] work," ECF No. 144 at 6, does not excuse its blanket non-payment.[3]  Putting aside the questionable merits of ASSA ABLOY's concerns, such a position is fundamentally at odds with the agreement that ASSA ABLOY negotiated and signed for the Court's approval. Specifically, the Final Judgment prohibits exactly the sort of self-help ASSA ABLOY now engages in because non-payment "interfere[s] with or impede[s] accomplishment of the monitoring trustee's responsibilities." Final Judgment § X(H); *see* Monitor Statement ¶ 47 (Monitor has "paused" competitive intensity work "because it has not been compensated by ASSA ABLOY in nearly half a year").  And whatever complaints ASSA ABLOY has about the exact amount of "costs associated with" the Monitor's compliance work, its *blanket* non-payment for that work is inconsistent with its concession that such work is authorized and the undisputed fact that ASSA ABLOY is responsible for its cost and expense.

The Final Judgment further provides an avenue for ASSA ABLOY to seek relief if it believed the Monitor exceeded her authority.  Under Sections X(C) and XV of the Final Judgment, ASSA ABLOY may lodge a *timely* objection to the actions at issue (which it did not do here) and, if necessary, seek timely relief from the Court to clarify the scope of the Monitor's authority going forward.  But ASSA ABLOY may not indefinitely withhold payments due, even when it believes the payment is for work not authorized by the Final Judgment, because self-help

---

[3] Although the Final Judgment permits the United States to recommend a substitute monitoring trustee "[i]f the United States determines that the monitoring trustee is not acting diligently or in a reasonably cost-effective manner," Final Judgment § X(K), the United States has made no such determination here, nor has ASSA ABLOY asked the United States to do so.

is not an authorized or appropriate way to deal with such a dispute.  *See*, *e.g.*, *Davis v. Nat'l Council of Negro Women, Inc.*, 821 F. Supp. 2d 262, 267 (D.D.C. 2011) (ordering plaintiff to return funds she had kept in "an attempt to rely on self-help in absence of legal authority").

To be sure, ASSA ABLOY concedes that its failure to pay the Monitor for compliance work is not based on any assertion that the work was unauthorized, *see* ECF No. 144 at 6, much less that it amounts to "malfeasance," which would be the only proper basis for objecting to work that ASSA ABLOY agrees is "in fulfillment of the monitoring trustee's responsibilities under any Order of the Court."  Final Judgment § X(C).[4]  By depriving the Monitor of payment, ASSA ABLOY has diminished her ability to perform the essential functions the Court appointed her to fulfill and forced her to carry unanticipated costs. *See* Monitor Statement ¶ 47.

Moreover, although ASSA ABLOY implies that it is still trying to "resolve [its] concerns" about the cost of the Monitor's compliance work through conferral with the Monitor, ECF No. 144 at 6, the United States is not aware, as of this filing, of any such ongoing efforts. To the contrary, according to the Monitor, "ASSA ABLOY has not spoken to [her] about the unpaid fees" since the May 28 conference that preceded ASSA ABLOY's motion, and her "understanding [is] that ASSA ABLOY is categorically refusing to pay any outstanding invoices."  Monitor Statement ¶ 15.  That understanding is consistent with ASSA ABLOY's statement to the United States on June 10, made in no uncertain terms, that it will not pay anything further to the Monitor absent judicial intervention.  The Monitor has been responsive to ASSA ABLOY's billing concerns before, *see supra* p. 8, but ASSA ABLOY simply stopped

---

[4] ASSA ABLOY's motion does not allege, and the United States has no reason to believe, that the Monitor has engaged in "malfeasance," which is conduct wholly outside the bounds of the law or reasonable disagreement. *See*, *e.g.*, *Malfeasance*, Black's Law Dictionary (11th ed. 2019) ("A wrongful, unlawful, or dishonest act; esp., wrongdoing or misconduct by a public official.").

13

engaging with the Monitor as to the other, unpaid invoices.  Each refusal to pay for the Monitor's

compliance work is a violation of the Final Judgment. *See Evans*, 206 F.3d at 1296.

