## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>          *Plaintiff*,<br><br>   v.<br><br>ASSA ABLOY AB<br><br>and<br><br>SPECTRUM BRANDS HOLDINGS, INC.<br><br>          *Defendants.* | Case No. 1:22-cv-02791-ACR |

## ASSA ABLOY AB'S REPLY IN SUPPORT OF ITS MOTION FOR CLARIFICATION OF THE FINAL JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.  THE MONITOR'S PROPOSED FIVE-YEAR INDUSTRY STUDY EXCEEDS
    THE SCOPE OF THE INVESTIATION PERMITTED BY THE PLAIN
    LANGUAGE OF THE FINAL JUDGMENT ....................................................................3

II.  THE NEGOTIATIONS BETWEEN THE PARTIES CONFIRM THE
     MONITOR'S INTERPRETATION OF THE FINAL JUDGMENT IS
     INCORRECT ...............................................................................................................10

III.  THE GOVERNMENT'S CROSS-MOTION SHOULD BE DENIED ............................12

     A.  ASSA ABLOY'S Dispute is Properly Before the Court .......................................13

     B.  ASSA ABLOY Has Not Violated the Final Judgment ..........................................17

     C.  The Monitor's Fees Are Unreasonable ................................................................19

CONCLUSION.....................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

\* Asterisks designate cases or authorities counsel chiefly relies upon.

**Page(s)**

**Cases**

*Ashcraft & Gerel v. Coady*,
    244 F.3d 948 (D.C. Cir. 2001)...................................................................................17

*Clorox Co. v. Sterling Winthrop, Inc.*,
    117 F.3d 50 (2d Cir. 1997) ......................................................................................7

*FTC v. Libbey, Inc.*,
    211 F. Supp. 2d 34 (D.D.C. 2002)............................................................................7

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
    467 U.S. 51 (1984)...................................................................................................14

*Nat'l Ass'n of Realtors v. United States*,
    97 F.4th 951 (D.C. Cir. 2024)..............................................................................5, 10

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*,
    298 F. Supp. 2d 81 (D.D.C. 2004)..........................................................................16

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992)................................................................................................12

*Segar v. Mukasey*,
    508 F.3d 16 (D.C. Cir. 2007)*............................................................................10, 17

*United States v. ITT Cont'l Baking Co.*,
    420 U.S. 223 (1975)*................................................................................................3

*United States v. Apple Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014) ......................................................................5

*United States v. Franklin Elec. Co., Inc.*,
    130 F. Supp. 2d 1025 (W.D. Wis. 2000) ..................................................................7

*United States v. Kellogg Brown & Root Servs., Inc.*,
    856 F. Supp. 2d 176 (D.D.C. 2012).........................................................................17

*United States v. Robinson*,
    459 F.2d 1164 (D.C. Cir. 1972)...............................................................................16

## <u>TABLE OF AUTHORITIES—CONTINUED</u>

**Page(s)**

**Other Authorities**

LCvR 7(m)..................................................................................................................13

Restatement (Second) of Contracts, § 237......................................................................17

3 J. Pomeroy, Equity Jurisprudence § 805 (S. Symons ed. 1941) .................................14

## INTRODUCTION

As ASSA ABLOY's Motion explained, the Final Judgment in this case authorizes the Monitor to, among other things, conduct a limited investigation to determine if Fortune's inability to use the Yale trademarks for commercial smart locks somehow diminished the "competitive intensity" of Fortune's acquired residential smart lock business.  If so, the Government can seek leave to re-open the proceeding solely to ask the Court to grant Fortune additional trademark rights. That limited investigation was specifically negotiated by the parties after ASSA ABLOY rejected the Government's initial proposal of a broad five-year study into any and all aspects of competition in the premium mechanical or smart locks businesses and its correspondingly broader potential remedies.  *See* ECF No. 144-1.

The Government's Opposition and Cross-Motion confirm that the Government is seeking to roll-back the deal it struck with ASSA ABLOY a year ago, and instead wants the Monitor to try to prove the theories that the Government sought to advance—but did not prove—during the litigation.  According to the Government, the Monitor should conduct "a thorough investigation of competitive intensity that considers all relevant factors and proper benchmarks," regardless of whether they relate to the Yale trademark, to residential smart locks, or even to Fortune at all.  *See* ECF No. 147 at 19–22.  From the Government's perspective, the study does not even have to relate to any of the relief the Government could ultimately seek.  *Id*. at 21.  But the Final Judgment does not authorize—or require ASSA ABLOY to pay for—some sort of academic research study untethered to the scope of any potential relief in this case.  The Government's suggestion to the contrary makes no sense and is facially unreasonable.

For her part, the Monitor defends the approximately ***$3.3 million*** in fees incurred over just a few months on the grounds that this expansive "competitive intensity" study comports with her

own personal interpretation of what is "reasonable" under the Final Judgment—which was included in a work plan apparently shared with the Government (but not ASSA ABLOY). *See* ECF No. 146 at ¶¶ 3, 10, 11, 18, 30, 31, 85. But the Final Judgment does not give the Monitor and her many retained consultants a "blank check" to bill ASSA ABLOY millions of dollars for analyses that are not expressly contemplated by the Final Judgment.

