**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
*Plaintiff*,

v.

ASSA ABLOY AB
and
SPECTRUM BRANDS HOLDINGS, INC.
*Defendants*.

Case No. 1:22-cv-02791-ACR

**<u>STATEMENT OF THE MONITORING TRUSTEE</u>**

**Table of Contents**

I.    Introduction ............................................................................................................... 1

II.    Corrections to the Factual Record ........................................................................... 5

III.   The Competitive Intensity Investigation Undertaken to Date Has Been Reasonable and Necessary to Comply with the Final Judgment .................................................... 16

IV.   Compliance Monitoring Pursued to Date Has Been Reasonable and Necessary to Comply with the Final Judgment .............................................................................. 24

V.    Compliance Monitoring Related to the Smart Lock Foreign Divestiture Assets (Vietnam Entity) Has Been Reasonable and Necessary to Comply with the Final Judgment ............. 26

VI.   Conclusion ................................................................................................................ 34

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1. | Email from Coolidge to Lazarus et al. re Monitoring Trustee Engagement with Attachment, Dated August 22, 2023. |
| 2. | Email from Coolidge to Lazarus et al. re Monitoring Trustee Engagement, Dated September 28, 2023. |
| 3. | Letter from Huppert to Lazarus re ASSA ABLOY Monitorship - Vietnam Asset Transfer, Dated February 29, 2024. |
| 4. | Email from Melamed to Coolidge et al. re Monitoring Trustee Requests, Dated May 17, 2024. |
| 5. | Email from Sega to Coolidge et al. re Monitoring Trustee Requests, Dated May 17, 2024. |
| 6. | Email from Lazarus to Coolidge, re ASSA ABLOY Invoices, Dated December 15, 2023. |
| 7. | Email from Lazarus to Coolidge, re Monitor invoices, Dated January 24, 2024. |
| 8. | Email from Coolidge to Lazarus, re ASSA ABLOY Invoices, Dated March 12, 2024. |
| 9. | Email from Coolidge to Huppert et al., re ASSA ABLOY monitorship invoices, Dated March 14, 2024. |
| 10. | Email from Coolidge to Lazarus et al. re Monitoring Trustee Requests, Dated March 28, 2024. |
| 11. | Response to March 7, 2024, Document Requests Directed to ASSA ABLOY. |
| 12. | Letter from Coolidge to Battaglia re Requested Projected Timelines, Dated June 7, 2024. |
| 13. | Email from Weick to Lazarus et al. re Document/Interview Requests, Dated December 21, 2023. |
| 14. | Email from Weick to Lazarus et al. re Compliance Follow-Ups, Dated January 11, 2024. |
| 15. | Email from Lazarus to Weick et al. re Document/Interview Requests, Dated January 26, 2024. |
| 16. | ASSA ABLOY APSO and Final Judgment Compliance Summary. |
| 17. | Capital Contribution Transfer Agreement Between Master Lock Co., LLC and ASSA ABLOY ASIA Holding AB, Dated October 19, 2023. |
| 18. | Capital Contribution Transfer Agreement, Dated November 23, 2023. |
| 19. | Capital Contribution Transfer Agreement, Dated December 12, 2023. |
| 20. | Email from Lazarus to Coolidge et al. re Additional Details on the Vietnam Divestiture, Dated December 28, 2023. |
| 21. | Email from Coolidge to Lazarus et al. re ASSA ABLOY, Dated February 1, 2024. |
| 22. | Email from Cohen-Millstein to Isaacs et al. re Vietnam Operational Control, Dated February 16, 2024. |

In anticipation of the status conference with the Court on July 9, 2024, the Monitoring Trustee in the above-captioned matter respectfully submits the following Statement:

## I.    Introduction

1.      I, Melinda R. Coolidge, submit this Statement to the Court to clarify the factual record regarding the monitorship in this case and aver that I have strictly adhered to the mandate for the Monitoring Trustee outlined in the Final Judgment (ECF No. 143, hereinafter "FJ").

2.      As an independent neutral appointed by the Court, I understand that it is my duty to conduct the investigations outlined for the Monitoring Trustee in the FJ independently and have faithfully maintained that independence. Because I have not previously had the opportunity to address the Court, I provide some background on the plans I have developed and worked to implement to fulfill my responsibilities as the Monitoring Trustee.

3.      Before being selected by the United States and appointed by the Court to serve as the Monitoring Trustee FJ § X.A, I submitted a detailed written proposal to the Department of Justice (hereinafter "DOJ") and participated in several interviews, outlining my qualifications and plans to fulfill the responsibilities assigned to the Monitoring Trustee under the FJ. I also included my proposed team of agents and consultants (hereinafter "Monitoring Trustee Team"), along with their qualifications, as indicated by Section X.E of the FJ.

4.      For the investigation into compliance with the FJ, Asset Preservation Stipulation and Order ("APSO"), and divestiture agreements under Section X of the FJ ("Compliance Monitoring"), I proposed employing a team of StoneTurn Group LLP (hereinafter "StoneTurn") consultants (all but two based in the United States) with extensive experience in compliance monitorships, including in divestiture transactions. With their expertise and assistance, we outlined our plan to conduct the Compliance Monitoring required by the FJ. Two of the proposed StoneTurn

team members were a partner and a Vietnamese-speaking senior consultant based in Singapore. These consultants were selected to ensure that the Monitoring Trustee Team could efficiently and effectively investigate the divestiture of the Foreign Smart Lock Divestiture Assets, namely, the facility in Vietnam.

5.      For the investigation into competitive intensity described in Section IV of the FJ, I proposed employing a team of economists from Bates White. This well-known and respected economic consulting firm, based in Washington, DC, is regularly engaged in antitrust matters. With their expertise and assistance, we outlined our plan to investigate any potential future changes to competitive intensity as mandated by the FJ.

6.      Additionally, I negotiated an engagement agreement with ASSA ABLOY that was finalized and executed on October 5, 2023. ECF No. 144-2. As part of those negotiations, I identified preliminary lists of individuals and workstreams associated with the compliance and competitive intensity workstreams. Ex. 1, at 13-14 (Exhibit D). ASSA ABLOY objected to the number of professionals initially identified for the team, and stated that the engagement "should include only individuals necessary at this point," noting that "the engagement letter sets out a process to add team members if and when necessary later on." Ex. 2, at 10 (email from G. Lazarus to M. Huppert on Sept. 20, 2023). To accommodate ASSA ABLOY's objections, I decreased the number of individuals listed in the engagement agreement and identified what each remaining individual would be responsible for, making clear that both the compliance work and the competitive intensity investigation would begin immediately. *Id*. at 6-8.

7.      For compliance, I identified the "main tasks" to ASSA ABLOY as follows:

- "[a]ssessment and testing of compliance of obligations under the Asset Preservation Stipulation and Order related to the operation, preservation and maintenance of the Premium Mechanical and Smart Lock divestiture assets";

2

- "[a]ssessment and testing of ASSA ABLOY's divestiture of the Premium Mechanical and Smart Lock Divestiture Assets";

- "[a]ssessment and testing of compliance with obligations related to the identification and hiring of Premium Mechanical and Smart Lock Divestiture relevant personnel";

- "[a]ssessment and testing of compliance with obligations, including ASSA ABLOY's ongoing efforts to assist Fortune Brands in assigning or otherwise transferring all contracts, agreements, and customer relationships included in the Premium Mechanical and Smart Lock Divestiture Assets";

- "[a]ssessment and testing of compliance with obligations, including ASSA ABLOY's warranties related to the operational condition of divestiture assets";

- "[a]ssessment and testing of compliance with obligations, including ASSA ABLOY's ongoing efforts to assist Fortune Brands in obtaining all necessary licenses, registrations, and permits to operate the Premium Mechanical and Smart Lock Divestiture Businesses";

- "[a]ssessment and testing of compliance with obligations, including ASSA ABLOY's ongoing efforts to assist Fortune Brands in entering into supply contract(s) for all products necessary to operate the Premium Mechanical and Smart Lock Divestiture Businesses";

- "[a]ssessment and testing of compliance with obligations, including ASSA ABLOY's ongoing efforts to assist Fortune Brands in providing transition services to cover all services necessary to operate the Premium Mechanical and Smart Lock Divestiture Businesses including services for back office, human resources, accounting, employee health and safety, and information technology services and support";

- "[a]ssessment, on-site visits and testing related to all services necessary to operate the manufacturing facility at Lot A10, Ba Thien II IP, Thien Ke, Binh Xuyen, Vinh Phuc, Vietnam";

- "[a]ssessment and testing of compliance with obligations and monitoring of the Yale brand name transition and wind-down";

- "[a]ssessment and testing of compliance with obligations and monitoring of the Yale access control system"; "[a]ssessment and testing of compliance with obligations and monitoring of patents[.]"