ASSA ABLOY is violating the Final Judgment by failing to pay not only for compliance

work, but also for refusing to pay the Monitor for her other categories of work, including her

investigation of competitive intensity.  As discussed further *infra* Part II, the competitive

intensity study is also authorized by the Final Judgment, and ASSA ABLOY's categorical

cessation of payment for it is likewise a violation of the Final Judgment.

### B.    ASSA ABLOY's Course of Conduct Precludes Its Objections to the Scope or Timing of the Monitor's Work to Date

ASSA ABLOY's course of conduct accompanying its non-payment of the Monitor is a

further reason for the Court to compel ASSA ABLOY's compliance with the Final Judgment and

reject its untimely objections. ASSA ABLOY's haphazard and inconsistent approach to this

matter has led to some late payments, some non-payments, and belated objections that do not

comply with the Final Judgment.  Although the Court need not reach these matters to enforce the

Final Judgment, the record supports the finding that ASSA ABLOY has waived its right to object

to these invoices and that the Monitor reasonably relied on misleading assurances of payment.

ASSA ABLOY should not now be rewarded for sitting on its hands and failing to comply with

the Final Judgment for the reasons set forth below.

First, although the Final Judgment sets forth clear dispute-resolution procedures, ASSA

ABLOY failed for months to engage in them.  The Court's Final Judgment provides that ASSA

ABLOY's objections to the conduct of the Monitor "must be conveyed in writing to the United

States and the monitoring trustee within 10 calendar days of the monitoring trustee's action that

gives rise to Defendants' objection."  Final Judgment § X(C).  That time limit for all objections,

along with the requirement that objections to in-scope work be based only on "malfeasance," *id.*,

are designed to force prompt airing and resolution of disputes, so that the Monitor is not left working under a cloud of uncertainty about whether she will be paid for her work.  The Final Judgment contemplates similarly prompt resolution of disputes between ASSA ABLOY and Fortune Brands.  *See id*. § XI(A) (requiring binding arbitration "within 15 days of notice by either party").  Despite the availability of this process, ASSA ABLOY failed to use it for months while the Monitor transparently conducted her work, including her competitive intensity investigation.

Recognizing this problem, ASSA ABLOY now claims that it was aware of the full scope of the Monitor's competitive intensity inquiry and her interpretation of the Final Judgment only since at least April 2, 2024.  ECF No. 144 at 4.  But the factual record, including the Monitor's invoices, demonstrate that ASSA ABLOY was on notice of the scope of the investigation much earlier.[5]  Yet even under ASSA ABLOY's timeline, it did not lodge "a formal objection" under the Final Judgment until May 8, 2024, *id*. at 5—more than a month after it purportedly became aware of her work, and long after the 10 calendar days during which it was required to make that objection.  Final Judgment § X(C).  ASSA ABLOY offers no excuse for this delay.  Indeed, ASSA ABLOY only sought relief from this Court after the Monitor made the United States aware of the violation, both the Monitor and the United States engaged in weeks of fruitless

---

[5] For example, the Monitor told ASSA ABLOY in September 2023 that she had hired a team of economists "to design and implement a study that measures changes in competitive intensity in the residential Smart Locks business over time," and ASSA ABLOY agreed with that proposal.  Ex. 1 at 1, 6.  And as ASSA ABLOY also admits, the Monitor issued requests for documents, data, and other information to ASSA ABLOY, which reflected the Monitor's contemplated scope of the competitive intensity inquiry, as early as March 7, 2024.  *See* ECF No. 144 at 7 (describing March 2024 requests that "reflect the breadth of the Monitoring Trustee's intended work").

conferral with ASSA ABLOY, and the United States repeatedly notified ASSA ABLOY it was in violation of the Final Judgment.  *See supra* pp. 9-10.