The Government and Monitor now ask the Court to hold that the Final Judgment requires ASSA ABLOY to pay for this expansive—and very expensive—investigation even though ASSA ABLOY explicitly negotiated for a narrower investigation in a specific time frame, and even though there has yet to be *any* determination that the divested residential smart lock business is less competitive under Fortune's ownership, much less that any such reduction is the result of any limitation on Fortune's ability to use the Yale trademarks. The plain language of the Final Judgment does not permit such an exercise or require ASSA ABLOY to fund it.

Instead of engaging directly in trying to resolve the parties' dispute about the scope of the "competitive intensity" study, the Government's Opposition and Cross-Motion attempt to reframe this dispute as one merely about payment of invoices. The Government argues that ASSA ABLOY is somehow barred as a matter of law from seeking relief because it has "delay[ed]" in bringing this dispute to the attention of the Court. *See* ECF No. 148 at 14–17. But the Government—not ASSA ABLOY—has repeatedly tried to forestall motions practice despite the impasse between the parties. Indeed, once it became clear that the Monitor's excessive invoices did not merely reflect initial costs of getting "up to speed" but rather reflected a run rate in excess of $500,000 *per month*, ASSA ABLOY sought to bring the dispute to the Court's attention as quickly as possible and filed the instant motion within one week of the Government finally confirming the parties were at an impasse on June 11, 2024. *See* ECF No. 144-7. Sensitive to the need to give

the Monitor confidence that funds will be available for payment once the dispute is resolved, ASSA ABLOY placed funds in escrow to cover the invoices.  *See* ECF No. 144-8.  The Government tries to have it both ways, arguing that both payment—and non-payment—of invoices somehow waives ASSA ABLOY's ability to seek relief.  Holding disputed funds in escrow until the dispute is resolved is the best way of preserving the parties' rights and avoiding the Government's unreasonable "Catch-22."

To the extent that it actually addresses the merits of the disputed "competitive intensity" study, the Government jettisons the text of the Final Judgment, disclaims the concessions it made during the negotiations, and turns these proceedings on their head by arguing that ASSA ABLOY is the party seeking a modification of the Final Judgment.  The plain text of the Final Judgment (and its negotiation history) simply does not authorize an ongoing five-year study of all the competitive dynamics in the door lock industry, much less one untethered to the Yale trademarks or residential smart locks.  The Court should grant ASSA ABLOY's Motion and deny the Government's Cross-Motion.

## ARGUMENT

**I.    THE MONITOR'S PROPOSED FIVE-YEAR INDUSTRY STUDY EXCEEDS THE SCOPE OF THE INVESTIGATION PERMITTED BY THE PLAIN LANGUAGE OF THE FINAL JUDGMENT**

The Government asks the Court to ignore the plain language of the Final Judgment and allow the Monitor to use the competitive intensity investigation to try to validate theories the Government's experts suggested in their litigation expert reports, but that the Government never proved at trial.  The Court should reject that invitation.  *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 237 (1975) (consent decrees are interpreted "without reference to the [alleged antitrust violation] the Government originally sought to enforce *but never proved* . . . through

litigation") (emphasis added).   As discussed in ASSA ABLOY's Motion, the Government's position is incorrect for at least four reasons.

*First*, the Monitor and the Government seek to rewrite the Final Judgment to exclude the time limitations on the "competitive intensity" investigation that were specifically negotiated by the parties.   In particular, the Monitor concedes her task is comparing the competitive intensity of ASSA ABLOY's residential smart lock business as of June 20, 2023 with the competitive intensity of Fortune's residential smart lock business "between June 20, 2026 and September 13, 2028." *See* ECF No. 146 at ¶ 32.   Indeed, Section IV of the Final Judgment does not authorize any "investigation" into Fortune's "competitive intensity" until a date that is "three years following the Divestiture Date," ECF No. 143 at 9 (Section IV), which is June 20, 2026.   That makes perfect sense.   Fortune was not in the residential smart lock business until the transaction closed in June 2023.   In addition to ASSA ABLOY seeking to reduce the burden of the Monitor's study, the parties contemplated that it would take Fortune some period to integrate the acquired smart lock business into its existing operations and to allow for a reasonable measurement of Fortune's "competitive intensity." *Cf.* ECF No. 147 at 26.   They settled on three years. *Id*.   But the Monitor intends to study "competition in real time" between 2023 and 2026 "to monitor how . . . competition evolve[s] over the course of [that] period," *see* ECF No. 146 at ¶¶ 36, 45, and demands that Fortune (and ASSA ABLOY, for some unknown reason) send her business plans every month so that she can continuously interview employees about those plans in real time over five years. *Id*. at ¶ 45.   That intrusive—and unauthorized—intermediate investigation between the two assessment 'snap shots'—one in June 2023 and the other between June 2026 and September 2028—does not square with the parties' agreement or the Final Judgment.   And, even by the

Monitor's own calculations, would result in up to $2 million in unauthorized costs to ASSA ABLOY.  *See id.* at ¶ 24.