*Id.* at 7-8.

8.     For competitive intensity, I told ASSA ABLOY that team members "will be responsible for monitoring changes to competitive intensity as outlined in the Additional Relief section of the FJ," including "design[ing] and implement[ing] a study that measures changes in

3

competitive intensity in the residential Smart Locks business over time"; "advis[ing] on the metrics of that study, including components of financial analysis and causation for changes to competitive intensity"; and "advis[ing] on merger specific issues related to the study of competitive intensity." *Id*. at 8.

9.      After I provided this additional information, removed certain individuals, and continued to include individuals responsible for the competitive intensity investigation, ASSA ABLOY raised no further objections to the individuals and anticipated scope of work. Rather, on September 26, 2023, ASSA ABLOY's counsel responded that "ASSA ABLOY is agreed with the modifications to the trustee team list that Melinda shared last week." *Id*. at 3. ASSA ABLOY signed the engagement agreement nine days later. I have reasonably relied on this engagement agreement with ASSA ABLOY in proceeding with the beginning stages of the competitive intensity investigation over the last 9 months.

10.      Since my appointment by this Court, my team and I have consistently adhered to the detailed proposal previously submitted to the DOJ and the engagement agreement signed by ASSA ABLOY. Should the Court find it helpful, I am happy to submit the detailed proposal made to the DOJ to the Court *in camera* (as I understand that the pre-appointment proposals of monitoring trustees are typically not shared with the monitored parties).

11.      Consistent with the Monitoring Trustee's obligation to "provide periodic reports to the United States" FJ § X.I, I have provided periodic telephonic and written reports to the DOJ on my ongoing investigation. DOJ attorneys have regularly advised me that my actions are consistent with their understanding of the scope of my duties as the Monitoring Trustee under the FJ.

## II.   Corrections to the Factual Record

12.     ASSA ABLOY's Motion for Clarification of the Final Judgment ECF No. 144 (hereinafter "Motion" or "Mot.") states that "[t]he Monitoring Trustee... planned an in-person visit with her team to Vietnam," calling this "an unjustified waste of resources." ECF No. 144 at 6 n.2. The site visit became necessary after the DOJ advised ASSA ABLOY in February 2024 that it had failed to meet its burden of proving transfer of the Smart Lock Foreign Divestiture Assets had occurred, or that transfer of "operational control [had taken place] . . . such that the purposes of the divestiture have been carried out." FJ § VI.C. Under the FJ, meeting this burden was required to avoid the $50,120 fine per day for failure to transfer the Vietnam facility to Fortune Brands on or before December 31, 2023. *Id.* The DOJ informed ASSA ABLOY that it "plan[ned] to continue to consider the operational-control issue and to consult with the Monitoring Trustee to determine whether information she has gathered or will gather might demonstrate that operational control has been given to Fortune Brands in Vietnam." Ex. 3, at 3. As I explained to Fortune Brands when requesting the site visit, and as I explained to ASSA ABLOY's counsel during our in-person conference on May 28, 2024, I had instructed two members of the StoneTurn team based in Singapore to conduct in-person interviews at the Vietnam facility. This planned 1.5-day visit would have incurred travel costs under $2,500. My assessment of issues related to transfer of the Vietnam facility is further described in Section V below.

13.     ASSA ABLOY's Motion states that I "canceled this trip following ASSA ABLOY's strenuous objections," ECF No. 144, at 6 n.2, which is misleading. Approximately two weeks before the scheduled site visit, I was informed that ASSA ABLOY received the final approval

documentation from the government of Vietnam necessary for the parties to close the transaction,[1] following which Fortune Brands released the purchase price from escrow,[2] and the parties succeeded in closing the transaction. Given this development, the two StoneTurn employees based in Singapore, who were originally tasked with conducting in-person interviews, conducted the same planned interviews remotely via Zoom instead, to accommodate Fortune Brands' concerns about disruption of the business were the site visit to occur in person.

      14.    ASSA ABLOY's motion states that "[w]hile there is no current dispute regarding the scope of the Monitoring Trustee's work beyond the competitive intensity study, ASSA ABLOY also has serious concerns about the costs associated with that work, and will present those to the Court in the event that the parties are unable to resolve those concerns." ECF No. 144, at 6. The FJ provides that "[t]he monitoring trustee will serve at the cost and expense of ASSA ABLOY pursuant to a written agreement." FJ § X.D. The written agreement between ASSA ABLOY and the Monitoring Trustee ("Engagement Agreement") provides that "ASSA ABLOY will promptly pay all invoices upon presentation, and in no case later than 60 days following presentation." ECF No. 144-2, Schedule A, at 11. Pursuant to the FJ and the Engagement Agreement, the Monitoring Trustee presented invoices on October 25, 2023, November 20, 2023, December 20, 2023, January 24, 2024, February 23, 2024, April 1, 2024, May 9, 2024, and June 17, 2024. Between November 20 and December 15, 2023, I had several conversations with ASSA ABLOY's outside counsel regarding the level of detail provided in our first two invoices. Ex. 6. I made the requested

---

[1] On May 14, 2024, Fortune Brands Counsel informed the Monitoring Trustee Team and provided documentation evidencing that the amended Enterprise Registration Certificate was received from the Vietnam regulator with an issue date of May 5, 2024. Ex. 4, at 1. On May 16, 2024, ASSA ALBOY Counsel informed me of the same. Ex. 5, at 2.

[2] On May 17, 2024, ASSA ABLOY Counsel and Fortune Brands Counsel informed the Monitoring Trustee Team and provided documentation evidencing that the $23.5M purchase price was released from escrow to ASSA ABLOY. Ex. 4, at 1.

adjustments to provide further details – including stating when our work related to the competitive intensity investigation (*id.*), and ASSA ABLOY's counsel indicated on January 24, 2024, that these invoices would be paid within 60 days. Ex. 7. On February 16, 2024, ASSA ABLOY paid one of these invoices, originally presented October 24, 2023 (No. 2002284) and accepted on December 15, 2023; the other has still not been paid. ASSA ABLOY also paid the invoice presented January 24, 2024, on February 16; this invoice identified significant work performed for the competitive intensity study. I did not know that ASSA ABLOY objected to or was refusing to pay for the work reflected in the now-disputed invoices until April 17, 2024.

15.     With the exception of the two invoices identified above, ASSA ABLOY has not paid the remaining invoices, and has not identified any portion of these invoices that it intends to pay or believes it should pay. Aside from the May 28, 2024, meet and confer, and the correspondence it attached to its motion, ASSA ABLOY has not spoken to me about the unpaid fees. Thus, it is my understanding that ASSA ABLOY is categorically refusing to pay the outstanding invoices. Because approximately 60% of the unpaid fees pertain to Compliance Monitoring (in ASSA ABLOY's words, "work beyond the competitive intensity study"), in my opinion, there is a "current dispute" to be resolved.