Second, ASSA ABLOY's course of conduct has resulted in the Monitor's continued performance under the consent decree in reasonable reliance that she would be paid.  *See* Monitor Statement ¶ 9.  For instance, in September 2023, ASSA ABLOY not only approved of the Monitor's staffing, including immediately retaining a team of people dedicated to conducting a competitive intensity investigation, but its counsel also endorsed such work as "necessary at [that] point."  Ex. 1 at 8.  ASSA ABLOY subsequently received a series of eight invoices, all but one of which expressly demanded payment for work performed on the Monitor's competitive intensity investigation.  *See supra* pp. 7-9.  In December 2023, the Monitor and ASSA ABLOY successfully agreed on the first two invoices submitted, only for ASSA ABLOY to later fail to pay one of them in February 2024.  Then, days later, it paid a different invoice (for work performed in December 2023, including on competitive intensity) without objection.  *Id*.

The Court has ample inherent authority to rely on this course of conduct to reject ASSA ABLOY's objections, but at least two legal doctrines confirm that this is the correct result.

First, ASSA ABLOY's prolonged failure to raise any formal objection to the Monitor's work, of which it was fully aware, amounts to a waiver of its rights under the Final Judgment's dispute-resolution procedures.  Final Judgment § X(C); *see*, *e.g.*, *United States v. Apple Inc.,* 992 F. Supp. 2d 263, 281, 287 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) (defendant waived objections to monitor's work by failing to raise them in timely fashion); *see also Petties v. Dist. of Columbia*, 238 F. Supp. 2d 114, 120-21 (D.D.C. 2002) (monitored party's non-payment violated consent decree where it "failed to abide by the procedures for payment disputes unequivocally established by Court order," including requirement to raise disputes "within 15

16

calendar days").  The Court may rely on that untimeliness alone to preclude ASSA ABLOY from now objecting to the scope or timing of the Monitor's work to date.

Second, because ASSA ABLOY's affirmative conduct reasonably gave the Monitor comfort that ASSA ABLOY approved of her competitive intensity investigation, and insofar as that comfort contributed to the Monitor continuing to expend significant resources on her competitive intensity investigation, *see* Monitor Statement ¶ 9, the Court may similarly conclude that ASSA ABLOY is estopped from now objecting to the timing or scope of that investigation. *See*, *e.g.*, *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984).

In any event, whether the Court concludes that ASSA ABLOY has violated the Final Judgment, waived its objections, and/or is estopped by the Monitor's reasonable reliance, it is clear that the Court has the power to remedy ASSA ABLOY's behavior and ensure compliance with the Final Judgment going forward.

## II.     The Monitor's Competitive Intensity Investigation Is Authorized by and Essential to the Final Judgment and Should Proceed Without Delay

The Monitor's investigation of the competitive intensity of the smart lock business now owned by Fortune Brands is expressly authorized by Section IV of the Final Judgment.  That investigation is a critical remedial measure designed to ensure that ASSA ABLOY's transactions, which have reshuffled the residential door hardware industry in the United States, do not impose lasting harm to competition.  *See* ECF No. 129 at 6-7.  All "ordinary tools of interpretation," Final Judgment § XVI(B), confirm that both the timing and scope of the Monitor's investigation to date are authorized and appropriate and should proceed without delay.

17

A.     **The Final Judgment Requires the Monitor to Investigate All Issues That Bear Upon Competitive Intensity**

The Court's Final Judgment authorizes the Monitor to investigate both (1) whether the competitive intensity of the now-divested smart lock business diminishes, and (2) if so, what the material cause(s) of that diminishment are.  Final Judgment § IV.  ASSA ABLOY's proposed limitations find no support in the Final Judgment, and so ASSA ABLOY effectively seeks modification of the Final Judgment, not mere "clarification."  *See, e.g.*, *Pigford v. Veneman*, 292 F.3d 918, 923-27 (D.C. Cir. 2002) (explaining distinction between "interpretation" and "modification" of consent decrees).[6]