The bulk of the Government's Opposition attacks a strawman on this point, suggesting that ASSA ABLOY's position is that the Monitor may not do *any* work at all before "three years following the Divestiture Date [June 20, 2023]."  *See* ECF No. 147 at 22–25.  To the contrary, ASSA ABLOY understands that the Monitor may analyze "competitive intensity" of the divested residential smart lock business at the time of the divestiture—the first "snap shot."  *See* ECF No. 144 at 11 n.3.  But that analysis hardly requires a significant investigation or millions of dollars in expense.  The litigation record provides a massive amount of information about sales and market share—as well as any necessary "context"—to establish the "competitive intensity" of the divested residential smart lock business as of June 2023.[1]  *See* ECF No. 147 at 24.  The Government fails to identify any reason why the Monitor should engage in a continuous five-year industry study, or why any work before June 2026 should go beyond the narrow task of establishing a "baseline" for which any changes in competitive intensity would later be measured between June 2026 and September 2028.[2]

---

[1]  Discovery closed only a few months before the divestiture date.  Any supplementation of the litigation record, therefore, would necessarily be limited and far less burdensome and intrusive than the Monitor's work plan contemplates.

[2] The Government's reliance on the "nearest reasonable referent" canon and *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 282–83 (S.D.N.Y. 2014) therefore is both misplaced and inapposite. *See* ECF No. 147 at 22–23.  And, for the same reason, ASSA ABLOY's acquiescence in the Monitor's retention of economists and its payments for certain activities associated with the competitive intensity investigation contemplated by the Final Judgment, *see id.* at 24, reveals nothing about how the Court should interpret the Final Judgment or whether the Monitor's excessive use of economists is unreasonable.  *See Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024) ("[I]f the text of the [document] is unambiguous, 'that is the end of the matter' and [the court] need not address . . . any other extrinsic evidence.") (citation omitted).  Again, ASSA ABLOY expected that initially high invoices reflected the Monitor "getting up to speed" with the litigation record to establish the "competitive intensity" baseline, and only later

*Second*, the Monitor and the Government seek to rewrite the Final Judgment to allow the Monitor to conduct a five-year industry study exploring "all relevant market conditions" affecting competition *before* she even identifies a scintilla of evidence that Fortune's residential smart lock business is less competitive than it was under ASSA ABLOY's control three years earlier. *See* ECF No. 147 at 19. This makes no sense given the express text of the Final Judgment and the limited nature of the Monitor's ultimate task: determining whether there is any diminution in "competitive intensity" caused, "in material part," by limitations on Fortune's rights to certain Yale trademarks in the United States and Canada. *See* ECF No. 143 at 9–10 (Section IV). To illustrate, in June 2026, a simple comparison of the divested business' sales or market share may reveal that Fortune's residential smart lock business is at least as competitive as it was under ASSA ABLOY and obviate the need for any further investigation at an early stage. Yet, if the Government and Monitor proceed as planned, the Monitor will spend millions of dollars studying competitive dynamics before *even observing* a reduction in "competitive intensity." *See* ECF No. 146 at ¶ 34. This approach is enormously expensive and inefficient and is inconsistent with the Final Judgment.

The Government and Monitor appear to be putting the "cart" of analysis before the "horse" of a finding of reduced "competitive intensity" in order to allow the Monitor to investigate and attempt to prove theories the Government presented during the trial, such as "economies of scope in selling a full line of door hardware products" and "mutual forbearance." *See* ECF No. 147 at 19; ECF No. 146 at ¶ 34. These theories are irrelevant to the scope of the divested Yale trademark rights or authorized relief under the Final Judgment because nothing prevents Fortune from

---

discovered that the Monitor instead intended to conduct a continuous, ongoing study over five years.

competing for commercial smart locks using a different brand.  *Cf. Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir. 1997) ("[T]rademarks are by their nature non-exclusionary" because a "trademark, unlike other intellectual property rights, does not confer a legal monopoly on any good or idea; it confers rights to a name only" and "merely enables the owner to bar others from use of the mark, as distinguished from competitive manufacture and sale of identical goods bearing another mark") (internal quotations omitted).[3]  Regardless, contrary to the Government's position, the Final Judgment simply does not give it, the Monitor, or even the Court, authority to reconsider wholesale whether "ASSA ABLOY's transactions, which have reshuffled the residential door hardware industry in the United States, do not impose lasting harm on competition."  ECF No. 147 at 17.

The Government tries to justify its expansive view of the Monitor's investigatory powers by asserting that the term "competitive intensity" is a "'term of art' in antitrust law."  *See* ECF No. 147 at 18 (citations omitted).  But it is not, and has no "established meaning" in antitrust law.  *Id.* (quotations and citations omitted).   None of the four cases the Government cites provide a definition of "competitive intensity"—and two of the four, *FTC v. Libbey, Inc.,* 211 F. Supp. 2d 34 (D.D.C. 2002), and *United States v. Franklin Elec. Co*., *Inc.*, 130 F. Supp. 2d 1025 (W.D. Wis. 2000), do not even use the term.  *See* ECF No. 147 at 18–19.  Instead, the Government's conceptual definition of "competitive intensity" simply mirrors its own advocacy during the trial, *see* ECF No. 59 at 11–12, but the Government's position was contested by the parties and never adopted by the Court.  It certainly provides no basis to discard the plain text of the Final Judgment.

---

[3] Moreover, although ASSA ABLOY continues to offer both residential and commercial smart locks post-divestiture, it no longer markets them under the same brand name.  *See* Press Release, *Yale Commercial is now ASSA ABLOY ACCENTRA*, https://www.accentra-assaabloy.com/en/Today (last visited on July 7, 2024).