16.     I raised the overdue invoices repeatedly with ASSA ABLOY's counsel, Ex. 8, and in an email to the DOJ on March 14, 2024, Ex. 9.

17.     For clarity regarding the amounts invoiced to ASSA ABLOY for compliance and competitive intensity, I include the following table:

| Invoice number | Month | Hausfeld Total | Hausfeld Compliance Workstream | Hausfeld Competitive Intensity Workstream | StoneTurn Compliance Workstream | Bates White Total | Bates White Competitive Intensity Workstream | Bates White Competitive Intensity Benchmarking | Expenses | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2002284 | Aug-23 & Sept-23 | $46,805.00 | $46,805.00 | N/A | $29,710 | N/A | N/A | N/A | $141.72 | $76,656.72 |
| 2002325 | Oct-23 | $78,101.00 | $54,776.00 | $23,325.00 | $83,130.00 | $50,985.00 | $50,985.00 | N/A | $10.76 | $212,226.76 |
| 2002358 | Nov-23 | $151,090.00 | $117,684.00 | $33,406.00 | $159,512.50 | $123,616.00 | $123,616.00 | N/A | $4,966.85 | $439,185.35 |
| 2002394 | Dec-23 | $57,514.00 | $57,514.00 | N/A | $93,855.00 | $128,824.00 | $128,824.00 | N/A | $160.47 | $280,353.47 |
| 2002418 | Jan-24 | $165,257.00 | $150,806.00 | $14,451.00 | $306,090.00 | $197,917.00 | $197,917.00 | N/A | $517.32 | $669,781.32 |
| 2002461 | Feb-24 | $146,406.00 | $121,368.00 | $25,038.00 | $161,372.00 | $194,921.50 | $194,921.50 | N/A | $2,480.88 | $505,180.38 |
| 2002473 | Mar-24 | $171,486.00 | $109,506.00 | $61,980.00 | $212,763.50 | $192,424.50 | $73,310.00 | $119,114.50 | $1,930.74 | $578,604.74 |
| 2002522 | Apr-24 | $166,016.00 | $84,124.00 | $81,892.00 | $149,837.50 | $193,368.00 | $42,685.50 | $150,682.50 | $2,817.25 | $512,038.03 |

18.     ASSA ABLOY's motion states that the time my team has billed to Planning and Project Management, DOJ Meetings & Communications, and Monitoring Trustee Team Meetings & Communications, is "purely administrative." ECF No. 144, at 6 n.2. However, under the FJ, I must:

> investigate and report on ASSA ABLOY's compliance with this Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between Acquirer and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment and regarding compliance with the terms of this Final Judgment.

FJ § X.I. All the time my team has billed ASSA ABLOY has been reasonable and necessary to comply with the mandates of the FJ. Under the terms of the FJ, I "must provide periodic reports to the United States setting forth Defendants' efforts to comply with their obligations under this Final Judgment and under the Asset Preservation Stipulation and Order," FJ § X.I, and my team has appropriately billed time for DOJ Meetings and Communications. The monitorship team members must also communicate with each other to (1) identify documents and evidence, (2) plan and prepare for meetings with ASSA ABLOY and Fortune Brands, (3) execute our work plans efficiently and avoid duplication of efforts, (4) discuss substantive developments, and (5) ensure all work planned is necessary and within the scope of my mandate. Accordingly, my team has

8

appropriately billed time for Monitoring Trustee Team Meetings & Communications. Similarly, the time billed for Planning and Project Management encompasses essential activities in scoping and preparation of work plans to ensure we fulfill and remain within my mandate for the minimum five-year term of the monitorship. FJ § X.J.

19.     ASSA ABLOY's motion states that the "burden of complying with the Monitoring Trustee's requests is even putting Fortune in a position where they are diverting resources they would prefer to invest directly in the divested business to make the business more competitive." ECF No. 144, at 2. Under the FJ, I am required to:

> investigate and report on ASSA ABLOY's compliance with this Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between Acquirer and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment and regarding compliance with the terms of this Final Judgment.

FJ § X.I. To date, Fortune has produced copies of the Divestiture Agreements or related documents referenced by the FJ or APSO, certain reference documents when it requested my assistance in responding to concerns it had regarding ASSA ABLOY's performance under the Divestiture Agreements, and 8 documents responsive to other requests. We have met with 16 Fortune Brands employees outside the legal department over a total of approximately 20 hours (two of which were requested by Fortune Brands, all of which covered issues required by the Compliance Monitoring obligations in FJ Section X, and eight of which were required for the operational control analysis in FJ Section VI.C). I understand that the time employees spend with my team is time they do not spend on other aspects of their job, and my team has made every effort to streamline questions and requests. In my opinion, each of these interviews and document requests was necessary to comply with the FJ.

20.     ASSA ABLOY's Motion states that I "regularly overstaff interviews." ECF No. 144, at 6 n.2. My team has conducted a total of about 5 hours of interviews with ASSA ABLOY

9

employees. Certain interviews were attended by members of multiple workstreams, and each of the team members were included because they were expected to ask questions or learn relevant information for their work as part of those interviews. In my opinion, attendance at these meetings was appropriate in light of the content that was expected to be discussed. I also regularly "write-off" time billed when I think it should have been completed more efficiently than it was.

21.     ASSA ABLOY's Motion states that I have made "broad and burdensome requests" for documents from ASSA ABLOY and Fortune. *Id.* at 8. To date, ASSA ABLOY has produced only copies of the Divestiture Agreements and related documents referenced by the FJ or APSO or pertaining to the Vietnam transaction, and zero documents responsive to other requests. The two document requests that ASSA ABLOY describes as "disputed" (*id*. at 7) are for documents and data regularly created by ASSA ABLOY in the ordinary course of business. During our telephone conference on April 2, 2024, and our in-person conference on May 28, 2024, I offered to discuss a reasonable timeframe for the production of these documents.

22.     ASSA ABLOY's Motion states that "ASSA ABLOY requested a conference with the Monitoring Trustee, which took place on April 2, 2024." *Id*. at 4. This is inaccurate. On March 7, 2024, I sent certain requests for documents and information to ASSA ABLOY's counsel. ECF No. 144-12. On March 22, 2024, ASSA ABLOY sent a document, *inter alia*, objecting to the scope of AA_DR_06 (which requested reports created in the ordinary course regarding the smart locks business). Ex. 10, at 3; Ex. 11. On March 25, 2024, I requested a meeting with ASSA ABLOY's counsel "to discuss [their] response to AA_DR_06" and proposed "April 2 between 1-3pm ET." Ex. 10, at 2. After follow-up from me, ASSA ABLOY's counsel confirmed the meeting for April 2, 2024, at 1pm Eastern. *Id*. at 1.

23.     During the May 28, 2024, in-person conference, I suggested ways for the parties to more effectively communicate and more efficiently reach resolution on any concerns they may have. For example, it would be more efficient if ASSA ABLOY's counsel would speak with me directly, rather than engaging in a time-consuming exchange of letters, and if they appointed a specific contact to facilitate access to personnel and other requested information. I also proposed conducting periodic status meetings to discuss meeting, document, or interrogatory requests, access to personnel and any related challenges, and to allow my team to provide more visibility into the anticipated timeline of our work and upcoming priorities. I also reiterated that the FJ requires actual evidence of compliance and not just representations from outside counsel, and providing my team with prompt access to relevant personnel or requested information will allow me to fulfill my mandate under the FJ more efficiently.