The Final Judgment does not define the term "competitive intensity," and because it is a "term of art" in antitrust law, it should be accorded "its established meaning."  *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991); *see also ITT Cont'l Banking*, 420 U.S. at 238 ("aids to construction" of consent decree include "any technical meaning words used may have had to the parties"); *FAA v. Cooper*, 566 U.S. 284, 291-92 (2012) (when a "term of art" is used, it is presumed to connote "the cluster of ideas that were attached to [it] in the body of learning from which it was taken").  The concept of a firm's "competitive intensity" captures the significance of that firm to the existing level of competition in the market, and it is often measured by looking to, among other things, (1) the assets the firm has at its disposal to compete, in both the short run and the long run, (2) the capabilities of the firm to use and operate those assets in competition with other firms, and (3) the firm's incentives to compete.  *See, e.g.*, *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 64-73 (D.D.C. 2017); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 73-77 (D.D.C.

---

[6] This is most clear from ASSA ABLOY's proposed order, which would essentially add four new paragraphs to the Final Judgment, each of which would place a new limit on the Monitor's competitive intensity investigation. *See* ECF No. 144-13.

2015); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 48 (D.D.C. 2002); *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033-34 (W.D. Wis. 2000); *see also* ECF No. 59 at 11-12.  In short, a variety of factors bear upon competitive intensity, and the Final Judgment gives the Monitor latitude to explore those factors through investigation of all relevant market conditions.

Competition does not take place in a vacuum and is not meaningfully measured with a single snapshot of time.  It occurs in a real-world scrum of rival firms that account for adjacent business units, market conditions, competing strategic incentives, and a variety of other factors that often require careful investigation and analysis to understand properly.  Nothing in the Final Judgment suggests that the Monitor is required (or expected) to do anything less than a thorough investigation of competitive intensity that considers all relevant factors and proper benchmarks for comparison.  ASSA ABLOY's arguments seek to divorce the Monitor's analysis from these real-world conditions that give meaning to the concept of competitive intensity.

ASSA ABLOY's arguments also elide the evidence presented at trial.  That evidence showed that there are several differences between ASSA ABLOY and Fortune Brands that may lead to a decrease in competitive intensity in the smart lock business following divestiture to Fortune Brands.  For example, ASSA ABLOY has a robust commercial and multifamily door hardware business that it used pre-divestiture to achieve economies of scope in selling a full line of door hardware products, especially to its most important smart lock customers.  *See*, *e.g.*, DX88 at 61-62; PX508 at 3.  ASSA ABLOY also used Yale as a "master brand" to sell both residential and commercial door hardware.  *See*, *e.g.*, PX 508 at 1; PX 361 at 6, 108; DX 143 at 10.  Fortune Brands has no similar adjacent business or strong door hardware brand.  Therefore, it needed to obtain from ASSA ABLOY a limited license to the Yale brand in the U.S. and Canada and sign a supply agreement with ASSA ABLOY to provide Yale-branded commercial

and multifamily products Fortune Brands could not manufacture on its own but needed to serve its smart lock customers.  The Monitor may investigate how these differences manifest in terms of Fortune Brands' competitive intensity relative to ASSA ABLOY and other smart lock rivals.

Rather than allow the Monitor to take these and other factors into account, ASSA ABLOY asks the Court to transform the competitive intensity investigation into a box-checking exercise that would leave the United States with no meaningful chance of additional relief in the event of diminished competitive intensity, thereby depriving the United States of the benefit of its bargain.  *See Pigford*, 292 F.3d at 927 (modification of consent decree "must preserve the essence of the parties' bargain").  Namely, ASSA ABLOY contends that, in evaluating competition, the Monitor cannot consider (1) other products that Fortune Brands or other firms use to compete in the market, (2) alternative explanations for diminishment in competitive standing, or even (3) other firms in the market.  ECF No. 144 at 11-13.  In other words, ASSA ABLOY seeks to design a competitive intensity investigation that is so incomplete and unreliable that it poses no risk of ever leading to ASSA ABLOY being required to make additional divestitures in the future. Taken in turn, each of ASSA ABLOY's three arguments to narrow the scope of the Monitor's investigation fail.