*Third*, the Final Judgment is clear: the relevant inquiry relates to the competitive intensity of *Fortune's* residential smart lock business post-divestiture. *See* ECF No. 143 at 9 (Section IV). The Monitor, however, admits that she intends to conduct a continuing probe into *ASSA ABLOY's* broader business for the entire five-year duration of the monitorship, seeking a stream of transaction-level data and sensitive strategic documents having nothing to do with its residential smart locks business or any limitations on Fortune's ability to use certain Yale trademarks. *See* ECF No. 146 at ¶ 44; ECF No. 147 at 20–21; *see also* ECF No. 144-11 (Document Request 16); ECF No. 144-12 (Document Request 6).[4]  The Monitor's task is not to compare ASSA ABLOY's broader business, or even its residential smart lock business, to Fortune's during the same time period.  Her task is quite clear: to determine, between two distinct "snapshots," whether Fortune's residential smart lock business competes as intensely (between 2026 and 2028) as that same business did under ASSA ABLOY's direction (as of June 2023). *See* ECF No. 146 at ¶ 32.  There is no reason or basis to conduct an ongoing study of *ASSA ABLOY's* business or plans post-divestiture.

ASSA ABLOY understands that the Monitor may need some limited information from ASSA ABLOY (and/or other market participants) in the future—for example, to try to assess market shares in 2026—and the Final Judgment vests the Monitor with the authority to obtain such documents or data for that purposes. *See* ECF No. 146 at ¶ 40.  But that limited authority does not

---

[4] The Monitor does not contest that ASSA ABLOY has promptly responded to each of her requests for documents, data, and interviews and that there are no outstanding, undisputed requests for ASSA ABLOY to address.  The Monitor claims, however, that ASSA ABLOY has produced "zero documents responsive" to certain document requests. *See* ECF No. 146 at ¶ 21.  That is incorrect. ASSA ABLOY has produced all documents and data that the Monitor sought other than those relating to the Monitor's proposed five-year industry study. *See* ECF No. 144-11 (Document Request 16); ECF No. 144-12 (Document Request 6).  In other words, ASSA ABLOY has produced everything to which the Monitor is entitled.  The only items outstanding are the disputed requests.

broaden the scope of the Final Judgment or justify the premature and extremely broad data and document requests served on ASSA ABLOY that the Monitor demands be refreshed every month. Nor does ASSA ABLOY become relevant to a post-divestiture inquiry into Fortune's residential smart lock business simply because the Government suggests—without any evidentiary support— that Fortune is "hindered" without a commercial business segment, and thus that the Monitor may investigate other firms with both residential and commercial offerings.  *See* ECF No. 147 at 20.

*Fourth*, the Final Judgment does not empower the Monitor to investigate separate and distinct business segments, such as multifamily and commercial, simply because the Government or Monitor call them "adjacent," *see* ECF No. 147 at 20, to the "residential Smart Locks business." *See* ECF No. 143 at 9 (Section IV).  The "competitive intensity" investigation the Final Judgment permits is limited to the "residential Smart Locks business."   The text contemplates nothing further.  *Id.*

The Government's contrary arguments are wrong and inconsistent with the text of the Final Judgment.  For example, the Government claims that "the divested smart lock business being studied already encompasses multifamily products, which have a hybrid character that can be residential or commercial," so the Monitor should be permitted to investigate those separate business segments.  *See* ECF No. 147 at 21.  The Government rests that argument on the Final Judgment's definition of "Smart Lock Divestiture Business," which in pertinent part, is "the Yale branded Multifamily *and* residential Smart Lock businesses in the U.S. and Canada (including Yale Real Living), but does not include . . . the Yale branded commercial business."  *See* ECF No. 143 at 6 (Section II(P)(2)) (emphasis added); *cf.* ECF No. 147 at 21.  But Section IV of the Final Judgment does not use the term "Smart Lock Divestiture Business."  *See* ECF No. 143 at 9 (Section IV) (expressly stating that the Monitor is to investigate the narrower "residential Smart Lock

business").  Instead, its definition supports ASSA ABLOY's reading of Section IV; the terms "Multifamily" and "commercial businesses" are listed separately from "residential Smart Lock businesses."  If the parties thought they were agreeing to an investigation covering these "adjacent" business segments, the Final Judgment surely would have said so.

Accordingly, based on the plain language, the Monitor's proposed five-year industry study exceeds the scope of the "competitive intensity" investigation the Final Judgment authorizes.

## II.   THE NEGOTIATIONS BETWEEN THE PARTIES CONFIRM THE MONITOR'S INTERPRETATION OF THE FINAL JUDGMENT IS INCORRECT

The Final Judgment is clear and refutes the Government's attempt to expand the Monitor's duties.  The Court need go no further to enter the relief ASSA ABLOY seeks.  As ASSA ABLOY noted in its Motion, consent judgments are construed as contracts.  *See Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007).  When the text of a contract is clear and unambiguous giving the terms used their ordinary meanings, then the Court need not go beyond the four corners of the document. *See Nat'l Ass'n of Realtors*, 97 F.4th at 957.

To the extent that the Court believes that the Final Judgment has any ambiguity, the negotiating history preceding the Final Judgment's entry confirms ASSA ABLOY's reading as correct and refutes that of the Monitor and Government.  *See* ECF No. 144-1.  The Government makes no serious argument otherwise.