24.     ASSA ABLOY's motion states that I provided a "forward-looking estimate of costs" of $4.5 million up to June 2026 for the competitive intensity investigation. ECF No. 144, at 6. As I stated in my June 7, 2024, email to ASSA ABLOY, ECF No. 144-10, I anticipate between $1-2.5 million in costs to complete the benchmarking task, which we intend to complete by the end of 2024. As I previously told ASSA ALBOY, we anticipate our costs will be closer to the lower end of the range, but the range reflects uncertainty around several factors, including the level of cooperation we receive from the parties to obtain the relevant data and documentation, issues working with and analyzing the data, and other issues that may arise and require follow-up. I then anticipate between $300,000-$750,000 in costs from Q1 2025 through Q1 2026, during which we expect there will be limited but important efforts to monitor the competitive intensity changes in the smart lock industry. This will allow us to report on competitive intensity changes on or shortly after June 2026. We expect to increase our efforts in Q2 2026 regarding our "investigation and

11

consultation with" the DOJ and the parties to "determine" on or after June 20, 2026 ("three years following the Divestiture Date"), whether Fortune's "competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date . . . and [s]uch diminishment in competitive intensity is in material part due to the limitations on [Fortune's] right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks[.]" FJ § IV. As a result, our estimated fees for this period range from $500,000 to $1.2M. Thus, our "forward-looking estimate of costs" for the competitive intensity investigation between now and June 2026 ranges from $1.8 million to $4.5 million. The higher end of the range is more likely if the parties resist production of the data, documents, and information necessary to complete my investigation, requiring more time negotiating, or if we meet resistance to obtaining answers to questions that would explain what we observe in the data or documents produced. The higher end of the range would also be more likely if there is a clear diminishment in Fortune's competitive intensity in the residential smart locks business by June 2026 relative to ASSA ABLOY's competitive intensity in that business in June 2023, as further investigation may then be required to determine whether the diminishment observed "is in material part due to limitations on [Fortune's] right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada as of the Divestiture Date." FJ § IV.

25.    ASSA ABLOY's motion states that during a conference with me on April 2, 2024, I explained that our fees:

> were, in part, due to an ongoing analysis of *every* aspect of competition in the smart locks business (not just the aspects potentially related to limitations on rights to the Yale trademarks in the United States and Canada), as well as other businesses beyond smart locks, over the *entire* five-year period of the monitorship (not just during the Assessment Period between June 20, 2026 and September 13, 2028).

ECF No. 144, at 4. I do not believe that this accurately represents what I conveyed during that conversation, and I have submitted multiple letters and emails to ASSA ABLOY explaining my

actual plans with regard to the investigation into competitive intensity required by FJ Section IV. *See* ECF Nos. 144-5 & 144-10.

26.     I further detailed these plans during our in-person conference with ASSA ABLOY, Fortune Brands, and the DOJ on May 28, 2024. This included sharing the following charts with anticipated activity flows:

Scenario 1:



Scenario 2:



Chart Key:

| Chart Key | |
|---|---|
| △ | Dates of Compliance Obligations and Reporting |
| ▲ | Dates of Competitive Intensity Obligations and Reporting |
| ■ | Anticipated Heavier Working Period for Each Task |
| ■ | Anticipated Lower Working Period for Each Task |
| ▥ | Work dependent on certain triggering events/options exercised by the Parties |
| ▧ | Work dependent on consultation required related to disputes raised |

27.      The charts are more fully explained in my June 7, 2024, letter, Ex. 12, but in brief, the first scenario models a relatively straightforward monitorship with a high degree of cooperation from the parties and relatively few unexpected issues to address, while the second scenario models a workflow where resistance by one or more parties to the monitorship, disputes between the parties, and other challenges require more intensive work by my team. Importantly, my team projects many of the compliance workflows to wind down by the end of this year in either scenario.

28.      ASSA ABLOY's Motion states that "the Monitoring Trustee intends to expand its investigation beyond the residential smart locks business, despite that bargained-for limitation in the Final Judgment." ECF No. 144, at 12. Since the potential cause of diminished competitive intensity that would result in potential reopening of the case is a "diminishment in competitive intensity . . . in material part due to limitations on [Fortune Brands'] right" to trademarks associated with "the Yale branded commercial business," it is my opinion that the FJ requires the Monitoring Trustee to investigate and understand the competitive overlap of residential and commercial smart lock market segments to make a principled assessment of causation. *See* FJ §§ II.P, IV.b. For example, if it appears that ASSA ABLOY has leveraged its position in commercial smart locks in a way that materially impacts competition for residential smart locks, that would bear on whether Fortune Brands' lack of the Yale brand name and trademarks in commercial smart locks in the U.S. and Canada contributed to a decline in competitive intensity.

29.     ASSA ABLOY's Motion states that I plan to conduct a "study . . . lasting for the entire five-year period of the monitorship." ECF No. 144, at 1. As I explained to ASSA ABLOY's counsel in the correspondence attached to its motion, ECF No. 144-10, as well as in the letter I sent on June 7, 2024, Ex. 12, I do not expect the investigation into competitive intensity mandated by Section IV of the FJ to require a constant work effort over the next five years. As shown in the two charts I provided to ASSA ABLOY and have included above, we anticipate the more time-intensive benchmarking work to be completed by the end of 2024, far less work to be necessary in 2025, and then a higher-intensity period of investigation again in 2026. If my team determines in 2026 that no diminishment of competitive intensity has occurred, then we anticipate another lighter year of work in 2027, followed by a final higher-intensity period of investigation in 2028 to reach a conclusion as required by the FJ (Scenario 1). If instead a diminishment of competitive intensity has occurred, "in consultation with" the DOJ and the parties, we may conduct additional investigation through 2027 to render a final conclusion in 2028 (Scenario 2). Further details on the investigation into changes in competitive intensity are provided below.

30.     ASSA ABLOY's Motion states that my interpretation of Section IV of the FJ "ignores the extensive negotiations between the parties that preceded . . . entry [of the Final Judgment]." ECF No. 144, at 1. As an independent monitor appointed after entry of the FJ, I was not involved in these negotiations and had no knowledge of them until ASSA ABLOY attached ECF No. 144-1 to its Motion. Nor do I believe the FJ mandates that I base my understanding of the Court's order on a redlined draft not previously provided to the Court. ASSA ABLOY's exhibit does not change my interpretation of my duties (or the relevant time frame of my duties) under the FJ, which I believe are clearly articulated in the language of the FJ.

III.    **The Competitive Intensity Investigation Undertaken to Date Has Been Reasonable and Necessary to Comply with the Final Judgment**

31.    Under Section IV of the FJ, I am required to "determine[]" whether "after three years following the Divestiture Date [i.e., June 20, 2026] and until the date that is five years from entry of this Final Judgment [i.e., September 13, 2028]" Fortune Brands' "competitive intensity in the residential Smart Locks business has diminished relative to ASSA ABLOY's competitive intensity in that business as of the Divestiture Date [i.e., June 20, 2023]" and, if so, whether "[s]uch diminishment in competitive intensity is in material part due to limitations on Acquirer's right to use the rights held by ASSA ABLOY to the Yale brand name or trademarks in the U.S. and Canada as of the Divestiture Date." I must do this "after investigation and consultation with the United States, ASSA ABLOY and [Fortune Brands]." I understand the "after investigation" provision to require me to investigate and gather facts and data regarding these issues rather than relying on public reports or representations by the parties.

32.    In order to fulfill this mandate, I need to: 1) determine the baseline competitive intensity of ASSA ABLOY in the residential Smart Locks business as of June 20, 2023; 2) determine whether Fortune Brands' competitive intensity has declined relative to that baseline at any point between June 20, 2026, and September 13, 2028; and 3) then, *only if I observe such a decline in competitive intensity*, identify whether limitations on Fortune Brands' rights to the Yale brand name or trademarks in the lines of business where it does not have access to that brand name (i.e., multifamily and commercial smart locks) caused that decline. Because I cannot make a determination three years after the Divestiture Date (June 2026) unless I conduct an investigation first, I determined that it would be appropriate for me to begin my investigation in advance of that date.