*First*, the evidence at trial demonstrated that investigation of adjacent business segments, including commercial and multifamily smart lock businesses, can be highly relevant to evaluating the competitive intensity of the divested smart lock business, as discussed *supra* p. 20. Indeed, a core purpose of the competitive intensity study is to examine whether the split of the Yale residential and commercial businesses, caused by the transactions supervised by the Final Judgment, had a material impact on the competitive intensity of the orphaned smart lock business and whether Fortune Brands should be permitted to use the Yale brand more broadly

20

"to compete for any category or customer segment." Final Judgment § IV.  Such a study cannot be conducted without reference to the products separated from the residential smart lock business or on other firms, like ASSA ABLOY, that are not hindered by similar separation.  And the divested smart lock business being studied already encompasses multifamily products, which have a hybrid character that can be residential or commercial.  *See id*. § II(P)(2) (defining divested business as including "the Yale branded Multifamily and residential Smart Lock businesses in the U.S. and Canada"); *id*. § II(*I*) (defining "Multifamily" to include "Residences in" multifamily buildings but also "common areas" and "entrances and exits").

*Second*, although the United States may not seek additional relief unless constraints on the Yale brand materially contribute to a diminishment in competitive intensity, that does not limit the Monitor's ability to investigate whether competitive intensity diminished in the first place.  That is, one is essential to the other, but the analyses can and do serve distinct purposes. Section IV of the Final Judgment contemplates that the Monitor may determine that a diminishment occurred but was caused by other factors.  And turning a blind eye to alternative explanations for a diminishment, as ASSA ABLOY contends the Monitor must do, *see* ECF No. 144 at 11-12, would call into question the accuracy and reliability of any determination that the diminishment was caused by limitations on the Yale brand.  *See*, *e.g.*, *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (court is justified in excluding opinion on causation that "utterly fails to consider alternative causes").

*Third*, any investigation of Fortune Brands' competitive intensity must evaluate the conduct and competitive standing of Fortune Brands' rivals because they are the firms with which Fortune Brands is competing.  The notion that an evaluation of competition must consider competing firms is foundational to antitrust law and economics and should be beyond cavil. *See*,

21

*e.g.*, *FTC v. Raladam Co.*, 283 U.S. 643, 649 (1931) ("It is obvious that the word 'competition' imports the existence of present or potential competitors . . . ."). ASSA ABLOY's brief implicitly concedes this point by acknowledging that "market share"—a relative measure of competitive standing that necessarily considers the performance of rival firms—is a "reasonable metric" of competitive intensity.[7] ECF No. 144 at 11 n.3.

**B.    The Final Judgment Does Not Limit When the Monitor May Conduct the Competitive Intensity Investigation**

ASSA ABLOY misreads the Final Judgment to suggest that the Monitor must wait to begin the required competitive intensity investigation that is vital to protecting competition. The Final Judgment requires the Monitor to determine "after investigation and consultation with the United States, ASSA ABLOY and [Fortune Brands]" whether competitive intensity has diminished "after three years following the Divestiture Date and until the date that is five years from entry of this Final Judgment," without limitation to when she undertakes the predicate investigation. Final Judgment § IV.

Under the well-established "nearest reasonable referent" canon, "ordinarily, and within reason, modifiers and qualifying phrases attach to the terms that are nearest." *Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*, 926 F.3d 819, 824 (D.C. Cir. 2019). Applying that canon here, the limiting clause beginning "after three years following the Divestiture Date" modifies only the phrase that immediately follows it ("the monitoring trustee determines"). Final Judgment § IV. This means that the Monitor must only wait three years after the Divestiture Date to "determine[]" whether "competitive intensity . . .