*First*, the Government admits that it originally sought a "competitive intensity" study that lasted the entire five-year monitorship period and that the parties ultimately agreed to an assessment of Fortune's residential smart lock business that would begin only "after three years following the Divestiture Date," *see* ECF No. 143 at 9 (Section IV), so that Fortune may "overcome any transitory dips in competitive intensity post-divestiture."  *See* ECF No. 147 at 26. The Government may not renege on that negotiated concession by directing the Monitor to

evaluate "competition in real time" between 2023 and 2026 "to monitor how . . . competition evolve[s] over the course of [that] period." *See* ECF No. 146 at ¶¶ 36, 45.  The parties did not agree to that—indeed, ASSA ABLOY explicitly rejected it—and the Court's Final Judgment does not order it.

*Second*, the Government does not contest that at every stage of the negotiations the contemplated "competitive intensity" investigation focused exclusively on Fortune's "competitive intensity" "after three years following the Divestiture Date," which occurred on June 20, 2023. *See* ECF No. 143 at 9 (Section IV).

*Third*, the Government concedes that its original proposal "would have broadened any investigation into the cause(s) of a diminishment in competitive intensity," *see* ECF No. 147 at 27 (emphasis omitted), to include *all* "[a]ssets that were not conveyed to Fortune . . . as a part of the divestiture (whether or not those assets were supposed to have been conveyed to Fortune . . . pursuant to the divestiture)." *See* ECF No. 144-1 at 4.  The Government, however, contends that the negotiations never altered the "steps required by the Monitor to investigate the *existence* of such a diminishment." *See* ECF No. 147 at 27 (emphasis in original).  This makes no sense: the Final Judgment only authorizes an assessment of whether limitations on certain *Yale trademark rights* caused a reduction in the competitive intensity of the divested business.  If so, the Government can seek to have additional trademark rights added to the divestiture. *See* ECF No. 143 at 9–10 (Section IV).  The parties did not agree—and the Final Judgment does not authorize— an unlimited study into smart lock competition untethered to any relief the Government may try to seek.  The Government's argument runs counter to the structure of the investigation to which the parties agreed, and the Court ordered.  The Government may not now disregard the concessions it

made during the negotiations, which limited both the Monitor's investigation and the additional relief available to the Government to certain Yale trademark rights.

*Fourth*, the Government concedes that it never sought the inclusion of the multifamily and commercial segments, which the Government acknowledges are distinct and "adjacent" to the residential smart lock business.  *See* ECF No. 147 at 20.  It may not now unilaterally add those terms to the Final Judgment after the fact.  In effect, the Government concedes that it is seeking a modification of the Final Judgment.  It has not moved for such relief, much less put before this Court any evidence that would warrant modification of a Final Judgment resulting from a negotiated settlement agreement.  *See Rufo v. Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 383 (1992) ("[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.").

While ASSA ABLOY does not believe that the Court needs to go beyond the Final Judgment itself, should it do so, the negotiating history conclusively refutes the Monitor's proposed five-year industry study and the Government's endorsement of it.

## III.    THE GOVERNMENT'S CROSS-MOTION SHOULD BE DENIED

The Government's "Cross-Motion" makes various arguments in an effort to put ASSA ABLOY in a procedural "box" so that it cannot challenge the scope of the Monitor's excessive invoices for her competitive intensity study.  *First*, the Government argues (incorrectly) that ASSA ABLOY cannot dispute anything at all because it failed to bring the dispute within 10 calendar days.  *See* ECF No. 148 at 14.  *Second*, the Government tries to have it both ways, arguing that both withholding payment *and making payment* justify denying ASSA ABLOY's Motion and granting the Government's Cross-Motion—the very reason why ASSA ABLOY saw no reasonable alternative other than safely depositing the disputed funds in escrow.  *Third*, notably

absent from the Government's Cross-Motion is any argument that the actual amounts of the invoices are "reasonable" as required under the Final Judgment. The Government's basic position appears to be that the Monitor has a "blank check" to charge ASSA ABLOY millions of dollars in fees, and that ASSA ABLOY has no recourse to the Court. The Government is wrong. Each of these issues is discussed separately below.

A.      ASSA ABLOY'S Dispute is Properly Before the Court.

The Government's "Cross-Motion" tries to conflate two different disputes between the parties, one that ASSA ABLOY raised, and one that it did not: (1) a dispute regarding the scope of the Monitor's "competitive intensity" study (the subject of ASSA ABLOY's Motion); and (2) a dispute regarding the Monitor's excessive fees for the remainder of her compliance work (the subject of the Government's Cross-Motion). As discussed below, ASSA ABLOY did not become aware of the excessive invoices for the compliance work until June 3, 2024, when the Monitor first provided a "break down" between costs associated with the "competitive intensity" and compliance workstreams. *See* ECF No. 144-9. Because the parties have not had an opportunity to meet and confer regarding the excessive invoices for compliance work, that dispute is not ripe for the Court. *See* LCvR 7(m); *see also* Civil Standing Order (Reyes, J.) at 5 ("The Court expects counsel to exhaust efforts to confer before bringing before it any such dispute."). Nevertheless, the Government is wrong that ASSA ABLOY has somehow "waived" its right to dispute the invoices for either workstream.