16

33.     Based on my team's analysis, and contrary to ASSA ABLOY's suggestion, ECF No. 144, at 4, it would not be logical to focus the competitive intensity investigation on the narrow question of the limitations on Fortune Brands' Yale brand name and trademark rights without first determining that there had been a diminishment in competitive intensity.

34.     And contrary to ASSA ABLOY's suggestion, it would not be possible to conclude that the limitations on Fortune Brands' Yale brand name and trademark rights were the cause of a decline in competitive intensity if I were only to consider one possible cause for the decline. For example, by considering evidence regarding shifting resources between products, I might conclude that Fortune Brands' competitive intensity in residential smart locks declined because it began shifting resources to its premium mechanical hardware line, while ASSA ABLOY shifted resources towards its smart locks (i.e., one of the concerns raised by Professor David J. Collis (an economist for the United States) in his report in this matter – the phenomenon of "mutual forbearance"). *See* Expert Report of Professor David J. Collis, Ph.D. on Behalf of the United States of America, at pp. 23-32, ¶¶ 56-75 (Mar. 24, 2023). Receiving business reviews and board packages discussing the smart lock and premium mechanical hardware businesses would assist my team in both detecting diminished competitive intensity in residential smart locks due to mutual forbearance and assessing whether the limitations on Fortune Brands' trademark rights contributed to a mutual forbearance outcome.

35.     To comply with my mandate under the FJ, I determined that I would need the assistance of economists with expertise in the sort of market analysis required to make conclusions about competitive intensity in the market. Consistent with the proposal made to the DOJ and with notice to ASSA ABLOY pursuant to Section X.E of the FJ, I retained economists at the consulting firm Bates White to provide that assistance.

36.     In consultation with Bates White, I determined that the investigation required by the FJ would need to proceed by first coming to an understanding of competition in the industry through review of relevant portions of the litigation record. My team would then need to establish benchmarks for competitive intensity as of June 20, 2023, including such factors as price, profitability, market shares, product quality, research and development, and other indicia of competition in the market. Next, my team would need to collect data to monitor how those indicia of competition evolve over the course of the period between June 20, 2023, and June 20, 2026, to understand what a diminishment in competitive intensity would look like, and to be able to promptly report on any diminishment in competitive intensity as of June 20, 2026, if necessary. Finally, my team would need to analyze the evidence regarding competitive intensity between June 20, 2026, and September 13, 2028, in order to report on any diminishment in competitive intensity between those dates and the cause of any such diminishment. The attachments to my June 7, 2024, letter to ASSA ABLOY's counsel, Ex. 12 (the charts pasted above), reflect the anticipated timing and work intensity for these phases of the investigation. A more detailed breakdown of the tasks required for these activities is included in a formal work plan prepared by my team. I can provide the work plan to the Court for *in camera* review upon request (the document reflects deliberative considerations by my team, so I would request *in camera* review of it to preserve the confidentiality of those deliberations).

37.     As a first step in the competitive intensity investigation, members of the Hausfeld and Bates White team reviewed and analyzed materials in the litigation record to understand the industry and the analyses that the parties' experts had undertaken. This involved review and analysis of qualitative evidence including business documents, deposition transcripts, and trial transcripts and exhibits to understand the different factors that industry participants identified as

relevant to competition in the industry and to gain an understanding of ASSA ABLOY's place in the industry prior to the transaction. It also involved obtaining and analyzing the underlying data used in the expert reports in the case to understand the analyses undertaken by the parties' expert witnesses. This work was both reasonable and necessary to comply with Section IV of the FJ.

38.     This review included evidence relevant to all smart lock market segments because the inquiry required by the FJ necessitates understanding how competition in residential smart locks intersects with the multifamily and commercial segments. Since the relevant inquiry is whether a "diminishment in competitive intensity [occurs]. . . in material part due to limitations on [Fortune Brands'] right" to trademarks associated with "the Yale branded commercial business," we need to understand the overlap of and interaction between smart lock market segments to make a principled assessment of competitive intensity and causation. *See* FJ §§ II.P, IV.b.

39.     In parallel with my team's review of the litigation record, I made certain initial requests for documents, written information, and interviews to both ASSA ABLOY and Fortune Brands. As to ASSA ABLOY, my team requested on December 21, 2023, that they identify employees who could sit for interviews on, *inter alia*, "ASSA ABLOY's integration of and plans for the residential and multi-family assets it acquired from Spectrum Brands (for the competitive intensity study)" and "ASSA ABLOY's plans for integrating or transitioning Spectrum's data systems and data management practices going forward, and ASSA ABLOY's plans for maintaining Spectrum's historical data (for the competitive intensity study)." Ex. 13. During a follow-up meeting to those requests with ASSA ABLOY counsel on January 2, 2024, my team explained that we anticipated needing information from ASSA ABLOY to have a complete picture of competition in the market for the competitive intensity investigation. In that meeting, ASSA ABLOY expressed a preference to submit written responses from counsel in order to narrow the scope of any

19

interviews, and my team agreed to that process on January 11, 2024. Ex. 14. ASSA ABLOY provided its initial written responses on January 26, 2024. Ex. 15 (email); Ex. 16 (attachment).

40.    After reviewing the litigation record sufficiently to begin the next steps in the competitive intensity inquiry, we evaluated what further evidence we would need to conduct the investigation. Because Section X.H of the FJ provides me with authority to seek documents and data from ASSA ABLOY and Fortune Brands, my team formulated requests to them based on a balanced assessment of what information would aid the investigation without unduly burdening the parties.

41.    As to ASSA ABLOY, I issued two requests for documents and data that I understood would likely be prepared in the ordinary course of business and accessible without extensive ESI searches: a request for "standard business reviews and management reporting packages relating to the smart lock business" (AA_DR_06) issued on March 7, 2024, and a request for "all electronic databases showing all transactions (on an individual transaction-by-transaction basis) from January 1, 2022, to the present in which you sold a Smart Lock product to any purchaser in the United States" (AA_DR_16) issued on March 19, 2024. ECF Nos. 144-11 & 144-12. These requests include completed reviews, board packages, and other "off-the-shelf" reports that would reflect competitive developments in the smart locks space (including the residential space), as well as sales data kept and managed by any publicly traded company.

42.    My team will need this information from ASSA ABLOY in order to develop a relatively complete picture of competition in the market. Assessing Fortune Brands' competitive intensity means assessing Fortune Brands' performance relative to the market. For example, if Fortune Brands' smart lock sales remain stable over time but the total smart lock sales in the industry increase year over year, the net result would be that Fortune Brands' market share would

decline over time; this may be an indication of reduced competitive intensity of the assets acquired by Fortune Brands. Likewise, if evidence develops that ASSA ABLOY has leveraged its position in commercial and multifamily smart locks in a way that materially impacts competition for residential smart locks, that would bear on whether Fortune Brands' lack of access to the Yale brand name and trademarks in commercial smart locks in the U.S. and Canada contributed to any decline in competitive intensity. And if the parties adopt a "mutual forbearance" strategy, information from both parties regarding smart locks and adjacent markets as reflected in ordinary course business reviews and reports would be necessary to identify such a market development and understand its impact on Fortune Brands' competitive intensity in residential smart locks. Since ASSA ABLOY remains a large competitor in the smart locks space, the tailored set of documents and information requested will provide important insights into market developments that I could not obtain through information from Fortune Brands alone.

43.    This information also relates to establishing the competitive benchmark. The litigation record ends in early 2023, so it does not contain evidence running all the way to the June 20, 2023, Divestiture Date. In particular, the parties' sales data, one of the key inputs for the competitive intensity analysis, were only produced in the merger litigation through September 2022 for ASSA ABLOY and October 2022 for Spectrum-HHI. Thus, my team does not have access to nine months (for ASSA ABLOY) and eight months (for Spectrum-HHI) of sales data leading up to the Divestiture Date.