---

[7] Similarly, the divested business's smart lock "sales," which ASSA ABLOY identifies as another "reasonable metric" of competitive intensity, ECF No. 144 at 11 n.3, is largely meaningless as a measure of competitive intensity unless compared to overall sales in the market and sales of rival firms, all of which would require investigation of firms other than Fortune Brands.

has diminished." *See id.* She need not wait that long to begin her "investigation and consultation." Indeed, the Final Judgment provides that the Monitor may make a determination about competitive intensity as soon as three years after the Divestiture Date, only "*after* investigation and consultation." *Id.* (emphasis added). In other words, the Final Judgment makes plain that the Monitor can and must undertake her investigation and consultation well in advance of the three-year mark to reach such a determination.

On this point, *Apple* is instructive. In that case, after the district court had found Apple liable for conspiring to raise the price of certain e-books, and after it had entered an injunction to remedy that violation, it appointed a monitor to "conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, *as they exist 90 days after his or her appointment*, are reasonably designed to detect and prevent violations of the antitrust laws." 992 F. Supp. 2d at 282 (emphasis added). Apple objected to the monitor working on that assessment during the first ninety days of his appointment, but the court rejected that objection because the ninety-day window was designed to give Apple "the opportunity . . . to revise its policies and procedures," not to limit when the monitor could conduct his assessment of those policies. *Id.* at 283. In such a situation, "any monitor would be expected to use the intervening period between his appointment and the ninetieth day to become familiar with the relevant aspects of the company, its personnel and procedures." *Id.*

Just as in *Apple*, the Final Judgment creates a three-year "window of opportunity," *id.*, for the divested smart lock business to overcome any transitory diminishment in competitive intensity before the Monitor can make her determination on that issue. And, like in *Apple*, that window "does not suggest that the Monitor was expected to, or authorized to, sit idle" for three years. *Id.* She can and should use the "intervening period" to begin her investigation. *See id.*

23

The parties' "course of performance" confirms what the text of the Final Judgment states: the Monitor was authorized and expected to investigate competitive intensity from day one. *See Cemex, Inc. v. Dept. of the Interior*, 560 F. Supp. 3d 268, 278-79 (D.D.C. 2021) (citing, *inter alia*, Restatement (Second) of Contracts §§ 202, 220, 223). "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Id*. at 278 (quoting Restatement (Second) of Contracts § 202(4)). Here, after the Final Judgment was entered, ASSA ABLOY confirmed its agreement with the Monitor immediately hiring personnel to conduct a competitive intensity investigation, the Monitor then began conducting and billing for that investigation as she had proposed, and ASSA ABLOY, "with knowledge of [that] performance," both "acquiesced in" and partially paid for it. *See id.*; *see supra* at pp. 5-9. That course of performance is an "aid in discerning what the parties meant" when they drafted and signed the Final Judgment. *Cemex*, 560 F. Supp. 3d at 279 (citation omitted).

ASSA ABLOY's interpretation of the Final Judgment is "strained and unreasonable," *Apple*, 992 F. Supp. 2d at 283, because it superimposes a cramped concept of "two 'snapshots'" that does not appear in the Final Judgment and ignores the practical realities of investigating competitive intensity. ECF No. 144 at 10. To evaluate competitive intensity at a point in time, the Monitor must be able to investigate the circumstances leading to that point in time, or else her analysis and conclusions to the Court will miss critical context.[8] This is why, in litigation,

---

[8] For example, in April 2024, it was reported that recent price hikes by ASSA ABLOY are one reason for its higher profits. *See Assa Abloy Cost Cuts and Price Hikes Help Offset Challenging Market*, Dow Jones Newswire (Apr. 24, 2024), https://www.morningstar.com/news/ dow-

the parties engaged in fact discovery dating back to 2019 to assess ASSA ABLOY's competitive intensity as of April 2023. The parties needed to understand "the relevant aspects of the company" and competition in the years leading up to trial. *Apple*, 992 F. Supp. 2d at 283.