*First*, ASSA ABLOY has not waived its objections to the Monitor's "competitive intensity" work and is not estopped from bringing such objections.[5] While the government invokes

---

[5] An estoppel exists only when the party claiming it relies on "its adversary's conduct 'in such a manner as to change his position for the worse' and that reliance [is] reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was

Paragraph X(C) of the Final Judgment to argue that ASSA ABLOY must raise any dispute within 10 calendar days, its quote of this provision carefully omits language that disproves their argument. *See* ECF No. 148 at 14.  In particular, the Final Judgment states that "Defendants may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities *under any Order of the Court* on any ground other than malfeasance by the monitoring trustee" unless such objections are conveyed "within 10 calendar days."  *See* ECF No. 143 at 27 (Section X(C)) (emphasis added).  But ASSA ABLOY's position is that the Monitor's actions with respect to the competitive intensity study are not authorized by the Final Judgment and are therefore outside the "monitoring trustee's responsibilities under any Order of the Court" to begin with. *Id.* As a result, the 10-day limit does not apply.  Indeed, for such disputes, the Final Judgment is clear that parties may "apply to the Court *at any time* for further orders and directions as may be necessary or appropriate to carry out or construe th[e] Final Judgment."  *See* ECF No. 143 at 32 (Section XV) (emphasis added).

Nor is ASSA ABLOY somehow otherwise untimely in bringing the "competitive intensity" dispute to the Court.  In late 2023, the Government and the Monitor apparently met privately to develop a plan for the "competitive intensity" study.  *See* ECF No. 146 at ¶¶ 3, 10–11. The details of that work plan have never been shared with ASSA ABLOY.  While the Monitor avers that the Government provided regular assurances that her actions are "consistent with their [sic] understanding of the scope of [her] duties" under the Final Judgment, *see id.* at ¶ 11, and in "her opinion . . . [her] work . . . has conformed strictly to the requirements of the Final Judgment

---

misleading."  *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984) (quoting 3 J. Pomeroy, Equity Jurisprudence § 805, at 192 (S. Symons ed. 1941)).  The Government makes no attempt to establish any change in its position to its detriment based on any of ASSA ABLOY's conduct, much less reasonable reliance.

and has been reasonable and necessary to fulfill my mandate as Monitoring Trustee," *id.* at ¶ 85, neither the Government nor the Monitor ever communicated that plan of action to ASSA ABLOY.[6] Instead, it was only after ASSA ABLOY received invoices approaching $2 million for just a few months of work, as well as burdensome document and data requests, that it began to become clear how the Monitor might be exceeding the scope of the Final Judgment. The relevant timeline is set forth below:

- **December 15, 2023:** ASSA ABLOY receives initial invoices for September ($76,656.72) and October ($212,226.76);

- **December 20, 2023:** ASSA ABLOY receives invoice for November ($439,185.35);

- **January 24, 2024:** ASSA ABLOY receives invoice for December ($280,353.47); and

- **April 8, 2024:** ASSA ABLOY receives invoice for February ($505,180.38).[7]

ASSA ABLOY met and conferred with the Monitor on April 2, 2024, providing the first indication of a dispute, and had further confirmation after receiving the invoice for the Monitor's work in February that the parties had a disagreement regarding the scope of the Monitor's investigation. ASSA ABLOY's April 17, 2024 letter, *see* ECF No. 144-4, triggered an extensive meet and confer process in which the Government hosted an in-person meeting on May 28, 2024. At that meeting, the Monitor for the first time presented to ASSA ABLOY her "anticipated activit[ies]" relating to the proposed five-year industry study. *See* ECF No. 146 at ¶ 26. It was

---

[6] The Government contends that an email from the Monitor on September 21, 2023, placed ASSA ABLOY on notice of Monitor's unauthorized five-year industry study. *See* ECF No. 146-2, Exhibit 2, at 3. But that email states only that the "competitive intensity" study will be conducted "as outlined . . . in the [Final Judgment]. *Id.* at 8. Accordingly, ASSA ABLOY would have no reason to suspect that the Monitor, with the Government's apparent acquiescence, planned to conduct an investigation far exceeding her authority under the Final Judgment. Indeed, that correspondence only shows that ASSA ABLOY was concerned that the team originally proposed by the Monitor was far larger than what is required to establish ASSA ABLOY's competitive intensity at the time of the divestiture. *Id.* at 3.

[7] ASSA ABLOY did not receive the invoice for the Monitor's February work until April 8, 2024, although the invoice is dated for April 1, 2024.

not until June 11, 2024 that the Government was willing to confirm that it agreed with the Monitor's position, which prompted ASSA ABLOY to file the instant motion on June 18, 2024, within a week of the Government confirming impasse.  Accordingly, the record is clear that ASSA ABLOY did not "sit[] on its hands," but instead engaged in good faith on this issue, including "weeks of . . . conferral" with the Government and Monitor before requesting the Court's guidance. *See* ECF No. 148 at 14–15.