44.    Additionally, the litigation record does not provide all the information needed for the competitive benchmarking workflow because the parties to the litigation engaged in a different exercise from the exercise required by the FJ. The competitive analyses and arguments developed by parties during the merger litigation was on the likely *prospective* impact of the proposed merger

21

and divestiture—not on establishing a baseline for a *retrospective* investigation of competitive intensity as the FJ requires. As I understand it, the parties and their experts sought not to establish a benchmark, but instead to predict future competitive outcomes from market behavior prior to 2023 in order to assess whether "the effect of" ASSA ABLOY's acquisition of certain assets from Spectrum Brands "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. For that reason, the analyses and the record from the merger review and litigation are not at all sufficient for the competitive intensity investigation. While those predictions and the information underlying them may help inform the establishment of a baseline for competitive intensity, the analysis required by the FJ requires me to understand the nature of competition as of June 20, 2023, and how competition has changed (if at all) between June 20, 2026, and September 13, 2028. My team thus needs actual evidence of market performance to complete the investigation required by the FJ, and the most readily available sources of that evidence for my team are ASSA ABLOY and Fortune Brands.

45.     My team has also determined that periodic receipt of updated information from ASSA ABLOY and Fortune Brands over the course of the monitorship will result in a higher-quality and more efficient investigation. By getting periodic productions, the team can efficiently review the parties' business assessments and plans and can update quantitative analyses with data received contemporaneously. This will allow us to understand competition in real time so we can report on Fortune Brands' competitive intensity promptly after June 20, 2026. Attempting to complete that work in 2026 will eliminate the efficiencies that could be gained from, for example, interviewing employees at the time certain events are occurring, rather than asking them to remember events from two years earlier (or losing access to employees entirely as they move to other employment). In addition, multiple employees whose perspectives would inform the

competitive intensity investigation have already left their roles with Fortune Brands or ASSA ABLOY.[3] Nor do we have assurances that the data and documents we will need will still be accessible in several years, when they exist now. *Cf.* FJ §§ IX.C, IX.F (sole preservation provisions in FJ requiring ASSA ABLOY to preserve certain materials "until one year after the Divestiture Date"). Furthermore, it will not take fewer working hours to complete the investigation if we were to wait until 2026 to start our work. Our work plan requires the same investigation and analysis to take place, regardless of start date.

46.     During the course of my team's work, we have conducted interviews with personnel at ASSA ABLOY and Fortune Brands. Where the employee responsibilities appeared to overlap with issues pertinent to competition in the market, economists from Bates White participated to minimize the need for multiple interviews with the same personnel, ensure that the necessary questions for the competitive intensity investigation were posed, and to give members of the economics team first-hand knowledge of the employees' responses to those questions.

47.     At the time this dispute arose, my team had begun the work of establishing benchmarks for competitive intensity. We had planned to conclude that phase by the end of 2024, assuming the necessary data was produced, as reflected in the timelines provided to ASSA ABLOY on June 7. At this time, the team has paused the work necessary for the competitive intensity investigation because it has not been compensated by ASSA ABLOY in nearly half a year.

48.     I met with ASSA ABLOY's counsel on April 2, 2024, to explain the reasons for my document and data requests to ASSA ABLOY relating to the competitive intensity investigation. I

---

[3] As an example, Fortune Brands' Vice President Sales North America & Canada (who previously served as Vice President Sales - Yale & August with ASSA ABLOY) left Fortune Brands in January 2024. One interview scheduled with an ASSA ABLOY employee likewise had to be rescheduled with a replacement because that person had left the company.

provided an explanation consistent with my statements above. I received a letter from counsel for ASSA ABLOY objecting to the competitive intensity investigation and other aspects of the monitorship on April 17, 2024, and I provided a written response on April 26, 2024. ECF No. 144-5. I also participated in an in-person meet-and-confer with ASSA ABLOY's counsel and the DOJ (as well as Fortune Brands' counsel) on May 28, 2024, during which I provided further explanations of the competitive intensity workflow consistent with my statements above and as documented in my June 7, 2024, letter to ASSA ABLOY's counsel. Ex. 12. I also provided (a) a breakdown of past fees divided between the compliance and competitive intensity workflows, and (b) estimates of fees for the competitive intensity investigation for the period June 7, 2024, to June 2026 by email to ASSA ABLOY's counsel on June 3, 2024, and June 7, 2024, respectively. ECF Nos. 144-9 & 144-10.

## IV.   Compliance Monitoring Pursued to Date Has Been Reasonable and Necessary to Comply with the Final Judgment

49.    Shortly after my appointment, I met with ASSA ABLOY's outside counsel, who provided a brief presentation on the workings of the Divestiture Agreements, the FJ, and the APSO. During that conversation, they proffered their position that the APSO largely superseded the FJ, and thus, no monitoring work was necessary apart from ensuring compliance with the Supply Agreement and Transition Services Agreement. *See also* ECF No. 144-4, at 1.

50.    However, the FJ requires that:

The monitoring trustee must investigate and report on ASSA ABLOY's compliance with this Final Judgment, the Asset Preservation Stipulation and Order, and any inter-party agreements between Acquirer and ASSA ABLOY relating to the divestiture, including by investigating and reporting pursuant to Section IV of this Final Judgment and regarding compliance with the terms of this Final Judgment.

FJ § X.I. Based on this provision, I determined that I needed to understand the terms of the Divestiture Agreements and their intersection with the FJ and APSO. My team spent a reasonable

amount of time reviewing these agreements, analyzing the intersections, mapping the contradictions, and determining which provisions governed. We determined that, contrary to ASSA ABLOY's belief that my responsibilities are "narrow," ECF No. 144-4, we had an obligation to "investigate and report on ASSA ABLOY's compliance" with all relevant obligations outlined in the FJ, APSO, and divestiture agreements. I discussed my conclusion with the DOJ, who confirmed that they also believed that such investigation was within their understanding of the scope of my responsibilities. *See also* ECF No. 144-5, at 2.

51.     We then identified 13 areas that required compliance monitoring and began constructing work plans and procedures required to ensure compliance, within my mandate under the FJ. *See* Ex. 12 and charts pasted above (identifying 13 Compliance Workstream Activities). My team has conducted 5 hours of interviews with ASSA ABLOY's employees, all of which were reasonable and necessary to meet the obligations of the Monitoring Trustee in the FJ.

52.     My investigation has also involved understanding certain apparent risks in the divestiture separation, such as senior-level employees with divested businesses continuing to have email addresses with ASSA ABLOY domains. I have also been called upon to respond to concerns raised by Fortune regarding ASSA ABLOY's performance under the Divestiture Agreements, including delays in the transfer of 11 customer service phone numbers (which have been resolved), as well as the failure of ASSA ABLOY to provide certain historical data for the divested businesses (which remains unresolved). These issues have required further efforts by my team.

53.     ASSA ABLOY has not raised any specific objections to the compliance work undertaken by my team aside from the work related to the divestiture of the Vietnam facility addressed below. I am available to provide further details to the Court about the work done on compliance issues should the Court request them.

V.    **Compliance Monitoring Related to the Smart Lock Foreign Divestiture Assets (Vietnam Entity) Has Been Reasonable and Necessary to Comply with the Final Judgment**

54.    Because, as described below, ASSA ABLOY and Fortune Brands did not close the Vietnam asset divestiture prior to December 31, 2023, FJ § VI.C, my team has conducted significant compliance analysis regarding the divestiture of the Smart Lock Foreign Divestiture Assets and taken a number of employee interviews on that topic. All of this work was reasonable and necessary under the FJ for the reasons described below.