By the same token, ASSA ABLOY's suggestion of conducting "a simple review of the [divested] business' sales or market share," ECF No. 144 at 11 n.3, is unlikely to suffice in making any reliable determination upon which the Court could rely later. *See* Final Judgment § IV (contemplating a contested proceeding seeking additional relief). Placing ASSA ABLOY's proposed blinders on the Monitor would handicap her investigation and leave ASSA ABLOY with the ability to control the record ultimately available to this Court: ASSA ABLOY could use any evidence it finds outside those "snapshots" to undermine the Monitor's conclusions or sweep such evidence under the rug if it supports her conclusions.

Moreover, as a practical matter, and as the Monitor informed ASSA ABLOY, the amount of work that the Monitor will dedicate to investigating competitive intensity will ebb and flow over the course of the monitorship. Monitor Statement ¶¶ 24, 26, 29. During the first year or so, the Monitor's work will be more extensive, as she and her team come up to speed on the litigation record and construct a pre-divestiture benchmark of competitive intensity. *Id*. Thereafter, the Monitor's work would then likely ebb and flow. *Id*. Thus, ASSA ABLOY's rudimentary projection of the first months' costs across the entire monitorship, *see* ECF No. 144 at 1, is misleading and contrary to what the Monitor has already advised ASSA ABLOY.

---

jones/202404241962/assa-abloy-cost-cuts-and-price-hikes-help-offset-challenging-market. To understand the import of the price hikes, the Monitor should be free to investigate them.

**C.     The Parties' Early Term Sheet Is Irrelevant and Does Not Suggest That Anything the Monitor Has Done Is Unauthorized**

The term sheet that ASSA ABLOY attaches to its motion, ECF No. 144-1, is irrelevant to the Court's construction of the Final Judgment because the meaning of the Final Judgment "must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). The Final Judgment is not ambiguous about the timing or scope of the Monitor's competitive intensity investigation, and therefore the Court should not consider the term sheet in interpreting it. *See*, *e.g.*, *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024) ("[I]f the text of the [document] is unambiguous, 'that is the end of the matter' and [the court] need not address the parties' negotiation history or any other extrinsic evidence.").

If the Court were to consider the term sheet, however, it would not change anything. The term sheet proposed a competitive intensity investigation that is different in three ways from the one embodied in the Final Judgment, but none of those differences matters here.

The first difference is that the term sheet would have permitted the Monitor to make a determination about diminishment of competitive intensity at any point during her term. *See* ECF No. 144-1 at 5. But, as discussed *supra* p. 24, the timing of the Monitor's *determination* relates only to how long the "window of opportunity," *Apple*, 992 F. Supp. 2d at 283, Fortune Brands has to overcome any transitory dips in competitive intensity post-divestiture. It does not limit when the Monitor may conduct her "investigation."

The second difference is that the term sheet would have permitted the Monitor to investigate and make a determination about the competitive intensity of the "premium mechanical door hardware business" that was also divested to Fortune Brands. ECF No. 144-1 at 5. ASSA ABLOY makes no claim that the Monitor has attempted any such investigation, and so that difference is likewise irrelevant to the present dispute.

26

The third difference is that the term sheet would have allowed the United States to seek additional relief if (i) competitive intensity diminished and (ii) any "[a]ssets that were not conveyed to Fortune . . . contributed in a non de minimis way to that diminishment." *Id.* That difference would have expanded the prospects for additional relief for the United States and would have broadened any investigation into the *cause(s)* of a diminishment in competitive intensity, but it would have had no effect on the steps required by the Monitor to investigate the *existence* of such a diminishment.

## CONCLUSION

For the reasons stated above, the Court should deny ASSA ABLOY's request to "clarify" (or modify) the Final Judgment, and the Court should grant the United States' cross-motion to enforce the Final Judgment. The Court should order immediate payment of the Monitor in accordance with the Final Judgment and any other relief that it concludes is appropriate.

Dated: July 2, 2024

Respectfully submitted,

_____/s/ *Matthew Huppert*_____
Matthew R. Huppert
Miranda Isaacs
Benjamin L. Rudofsky
Trial Attorneys
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
Telephone: (202) 476-0383
Email: Matthew.Huppert@usdoj.gov

*Counsel for Plaintiff United States of America*

27