*Second*, ASSA ABLOY has not somehow waived its objections to the Monitor's compliance work.  The Government's assertions that ASSA ABLOY declined to timely object to the Monitor's compliance-related work and that ASSA ABLOY never asserted that this work constituted to "malfeasance" are demonstrably false.  *See* ECF No. 148 at 13.  It was not until June 3, 2024 that the Monitor provided a purported breakdown of the fees invoiced between the "competitive intensity workstream" and the "compliance workstream," which are not separately categorized in the invoices sent to ASSA ABLOY.  *See* ECF No. 144-3.  This breakdown revealed for the first time that the Monitor had run up millions of dollars in fees and costs exclusively related to her compliance work.  *See* ECF No. 144-9.  *Within hours*, ASSA ABLOY objected to those costs and told the Government and Monitor that the compliance-related fees to date "plainly reflect malfeasance" under the terms of the Final Judgment.  *See* Exhibit 1, Ltr. from L. Battaglia to M. Isaacs, dated June 3, 2024.  Notably, the Government omitted any reference to that letter in its Cross-Motion.  The Government never explains how objecting within hours of learning the facts constitutes a "waiver" of any type.  A "[w]aiver is 'an intentional relinquishment or abandonment of a known right.'"  *See Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (quoting *United States v. Robinson*, 459 F.2d 1164, 1168 (D.C. Cir. 1972)).  The

Government's Cross-Motion comes nowhere close to establishing a factual basis that would support such a finding.

**B.      ASSA ABLOY Has Not Violated the Final Judgment.**

The Government contends that ASSA ABLOY has breached the Final Judgment by withholding payment to the Monitor on certain invoices.  The Government then goes one step further and argues that both withholding payment *and making payment* on certain other invoices justify denying ASSA ABLOY's Motion and granting the Government's Cross-Motion.   But neither the Final Judgment nor the record supports the Government's "tails I win, heads you lose" argument.

The Final Judgment and the Engagement Agreement with the Monitor are construed as contracts.  *See Segar*, 508 F.3d at 21.  And, as discussed above, the Monitor has breached these agreements by launching a "competitive intensity" study that the Final Judgment explicitly forecloses.  One party to a contract need not continue to perform when the counterparty breaches. In that situation, the law excuses the non-breaching party's non-performance.  *See United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 185 (D.D.C. 2012) (under the "prior material breach doctrine," "a party may defend against a breach of contract claim on the ground that its performance was excused by the other party's prior breach of the contract")*; see also Ashcraft & Gerel v. Coady*, 244 F.3d 948, 950 (D.C. Cir. 2001) ("[W]e take no issue with the rule in the Restatement" under which "a party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render any such performance due at an earlier time'") (quoting Restatement (Second) of Contracts, § 237)).  ASSA ABLOY had every intention of paying the Monitor's invoices until it became clear that the Monitor was in breach of contract.  Put differently, ASSA ABLOY's handling of the invoices is not some

17

"unauthorized self-help" remedy, *see* ECF No. 148 at 12, but the direct and lawful result of the Monitor's breach of contract.

More fundamentally, however, ASSA ABLOY is sensitive to the need to give the Monitor confidence that funds will be available for payment once the dispute is resolved, and therefore ASSA ABLOY placed $2,917,016.58 in escrow to cover the balance of the disputed invoices. *See* ECF 144-7. Those funds cannot be moved until the end of the year absent a Court order or agreement of the parties. Thus, the notion that ASSA ABLOY has "refus[ed] to pay the Monitor," *see* ECF No. 148 at 14, is misleading; ASSA ABLOY has already made the payment. The only item left to be decided is how much of the disputed invoices should be paid out of escrow, based on the Court's guidance about whether the Final Judgment authorizes the Monitor's planned "competitive intensity" study and whether the amounts expended on compliance activities are reasonable.

The escrow was in part necessitated by the Government's position that both paying—and not paying—would be used against ASSA ABLOY in motions practice. For example, the Government argues that ASSA ABLOY withholding payment from the Monitor justifies denying ASSA ABLOY's Motion. *See* ECF No. 148 at 11–13. But then, in the same breath, argues that ASSA ABLOY's payment of certain invoices means that it somehow "acquiesced" to the scope of the Monitor's study by "partially pa[ying] for it," thereby justifying denying ASSA ABLOY's Motion. *See* ECF No. 148 at 16; ECF No. 147 at 24. The most reasonable solution ASSA ABLOY could devise in light of the Government's "Catch-22" was to place the disputed funds into escrow and promptly seek guidance from the Court.

C.      **The Monitor's Fees Are Unreasonable.**

Contrary to the Government's assertion, the Final Judgment does not cut the Monitor a blank check.  ASSA ABLOY is only obliged to pay the Monitor's *reasonable* costs and expenses.[8] Yet, the Government does not even attempt to defend the Monitor's invoices as reasonable.  Nor does the Monitor articulate how she billed nearly $2 million and over 2,000 hours to the straightforward task of ensuring ASSA ABLOY "compl[ies] with [the] Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between [Fortune] and ASSA ABLOY."  *See* ECF No. 143 at 28 (Section X(I)); *see also* ECF No. 146 at ¶ 17; ECF No. 144-3.  Notably, the Monitor concedes that over $1 million of those invoiced fees are purely administrative, consisting of vague activities like "Planning and Project Management, DOJ Meetings & Communications, and Monitoring Trustee Team Meetings & Communications."  *See* ECF No. 146 at ¶ 18.