55.    Sections II.S and VI.C of the FJ anticipated that the Smart Lock Foreign Divestiture Assets (*i.e.*, the Smart Lock Divestiture Assets located at Lot A10, Ba Thien II IP, Thien Ke, Binh Xuyen, Vinh Phuc Vietnam (hereinafter "Vietnam Entity")) would be transferred later than the rest of the Smart Lock Divestiture Assets. However, the FJ placed a timeline on the transfer of the Vietnam Entity, described below.

56.    FJ Section VI.A required ASSA ABLOY "within 3 calendar days after the closing of the Transaction, to divest the Smart Lock Divestiture Assets in a manner consistent with this Final Judgment to Acquirer, except that, for individual assets subject to Regulatory Approvals, ASSA ABLOY is ordered and directed to divest such assets by the later of 3 calendar days after the closing of the Transaction or 15 days after the relevant Regulatory Approvals have been received."

57.    FJ Section VI.C states, "[t]o incentivize ASSA ABLOY to achieve Transfer of Smart Lock Foreign Divestiture Assets as expeditiously as possible, after December 31, 2023, ASSA ABLOY is ordered to pay to the United States $50,120 per day until ASSA ABLOY achieves Transfer of Smart Lock Foreign Divestiture Assets, provided, however, that such payments will not be due if ASSA ABLOY can demonstrate to the United States, after consultation with the monitoring trustee, that (1) Transfer of Smart Lock Foreign Divestiture Assets was delayed due to

a force majeure event, or (2) operational control has otherwise been given to the Acquirer such that the purposes of the divestiture have been carried out. If ASSA ABLOY relies on point (2) of this provision, it shall confer with the United States in an effort to reach agreement on whether the steps taken carry out the purposes of the divestiture, and if the parties are unable to reach agreement, ASSA ABLOY may ask the Court to resolve this issue." FJ § VI.C.

58.    The Stock Purchase Agreement ("SPA") between the parties also contemplated a deferred closing for Vietnam due to "customary closing conditions and regulatory conditions" in Vietnam. ECF No. 128-2 at 30. Sections 2.08(c) – 2.08(d) of the SPA outline numerous requirements associated with the Vietnam deferred closing, including the requirement to enter into a "Foreign Acquisition Agreement" in accordance with local law. *Id*. at 29-31.

59.    Section 2.08(c)(i)(A) "Deferred Closing (Vietnam)" of the SPA Disclosure Schedule provides a list of assets relevant for the Vietnam Business, including a list of (1) relevant business employees (the "Vietnam Team"), (2) the Owned Real Property, (3) reliability test equipment, (4) fixed assets, and (5) equipment held by the Vietnam Business. *Id*. at 30.

60.    Section 1 ("Vietnam Closing") of the Closing Implementation Letter dated April 13, 2023, outlines numerous requirements regarding the transfer of the Vietnam legal entity to Fortune Brands. ECF No. 128-2, at 122-24. Section 1(a) states that the "[t]he 'Vietnam Entity' shall be deemed to mean ASSA ABLOY Smart Product Vietnam Co., Ltd. ('AAVN'), rather than a new entity to be formed under the laws of Vietnam in order to hold the assets and conduct the Vietnam Business." *Id*. at 122. Additionally, the Closing Implementation letter requires "[t]he execution and delivery of a Foreign Acquisition Agreement to effect the sale of the equity securities" of AAVN to Fortune Brands as well as an "Investment Registration Certificate"

("Amended IRC") and an "Enterprise Registration Certificate" ("Amended ERC") to "reflect [Fortune Brands] as the registered owner of the equity securities of AAVN." *Id*. at 123.

61.     On October 19, 2023, the Vietnam Foreign Acquisition Agreement, or the "Capital Contribution Transfer Agreement," was executed by Master Lock Company LLC (the "Buyer" or "MLC"), a wholly owned subsidiary of Fortune Brands, and ASSA ABLOY Asia Holding AB (the "Seller" or "ASSA ABLOY Asia"). Ex. 17.

62.     The Capital Contribution Transfer Agreement discusses the "Purchased Capital Contribution" as well as various other provisions governing the Vietnam Closing. For example, Article IV contains provisions for the Vietnam Closing that require, among other things: (1) "[t]he evidence that the Company shall have submitted to the IZ Vinh Phuc the application for the Amended IRC", (2) "the original M&A Approval or a written confirmation of the IZ Vinh Phuc that the M&A Approval is not required", (3) "the original copy of the amended ERC, recording, among others, the Buyer as the sole owner" of AAVN, and (4) "[p]ayment of the Purchase Price by [Fortune Brands] to the designated account of [ASSA ABLOY] shall discharge in full [Fortune Brands'] obligation to pay such Purchase Price under this Agreement." *Id*. at 9-10. Additionally, Article III describes "Conditions Precedent" which outline further requirements that must occur prior the Vietnam Closing, as well as written notice from ASSA ABLOY to Fortune Brands confirming that "at all Conditions Precedent are satisfied" and a written notice from Fortune Brands to ASSA ABLOY (the "CP Satisfaction Notice") "confirming that all and any Conditions Precedent are satisfied or waived." *Id*. at 9. Finally, Article IV states that "[u]pon the Vietnam Closing, the Buyer shall become the sole owner of the Company with full title to the Purchased Capital Contribution and shall be entitled to exercise all ownership with respect to the Purchased Capital Contribution made or paid on or after the Vietnam Closing Date." *Id*. at 10.

63.     On November 23, 2023, a "Short Form" Capital Contribution Transfer Agreement was executed by MLC and ASSA ABLOY Asia (the "Short Form CTA"), as well as a "Confirmation on the Completion of the Transfer of Capital Contribution in ASSA ABLOY Smart Product Vietnam Co. Ltd. (the 'Confirmation')" dated November 24, 2023. Ex. 18. The Short Form CTA discusses the Purchased Capital Contribution, the purchase price and payment, and other provisions relating to the completion of the sale of AAVN.

64.     On December 12, 2023, a second Short Form CTA was executed by MLC and ASSA ABLOY Asia (including a "Confirmation" dated December 23, 2023) which required Fortune Brands to "promptly open an escrow account" to "make payment of the Purchase Price" within ten days after the issuance of the Amended ERC "recording [Fortune Brands] as the new owner of 100% of the charter capital of the Company[.]" Ex. 19, at 2. The Short Form CTA dated December 12, 2023, also "terminated in its entirety" the Short Form CTA dated November 23, 2023. *Id*. at 3.

65.     According to a December 28, 2023, email from counsel for ASSA ABLOY, "On December 22, 2023, (1) an affiliate of Fortune Brands paid the US$23,500,000 purchase price in consideration for the transfer of ownership of the shares of the Vietnam Entity and (2) Fortune Brands and ASSA ABLOY registered the change of ownership of the Vietnam entity with the Department of Planning and Investment of Vinh Phuc ("DPI")." Ex. 20. Counsel further advised that, "The purchase price is being held in an escrow account at JP Morgan Chase Bank, N.A. and will be released to ASSA ABLOY upon issuance by the DPI of an amended enterprise registration certificate evidencing a wholly owned subsidiary of Fortune Brands as the owner of the Vietnam Entity." *Id*. My understanding, based in part on representations from Fortune Brands, was that issuance of the Amended ERC was necessary to the transfer of legal title to Fortune Brands and

that the divestiture of the Smart Lock Foreign Divestiture Assets had not closed as of the end of 2023 due to the lack of the Amended ERC.

66.     On January 26, 2024, ASSA ABLOY submitted its "APSO and Final Judgment Compliance Summary." Ex. 16. In this summary, ASSA ABLOY stated that it transferred the Smart Lock Foreign Divestiture Assets in Vietnam to Fortune Brands on December 22, 2023. *Id*. at 15. To support its claim, ASSA ABLOY stated that it "moved its inventory and equipment out of the Vietnam Entity between July 13 and August 31, 2023, at which point all assets at the Vietnam plant were being used for Fortune's benefit." *Id*. ASSA ABLOY also stated that on November 23, 2023, "ASSA ABLOY amended the charter of the Vietnam entity to reflect that it was owned by subsidiary of Fortune Brands." *Id*. This summary did not include any additional information on how Fortune Brands has operational control over the Vietnam Entity nor did it include an approved Amended ERC.