This extraordinary devotion of time and treasure is facially unreasonable and plainly reflects malfeasance by the Monitor.  *See* Exhibit 1, Ltr. from L. Battaglia to M. Isaacs, dated June 3, 2024.  The Monitor has provided no other plausible explanation.  The Monitor concedes that it has not been embroiled in compliance disputes between ASSA ABLOY and Fortune since the divestiture was completed.  *See* ECF No. 146 at ¶¶ 52, 83.  Indeed, the Monitor musters only a handful of perceived compliance-related issues that she felt compelled (or which the Government requested) to investigate further.  *Id.*  Those perceived issues, however, do not justify the Monitor's

---

[8] The Final Judgment provides that "[t]he monitoring trustee will serve at the cost and expense of ASSA ABLOY *pursuant to a written agreement*, on terms and conditions . . . approved by the United States in its sole discretion."  *See* ECF No. 143 at 27 (Section X(D)) (emphasis added). That written agreement—which the Government approved—obliges ASSA ABLOY to pay only for "*reasonable* fees, costs and expenses incurred in connection with the Monitorship."  *See* ECF No. 144-2 at 4 (emphasis added).

millions in fees and thousands of billable hours.[9]  If anything, they are illustrative of the Monitor's grossly inefficient and wasteful conduct to date.

Take the Monitor's investigation into "whether Fortune Brands had operational control over [ASSA ABLOY's Vietnam facility] on or before December 31, 2023," for example.  *See* ECF No. 146 at ¶ 82.  As the Monitor readily admits, the Final Judgment contemplated that ASSA ABLOY's Vietnam facility "would be transferred later than the rest of the Smart Lock Divestiture Assets," because there was no way to predict or control when the Vietnamese government would approve the transfer.  *Id.* at ¶ 55.  And, for that same reason, the Final Judgment provided ASSA ABLOY the option of demonstrating that Fortune was provided operational control prior to December 31, 2023.  *Id.* at ¶ 57.

After December 31, 2023 passed, ASSA ABLOY—and Fortune—told the Monitor that Fortune had full control of the Vietnam plant.  *Id.* at ¶¶ 66, 70.  Still, despite Fortune having every incentive to inform the Monitor if operational control had not transferred on time, the Monitor launched a full-fledged investigation, which included "research[ing] and establish[ing] assessment criteria relevant to operational control," developing a "work plan," interviewing multiple Fortune employees, and ultimately planning an in-person site visit to Vietnam.  *Id.* at ¶¶ 72–73.[10]  The

---

[9] Two of these perceived issues, "senior-level employees [of the] divested businesses continuing to have email addresses with ASSA ABLOY domains," and "delays in the transfer of 11 customer service phone numbers," *see* ECF No. 146 at ¶ 52, were easily dispelled with a limited inquiry, and the facts giving rise to both of these perceived issues were expressly contemplated by the transition services agreement.  As to the "unresolved" perceived issue referenced by the Monitor, ASSA ABLOY and Fortune are continuing to, in good faith, discuss the availability of "certain historical data for the divested business."  *Id.*

[10] The Monitor suggests this investigation was warranted because ASSA ABLOY was "unable to answer several questions that [the Government] posed about the operation of the Vietnam smart lock manufacturing facility," but that proves the opposite.  *Id.* at ¶ 69.  As ASSA ABLOY explained to the Government, ASSA ABLOY could not answer certain questions the Government posed about the current operation of the Vietnam facility because it had already handed it over to Fortune months earlier.

Government and Monitor do not explain why Fortune's representation that it had operational control of the Vietnam plant—which could have been easily corroborated by a simple phone call with Fortune personnel—was insufficient to determine ASSA ABLOY's compliance with that provision of the Final Judgment and required this investigation.

The Monitor's massive and wasteful investigation to simply confirm the obvious fact that ASSA ABLOY handed over the Vietnam facility to Fortune cannot plausibly justify the $2 million in fees and 2,000 hours the Monitor has purportedly dedicated to compliance work. The Final Judgment does not obligate ASSA ABLOY to bear such extreme and facially unreasonable costs. Likewise, the Monitor has billed approximately $1.3 million in connection to the "competitive intensity" workstream." *See* ECF No. 146 at ¶ 17. The fees related to activities exceeding the scope of the "competitive intensity" investigation the Final Judgment contemplates, *see supra* Sections I-II, are inherently unreasonable. Nothing in the Final Judgment or the Monitor's written agreement with ASSA ABLOY compels ASSA ABLOY to pay those fees or costs.

## <u>CONCLUSION</u>

For the foregoing reasons, pursuant to Section XV of the Final Judgment, ASSA ABLOY respectfully requests that the Court clarify the appropriate scope of the Monitor's duties regarding the "competitive intensity" investigation contemplated by Section IV of the Final Judgment and that the Court deny the Government's Cross-Motion.

Dated: July 8, 2024

Respectfully submitted,

/s/ *Justin W. Bernick*
Justin W. Bernick (D.C. Bar No. 988245)
Lauren E. Battaglia (D.C. Bar No. 1007093)
Charles A. Loughlin (D.C. Bar No. 448219)
William L. Monts, III (D.C. Bar No.
428856)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
justin.bernick@hoganlovells.com

/s/ *David I. Gelfand*
David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 974-1500
dgelfand@cgsh.com

*Counsel for Defendant ASSA ABLOY AB*