67.     On January 29, 2024, I shared with ASSA ABLOY my concerns about ASSA ABLOY's lack of evidence of actual legal transfer of the Vietnam Entity to Fortune Brands. I reminded ASSA ABLOY that it had the option to demonstrate operational control of the Vietnam Entity to the DOJ as an alternative. In response, on February 1, 2024, ASSA ABLOY stated in an email that it "maintains that the Vietnam facility transferred to Fortune . . . [and] as [the Monitoring Trustee] suggested, [ASSA] plan[s] to contact the DOJ tomorrow to propose discussing the transfer of operational control." Ex. 21, at 1-2.

68.     In response, on February 1, 2024, I provided further guidance to ASSA ABLOY stating that as the FJ contemplates "'confer[ring] with the United States in an effort to reach agreement on whether the steps taken carry out the purposes of the divestiture, . . . if an initial proffer from ASSA to show how operational control has been transferred 'such that the purposes

of the divestiture have been carried out' does not result in agreement, then . . . [ASSA] will receive guidance on what else the DOJ may need to see in order to reach agreement." Ex. 21 at 1.

69.     On February 7, 2024, ASSA ABLOY, the DOJ, and I met via videoconference to discuss the issue of operational control of the Vietnam Entity. At this meeting, ASSA ABLOY reiterated its position laid out in the December 28, 2023, email and was unable to answer several questions that the DOJ posed about the operation of the Vietnam smart lock manufacturing facility and the entity that owns it. Due to ASSA's inability to answer those critical questions, ASSA ABLOY agreed to contact Fortune Brands to gather more information about the operation of the Vietnam entity.

70.     On February 16, 2024, ASSA ABLOY's outside counsel forwarded an email to the DOJ and to me from Fortune Brands' outside counsel that stated:

> Jason Williams, as legal representative and Chairman of ASSA ABLOY Smart Product Vietnam Co., Ltd. ("AASPV"), directs all aspects of the business and operations of AASPV.  Chris Demko, the Director of Operations of AASPV, takes direction from Jason Williams, and, in turn, directs the day-to-day operations of the business.

> Employees of AASPV are paid via the entity's own payroll.  The entity's operations generate sufficient cash to fund its working capital requirements.

> No member of the ASSA ABLOY group has any role in the oversight, management, or control of AASPV.

Ex. 22.

71.     In response, on February 29, 2024, the DOJ stated to ASSA ABLOY that ASSA ABLOY's February 16, 2024, correspondence "did not provide any meaningful detail, repeated statements that ASSA ABLOY had already made on February 7, and did not answer any of the unanswered questions [the DOJ] posed to [ASSA ABLOY] on February 7." Ex. 3, at 2-3. As such, the DOJ found that "ASSA ABLOY has not satisfied its obligation under the Final Judgment to 'demonstrate to the United States' that 'operational control has otherwise been given to [Fortune

Brands] such that the purposes of the divestiture have been carried out." *Id*. at 3. Nevertheless, the DOJ notified ASSA ABLOY that it would "plan to continue to consider the operational-control issue and to consult with the Monitoring Trustee to determine whether information she has gathered or will gather might demonstrate that operational control has been given to Fortune Brands in Vietnam." *Id*. *See also* FJ §§ VI.C, X.I.

72.     In accordance with Section X.I of the FJ, and at the request of the DOJ, my team and I researched and established assessment criteria relevant to operational control and prepared a work plan to investigate and report on whether operational control had transferred. Much of this involved interviewing Fortune Brands employees with relevant knowledge of the operations of the Vietnam facility as well as information technology, accounting and finance, and legal employees to gain an understanding of Fortune's perspective.

73.     The work plan included a site visit to the Vietnam Entity by StoneTurn employees based in Singapore. *See* FJ § X.H ("ASSA ABLOY and Acquirer must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets."). Contrary to ASSA ABLOY's representations in its motion, I did not intend to visit the facility myself. To avoid extensive travel time and costs, the work plan involved only the two Singapore-based StoneTurn employees visiting the facility. Total estimated costs for the planned travel were less than $2,500.

74.     One week before the intended visit, Fortune Brands canceled the visit. On April 24, 2024, I spoke with Fortune Brands and secured a replacement date for the visit on May 28, 2024.

75.     On May 14, 2024, Fortune Brands notified me that it had "received the amended ERC overnight" on May 13, 2024 (with an issuance date from the Vietnam government of May 5, 2024). Ex. 4 at 1. Fortune Brands also informed me that it was "working closely with AA and local

counsel in VN to complete closing logistics and release the purchase price that is being held in escrow." *Id.*

76.     On May 15, 2024, my team provided Fortune Brands with agendas for the scheduled May 28, 2024, site visit.

77.     On May 16, 2024, ASSA ABLOY counsel e-mailed me a copy of the Amended ERC. Ex. 5, at 2.

78.     On May 17, 2024, Fortune Brands notified me that it had "completed all of [their] closing logistics in Vietnam and released the $23.5 purchase price from escrow to ASSA today, and [ASSA] confirmed receipt." Ex. 4, at 1. Fortune Brands further stated that "[w]ith the ERC approval received, [Fortune Brands was] able to submit [their] post-closing IRC application to the regulator in Vietnam yesterday." *Id.*

79.     On May 17, 2024, ASSA ABLOY counsel notified me that the payment from escrow was released to ASSA ABLOY and stated that "[t]he closing of the transfer of the Purchased Capital Contribution under the CTA occurred on May 17, 2024." Ex. 5, at 1.

80.     On May 21, 2024, I notified Fortune Brands that interviews with the onsite employees were still necessary to assess operational control over the prior six to eleven months, but the interviews could be held via Zoom if preferred, given that the final regulatory approvals to secure transfer of ownership had occurred.

81.     On May 28, at my direction, the two Singapore-based StoneTurn employees conducted a virtual site visit with Chris Demko, a Fortune Brands employee, six members of the AASPV Management Team,[4] and four other AASPV employees.

---

[4] Including individuals from Finance/Accounting, Human Resources, Procurement/Materials, Production/Warehousing, and Technical/Quality Control.

33

82.     On June 6 and June 11, 2024, my team and I presented the findings to the DOJ from the investigation into whether Fortune Brands had operational control over the Vietnam Entity on or before December 31, 2023. During this presentation, my team and I reviewed the key observations and sources for each of the assessment criteria.

83.     My team and I reported to the DOJ that based on assessment of evidence gathered, I had concluded that operational control of the Smart Lock Foreign Divestiture Assets was transferred to Fortune Brands on or before December 31, 2023.

84.     My team and I were able to arrive at this conclusion by conducting an efficient and reasonable investigation into the question of whether Fortune Brands has operational control over the Vietnam Entity on or before December 31, 2023.

## VI.     <u>Conclusion</u>

85.     In my opinion, my work and the work of the team supporting me has conformed strictly to the requirements of the Final Judgment and has been reasonable and necessary to fulfill my mandate as Monitoring Trustee. I am available to provide any information the Court may find useful, and I look forward to discussing the ongoing monitorship with the Court at the Status Conference on July 9, 2024.

DATED: July 1, 2024                             Respectfully submitted,
Washington, D.C.


                                                */s/ Melinda R. Coolidge*
                                                Melinda R. Coolidge
                                                HAUSFELD LLP
                                                888 16th Street, N.W.
                                                Ste 300
                                                Washington, D.C. 20006
                                                (202) 540-7144
                                                mcoolidge@hausfeld.com


                                                *Monitoring Trustee*